1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    JOHN WILEY & SONS, INC.,           :  13-CV-816 (WHP)
                                        :
5                       Plaintiff,      :  February 13, 2014
                                        :
6               v.                      :  500 Pearl Street
                                        :  New York, New York
7    BOOK DOG BOOKS, LLC., et al.,      :
                                        :
8                    Defendants.        :
     ------------------------------------X
9
      TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONIC DISCOVERY DISPUTES
10          BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
                 UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12

13   For the Plaintiff:         MATTHEW OPPENHEIM, ESQ.
                                JULIE CHEN, ESQ.
14                              Oppenheim & Zebrak, LLP
                                4400 Jenifer Street NW
15                              Washington, DC 20015

16

17   For the Defendants:        TIFFANY MILLER, ESQ.
                                Bailey Cavalieri
18                              10 West Broad Street, Suite 2100
                                Columbus, Ohio 43215
19

20

21   Court Transcriber:         SHARI RIEMER
                                TypeWrite Word Processing Service
22                              211 N. Milton Road
                                Saratoga Springs, NY 12866
23

24

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1          THE COURT: Hello.  This is Judge Gorenstein.  Who's

2     on the line, please?

3          MR. OPPENHEIM:  Your Honor, this is Matt Oppenheim

4     on behalf of the plaintiff publishers and I also have on the

5     line with me my colleague Julie Chen.

6          MS. MILLER:  Hello, Your Honor.  Tiffany Miller

7     calling from Columbus, Ohio and I'm calling on behalf of the

8     defendants.

9          THE COURT: Okay.  We're here based on letters --

10    well, first there's a set which started with a letter February

11    4th.  There's a responsive letter February 6th and there's a

12    letter February 5th and a responsive letter February 10th and

13    then a letter February 10th, a responsive letter February 12th.

14         I assume you know, Mr. Oppenheim, that I got an

15    unredacted version of the documents that you sent me.  My

16    clerk had asked Ms. Miller to send back.

17         MR. OPPENHEIM: I was not aware of that, Your Honor,

18    but that's fine.

19         THE COURT: Okay.  I'm sorry.  I thought -- I would

20    have asked Ms. Miller to tell you.  It was an oversight.

21         MS. MILLER: I'm sorry.  That just happened literally

22    within the last 40 minutes I would say.

23         MR. OPPENHEIM: In fact, Your Honor, if we were there

24    in person I would hand up additionally -- additional redacted

25    documents that we've seen recently in our document review that

1   are -- the redactions are even more kind of curious.  So I'm

2   not sure by looking at a few of them we can resolve this but

3   I'd be interested in understanding Your Honor's view.

4   　　　　THE COURT: The other thing that happened was Ms.

5   Miller sent me three documents she thought she might refer to

6   during the hearing.  I assume you got those.

7   　　　　MR. OPPENHEIM: I didn't know she had sent them to

8   you but she did send me a number of things.

9   　　　　THE COURT: It was marked A, B and C.  I haven't

10  looked at them but I just want to make sure you have them in

11  case I'm asked to look at them.  Do you have A, B and C?

12  　　　　MS. MILLER: Yes --

13  　　　　THE COURT: I'm asking Mr. Oppenheim.

14  　　　　MR. OPPENHEIM: I do.

15  　　　　THE COURT: Okay.

16  　　　　MR. OPPENHEIM: Yes, I do.  I received them.

17  　　　　THE COURT: Let's start with I guess the first letter

18  which is the one dated February 4th that contains the

19  plaintiff's requests and my plan was just to go through the

20  issues as raised.

21  　　　　The first one is the spreadsheets.  My only question

22  to Ms. Miller is is there -- there was a reference to a burden

23  in providing them in Excel format.  So I was wondering what

24  you meant by that.

25  　　　　MS. MILLER: Well, the documents that have been

4

1    specifically referenced were not actually created in an Excel

2    format but these are lists that were literally typed up

3    because the court told us to and if we're talking about the

4    sales and forces lists right now these are two of the items

5    that I emailed to you today, the B and C items so you can see

6    what they looked like.  These are two of the items that have

7    been -- we've been I think arguing about wanting an Excel

8    spreadsheet.

9              Your Honor told us to supply a list of sources of

10   books and Your Honor told us to supply a list of sales of

11   books and so we did that.  If you look at B and C you can see

12   exactly what we produced.

13             THE COURT: Let me focus you on the question.  What

14   format did you produce them -- not produce them.  Create them

15   in.

16             MS. MILLER: PDF.

17             THE COURT: I don't think you would have created them

18   in PDF.  I don't think that's possible.

19             MS. MILLER: My client typed them up and sent them to

20   me in PDF.  They may have been typed up in Word or in Excel.

21   I'm not one hundred percent sure.

22             THE COURT: Okay.

23             MS. MILLER: These are just columns and --

24             THE COURT: Well, I think you need to find out the

25   answer to that question and whatever format that they produced

1  it in you should produce to the plaintiff so that he can work

2  with the data if that's what he wants to do.  It sounds like

3  there would be absolutely no burden in that.

4          MS. MILLER: Well, Your Honor, I have a concern.  As

5  you can see from the columns of data if the IC numbers and the

6  dates and the numbers get separated and mixed up which is

7  completely possible in Excel and a new document is created,

8  how are we going to deal with that situation?

9          THE COURT: I'm totally lost.  You have a document

10  that you've created, Ms. Miller --

11          MS. MILLER: I don't know --

12          THE COURT:  -- that's marked.  There's pages on it.

13          MS. MILLER: Yes.

14          THE COURT: So that's the end of that.

15          MS. MILLER: Right.

16          THE COURT: You don't need to worry.  You have your

17  document.  I'm sure you'll recognize it.  If someone tried to

18  present a fraudulent document I think you'd know right away

19  and I don't think you should be assuming that plaintiffs would

20  present a fraudulent document anyway.

21          MS. MILLER: All right.  So if they reformat the

22  information and try to produce it or present it in a different

23  fashion it would not be evidentiary quality I guess is what

24  you're saying.

25          THE COURT: No, it is not.  I'm saying it wouldn't be

6

 1    your document.

 2              Do you understand my ruling?

 3              MS. MILLER: Yes.

 4              THE COURT: Let's go on to the next one.  Redaction.

 5    This is not the first time an issue like this has come up

 6    before me.  My -- the presumption here, and it's actually a

 7    presumption I think in case law as well is that there should

 8    not be page by page -- redactions within a page for non

 9    responsiveness as opposed to privilege.  So I'm going to have

10    to put the burden on you, Ms. Miller, to explain why this

11    should be happening here with respect to all the documents

12    that you did it in.  If there's a way for you to group them

13    that would be helpful.

14              Maybe to start you off, I didn't have a lot of time

15    but I did look at your redactions to bank statements and --

16    let's see if I can find it.

17              MS. MILLER: Yes.

18              THE COURT: The Chase bank statement, August 2008,

19    August 29, 2008.  Do you see what I'm talking about?

20              MS. MILLER: Yes.

21              THE COURT: And you have deposits and additions and

22    checks paid and then there's a section that's redacted in its

23    entirety and you even redacted the title of that section which

24    I don't know why that would be a secret but if you want to

25    tell me now that it's a secret we'll -- I'll try to figure out

7

1  how to do this phone call because we are being recorded and

2  anyone can order a transcript at any time.  So I'm talking

3  about the Page 7 of 10 and onward.  Is the fact that what you

4  redacted you feel that is secret?

5          MS. MILLER: Yes.  I will explain what exactly we did

6  here.  First of all, these redactions were done in -- with the

7  assistance of folks, financial accounting type folks that

8  worked for my client to --

9          THE COURT: Before you get to that.  Is literally the

10 category of what this is you feel secret?  I mean I'm ready to

11 say what it is right now.  It's written in big letters in the

12 middle of the page.

13         MS. MILLER: The heading I personally don't feel is

14 secret.  I think the fact that that got subsumed in

15 [inaudible] may just be a secretarial error.

16         THE COURT: Okay.  So we'll say right now it's the

17 section on electronic withdrawals and it has --

18         MS. MILLER: Yes.

19         THE COURT: That's the entire redaction.  I'm doing

20 this for Mr. Oppenheim's benefit.  It's a section that goes

21 from the beginning of August to the end of August and it has

22 all the electronic withdrawals by date, description and amount

23 and then it has a total amount at the end.  So go ahead,

24 explain to me what that --

25         MS. MILLER: Yes.  So I agree with Your Honor.  I

8

1   don't think the header, electronic withdrawals, is

2   confidential.  I think that when this redaction was done it

3   was just -- that was just subsumed within the section.

4           But, in any event, what -- the reason these

5   transactions were redacted is because Your Honor asked us to

6   produce information reflecting all monies, all transactions

7   reflecting monies or benefits to and from Mr. Smyers or on his

8   behalf in some fashion.  All of these electronic withdrawals

9   have to do with nothing of that kind.  Nothing to do on or

10  behalf of Mr. Smyers or anything to do with that.

