IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

JOHN WILEY & SONS, INC., et al.,

      Plaintiffs,                        Case No. 1:13-CV-00816-WHP-GWG

         v.                          Judge William H. Pauley, III

BOOK DOG BOOKS, LLC, et al.,        Magistrate Judge Gabriel W. Gorenstein

      Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, Defendant Book Dog Books, LLC seeks full summary judgment on Counts 4 and 8 and partial summary judgment on Counts 1,2, 3, 5, and 6 of Plaintiffs' ~~first~~ second amended complaint. A notice of this motion, a statement of facts for which Defendants contend there is no genuine issue to be tried, this supporting memorandum of law, and supporting affidavits are all being filed contemporaneously and to support the motion.

Respectfully submitted,

s/ Tiffany C. Miller
Tiffany C. Miller (Ohio 0072881)
Bailey Cavalieri LLC
One Columbus
10 West Broad Street, 21st Floor
Columbus, Ohio  43215-3422
Telephone:  (614) 229-3211
Telefax:  (614) 221-0479
tiffany.miller@baileycavalieri.com

Janice Berkowitz (JB-4489)
Ahmuty, Demers & McManus
200 I U Willets Road

1

Albertson, NY 11507-2200
Telephone: (516) 535-1887
Telefax: (516) 294-5387
janice.berkowitz@admlaw.com

Neil B. Mooney (NM0300)
The Mooney Law Firm, LLC
1911 Capital Circle N.E.
Tallahassee, FL 32308
Telephone: (850) 893-0670
Telefax: (850) 391-4228
nmooney@customscourt.com

Attorneys for Defendants

<u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................... 4

II.  STATEMENT OF INDISPUTABLE FACTS ........................................... 6

III. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE FOR THIS CASE ...... 17

IV. APPLICABLE LAW ............................................................................... 19

   A.   Copyright Infringement..................................................................... 19

   B.   Trademark Infringement, Counterfeiting, and Dilution ............................. 20

   C.   Illegal Importation of Counterfeit Goods.............................................. 21

   D.   Conspiracy to Commit Fraud ............................................................. 21

V.  ARGUMENT ....................................................................................... 23

   A.   Plaintiffs cannot establish copyright or trademark infringement on 124 of the titles at issue because they cannot evidence any specific counterfeit copy was distributed by Defendants. ........................................................................ 23

      1.   As to 49 of the titles, Plaintiff's only evidence is having viewed copies in Defendants' possession that Defendants quarantined specifically to make sure those were NOT distributed. ........................................................................ 24

      2.   As to 41 of the titles, Plaintiffs acquired counterfeit evidence from third parties who cannot confirm whether those copies came from Defendants. ........ 25

      3.   As to 28 of the titles, Plaintiffs' rely on a combination of unsold quarantined copies within Defendants' possession and copies surrendered from suppliers who cannot verify the source.......................................................................... 26

      4.   For 6 titles, there is no counterfeit copy at all. .......................................... 26

      5.   A note about the remaining 16 titles. ...................................................... 26

   B.   Conspiracy to commit fraud claim fails because there is no predicate fraud claim pleaded and Plaintiffs admit they have no evidence of collusion. ............... 27

VI. CONCLUSION...................................................................................... 28

3

I.    <u>INTRODUCTION</u>

This case involves multiple counts of copyright and trademark infringement (Counts 1 through 6). These counts are iterated under varying federal statutes but all boil down to one thing—the allegation that Defendants purportedly violated a copyright or trademark right held by Plaintiffs by *distributing* some counterfeit copy if a copyrighted book title.

Plaintiffs do not allege any creation, production, or manufacturing of infringing materials.

The works at issue are all college-level textbooks. Plaintiffs are publishers of these works.

Defendant Book Dog Books, LLC ("BDB") is a retail buyer and seller of college-level textbooks, and Defendant Philip Smyres is BDB's owner and CEO. BDB purchases textbooks on the open market from retail and wholesale suppliers and online buyback of used books (primarily from college students). BDB then rents and resells those books online, primarily to college students looking to buy used books at reduced prices.

Plaintiffs commenced this action with infringement allegations on multiple textbook titles and some protected trademarks appearing in some of those titles. As this case evolved and discovery progressed, Plaintiffs continuously altered the list of titles at issue, adding and subtracting titles as they went.

Today, discovery is closed and the list of titles at issue is final. Plaintiffs have recently filed a second amended complaint that provides the final lists of copyrighted titles and trademarks at issue.

There are 140 titles at issue for purposes of the copyright infringement claims. Those 140 titles are listed in Exhibit A to Plaintiffs' second amended complaint (Docket No. 263-1.)[1] There are 11 trademarks at issue, listed in Exhibit B to the second amended complaint.

To summarize the evidence Plaintiffs intend to use to try to prove copyright and trademark infringement, Plaintiffs created a document they call their "roadmap." According to Plaintiffs, this "roadmap" summarizes all evidence that Plaintiffs have to attempt to prove their infringement claims. On June 10, 2015, Plaintiffs produced a final "Revised Roadmap" to update Plaintiffs' listing of their potential evidence. (Miller Decl. Ex. B.)[2] [3]

Plaintiffs' purported evidence for 124 out of those 140 titles is insufficient and faulty, which is confirmed by the Revised Roadmap. According to the Revised Roadmap, for 124 of those titles, Plaintiffs do not possess *any* evidence to prove Defendants actually distributed an infringing copy of that work. Rather, Plaintiffs' case for 124 of the titles is based on nothing more than a speculation that

---

[1] Exhibit A to the second amended complaint lists the titles at issue by numbering them 1 through 133. However, for a few of the listed titles, there are multiple editions of the same title that Plaintiffs are bringing into issue. Thus, although the list is numbered 1 through 133, the number of works at issue is actually 140.

