UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WILEY & SONS, INC., CENGAGE LEARNING, INC., and PEARSON EDUCATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BOOK DOG BOOKS, LLC and PHILIP SMYRES, <br><br> Defendants. | Case No. 1:13-cv-00816 (WHP) (GWG) <br><br> Judge William H. Pauley III <br><br> Magistrate Judge Gabriel W. Gorenstein |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' NEW MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

I.    SUMMARY OF DEFENDANTS' NEW FILINGS .......................................................... 3

II.   DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT IS AS BASELESS AS THEIR FIRST MOTION FOR SUMMARY JUDGMENT. .................... 4

    A. Defendants' Legal Standard is (Still) Wrong.......................................................... 5

    B. Defendants Distort (Again) the Facts in the Case....................................................6

        i. The 16 works for which Defendants do not seek summary judgment.........8

        ii. The 49 titles for which Defendants claim Plaintiffs' "only evidence" is they were found in Defendants' possession during inspection.................. 10

        iii. The 69 titles that were surrendered by third party suppliers and found in Defendants' possession.................................................................................11

        iv. The six titles for which there is no counterfeit exemplar............................13

    C. Defendants' Arguments As to Plaintiffs' Claims for Conspiracy to Commit Fraud and the Illegal Importation of Counterfeit Goods are Without Merit .................... 13

    D. The Court Should Disregard Significant Portions of the Miller Declaration ........14

CONCLUSION...............................................................................................................................16

Plaintiffs hereby submit this supplemental memorandum of law in response to Defendants' new Motion for Partial Summary Judgment (ECF Nos. 265-271).  Pursuant to the Court's instructions, Plaintiffs do not file an entirely new memorandum but rather simply supplement their prior filings.  (ECF Nos. 239-242).[1]

## PRELIMINARY STATEMENT

By seeking only partial summary judgment with respect to Plaintiffs' copyright and trademark claims, Defendants do not dispute that they have distributed counterfeit textbooks. Instead, Defendants merely argue over the number of different titles they have infringed.  As to that question, Defendants' new motion for partial summary judgment suffers from the same fatal infirmities as their prior motion for partial summary judgment.  Legally, the new motion rests upon a glaringly incorrect statement of the law.  Factually, the motion ignores or mischaracterizes the mountain of evidence against them in this case.

Defendants maintain that Plaintiffs cannot prevail in showing infringement of a particular title unless Plaintiffs appear at trial armed with a counterfeit copy of the copyrighted book and unequivocal, direct proof that Defendants distributed such copy.  *See* Memorandum in Support of Defendants' [Second] Motion for Partial Summary Judgment (ECF No. 270) (Defendants' Second MPSJ") at 6.  But Defendants had no support for such unprecedented position in their initial motion and have none for it in their new motion.  In actuality, neither copyright law nor

---

[1] Plaintiffs adopt and incorporate by reference their prior Memorandum in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Plaintiffs' Initial Opposition")  (ECF No. 239) and the Declaration of Julie C. Chen filed therewith (ECF No. 241).  At the same time, Plaintiffs submit herewith a new Rule 56.1 Statement and Counterstatement to Defendants' Statement of Undisputed Facts ("Plaintiffs' New 56.1 Statement") and a Supplemental Declaration of Julie C. Chen ("Chen Supp. Decl.").  Plaintiffs prepared their New 56.1 Statement because Defendants' new Motion for Partial Summary Judgment renumbers the original titles at issue and because there are additional titles as well as facts associated with those new titles.

1

the rules of evidence demand such stringent proof.  In relying upon a wrong standard of law, Defendants' arguments as to why Plaintiffs failed to meet that standard are a fool's errand.

The facts overwhelmingly show that Defendants have continued to import and distribute counterfeit textbooks after promising in a settlement agreement not to do so anymore.  In attacking Plaintiffs' evidence, Defendants conveniently ignore everything other than the counterfeit exemplars offered by Plaintiffs.  Among other things, Defendants ignore:  (i) their own internal emails where they identify books as counterfeit; (ii) that they purchased books from known counterfeit suppliers; (iii) that they had counterfeit books in their inventory – that were examples of what they had already sold; (iv) that they destroyed a large number of counterfeit books on the eve of being sued; and (v) that distributors turned over to Plaintiffs counterfeit textbooks that the distributors believed they obtained from Defendants.  (Plaintiffs' Initial Opposition at 2-7).   Defendants claim that none of the distributors could say definitively that they obtained the counterfeits from Defendants.  But, as set forth in detail in Plaintiffs' New Rule 56.1 Statement, that is simply not an accurate statement of the testimony from these distributors.  Having said that, "definitive" proof is not required  -- the actual standard is a preponderance of the evidence.

