UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN WILEY & SONS, INC. et al.,                    :

                                                   :

                              Plaintiffs,          :        REPORT AND
                                                            RECOMMENDATION
                                                   :
              -v.-
                                                   :        13 Civ. 816 (WHP) (GWG)
BOOK DOG BOOKS, LLC et al.,

                                                   :

                              Defendants.          :
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiffs John Wiley & Sons, Inc. ("Wiley"), Cengage Learning, Inc. ("Cengage"), and

Pearson Education, Inc. ("Pearson") filed suit against Book Dog Books, LLC ("BDB") and

Philip Smyres, its owner and chief executive officer, alleging various claims primarily related to

copyright and trademark infringement.  Defendants have filed a motion for partial summary

judgment.[1]  For the reasons stated below, defendants' motion should be granted in part and

---

        [1]  See Motion for Partial Summary Judgment by Defendants, filed June 15, 2015 (Docket
# 266) ("Def. Mot."); Statements of Facts for Which Defendants Contend There is No Genuine
Issue to Be Tried, filed June 15, 2015 (Docket # 267) ("Def. 56.1"); Declaration of Philip
Smyres in Support of Defendants' Motion for Partial Summary Judgment, filed June 15, 2015
(Docket # 268) ("Smyres Decl."); Declaration of Tiffany C. Miller, filed June 15, 2015 (Docket
# 269) ("Miller Decl."); Notice of Filing Deposition Transcript Pages in Support of Defendants'
Motion for Partial Summary Judgment, filed June 15, 2015 (Docket # 271) ("Dep. Trans.");
Memorandum in Support of Defendants' Motion for Partial Summary Judgment, filed June 22,
2015 (Docket # 272) ("Def. Mem."); Plaintiffs' Supplemental Memorandum in Opposition to
Defendants' New Motion for Partial Summary Judgment, filed June 29, 2015 (Docket # 276)
("Pl. Supp. Mem."); Supplemental Declaration of Julie C. Chen, filed June 29, 2015 (Docket
# 277) ("Supp. Chen Decl."); Plaintiffs' New Local Rule 56.1 Counter-Statement of Undisputed
Facts and Response to Defendants' New Statement of Facts for Which Defendants Contend
There is No Genuine Issue to Be Tried, filed June 29, 2015 (Docket # 278) ("Pl. 56.1");
Plaintiffs' Response to Defs' New 56.1 Statement (annexed to Pl. 56.1 at 13-52) ("Pl. 56.1
Resp."); Reply Brief in Support of Defendants' Motion for Partial Summary Judgment, filed July

1

denied in part.

I.      BACKGROUND

    A.      Facts

Unless otherwise stated, the following facts are either not in dispute or reflect plaintiffs'

version of the facts as supported by admissible evidence.

       1.      The Parties

BDB is a buyer and seller of educational books, including textbooks that are published by

plaintiffs.  Def. 56.1 ¶ 1; Second Amended Complaint, filed May 27, 2015 (Docket # 263)

("SAC"), ¶ 2.  BDB's business includes the purchasing and reselling of used college textbooks

from college students and academics.  Smyres Decl. ¶ 8.  BDB has previously conducted

business under the trade names UBX Book Exchange, Buckeye Books, TextbooksRUs.com

("TRU"), and Textbooksrush.com.  Id. ¶ 4.  Smyres is the founder, chief executive officer, and

"Managing Member" of BDB.  Id. ¶ 3.

       2.      The "Roadmap"

During this action, plaintiffs created a document that they refer to as a "Roadmap" that

gives information on each of 133 titles that are the subject of this action.  Supp. Chen Decl. ¶ 3.

---

13, 2015 (Docket # 282) ("Def. Reply").

    Plaintiffs' opposition papers have incorporated by reference their prior filings in
opposition to defendants' previous motion for partial summary judgment.  See Memorandum in
Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment, filed
Mar. 9, 2015 (Docket # 239) ("Pl. Mem."); Declaration of Richard P. Essig, filed Mar. 9, 2015
(Docket # 240) ("Essig Decl."); Declaration of Julie C. Chen, filed Mar. 9, 2015 (Docket # 241)
("Chen Decl.").

The list totals 140 "works" because some of the titles appear in more than one edition.[2]  The

Roadmap consists of a "compilation and summary, pursuant to Rule 1006 of the Federal Rules of

Evidence, of the evidence . . . that was produced by Defendants and third-parties."  Chen Decl.

¶ 14; see also id. ¶¶ 5-7 (describing the evidence produced to plaintiffs by defendants and third

parties).  The Roadmap lists, for each work and to the extent known, identifying information

about the book (such as title, author, ISBN, and publisher), whether any counterfeit exemplars of

that work either were discovered at defendants' premises or were obtained from third parties, the

source of any such counterfeit exemplars, the suppliers to defendants of the work where known,

and information about the sales of that work.  Defendants do not contest the accuracy of the

summary of evidence contained in the Roadmap.  See generally Def. 56.1 ¶ 10; Miller Decl. ¶ 6.

Accordingly, we cite to the Roadmap as admissible evidence.

    Only 124 works are at issue in this motion because defendants are not seeking summary

---

[2]  In addition to the Roadmap, a numbered list of the 133 titles and 140 works at issue is
also annexed as Exhibit A to the Second Amended Complaint.  See List of Plaintiffs'
Copyrighted Works Infringed (annexed as Ex. A to SAC).  The Roadmap created by plaintiffs is
not in the same order as the list annexed to the Second Amended Complaint.  Def. 56.1 ¶ 12.
Defendants have reordered the Roadmap produced by plaintiffs so that it corresponds with the
list annexed to the Second Amended Complaint.  Miller Decl. ¶ 6.  Citations to the "Roadmap"
and "Roadmap Nos." herein refer to the 140 works as contained in defendants' reorganized
Roadmap.  See the "Revised Roadmap" (annexed as Ex. B to Miller Decl.).  Additionally,
plaintiffs have provided a chart of the 140 works in the Roadmap in numerical order and, for
each work that was cited in defendants' initial motion for summary judgment, each work's
number as cited in the parties' original briefing.  See Title Number Conversion Chart -
Defendants' Second Motion for PSJ to Defendants' First Motion for PSJ (annexed as Ex. 1 to
Supp. Chen Decl.) ("Conversion Chart").

    The Roadmap was first produced to defendants on April 24, 2015, and it was
supplemented on June 10, 2015.  Supp. Chen Decl. ¶ 3.  The counterfeit exemplars listed in the
Roadmap were made available to defendants over the course of three inspections — on October
22, 2013, November 14, 2014, and May 7, 2015.  Id. ¶ 4.  Legitimate exemplars were provided
to defendants for inspection at the November 14, 2014 and May 7, 2015 inspections.  Id.

judgment as to 16 of the works contained in the Roadmap: Nos. 3, 8, 15, 22, 38, 44, 54, 76, 89, 94, 113, 118, 120, 124, 128, and 130.[3]

3. <u>Prior Litigation</u>

In 2007, plaintiffs and other publishers sued defendants asserting various claims, including copyright and trademark claims relating to the importation and distribution of counterfeit textbooks.  <u>See</u> Complaint, filed Oct. 2, 2007 (Docket # 1 in <u>Cengage Learning Inc. et al. v. Buckeye Books et al.</u>, No. 07 Civ. 8540 (S.D.N.Y.)), ¶¶ 98-185.  The case was settled pursuant to a July 11, 2008 settlement agreement in which, among other things, defendants agreed to disclose the suppliers of counterfeit books and to not infringe again.  <u>See</u> Settlement Agreement and Mutual Releases, dated July 11, 2008 (annexed as Ex. 2 to Declaration of Julie C. Chen in Support of Plaintiffs' Motion for Sanctions, filed Nov. 5, 2014 (Docket # 170)),

---

 [3]  While defendants have not specifically identified the 16 works included in the Roadmap for which they are not seeking summary judgment, they can be deduced based on information contained in the parties' filings.  In their previously-filed summary judgment papers, defendants identified 13 works for which they were not seeking summary judgment: Roadmap Nos. 3, 13, 16, 28, 32, 47, 66, 79, 85, 91, 92, 101, and 108.  <u>See</u> Statement of Facts for Which Defendants Contend There is No Genuine Issue to Be Tried, filed Jan. 26, 2015 (Docket # 208), ¶ 27.  The new numbers are available from the Conversion Chart and are included in the list above, with one exception.  Although defendants previously stated they were not moving for summary judgment on Roadmap No. 13 — which corresponds to Roadmap No. 13 in the new motion, <u>see</u> Conversion Chart — it appears that defendants are in fact moving for summary judgment as to this work.  We reach this conclusion because it is included in defendants' list of 124 works for which they are moving for summary judgment.  <u>See</u> Ex. C to Miller Decl. (identifying, by Roadmap No., the 124 works for which defendants seek summary judgment, including Roadmap No. 13).  Accordingly, the Court will construe defendants' motion as including Roadmap No. 13.

 In addition to the twelve titles identified in the previous paragraph, we have identified four other works — identified in the current Roadmap as Nos. 94, 113, 124, and 130 — that are not included in defendants' list of works for which they are moving for summary judgment.  <u>See</u> Miller Decl. ¶¶ 7-8 & Ex. C (identifying by Roadmap number the 124 works for which defendants seek summary judgment).  Accordingly, the Court assumes these works are not being included in the defendants' motion.

¶¶ 5-10; Chen Decl. ¶ 4.  In the disclosure mandated by the settlement agreement, defendants informed plaintiffs that Best Books World ("BBW"), a supplier from Thailand, was "the source of most if not all the pirated books."  Smyres Deposition Exhibit # 13 (annexed as Ex. 1 to Chen Decl.) ("Smyres Dep. Ex. 13"), at 2;[4] Chen Decl. ¶ 4.

