UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOHN WILEY & SONS, INC. et al.,                :

                                               :

                      Plaintiffs,              :        OPINION AND ORDER

                                               :

         -v.-                                   :

                                               :        13 Civ. 816 (WHP) (GWG)
BOOK DOG BOOKS, LLC et al.,                     :

                                               :

                      Defendants.              :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

         Plaintiffs John Wiley & Sons, Inc. ("Wiley"), Cengage Learning, Inc. ("Cengage"), and

Pearson Education, Inc. ("Pearson"), bring this motion seeking sanctions for spoliation of

evidence against defendants Book Dog Books, LLC ("BDB") and its owner, Philip Smyres.[1]  For

the reasons stated below, this motion is denied.

I.       FACTUAL BACKGROUND

         In 2007, plaintiffs, along with publisher McGraw-Hill Companies, Inc. ("McGraw-Hill"),

sued defendants for claims involving, inter alia, copyright and trademark infringement.  See

---

[1]  See Plaintiffs' Notice of Motion for Sanctions for Spoliation, filed Nov. 5, 2014
(Docket # 168); Plaintiffs' Memorandum in Support of Their Motion for Sanctions for
Spoliation, filed Nov. 5, 2014 (Docket # 169) ("Pl. Mem."); Declaration of Julie C. Chen in
Support of Plaintiffs' Motion for Sanctions, filed Nov. 5, 2014 (Docket # 170) ("Chen Decl.");
Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Sanctions for
Spoliation, filed Dec. 3, 2014 (Docket # 185) ("Def. Mem."); Declaration of Tiffany C. Miller in
Support of Defendants' Memorandum of Law in Opposittion [sic] to Plaintiffs' Motion for
Sanctions for Spoliation, filed Dec. 3, 2014 (Docket # 186); Plaintiffs' Reply Memorandum in
Support of Their Motion for Sanctions for Spoliation, filed Dec. 15, 2014 (Docket # 193);
Declaration of Matthew J. Oppenheim in Support of Plaintiffs' Motion for Sanctions, filed Dec.
15, 2014 (Docket # 194).

Complaint, filed Oct. 2, 2007 (Docket # 1 in Cengage Learning Inc. et al. v. Buckeye Books et al., No. 07 Civ. 8540 (S.D.N.Y.)).  The case was settled in 2008.  See Settlement Agreement and Mutual Releases, dated July 11, 2008 (annexed as Ex. 2 to Chen Decl.) ("Settlement Agreement").  In the Settlement Agreement, defendants agreed to cease the sale and importation into the United States of "pirated" and non-United States editions of the textbooks of the publisher-parties to that agreement, which include plaintiffs here.  Id. ¶ 5.  Paragraph 10 of the Settlement Agreement required defendants to disclose the sources of counterfeit books that had previously been obtained by defendants.  Id. ¶ 10.  Defendants were also to be given a "point of contact" at plaintiffs that would permit defendants to send copies of pirated or suspected pirated textbooks to obtain plaintiffs' views as to their authenticity.  Id. ¶ 12.  For a period of 36 months, any failure by plaintiffs to opine within 15 days on the authenticity of a book sent pursuant to this provision meant that defendants could "assume legitimacy" of the book and be released from any claims regarding it.  Id.  The Settlement Agreement also gave plaintiffs the right to verify, including through physical inspection, defendants' adherence to the settlement terms for a period of 36 months following the date of the agreement.  Id. ¶ 8.  The Settlement Agreement did not, however, require defendants to disclose to plaintiffs in the future any purchase, receipt, or sale of counterfeit books or suspected counterfeit books that came into defendants' possession after the date of the agreement.

As required by paragraph 10 of the Settlement Agreement, defendants sent to plaintiffs a document identifying a Thai supplier named "BestBooksWorld" ("BBW") as the "source of most if not all the pirated books."  See Chen Decl., Ex. 7.  Nonetheless, defendants continued to use BBW as a supplier of textbooks.  See Deposition of Philip Smyres, dated Nov. 20, 2013 (annexed in part as Ex. 6 to Chen Decl.) ("Smyres I"), at 253.