11          And if you want me to go into the greater issue of

12  why we care that the other side sees this or not I can go into

13  that now but that's the starting point is none of this

14  information contains that type of stuff.

15          THE COURT: I'm just wondering why all of the

16  deposits and additions and all of the check page would have

17  been left in but not the electronic withdrawals.

18          MS. MILLER: Because the electronic withdrawals, the

19  detail of it actually reveals the names of entities of

20  vendors, customers, suppliers of people that we do business

21  with.  It reveals details of what we do in the course of

22  business whereas if you look earlier in that same page, check

23  paid, you cannot learn anything about checks paid as to who or

24  why or what are being paid those amounts.

25          THE COURT: Okay.  I mean you left the dates and the

9

1  amounts of payment and yet you redacted them from the

2  electronic withdrawals.  It just seems inconsistent.

3          MS. MILLER: I don't understand.

4          THE COURT: For the checks --

5          MS. MILLER: What's the question?

6          THE COURT:  -- you left the date of the check and

7  the amount of the check.

8          MS. MILLER: Yes.

9          THE COURT: For the electronic withdrawals you

10  redacted the date of the withdrawal and the amount of th

11  withdrawal.  It seems inconsistent.

12          MS. MILLER: Yes.  As you can see from the electronic

13  withdrawal section it contains detail that explains to you

14  more about who -- what the money is being used for.

15          THE COURT: I understand that.  Do you understand my

16  point?  Do you understand why I think it's inconsistent?

17          MS. MILLER: No, I don't understand.

18          THE COURT: For the checks you left the date of each

19  check and the amount of each check.  For the electronic

20  withdrawal you redacted the date and you redacted the amount.

21          MS. MILLER: Oh, you're saying it would be better if

22  I had redacted the detail but left the date and the amount

23  revealed?

24          THE COURT: I'm trying to understand whether there's

25  a consistency or not in the redaction.  That's all I'm trying

1    to get at right now.

2         MS. MILLER: Well, maybe it would help if I explain.

3    When you're redacting these documents in an electronic form

4    using for example an Adobe type product, and there are many

5    other products you can use, generally you redact one complete

6    line at a time.  I guess our feeling was if we were redacting

7    the detail that it really didn't make a difference either/or

8    whether we also redacted the date and the dollar amount as

9    well.  I would be happy to -- I think -- I see no problem with

10   doing this again and redacting the transaction detail and

11   leaving them with the dollar and the date but I doubt that

12   that will address the concern that plaintiff's counsel is

13   expressing.

14         THE COURT: I wasn't asking for the solution.  I was

15   trying to understand why there is an inconsistency and you've

16   just explained it.  So that answers my question as to why you

17   did it that way.

18         Let me just -- I'm going to give -- I mean maybe

19   since it was Mr. Oppenheim who pointed out some of these

20   document redactions to give it a chance for me to go through

21   and discuss with you I guess what's been redacted.  Mr.

22   Oppenheim, do you have some other way you want to proceed on

23   this?

24         MR. OPPENHEIM: I don't think we can deal with this

25   problem, Your Honor, by looking at each and every page that

11

1    was redacted.  We sent you a couple of examples and if I were

2    there sitting in person which I tried but the snow beat me out

3    of there, I would hand up to you a document that we saw the

4    other day that was just recently produced where it's emails

5    back and forth and we get the substance of all the emails but

6    the subject line, you know the re: line, that's redacted.

7           Their one scenario can be underlying email, the

8    substance of the emails be relevant and it clearly is and the

9    re: line isn't or text messages back and forth between

10   individuals here regarding the purchase of the books alleged

11   in the fraud claim and every other line of the conversation is

12   redacted out.  You can't possibly follow the conversation in

13   the text messages.

14          So I'm not sure how we deal with this by looking at

15   one or two examples and say well, it's okay here and it's not

16   okay there unless you want the defendants to submit to you in

17   camera every time they did a redaction which would be an

18   enormous amount of work on the court's -- I don't think that

19   redactions like this when for instance I'm looking at a

20   conversation and text messages literally right on point with

21   respect to the issues here in this case that I should have to

22   try to decipher whether the one word redacted out of a

23   sentence is relevant.  I mean literally you get an entire

24   sentence and they take out one word.  So this is a --

25          THE COURT: I think you actually sent an example in

12

1   your last page with a conversation where there are parts

2   redacted.  Am I right?

3                MR. OPPENHEIM:  I have to pull apart which exhibits

4   we sent and which ones I had in my folder.

5                MS. MILLER: And this is a good example.  I'd be

6   happy to explain.  This is very --

7                THE COURT: Hold on.  Let Mr. Oppenheim get in front

8   of him.

9                MR. OPPENHEIM: So that would be --

10               THE COURT: I think Cahill 1218 in your version.

11               MR. OPPENHEIM: I have Cahill 1405 in front of me.  I

12  have Cahill 6 in front of me.  Cahill 505.  You said it was

13  14.  I'm sorry.

14               THE COURT: 14 -- 1218.  It's literally the very last

15  page of what you sent me.

16               MR. OPPENHEIM: Yes, okay.  I have it now.  Yes.

17               THE COURT: That's fine.  And I have yours and I have

18  the unredacted version and -- let me tell Ms. Miller my

19  principle and you can tell me why it shouldn't be applied.

20  But if you have conversations like this it's -- unless there's

21  a legal privilege it's just too confusing to redact portions

22  of the conversation that you think go off on another topic or

23  in this case some phrases and words that go off on another

24  topic.  I just think it's too hard to work with.

25               MS. MILLER: May I respond?

1        THE COURT: Yes.

2        MS. MILLER: Well, I know it's difficult to -- I mean

3   certainly I wouldn't think you would know this from reading it

4   but there is a reference to a name here that is in the

5   conversation relating to that name was redacted for a very

6   specific purpose.  This is a supplier of books that defendants

7   used and we -- I can go into the deep and dark reasons why it

8   is very [inaudible] that neither counsel nor the clients are

9   revealed the names of suppliers and vendors that we work with.

10  But this is a conversation about another supplier that does

11  not supply any of the titles that have been brought into issue

12  in this case.  It's another supplier.  It's not a supplier in

13  Thailand.  It's not involved in this case whatsoever and it

14  is -- this supplier as well as the names of other suppliers is

15  very highly critical that neither counsel nor their client

16  know the names of them because we have experienced in the past

17  with them using this information against us to our detriment

18  in spite of protective orders and it's not responsive.

19        Your Honor, a protective order is a protective order

20  and that's fine but Rule 26 says we don't have to produce non

21  response and non relevant documents or information and a

22  protective order is not a blank check to get to walk into

23  someone's business and start rifling through all their

24  business information and that's what plaintiffs are after

25  here.

14

1          MR. OPPENHEIM: Your Honor, can I --

2          THE COURT: Yes, go ahead.

3          MR. OPPENHEIM: -- this is Mr. Oppenheim.  Can I

4   respond for a moment?

5          THE COURT: Yes.  Yes, go ahead.

6          MR. OPPENHEIM: I have no idea what Ms. Miller is

7   referring to when she suggests that the plaintiffs have

8   obtained information in the course of litigation that they

9   have used to the detriment of the defendants.  She throws

10  things like that out there and unless she's prepared to put

11  forward evidence and really make that a claim she can't just

12  throw that out there because I'm certainly not aware of it.

13         If there's -- if they're engaged in legitimate

14  business there should be no issue in disclosing this subject

15  to the protective order which is a protective order that they

16  negotiated and they stipulated to.  It has two levels of

17  protection.  So if it's highly confidential so it shouldn't

18  get to the business people in the company they can take care

19  of that.

20         If it's illegitimate business that they're trying to

21  hide and avoid being subject to claims on then that's a

22  different issue and they have no basis to say well, because

23  we're engaged in other improper and illegal activities we

24  shouldn't have to show it in the context of this litigation.

25  I don't know which it is but either way I just don't see how

1   they can -- how they can take the position they're taking.

2            THE COURT: Okay.

3            MS. MILLER: Your Honor --

4            THE COURT: Go ahead.  Go ahead.

5            MS. MILLER: First of all, I'm not contending that

6   we're engaging in illegitimate business. I'm contending we're

7   engaging in business that is none of plaintiff's business that

8   they would love to know and they typically use these lawsuits

9   for the very purpose of finding out the nature of our

10  business.  That -- the value of that information is more

11  valuable than any claim they have in this case.

12           Setting that aside, I can give Your Honor a very

13  specific example of how plaintiffs have used this case and

14  used information they have found in this case to the detriment

15  which I would be happy to share with Your Honor if you think

16  it's necessary.