[2] The Declaration of Tiffany C. Miller, counsel of record for Defendants, is filed herewith.

[3] By citing the Revised Roadmap herein, Defendants do not concede that the Revised Roadmap, in and of itself, constitutes proper evidence of anything. It is merely a *summary* of potential trial evidence that Plaintiffs might present at trial. To the extent the Revised Roadmap does purport to list certain trial evidence Plaintiffs might present on each title, it is useful to help the Court discard claims, given that the Court may use it to confirm that Plaintiffs do not have *any* evidence in hand (according to their own "roadmap") to positively prove any single instance of an infringing distribution for at least 124 out of the 140 titles at issue.

Defendants *might* have distributed an infringing copy (even though Plaintiffs cannot prove Defendants actually did so).

Success on the copyright and trademark infringement claims will require evidence of an actual and definite distribution of an infringing copy—that is, bringing to trial an infringing copy, proving it is indeed counterfeit, and proving Defendants distributed/sold that particular counterfeit copy. Plaintiffs' Revised Roadmap concedes they do not possess that type of evidence (after two years of discovery) for at least 124 of the titles. Because trial evidence will necessarily require Plaintiffs to present title-by-title evidence of infringement, it would be a waste of the Court's and jury's time to allow Plaintiffs to proceed on those 124 titles for which Plaintiffs already concede they cannot meet their burden of proof to show a specific counterfeit distribution by Defendants. The Court should summarily adjudicate claims on those 124 titles and limit the trial issues to the remaining 16 titles.

Also, Plaintiff Pearson Education asserts a conspiracy to commit fraud claim. However, Pearson and its representatives concede they have no evidence to support that claim—only unsubstantiated suspicions. That is not enough to proceed to trial and so the Court should also eliminate that claim on summary judgment.

## II.   STATEMENT OF INDISPUTABLE FACTS

1. Defendant Book Dog Books, LLC ("BDB") is a buyer and seller of educational books, including textbooks published by Plaintiffs. (Second Am. Compl. ¶ 2 (Docket No. 263, "Compl.") BDB has also conducted business under the trade name "Textbooksrus.com" (sometimes referred to as "TRU"). (*Id.* ¶ 13.)

2.   Defendant Philip Smyres is the CEO and managing member of BDB. (Compl. ¶ 14.)

3.   This action was initiated on Feb. 4, 2013 (Docket No. 1) with an amended complaint filed on April 24, 2013 (Docket No. 16) alleging nine causes of action, primarily in the realm of copyright and trademark infringement related to college-level textbook titles published by Plaintiffs. A second amended complaint ("complaint") was filed on May 27, 2015 (Docket No. 263), reducing the case to eight causes of action.

4.   Plaintiffs' complaint contains a "conspiracy to commit fraud" count (Count 8) by which Pearson alleges Defendants fraudulently conspired with "third parties" to purchase and sell in the United States copies of Pearson titles (although not identifying what titles were supposedly involved in this "conspiracy") that Pearson contends were not meant to be sold in the United States. (Compl. ¶¶103–109.)

5.   Defendants answered the complaint on June 10, 2015 (Docket No. 264) wherein all material allegations were denied.

6.   Plaintiffs' complaint alleges various counts (Counts 1 thru 6) all premised on allegations that certain titles to which Plaintiffs hold copyrights and trademark rights were wrongly imported, distributed, offered for sale, sold, marketed, or advertised in violation of either copyright laws or trademark laws by Defendants. (Compl. ¶¶ 62–96.)

7.   During this action, Plaintiffs' counsel represented that Plaintiffs would create and produce a "roadmap" listing all information and evidence upon which Plaintiffs

rely to support their copyright and trademark infringement claims. (2/13/2014 Hearing Tr. at 40–46 (Docket No. 85); 2/25/2014 Hearing Tr. at 38 (Docket No. 98); Miller Decl. ¶¶ 5,6, Ex. B.)

8.  Plaintiffs' initial "roadmap" was produced on November 25, 2014. The Roadmap at that time listed 118 titles upon which Plaintiffs premise their copyright and trademark claims. (*Id.*)

9.  On June 10, 2015, Plaintiffs produced a "Revised Roadmap," pages 1 through 185, adding more titles at issue in this case (now totaling 140 titles). (*Id.* Ex. B.)

10. The Revised Roadmap lists, for each of the 140 titles, all evidence Plaintiffs have supposedly collected and would present at trial to try to prove infringement for each title. The listing of physical evidence for each title can be found under the heading "Source of Counterfeit Exemplar" on each of the roadmap pages. (*Id.*[4]; Cengage Depo. at 15–16; Pearson Depo. at 7–8.)[5]

11. On November 14, 2014 and May 7, 2015, Defendants inspected the physical specimens of books Plaintiffs represent they will use as evidence to support their claims. Plaintiffs' counsel have represented that all copies of "counterfeit exemplars" that Plaintiffs' possess and that are listed in the Revised Roadmap, were provided at these inspections. (Miller Decl. ¶ 11.)