In their new motion, Defendants offer no explanation for why, almost two years into this litigation, they were caught distributing 22 new counterfeit titles.  Defendants purchased thousands of counterfeit books that originated from a company in Jordan named Morena and were sold into the United States to a distributor named Tichenor College Textbook Company ("Tichenor").  Despite allegedly having put into place a litany of controls to prevent the purchase and distribution of counterfeit books, Defendants did not catch a single one of these counterfeit Morena books.  Plaintiffs bought counterfeit copies of these titles directly from Defendants.

Plaintiffs found other counterfeit copies sitting in Defendants' inventory, ready to be sold. Plaintiffs even obtained counterfeit copies from individuals that purchased them from Defendants. Notwithstanding all of this overwhelming evidence, Defendants, astoundingly, still dispute that they distributed counterfeit books from Morena.

In addition, Defendants' new motion wholly fails to address Plaintiffs' pending Motion for Sanctions for the Spoliation of Evidence (ECF No. 168), which describes Defendants' systematic evidence destruction program. Defendants deliberately destroyed large quantities of counterfeit books while conveniently not keeping records of what they destroyed. Having engaged in such conduct, Defendants must not be allowed to argue there is a lack of evidence.

## I. SUMMARY OF DEFENDANTS' NEW FILINGS

On April 24, 2013, Plaintiffs' filed a First Amended Complaint ("FAC") (ECF No. 16) containing nine counts—seven related to copyright and trademark infringement and counterfeiting, the Eighth for breach of contract and the Ninth for conspiracy to commit fraud. While Exhibit A to the FAC listed 79 works at issue, Plaintiffs added to and amended the works at issue based on information obtained through discovery. As a result, at the time Defendants filed their first Motion for Partial Summary Judgment ("Defendants' First MPSJ") (ECF No. 207) on January 26, 2015, there were 118 works at issue. Defendants' First MPSJ moved for full summary judgment on Count 5 (Illegal Importation of Counterfeit Goods) and Count 9 (Conspiracy to Commit Fraud) and partial summary judgment on Counts 1, 2, 3, 4, 6 and 7 with respect to 105 of the 118 works at issue.

In January 2015, however, Plaintiffs discovered that Defendants were still continuing to sell counterfeit textbooks. As a result, the Court permitted Plaintiffs to reopen discovery to determine the extent and scope of that infringement (ECF No. 217). That discovery ultimately

3

revealed that Defendants had distributed 22 additional counterfeit works, which they had obtained from a different source, Morena, through Tichenor, a U.S. distributor.  At Defendants' request and with leave of the Court, on May 27, 2015, Plaintiffs filed a Second Amended Complaint ("SAC") to set forth the final number of works at issue.  (ECF No. 263).  Plaintiffs' SAC identified in Exhibit A the final list of works at issue, consisting of 133 titles.  Since some titles had more than one edition at issue, there was a total of 140 works at issue (the original 118 plus the newly-identified 22 works).   The SAC also eliminated the Fourth claim for relief (Trafficking in Counterfeit Documentation or Labels Under 18 U.S.C. § 2318) and renumbered the remaining counts.

On June 15, 2015, Defendants filed their Second MPSJ, with a new Local Rule 56.1 Statement of Facts for Which Defendants Contend There is no Dispute, a new Declaration of Tiffany C. Miller, Esq. in place of the previously filed Declaration of Neil Mooney, Esq., and the Declaration of Philip Smyres previously submitted.   (ECF Nos. 265-271).  In Defendants' Second MPSJ, Defendants discuss the counterfeit Morena books purchased from Tichenor and allocate the 22 new works among the various "categories" into which they had previously divided Plaintiffs' evidence.  Notably, Defendants do not seek summary judgment for three of the 22 new works, recognizing that the evidence of their distribution of these counterfeit books cannot be contested.  Defendants' Second MPSJ is identical to their First MPSJ, only it adds 19 additional works for which Defendants seek summary judgment.

## II. DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT IS AS BASELESS AS THEIR FIRST MOTION FOR SUMMARY JUDGMENT.