### 4.    Defendants' Dealings With BBW

In mid-2008, defendants purchased copies of six of plaintiffs' works from BBW, Smyres Dep. Ex. 13 at 5-7; see Roadmap Nos. 10a, 20, 50, 105, 131, and 133a, and shipped copies of three of the works to Cengage in order to determine if they were counterfeit, Smyres Dep. Ex. 13 at 2.  Cengage confirmed that two of the three were counterfeit and stated that it needed to do more research into the third work.  Id.  Defendants subsequently returned the remaining copies of all six works to BBW.  See Smyres Deposition Exhibit # 15 (annexed as Ex. 35 to Chen Decl.), at 1-2; Smyres Deposition Exhibit # 17 (annexed as Ex. 35 to Chen Decl.), at 1.  Defendants returned fewer copies than they originally bought.  See Smyres Dep. Ex. 13 at 6-7; Email from Mikeal Vancleave, dated Nov. 11, 2008 (annexed as Ex. 36 to Chen Decl.), at 1-2.

In September 2009, defendants began to do business with BBW again, a relationship that was renewed notwithstanding BBW's having acknowledged to Smyres — without any evidence of contradiction by Smyres — that Smyres did "not trust" BBW's books.  Smyres Deposition Exhibit # 19 (annexed as Ex. 37 to Chen Decl.) ("Smyres Dep. Ex. 19"), at 1.

As part of his "due diligence," Smyres attempted to meet an individual from BBW named "Ple," with whom Smyres had been communicating.  Deposition of Philip Smyres, dated Nov. 20, 2013 (annexed as Ex. 33 to Chen Decl.) ("Smyres Dep. I"), at 259; see, e.g., Smyres

---

[4]  References to pages of this exhibit refer to the ECF-assigned pagination.

Dep. Ex. 19 at 1 (email correspondence between Smyres and Ple).  Despite "tr[ying] to reach out to her many times," Smyres was "never able to connect with her face to face."  Smyres Dep. I at 259.

In April 2011, Smyres was concerned that there was a "lot of talk about counterfeit books coming from Thailand," and he told BBW that he would only consider buying more books from it if BBW could "produce a publisher invoice."  Smyres Deposition Exhibit # 28 (annexed as Ex. 39 to Chen Decl.), at 2.  BBW told defendants that it could "not [be] responsible but [it] was sure all [its] books are not counterfeit copies."  Id.  Defendants subsequently stopped communicating with BBW.  Smyres Dep. I at 282.

In total, defendants purchased over 11,000 books from BBW.  See Chen Decl. ¶ 6(a).[5] Defendants do not have a comprehensive list of all the works purchased from BBW since 2006. See Deposition of Philip Smyres, dated June 5, 2014 (annexed as Ex. 11 to Chen Decl.) ("Smyres Dep. III"), at 76-79.  While defendants were able to produce some purchase orders, Smyres testified that the "data" from 2006, 2007, and 2008 from the "purchase order system" was "not very good."  Id. at 77-78.  For example, the records produced by defendants did not include purchases by defendants from individuals who sold defendants only one book.  Id. at 70. Defendants did not keep a list of counterfeit books found in their inventory or a list of suppliers of counterfeit books.  Deposition of David Dimm, dated Feb. 28, 2014 (annexed as Ex. 24 to Chen Decl.) ("Dimm Dep."), at 33-34.

---

[5]  While plaintiffs do not provide a time period for this sourcing information, Chen Decl. ¶ 6, defendants do not suggest that specifying the time period is necessary for consideration of their arguments.

5.      Defendants' Dealings with the Blackerbys

In the summer of 2008, defendants began to purchase textbooks from Perry and Mark Blackerby through the Blackerbys' company "Life Everest, LLC" and their "Booksvalue" website.  See Deposition of Philip Smyres, dated June 4, 2014 (annexed as Ex. 40 to Chen Decl.) ("Smyres Dep. II"), at 147-50.  Smyres did not ask the Blackerbys where their textbooks came from.  Id. at 149.  Smyres believed that the Blackerbys were obtaining the books from overseas.  Id. at 149-50.  Plaintiffs point out, see Pl. Mem. at 4, that the Blackerbys had previously been sued for importing and distributing counterfeit textbooks, see John Wiley & Sons, Inc. v. Booksvalue.com, Inc., No. 06 Civ. 2314 (N.D. Ala.), though plaintiffs have not shown that Smyres knew of this suit.

In February 2011, a customer named Lindsey Bache notified defendants that he was returning 20 copies of a work published by Cengage, identified as Roadmap No. 35, that defendants had sold him and that Bache believed to be counterfeit.  Smyres Dep. II at 105; see Email Correspondence between Lindsey Bache and Defendants (annexed as Ex. 46 to Chen Decl.) ("Bache Email").  Defendants traced the source of these counterfeit books to the Blackerbys.  Smyres Dep. II at 106; Email from Tom Cahill to Mark Blackerby, dated Feb. 23, 2011 (annexed as Ex. 10 to Chen Decl.) ("Cahill Email").

After identifying the Blackerbys as their source of the copies of Roadmap No. 35 that Bache returned, defendants began to check other books in their inventory that the Blackerbys had sold them.  Smyres Dep. at 105-06.  Smyres testified that the other books they checked "had similar pix[e]lated pictures" and therefore "could possibly be . . . not good books."  Id. at 106.  Over time, defendants "pulled books that had the same characteristics" as the books returned by Bache, many of which defendants had received from the Blackerbys or BBW.  Id. at 106-08.

7

In addition to identifying Roadmap No. 35, defendants identified four other works that they purchased from the Blackerbys, all published by Cengage, that defendants found in their inventory and that they concluded were counterfeit.  See Cahill Email; Roadmap Nos. 31, 40, 51, 63.  There were 422 such books.  Id.  Defendants told Mark Blackerby that "the guys in the warehouse have determine [sic] that 5 titles in the [file attached to the email] are also counterfeit" and defendants were going to be returning them.  Cahill Email (listing Roadmap Nos. 31, 35, 40, 51, and 63).  Defendants told Blackerby that they had 422 copies of the five works remaining in their inventory.  Id.  They had originally purchased at least 829 copies of these five works from the Blackerbys, Chen Decl. ¶ 6(c).  Defendants subsequently returned the 422 copies to the Blackerbys.  Deposition of Mark Blackerby, dated Aug. 22, 2013 (annexed as Ex. 8 to Chen Decl.), at 75, 79; Email from Mark Blackerby, dated Feb. 10, 2011 (annexed as Ex. 9 to Chen Decl.) ("Blackerby Email").  Smyres testified that the reason they returned the 422 books to the Blackerbys was because they were counterfeit.  Smyres. Dep. II at 136-37.

Mark Blackerby confirmed in his testimony that defendants returned 422 counterfeit books purchased from him.  Deposition of Mark Blackerby, dated Aug. 22, 2013 (annexed in part as Attach. # 1 to Dep. Trans.) ("Blackerby Dep."), at 78-79.  After defendants returned the counterfeit books to Mark Blackerby, he resold them.  Id. at 78-81.  However, Blackerby testified that some of the counterfeit copies were not sold, but instead were going to be returned to the publishers.  Id. at 80.  In 2011, plaintiffs sued the Blackerbys for copyright and trademark infringement.  Chen Decl. ¶ 5.  Pursuant to a settlement of that action, the Blackerbys surrendered "all remaining counterfeit inventory within their possession."  Id.; see also Ex. 2 to Chen Decl. (identifying the surrendered inventory).  Pearson stated that it is "not aware" of whether the copies surrendered by the Blackerbys to plaintiffs included any of the books

8

returned by defendants to the Blackerbys.  Pearson Dep. at 65.

      6.    <u>Other Evidence of Defendants' Buying, Selling, or Disposing of Counterfeit Books</u>

Defendants further examined their inventory and set aside more books, including books received from the Blackerbys and BBW.  Smyres Dep. II at 103-07.  At some point between February and July 2011, Smyres ordered that a pallet of the books that had been removed from defendants' inventory be taken to a barn of an employee and destroyed.  Smyres Dep. at 118-19, 133; Deposition of Mark Charles Davenport, dated June 18, 2014 (annexed as Ex. 23 to Chen Decl.), at 40, 53, 56.  Defendants have no way to identify which books were set aside or destroyed.  Smyres Dep. II at 119-20, 134.

One of defendants' customers, Follett Corporation ("Follett"), terminated its account with defendants in the summer of 2007, after determining that defendants had sold it counterfeit books.  <u>See</u> Deposition of Michael P. Dalpe, dated Nov. 12, 2013 (annexed in part as Ex. 19 to Chen Decl.) ("Dalpe Dep. I"), at 32, 106, 120-21, 191-92.  However, Follett later started to do business with defendants again.  <u>See id.</u> at 192-93.  In May 2011, Follett rejected and returned to defendants an unopened shipment of books it suspected were counterfeits, and Follett once again terminated its account with defendants.  <u>See</u> Deposition of Kevin Doenges, dated Nov. 21, 2013 (annexed as Ex. 25 to Chen Decl.) ("Doenges Dep."), at 58-61; Doenges Deposition Exhibit # 37 (annexed as Ex. 26 to Chen Decl.); Smyres Dep. II at 198-200.  One of BDB's employees, Kevin Doenges, testified that unless the books they received back from Follett were on a list that defendants had of potentially counterfeit titles, the books were put back into inventory for sale. Doenges Dep. at 60-61.

According to Smyres, every book that BDB receives that is "identified with any

suspicious quality" is evaluated and researched by "supervisory level staff."  Smyres Decl. ¶ 10.

If BDB suspects it is of a "counterfeit quality," the book is removed from inventory and not

resold.  Id.  However, defendants do not formally train employees on detecting counterfeits, and

they are unable to determine definitively whether a book is counterfeit or not.  See Smyres Dep.

II at 96, 98-99; Dimm Dep. at 14-15; Doenges Dep. at 133-34; Deposition of John Glass, dated

Dec. 10, 2014 (annexed as Ex. 30 to Chen Decl.) ("Glass Dep."), at 212.  Until April 2013,

defendants had a policy of destroying textbooks they believed to be counterfeit that they found.

Dimm Dep. at 33, 44-45, 66; Smyres Dep. II at 242-45.  While defendants maintained a log of

the books involved in this case that they identified as counterfeit, they did not keep a list of the

suppliers that provided the counterfeit or a list of which books were returned or destroyed apart

from the list of works involved in this case.  See Dimm Dep. at 33-34; Smyres Dep. II at 242,

248.  The records defendants do maintain are also inconsistent: for example, records of sales

often exceeded their records of purchases, because defendants did not record buybacks, returns,

or rentals.  Smyres Dep. III at 74-76.