2

Defendants also began to purchase textbooks from Perry Blackerby and his brother, Mark Blackerby, through an entity the Blackerbys controlled called "Life Everest, LLC." Deposition of Philip Smyres, dated June 4, 2014 (annexed in part as Ex. 9 to Chen Decl.) ("Smyres II"), at 147-50. In February 2011, a customer of defendants, Lindsay Bache, told plaintiffs that defendants sold him 20 copies of a textbook, published by Cengage, that he claimed were counterfeit. Smyres II at 105; Email from Matt Oppenheim, dated July 19, 2013 (annexed as Ex. 5 to Chen Decl.) ("Bache Email"). Defendants believed that the books came from either Mark Blackerby or Life Everest. Smyres II at 106, 111-12. Defendants also checked other textbooks in their inventory that were purchased from Mark Blackerby that had characteristics similar to the counterfeits they previously identified. Id. at 106-08. Defendants concluded that five other titles from Mark Blackerby — totaling 422 copies, all published by Cengage — were counterfeit as well. Email from Josh Frenette, dated Feb. 23, 2011 (annexed as Ex. 10 to Chen Decl.); Smyres II at 111-13. Defendants shipped the 422 copies back to Mark Blackerby, who later resold them. Smyres II at 112; Deposition of Mark Blackerby, dated Aug. 22, 2013 (annexed in part as Ex. 29 to Chen Decl.), at 75-80.

Following these incidents, defendants assert that they began to inspect all of their inventory. Smyres II at 105. The books that had characteristics similar to the books sold to Lindsay Bache were "pulled" and set aside based on defendants' suspicions that they were counterfeit. Id. at 106-07, 137-38, 144-145. Many of these books were obtained from the Blackerbys or from BBW. Id. at 107-08. Certain books identified as potentially counterfeit were stored on a pallet and sent to a barn owned by Mark Davenport, id. at 139, the director of a division of BDB, Chen Decl. ¶ 29. However, not all of the books identified as potentially counterfeit were sent to Mark Davenport's barn. Smyres II at 139-40. The other books were

placed on a pallet and stored in defendants' warehouse, id. at 139-42, because, as Smyres

explained, he "didn't know what to do with them," id. at 144-145.  He "felt [they] needed to

keep them for . . . . whatever reason . . . until [they] ask counsel what to do with them" and that

"[t]hey were potential evidence in a case that didn't exist, but they were potential issues that

[they] wanted to have — make available, make available to whomever."  Id. at 145-46.  Smyres

further testified that he wanted to keep the books because they were "possibly alleged counterfeit

and [he] didn't want to destroy them because [he] didn't want any problems like [he's] having

right now, so [he] didn't want to have a problem."  Id. at 133.  When asked whether he

understood the books were being preserved because they could be evidence, Smyres responded

"I was preserving some things, yes."  Id.  Smyres stated that he stored some of the potentially

counterfeit books in Mark Davenport's barn, rather than in defendants' warehouse, because his

"concern was that they would be put back in inventory," id. at 129, and because Mark Davenport

had a truck to take the books there, id. at 131.

On April 5, 2011, Smyres informed BBW that he would no longer purchase textbooks

from it unless BBW could produce a publisher invoice because there was "a lot of talk about

counterfeit books coming from Thailand."  Email from Philip Smyres, dated Apr. 5, 2011

(annexed as Ex. 8 to Chen Decl. at 2).  BBW responded that it "c[ould] not [be] responsible but

[it] was sure all [its] books [were] not counterfeit copies."  Email from "Bestbooks textbook,"

dated Apr. 6, 2011 (annexed as Ex. 8 to Chen Decl. at 2).  However, BBW did not provide a

publisher invoice and Smyres subsequently ended communications with it.  Smyres I at 282.