17           THE COURT: No, it's not necessary.  This is what

18  we're going to do.  We're going to have a third level of

19  confidentiality which is attorney's eyes only.  Any

20  conversations where little bits within a page have been

21  redacted are going to be produced in unredacted form to

22  counsel.  If there -- that's going to deal with the

23  conversations and text messages and things like that.

24           Is there some other way -- some way we can

25  characterize other redactions that have gone on.  That's a

1   question for Mr. Oppenheim.

2          MS. MILLER: Your Honor, can I clarify?  Will that --

3   and I'm happy that you brought up that third level because

4   that was going to be a suggestion of mine.  Could we please

5   make that clear that that's attorney's eyes only is for

6   counsel of record in this action, not for corporate counsel?

7          THE COURT: That's fine.  Counsel of record,

8   information to be used only for purposes of this litigation.

9          Now, what can we do to categorize the other

10  redactions or talk about them, Mr. Oppenheim?  Do you have any

11  ideas?  To me the principle should be -- the burden is going

12  to be on you, Ms. Miller.  The principle should be within a

13  page there just shouldn't be redactions unless there's a

14  reason that you're going to be able to persuade me that even

15  counsel without the corporate client should not be able to

16  look at it.

17         MS. MILLER: Well, Mr. Oppenheim has expressed to me

18  generally that the reason he doesn't like the redactions is

19  because he doesn't trust us that the information we've

20  redacted is not relevant.  So if I have absolute assuredness

21  that people within his firm -- attorneys within his firm only

22  are going to be reviewing it simply to confirm that the

23  information is trustworthy of what I said, that's fine.

24         THE COURT: You can produce an unredacted version.

25         MS. MILLER: We've been burned before so we're very

17

1  weary of this.

2          MR. OPPENHEIM: You know, Your Honor --

3          THE COURT: Mr. Oppenheim --

4          MR. OPPENHEIM:  -- [inaudible] allegation.

5          THE COURT: Mr. Oppenheim, listen, Ms. Miller, I'm

6  considering that stricken because I don't want to go back over

7  that.  I need to solve this problem.  So we're going to have a

8  production without the redactions.  We'll have this third

9  level of confidentiality.  If for some reason, Mr. Oppenheim,

10 you think there's been an over-redaction and you need to share

11 something with your client that got redacted you'll have to

12 either get an agreement with Ms. Miller to put it to another

13 level or you'll come back to me.

14         MR. OPPENHEIM: Yes, Your Honor.

15         THE COURT: Does that take care of the redaction

16 requests I guess?  We can go on to the next thing.

17         MR. OPPENHEIM: Yes, Your Honor.

18         THE COURT: Bank statements and tax returns.  Why

19 don't you refresh my memory, Mr. Oppenheim, of what this is?

20         MR. OPPENHEIM: I think there are three issues within

21 this category.  The first is that at the last hearing Your

22 Honor ordered the production of the bank statements for the

23 defendant's companies for which he owned 51 percent or more of

24 the companies.  After significant back and forth Mr. Mooney

25 asked whether it was adequate for the defendants to simply

1  produce those portions of the bank statements that had

2  relevant transactions and you said no.  Well, that's what they

3  did anyway and it's very difficult to piece together what's

4  happened from the bank returns because we don't have all of

5  them and with the redactions we can't possibly begin to

6  understand what the references to checks are is.

7          Your Honor, for purposes of the redaction discussion

8  looked at some of those bank returns.  Simply looking at a

9  bank return that says that they wrote a check on the 1st of the

10 month for $50,000.00 without being able to see who that check

11 was paid to makes things very difficult.  It effectively makes

12 the bank statements useless.

13         THE COURT: Well, have we perhaps, Ms. Miller, solved

14 this problem with this ruling about redactions or is this a

15 separate issue?  I mean actually I do have the memory that you

16 were supposed to produce the whole thing but I don't have a

17 problem with your doing it attorney's eyes only under the

18 system I just said.

19         MS. MILLER: I think Your Honor is right.  I mean

20 that's exactly what I was thinking as he was speaking.  I

21 think our understanding of what Mr. Mooney said was that he

22 wanted the chance to produce documentation for each

23 transaction.  I didn't think we viewed that as within a bank

24 statement but I guess that's not a here or there -- neither

25 here or there.  If we have assurance that if we unredact these

1  and no one will see them except Mr. Oppenheim and Ms. Sutter

2  and Ms. Chen then I think that solves our problem.

3         THE COURT: Okay.  Again, if, Mr. Oppenheim, you

4  think there's some other level that needs to be attached to

5  some redaction you'll work that out or come to me.

6         MR. OPPENHEIM: Yes.

7         THE COURT: What's left on the bank statements then?

8         MR. OPPENHEIM: Well, just two quick issues, Your

9  Honor.  It wasn't just that there were redactions.  There were

10  entire statements that weren't produced because they decided

11  they weren't --

12         THE COURT: They should all be produced for the time

13  period and you can consider an entire state statement to be

14  within the attorney's eyes only designation, Ms. Miller.

15         MS. MILLER: Well, I guess I'm not clear about that.

16  Your Honor wanted us to produce all statements reflecting any

17  kind of transaction to or from Mr. Smyers or on his behalf.

18  So there are instances of entities who just literally have no

19  bank statements and there may have been a few instances where

20  the bank statements had no information of any transaction of

21  that kind.  So we may have withheld one or two statements

22  because it literally has no transactions of that kind.

23         THE COURT: Well, for the sake of consistency let's

24  just include those and they'll have the same protection.

25  [Everyone speaking over each other.]

1          MR. OPPENHEIM: No bank statements were produced.

2          THE COURT: Hold on, hold on, hold on.  Folks, only

3    one person can talk at a time.

4          MS. MILLER: All right.  Sorry.

5          THE COURT: So let's go Mr. Oppenheim and then Ms.

6    Miller.

7          MR. OPPENHEIM: Right.  So there are entire companies

8    for which no bank statements were produced and it's not just

9    the issue of payments to and from Mr. Smyers.  Having taken

10   the deposition of the chief financial officer yesterday I've

11   now learned that all of the -- there are 20 some companies and

12   they're all funded through different companies and they write

13   checks back and forth to each other.  So watching kind of the

14   flow of the money between the companies may also become

15   relevant.  We need to make sure we have all the right

16   defendants in the case.  So it goes to needing kind of -- get

17   all of the bank statements for all of the companies as I think

18   Your Honor has said.

19          THE COURT: I think that's where we are anyway,

20   right, Ms. Miller?

21          MS. MILLER: No, absolutely not.  This is totally

22   completely outside of anything that was ever contemplated

23   here.  Now Mr. Oppenheim is wanting to discover financial

24   information of multiple entities who are not named as

25   defendants here just so he can think about whether he wants to

21

1   sue them for whatever reason and this is -- this is a fishing

2   expedition and this is not acceptable.

3          The CFO at the deposition which occurred yesterday

4   made it very plain which entities Mr. Smyers has ever received

5   money from or who have ever paid monies on his behalf.  There

6   are multiple other entities who are holding companies, who are

7   real estate related companies, who are companies that have

8   nothing to do with anything in this case and certainly are not

9   named as defendants who may or may not have bank statements

10  and a lot of them do not because they just do not hold money.

11         But Mr. Oppenheim is trying to delve into every

12  detail of every little entity that Mr. Smyers has any interest

13  in and that's not what this case is about.  I mean the court

14  has to cut this off somewhere.  The entity that is named in

15  this case is Book Dog Books.  If we're going to --

16         THE COURT: Ms. Miller, though -- Ms. Miller --

17         MS. MILLER:  -- [inaudible] invest Book Dog Books.

18         THE COURT: Ms. Miller, I think there was no doubt

19  that entities in which he had a controlling interest in

20  were -- regardless of whether they're defendants there was

21  supposed to be some kind of production from them; right?

22         MS. MILLER: And we did that.  Even though we contend

23  that it has nothing to do with this case we complied with what

24  you said.  We provided any bank statement reflecting any to or

25  from or on behalf of transactions.  We provided those bank

22

1   statements.  Mr. Oppenheim is now asking to get into something

2   else and I think this is an appropriate time for us all to

3   reflect back on the question of why is the court allowing this

4   in any event.  I mean this financial information is not really

5   relevant to any of the copyright trademark breach of contract

6   claims in this case and I know that at one point a long time

7   ago Mr. Oppenheim argued that he should get to see these

8   things to try to make a case that he should get to pierce the

9   corporate veil but this has gotten -- I mean this is just

10  compounded into something that is just let me see everything

11  that you have that has anything to do with any business, any

12  personal financial information.  So let's talk about why this

13  is not relevant.

14          THE COURT: I think my prior -- I'd like to just

15  stick with whatever my prior ruling was.  I think the prior

16  ruling was that any entity in which he had the 51 percent or

17  more interest that they were going to get financial records of

18  those companies to the extent that there were any transactions

19  between them or between him and those other companies.