---

[4] This is highlighted on the first page of the Revised Roadmap (Miller Decl. Ex. B, first title listed). Each of the 140 titles listed in the Revised Roadmap includes a similar category, "Source of Counterfeit Exemplar," reflecting the nature of physical evidence upon which Plaintiffs rely.

[5] Defendants incorporate herein their filing indexing all deposition transcript pages cited herein. Copies of *complete* deposition transcripts have not been filed of record because most depositions in this action contain multiple portions designated as Confidential or Highly Confidential. However, the pages being filed as cited herein are not designated for confidentiality.

12. A numbered list of the 140 titles at issue can be found at Exhibit A to the complaint (Docket No. 263-1). The Revised Roadmap was not created in the same order as Exhibit A to the complaint. For ease of explanation, the Revised Roadmap pages have been reorganized and numbered (handwritten numbers in lower right-hand corner) to correlate identically to the numbered list of titles that are Exhibit A to the complaint.

13. The Revised Roadmap confirms that, for 124 of the 140 titles, Plaintiffs do not have evidence of any counterfeit book copy that was distributed by Defendants. (Miller Decl. Ex. B.)

14. The Revised Roadmap states that, for 49 of the 140 titles, Plaintiffs' only purported "evidence" to support their infringement claims is that they viewed, during discovery, unsold copies of those 49 titles removed from inventory and being held in quarantine by BDB because BDB had set them aside to not be distributed. These are all copies that BDB purposefully took out of circulation—not to ever be distributed. (*Id.* Exs. B, C.)

15. To the extent the Revised Roadmap references "Inspection of Defs' Inventory," this is a reference strictly to book copies that BDB removed from inventory and that BDB did not sell or distribute. (Glass Depo. at 210–14, 222; Garry Depo. at 134–9.) To this day, those books remain quarantined and out of circulation.

16. During their investigation of sources of counterfeits, each of Pearson and Cengage convinced certain book suppliers/wholesalers to voluntarily "surrender"

large batches of books within those suppliers' possession. (Garry Depo. at 159; Pearson Depo. at 49, 60–8; Cengage Depo. at 45–8; Tichenor Depo. at 202–203.) Pearson and Cengage provided various suppliers with lists of titles for which Pearson and Cengage were experiencing counterfeit problems. Four suppliers, including MBS Book Exchange ("MBS"), Follett Corporation, Texas Book Company, and Mark Blackerby, surrendered to Pearson and Cengage copies of certain titles about which Pearson and Cengage were concerned.  A fifth supplier, Tichenor College Textbook Co., allowed Plaintiffs (along with other publishers not involved in this case) to come to the Tichenor warehouse to inspect copies of certain titles requested. Following that inspection, Tichenor surrendered to Plaintiffs some copies of some of the titles inspected, which are identified as Tichenor Exemplars in the Revised Roadmap. (Tichenor Depo. at 147–148.)

17.  For multiple titles appearing in the Revised Roadmap, the Revised Roadmap indicates the only evidence of infringement is books Plaintiffs acquired from third-party suppliers during this "surrender" process. (Miller Decl. Ex. B, C.)[6]  These are all suppliers from which BDB bought and sold books (MBS, Follett, Texas Book, and Tichenor) or from which BDB purchased books and made unsold returns (Blackerby). (*Id.*)

18.  For those batches of books (as listed in the Revised Roadmap) that Follett, Texas Book, Tichenor, and Blackerby turned over to Plaintiffs, using those books as the only evidence of counterfeit distribution presents a fatal evidentiary problem.

---

[6] For 41 of the titles at issue, Plaintiffs' on physical evidence is some copy the title turned over to Plaintiffs by one of these five suppliers/wholesalers (not a copy distributed by Defendants and not even a copy found in Defendants' possession). (Miller Decl. Ex. B.)

These supposed exemplar counterfeit books came directly from these suppliers' inventory. All of these suppliers confirm that they cannot identify their source of any particular book copy. Because of this, Plaintiffs and the suppliers have no way of knowing whether any book came to the supplier from BDB or someone else. Specifically:

a.     Follett Corporation confirms that, for counterfeit books it found in its inventory and turned over to Plaintiffs, Follett "couldn't say one way or other whether or not it came from the defendants." Follett is "not sure" what shipments to Plaintiffs would have included books sourced from Defendants, and books Follett bought from Defendants and others were not tracked, separated, or isolated in any fashion (thus, there is no way to tell the source of any particular book copy). (Dalpe Depo. at 213–14, 264.)[7]

b.     Texas Book Company confirms that, when it purchases books from companies like BDB, it does not track the source of each book copy. Texas Book states it is commonplace to purchase multiple copies of the same title from different sources and not record which copy came from which source. When Texas Book buys multiple copies of the same title from different sources, it has no way of distinguishing which copy came from which source. For counterfeit books Texas Book turned over to Plaintiffs, it provided no way

---

[7] Michael Dalpe appeared for deposition on Nov. 12, 2013 in response to a deposition subpoena. He is vice president of course material sourcing for Follett Corporation.