Defendants' Second MPSJ contains the same infirmities and flaws as their First MPSJ; as such, Plaintiffs respectfully refer the Court in the first instance to Plaintiffs' Initial Opposition (ECF No. 239) in response to Defendants' Second MPSJ.  This Supplemental Opposition

addresses the new material contained in Defendants' Second MPSJ. Defendants' arguments with respect to the new works and the evidence that supports those works must similarly be rejected.

### A. Defendants' Legal Standard is (Still) Wrong.

Like their First MPSJ, Defendants continue to apply an invented standard for proving copyright infringement. According to Defendants, that standard will require evidence consisting of "bringing to trial an infringing copy, proving it is indeed counterfeit, and proving Defendants distributed/sold that particular counterfeit copy." Defendants' Second MPSJ at 6. Defendants' standard, however, is not the law, and could never be the law. As Plaintiffs set forth in their Initial Opposition, copyright infringement is proven time and time again with circumstantial evidence, and there is no requirement (and no case law cited by Defendants that so requires) that a plaintiff have the actual counterfeit work in hand. (*See* Plaintiffs' Initial Opposition at 8-11). In fact, because piracy typically happens behind closed doors, it is imperative that courts consider circumstantial evidence. *Id.*

Defendants' Second MPSJ attempts to address Plaintiffs' overwhelming circumstantial evidence of infringement by creating out of whole cloth yet another legal standard that exists nowhere in the law. Now they say that the circumstantial evidence must be "of someone who claims to have seen some counterfeit copy distributed by Defendants." (Defendants' Second MPSJ at 23). Not surprisingly, Defendants have again cited no law to support this fictitious standard. Defendants have no answer to the overwhelming direct and circumstantial evidence upon which a jury will very likely find that Defendants not only distributed counterfeit copies of the works at issue, but did so willfully.

Defendants seek to portray themselves as an upstanding business and owner who were inadvertently caught with isolated copies of counterfeit textbooks, but which they almost never

distributed. The evidence, however, paints a very different picture. Defendants buy books at the lowest possible cost, exercising absolutely no care to determine if the books are legitimate. Indeed, the evidence demonstrates that Defendants knew that they were dealing with illegitimate sources. Plaintiffs' Initial Opposition at 3-4. Among the sources from which Defendants purchased books were sellers with a history of selling counterfeit books. *Id.* On numerous occasions, Defendants' own customers discovered that Defendants sold them counterfeit books. This includes one of the largest wholesalers in the nation, Follett, which ultimately terminated Defendants' accounts because of the counterfeits. *Id.* at 5-7. Defendants themselves identified numerous counterfeits and either returned or destroyed them, deliberately failing to keep any records of the quantities, titles or of the suppliers who provided those books. *Id.* The evidence shows that, even during the course of this ongoing litigation, Defendants exercised no meaningful controls to avoid purchasing and selling additional counterfeits. *Id.* at 7. Under the prevailing case law, such circumstantial evidence will not only defeat Defendants' motion for summary judgment, it well may be sufficient to award summary judgment in favor of Plaintiffs. *See id.* at 9-11.

    **B.**     **Defendants Distort (Again) The Facts in the Case.**

In addition to misstating the legal standard to be applied, Defendants grossly distort the facts in this case. In their Second MPSJ, as in their First MPSJ, Defendants slotted each of the works into certain evidentiary categories they created. These categories, as described in Exhibit C to the Miller Declaration,[2] are ill conceived and do not accurately describe the evidence

---

[2] As set forth in Section II.D *infra*, Exhibit C, as well as other significant portions of the Miller Declaration, and any statements of "fact" contained in Defendants' New Rule 56.1 Statement that rely on those portions of the Miller Declaration, should be disregarded by the Court in considering Defendants' Second MPSJ. They are not based on personal knowledge, are unreliable and, as such, do not constitute admissible evidence.

6

collected regarding each of the titles at issue in the case.