Lastly, there is evidence that defendants bought at below-market prices.  For example,

defendants' records show one purchase of 12 new copies of a single work from an online seller

named Ploypatsorn Jaruankool at a price roughly 50 percent less than the price charged by

Pearson.  Id. at 65-66.

> 7.   Evidence Regarding Counterfeit Works Provided to Plaintiffs by
>       Customers of Defendants

 During plaintiffs' investigations in this lawsuit, certain customers of defendants,

including Texas Book Company ("TBC"), MBS Book Exchange ("MBS"), and Follett,

surrendered books to plaintiffs for inspection that they believed to be counterfeit.  See 30(b)(6)

Deposition of William A. Sampson, Esq., dated June 12, 2014 (annexed in part as Attach. # 3 to Dep. Trans.), at 44-45; Deposition of John R. Garry, dated June 11, 2014 (annexed in part as Attach. # 8 to Dep. Trans.). at 159; 30(b)(6) Deposition of John R. Garry, dated June 11, 2014 (annexed in part at Attach. # 11 to Dep. Trans.) ("Pearson Dep."), at 49; Email Correspondence between Mike Dalpe and Richard Essig (annexed as Ex. 3.1 to Chen Decl.).  According to the Roadmap, plaintiffs confirmed that at least some of the books surrendered to them were in fact counterfeit.  See, e.g., Roadmap No. 4 (identifying MBS as a source of counterfeit exemplars, the approximate dates the books were surrendered, and the Bates numbers of the books).  For most of these works, however, there is no direct evidence that a particular book was sold to the customer by defendants.

Thus, although Follett represented that it had "no doubts" that defendants supplied "some" of the counterfeit books that were surrendered to plaintiffs and that it was "absolute[ly] certain[]," based on its analysis, that defendants supplied at least one identifiable counterfeit work to Follett, Dalpe Dep. I at 300-01, Follett also stated that it "couldn't say one way or the other whether or not" particular counterfeit books came from the defendants, Deposition of Michael P. Dalpe, dated Nov. 12, 2013 (annexed in part as Attach. # 4 to Dep. Trans.) ("Dalpe Dep. II"), at 213-14.

TBC stated that it stored all copies of the same title in a warehouse together and that upon receipt of a title from multiple sources, it did not indicate the source of each copy. Deposition of Thomas Steele, dated Nov. 21, 2014 (annexed in part as Attach. # 14 to Dep. Trans.) ("TBC Dep."), at 26-27.  Thus, TBC is unable to identify which copies of the title were obtained from a particular source.  Id. at 27.  When TBC surrendered counterfeit books to plaintiffs, TBC did not put any markings on the books to "identify anything" for them, such as

their source, and thus could not could not trace any particular copy to defendants.  Id.  TBC eventually terminated its business with defendants because of its concern about the "business risk" of purchasing books from defendants.  Deposition of Thomas Steele, dated Nov. 21, 2014 (annexed in part as Ex. 41 to Chen Decl.), at 40, 47-48.

MBS stated that when it received inventory from defendants, it was "intermingled with inventory provided by other suppliers," and that it was "real tough" to determine the supplier of a particular copy of a title unless there was a "receiving number of [sic] a sticker" on the copy.  Deposition of Lon David Daniel, dated Nov. 19, 2014 (annexed in part as Attach. # 5 to Dep. Trans.) ("Daniel Dep. I."), at 85.  MBS did not start to place "receiving number" labels on books to track the source of the books until August 2011.  See Deposition of Lon David Daniel, dated Nov. 19, 2014 (annexed as Ex. 20 to Chen Decl.) ("Daniel Dep. II"), at 84.  After that date, MBS maintained a list that identified the date of receipt and receiving number of books received from particular customers.  See Exhibit MBS 3 (annexed to Daniel Dep. I) ("Exhibit MBS 3").  Thus, MBS could compare the receiving number on a book to the receiving number on the list in order to determine who supplied the particular copy.  See Daniel Dep. I at 58.

After MBS had surrendered counterfeit books to Pearson and Cengage, Pearson and Cengage compiled a list of the receiving numbers found on those books and sent the list to MBS to identify the source.  Daniel Dep. II at 83.  A representative from MBS testified that several of the books were supplied to MBS by defendants.  See id. at 83-84.  Plaintiffs' own review of the books surrendered by MBS revealed copies of six counterfeit works without receiving numbers that had defendants' own stickers on them, indicating that defendants were the supplier.[6]  Pl.

---

[6]  Plaintiffs previously asserted that there were seven counterfeit works, Roadmap Nos. Roadmap Nos. 3, 8, 15, 38, 100, 120, and 128, that were found bearing defendants' stickers.

56.1 ¶ 26; see Chen Decl. ¶ 11.  A representative of MBS testified that it was "more likely" that defendants were the source of counterfeit books that MBS had received than MBS's other suppliers, Daniel Dep. II at 137, though the basis for this conclusion is not contained in the record provided by the parties.  In later questioning, the representative ultimately agreed with the questioner's assertion that Smyres was more likely to be the source of counterfeit books than other suppliers MBS deals with because he was obtaining his books from overseas.  Id. 138-39.

### 8.   Test Purchases by Plaintiffs

 In March 2013, plaintiffs purchased copies of Roadmap Nos. 22, 44, 54, and 130 from defendants over the internet and found them to be counterfeit.[7]  Chen Decl. ¶ 12; Exhibit 6 at Bates Nos. BP-SMY-018778 to BP-SMY-020466.

In December 2014, plaintiffs purchased two copies of Roadmap No. 94 (the "Krugman Title") from defendants over the internet and both were counterfeit.  Essig Decl. ¶¶ 4-5. Defendants informed plaintiffs that the source of the Krugman Title was Tichenor College

---

Chen Decl ¶ 11.  It is unclear where the discrepancy arises.  The Roadmap identifies a "stickered" copy of the work under the "source of counterfeit exemplar[s]" for six of these works — Roadmap Nos. 3, 8, 15, 38, 120, and 128.  As discussed above, these six works are not at issue on this motion.  Roadmap No. 100 does not list a "stickered" copy as a "source of [a] counterfeit exemplar," and defendants are moving for summary judgment with respect to this work.  Although not listed in the Roadmap, plaintiffs apparently possess a "stickered" counterfeit exemplar of this work.  See Photographs of Books (annexed as Ex. 5 to Chen Decl.) ("Sticker Photographs"), at BP-SMY-025598 (photograph of Roadmap No. 100 with a "TextbooksRus.com" sticker); Chen Decl. ¶ 11 (identifying the photographed book as counterfeit).

[7] Plaintiffs also represent that they purchased counterfeit copies of Roadmap No. 89 from defendants over the internet.  Chen Decl. ¶ 12; see also Roadmap No. 89 (noting a "TRU Test Purchase" as the source of the counterfeit exemplar).  The exhibit cited in support of this assertion does not appear to document any purchase of Roadmap No. 89.  See Ex. 6 to Chen Decl. ("Exhibit 6").  We need not resolve this discrepancy now, however, because defendants have not moved for summary judgment as to this work.

Textbook Company ("Tichenor").  Supp. Chen Decl. ¶ 7.

9.    Tichenor's Sales to Defendants

After being contacted by plaintiffs, Tichenor identified an entity called "Morena for International Trading" ("Morena"), a broker from Jordan, as its source of the Krugman Title.  Id. ¶ 9; see also Ex. 3 to Supp. Chen Decl. (letter from Tichenor's counsel identifying Morena as the source); Deposition of Tim Tichenor, dated June 3, 2015 (annexed as Ex. 2 to Supp. Chen Decl.) ("Tichenor Dep."), at 71 (authenticating the letter).

Thereafter, Tichenor quarantined all books in its inventory that it had purchased from Morena.  Supp. Chen Decl. ¶ 10; see also Ex. 4 to Supp. Chen Decl. (email from Tichenor's counsel confirming that Tichenor was quarantining the books); Tichenor Dep. at 136 (authenticating the email).  On February 26, 2015, Tichenor provided to plaintiffs a list of all the books that it purchased from Morena that were subsequently sold to defendants.  Supp. Chen Decl. ¶ 11; see also Ex. 5 to Supp. Chen Decl. (email with attachments identifying books purchased from Morena and sold to defendants); Tichenor Dep. at 118-22 (authenticating the email and attachments).  Tichenor had sold copies of 23 counterfeit works to defendants. See Supp. Chen Decl. ¶¶ 12-13.  On March 2, 2015, defendants agreed to quarantine their remaining inventory obtained from Tichenor and allowed plaintiffs to inspect it.  Id. ¶ 13. Plaintiffs found copies of three of the counterfeit works Tichenor had purchased from Morena and later sold to defendants but did not find any copies of the other 20 works.  Id. ¶ 13.  Of the three counterfeit works found, defendants were missing copies that they had purchased from Tichenor for Roadmap Nos. 43b and 82.[8]  Supp. Chen Decl. ¶ 13.  On March 6 and 13, 2015,

_____

    [8]  For the remaining counterfeit work found in defendants' inventory, all copies sold to defendants by Tichenor were found in defendants' possession, and therefore plaintiffs have not

plaintiffs inspected Tichenor's quarantined inventory and discovered counterfeit copies of works published by plaintiffs.  Id. ¶ 12.

Based on business records produced by defendants and Tichenor from October 2013 through January 2015, Tichenor sold to defendants a total of 459 copies of 21 works (excluding the Krugman Title, which is not at issue on this motion, and the counterfeit work for which defendants still possessed all of the copies they purchased from Tichenor) that Tichenor had purchased from Morena.  Id. ¶ 14.  Plaintiffs found only 9 of the 459 copies in defendants' inventory at the March 2, 2015 inspection.  Id.

Tim Tichenor — the co-owner of Tichenor, id. ¶ 8 — testified that Tichenor could not confirm the source of a particular copy of a book if they were purchasing copies of it from multiple sources, Tichenor Dep. at 203.  However, if Tichenor purchased a particular work from a single source or if they had previously purchased a book from two different sources and only purchased new books from a single source, they could confirm the source of those books.  Id. at 203-04.  Mr. Tichenor confirmed that, based upon a summary of Tichenor's purchase and sale records created by plaintiffs from Tichenor's documents, see Ex. 6 to Supp. Chen Decl. ("Tichenor Spreadsheet"), 19 of the 22 works at issue that defendants purchased from Tichenor had been purchased by Tichenor from Morena, Supp. Chen Decl. ¶ 15; see Tichenor Dep. at 142-45.  For the remaining three works, there is a "high likelihood," Supp. Chen Decl. ¶ 15, that the books defendants purchased from Tichenor had been purchased by Tichenor from Morena, see Tichenor Dep. at 205-08; Tichenor Spreadsheet.