Also on April 5, 2011, Kevin Doenges, defendants' inventory control manager, Chen

Decl. ¶ 25, created a "bestbook counterfeit list," which listed the total inventory remaining from

BBW — 591 books across 13 titles, Email from Kevin Doenges, dated Apr. 5, 2011 (annexed as

Ex. 18 to Chen Decl.) ("Doenges Email").  These titles were published solely by plaintiffs.  See Chen Decl. ¶ 7.  Doenges indicated that he had "remove[d] them from inventory" and was waiting to hear from Smyres about returning them.  See Doenges Email.  He also advised the recipients of the email to "please keep mum about this."  Id.

On May 27, 2011, Andrew Gordon, an employee of defendants, received a phone call from a customer — Mike Dalpe of the Follett Corporation — stating that defendants' account with Follett was "being canceled" because defendants "ha[d] been sending them counterfeit books."  Email from Andrew Gordon, dated May 27, 2011 (annexed as Ex. 11 to Chen Decl.) ("Gordon Email"); Smyres II at 198-99.  Gordon recounted this conversation to Smyres and indicated that he told Dalpe that defendants did not know the books were counterfeit, but that Gordon did not think he could say anything to change Dalpe's mind.  See Gordon Email. Smyres testified that "by th[is] time we were — it appeared to be, you know, books of concern or suspicious books that could be counterfeit and we were trying to get those pulled off our shelves."  Smyres II at 199-200.  Follett returned the shipment of books that it had purchased from defendants that it believed to be counterfeit.  Deposition of Kevin Doenges, dated Nov. 21, 2013 (annexed in part as Ex. 20 to Chen Decl.) ("Doenges Dep."), at 60-61.  Doenges testified that defendants "just put them back in inventory" for resale unless "any of those titles matched the title of potential counterfeit books on [their] list that [they] had at that time."  Id. at 61.

On June 20, 2011, Beverly Elliot, from Texas Book Company, notified defendants that certain titles, which she specified, might be counterfeit and that Texas Book Company had purchased some of those titles from defendants.  Email from Beverly Elliott, dated June 20, 2011 (annexed as Ex. 12 to Chen Decl. at 3); Smyres II at 250-51.  On June 29, 2011, Mark Blackerby told defendants that Perry Blackerby was "in the final stages of wrapping up the counterfeit

5

issues from February thru [sic] March," and that Perry Blackerby met with Pearson "to try and defuse any future issues" but it was "not clear as to how much good it did."  Email from Tom Cahill, dated June 28, 2011 (annexed as Ex. 30 to Chen Decl.).

On July 1, 2011, Smyres told Mark Davenport to "get rid of" the books stored in his barn "because of the suspicion" that they were counterfeit and "[s]o they wouldn't creep back into circulation."  Deposition of Mark Charles Davenport, dated June 18, 2014 (annexed in part as Ex. 24 to Chen Decl.) ("Davenport Dep."), at 42-43.  Smyres instructed Mark Davenport to take the books "to the dump and [pour] water . . . all over them."  Smyres II at 118.  Mark Davenport took the books to the dump that day and watched them get run over by "earth-moving equipment."  Davenport Dep. at 56, 60.  Mark Davenport took pictures with his phone of the books being run over "[t]o prove [they] were destroying the books."  Id. at 56.

On August 5, 2011, plaintiffs sent Smyres a cease-and-desist letter concerning the sale, offering for sale, and distribution of unauthorized copies of textbooks.  Letter from Matthew J. Oppenheim, dated Aug. 5, 2011 (annexed as Ex. 14 to Chen Decl.) ("Aug. 5 Letter").  The letter accused Smyres of engaging in the illegal distribution of "infringing textbooks."  Id. at 1.  The letter also stated that Smyres "must not destroy, conceal or alter any of the textbooks [BDB] currently ha[d] in [its] inventory" but instead must "preserve them" until the matter was resolved, whether through settlement or litigation.  Id. at 2.  The letter did not identify any specific copyrighted work at issue.  See id. at 1-3.