20          MS. MILLER: Well, that's been completed.  That's

21  been done except --

22          THE COURT: So, Mr. Oppenheim, you're looking for

23  something beyond that?

24          MR. OPPENHEIM: I don't think that's been done, Your

25  Honor.  What --

23

1          THE COURT: Hold on.  First answer my question if you

2    can.  Mr. Oppenheim, are you looking for something beyond that

3    or are you saying this hasn't been done?  Which is it?

4          MR. OPPENHEIM: Well, that question goes to -- when

5    you asked about bank statements I said I thought there were

6    three issues.  So your question now goes to the other two

7    issues but with respect to the bank statement issue what Ms.

8    Miller is saying has been done has not been done because what

9    I understood your ruling to be, and I think it's pretty clear

10   from the record of the last hearing was for any company in

11   which Mr. Smyers owns 51 percent or more that they will

12   produce the bank returns from 2008 to 20 --

13         THE COURT: Regardless of whether it has to do with

14   transfers to him or other companies.

15         MR. OPPENHEIM: Right.

16         THE COURT: I actually don't have a memory of it and

17   I'd like to just --

18         MR. OPPENHEIM: Well, that --

19         THE COURT: Show me the transcript.  Whatever I ruled

20   I feel we're going to stick with it.

21         MR. OPPENHEIM: And that was what you ruled.  What

22   they've done is they've said --

23         THE COURT: Hold on.  Stop.  Stop.  Hold on.  If you

24   can just show it to me.  I have it in front of me.  Tell me

25   the page.

24

1          MR. OPPENHEIM: Julie, you're on the line.  Do you

2  have the cite to where that is in the transcript?

3          MS. CHEN: We cited it in our letter.  Is it Pages 26

4  to 27?

5          THE COURT: Hold on.

6                    [Pause in proceedings.]

7          MR. OPPENHEIM: Yes, on --

8          THE COURT: Hold on.  Hold on.  Hold on.  Hold on.

9          MR. OPPENHEIM: Okay.

10                    [Pause in proceedings.]

11          THE COURT: Yes, that is the ruling I made.  I said

12  he should look at the big picture and you should get

13  everything.  So, Ms. Miller, we're going to continue with that

14  ruling.

15          MS. MILLER: I don't understand.

16          THE COURT: I said that rather than have you make a

17  judgment about which were entities that -- that only the

18  entities that he owned were -- let me back up.

19          Rather than have you make a judgment within each of

20  the bank statements that you should only produce those that

21  show transaction to the entities I said just produce all of

22  the bank statements.

23          MS. MILLER: So Your Honor is telling us to produce

24  bank statements that include no responsive information at all?

25          THE COURT: Well, you're producing -- yes.  While it

1  may not be responsive in the sense that it's not these

2  specific transactions but they made the case to me that they

3  had to understand the financial operations of these very

4  complex companies and that in order to understand that they

5  really had to see where the money was going.

6          MS. MILLER: Your Honor, I guess what I'm asking is

7  under what circumstances can I now ask you to revisit the

8  issue of whether that's appropriate.

9          THE COURT: I think we're beyond that at this point.

10  Reconsideration is done.

11          MS. MILLER: I mean the plaintiffs are going to be

12  able to dig into financial information even though it has

13  nothing whatsoever to do with their claims for the rest of

14  this case?

15          THE COURT: Ms. Miller --

16          MS. MILLER: I think we have --

17          THE COURT: -- the tone of the question is -- Ms.

18  Miller, the tone of the question is bordering now on the

19  inappropriate.  So we need to get back on track here.  I made

20  a ruling on January 23rd.  There was no motion to reconsider

21  it.  It's clear to my mind.  I said at the time I didn't think

22  there was a burden to it.  I don't even hear a burden now.

23  There's a concern that it could be used improperly.  I'm

24  willing to say that we'll use this third level of production

25  to get it done but that's it.  We're not going to revisit it.

26

1          What's next, Mr. Oppenheim?

2          MR. OPPENHEIM: Okay, Your Honor.  With respect to

3    the bank statements issue there are two other issues.  One is

4    the 50 percent ownership versus 51 percent.  Your Honor did

5    rule 51 percent.  What we have subsequently learned is that

6    Book Dog Books used to purchase all of its own books.  So the

7    counterfeit books and the fraud books were purchased through

8    Book Dog Books.  Until roughly --

9          THE COURT: Mr. Oppenheim, this point was made in a

10   footnote and if there is a back story as to why this wasn't

11   raised earlier and why it's being raised now I need to have

12   that and I don't want to do it orally now on the phone.  So if

13   you want to make a new application you can make the new

14   application.

15         MR. OPPENHEIM: We can do that, Your Honor.  It came

16   up in the deposition yesterday.  Yes, we included it in a

17   footnote.  We now fully understand it from the deposition.  If

18   you want we'll submit a letter on it, Your Honor.  That's

19   fine.

20         THE COURT: That's fine.

21         MR. OPPENHEIM: The third issue with respect to bank

22   statements is the issue of personal bank statements.  Your

23   Honor didn't address it specifically one way or the other

24   during the last hearing.  The plaintiffs presumed that the

25   bank statements would include that of the defendant Phil

27

1   Smyers and the defendants of course presumed that it didn't.

2   So we really are trying to understand the monies earned by Mr.

3   Smyers as the owner and operator of these companies and trying

4   to piece it together exclusively from the documents we have so

5   far has been very difficult.

6           So we've asked for and the defendants have refused

7   to provide the tax returns for Mr. Smyers and so we now raise

8   this issue with Your Honor.

9           THE COURT: Ms. Miller.

10          MS. MILLER: They're asking for his personal tax

11  returns?  We have to date produced every W-2 and every K-1

12  which fully reflects every dollar that Mr. Smyers has received

13  personally from any of these companies.  Yesterday at the

14  deposition the CFO of the company testified in very explicit

15  terms and confirmed that with those documents and the

16  company's tax returns which Mr. Oppenheim has which includes

17  the line item on the tax return listing distributions for Book

18  Dog Books.  They have all of the information showing all

19  monies he has received personally from Book Dog Books and the

20  other companies.

21          This is a personal intrusion.  Your Honor's previous

22  order in no way included personal information, personal tax

23  returns.  There's no need for it and again I reiterate that

24  the claims in this case damages are not measured whatsoever

25  based on income, profit or anything of the kind.  Trademark

1  and copyright claims are based on actual damages or statutory

2  damages measured on each instance of profit from each instance

3  of infringement, not based on overall profits or income.

4          MR. OPPENHEIM:  Respectfully, Your Honor, with

5  respect to that last point, that's not accurate.  First off,

6  in terms of statutory damages, one of the factors that a jury

7  gets to consider in a statutory damages case is deterrence and

8  in order to measure deterrence you need to understand the

9  earnings of the defendant in order to deter them from future

10 infringing conduct.  In a case like this where it's the second

11 lawsuit of infringement that will be a substantial factor for

12 the jury to consider.

13          Also, with respect to the fraud claim, obviously

14 punitive damages, the issue of overall profits and worth is a

15 factor.

16          THE COURT: I think that --

17          MS. MILLER: May I respond, Your Honor?

18          THE COURT: That's not necessary.  I think, Mr.

19 Oppenheim, this is getting beyond what I think I'm prepared to

20 order.  You're getting all the information about how these

21 companies made pay outs to him or the related companies and

22 ultimately to him and to now explore his personal bank

23 statements or tax returns I think that's beyond what I'm

24 prepared to permit right now.  So that application is denied.

25          What's next?

1          MR. OPPENHEIM: The next issue, Your Honor, is the

2    inspection of the non plaintiff books which we discussed at

3    the last hearing.  That inspection is actually occurring

4    today.  I have -- we have people flown in to Ohio who are

5    engaging in that inspection.

6          At the time that we discussed this at the hearing

7    last -- I guess it was in December the issue was raised of

8    concerns about the information of the non plaintiff books

9    going outside of the parties to the case.  So Your Honor

10   ordered that there be a limitation that they --

11         THE COURT: Is this issue not resolved?  Because

12   defendants --

13         MR. OPPENHEIM:  -- [inaudible].

14         THE COURT: Mr. Oppenheim, this issue was not

15   resolved?

16         MR. OPPENHEIM: No.  In fact, we have experts in

17   their conference room right now who are not being allowed to

18   see -- experts with the companies who are plaintiffs who want

19   to look at these other books to determine whether or not

20   there's a massive counterfeiting going on more generally which

21   is one of the claims in the case and they're not being allowed

22   into that conference room.  They've been -- everybody has been

23   told they can't share the information outside of the --

24   counsel in the case.  Yet all they're doing is saying well,

25   the lawyer can go in and the person who's a paralegal at one

30

1  of the companies who isn't an expert in reviewing whether a

2  book is a counterfeit can go in but the people who are the

3  experts aren't allowed to see them.