for Plaintiffs to distinguish the originating source of each book. (Texas Book Depo. at 26–27.)[8]

c.    Except for three titles for which Tichenor only ever had one source (not Defendants), Tichenor confirms that it cannot confirm the source of any particular book copy (when the books are incoming from more than one source). Tichenor does not track, in its inventory, which copies of a title come from which source. For all but three titles that Tichenor surrendered to Plaintiffs, there is no way for Plaintiff to distinguish or know where Tichenor sourced that particular book copy. (Tichenor Depo. at 203.)[9] For the three titles for which Tichenor only has one source, that source is not Defendants. (*Id.* 203–204.) In other words, Plaintiffs' only "evidence" for titles relying on Tichenor exemplars is that Plaintiffs' found some copies within Tichenor's possession that Tichenor sources from some purported unreliable source (*not* Defendants).

d.    Mr. Mark Blackerby confirms that any books Defendants bought from him and then subsequently returned to him (or his company, LifeEverest) (because Defendants questioned their authenticity), Blackerby resold all the returned copies elsewhere prior to surrendering any books to Plaintiffs. Hence, no book tying back to Defendants would be included within the

---

[8] Mr. Thomas Steele was produced for deposition on Nov. 21, 2014 in response to a subpoena directed to Texas Book Company to produce a representative under Rule 30(b)(6). Mr. Steele is chief financial officer for Texas Book.

[9] Mr. Tim Tichenor was produced for deposition on June 3, 2015 in response to a subpoena directed to Tichenor to produce a representative under Rule 30(b)(6). Mr. Tichenor is the president, CEO, and co-owner of Tichenor.

counterfeit books Blackerby surrendered to Plaintiffs. (Blackerby Depo. at 78–81, 136–7.)[10]

19. For copies of books MBS turned over to Plaintiffs, MBS confirms its inventory is kept in a comingled fashion and it cannot determine whether copies surrendered to Plaintiffs came from BDB or someone else. (Lon Daniel Depo. at 85, 105, 126–7.)[11]  At certain times, MBS placed stickers on books bearing a receiving number associated with its source of that book. MBS maintained a seven-page list of receiving numbers it used for books purchased from Defendants. (*Id.* at 58, Ex. 3.) Plaintiffs produced for inspection the counterfeit exemplars in its Revised Roadmap and not one of those books bears a MBS receiving number associated with Defendants. (Miller Decl. ¶ 12; Daniel Depo. Ex. 3.)

20. For 19 titles, Plaintiffs rely strictly on counterfeit exemplars turned over to it by MBS to purportedly evidence the concept that Defendants distributed a counterfeit book to MBS. (Miller Decl. Ex. 9–12.) Several other titles rely on evidence that is a combination of MBS surrendered books plus books in Defendants' unsold quarantine set. (*Id.*)

21. Out of the titles in Exhibit A to the complaint (and in the Revised Roadmap), MBS turned over to Plaintiffs many thousands of book copies beyond anything BDB ever received.  (Miller Decl. ¶ 12, Ex. D.)  According to MBS, there is no way to

---

[10] Mr. Blackerby was produced for deposition on Aug. 22, 2013. Mr. Blackerby is the owner of LifeEverest, LLC and brother/former business affiliate of Perry Blackerby.

[11] Mr. Lon David Daniel was produced for deposition on Nov. 19, 2014 in response to a subpoena directed to MBS Textbook Exchange to produce a representative pursuant to Rule 30(b)(6). Mr. Daniel is inventory control manager for MBS.

determine the source of the MBS exemplars upon which Plaintiffs purport to rely as exemplar evidence of infringement. (Lon Daniel Depo. at 85, 105, 126–7.)

22. At the Rule 30(b)(6) deposition of Plaintiff Pearson Education,[12] Pearson confirmed that the "Source of Counterfeit Exemplar" category in the Roadmap is meant to identify all physical evidence Pearson has in support of its infringement claim for each title. (Pearson Depo. at 10.)

23. Pearson concedes that, for those counterfeit books that suppliers surrendered to Pearson, Pearson has no way of telling whether Defendants or someone else distributed a particular book copy. (Pearson Depo. at 48.) Pearson does not refute that BDB sold legitimate copies of the titles. (*Id.* at 51–4.) Pearson confirms that at least some of the surrendered books it received were authentic. (*Id.* at 58–9.) Pearson concedes that no book provided to it by Blackerby was initially sourced from BDB. (*Id.* at 65.)

24. At the Rule 30(b)(6) deposition of Cengage Learning, Inc.,[13] Cengage confirmed that the roadmap information, particularly the exemplars listed, reflects its belief (or what Cengage views as a "likelihood") that Defendants may have distributed a counterfeit copy of that title. (Cengage Depo. at 25.) Cengage confirms that, if a roadmap title does not indicate Cengage acquired the exemplar book through a "test purchase" or has a TRU/UBX sticker on it, that means Cengage has no physical sample of a counterfeit book it can link to Defendants. (*Id.* 35–8.)

---

[12] Pearson's Rule 30(b)(6) deposition was taken on June 11, 2014. Mr. John R. Garry was presented by Pearson as their designated representative and testified about the Roadmap.