In the First MPSJ, Defendants stated that they were not contesting summary judgment on 13 of the 118 works at issue;[3] that number has increased in the Second MPSJ to 16. For the remaining 124 (originally 105) titles, Defendants argue that Plaintiffs cannot prove that Defendants distributed those works. Within these 124 works, Defendants claim that for 49 of those titles,[4] Plaintiffs' "only evidence" is they were found in Defendants' possession during inspection. As Defendants argue, there can be no distribution because, based solely on the fact that they were found in Defendants' possession, *ipso facto*, they were never distributed. This number has not changed. Second MPSJ at 15. For 41 titles[5] (originally 23 titles), Defendants claim that Plaintiffs' "only" proof is that the counterfeit exemplars were obtained from third parties who cannot confirm whether those copies came from Defendants. *Id.* at 25-26. For another 28 titles[6] (originally 27), Defendants claim that Plaintiffs' "only" proof is a combination of having found copies in Defendants' possession during inspection and having copies surrendered from third parties, who cannot confirm their source. *Id.* at 26. For the remaining

---

[3] Those original 13 titles were, based on Defendants' original numbering of the works, Titles 3, 13, 16, 28, 32, 47, 66, 79, 85, 91, 92, 101 and 108. Under the new numbering adopted by Defendants, the 13 works are Titles 3, 13, 15, 22, 76, 89, 38, 44, 54, 118, 120, 8, and 128. For the Court's reference, Plaintiffs have prepared a chart that converts the Title numbers from Defendants' First MPSJ to the corresponding Titles in Defendants' Second MPSJ. That conversion chart is attached to the Chen Supplemental Declaration as Exhibit 1.

[4] New Titles 1, 2, 5, 7, 10c, 14, 19, 23, 34, 39a, 41, 43a, 45, 49, 52, 56, 59, 60, 62, 64, 66, 73, 77, 78, 79, 80, 81, 86, 88, 92, 93a, 93b, 97, 98, 99, 101, 102, 103, 106, 107, 108, 109, 112, 117, 122, 125a, 125b, 127, 133b.

[5] New Titles 10b, 11, 12, 16, 17, 21, 25, 26, 28, 39b, 40, 42, 46, 47, 48, 55, 57, 63, 65, 67, 69, 71, 72, 74, 75, 83, 85, 87, 90, 95, 100, 104, 110, 111, 115, 116, 119, 121, 123, 129, 132.

[6] New Titles 4, 6, 9, 13, 18, 24, 27, 29, 30, 31, 32, 33, 35, 36, 37, 43b, 51, 53, 58, 61, 68, 70, 82, 84, 91, 96, 114, 126.

six works, Defendants claim that because Plaintiffs have not provided any counterfeit exemplar, there *is* therefore no proof. *Id*. Defendants' sole focus on where Plaintiffs' counterfeit exemplars came from, however, not only distorts the evidence relating to those exemplars, but also wholly ignores the plethora of other evidence, as set forth in Plaintiffs' Revised Roadmap and in Plaintiffs' New Rule 56.1 Statement, that evidences Defendants' sale of the counterfeit works at issue.

        i.     **The 16 Works For Which Defendants Do Not Seek Summary Judgment**

In Defendants' First MPSJ, Defendants admitted that there are 13 works for which they could not seek summary judgment in good faith. Defendants' First MSPJ at 27. In the Second MPSJ, Defendants have added three additional works to the 13 that Defendants do not contest on summary judgment, Titles 94, 113 and 124. (Defendants' Second MPSJ at 26-27). As set forth in Plaintiffs' New 56.1 Statement ¶¶ 31, 38, these three works were purchased directly from Defendants in December 2014 or provided to Plaintiffs by Defendants' retail customers. All in all, the evidence that Defendants distributed these 16 works is conclusive.[7]

By not moving for summary judgment on these 16 works, Defendants hope to avoid having such direct evidence cast doubt on Defendants' arguments with respect to the remaining 124 titles. For instance, and as more fully set forth below, Defendants claim that the discovery of a counterfeit book in their possession does not mean that they sold other copies of that title, and suggests that is due to their "strict practice and protocol" of inspecting "every" book for counterfeit qualities. (Defendants' Second MPSJ at 17). Evidence, however, that Defendants

---

[7] Within the last week, Plaintiffs have obtained another book (Title 90) from one of Defendants' online customers and confirmed that the book is counterfeit. (*See* Chen Supp. Decl. ¶ 17). Applying the apparent criteria used by Defendants, there should be now 17 titles for which Defendants cannot in good faith seek summary judgment.

have continued to sell counterfeit books *throughout* the course of this litigation, to Plaintiffs as well as to others, demonstrates that Defendants' supposed effort to quarantine books is less than efficacious. Similarly, evidence of counterfeit books containing Defendants' own stickers that were found among the inventory turned over by Defendants' customers undermines their argument that the source of those surrendered books was not Defendants. (Plaintiffs' New 56.1 Statement ¶¶ 25-26). Indeed, it is highly probative evidence that the surrendered books were ultimately sourced from Defendants.