_____

included it in this case.  Id.  Thus, there are 22 works at issue in this case that were sold by Tichenor to defendants.  See Roadmap Nos. 11, 12, 21, 39b, 43b, 46, 47, 48, 65, 82, 83, 85, 87, 90, 94, 95, 113, 116 121, 123, 124, 132.  As noted above, defendants are not moving for summary judgment on Roadmap Nos. 94, 113, and 124.

Defendants thereafter produced a list of all individuals to whom they had sold the books they purchased from Tichenor.  Supp. Chen Decl. ¶ 16.  Plaintiffs received copies of four books, copies of either Roadmap Nos. 90, 113, or 124, from some of these individuals who had purchased them from defendants.  Id. ¶¶ 16-17.  Upon examination, they were determined to be counterfeits.  Id.

10.  Philomath's Sales to Defendants

Defendants also did business with a foreign reseller, Philomath Co. Ltd. ("Philomath"), see Deposition of Thomas Cahill, dated Feb. 19, 2014 (annexed in part as Ex. 12 to Chen Decl.) ("Cahill Dep."), at 205, which is based in Thailand, see id. at 202-06; Cahill Deposition Exhibit 131 (annexed as Ex. 13 to Chen Decl.) ("Cahill Dep. Ex. 131"), at 1216.  Thomas Cahill was in charge of Asian purchasing operations and bulk purchases for BDB.  Cahill Dep. at 24, 124-25. Cahill first heard of Philomath because a supplier had sent BDB a shipment that had Philomath's name and address on an invoice.  Id. at 185.  These invoices included a statement indicating that the shipments were sold for distribution solely outside of the United States.  See Pearson Education Invoices (annexed as Ex. 14 to Chen Decl.).  Cahill knew that he was purchasing books from Philomath for BDB at prices that he could not obtain in the United States.  Cahill Dep. at 222.

In one instance, Philomath was purchasing books from Pearson and Cengage for a university in Bangkok, and Philomath invited Cahill to bid against other competitors to "share the books that [Philomath] ordered."  Id. at 205-08.  However, Philomath told Cahill that it had to "pay Pearson staff to get U.S. version[s]."  Id. at 212.  Cahill believed that these payments were only attempts to "increase [Cahill's] costs" and were not bribes used to get books Philomath would otherwise not be permitted to purchase for defendants.  Id. at 212-14.

16

Philomath often asked Cahill which books defendants wanted to purchase before submitting orders to Pearson.  See Cahill Dep. Ex. 131 at 1216; Cahill Deposition Exhibit 133 (annexed as Ex. 15 to Chen Decl.), at 1256; Cahill Deposition Exhibit 135 (annexed as Ex. 16 to Chen Decl.), at 1059.  Cahill also asked Philomath to provide "links" to access Philomath's invoices that it received when Philomath placed orders with Pearson.  Cahill Dep. at 214-16.

          11.    Numerical Information on Counterfeit Works

Information provided to plaintiffs by defendants and third parties, in the form of lists of defendants' sources, Chen Decl. ¶¶ 6, 14, lists of defendants' sales, id. ¶¶ 7, 14, and a list of surrendered inventory from the Blackerbys, id. ¶¶ 5, 14, in addition to the information provided by Tichenor, see Supp. Chen Decl. ¶¶ 6-18, reveals the following.  For 49 of the 124 works at issue, the only counterfeit exemplars plaintiffs have were discovered in defendants' possession after they had been quarantined by defendants.  See Roadmap Nos. 1, 2, 5, 7, 10c, 14, 19, 23, 34, 39a, 41, 43a, 45, 49, 52, 56, 59, 60, 62, 64, 66, 73, 77, 78, 79, 80, 81, 86, 88, 92, 93a, 93b, 97, 98, 99, 101, 102, 103, 106, 107, 108, 109, 112, 117, 122, 125a, 125b, 127, 133b.  With respect to 40 of the 124 works at issue on this motion, the only counterfeit exemplars plaintiffs have were surrendered to them by third parties.[9]  See Roadmap Nos. 10b, 16, 26, 28, 40, 42, 55, 57, 63, 67,

---

    [9]  In defendants' own summary of the Roadmap, defendants list 43 distinct works for which the only counterfeit exemplar identified in the Roadmap was from a third party surrender.  See Ex. C to Miller Decl.  However, according to the Roadmap — which defendants relied on in creating this summary — counterfeit exemplars of Roadmap Nos. 7 and 60 were found in defendants' quarantined inventory and were not surrendered by a third party.  See Roadmap Nos. 7 and 60; see also Ex. C to Miller Decl. (listing Roadmap Nos. 7 and 60 under the "BDB's Unsold Quarantine Books" category).  Further, the Roadmap shows that counterfeit exemplars of Roadmap No. 100 were found both in defendants' unsold inventory and surrendered to plaintiffs by third parties, see Roadmap No. 100, and thus should have been placed by defendants in their "Combo of Unsold Quarantine + Supplier Books" category, Ex. C to Miller Decl.  Accordingly, there are only 40 distinct works in this category.

69, 71, 72, 74, 75, 104, 111, 115, 119, 129 (surrendered by MBS); Roadmap Nos. 16, 17, 25, 28,

110 (surrendered by Follett); Roadmap Nos. 17 (surrendered by TBC); Roadmap Nos. 63, 67

(surrendered by Mark Blackerby); Roadmap Nos. 11, 12, 21, 39b, 46, 47, 48, 65, 83, 85, 87, 90,

95, 116, 121, 123, 132 (surrendered by Tichenor).  With respect to 29 of the 124 works at issue,

plaintiffs both discovered a counterfeit copy in defendants' quarantined inventory and received a

counterfeit copy from a third party's surrender.[10]  See Roadmap Nos. 4, 6, 9, 13, 18, 24, 27, 29,

30, 31, 32, 33, 35, 36, 37, 43b, 51, 53, 58, 61, 68, 70, 82, 84, 91, 96, 100, 114, 126.  For six of

the 124 works at issue, plaintiffs have no counterfeit copy in their possession.  See Roadmap

Nos. 10a, 20, 50, 105, 131, 133a.

    Defendants purchased copies of 61 distinct works involved in this lawsuit from either

BBW or the Blackerbys.  See Chen Decl. ¶¶ 6(b)-(d).  Defendants purchased copies of Roadmap

Nos. 3, 6, 10a, 10b, 13, 15, 16, 17, 18, 20, 24, 25, 26, 28, 30, 32, 33, 36, 37, 38, 40, 42, 50, 53,

57, 58, 61, 68, 69, 71, 72, 75, 91, 96, 104, 105, 110, 111, 114, 115, 118, 119, 120, 122, 126, 128,

129, 131, 133a, and 133b from BBW.  Chen Decl. ¶ 6(b).  They purchased copies of Roadmap

Nos. 4, 6, 9, 15, 16, 18, 27, 31, 35, 36, 37, 40, 51, 55, 63, 68, 74, 77, 100, 104, 110, 115, and 120

from the Blackerbys.  Chen Decl. ¶ 6(d).

    B.    Procedural History

    Plaintiffs filed the original complaint in this action on February 4, 2013 (Docket # 1) and

a First Amended Complaint on April 24, 2013 (Docket # 16).  On January 26, 2015, defendants

filed their first motion for partial summary judgment.  See Motion for Partial Summary

---

[10]  Defendants assert that there are 28 works in this category.  See, e.g., Ex. C to Miller Decl.  As discussed in the prior footnote, Roadmap No. 100 should have been placed in this category, for a total of 29 works.

Judgment by Defendants, filed Jan. 26, 2015 (Docket # 207).  At the time, there were 118 works at issue in this case.  See Pl. 56.1 Resp. ¶ 8.

While the motion was sub judice, plaintiffs indicated that they wished to add 22 new works to the litigation.  See Letter from Julie C. Chen and Tiffany C. Miller, filed May 6, 2015 (Docket # 257), at 2.  Defendants agreed to allow amendment of the complaint to add these works but stated that they wished to file a supplemental memorandum in support of their motion for partial summary judgment based on the addition of these new works.  Id.  Accordingly, the Court deemed defendants' original motion for partial summary judgment withdrawn without prejudice.  See Order, filed May 8, 2015 (Docket # 259).

On May 27, 2015, plaintiffs filed a Second Amended Complaint alleging claims for copyright infringement, trademark infringement, trademark counterfeiting, illegal importation of counterfeit goods, trademark dilution, unfair competition and false designation of origin, breach of contract, and conspiracy to commit fraud.  See SAC ¶¶ 59-109.  Annexed to the Second Amended Complaint was a list of the 140 works plaintiffs believed defendants infringed.  See Ex. A to SAC.  On June 15, 2015, defendants filed the instant motion for summary judgment.

C.    Plaintiffs' Objections to Defendants' Local Rule 56.1 Statement

After defendants filed their original motion for partial summary judgment, plaintiffs filed a motion to strike parts of defendants' Local Rule 56.1 statement and parts of the declaration by defendants' counsel, Neil B. Mooney, that were filed in support of defendants' original motion for partial summary judgment.  See Plaintiffs' Motion to Strike Portions of the Declaration of Neil B. Mooney and Defendants' Local Rule 56.1 Statement of Facts Submitted in Support of Defendants' Motion for Partial Summary Judgment, filed Feb. 26, 2015 (Docket # 223).  Plaintiffs now state that they do not wish to renew their motion to strike, Pl. Supp. Mem. at 14,

and defendants have not relied on these documents in their renewed motion for partial summary judgment, see Defendants' Notice of New Motion for Partial Summary Judgment, filed June 15, 2015 (Docket # 265), at 1 (explaining that defendants' new motion for partial summary judgment "supplants, entirely" their prior motion).