On August 24, 2011, defendants responded, through their attorney Neil Mooney, stating that Smyres was "unaware of selling or otherwise distributing any pirated or otherwise unauthorized copies of any books whatsoever."  Email from Neil Mooney, dated Aug. 24, 2011 (annexed as Ex. 15 to Chen Decl. at 2) ("Mooney Email"); Smyres II at 298.  Mooney asked

plaintiffs' counsel to "identify with specificity any objectionable alleged sales or distribution, and [they] will determine if [his] information is accurate."  Mooney Email.  On August 30, 2011, plaintiffs' counsel followed up by letter to Mooney, which again instructed defendants to preserve "any of the textbooks" BDB then had "in [its] inventory."  Letter from Matthew J. Oppenheim, dated Aug. 30, 2011 (annexed as Ex. 3 to Chen Decl.) ("Aug. 30 Letter"), at 2.  The letter included as an exhibit a list of 10 "Examples" of counterfeit works defendants were alleged to be distributing illegally.  Id. at 4.  Mooney responded via email, stating, "Obviously, any counterfeit editions will be returned upon request and until then maintained in strict confidence."  Email from Neil Mooney, dated Sept. 12, 2011 (annexed as Ex. 4 to Chen Decl.).

Two of the boxes Mark Davenport had stored in his barn were not destroyed at the dump in July 2011.  Davenport Dep. at 44, 53.  In March or April 2012, Mark Davenport's son, Noah Davenport, was caught trying to sell copies of the potentially counterfeit books from the remaining boxes back to a bookstore owned by defendants.  Id. at 46-48, 61.  The employees of the store did not immediately recognize that the books were counterfeit, but rejected the sale because the seller seemed "suspicious."  Id. at 48.  Based on photographs from a security camera, the seller was identified as Mark Davenport's son.  MacFarland Dep. at 69-71; Email from Andrew Gordon, dated May 21, 2012 (annexed as Ex. 27 to Chen Decl.); Email from Barbara MacFarland, dated May 26, 2012 (annexed as Ex. 28 to Chen Decl.).  After calling Smyres and attempting to explain the circumstances, Mark Davenport "threw [the remaining boxes] away on [his] own" because he "wanted this to not be true, so [he] didn't say anything about the books — the boxes of books that got left behind.  And [he] just waited until trash day and threw them in the trash."  Davenport Dep. at 63.  Mark Davenport later informed Smyres of the books' destruction, who was happy because "they were destroyed, as they were supposed to

be in the first place." Id. at 71-72.

Plaintiffs point out, see Pl. Mem. at 11-12, that several of defendants' key employees testified that they were never given instructions to "preserve evidence," see Deposition of Barbara Jean MacFarland, dated July 8, 2014 (annexed in part as Ex. 26 to Chen Decl.), at 78-80; Deposition of Thomas Cahill, dated Feb. 19, 2014 (annexed in part as Ex. 23 to Chen Decl.), at 254-55; Deposition of Josh Frenette, dated Feb. 11, 2014 (annexed in part as Ex. 17 to Chen Decl.) ("Frenette Dep."), at 161-62; Doenges Dep. at 159. David Dimm, Director of Inventory Management, testified that defendants had a policy, as of January 2013, of destroying potentially counterfeit books by shredding them, unless the books were on a list of specific titles provided to defendants by the publishers. Deposition of David Dimm, dated Feb. 28, 2014 (annexed in part as Ex. 21 to Chen Decl.), at 33-34, 44-45, 92-93. If there was a questionable book that was not on the list, the policy was to "destroy those[] [but] [i]f it[] come[s] from a student and it is very expensive, [BDB] may send that back to them." Id. at 33. Defendants did not keep a log of the books that were considered questionable that were not on a list provided to them by the publishers. Id. at 34. Dimm stated that "[i]f it is books that are on the list . . . then we are holding those." Id. at 33. Smyres testified that "once [they] had a list of books, the list of books were quarantined, but all other books that were not part of this case were — that we thought might be counterfeit may have been destroyed, but not the books in this case." Smyres II at 265. Smyres stated that their policy "is not to destroy books that are involved in this case." Id. at 100. However, Josh Frenette, an employee of defendants, Chen Decl. ¶ 22, stated that it was not the defendants' regular practice to destroy or recycle books that they had determined to be fake or counterfeit, Frenette Dep. at 160-61. In an email exchange between Smyres and Dimm about "fraud controls," Smyres stated that books received from suppliers that do not "compare