4          THE COURT: Ms. Miller.

5          MS. MILLER: Yes.  We've got the books -- well, first

6  of all, all the -- a great majority of the books for the

7  inspection everybody from Mr. Oppenheim's side of things that

8  showed up they're all allowed to look at them and rifle

9  through them, do whatever they want.

10         There's a small subset of books which you may recall

11 we talked about at the last hearing.  These are books that

12 were quarantined with the names of other publishers other than

13 the plaintiffs in this case that were quarantined on -- as

14 being potentially suspicious, questionable, not guaranteed

15 counterfeit that's questionable and Mr. Oppenheim demanded

16 that his folks be allowed to see stuff from these other

17 publishers too even though they're not involved in this case.

18         Your Honor said that okay, we'll let you see these -

19 - the books relating to these other publishers but only the

20 attorneys under the highly confidential of the protective

21 order and that's what we're doing.  The folks at the

22 inspection today we have allowed.  There's one person there

23 who's a member of Mr. Oppenheim's firm who's certainly been

24 allowed to see the books and one of --

25         THE COURT: Who is it you're not -- who is it you're

31

1   not letting see the books?

2          MS. MILLER: The people who have not been designated

3   under the highly confidential designation, the highly

4   confidential stuff.

5          THE COURT: Yes.

6          MS. MILLER:  There's one other person there who's

7   been designated for that.  So that person has been allowed to

8   see them.

9          THE COURT: Mr. Oppenheim.

10         MR. OPPENHEIM: Your Honor, if you reviewed your

11  transcript from that hearing nowhere in that transcript did

12  you say that it would be subject to the highly confidential

13  part of the protective order.  In fact --

14         THE COURT: What is -- just so I understand.  Who is

15  it you want in that you can't get in under that designation?

16         MR. OPPENHEIM: So for both Pearson and Cengage we

17  have onsite, for lack of a better term, production experts.

18  These are the people who know what a book should look like if

19  it's made legitimately.  These are the people who will testify

20  at trial about the fact that the books are counterfeit,

21  that --

22         THE COURT: Including ones that aren't the

23  plaintiffs?

24         MR. OPPENHEIM: And they would be the ones who would

25  be able to say I also examined, assuming this is the case,

32

1   other books that the defendants had purchased that came from

2   either the same sources or other sources.  We don't know yet.

3   That were counterfeit.

4          But my paralegal isn't -- or my lawyer and company's

5   paralegal aren't going to testify.  So letting them see the

6   books is of no value.  So these people are within the company.

7   They're subject to the protective order, not the highly

8   confidential but the confidential portion of the protective

9   order and that fulfills what Your Honor said at the last

10  hearing which is it couldn't go outside of the company.

11          THE COURT: Okay.

12          MS. MILLER: Your Honor --

13          THE COURT: Yes, go ahead.  I mean these are not

14  books of the plaintiffs.

15          MS. MILLER: So they have nothing to do with the case

16  in any event.

17          THE COURT: But we're past that.

18          MS. MILLER: This is a copyright case.

19          THE COURT: We're past that.  So the inspection has

20  been ordered.  It's hard to see how it's of any value unless

21  there's someone with some expertise.  Now, if we need to put

22  restrictions on them as to what they can do with this

23  information we can talk about that.  I gather there's already

24  some restriction under the lower level of confidentiality.  I

25  assume they can only use it for this litigation.  Is that

1   right, Mr. Oppenheim?  I don't know.

2            MR. OPPENHEIM: Yes.  That's correct, Your Honor.

3   And I understand -- I just received an email from my lawyer

4   who's there who says not only are they not letting him in,

5   apparently they're not allowing my lawyer who's there to take

6   notes as to what the books are or to take pictures of the

7   copyright pages so we have information about it.  This is --

8   with all due respect, it should not be this difficult.

9            THE COURT: Well --

10           MS. MILLER: These are books from other publishers.

11  You can't make anything in this case out of that.  So why are

12  we even talking about it?

13           THE COURT: Well, I made the ruling.  I felt it could

14  be relevant to intent.  So we have to have a meaningful

15  inspection and a meaningful inspection requires people who

16  understands what these books look like and requires them at a

17  minimum to be able to take notes.  I don't frankly see the

18  problem with photographs as long as everything that's taken is

19  shared with the other so they know it's exactly what's there

20  and that it's kept confidential in the same way that other

21  items are being kept confidential.  So that's the ruling with

22  respect to that.

23           MS. MILLER: Okay.  Well, in light of that, Your

24  Honor, if you could right now tell me who -- there's a group

25  of people at my office in Columbus right now who want to look

1   at these books.  Can we get a ruling on -- I've been informed

2   that there's one person, a Richard or a Dick or something --

3   somebody like that who may be so called expert on other

4   publisher's books, can we get a ruling that he may go look at

5   the books and takes notes and that will be the limit of it?

6           THE COURT: Who is you don't want to -- I don't know

7   who's there.  Frankly I'm surprised that none of this was

8   arranged in advance and discussed in advance but I guess we --

9           MS. MILLER: It was and I -- the court previously

10  ruled that this would be subject to highly confidential and so

11  I set this up highly confidential --

12          MR. OPPENHEIM: That is not --

13          THE COURT: Hold on.  Hold on.  Folks.  Folks.  Don't

14  talk to each other and don't interrupt each other.

15          I'm prepared to try to make people's lives easier by

16  making some rulings but I think the two of you need now -- now

17  that you know what my ruling is you two need to figure

18  something out after we hang up and then if you don't work it

19  out call me back.  I'll be here until at least six or 6:30.

20  But I don't want to -- I don't know who's there.

21          MS. MILLER: But, Your Honor -- it's a travel issue.

22  I mean these people are all here from out of town.  So if

23  they're going to do it they should do it now.

24          THE COURT: Okay.  I agree.  I'm saying let them do

25  it and that doesn't seem to be sufficient.  So the details I

1  was thinking you could work out.  If you're not capable of

2  that tell me what it is you want me to order.

3          MS. MILLER: Well, I -- I guess I --

4          THE COURT: Go ahead, Ms. Miller.

5          MR. OPPENHEIM: There are three people there.

6          MS. MILLER: Go ahead.  Go ahead.

7          THE COURT: Go ahead, Mr. Oppenheim.

8          MR. OPPENHEIM: There are three people there from the

9  plaintiffs who are not being allowed in.  Two from Pearson and

10 one from Cengage.  All three of them are production people.

11 We would like them to be able to review the non plaintiff

12 books, to take notes, if necessary take pictures.  They will

13 do subject to the protective order.  We will keep the

14 information confidential and to the extent that the defendants

15 want copies of the pictures that they take of the books we

16 will of course produce those.

17         THE COURT: What more do you need, Ms. Miller?

18         MS. MILLER: So I will allow all of these people to

19 come in and see the books if all of their information will

20 remain highly confidential.

21         THE COURT: What's the difference between -- what

22 is --

23         MS. MILLER: Confidential allows --

24         MR. OPPENHEIM: The protective order doesn't allow

25 them -- the protective order only allows the in house counsel

1   and the folks in charge of anti piracy to be subject to the

2   highly confidential designation.  So I'm not sure that would

3   be contrary to the protective order as I recall it.  I don't

4   have it right in front of me but that's what I recall we

5   negotiated.

6          So I think it should be subject to the confidential

7   restriction.  That means it won't leave Pearson or Cengage.

8          THE COURT: I don't know the differences.  Ms.

9   Miller, what is the difference?  What is the difference

10  between my now saying it's highly confidential versus

11  confidential?  Tell me what that means.  I don't even know.

12         MS. MILLER: I mean confidential basically allows

13  everyone on both sides, the parties, anybody to see

14  everything.  Basically the only stipulation is a promise to

15  not use -- to not share it with people not involved in the

16  litigation and not use it outside the litigation.

17         Highly confidential is [inaudible] restricted to a

18  subset of people for the parties that have decision making

19  power on certain topics.  In effect, our highly confidential

20  status has become ineffective because plaintiffs have taken

21  the position that pretty much anyone who makes any decision

22  relating to this litigation counterfeiting activities don't

23  have decision making power on pricing and selection of

24  customers.

25         So they've already designated about seven or eight

1  people within the company outside of counsel who can see all

2  of our highly confidential documents whereas --

3          THE COURT: So the difference is -- I'm just trying

4  to understand the difference, Ms. Miller.  I'm just trying to

5  understand the difference.  So the difference to you is who --

6          MS. MILLER: Yes.  So that's --

7          THE COURT: Hold on.  Ms. Miller, Ms. Miller --

8          MS. MILLER:  -- difference is everybody in the

9  company versus --

10          THE COURT: Ms. Miller, Ms. Miller.  Ms. Miller, if

11  I'm talking you've got to stop because we can't make a

12  transcript if we're both talking.

13          MS. MILLER: I'm sorry. I'm breaking in and out a

14  little bit.