[13] Cengage's Rule 30(b)(6) deposition was taken on June 12, 2014. Mr. William A. Sampson was presented by Cengage as their designated representative and testified about the Roadmap.

25. Cengage confirms that, for books surrendered to it, it has no way to "pick up a book" and figure out where it came from (unless there is a company sticker on it). (*Id.* at 48.)

26. At the Rule 30(b)(6) deposition of Plaintiff John Wiley & Sons, Inc., its representative confirmed that, as to *its* titles in the Roadmap, Wiley has no physical evidence to support its infringement claims. Wiley's infringement claims are based on a "guess" that Defendants sold counterfeit copies. (Wiley Depo. at 17–18.)[14] Wiley has no information Defendants ever sold a counterfeit copy of its listed titles. (*Id.* at 21.)

27. For 28 of the titles at issues, the roadmap evidence/exemplars listed include a combination of exemplars found in BDB's quarantine inventory and books surrendered by those four outside suppliers (as explained above), but no other evidence. (Miller Decl. Exs. B, C.)

28. There are 16 titles for which Defendants do *not* seek summary judgment, although they will challenge the veracity of claims on those titles at trial. These are titles for which Plaintiffs have produced some physical specimen of a book bearing a sticker on it suggesting it *may* have once been sold by BDB (8 books) or retail test-purchase exemplars that Plaintiffs claim to have purchased directly from BDB 8 books). (*Id.*)

29. Pearson has no evidence that Defendants have engaged in the business of importing. (Pearson Depo. at 108–109; Essig Depo. at 39–40.)

---

[14] An individual deposition of Lisa Suarez, senior inventory manager for John Wiley & Sons, Inc., was taken on Nov. 8, 2013. A Rule 30(b)(6) deposition of Wiley, for which Ms. Suarez was presented as that company's representative, was taken on July 18, 2014.

30. Wiley does not contend that Defendants have engaged in wrongful activities in connection with importing. (Suarez Depo. at 47.)

31. Cengage has no evidence that Defendants have engaged in the business of importing. (Cengage Depo. at 6–7.)

32. Pearson has no evidence that Defendants conspired with Philomath, *or communicated with Philomath at all* prior to Philomath contracting with Pearson to buy books meant for overseas sales, or arranged for Philomath to violate its contract with Pearson. (Pearson Depo. at 98–100; LaVacca Depo. at 88–9.) Pearson's fraud claim is premised entirely on its understanding that BDB purchased books from a "foreign reseller" and Pearson's assumption that Defendants should have known of contract restrictions between Pearson and the reseller. (Garry Depo. at 70–2.) But Pearson has no evidence that Defendants solicited any foreign reseller to break its restriction agreements with Pearson.

33. The alleged co-conspirator related to Pearson's conspiracy to commit fraud claim (Count 8) is Philomath Co. Ltd. (Compl. ¶ 55.) Mr. Thomas Cahill was the purchasing agent who negotiated, on behalf of BDB, to purchase books from Philomath and who had all communications leading up to those purchases. Mr. Cahill confirms he never knew what contract arrangements Philomath (or Mr. Sunsiri, its owner) had with Pearson. (Cahill Depo. part 1 at 205, 221–2.) Mr. Cahill confirms he merely negotiated alongside other competitors for the lowest price possible to buy books from Philomath, he felt that Philomath was trying to negotiate a higher cost on the books, and that the negotiation occurred with Mr.

Cahill not knowing anything about any contract restrictions between Philomath and Pearson. (*Id.* at 207–208, 213–14.)

34. BDB's business largely involves purchasing and resale of used college textbooks from college students and academics, using online portals to buy and sell those books. This typically involves the purchase and sale of single copies of books or a few books at a time. (Smyres Decl. ¶ 8.)

35. BDB has a strict practice and protocol of inspecting and evaluating every book incoming to its possession for potential counterfeit qualities. BDB trains its staff to inspect all incoming books. The inspection process includes hands-on review and inspection of every book, whether new or used, that comes to BDB through the online student buy-back process and other purchase means. BDB staff is trained to identify suspicious book qualities. As BDB learns more about how to identify counterfeit qualities, BDB updates and evolves its training and inspections processes. (*Id.* ¶ 10.)

III.   PARTIAL SUMMARY JUDGMENT IS APPROPRIATE FOR THIS CASE

This Court and the Second Circuit have recognized that summary judgment, used properly, is a "vital procedural tool to avoid wasteful trials." *Capital Imaging Assocs., P. C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 541 (2d Cir. 1993), *Ayala v. Bellevue Hosp.*, 1999 U.S. Dist. LEXIS 12982, at *5 (SDNY Aug. 19, 1999).

Although the Court is to resolve ambiguities and draw reasonable inferences in favor of the non-moving party, "the moving party is not required to affirmatively disprove unsupported assertions." *Id.* at *4. If the moving party meets its burden,

the burden shifts to the nonmoving party to offer "specific facts showing that there is a genuine issue for trial." *Id.*; Fed. R. Civ. P. 56(e).

"[T]o withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the non-movant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–9 (1986).

If the evidence for the nonmoving party is a mere scintilla or "not significantly probative," the court may grant summary judgment. *Id.* at 248.

Disputes over irrelevant facts will not preclude summary judgment. *Id.* The goal is to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–4 (1986).

Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996); *Alpha Media Works, Inc. v. Perception Research Servs.*, 2012 U.S. Dist. LEXIS 16493, 11–12 (SDNY Feb. 9, 2012).

Plaintiffs claim copyright and trademark infringement on 140 titles (works) by Defendants allegedly distributing one or more counterfeit copies of each work. However, for 124 of those works, Plaintiffs have no evidence to prove Defendants distributed any counterfeit copy. It would be wasteful to spend time on 124 work for which Plaintiffs have not evidence of any counterfeit copy distributed by Defendants.

IV.   APPLICABLE LAW

    A.   Copyright Infringement

Count 1 of the first amended complaint alleges copyright infringement under 17 USC §§ 101 et seq.

"To establish infringement of copyright, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010). "The word copying is shorthand for the infringing of any of the copyright owner's five exclusive rights" enumerated in 17 U.S.C. § 106. *Id.* Those rights include the rights to display, perform publicly, reproduce, *distribute*, and prepare derivative works of the copyrighted material. *See* 17 U.S.C. § 106; *Pearson Educ., Inc. v. Ishayev*, 9 F. Supp. 3d 328, 335 (SDNY 2014).

  A copyright infringement claimant must prove 1) which specific original works are the subject of the copyright claim, 2) that the claimant owns the copyrights in those works, 3) that the copyrights have been registered under the statute, and 4) by what acts during what time the defendant infringed the copyright. *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (SDNY 1992).

The acknowledged absence of evidence to prove the fourth element—that is, what were the infringing acts by Defendants and at what time—should give rise to summary judgment on 124 of the titles. Plaintiffs allege their copyrights were infringed by Defendants distributing counterfeit versions of Plaintiffs' copyrighted works. Yet, for 124 of those titles, Plaintiffs have failed to produce or list any evidence by which they might prove that Defendants distributed a counterfeit copy.

B.    <u>Trademark Infringement, Counterfeiting, and Dilution</u>

Counts 2, 3, 5, and 6 allege violation of Plaintiffs' trademark rights under chapter 15 of the United States Code.

To prevail on any claim of trademark infringement, Plaintiffs must show they own a valid trademark and that the Defendants' "use" of the trademark is likely to cause confusion regarding the source of the product. *Tanning Research Labs., Inc. v. Worldwide Imp. & Exp. Corp.*, 803 F. Supp. 606, 608-09 (E.D.N.Y. 1992); *see also* 15 U.S.C. § 1114(1)(a) (prohibiting the unauthorized use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive").

To prevail on a claim of false designation of origin, Plaintiffs must establish that 1) the trade dress is distinctive; 2) there is a likelihood of confusion between the parties' products; and 3) the trade dress is not functional. 15 U.S.C. § 1125(a)(3); *Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*, 2014 U.S. Dist. LEXIS 112274, 5-6 (EDNY Aug. 5, 2014).

Plaintiffs' trademark claims are based strictly on the theory that, because Defendants allegedly re-sold/distributed copies of counterfeit books, that trademarks and labels on those books purporting to be marks owned by Plaintiffs are also counterfeit and false. Plaintiffs' copyright and trademark claims are in tandem, based on the purported distribution of  some counterfeit copy of Plaintiffs' protected works.

Thus, all the trademark claims likewise comes back to whether Plaintiffs can evidence Defendants distributed a counterfeit copy of one of the works at issue.

C.    Illegal Importation of Counterfeit Goods

Count 4 is brought under 15 USC § 1124 and 19 USC § 1526, alleging that Defendants knowingly imported counterfeit copies of books.

This claim is distinctive from the others insomuch as no private cause is available to Plaintiffs under these statutes. "15 USC § 1124 does not itself provide a remedy to the holders of infringed trademarks." *Akhenaten v. Najee*, 544 F. Supp. 2d 320, 325 (SDNY 2008).[15]

Also, 19 USC § 1526 provides only for civil penalties assessed by the United States Customs Service. 19 USC § 1526(f).  That statute provides for the possibility of regulatory fines, but not for a private cause of action.

D.    Conspiracy to Commit Fraud

Count 8 alleges a conspiracy to commit fraud. There is no *direct* fraud claim stated. Also, the other persons whom Plaintiff suggest were a part of this so-called conspiracy are not parties to this action.

New York recognizes a cause of action for conspiracy to commit fraud. *See, e.g., Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 451 n. 97 (SDNY 2012) (citing *Brackett v. Griswold*, 112 N.Y. 454, 466, 20 N.E. 376, 379 (1889)). The elements of the claim include: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties'

---

[15] In *Akhenaten*, this Court recognized that several courts have interpreted 15 USC §§ 1116 and 1117 as creating a private cause of action under 15 USC § 1124.  However, there are no claims in this case asserted under those statutes.

intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Abu Dhabi*, 888 F. Supp. 2d at 451 n. 97.