Even as they refuse to discuss in this motion the direct evidence of infringement against them, what little Defendants "note" about those titles is nevertheless highly inaccurate. For example, Defendants claim that 15 of the 16 titles were sourced from "student buy-backs." (Defendants' Second MPSJ at 27). Defendants, however, provide no citations to any evidence in the record to support that statement. Indeed, that statement and the statement that "none" of the 16 works were obtained by Defendants' from "suspect sources" (*Id.* at 26) are contradicted by the evidence, which shows that seven of those 16 titles were sourced from Best Books World ("BBW") or the Blackerbys, two known suppliers of counterfeit books. (Plaintiffs' New 56.1 Statement ¶ P33). Moreover, Defendants are hard pressed to make such a claim when they have admitted that their own records from BBW are incomplete. (Plaintiffs' Initial Opposition. at 15; Plaintiffs' New 56.1 Statement ¶ 46). Additionally, Defendants mischaracterize the record by asserting that one of the titles came from Tichenor, which "continues to question whether that one title was indeed counterfeit." (Defendants' Second MPSJ at 27). In the quoted deposition transcript, Tichenor's representative states only that he remained "hopeful" that Morena, its Middle-Eastern supplier, could still come up with publishers' invoices to prove the legitimacy of the books. Indeed, Tichenor acknowledged that neither it nor Morena were "experts" when it

came to counterfeits. (Tichenor Depo at 102). On the other hand, Defendants have provided no evidence that could dispute Plaintiffs' own expert's findings that all counterfeit exemplars listed in the Revised Roadmap, including the 16 works obtained directly from Defendants, are counterfeit. (Chen Supp. Decl. ¶ 5).

        ii.    **The 49 titles for which Defendants claim that Plaintiffs' "only evidence" is they were found in Defendants' possession during inspection.**

Defendants' arguments regarding 49 titles having no evidence other than a counterfeit copy being found in Defendants' possession has not changed; the argument still suffers from a massive factual infirmity. The evidence shows that Defendants sourced many of these titles from known counterfeit suppliers in large quantities. The evidence also shows that Defendants sold multiple, sometimes thousands of, copies of these titles. (Plaintiffs' Initial Opposition at 17-18). The underlying assumption in Defendants' argument is that they have a foolproof method of inspecting and catching every counterfeit book that they receive. Given Defendants' self-described inability to identify counterfeits, this assumption is laughable. (Plaintiffs' Initial Opposition at 7). This is especially so when, despite these professed procedures, Defendants have time and time again sold counterfeit books to the Publishers, to other distributors and to retail customers at large. *See supra* Section II.B.i. Moreover, even with respect to Defendants' claim that the particular counterfeit textbooks that were found within their possession are "still within Defendants' possession [and] were not distributed," Defendants cannot provide any factual support from the record for that statement. (Defendants' Second MPSJ at 24). Rather, as set forth in Plaintiffs' Initial Opposition, Defendants failed to maintain records of rentals, returns or buybacks. (Plaintiffs' Initial Opposition at 15; Plaintiffs' New 56.1 Statement ¶ 47). Thus, there is no reason to believe that just because a counterfeit book was found in Defendants'

10

possession that such particular copy had never been rented, sold, or otherwise distributed by Defendants. In light of the evidence, a jury will easily conclude that the opposite is true.

### iii. The 69 titles that were surrendered by third party suppliers and found in Defendants' possession.

Defendants claim that they are entitled to summary judgment for 69 of the 140 works (originally 50 of the 105 works) at issue because they were surrendered to Plaintiffs by "third party suppliers" "who cannot confirm whether those copies came from Defendants." (Defendants' Second MPSJ at 25). These 69 works include those 41 works for which Defendants claim that copies were only surrendered by third parties and the 28 works for which counterfeit copies were both found in Defendants' possession and surrendered by the third-parties. *Id.* at 25-26. As Defendants put it, "Plaintiffs received batches of books from these suppliers *with no information* to connect any particular copy to Defendants." *Id.* (emphasis added). Defendants' claim that there is "no information" to connect these counterfeits to Defendants is demonstrably false.