In briefing the current motion, plaintiffs continue to object to portions of defendants' Local Rule 56.1 Statement — in particular, its citations to paragraphs 9, 10, and 12, and Exhibits B, C, and D of the Miller Declaration.  See Pl. Supp. Mem. at 14-15.  In adjudicating this motion, however, the Court has not relied on paragraphs 9, 10, or 12 or Exhibit D of the Miller Declaration.

With respect to Exhibit B, the revised version of the Roadmap, plaintiffs object to some unspecified citations by defendants to this document on the grounds that defendants "are without personal knowledge to opine on what the contents represent."  This argument is rejected given that it is plaintiffs who have relied on the Roadmap (without objection by defendants) to meet their burden of proof on this motion.  Obviously, it is appropriate for defendants to cite to this document as long as the citation is accurate.

With respect to Exhibit C of the Miller Declaration (defendants' summary of the Roadmap), plaintiffs object on the grounds that it constitutes argument and that it is "rife with errors."  Id. at 15.  While the Court has relied upon Exhibit C, it has only been in the context of deciphering which works are actually the subject of the instant motion and which category of their argument defendants contend each work belongs in.

II.    LAW GOVERNING SUMMARY JUDGMENT MOTIONS

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of

material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

 In determining whether a genuine issue of material fact exists, "[t]he evidence of the

non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the

non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59

(1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any

material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must

come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))

(emphasis and additional citation omitted), and "may not rely on conclusory allegations or

unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation

omitted).  In other words, the nonmovant must offer "concrete evidence from which a reasonable

juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving

party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to

'make a showing sufficient to establish the existence of an element essential to [its] case.'"

Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (alteration

in original).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff

fails to come forward with enough evidence to create a genuine factual issue to be tried with

respect to an element essential to its case."  Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996)

(citing Anderson, 477 U.S. at 247-48).

III.    DISCUSSION

Defendants move for partial summary judgment on the grounds that (1) plaintiffs'

copyright and trademark infringement claims fail with respect to 124 of the 140 works because

plaintiffs cannot show that a counterfeit copy was distributed by defendants, Def. Mem. at 23-

26; (2) plaintiffs' illegal importation of counterfeit goods claim fails because no private cause of

action exists for the claim as pleaded, see id. at 21; (3) Pearson's conspiracy to commit fraud

claim fails because plaintiffs did not plead a predicate fraud claim and have no evidence of

collusion, id. at 27-28; and (4) plaintiffs' claims for trademark counterfeiting, trademark

dilution, and unfair competition and false designation of origin with respect to the 124 works fail

because plaintiffs cannot show that a counterfeit copy was distributed by defendants, see id. at

20-21, 23-26.[11]

A.    Copyright and Trademark Infringement

Defendants argue that they are entitled to partial summary judgment as to plaintiffs'

claims for copyright and trademark infringement for 124 of the 140 works at issue in this case

because plaintiffs are unable to prove that a counterfeit copy was distributed by defendants.  Def.

Mem. at 23-26.  In their memorandum, defendants have broken up these 124 works into four

categories.  See id. at 23-26; see also Ex. C to Miller Decl. (listing the 124 works in four

categories based upon the contents of the Roadmap provided by plaintiffs).  Defendants assert

that (1) for 49 of these 124 works, the only evidence plaintiffs have are the counterfeit copies

---

[11]  It appears that defendants have moved for partial summary judgment solely as to
plaintiffs' claims that defendants sold or distributed counterfeit works, not as to any claims that
defendants imported counterfeit works in violation of 17 U.S.C. § 602(a)(2).  SAC ¶¶ 59-69.
Accordingly, this Report and Recommendation addresses defendants' motion as to plaintiffs'
copyright and trademark claims relating to the sales or distribution of works, not as to any claims
by plaintiffs that defendants imported particular works in violation of 17 U.S.C. § 602(a)(2).

that were found in defendants' possession that were quarantined and therefore were not distributed, Def. Mem. at 24-25; (2) for 41[12] of the works, the counterfeit copies plaintiffs use as evidence were acquired from third parties who cannot confirm that they received the copies from defendants, id. at 25-26; (3) for 28[13] of the works, plaintiffs' evidence consists of a combination of the previous two types of evidence, which they assert is still insufficient, id. at 26; and (4) for six of the works, there is no counterfeit copy in plaintiffs' possession at all, id.

     To establish a claim for copyright infringement, a plaintiff must prove two elements: first, "ownership of a valid copyright"; and second, "copying of constituent elements of the work that are original." E.g., Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991)) (internal quotation marks omitted). To establish the second element, a plaintiff must show, inter alia, that the defendant "actually copied" the work. E.g., Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001) (citation and internal quotation marks omitted); accord Shine v. Childs, 382 F. Supp. 2d 602, 607 (S.D.N.Y. 2005). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in [17 U.S.C. § 106]." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation and internal quotation marks omitted). These rights include the rights to "reproduce, perform publicly, display publicly, prepare derivative works of,

---

     [12] Although defendants assert there are 41 works in this category, as discussed above, defendants actually list 43 distinct works in their summary and it appears that Roadmap Nos. 7, 60, and 100 were mistakenly included in this category. Thus, there are only 40 works in this category.

     [13] Although defendants assert there are 28 works in this category, as discussed above, counterfeit exemplars for Roadmap No. 100 were found both in defendants' quarantined inventory and in a third party surrender. Thus, there are 29 works in this category.

and distribute copies of, [the] copyrighted work." Id. (citing 17 U.S.C. § 106).  Thus, section

106 of the Copyright Act gives the owner of a valid copyright the exclusive right, inter alia, to

"reproduce the copyrighted work in copies" and to "distribute copies . . . of the copyrighted work

to the public by sale or other transfer of ownership."  17 U.S.C. § 106(1), (3); see, e.g., Yash Raj

Films (USA), Inc. v. Adda Rong, Inc., 2010 WL 1270013, at *3 (E.D.N.Y. Mar. 12, 2010)

("Among the exclusive rights of the copyright owner is the right to reproduce, and to authorize

others to reproduce, the copyrighted work in copies and to distribute the copies to the public by

sale.") (citation omitted).

15 U.S.C. § 1114(1)(a) proscribes the unauthorized "use in commerce [of] any

reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with

the sale, offering for sale, distribution, or advertising of any goods or services on or in

connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."

Thus, to establish a claim for trademark infringement, a plaintiff must prove that "(1) it has a

valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used

the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services,

(5) without the plaintiff's consent."  1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400,

406-07 (2d Cir. 2005) (internal citations, quotation marks, and ellipses omitted) (stating that

these requirements apply to both registered and unregistered trademarks).

As an initial matter, we reject defendants' argument that plaintiffs are required to prove

the "distribution" requirement by offering at trial a counterfeit copy of each of the 124 works

that is alleged to have been distributed by defendants, or by offering the testimony of someone

who has "seen" the counterfeit.  See Def. Mem. at 23-24; see also id. at 6 ("Success on the

copyright and trademark infringement claims will require . . . bringing to trial an infringing copy,

proving it is indeed counterfeit, and proving Defendants distributed/sold that particular counterfeit copy.").  As case law makes clear, "circumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment."  Gayle v. Gonyea, 313 F.3d 677, 684 (2d Cir. 2002) (citation omitted).  At this stage, plaintiffs need only show that a reasonable jury could return a verdict in their favor.  Anderson, 477 U.S. at 248.  While plaintiffs must ultimately prove infringement by defendants, such proof is frequently accomplished through circumstantial evidence.  See Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc., 507 F. App'x 26, 30 (2d Cir. 2013) (not fatal to plaintiffs' motion for summary judgment that plaintiffs failed to produce "any counterfeit items sold by" the defendants where there was "a significant amount of circumstantial evidence"); London-Sire Records, Inc. v. Doe 1, 542 F. Supp. 2d 153, 177 (D. Mass. 2008) ("While the plaintiffs must eventually prove that an actual infringement of [their] rights occurred, they may certainly do so through circumstantial proof and inference.").  Thus, in Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627 (S.D.N.Y. 2011), modified on other grounds on reconsideration, 2013 WL 1987225 (S.D.N.Y. May 14, 2013), a copyright infringement case, the court held that  plaintiffs "need not offer actual copies of the works at issue."  821 F. Supp. 2d at 647.

Notably, the sole case relied upon by defendants for their argument contains no holding requiring production or witnessing of an actual counterfeit copy.  See Def. Mem. at 19 (citing Kelly v. L.L. Cool J., 145 F.R.D. 32 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994)); Def. Reply at 8-9 (same).  In Kelly, the court merely stated that "[a] properly plead [sic] copyright infringement claim must allege 1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant

infringed the copyright." 145 F.R.D. at 36 (citations omitted). It says nothing about what form of proof plaintiffs are required to use to demonstrate these elements at trial.

Of course, circumstantial evidence is available not only to prove the fact that a counterfeit exemplar was distributed, but also to prove the distribution itself. See, e.g., Capitol Records, Inc. v. Thomas, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("[D]irect proof of actual dissemination is not required by the Copyright Act. Plaintiffs are free to employ circumstantial evidence to attempt to prove actual dissemination.") (emphasis in original); see also Atl. Recording Corp. v. Howell, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008) ("[E]vidence that a defendant made a copy of a work available to the public might, in conjunction with other circumstantial evidence, support an inference that the copy was likely transferred to a member of the public.") (citation omitted). See generally 2 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 8.11[D][5][b] (Matthew Bender, rev. ed.) ("Given the rarity of direct evidence in copyright litigation that defendant at bar copied from plaintiff's work, the classic case of copyright infringement relies on circumstantial evidence . . . . Along similar lines, it has been held that circumstantial evidence suffices to establish actual distribution. There is nothing exceptional about that conclusion.") (footnotes omitted).

Recognizing that circumstantial evidence is entirely appropriate to prove a copyright or trademark violation, we now turn to the particular claims by defendants as to the insufficiency of proof to be offered by plaintiffs at trial.