8

positively" to a comparison copy received directly from a publisher are "set aside and destroyed." Email from Philip Smyres, dated Apr. 8, 2013 (annexed as Ex. 22 to Chen Decl.).

In October 2012, defendants identified two titles that they purchased from a Taiwanese supplier, published by Pearson, that may have been counterfeit. Email from Kevin Doenges, dated Oct. 4, 2012 (annexed as Ex. 13 to Chen Decl.). At his deposition, Smyres stated that it was possible that the books were destroyed. Smyres II at 273.

On December 18, 2012, defendants filed a lawsuit in the Southern District of Ohio, seeking, inter alia, a declaration that they have not infringed plaintiffs' copyrights. See Complaint, filed Dec. 18, 2012 (Docket # 1 in Book Dog Books, LLC v. Cengage Learning, Inc. et al., No. 12 Civ. 1165 (S.D. Ohio)). On September 5, 2013, the case was transferred to the Southern District of New York. It was dismissed without prejudice following filing of a notice of voluntary dismissal by the plaintiffs in that action. Plaintiffs' Notice of Voluntary Dismissal [Without Prejudice], filed Nov. 7, 2014 (Docket # 88 in 13 Civ. 6413).

In January 2013, an internal email exchange revealed that defendants received copies of a title published by Cengage that were "very fake." Email from Josh Frenette to Tom Cahill, dated Jan. 2, 2013 (annexed as Ex. 19 to Chen Decl.) ("Frenette Email"). When Tom Cahill, another employee of defendants, Chen Decl. ¶ 28, asked to see the books, Frenette replied that the "books have already been disposed of," Frenette Email.

Plaintiffs filed their initial complaint on February 4, 2013, see Complaint, filed Feb. 4, 2013 (Docket # 1) ("Compl."), and a second amended complaint on May 27, 2015, alleging claims including copyright and trademark infringement against BDB and Smyres, see Second Amended Complaint, filed May 27, 2015 (Docket # 263) ("SAC"), ¶¶ 59-109. Attached to both complaints were lists of plaintiffs' titles that defendants were alleged to have infringed. See Ex.

A to Compl.; Ex. A to SAC.

On October 24, 2013, February 13, 2014, and March 4, 2014, representatives of Pearson and Cengage inspected books set aside by defendants.  Chen Decl. ¶ 6.  The books that were set aside consisted of works published by Pearson, Cengage, Wiley, and McGraw-Hill.  Id. Plaintiffs discovered 208 counterfeit Cengage books, 96 counterfeit Pearson books, and 26 counterfeit McGraw-Hill books.  Id.  On June 4, 2014, Wiley inspected five copies of a Wiley title that had been set aside.  Id.  All five were found to be counterfeit, and as a result of that inspection, plaintiffs were able to identify 80 additional counterfeit titles, 51 of which were added to this case.  Id.  The 51 titles were comprised of "21 Cengage titles, 29 Pearson titles, and one Wiley title."  Id.

During these inspections, however, plaintiffs did not find any copies of 4 of the 13 titles that Doenges had  identified in the "bestbook counterfeit list."  Chen Decl. ¶ 8.  As of the time plaintiffs filed this motion, 32 of the titles at issue in this case were never found in defendants' inventory and 28 of those 32 titles were sold to defendants by BBW or Mark Blackerby/Life Everest.  Id. ¶ 9.