15          THE COURT: All right.  It seems to me the difference

16  is between who these people can share the information they

17  learn in their notes and the photographs with.  Is that what

18  it is?

19          MS. MILLER: The limits of who can see it in the

20  first instance and who they can share it with, yes.

21          THE COURT: Okay.  Since there seems to be an

22  emergency let's just say for the moment that they will share

23  it only with the group in the highly confidential category.

24          And, Mr. Oppenheim, if you need them to be able to

25  go outside that I will be -- revisit this de novo.  I'm making

1   this ruling only so that we don't have this argument right now

2   while there are people there.  Okay?

3           MR. OPPENHEIM: Very well, Your Honor.

4           MS. MILLER: So only highly confidential people?

5           THE COURT: For right now.  That's just --

6           MS. MILLER: For right now.

7           THE COURT: That's just for -- until Mr. Oppenheim --

8   if he comes back to me I will revisit the question de novo.

9           MS. MILLER: Your Honor, you think we should allow

10  them to take notes?

11          THE COURT: I said notes and photographs as long as

12  the photographs are shared with you.  Again, all that material

13  treated in the same way, highly confidential for now.

14          MS. MILLER: Will the notes be shared with me?

15          THE COURT: No, that's work product.  That's not

16  necessary.

17          MS. MILLER: But the notes will be highly

18  confidential.

19          THE COURT: Within the plaintiff's side for now, yes.

20          MS. MILLER: Okay.  Well, I'll -- I just want to know

21  if I can send a message to my people right now to let that

22  happen.

23          THE COURT: Okay.  I don't want to interfere with the

24  progress of this.

25          MR. OPPENHEIM: I think, Your Honor, we've -- unless

1  I'm told otherwise by Ms. Chen on the phone I think we've

2  completed --

3            THE COURT: We've got through your letter.

4            MR. OPPENHEIM:  -- completed the February 4th letter,

5  yes.

6            THE COURT: So now we get to go to defendant's

7  letter.  Ms. Miller, are you with us?

8            MS. MILLER: Yes, I'm here.

9            THE COURT: Okay.  So I actually was very thrown off,

10  Ms. Miller, by your letter because I was trying to figure out

11  what discovery requests you made that is in your view not

12  being responded to.

13            MS. MILLER: Yes, Your Honor.  Well, we've made

14  several discovery requests worded in different ways that were

15  basically saying telling us what you have, and I'm

16  paraphrasing.  Tell us what you have to back up your claim of

17  copyright infringement.  To prove copyright infringement you

18  have to show an instance of -- well, in this case an instance

19  of a distribution of an infringing work and --

20            THE COURT: Can you answer something for me?

21            MS. MILLER:  -- [inaudible] sure what happened.

22            THE COURT: This sounds very much like a contention

23  interrogatory.  Would you say that's essentially what we're

24  talking about?

25            MS. MILLER: A contention interrogatory?  The way I'm

40

1   wording it right now?

2           THE COURT: Well, or however it was worded.  Maybe

3   it's not.  I'm just --

4           MS. MILLER: The way it was worded back then, no.

5   The way it was worded back then was please produce copies of

6   all documents that support your claim that these folks engaged

7   in distribution of infringing copies of your works and your

8   [inaudible].  That should subsume anything that shows that you

9   have --

10          THE COURT: So documents currently in their

11  possession --

12          MS. MILLER:  -- [inaudible].

13          THE COURT: Documents currently in their possession

14  that reflect infringement by the defendants.

15          MS. MILLER: Yes.

16          THE COURT: I'm not sure that's being objected to or

17  that's even what I understood the letter to be about.  There

18  seems to be something else going on but you tell me, Mr.

19  Oppenheim.  Are there other --

20          MS. MILLER: Well, I --

21          THE COURT: Hold on.  Hold on.  Let me ask Mr.

22  Oppenheim.  Are there documents in the possession of the

23  plaintiffs, not ones that they received from the defendants

24  but ones that were in your possession that show infringement

25  by the defendants that have not been produced?

1          MR. OPPENHEIM: Your Honor, we've responded to their

2    document requests and produced the documents that they've

3    requested and I believe that we have produced the documents

4    for the infringement that we're aware of as of right now.  To

5    the extent that additional titles are discovered through this

6    inspection we'll have to supplement our discovery responses.

7          The contention aspect of this, which you put your

8    finger on immediately, is exactly what Mr. O'Grady and I

9    discussed several months ago and we had a very civil

10   conversation about how to handle this.  What I suggested as a

11   solution and he agreed was we would create this roadmap as has

12   been explained in the letters.  The plaintiffs would create a

13   roadmap which would connect the evidence with respect to each

14   copyrighted work and that that was not a substitute for the

15   underlying evidence which was already being produced but

16   rather would connect the dots for them as to how we intended

17   to proceed with respect to each title and what documents we

18   intended to rely on.

19         Frankly, what we were offering was in many respects

20   much more than we're obliged to provide but we thought it made

21   sense as a way to proceed because this roadmap would be

22   something that we would want to use in the case and that they

23   would need to understand the claims.  So we offered to do it

24   and we said we would make a witness available who will testify

25   as to the roadmap and answer their questions on it.

1          We had resolved that issue.   New counsel apparently

2    is not in line with this.   So here we go but to the extent

3    that she sent a letter identifying specific discovery items

4    that we -- she contended we had not produced we responded and

5    we gave her -- and this is Exhibit 1 in -- to our February 10th

6    letter to Your Honor.   We responded to her letter.   You claim

7    that we didn't produce the following things, here they are and

8    here are the Bates ranges for those documents.

9          So if the defendants have a specific document

10   request that we have not responded to or they think we have

11   not responded to they should ask us about it but simply

12   throwing out there to us well, you haven't proven your claims

13   at this point in the case it's not something I can get my arms

14   around to understand what she -- what the defendants are

15   looking for.

16          THE COURT: All right.   Ms. Miller, I actually want

17   to limit it to the way I framed it because to me the issue is

18   is there a discovery request that hasn't been responded to and

19   if so, what is it.   You told me it was you want documents in

20   their possession that show your infringement and they say they

21   have given you such documents in their possession.   So tell me

22   what it is you think that you're entitled to that I should

23   order.

24          MS. MILLER: Yes.   Well, in order to -- in order to

25   have had an infringement claim at all they would necessarily

43

1  have to have some information about when a distribution of an

2  infringing book occurred.  We have not yet received any

3  documentation reflecting the distribu -- proof of my clients

4  distributing an infringing title on any --

5          THE COURT: Okay.  So you think that there are --

6          MS. MILLER: I assume --

7          THE COURT: Hold on.  Ms. Miller, you think there are

8  documents in their possession that they have not produced to

9  you that show particular dates on which your client infringed;

10 is that what you're saying?

11         MS. MILLER: Yes, because they filed this claim I

12 assume they have evidence to support the claim and we haven't

13 gotten it.  So --

14         THE COURT: I don't want to know the basis --

15         MR. OPPENHEIM:  -- [inaudible].

16         THE COURT: Ms. Miller, if the answer to this is they

17 couldn't have filed the complaint without having this document

18 I'm not going to accept that as a basis for me to make a

19 discovery ruling.  I'm going to make the ruling based upon

20 whether they have documents that they've -- in their

21 possession that they've refused to produce to you.

22         MS. MILLER:  That's fine.

23         THE COURT:  So is it your contention that they have

24 a document in their possession that show dates of infringement

25 that they've refused to produce to you?

1          MS. MILLER: It's my contention that either they have

2   them and they refused to produce them or they need to tell me

3   they don't have any, one of the two.

4          THE COURT: Okay.  Well, I think it's enough for them

5   to say that we've given you documents A through D or all that

6   we have on that topic or 1 through 10 or all we have on that

7   topic.  I don't think --

8          MS. MILLER: Right.

9          THE COURT: That's quite enough.

10          MS. MILLER: If there is nothing -- yes, yes.

11          THE COURT: So are there documents in your

12   possession, Mr. Oppenheim?  I mean I think the problem, Ms.

13   Miller, is your view of this is you asked them for documents,

14   you didn't get very much, you don't think that they could have

15   put a complaint together based on those documents and you

16   think there's something wrong with that.  And that's fine for

17   you to think but that's not what discovery is about.  What

18   discovery is about is what's in their possession that they

19   haven't given to you.  If they tell me they don't have

20   documents in their possession on a particular category I can't

21   do anything about that from a discovery point of view.  I

22   can't order someone to produce something they don't have.  So

23   if they don't have it that's the end of it.

24          There was nothing in your letter that suggested that

25   there was some particular document they were refusing to

45

1   produce to you that was sitting in their possession they were

2   refusing to give to you.  So I don't know what I can do for

3   you, Ms. Miller.