*However*, "[u]nder New York law, civil conspiracy to commit fraud, standing alone, is not actionable . . . if the underlying independent tort has not been adequately pleaded." *Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 482 (EDNY 1998), aff'd, 205 F.3d 1327 (2d Cir. 2000); *Guru Kripa Foods, Inc. v. Inter, Inc.*, No. 10-CV-0229, 2012 U.S. Dist. LEXIS 113187, 2012 WL 3306520, at *9 (EDNY Aug. 10, 2012) (finding conspiracy to commit fraud claim was not cognizable because no fraud claim was alleged) (citing *Thyroff v. Nationwide Mut. Ins. Co.*, 57 A.D.3d 1433, 1435, 870 N.Y.S.2d 666, 669 (4th Dep't 2008) ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action.")); *Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-CV-3291, 10-CV-3354, 2012 U.S. Dist. LEXIS 55284, 2012 WL 1372260, at *23–24 (EDNY Apr. 18, 2012) (collecting cases).

Here, Plaintiffs have not alleged a direct fraud claim against Defendants, which is fatal to the conspiracy claim. *Ainbinder v. Money Ctr. Fin. Group, Inc.*, 2014 U.S. Dist. LEXIS 9864, 22–24 (EDNY Jan. 2, 2014). It is impossible for Plaintiffs to pursue a "conspiracy to commit fraud" claim when they assert no fraud claim.

V.   <u>ARGUMENT</u>

    A.   <u>Plaintiffs cannot establish copyright or trademark infringement on 124 of the titles at issue because they cannot evidence any specific counterfeit copy was distributed by Defendants.</u>

Counts 1, 2, 3, 5, and 6 allege that Defendants violated Plaintiffs' copyrights and trademark rights by distributing some specific counterfeit copy of the 140 titles at issue.

Plaintiffs cannot succeed, even minimally, in proving a violation of either its copyrights or trademark rights under the listed statutes unless each can come to trial and lay the following minimal evidentiary foundation:

(1) Produce for the jury's view each counterfeit copy;

(2) Demonstrate ownership of a copyright or trademark for that title;

(3) Establish that the copy is indeed a counterfeit; and

(4) Establish that Defendants themselves either produced or distributed that counterfeit copy.

 As confirmed by the complaint, Plaintiffs do not allege Defendants were involved in the creation, production, or manufacture of protected works. Therefore, this case relates strictly to the question of distribution.

There are 140 protected works at issue. At trial, Plaintiffs must present a counterfeit copy of each work (or circumstantial evidence of someone who claims to have seen some counterfeit copy distributed by Defendants) and prove that

Defendants distributed that particular counterfeit copy (and when).[16] However, discovery has revealed Plaintiffs cannot make that proof on 124 titles.

1. *As to 49 of the titles, Plaintiff's only evidence is having viewed copies in Defendants' possession that Defendants quarantined specifically to make sure those were NOT distributed.*

Of the 140 titles at issue, Plaintiffs' Revised Roadmap confirms the only basis for including 49 of those titles is because Plaintiffs viewed a counterfeit copy when they inspected Defendants' unsold quarantined books. (Miller Decl. Ex. B.)

As has been established, Defendants set aside and quarantined numerous book copies that were suspect, some based on concerns of potential counterfeit issues.  These are book copies that Defendants purchased or acquired, but then did *not* distribute.

Plaintiffs' only evidence for these 49 titles is copies of books still within Defendants' possession that were not distributed. (*Id.*)

Discovery is closed and, for these 49 titles, Plaintiffs can do no better than to point out that Defendants pulled suspected copies of these 49 titles out of circulation and did not distribute them.

Plaintiffs have no evidence of distribution on these 49 titles. Plaintiffs' claims on those 49 titles are restricted instead to total speculation—that is, Plaintiffs postulate that, because Defendants acquired counterfeit copies, even though they did not sell them, that a jury still might presume that other unidentified counterfeit copies were sold at other times. This is not only pure speculation, it is confirmation

---

[16] There is a three-year statute of limitations on copyright infringement claims, so evidence of the date of the alleged infringing act is critical. *Flo & Eddie, Inc. v. Sirius XM Radio*, 105 U.S. Dist. LEXIS 6101, at *12 (SDNY Jan. 15, 2015).

of non-evidence. It is a mere theory, which is too speculative to allow the claims to move past the summary judgment phase. These speculations provide no proof of a counterfeit copy, when it was distributed, or who distributed it. Plaintiffs' claim for these 49 titles is nothing more than a "guess" that some other counterfeit copy may have, at one time, been sold.

Because there is no genuine question of material fact (that is, Plaintiffs admittedly cannot evidence a counterfeit copy distributed by Defendants) on these 49 titles, the Court should issue summary judgment on those 49 titles.

2. *As to 41 of the titles, Plaintiffs acquired counterfeit evidence from third parties who cannot confirm whether those copies came from Defendants.*

Out of the 140 titles at issue, Plaintiffs' Revised Roadmap reveals their evidence for 41 of those titles is strictly counterfeit exemplars surrendered to Plaintiffs by third-party suppliers. (Miller Decl. Ex. B, C.)

The five wholesalers/suppliers listed on the Revised Roadmap for this purpose are Follett, MBS, Texas Book, Tichenor, and Mark Blackerby. As cited in the Statement of Facts, at depositions of these five suppliers, they all confirmed that, for the books they surrendered to Plaintiffs, they did not keep track of and there is no way to confirm which copies of those surrendered books were sourced from where or whom.