As set forth in Plaintiffs' Initial Opposition, the source of the counterfeit exemplars is but one piece of a set of evidence described in the Revised Roadmap, which Defendants wholly ignore. That evidence includes sales, purchase and surrender documents, all identified in the Revised Roadmap, from both Defendants and their customers, that show a temporal progression from the time Defendants purchased their inventory from a suspect supplier like BBW or the Blackerbys, to their sale of those books to their customers, Follett, Missouri Book Service ("MBS"), and Texas Books, to their customers' surrender of those books to Plaintiffs. (Plaintiffs' Initial Opposition at 18-19). A jury will easily conclude from those records that Defendants' books were part of the inventory surrendered by Defendants' customers to Plaintiffs, a conclusion held by both Follett and MBS who surrendered the bulk of the exemplars

11

at issue.  (*Id.* at 19; see also Plaintiffs' New Rule 56.1 Statement ¶¶ 20-24).

In this grouping of 69 titles, Defendants also misrepresent the evidence with respect to counterfeit exemplars obtained from the Blackerbys and from the new source, Tichenor.  As explained in Plaintiffs' Initial Opposition, Plaintiffs do not claim that the counterfeit exemplars were returned by Defendants to the Blackerbys.  Defendants' Second MPSJ at 12-13.  Rather, the Blackerbys' remaining inventory of counterfeit books is representative of what was sold to Defendants who, in turn, distributed them.  (Plaintiffs' Initial Opposition at 20).

The same applies to the newly added 19 works (falling within this category) that Defendants purchased from Tichenor.  Defendants state that Tichenor testified that, "there is no way for Plaintiff [sic] to distinguish or know where Tichenor sourced that particular book copy," although the source was "not Defendants."  (Second MPSJ at 12).  Defendants' argument totally misses the mark.  Plaintiffs do not argue that Defendants were the source of the counterfeit books found in Tichenor's inventory.  Rather, because Tichenor was a *supplier* of counterfeit books *to* Defendants, the counterfeit inventory found within Tichenor's possession is representative of what Tichenor sold to Defendants.  The copies of the two titles found during Plaintiffs' inspection of Defendants' remaining Tichenor inventory, along with the copies of the three Tichenor titles that Defendants do not contest, each bear the same markings and counterfeit characteristics as those found in Tichenor's supply of Morena books.  Chen Supp. Decl. ¶ 18.  Moreover, by examining the purchase and sales records produced by Tichenor and Defendants, Tichenor confirmed at its deposition that, as a matter of plain mathematics, it can be determined that 19 of the 22 new works at issue are books that Tichenor sourced from Morena and then sold to Defendants.  Chen Supp. Decl. ¶ 15.  For the remaining three works, there is a high likelihood that Morena was the source of the copies sold to Defendants.  Thus, a jury could easily conclude

that all of the books purchased by Defendants from Tichenor were counterfeit books sourced from Morena like the ones found in Tichenor's inventory. And because Defendants no longer had those books in their own inventory, a jury could also easily conclude that Defendants had sold counterfeit copies of those 22 titles. Chen Supp. Decl. ¶ 14.

As stated in Plaintiffs' Initial Opposition and above, and as set forth on a work-by-work basis in Plaintiffs' New Rule 56.1 Statement, while Defendants repeatedly claim that the sourcing of the counterfeit exemplars is Plaintiffs' "only" evidence, that claim is simply not true. There is a plethora of evidence linking the counterfeit exemplars to Defendants' distribution of those works.

### iv.   The six titles for which there is no counterfeit exemplar.

Consistent with Defendants' erroneous standard of law, they claim that they are entitled to summary judgment on six titles for which there is no counterfeit exemplar. Neither this argument nor the number of works under this category has changed from Defendants' First MPSJ. As set forth in Plaintiffs' Initial Opposition and in Plaintiffs' New Rule 56.1 Statement, Defendants themselves identified these works to be counterfeit and returned them to BBW. Having imported, and then returned fewer books than they bought from BBW, Defendants' distribution of these counterfeit works is indisputable. (Plaintiffs' Initial Opposition at 21-22; Plaintiffs' New 56.1 Statement ¶ 39).

### C.   Defendants' Arguments As to Plaintiffs' Claims for Conspiracy to Commit Fraud and the Illegal Importation of Counterfeit Goods Are Without Merit.