###### 1.    The 49 Works Found in Defendants' Possession

Defendants contend that for 49 of the 124 works, plaintiffs' "only" evidence consists of unsold counterfeit copies of each of the 49 works that were found in defendants' possession after

they had been quarantined by defendants.[14]  Def. Mem. at 24-25.  Plaintiffs offer other evidence

on this question that they contend is relevant.  In addition to the counterfeit exemplars found in

defendants' inventory, plaintiffs have introduced evidence of the number of copies of each of the

49 works that were sold by defendants, which is derived from information produced by

defendants and third parties.  See Chen Decl. ¶ 7(b); see also Roadmap Nos. 1, 2, 5, 7, 10c, 14,

19, 23, 34, 39a, 41, 43a, 45, 49, 52, 56, 59, 60, 62, 64, 66, 73, 77, 78, 79, 80, 81, 86, 88, 92, 93a,

93b, 97, 98, 99, 101, 102, 103, 106, 107, 108, 109, 112, 117, 122, 125a, 125b, 127, 133b

(identifying the quantity of copies sold by defendants).  For the majority of the 49 works,

defendants sold hundreds of copies, see Roadmap Nos. 1, 5, 7, 10c, 14, 19, 23, 39a, 43a, 52, 56,

59, 62, 64, 73, 77, 78, 80, 81, 88, 92, 93b, 97, 98, 99, 101, 102, 103, 107, 108, 109, 112, 117,

125a, 125b, 133b, and for some works, they sold thousands of copies, see Roadmap Nos. 34, 49,

60, 86, 106.

Additionally, although defendants have removed some counterfeit books from their

inventory and quarantined them, plaintiffs have provided significant evidence that defendants'

efforts to avoid the acquisition of counterfeit books were ineffective.  In addition to the fact that

counterfeit exemplars of one work were purchased from defendants as late as December 2014,

see Essig Decl. ¶¶ 4-5; Supp. Chen Decl. ¶ 6, defendants' own employees admit that they have

not been trained to reliably identify counterfeits in order to remove them from inventory, see

Smyres Dep. II at 96, 98-99; Dimm Dep. at 14-15; Doenges Dep. at 133-34; Glass Dep. at 212.

---

[14]  The 49 works are Roadmap Nos. 1, 2, 5, 7, 10c, 14, 19, 23, 34, 39a, 41, 43a, 45, 49, 52, 56, 59, 60, 62, 64, 66, 73, 77, 78, 79, 80, 81, 86, 88, 92, 93a, 93b, 97, 98, 99, 101, 102, 103, 106, 107, 108, 109, 112, 117, 122, 125a, 125b, 127, and 133b.

Moreover, even when the defendants have identified potentially counterfeit books and quarantined them, they failed to keep any records as to what those works were or who supplied them so that they might identify other potential counterfeits in the future.  See Smyres Dep. II at 242; Dimm Dep. at 33-34.   As plaintiffs put it, there is ample evidence that would allow a jury to conclude that "Defendants routinely fail to identify counterfeits" and that they have a "history of sourcing from sketchy overseas suppliers . . . who have in the past sold them counterfeit books."  Pl. Mem. at 17-18.

When we consider this evidence combined with the fact that the listed counterfeit works were found in defendants' inventory, however, we still cannot conclude that a reasonable jury could find by a preponderance of the evidence that defendants distributed a counterfeit copy of any one of these 49 works.  In brief, there is no reliable evidence that the other copies that defendants previously acquired of these works were counterfeit.  And without the foundational finding that the other copies of the work previously in the defendants' possession were counterfeit, it would be impossible for a factfinder to find by a preponderance of the evidence that the sale by defendants of one of these works amounted to the sale of a counterfeit copy

Plaintiffs assert that defendants' poor recordkeeping practices should allow a jury to conclude that defendants must have had other counterfeit copies of these works and that they must have distributed those works.  Id. at 15-16.  Tellingly, however, the cases plaintiffs cite to support this proposition, see id. at 16, do not resemble the situation here.  In Pearson Education, Inc. v. Frances, 2013 WL 1360340 (S.D.N.Y. Apr. 3, 2013), the defendant was only selling infringing copies of the works at issue and advertised those infringing copies for sale.  Id. at *3.  The seller directed buyers not to provide any information that would identify the infringing works in their sales orders.  See id.  The court concluded that, based on the volume of sales and

28

the incomplete records, a jury could find that the infringing works were sold.  Id.  Here by contrast, the inference that defendants sold other counterfeit copies of each of these infringing works rests entirely on surmise.  As is made plain by the evidence in the record, there are counterfeit copies of works that have entered the stream of commerce.  Thus, the mere fact that a seller has in its possession a counterfeit copy does not permit a finding that all copies of that particular work previously sold by that seller were likely to have been counterfeit.  The other case cited by plaintiffs, Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199 (4th Cir. 1997), is irrelevant as it held only that a library's offering of an infringing work to the public — by "mak[ing] the work available to the borrowing or browsing public" — constituted a "distribution within the meaning of [17 U.S.C. § 106(3)]."  Id. at 203.  Here, defendants never claimed to the public that the copies they were offering for sale were the counterfeits.

Plaintiffs are understandably frustrated by the fact that defendants' recordkeeping makes it impossible to connect purchases and sales of particular works.  As they put it, defendants' recordkeeping practices mean that "there is scant information regarding whether the particular counterfeit books found in Defendants' possession had already been distributed."  Pl. Mem. at 15.  But this is precisely the problem.  Any failure to show a distribution of a "particular" counterfeit book is fatal to plaintiffs' claims.  The copyright statute does not contemplate a claim that a defendant at some point engaged in copyright infringement as to some work.  Rather, the statute contemplates a claim asserting the violation of exclusive rights in "the copyrighted work," e.g. 17 U.S.C. § 106 (emphasis added) — that is, a particular work.  This requirement is reflected in the myriad cases that require a pleading in a copyright case to identify the "specific original works [that] are the subject of the claim."  E.g., LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501, 507-08 (S.D.N.Y. 2015); accord Kelly, 145 F.R.D. at 36.  Thus, plaintiffs

cannot prevail on a claim of copyright infringement unless they can identify a specific work and show that defendants distributed a counterfeit copy of that specific work.[15]

Plaintiffs also argue that even a counterfeit exemplar found in defendants' possession might itself have been previously rented or sold inasmuch as defendants do not maintain records of rentals, returns, or buybacks. Pl. Supp. Mem. at 10. Plaintiffs argue that "there is no reason to believe that" such a rental or sale had not occurred. Id. at 10-11. But it is plaintiffs' burden to prove such a rental or sale did occur. A reasonable jury could not find such a rental or sale occurred merely based on the presence of a counterfeit copy in defendants' inventory.

For these reasons, defendants' motion for partial summary judgment on plaintiffs' copyright and trademark infringement claims should be granted with respect to these 49 works.

> 2. The (a) 23 Works Surrendered by Third Party Customers of Defendants For Which No Copies Were Found in Defendants' Possession and (b) 19 Works that Tichenor and Mark Blackerby Surrendered to Plaintiffs[16]

Defendants argue that they should be granted summary judgment as to all works where there is only evidence of "counterfeit exemplars surrendered to Plaintiffs by third-party suppliers." Def. Mem. at 25. We view this argument as presenting two situations in which exemplars were surrendered to plaintiffs. One involves customers of defendants, consisting of MBS, Follett, and TBC. The other situation involves suppliers to defendants — specifically, Tichenor and Mark Blackerby, who sold works to defendants and surrendered exemplars of

---

[15] Plaintiffs' trademark claim rests on their assertion that any counterfeit books that were sold by defendants contained their trademarks. E.g., SAC ¶¶ 9, 46, 72. Thus, plaintiffs' trademark claim similarly must show the distribution of a particular unauthorized work.

[16] As noted above, there are 40 distinct works in this section. As discussed below, Roadmap Nos. 63 and 67 were surrendered by both third party customers of defendants as well as from Mark Blackerby.

certain counterfeit works to plaintiffs.  We discuss each situation separately.

        a.        The 23 Works Surrendered by Third Party Customers of Defendants For Which No Copies Were Found in Defendants' Possession

In this category are counterfeit books that have been turned over or "surrendered" to plaintiffs over the last several years by entities that were at some point in time customers of defendants, including MBS, Follett and TBC.  See Def. Mem. at 25-26; Roadmap Nos. 10b, 16, 26, 28, 40, 42, 55, 57, 63, 67, 69, 71, 72, 74, 75, 104, 111, 115, 119, 129 (surrendered by MBS); Roadmap Nos. 16, 17, 25, 28, 110 (surrendered by Follett); Roadmap Nos. 17 (surrendered by TBC).  With respect to Roadmap Nos. 40 and 63, there is additional evidence distinguishing them from the other 21 works in this category.  Roadmap Nos. 40 and 63 are discussed in more detail in section III.A.4 below.  With respect to the other 21 works, there is no evidence that the customers have records on a work-by-work basis that would allow them to identify where each book they surrendered came from.  Nor has any evidence been marshaled by plaintiffs in their memoranda of law that gives information on whether there were or were not other book suppliers who might have provided the counterfeit works to these customers.

Follett, through its representative, testified that it "couldn't say one way or the other whether or not" specific counterfeit books found in its inventory came from defendants.  Dalpe Dep. II at 214.  Nonetheless, Follett further testified that, based on its own mathematical analysis, it was an "absolute certainty" that defendants supplied "some" of the counterfeit copies of Roadmap No. 13 to Follett, and that it had "no doubts" that defendants supplied at least "some" of the other counterfeit books Follett surrendered to the publishers, though it could not attest to a certainty based upon mathematical analysis.  Dalpe Dep. I at 300-01.  The problem with this testimony is that plaintiffs' briefs marshal no evidentiary basis for Follett's assertions.

The fact that Follett is "certain" or has "no doubt" as to the source of the books cannot substitute for evidence that would allow a reasonable jury to conclude by a preponderance of the evidence that defendants actually sold an identified counterfeit work to Follett. With the cited testimony alone, no reasonable juror could reach this conclusion as to any particular book that had been in Follett's possession.

TBC testified that when it receives books from companies like BDB, it stores all books of the same title together on shelves in its warehouse. TBC Dep. at 27. Once the books are aggregated, TBC has no way to determine "which books came from which source, if they're all the same title." Id. at 26-27. When TBC surrendered counterfeit books to plaintiffs, TBC did not put any markings on the books to "identify anything" for them, such as their source. Id. at 26.