## II.   LAW GOVERNING MOTIONS FOR SPOLIATION SANCTIONS

Spoliation is "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).  A party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation claim.  Id. at 109; accord Centrifugal Force, Inc. v. Softnet Commc'n, Inc., 783 F. Supp. 2d 736, 740-41 (S.D.N.Y. 2011) (citation omitted).  These elements are (1) that "the party having control over the evidence . . .

10

had an obligation to preserve it at the time it was destroyed"; (2) that the evidence was

"destroyed with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to

the party's claim or defense.  Byrnie, 243 F.3d at 107-09 (citations omitted and punctuation

altered); accord Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012).  Any

sanction imposed by a court should be designed to "(1) deter parties from engaging in spoliation;

(2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3)

restore the prejudiced party to the same position he would have been in absent the wrongful

destruction of evidence by the opposing party."  West, 167 F.3d at 779 (citations and internal

quotation marks omitted); accord Chin, 685 F.3d at 162.  Additionally, "[i]t is well accepted that

a court should always impose the least harsh sanction that can provide an adequate remedy.  The

choices include — from least harsh to most harsh — further discovery, cost-shifting, fines,

special jury instructions, preclusion, and the entry of default judgment or dismissal."  Pension

Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 469

(S.D.N.Y. 2010) (internal citations omitted), abrogated on other grounds by Chin, 685 F.3d 135.

III.   DISCUSSION

To meet the first element of spoliation, plaintiffs must show that defendants "had an

obligation to preserve [the evidence] at the time it was destroyed."  Byrnie, 243 F.3d at 107

(citation and internal quotation marks omitted).  "Identifying the boundaries of the duty to

preserve [evidence] involves two related inquiries: when does the duty to preserve attach, and

what evidence must be preserved?"  Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216

(S.D.N.Y. 2003) (emphasis omitted).  In the usual situation, "[t]he obligation to preserve

evidence arises when [a] party has notice that the evidence is relevant to litigation or when a

party should have known that the evidence may be relevant to future litigation."  Fujitsu Ltd. v.

Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citation omitted); accord R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 23 (S.D.N.Y. 2010); Scalera v. Electrograph Sys., Inc., 262 F.R.D. 162, 171 (E.D.N.Y. 2009); Treppel v. Biovail Corp., 249 F.R.D. 111, 118 (S.D.N.Y. 2008).  Thus, this obligation to preserve evidence arises "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation."  Kronisch v. United States, 150 F.3d 112, 126-27 (2d Cir. 1998) (citations omitted), abrogated on other grounds by Rotella v. Wood, 528 U.S. 549 (2000). "[W]hen the duty to preserve evidence arises may, under certain circumstances, be dependent upon the nature of the evidence."  Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009).

Plaintiffs argue that defendants had a duty to preserve all counterfeit or suspected counterfeit books long before the suit in the instant matter was filed on February 4, 2013 based on the fact that the defendants had previously been sued and that they were aware that they were on some occasions dealing in counterfeit works.  See Pl. Mem. at 3-9.  In support of this argument, plaintiffs point to cases involving individuals who had experienced an accident or assault on a defendant's premises.  Pl. Mem. at 3.  Courts have found in such cases that the person in control of the premises was obligated to preserve video of the incident even in the absence of a lawsuit or a request to preserve evidence.  See Taylor v. City of New York, 293 F.R.D. 601, 610-11 (S.D.N.Y. 2013); Slovin v. Target Corp., 2013 WL 840865, at *3 (S.D.N.Y. Mar. 7, 2013); see also Quraishi v. Port Auth. of N.Y. & N.J., 2015 WL 3815011, at *5 (S.D.N.Y. June 18, 2015). ("[C]ourts have consistently found defendants put on notice by a serious accident or injury occurring on their premises.") (citations omitted).  But we see a vast

difference between a "serious accident or injury" occurring on a landowner's premises — an event that is frequently followed by a lawsuit — and the situation here.  The sale of a counterfeit book by a bookseller does not rise anywhere near the level of damage caused by a personal injury and thus it frequently happens that such sales are not followed by litigation.  Moreover, a person injured in an accident or other incident is obviously aware of the incident, making it far more likely that he or she will sue.  In the case of a sale by a bookseller of an infringing work, the injured party — that is, the copyright holder — is likely to be completely unaware of the sale.   Thus, we view the sale of a counterfeit work — particularly, an unwitting sale as defendants assert here — as creating far different expectations for litigation than is created by an accident causing personal injury.