4        MS. MILLER: Actually, I appreciate Your Honor's

5   comment.  I one hundred percent agree with what you're saying

6   and maybe my letter did not say it explicitly.  It's been

7   discussed in conversations or emails between counsel.  I agree

8   with you.  If they don't have it they can't produce what

9   doesn't exist.  I get that.  But what -- I guess what I'm

10  missing is a representation that there is nothing else.  I

11  keep asking do you have anything else or is this it, are we

12  done, and I can't seem to get that finality so I can know that

13  there's nothing else.

14       THE COURT: You're worried there's a rolling

15  production?  We have to distinguish between documents they may

16  have gotten from you in discovery which they are not obligated

17  to produce back to you in documents that they have custody and

18  control of independent of this litigation.

19       So with respect to that, I don't know that we need a

20  representation other than the other party comes in and says

21  here are all the documents, I don't have anything else.  I

22  assume when you produced documents, Mr. Mr. Oppenheim, that's

23  your position, you're not holding anything back.  Is that

24  right?

25       MR. OPPENHEIM: We're not holding anything back.

1          Your Honor, may I just -- it's hard to sit quietly.

2     I'm doing my best but when defendant says you can't file a

3     copyright case without having --

4          THE COURT: Mr. Oppenheim, Mr. Oppenheim, Mr.

5     Oppenheim, I cut them off on that argument and I'm going to

6     have to cut you off on responding to it.

7          MR. OPPENHEIM: Okay.

8          THE COURT: Because it's not the law.

9          MR. OPPENHEIM: Okay.  So anyways, no, we're not

10    withholding documents, Your Honor, and we've in fact produced

11    documents that she claims we haven't produced.  I don't know

12    whether she hasn't reviewed the production or she doesn't

13    understand the --

14         THE COURT: It's enough, Mr. Oppenheim.  It's enough

15    for you to say there isn't a rolling production with respect

16    to these matters.  What you have so far -- anything you know

17    about that you have so far you have produced?

18         MR. OPPENHEIM: Yes.

19         THE COURT: Okay.  I think that takes care of that

20    set of letters.  Now we're at the depositions which I don't

21    know that we're going to be able to accomplish but we might be

22    able to narrow it.

23         Actually I wanted to start, Ms. Miller, with a

24    question to you.

25         MS. MILLER: Yes, Your Honor.

1          THE COURT: It related to a statement you made -- and

2    I'll read it to you.  It's your letter, Page 4.  You say you

3    find it "Unfair that the court ordered after plaintiffs

4    insisted that defendants overseas representative Tom Cahill

5    was required to travel from Australia and appear in person in

6    the United States for his deposition while none of plaintiffs

7    overseas representatives are being put to the same burden."

8    Can you tell me where I ordered that?

9          MS. MILLER: I don't think that you ordered it.  I

10   think Judge Pauley ordered it.

11         THE COURT: Mr. Oppenheim, did Judge Pauley order

12   that?

13         MR. OPPENHEIM: No, no.  Judge Pauley issued no such

14   order.  I assume she's referring to the Mr. Cahill issue.

15         THE COURT: Which I dealt with in December.

16         MR. OPPENHEIM: Yes.

17         THE COURT: That was me.  I have the transcript in

18   front of me.

19         MS. MILLER: Oh, yes.

20         THE COURT: Tell me where I did it.  First of all,

21   Mr. Oppenheim, it's your understanding that's what I ordered?

22         MR. OPPENHEIM: I'm sorry, Your Honor.  I'm trying to

23   catch up and pull out that sentence in our letter.  Let me get

24   it quickly here.

25         MS. MILLER: I think Your Honor is right.  I think

1  you did at some point say Mr. Cahill will come here.   I know

2  it's the last hearing it was clarified.   I asked you if it

3  could be done in Columbus and you said no, it will be done in

4  New York.

5          THE COURT: I want the line because I don't think I

6  ever ordered that.

7          MR. OPPENHEIM: No.   In fact, what happened, Your

8  Honor, is that Mr. O'Grady and I discussed the issue and the

9  issue of cost and the burden of a video deposition and Mr.

10 O'Grady --

11         THE COURT: Right.   I proposed a video deposition so

12 as not to inconvenience Mr. Cahill.   So I want to know why Ms.

13 Miller is saying that I was being unfair by ordering something

14 that I don't think I ordered.   If I'm wrong I'd like to know

15 the page of the deposition -- I'm sorry, of the transcript

16 where I did it.

17         MS. MILLER: Maybe I am mistaken.   Mr. Oppenheim had

18 taken the position with us that we were obligated to bring him

19 here and then it became a question of trying to get him to pay

20 half the costs.   We didn't want to bring him here.   There

21 were --

22         THE COURT: You're not answering my question, Ms.

23 Miller.   Ms. Miller, you made a statement about something I

24 did.

25         MS. MILLER: [Inaudible]

1          THE COURT: Ms. Miller, you have to not interrupt me.

2     You made a statement about something I ordered.  If in fact

3     it's incorrect that's fine, just tell me.  If it's correct,

4     tell me that.  If you don't know, tell me that.

5          MS. MILLER: I don't have a citation so I don't know.

6          THE COURT: I don't think I ever ordered that.  So if

7     that has affected your perception of my fairness or unfairness

8     I think you might want to think about that.

9          Let's go to the deposition issue.

10          MR. OPPENHEIM: Yes, Your Honor.  I think the

11     first -- I think the best way to break this down is into

12     groups.  The first group is the CEO's group.

13          THE COURT: Yes, it seemed like there was an

14     agreement with a caveat from Ms. Miller and I think I --

15          MR. OPPENHEIM: Your Honor --

16          THE COURT: Sorry.

17          MR. OPPENHEIM: Sorry.  Go ahead.

18          THE COURT: It was that there was an -- and I think

19     the wording was a little broader than I think would be

20     required or should be required but we can talk about that but

21     since you haven't had a chance to respond, Mr. Oppenheim, go

22     ahead.

23          MR. OPPENHEIM: We'll stipulate, Your Honor, that we

24     have no intent on calling the CEOs but if for some reason that

25     would change before trial we would absolutely provide the

50

1  defendants with an opportunity to take their deposition.

2  We've already said in a letter to the court that they have no

3  percipient knowledge of the facts of this case and we don't

4  have an intent on calling them.

5          If for some reason our representation to the court

6  isn't enough and the defendant requires us to get that

7  representation directly from the CEOs, I suppose we can do

8  that.  But I don't think we should have to have counsel

9  provide anything beyond that.

10          THE COURT: Well, is there a problem doing the

11  affidavit or not?

12          MR. OPPENHEIM: I mean --

13          THE COURT: I mean I think the issue should be

14  whether they have information other than information they

15  obtained as a result of this -- the filing of this -- from

16  lawyers as a result of filing this lawsuit and so forth.

17          MR. OPPENHEIM: Meaning, had they been briefed on the

18  lawsuit [inaudible] twice.

19          THE COURT: I don't think that should be --

20          MR. OPPENHEIM: But that's not knowledge.

21          THE COURT: Right.  So an affidavit of that kind I

22  would have required if there had been motions.  So it seems

23  fair to ask for that.

24          And then on the other point it seems to me you

25  should be able to say just as you said, and you can say it in

1   a letter, a written form that you have no intention at this

2   time to call in for any purpose and if something arises that

3   you don't foresee at this time that leads you to believe they

4   have relevant information you would immediately inform the

5   other side.

6            MR. OPPENHEIM: Absolutely, Your Honor.

7            THE COURT: Is that going to be enough, Ms. Miller?

8            MR. OPPENHEIM:  I agree.

9            MS. MILLER: So we'd be allowed a deposition if

10  they'd be intended to be a witness of any kind.

11           THE COURT: I can't imagine not allowing you a

12  deposition if they suddenly announce that these people had

13  information and it's -- I can't fathom it right now.

14           MS. MILLER: Okay.  I'm sure Your Honor understands

15  we're just trying to --

16           THE COURT: A very reasonable request, Ms. Miller.  A

17  very reasonable request.

18           I think on the issue of the 30(b)(6) depositions the

19  letters were unfortunately very unclear to me and it seemed to

20  be disputes.  I don't know that we can deal with them right

21  now since I have a conference in ten minutes.  But I'm trying

22  to understand -- it's of some importance to me what happened

23  before and whether there was truly a 30(b)(6) deposition of

24  the corporations before on topics that defendants decided and

25  if that happened and there are now new topics I think I need a

1   good understanding of what happened that made them unable to

2   ask those questions originally because there really shouldn't

3   be multiple 30(b)(6)s of a corporation.  I'm not saying it's

4   impossible but in an orderly world we would do a single notice

5   with all of our topics.  They would prepare their people and

6   they wouldn't have to go back and do that again.

7            So I don't have a good understanding of how we got

8   in this situation.  There seems to be a disagreement as to

9   whether there have been 30(b)(6) depositions at all.  So I

10   think I'm going to need a little more detail on that.  If

11   there's something else you think I can deal with in the next

12   five or ten minutes I'm happy to try.