In other words, Plaintiffs received batches of books from these suppliers with no information to connect any particular copy to Defendants. For these 41 titles, Plaintiffs plan to present evidence of just "some" counterfeit copy that Plaintiffs received from these suppliers. But Plaintiffs have no way of proving if Defendants

were that supplier's source of the book. And books found in these non-party suppliers' possession that came from elsewhere are irrelevant. Once again, the entirety of Plaintiffs' claim for these 41 titles is sheer speculation and no actual evidence.

3. *As to 28 of the titles, Plaintiffs' rely on a combination of unsold quarantined copies within Defendants' possession and copies surrendered from suppliers who cannot verify the source.*

For another 28 of the titles, Plaintiffs' exemplar evidence is a combination of exemplars viewed within Defendants' unsold quarantined books and books surrendered by third-party suppliers who did not keep track of where they sourced those copies. As stated in the above sections one and two, Plaintiffs cannot prove Defendants distributed the counterfeit exemplars being used as evidence for these 28 books, and so summary judgment is appropriate.

4. *For 6 titles, there is no counterfeit copy at all.*

The Revised Roadmap confirms that, for 6 titles brought into issue, Plaintiffs have no evidence at all (no counterfeit exemplar) to prove infringement claims. Therefore, summary judgment is appropriate on these 6 titles. (Miller Decl. Ex. B, C.)

5. *A note about the remaining 16 titles.*

For the remaining 16 titles at issue, under the summary judgment standard of law, Defendants do not believe it would be appropriate or in good faith to request summary judgment. However, Defendants here note for the Court that, for the 16 titles remaining at issue for trial, none came to Defendants from what Plaintiffs view as "suspect" sources of counterfeits (Best Book World, Pli, or Blackerby).

Fifteen of those are books sourced from student buy-backs. These are used, worn books that are difficult to distinguish as potentially counterfeit. Just one title (Title 94) was sourced from Tichenor, a highly reliable U.S. textbook supplier in Indiana that has been in business for more than 50 years (Tichenor Depo. at 9) with a sterling reputation. Tichenor continues to question whether that one title was indeed counterfeit. (*Id.* at 101–103.)

Even if Plaintiffs can meet their burden of showing these few books are counterfeits (and the dates they were distributed), the circumstances of how the books were acquired by BDB will significantly challenge Plaintiffs' concept of any willful distribution of counterfeits.

> B.   Conspiracy to commit fraud claim fails because there is no predicate fraud claim pleaded and Plaintiffs admit they have no evidence of collusion.

Count 8 is the conspiracy to commit fraud claim. As stated under the above cited law, a conspiracy to commit fraud claim fails when there is no underlying direct fraud claim pleaded. Here, no direct fraud claim was pleaded. The Court can dispose of the fraud claim on that basis alone.

This claim is asserted only by Pearson (and not the other two Plaintiffs). Pearson alleges Defendants conspired and colluded with an overseas supplier (Philomath) to have Philomath convince Pearson to sell it books at reduced prices, restricted to overseas sales, but intending to violate that restriction and sell them to Defendants within the United States.

As listed in the Statement of Facts, Pearson has no information or evidence to prove Defendants had any contact with Philomath in connection with

Philomath's contract arrangements with Pearson. The evidence is undisputed that Defendants knew nothing about sales restrictions agreed to as between Philomath and Pearson. Pearson has identified nothing by which it might evidence communications or interactions between Defendants and Philomath at a time with Philomath was negotiating its agreements with Pearson. Mere speculation is not enough, and so summary judgment is proper on the conspiracy claim.

VI.   <u>CONCLUSION</u>

Attached as Exhibit C to the Miller Declaration is a chart indicating those works for which Defendants seek summary judgment, indicating the categories/reasons as argued above.

There is no genuine issue of material fact on 124 of these titles—Plaintiffs have revealed the evidence they intend to rely on to prove infringement on those titles. That so-called "evidence" (the "counterfeit exemplars" listed for each title in the Revised Roadmap) confirms Plaintiffs do not have proof of a counterfeit copy distributed by Defendants.

The conspiracy claim should be eliminated for admitted lack of evidence and for lack of a predicate fraud claim. Finally, summary judgment should be issued on Count 4 (illegal importation) because no private cause of action exists to Plaintiffs as that claim is stated.

28

Respectfully submitted,

s/ Tiffany C. Miller
Tiffany C. Miller (Ohio 0072881)
Bailey Cavalieri LLC
One Columbus
10 West Broad Street, 21st Floor
Columbus, Ohio  43215-3422
Telephone:  (614) 229-3211
Telefax:  (614) 221-0479
tiffany.miller@baileycavalieri.com

Janice Berkowitz (JB-4489)
Ahmuty, Demers & McManus
200 I U Willets Road
Albertson, NY 11507-2200
Telephone: (516) 535-1887
Telefax: (516) 294-5387
janice.berkowitz@admlaw.com

Neil B. Mooney (NM0300)
The Mooney Law Firm, LLC
1911 Capital Circle N.E.
Tallahassee, FL 32308
Telephone: (850) 893-0670
Telefax: (850) 391-4228
nmooney@customscourt.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify the foregoing supporting memorandum of law was served upon

Plaintiffs by transmitting a copy of it to and through the Court's ECF system on

June 15, 2015, which will send an NEF to Plaintiffs' counsel of record, who are

listed as recipients for NEFs in this action.

s/ Tiffany C. Miller
Tiffany C. Miller (Ohio 0072881)