Defendants have asserted no new arguments or facts with respect to their motion for summary judgment as to Plaintiffs' Claims for Conspiracy to Commit Fraud (Count 8) or for the Illegal Importation of Counterfeit Goods (Count 4). Defendants' Second MPSJ at 21, 27-28. As such, Plaintiffs respectfully refer the Court to their Initial Opposition that describes Plaintiffs'

allegations and evidence of fraud and Defendants' conspiracy therewith, and the well-established law providing a private cause of action for the illegal importation of counterfeit goods. (Plaintiffs' Initial Opposition at 22-25).

### D. The Court Should Disregard Significant Portions of the Miller Declaration.

Plaintiffs do not at this point renew their Motion to Strike (*see* ECF No. 224). Plaintiffs, however, object to the citations by Defendants in their brief and Second Rule 56.1 Statement to paragraphs 9, 10 and 12 and Exhibits B, C and D of the Miller Declaration as "evidence" of fact. Plaintiffs request that the Court disregard those portions of the Miller Declaration. Evidence submitted in support of a motion for summary judgment must be admissible evidence and not contain legal argument.

First, the Miller Declaration makes factual assertions concerning data produced by MBS in response to a subpoena. (Miller Decl. ¶¶ 9, 10, Ex. D). But the Miller Declaration fails to identify what that data is, or where it was produced or shared with Plaintiffs. The Miller Declaration also fails to refer to any testimony from MBS that would authenticate or otherwise explain the data.

Second, Defendants cite to Exhibit B of the Miller's Declaration as support for their factual statements or to demonstrate Plaintiffs' purported lack of evidence. Yet, Exhibit B consists only of Plaintiffs' 185-page Revised Roadmap (as renumbered and reorganized by Defendants) that summarizes the evidence pertaining to each specific work at issue. Since the Revised Roadmap was compiled by Plaintiffs, Defendants are without personal knowledge to opine on what the contents represent. In addition, Defendants' claim that the Revised Roadmap is exhaustive is plainly inaccurate. *See supra* at 10-14.

14

Third, Exhibit C of the Miller Declaration, where Defendants assign the works at issue into various categories of evidence allegedly relied upon by Plaintiffs, constitutes argument, not evidence, and is not even reliable. Exhibit C is also rife with errors. For example, titles appear in more than one category (*e.g.,* Titles 7 and 60); titles are misclassified (copies of Title 100, for example, were both turned over by third party suppliers and found in Defendants' inventory); and the titles listed within a category do not add up to the numbers specified in that category (*e.g.*, in the third category of "Books From Supplier Turnovers (No Connection to BDB)," while Defendants note "(41 total)," there are actually 49 titles listed in this section). Equally unreliable is that the Exhibit C categories imply that the source of the counterfeit exemplars is the only evidence associated with the 140 works at issue, when in actuality the Revised Roadmap lays out, and cites to, extensive evidence linking the sale of those counterfeit works to Defendants.

Finally*,* Defendants' citations to Exhibits B and C are highly improper because they fail to specify what within those Exhibits is supportive of their factual assertions. Paragraph 13 of Defendants' New Rule 56.1 Statement, for example, states, "The Revised Roadmap confirms that, for 124 of the 140 titles, Plaintiffs do not have evidence of any counterfeit book copy that was distributed by Defendants." As support for that broad and conclusory statement of "fact," Defendants cite to "Miller Decl. Ex B," *i.e. the entire Revised Roadmap itself.* Plaintiffs (and the Court) are left to guess at for which 124 titles Defendants make this claim and what within the 185-page Revised Roadmap will support their assertion.

In short, the Miller Declaration, like the Declaration of Neil Mooney, Esq. that preceded it, contains numerous statements and exhibits that are not admissible evidence or are otherwise unreliable. Defendants' use of paragraphs 9, 10, and 12 and Exhibits B, C, and D of the Miller Declaration to support their New Rule 56.1 Statement should be disregarded by the Court.

**CONCLUSION**

      For the reasons set forth above, Defendants' new Motion for partial summary judgment should be denied in its entirety.

Dated:  June 29, 2015

Respectfully submitted,

OPPENHEIM + ZEBRAK, LLP

By:   /s/ *Matthew J. Oppenheim*
Matthew J. Oppenheim
Julie C. Chen
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Avenue NW, Suite 503
Washington, DC 20015
(202) 480.2999 Telephone
matt@oandzlaw.com
julie@oandzlaw.com

*Counsel for Plaintiffs*