MBS testified that when it purchased inventory from defendants, it keeps that inventory "intermingled with inventory provided by other suppliers." Daniel Dep. I at 85. MBS started to place "receiving number" labels on books to track the source of the books in August 2011. See Daniel Dep. II at 53, 84. These stickers could be used to identify the source of a particular book. Daniel Dep. I at 58, 85; see also Exhibit MBS 3 (a list of receiving numbers with corresponding "Customer"). Other than looking at the receiving number, MBS testified that it is "real tough" to determine who supplied a particular book. Daniel Dep. I at 85.

MBS also provided to plaintiffs a list of receiving numbers affixed to books they had purchased. See Email from Lon Daniel, dated Jan. 17, 2014 (annexed as Ex. 22 to Chen Decl.) ("Daniel Email"). Several books — including copies of Roadmap Nos. 76 and 118 — had receiving numbers associated with defendants. See Chen Decl. ¶ 10; Bates Nos. BP-CF-103 and BP-CF-104 (annexed as Ex. 4 to Chen Decl.) (receiving numbers "5292491-9" and "5119409-

0"); Spreadsheet (annexed to Daniel Email), at 17 (noting that receiving numbers "52924919" and "51194090" were associated with "UBX Book Exchange" in Columbus, Ohio).  Neither of these works are part of this summary judgment motion.

After reviewing counterfeit books surrendered by MBS, several counterfeit works were identified bearing stickers of defendants' prior business names.  Chen Decl. ¶ 11; Sticker Photographs.  MBS testified that a book that had such a sticker meant that at one time defendants had owned the book and  "somewhere along the line [defendants] had distributed th[e] book and MBS got it and then MBS determined it was counterfeit and turned it over to the publishers." Daniel Dep. I at 105.  The only one of these works at issue on this motion is Roadmap No. 100, which is addressed in section III.A.3 below.

The import of all this evidence is that certain customers of defendants at some point had counterfeit works in their possession.  It is also clear that, at least in the case of MBS, defendants sold other counterfeit works that are not the subject of this motion.  But it would require speculation to find that defendants actually sold these customers any of the 21 counterfeit works that are at issue in this branch of defendants' motion.  Plaintiffs assert, without actually marshaling the evidence in their memoranda of law, that there is a significant "temporal progression" that shows the flow of books from defendants' suppliers to defendants and then to their customers.  Pl. Mem. at 18; Pl. Supp. Mem. at 11.  This chain seems to boil down to the proposition that for some of the works, defendants sold copies to their customers "within weeks following the purchase from BBW or the Blackerbys."  Pl. Mem. at 18-19.  But there is no evidence that a majority, let alone all, of BBW and the Blackerbys' business involved the sale of counterfeits, so this temporal connection alone has little evidentiary value.  Nor, as already noted, is there any evidence that would allow a jury to conclude that the counterfeit books found

in defendants' customers' possession actually came from defendants.

Accordingly, a reasonable jury could not find that counterfeit copies of 21 of the works found in defendants' customers' possession — Roadmap Nos. 10b, 16, 17, 25, 26, 28, 42, 55, 57, 67, 69, 71, 72, 74, 75, 104, 110, 111, 115, 119, 129 — were distributed by defendants.

        b.    <u>The 19 Works that Tichenor and Mark Blackerby Surrendered to Plaintiffs</u>

For 19 works, plaintiffs' counterfeit exemplars were surrendered not by customers of defendants but rather by two entities that <u>sold</u> books to defendants — specifically, Mark Blackerby and Tichenor.  <u>See</u> Roadmap Nos. 63, 67[17] (surrendered by Mark Blackerby); Roadmap Nos. 11, 12, 21, 39b, 46, 47, 48, 65, 83, 85, 87, 90, 95, 116, 121, 123, 132 (surrendered by Tichenor).  As noted above, there is additional evidence with respect to Roadmap No. 63, which is discussed in more detail in section III.A.4 below.

Plaintiffs' argument as to the Blackerby surrenders is that "a counterfeit title found within Blackerbys' inventory supports more than a reasonable inference that copies of that title sold by Blackerby to Defendants (which Defendants then sold) were also counterfeit."  Pl. Mem. at 20.  This chain of inference again depends on the initial inference that all or at least a very large portion of the particular works sold by Blackerby to defendants consisted of counterfeit books.  However, as already discussed, the mere fact that Blackerby has had a history of dealing in some counterfeit books on some occasions is not a strong enough basis for an inference that the copies of a particular work sold to defendants were themselves counterfeit.

---

[17]  Although Roadmap No. 67 identifies a "Blackerby Surrender" as a source of a counterfeit exemplar, it only identifies "Amazon Flash" under the section "Defendants' Sourcing."  Roadmap No. 67.  Neither party explains this discrepancy.  However, we need not resolve this issue because, for reasons stated below, a reasonable juror could not conclude that defendants distributed a counterfeit copy of this work.

With respect to Tichenor, as has already been described, plaintiffs purchased two counterfeit copies of the Krugman Title (Roadmap No. 94) from defendants in December 2014, Essig Decl. ¶¶ 4-5, and confirmed that Tichenor was defendants' source for the counterfeits, Supp. Chen Decl. ¶ 7.  The Krugman Title is not the subject of this motion.  Tichenor then identified Morena as their source, id. ¶ 9, and quarantined all of the books in its inventory that had been purchased from Morena, id. ¶ 10.  Tichenor's quarantined inventory contained counterfeit copies of works published by plaintiffs — 23 of which had been sold by Tichenor to defendants.  Id. ¶¶ 12-13.  Defendants then quarantined their remaining inventory obtained from Tichenor and allowed plaintiffs to inspect it.  Id. ¶ 13.  Plaintiffs found copies of only three of the counterfeit works Tichenor had purchased from Morena and later sold to defendants, and for two of them, not in the quantities that had been originally obtained by defendants from Tichenor. Id.  Plaintiffs thus assume that Tichenor must have sold counterfeit works to defendants, and then, for 22 of the works, defendants must have sold them to others.  See Pl. Supp. Mem. at 13.

Once again, the failure of proof here revolves around the source of the books.  There is almost no information regarding the nature of Morena's business and whether the counterfeit copies reflected the entirety, the majority, or a small percentage of the books that Morena distributed.  In the absence of this information, a jury could not begin to travel the causal chain that would allow them to conclude that the books from Tichenor that defendants ultimately sold were counterfeit.

Accordingly, summary judgment should be granted for defendants as to this category. This conclusion is subject to two exceptions.  For one of these works, Roadmap No. 90, plaintiffs "recently" obtained a copy from an individual who purchased it from defendants, and plaintiffs confirmed it to be counterfeit.  Supp. Chen Decl. ¶ 17; Pl. Supp. Mem. at 8 n.7.  Thus,

summary judgment should not be granted with respect to Roadmap No. 90.

As noted above, Roadmap Nos. 63 and 67 were surrendered by both one of defendants'
customers and Mark Blackerby. Roadmap No. 63 is discussed in section III.A.4 below. As for
Roadmap No. 67, that plaintiffs have counterfeit exemplars from a customer and a supplier to
defendants makes no meaningful difference because, for the same reasons discussed above, a
juror could not conclude from the mere presence of a counterfeit book in a customer's
possession that defendants distributed counterfeit copies of that book to the customer.

3.      The 29 Works with Combined Evidence

This category consists of 29 works for which a counterfeit copy was found in
defendants' possession after being quarantined and for which a counterfeit copy was surrendered
by a third party. See Roadmap Nos. 4, 6, 9, 13, 18, 24, 27, 29, 30, 31, 32, 33, 35, 36, 37, 43b,
51, 53, 58, 61, 68, 70, 82, 84, 91, 96, 100, 114, 126. As has been described above, only
speculation would allow a jury to connect a counterfeit work in a third party's possession to an
actual sale by defendants. While the existence of a counterfeit copy of a work in defendants'
possession makes the inference that a sale by defendants took place stronger, these
circumstances, even in combination with the other evidence in this case, still do not allow for a
reasonable inference that there was an actual the sale of a specific counterfeit work by
defendants for the reasons already stated.

This conclusion is subject to several exceptions. First, for one of these works, Roadmap
No. 35, there is evidence that defendants distributed counterfeit copies of the work to a
customer, Lindsey Bache. See Roadmap No. 35; Smyres Dep. II at 105; Bache Email. In
February 2011, Bache determined that at least one copy of Roadmap No. 35 that he purchased
from defendants was counterfeit, see Blackerby Dep. at 76, and informed defendants that he was

returning 20 copies of that work that he had purchased from them because he suspected them of being counterfeit, Bache Email at BP-SMY-017819; see Smyres Dep. II at 105.  Defendants traced the source of these books to the Blackerbys.  Smyres Dep. II at 106; Cahill Email.  Defendants subsequently began to segregate books in their inventory that had characteristics similar to the books returned by Bache because they were "possibly . . . not good books."  Smyres Dep. II at 106.  Smyres returned to Blackerby the copies of Roadmap No. 35 that Smyres received from Bache because Smyres suspected them of being counterfeit.  See Blackerby Dep. at 74-79; see Blackerby Email.  Subsequently, defendants told Blackerby that they were returning copies of five works, including Roadmap No. 35, that defendants stated "are also counterfeit."  Cahill Email.  Accordingly, a reasonable jury could conclude that defendants distributed a counterfeit copy of Roadmap No. 35 to Bache.  Thus, summary judgment should not be granted with respect to Roadmap No. 35.

Second, as discussed above, although it is not listed in the Roadmap, there is evidence of a "stickered" counterfeit exemplar of Roadmap No. 100.  See Sticker Photographs at BP-SMY-025598; Chen Decl. ¶ 11.  The "stickered" exemplar of Roadmap No. 100, which was determined to be counterfeit, was surrendered to plaintiffs by MBS.  Chen Decl. ¶ 11.  Because a reasonable jury could conclude that the sticker indicates that the copy came from defendants, the jury could conclude that defendants distributed the copy to MBS.  Thus, summary judgment should not be granted as to Roadmap No. 100.

Finally, there is additional evidence with respect to Roadmap Nos. 31 and 51, which are discussed in more detail in the next section.