Plaintiffs perhaps envision a regime under which any tortfeasor is required to preserve all evidence of their wrongdoing indefinitely.  That is not the law that governs spoliation, however. Instead, a prerequisite to the duty to preserve is that there be actual litigation or "reasonably foreseeable" litigation.  Byrnie, 243 F.3d at 107.  Given the circumstances that existed at the time the destruction of books occurred, we cannot find that litigation over the counterfeit books defendants found in their possession — not only the ones that had never been sold but even the relative few that had been returned from purchasers — was "reasonably foreseeable."

Additionally, the lack of an obligation to preserve is even more obvious given the character of the evidence that plaintiffs assert should have been preserved.  A counterfeit book — as opposed to, for example, a record showing a sale of a particular counterfeit book — usually provides little evidence of an actual copyright violation by the possessor of the book. See generally John Wiley & Sons v. Book Dog Books, LLC, 2015 U.S. Dist. LEXIS 133121, at *43-*50 (S.D.N.Y. Sept. 30, 2015).  Thus, from a seller's perspective, the mere existence of a

counterfeit book in its inventory would not signal that the book constituted evidence "relevant" to a future litigation. Fujitsu Ltd., 247 F.3d at 436. The reasonableness of this view is bolstered by the fact that even the Follett Corporation, "one of the nation's oldest and largest book distributors" to use plaintiffs' characterization, see Memorandum in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment, filed Mar. 9, 2015 (Docket # 239), at 6, did not preserve several hundred counterfeit titles it received from defendants but instead returned them without notifying the publishers, see Deposition of Michael P. Dalpe, dated Nov. 12, 2013 (annexed in part as Ex. 19 to Declaration of Julie C. Chen, filed Mar. 9, 2015 (Docket # 241)) at 120-21.[2]

In plaintiffs' view, defendants should have known of the need to preserve all counterfeit books defendants found in their inventory based on the fact that defendants had previously been sued by plaintiffs and had entered into the Settlement Agreement. See Pl. Mem. at 9. For plaintiffs, the existence of the Settlement Agreement meant that "Defendants knew that the counterfeit textbooks they destroyed or failed to preserve were potential evidence for a litigation." Id. However, we do not see how the prior litigation between the parties and the settlement agreement change the analysis. The mere fact that plaintiffs previously sued defendants over copyright and trademark violations does not suggest that any future sale of a counterfeit book was likely to result in litigation. As for the Settlement Agreement, it contained

---

[2] Another case relied on by plaintiffs, UMG Recording, Inc. v. Escape Media Group, Inc., 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014), see Pl. Mem. at 3-4, is distinguishable based on the nature of the evidence that was alleged to be spoliated. In UMG Recording, Inc., the defendant's business was to make copyrighted music available to the public over the internet and the defendant was "aware that its business model depended upon the use of infringing content." Id. at 2. Unlike the situation here, the spoliated evidence in that case was directly relevant to showing which particular music had been made available and what means had been used to do so. See id. at *7-*10.

no obligation to preserve exemplars of counterfeit books that came into defendants' possession following the execution of the agreement — a provision that might have been included.  Instead, its central feature was to put into the form of injunctive relief defendants' pre-existing obligations not to distribute or import counterfeit books.  Settlement Agreement ¶ 5.  Of course, plaintiffs' argument as to prior litigation does nothing to address the minimal relevance of the counterfeit exemplars as an evidentiary matter.

Plaintiffs imply that Smyres testified that he knew some of the textbooks that he had ordered destroyed were "potential evidence in a [future] case."  Pl. Mem. at 7 (quoting Smyres II at 146).  In fact, Smyres, following the wording of the questioner at the deposition, said the books were "potential evidence <u>in a case that didn't exist</u>."  Smyres II at 146 (emphasis added).  This statement does not reflect that he thought litigation was "reasonably foreseeable" at the time of the books' destruction.  <u>Byrnie</u>, 243 F.3d at 107.

Plaintiffs did send a cease-and-desist letter to defendants dated August 5, 2011, that asserted defendants engaged in copyright and trademark infringement and included a demand that defendants preserve evidence.  Aug. 5 Letter at 2.  Case law has recognized that such letters will in some instances create an obligation to preserve evidence.  <u>See</u> <u>R.F.M.A.S.</u>, 271 F.R.D. at 33 ("In many copyright cases, the duty to preserve evidence is triggered when the defendants receive a cease-and-desist letter from the plaintiff.") (citation omitted) (dictum).  But to be effective in alerting a party to the potential institution of litigation, the letter must give some specifics as to the particular claim that will be made.  The Aug. 5 Letter, however, said only that the plaintiffs had evidence that the defendants "engaged in the illegal and improper distribution of infringing textbooks."  Aug. 5 Letter at 1.  It did not list any specific acts of infringement or even provide a list of titles that were at issue.  Moreover, its demand for preservation was

breathtakingly broad — instructing defendants to preserve "any" of the "textbooks [they] currently have in [their] inventory." Id. at 2. In the context of defendants' business operations — which involved the buying or selling of "millions" of books, Def. Mem. at 11 — defendants could not have been expected to preserve indefinitely every single textbook in their inventory. Nor would it be reasonable for this Court to impose an obligation even as to any counterfeit books given that the mere presence of counterfeit textbooks in a bookseller's inventory has only minimal evidentiary value in showing that defendants had committed a copyright or trademark violation.

On August 30, 2011, plaintiffs — while repeating their demand that defendants preserve all of the textbooks in their inventory, Aug. 30 Letter at 2 — for the first time attached a list of 10 titles that they contended had been infringed, id. at 4. We will accept arguendo that this letter put defendants on notice that they had an obligation to preserve any counterfeit copies of the 10 works listed. But the Court is unaware of any evidence that defendants destroyed any counterfeit exemplars of those 10 works.

The filing of this lawsuit on February 4, 2013, certainly gave notice to defendants that they had to preserve any evidence relevant to the claims in the lawsuit. Plaintiffs do not identify, however, any act of spoliation of evidence relevant to the claims in the lawsuit that occurred after February 4, 2013.

Because plaintiffs have not met their burden of showing that defendants had an obligation to preserve counterfeit books they found in their possession, it is not necessary to reach the other elements of a spoliation claim.

16

IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for sanctions for spoliation of evidence

(Docket # 168) is denied.[3]

SO ORDERED.

Dated: October 2, 2015
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[3]  This ruling should not be construed as opining on whether a permissive (rather than a mandatory) adverse inference instruction is appropriate as a result of the defendants' destruction of specific books.  As the Second Circuit has made clear, a permissive adverse inference instruction does not necessarily reflect a sanction and its delivery to a jury does not require the same findings necessary to impose a spoliation sanction.  See Mali v. Fed. Ins. Co., 720 F.3d 387, 391-94 (2d Cir. 2013); Klipsch Grp., Inc. v. Big Box Store Ltd., 2014 WL 904595, at *4 (S.D.N.Y. Mar. 4, 2014).  Additionally, the decision whether to grant a permissive adverse inference instruction "will necessarily be informed by factors and evidentiary support different from what is necessary to obtain a spoliation sanction."  Singh v. Penske Truck Leasing Co., L.P., 2015 WL 802994, at * 7 (S.D.N.Y. Feb. 26, 2015).