13            MS. MILLER: A question about when you -- I know you

14   added on an attorney's eyes only layer to protectiveness.  Do

15   we just want to leave that verbal from the hearing or did you

16   want us to revise the protective order to reflect that?

17            THE COURT: Whatever makes you more comfortable.  I

18   would think that you might want something in writing that sets

19   it out and maybe there's something people sign.  I leave that

20   completely up to you.  If you feel you need it, Ms. Miller,

21   then you should draft it and give it to the other side and I

22   will sign it as quickly as I get it.

23            MR. OPPENHEIM: Your Honor, with -- I'm sorry.  Are

24   we done with that topic?  I don't want to cut it off.

25            THE COURT: I think so.

53

1              MR. OPPENHEIM: With respect to the 30(b)(6) issue, I

2      agree entirely with what Your Honor said.  We want to know the

3      totality of what it is we're going to be required to produce

4      witnesses on before we start producing witnesses again because

5      I don't want to have to have witnesses who have testified be

6      re-examined yet again.  So I know that the defendant has asked

7      to take the depositions of Mr. Garry and Mr. Sampson which

8      we've agreed to allow them to do and I'm prepared to make them

9      available as well as Mr. Lavoka [Ph.] but I don't want to do

10     that until we've resolved what the -- what if any 30(b)(6)

11     topics we may have to provide witnesses on because we would

12     very well might just designate those witnesses to testify on

13     them.

14             Now, from our perspective with respect to the ten

15     30(b)(6) topics that were raised in the February -- the

16     February 10th letter we believe most of them -- they've already

17     examined Mr. Essig on -- at length.  In fact, most of these

18     came up at the December hearing with Your Honor.  So we're

19     kind of trotting ground we've been over again.  But to the

20     extent that it would assist Your Honor in resolving this what

21     we could do is with respect to each of those ten topics give

22     you excerpts from the other depositions showing that they've

23     already asked questions on these as well as giving you the

24     prior 30(b)(6) notices where we said we were going to provide

25     witnesses on those topics and which I think Your Honor already

1   has as an exhibit to Exhibit 4 to our letter as well as the

2   other exhibits to the letter which already lay out that we

3   provided -- that they noticed up the depositions of

4   representatives of the company which -- who all testified

5   already.

6           But if Your Honor wants excerpts on each of these

7   topics from the depositions we can do that.  I don't know --

8           THE COURT: I don't think I meant to be saying that.

9           MR. OPPENHEIM: Okay.

10          THE COURT: What -- this is my vision of what

11  happened is that there were some people from these companies

12  examined.  In the plaintiff's view you think they were

13  pursuant to a 30(b)(6) notice that you objected to and said

14  here's what we'll prepare them on.  Is that right?  Is that

15  your view, Mr. Oppenheim?

16          MR. OPPENHEIM: Well, they did two things previously.

17  One is they issued a 30(b) -- a general -- a 30(b)(6) notice

18  with respect to four topics and we objected to those topics

19  but then we'd make witnesses available to a narrower aspect of

20  those topics because the topics were quite broad.

21          THE COURT: Which you set out in the --

22          MR. OPPENHEIM: Then they noticed -- which we set out

23  in -- it's Exhibit 4 to the letter we sent you, Your Honor.

24          THE COURT: Okay.

25          MR. OPPENHEIM:  And then they also noticed, and

1    these are Exhibits I think 1, 2 and 3 of our letter if I've

2    got this right, they noticed up a deposition of Pearson

3    Education and they asked to depose Pearson Education attention

4    Richard Essig.  And we produced Mr. Essig in --

5             THE COURT: Your view that was a 30(b)(6) deposition?

6             MR. OPPENHEIM: Well, and they in fact asked

7    questions on all of the topics that they list -- almost,

8    virtually all of the topics that they're listing now.  So they

9    really are seeking -- Mr. Essig would be the witness on many

10   of these things so they really --

11            THE COURT: Maybe this is the issue and maybe -- you

12   can tell me, Ms. Miller.  It sounded like part of your

13   complaint, Ms. Miller, was that there were I don't knows given

14   to some topics but that may be the answer, the 30(b)(6) answer

15   on that topic which is that the corporation doesn't have

16   information on those particular questions and you just need an

17   assurance that that's in fact their final answer.  So that

18   part of what's going on here?  I can't really tell.

19            MS. MILLER: Absolutely correct.  If they want to

20   stipulate that Pearson's evidence or testimony will not be

21   beyond what Mr. Essig will say or has said that's fine.

22            THE COURT: So maybe the way to deal with this is

23   for -- I mean I might be able to narrow some topic areas.  I'm

24   not sure but for you to say please confirm that the answers

25   given to -- by Mr. So and So at this deposition represent the

56

1  corporation's knowledge with respect to the following

2  questions I asked at the deposition and then you would

3  identify them by page or page range or something like that.

4  Do you think that could solve a lot of this?

5          MS. MILLER: I think that would solve a lot of this.

6  I think it may leave open some debate about things that

7  weren't talked about at all at the deposition.

8          THE COURT: So now we're at the areas that you did --

9  that your predecessor didn't ask about and you feel you would

10 like the opportunity to ask about; right?

11         MS. MILLER: Right.

12         THE COURT: So as to those topic areas that's what I

13 think I need the letters on, for you to say here's what we

14 didn't ask about, here's why we didn't ask about them and

15 here's -- and we think we're entitled and he's going to

16 answer -- Mr. Oppenheim will answer either by saying those are

17 not relevant or you shouldn't get a second bite at the apple

18 or both.  I think maybe if we can try to narrow it to my

19 getting letters on that it will be a big help.  Do you think

20 that might work, Ms. Miller?

21         MS. MILLER: The letters on [inaudible - breaking up

22 on telephone] ask about and why.

23         MR. OPPENHEIM: Though, Your Honor, I assume that

24 even once you receive those letters you'll still consider the

25 case law that says that they can't -- they can't seek to take

1   30(b)(6)s again.

2         THE COURT: No, I'll consider that and I think what I

3   said is it's not absolute.  I said normally one should do it

4   all at once and not come back and do it again but I said I

5   could imagine situations where that wasn't true.  For example,

6   you might learn something in discovery that opened up a topic

7   area that you had no reason to know was at issue in the case.

8   There's all kinds of reasons why you might validly -- not all

9   kinds but there are some reasons why you might validly need a

10  second 30(b)(6) deposition.

11        Also, Ms. Miller may have some argument that in fact

12  those weren't 30(b)(6) depositions and I don't want to

13  foreclose her from arguing that.  I have no idea.  But that I

14  think is the framework under which we should be operating.

15        MR. OPPENHEIM: We'll respond to Ms. Miller's letter

16  and see if we can narrow --

17        THE COURT: I think, Ms. Miller, you should try to do

18  what I said which is to say on these questions please confirm

19  this is the position of the corporation and then whatever is

20  left you'll -- it will be brought to me by letter.

21        MS. MILLER: One other quick question, Your Honor.  I

22  know you've got to go but are we still okay with the current

23  case schedule?  We're still on board with that?

24        THE COURT: I don't know but if the parties have a

25  problem with it there's a very specific method in my rules for

58

1    getting an extension.  So I'd like you to follow that --

2              MR. OPPENHEIM: Your Honor, at the -- I'm sorry, I

3    didn't mean to --

4              THE COURT: Go ahead.  Go ahead.

5              MR. OPPENHEIM: At the last conference -- the current

6    discovery schedule is set to close on February 28th and at the

7    end of the last conference I raised with Your Honor that it

8    seemed unlikely that we would be quite done by February 28th

9    given the outstanding issues and Your Honor's response was of

10   course that's not a problem, we can deal with that.  Or

11   something to that effect and I don't know offhand whether we

12   were still on the record at that point.  I think we probably

13   weren't --

14             THE COURT: I'm sure we were and it sounds like

15   something I would say.  So go ahead.

16             MR. OPPENHEIM: So I think we're close, Your Honor,

17   but I know for instance that --

18             THE COURT: You're close on what?

19             MR. OPPENHEIM: Well, I think we're getting close to

20   concluding discovery but there's --

21             THE COURT: I actually don't want to have this

22   conversation.  I would like you to use my process which is for

23   the two of you to discuss whether you are mutually agreeing to

24   an extension and if you're not to write competing letters on

25   the topic.

59

1              MR. OPPENHEIM: Very well, Your Honor.

2              THE COURT: Ms. Miller, anything we can do in the

3    last two minutes?

4              MS. MILLER: Nothing further, Your Honor.  Thank you.

5              THE COURT: Mr. Oppenheim, anything?

6              MR. OPPENHEIM: No.  Thank you, Your Honor.

7              THE COURT: Thank you everyone.

8                         * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

60

1       I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                           _____

6                                       Shari Riemer

7   Dated:   February 22, 2014