4.      Roadmap Nos. 31, 40, 51, and 63

With respect to Roadmap Nos. 31, 40, 51, and 63, there is a much stronger showing that

defendants distributed counterfeit copies of these works.  After being alerted to the problems

with Roadmap No. 35 by Bache, defendants found 100 copies of Roadmap No. 31, 20 copies of

Roadmap No. 40, 70 copies of Roadmap No. 51, and 161 copies of Roadmap No. 63 in their

inventory that they had also purchased from the Blackerbys and that they determined were

counterfeit.  See Cahill Email.  They subsequently returned these 422 copies (which included the

71 copies of Roadmap No. 35) to the Blackerbys.  See Cahill Email; Blackerby Dep. at 75, 78-

79.  Both an employee of defendants, see Cahill Email, and Smyres, see Smyres Dep. II at 136-

37, stated that they were returning these 422 books to the Blackerbys because they were

counterfeit.  Blackerby also testified that the reason they were returned was because defendants

believed they were counterfeit.  Blackerby Dep. at 75, 78-79.

     However, defendants had originally purchased at least 829 copies of these same five

works from the Blackerbys.  Chen Decl. ¶ 6(c).  The 422 copies of these five works that

defendants returned to the Blackerbys were the only copies of these works that defendants had in

their inventory that had been purchased from the Blackerbys.  See Cahill Email (identifying the

422 copies as the "Qty Remaiding [sic]").  In other words, every single identifiable copy of these

five works in defendants' possession that had been purchased from the Blackerbys was

counterfeit.  Under these circumstances, a reasonable jury could conclude that the remaining 407

copies of these five works purchased from the Blackerbys were also counterfeit.  In light of the

fact that defendants are in the business of selling and renting books, the jury could also

reasonably conclude that the 407 copies of the five works were not found in defendants'

inventory because they had been distributed by the defendants.

     In sum, because that there is sufficient evidence to allow a jury to conclude that

defendants distributed counterfeit copies of Roadmap Nos. 31, 40, 51, and 63, summary

judgment should be denied with respect to these works.

       5.     The Remaining Six Works

For the remaining six works, there was neither an exemplar of a counterfeit book in defendants' possession nor an exemplar in a supplier's possession. See Roadmap Nos. 10a, 20, 50, 105, 131, 133a. For the reasons already stated, there is insufficient proof of any distribution by defendants of one of these works.

      B.     Illegal Importation of Counterfeit Goods

Plaintiffs assert a claim for the illegal importation of counterfeit goods under 15 U.S.C. § 1124 and 19 U.S.C. § 1526 on the ground that defendants knowingly imported counterfeit copies of books. SAC ¶¶ 81-84. Defendants contend that there is no private cause of action available to plaintiffs under 15 U.S.C. § 1124 or 19 U.S.C. § 1526. Def. Mem. at 21. We need not address whether plaintiffs have a private cause of action under 15 U.S.C. § 1124, however, because plaintiffs have a private cause of action under 19 U.S.C. § 1526.

Defendants argue that 19 U.S.C. §1526 "provides only for civil penalties assessed by the United States Customs Service" and "not for a private cause of action." Id. (citing 19 U.S.C. § 1526(f)). However, 19 U.S.C. § 1526(c), entitled "Injunction and damages," provides that

> Any person dealing in any . . . merchandise [bearing unauthorized trademarks] may be enjoined from dealing therein within the United States or may be required to export or destroy such merchandise or to remove or obliterate such trademark and shall be liable for the same damages and profits provided for wrongful use of a trademark, under the provisions of sections 81 to 109 of Title 15.

19 U.S.C. § 1526(c). It is settled in this Circuit that the owner of a trademark has the right to pursue a private causes of action for damages under 19 U.S.C. § 1526. See, e.g., Original Appalachian Artworks, Inc. v. Granada Elecs., Inc., 816 F.2d 68, 71 (2d Cir. 1987); Philip Morris USA Inc. v. C.H. Rhodes, Inc., 2010 WL 1196124, at *4 (E.D.N.Y. Mar. 26, 2010);

<u>Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.</u>, 2010 WL 2133937, at *5 (E.D.N.Y. Mar. 11, 2010).  Thus, defendants' motion for summary judgment with respect to plaintiffs' claim for illegal importation of counterfeit goods should be denied.

       C.     <u>Conspiracy to Commit Fraud</u>

       Defendants argue that Pearson's claim alleging a conspiracy to commit fraud fails because plaintiffs have not pleaded an underlying fraud.  <u>See</u> Def. Mem. at 22.  "New York . . . recognize[s] a cause of action for conspiracy to commit fraud."  <u>E.g.</u>, <u>Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.</u>, 888 F. Supp. 2d 431, 451 n.97 (S.D.N.Y. 2012) (citation omitted); <u>accord</u> <u>Maersk, Inc. v. Neewra, Inc.</u>, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008).

> To establish a prima facie case for conspiracy, a plaintiff must allege the primary tort and four additional elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury."

<u>Amusement Indus., Inc. v. Stern</u>, 786 F. Supp. 2d 758, 783 (S.D.N.Y. 2011) (quoting <u>Chrysler Capital Corp. v. Century Power Corp.</u>, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991); <u>accord</u> <u>Kashi v. Gratsos</u>, 790 F.2d 1050, 1055 (2d Cir. 1986) ("In alleging conspiracy, the plaintiff carries the burden of proving (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage.") (citation and internal quotation marks omitted); <u>Decter v. Second Nature Therapeutic Program, LLC</u>, 42 F. Supp. 3d 450, 464 (E.D.N.Y. 2014) ("To properly plead civil conspiracy for these limited purposes, a plaintiff must allege both a primary tort and also show the four elements of a conspiracy . . . .") (citation and internal quotation marks omitted).

       Here, Pearson's claim for civil conspiracy is that defendants conspired with Philomath to defraud Pearson.  <u>See</u> SAC ¶¶ 55-58, 103-09.  Thus, to survive the motion for summary

judgment, Pearson was required to set forth its evidence that (1) that Philomath committed a

fraud against Pearson (that is, the "primary tort") and (2) that defendants conspired with

Philomath to commit this fraud.  See generally Maersk, Inc., 554 F. Supp. 2d at 458.  While

Pearson has provided some evidence regarding the second of these prongs, see Pl. Mem. at 23,

they marshal no admissible evidence at all regarding the underlying tort: that is, the alleged fraud

by Philomath against Pearson.

To survive the motion for summary judgment as to the first prong of the inquiry, Pearson

was required to show proof that would allow a jury to find:

> that (1) [Philomath] made material representations that were false, (2)
> [Philomath] knew the representations were false and made them with the intent to
> deceive [Pearson], (3) [Pearson] justifiably relied on [Philomath's]
> representations, and (4) [Pearson] was injured as a result of [Philomath's]
> representations.

Cerabono v. Price, 7 A.D.3d 479, 480 (2d Dep't 2004) (internal citations omitted).  Pearson

points to no evidence for any of these elements.  See Pl. Mem. at 23-24.  Instead, it cites to

allegations of the complaint and to the fact that it recently sued Philomath.  See id. at 23.

Obviously, these citations cannot satisfy Pearson's evidentiary burden to prove the underlying

tort of fraud, and thus defendants' motion for summary judgment as to plaintiffs' claim for civil

conspiracy to commit fraud should be granted.  See generally Corbett v. eHome Credit Corp.,

2010 WL 1063702, at *3 n.5 (E.D.N.Y. Mar. 22, 2010) ("A claim for civil conspiracy is only

actionable if the complaint states a claim for the underlying tort.") (citations omitted); Fisher v.

Big Squeeze (N.Y.), Inc., 349 F. Supp. 2d 483, 489 (E.D.N.Y. 2004) ("Civil conspiracy cannot

stand on its own, apart from an independent claim asserting the underlying tort that the

defendants allegedly conspired to commit.") (citation omitted); Am. Preferred Prescription, Inc.

v. Health Mgmt., Inc., 252 A.D.2d 414, 416 (1st Dep't 1998) ("[P]laintiff has failed to

sufficiently allege an actionable underlying tort and thus there is no support for the conspiracy allegations."); Buccieri v. Franzreb, 201 A.D.2d 356, 358-89 (1st Dep't 1994) ("Since the complaint sets forth no otherwise actionable tort, plaintiff's fifth cause of action [alleging conspiracy] must be dismissed . . . .").[18]

Accordingly, defendants' motion for summary judgment should be granted as to Pearson's claim for conspiracy to commit fraud.

> ### D.     Other Trademark Claims

Plaintiffs allege various other trademark-related claims for which defendants seek partial summary judgment, see Def. Mem. at 20-21, 23-26, consisting of Trademark Counterfeiting under 15 U.S.C. § 1114(1)(a), SAC ¶¶ 77-80; Trademark Dilution in violation of 15 U.S.C. § 1125(c), id. ¶¶ 85-89; and Federal Unfair Competition and False Designation of Origin in violation of 15 U.S.C. § 1125(a), id. ¶¶ 90-96. Defendants contend that they are entitled to partial summary judgment on these claims as to the 140 works at issue unless "Plaintiffs can evidence Defendants distributed a counterfeit copy of . . . the works at issue." Def. Mem. at 21. Plaintiffs do not contest this argument. Thus, to the extent infringement claims as to particular works are being dismissed because of the lack of proof of distribution or sale, the claims under these other statutes must also fail.

> ### IV.     CONCLUSION

For the foregoing reasons, defendants' motion to for partial summary judgment (Docket

---

[18] Perhaps there is evidence somewhere in the record to meet these elements. However, a district court is not required to "scour the record on its own in a search for evidence." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 125 (2d Cir. 2013) (citation and internal quotation marks omitted). Instead, it is the party's responsibility to set forth such evidence in its memorandum of law.

# 266) should be granted in part and denied in part.  Specifically, defendants' motion should be granted as to all trademark and copyright-related claims for sales regarding the following works: Roadmap Nos. 1, 2, 4, 5, 6, 7, 9, 10a, 10b, 10c, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 36, 37, 39a, 39b, 41, 42, 43a, 43b, 45, 46, 47, 48, 49, 50, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 91, 92, 93a, 93b, 95, 96, 97, 98, 99, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 114, 115, 116, 117, 119, 121, 122, 123, 125a, 125b, 126, 127, 129, 131, 132, 133a, and 133b, and as to Pearson's claim for civil conspiracy, and denied in all other respects.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. William H. Pauley III at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Pauley.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: September 30, 2015
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge