USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/29/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JOHN WILEY & SONS, Inc., *et al.*,

                Plaintiffs,

   -against-

BOOK DOG BOOKS, LLC, and PHILIP
SMYRES,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

: 13cv816

: MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

      John Wiley & Sons, Inc., Cengage Learning, Inc., and Pearson Education, Inc. (the "Publishers") bring this action against Book Dog Books, LLC and Philip Smyres ("Book Dog") for copyright and trademark infringement, illegal importation of counterfeit goods, breach of contract, and conspiracy to commit fraud. On September 30, 2015, Magistrate Judge Gabriel Gorenstein issued a Report and Recommendation (the "Report") that recommended largely granting Book Dog's motion for summary judgment, dismissing the Publishers' conspiracy to commit fraud claims, and dismissing 117 of 124 infringement claims. (See ECF No. 308.) The Publishers object. For the following reasons, this Court declines to adopt the Report's recommendation as to the 117 infringement claims, and adopts the Report in all other respects.

## BACKGROUND

      The parties in this case are serial litigants. Familiarity is presumed with the multiple memoranda and orders that have been entered in this action. See John Wiley & Sons, Inc. v. Book Dog Books, LLC, No. 13-cv-816 (S.D.N.Y. filed Feb. 4, 2013). But on the off chance that someone may happen upon this Memorandum and Order, the following summary—drawn from an earlier opinion—sets the stage.

The Publishers create and distribute educational textbooks. (Second Amended Compl. ¶ 1 ("SAC").) Book Dog Books, LLC is a textbook reseller. (SAC ¶ 2.) Defendant Philip Smyres ("Smyres") is its founder and chief executive officer. Over the years, the parties have continually sparred over counterfeit textbooks allegedly sold by Book Dog. In 2007, the Publishers[1] sued Book Dog, asserting similar infringement claims. See Cengage Learning, Inc. v. Buckeye Books, No. 07-cv-8540 (S.D.N.Y. filed Oct. 2, 2007). In 2008, Book Dog entered into an agreement to settle that action (the "Settlement Agreement"). (See Declaration of Julie C. Chen dated January 26, 2015, Ex. 1, ECF No. 203.) In a disclosure under the Settlement Agreement, Book Dog informed the Publishers that "Best Books World," ("Best Books") a Thailand supplier, was the source of "most if not all the pirated books." (Declaration of Julie C. Chen dated March 9, 2015, ¶ 4 ("Chen Decl."); Chen Decl. Ex. 1, Smyres Dep. Ex. 13, at 2.)

Despite its promise not to infringe, Book Dog maintained neither lists of counterfeit books found in its inventory nor lists of those counterfeit suppliers. Compounding the problem, Book Dog's CEO acknowledged that the company's purchase-order system was "not very good." (Chen Decl., Ex. 11, June 5, 2014 Deposition of Philip Smyres, at 77–78; Chen Decl. Ex. 24, February 28, 2014 Deposition of David Dimm, at 33–34 ("Dimm. Dep.").) And nonetheless, Book Dog continued to deal with Best Books and purchased more than 11,000 textbooks from them. (Chen Decl. ¶ 6(a).)

Book Dog also purchased textbooks from other distributors such as Mark and Perry Blackerby (and their company "Booksvalue.com"). (See Chen Decl. Ex. 40, June 4, 2014 Deposition of Philip Smyres ("Smyres Dep. II"), at 147–50.) The Blackerbys had been sued previously for importing and distributing counterfeit textbooks. See John Wiley & Sons, Inc. v.

---

[1] While not a plaintiff in this action, McGraw Hill Companies, Inc. was a plaintiff in the 2007 action.

2

Booksvalue.com, Inc., No. 06-cv-2314 (N.D. Ala. filed Mar. 24, 2006). And Smyres himself believed that the Blackerbys were obtaining books from overseas. (See Chen. Decl. Ex. 40, Smyres Dep. II, at 147–50.)

In 2014, the Publishers purchased several counterfeit works from Book Dog's website. (Chen Decl. ¶ 12.) Those books were sourced from the "Tichenor College Textbook Company" ("Tichenor"). (See Supplemental Declaration of Julie C. Chen dated June 29, 2015, ¶ 7, ECF No. 277 ("Supp. Chen Decl.").) Tichenor later confirmed that the counterfeit textbooks originated with a Jordanian broker named "Morena for International Trading." (Supp. Chen. Decl. ¶ 9.) And a Thailand-based book reseller, Philomath Co. Ltd ("Philomath"), made bulk sales to Book Dog in spite of the fact that its books were labeled for distribution only outside of the United States. (See, e.g., Chen Decl. Ex. 12, Feb. 19, 2014 Deposition of Thomas Cahill, at 185–237; Chen. Decl. Ex. 14.)

I. Book Dog's Motion for Summary Judgment

The Publishers claim copyright and trademark violations with respect to 140 works.[2] The Publishers' evidence is summarized in their "Revised Roadmap," a document designated to replace the voluminous evidence the Publishers would otherwise use to prove their claims.[3] For each work, the Roadmap lists identifying information, whether counterfeit exemplars were discovered on Book Dog's premises or obtained from third parties, the source of any counterfeit exemplars, Book Dog's suppliers, and any information about the sales of that

---

[2] The Revised Roadmap identifies 133 titles. However, because some titles appear in more than one edition, 140 total works have been identified in this action. (See Report at 2–3.)

[3] See Fed. R. Evid. 1006 ("The proponent [of evidence] may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.").

3

work. (See ECF No. 269-3, at 3 ("Revised Roadmap").) Book Dog does not generally contest the accuracy of the evidence contained in the Revised Roadmap. (See Defendants' Local Rule 56.1 Statement ¶ 10, Declaration of Tiffany C. Miller, ¶ 6 ("Miller Decl.").)

II. The Report

In recommending that Book Dog's motion be granted as to the trademark and copyright infringement claims for 117 of the 124 works,[4] the Report created categories based on the location where the Publishers discovered a counterfeit textbook. (Report at 22–39.) The Magistrate Judge concluded that the absence of a counterfeit exemplar in the possession of Book Dog or a counterparty warranted granting summary judgment against the Publishers on 6 works. (Report at 39.) With respect to 49 counterfeit works actually found in Book Dog's possession, the Magistrate Judge concluded that possession alone could not give rise to an inference that Book Dog distributed them. (Report at 26–30.) For another 23 counterfeit works found only in the possession of Book Dog's customers, the Magistrate Judge concluded that the customers' lack of records precluded an inference that the textbooks came from Book Dog.[5] (Report at 30–34.) For 19 counterfeit works found in the possession of Book Dog's suppliers, Tichenor and the Blackerbys, the Magistrate Judge found that the Publishers could not prove that those specific textbooks were diverted to Book Dog. (Report at 34–36.) Finally, for 29 counterfeit works found both in Book Dog's possession and in the possession of one of Book Dog's counterparties, the Magistrate Judge concluded that while the presence of those works in both locations gave rise to a "stronger" inference of infringement, a reasonable jury could still not infer that a

---

[4] Because of overlap between certain categories identified in the Report, the sum total of the categorized works exceeds 124.

[5] In 2011, one customer, MBS Book Exchange, began placing stickers on their textbooks to identify their source. (See Report at 12.)

4

counterfeit textbook transuded from Book Dog's suppliers, to Book Dog, and through to Book Dog's customers. (Report at 36–38.) The Magistrate Judge recommended denying summary judgment as to 4 works for which Book Dog's internal correspondence indicated that the company had returned counterfeit works to the Blackerbys, but had nonetheless ordered additional copies of the same titles. (Report at 38.)

On the "illegal importation of counterfeit goods" claim, the Magistrate Judge concluded that 19 U.S.C. § 1526 creates a private right of action for damages. (Report at 39.) And on the "conspiracy to commit fraud" claim, the Magistrate Judge concluded that the Publishers' allegations—and the filing of a lawsuit against Philomath—were insufficient to sustain the Publishers' burden of proof at summary judgment. (Report at 42.)

## LEGAL STANDARD

Courts "may accept, reject, or modify, in whole or in part, the findings or recommendations of a magistrate judge." 28 U.S.C. § 636(b)(1). "This Court reviews de novo those parts of the Report to which objections are made and reviews the remainder for clear error on the face of the record." Strujan v. Teachers Coll. Columbia Univ., No. 08-cv-9589, 2010 WL 3466251, at *2 (S.D.N.Y. Sept. 3, 2010) (citing 28 U.S.C. § 636(b)(1)); see Johnson v. Greiner, No. 03-cv-5276, 2007 WL 2844905, at *7 (S.D.N.Y. Sept. 28, 2007).

Summary judgment should be rendered if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a

5

reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).

This Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. See Liberty Lobby, 477 U.S. at 255; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A party opposing summary judgment "must show that there is admissible evidence sufficient to support a finding in [his] favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001).

## DISCUSSION

### I. Copyright and Trademark Claims

The Publishers bring claims for copyright infringement, alleging that Book Dog sold numerous counterfeit copies of their textbooks. "To establish infringement of copyright, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (quotation omitted). Book Dog disputes only whether it "copied" any copyrighted works. For the purposes of the Copyright Act, the prohibition on "copying" extends to "distribut[ing] copies of [the] copyrighted work." Arista Records, 604 F.3d at 117.[6]

Relying on the same facts, the Publishers also bring a bevy of Lanham Act claims. For the Publishers to prove their "Lanham Act claims—of trademark counterfeiting and infringement in violation of 15 U.S.C. § 1114, and false designation of origin and trade dress infringement in violation of 15 U.S.C. § 1125(a)—they must demonstrate (1) that they had a protectable interest in the marks, and (2) that Defendants' unauthorized commercial use of the

---

[6] The "first sale" doctrine protects consumers or used-book sellers who, after buying a copyrighted work, choose to resell the copy to a third party. See Kirtsaeng v. John Wiley & Sons, Inc., 133 S. Ct. 1351, 1355 (2013). However, the "first sale" doctrine does not protect persons who resell pirated works. See Kirtsaeng, 133 S. Ct. at 1361.

marks was likely to confuse consumers as to the source of the goods." Nike, Inc. v. Top Brand Co. Ltd., No. 00-cv-8179, 2005 WL 1654859, at *4–5 (S.D.N.Y. July 13, 2005) (citing Virgin Enters. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003)).[7] Book Dog disputes only that it engaged in unauthorized "use" by selling the Publishers' trademarked works.

Book Dog argues that the Publishers cannot rely on certain circumstantial evidence—such as the presence of a copyrighted text only in Book Dog's inventory, or in the inventories of its counterparties—to show that Book Dog actually distributed specific infringing works to its customers. The parties agree that for most of the Publishers' works, there are no accounting records that demonstrate the full chain of title: (1) that Book Dog bought a pirated textbook from a supplier; (2) that Book Dog had that specific textbook in its inventory; and (3) that Book Dog sold that specific textbook to a customer. Instead, the Publishers rely on a combination of the presence of infringing texts in the inventories of Book Dog or its counterparties, Book Dog's inventory practices, and Book Dog's destruction of documents to demonstrate a history of dealing in pirated textbooks.

To oppose a motion for summary judgment, the Publishers need not rely on indisputable evidence of infringement. Rather, reading the evidence in the light most favorable to the Publishers, they need only create a "genuine dispute of material fact" as to whether Book Dog infringed the 124 works at issue in Book Dog's motion.

"[C]ircumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment." Gayle v. Gonyea, 313 F.3d 677, 678

---

[7] Plaintiffs also bring a claim for unfair competition. The nuances of the differing elements required by the trademark-infringement claims and the unfair competition claims are not relevant for the purposes of Book Dog's motion. By analogy, the "unfair competition" claim requires the use of a misleading promotion that damaged the plaintiffs' reputation. See UPS Store, Inc. v. Hagan, No. 14-cv-1210, 2015 WL 925697, at *4 (S.D.N.Y. Nov. 18, 2015).

(2d Cir. 2002). Indeed, the Second Circuit has concluded that the improper copying or distribution of a plaintiff's work may be shown "either by direct evidence or by indirect evidence." Repp v. Webber, 132 F. 3d 882, 889 (2d Cir. 1997). And such indirect evidence "includ[es] access to the copyrighted work, similarities that are probative of copyright . . . and expert testimony." Webber, 132 F.3d at 889; see Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627, 647 (S.D.N.Y. 2011) ("[Plaintiffs] need not offer actual copies of the works at issue. . . . [T]estimony and other documents are sufficient to establish that copying occurred."); cf. Island Software & Comput. Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 264 (2d Cir. 2005) (permitting proof of willful infringement through circumstantial evidence).

  Book Dog's cramped approach to the chain of title for each allegedly infringing work is not supported by case law. As the Magistrate Judge noted, the "sole case" relied upon by Book Dog "contains no holding requiring production or witnessing of an actual counterfeit copy." (Report at 25 (citing Kelly v. L.L. Cool J., 145 F.R.D. 32 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994).) While it is true that the evidence of infringement would be stronger if each infringing sale could be separately identified, lax record-keeping by Book Dog, its suppliers, and its customers inhibits such proof. (See Chen Decl. Ex. 40, Smyres Dep. II, at 242–43; Chen Decl. Ex. 24, Feb. 28, 2014 Deposition of David Dimm, at 33–34 ("Dimm Dep.").) And, what records did exist were sometimes destroyed. (Chen Decl. Ex. 40, Smyres Dep. II at 118–19, 133; Chen Decl. Ex. 23, June 18, 2014 Deposition of Mark Davenport at 40, 52–56.)

  For example, while Book Dog's CEO ordered that a pallet of counterfeit books be taken to a barn and destroyed, no records were maintained of what was destroyed. And until April 2013, Book Dog continued to destroy or return counterfeit textbooks without keeping records of what was returned or destroyed, even though Book Dog had been on the receiving end

8

of infringement lawsuits. (Chen Decl. Ex. 40, Smyres Dep. II, at 242–45; Chen Decl. Ex. 24, Dimm Dep., at 33, 33–45, 46.) A factfinder might infer from a distributor's failure to retain such records that the goods sold were counterfeit. See, e.g., Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc., 507 F. App'x 26, 31 (2d Cir. 2013) (summary order) (affirming summary judgment order on grounds that the defendant failed to act with "sufficient care to ensure that its goods were not counterfeit," and "exhibited willful blindness with respect to the goods it acquired"). Here, Book Dog was generally aware that it was sourcing books from alleged counterfeiters, continued to do business with them, and for many years, failed to maintain records that would confirm or dispel suspicions that their inventory contained counterfeits.

In sum, a reasonable jury could find that Book Dog's purchases from suppliers accused of dealing in counterfeit textbooks, failure to keep accurate records, and destruction of potentially infringing textbooks—combined with the counterfeit exemplars uncovered by the Publishers—support the inference that Book Dog sold the counterfeit textbooks. The fact that certain textbooks were found only in Book Dog's possession, only in the possession of Book Dog's customers or suppliers, or in the possession of none of these entities does not preclude an inference that the records would have been available if Book Dog had adequate anti-counterfeiting measures and accurate books and records. Accordingly, this Court declines to adopt the Magistrate Judge's recommendation that summary judgment be granted to Book Dog on the copyright and trademark infringement claims.

II. Illegal Importation of Counterfeit Goods

No objection was raised to the Report's recommendation to deny Book Dog's motion for summary judgment on the claim for importation of counterfeit goods. And 15 U.S.C. § 1526 provides a private cause of action. See Original Appalachian Artworks, Inc. v. Granada

Elecs., Inc., 816 F.2d 68, 70 (2d Cir. 1987) ("The markholder . . . may pursue private remedies against the importer under section 526(c) [of the Tariff Act of 1922].").

III.     Conspiracy to Commit Fraud

The Magistrate Judge concluded that aside from the pleadings, the Publishers failed to present evidence of an underlying fraud. Wisely, the Publishers "do not challenge" the Magistrate Judge's recommendation to dismiss the civil conspiracy count. (ECF No. 317, at 1.)

CONCLUSION

For the foregoing reasons, this Court declines to adopt that portion of the Report granting summary judgment to Book Dog on 117 of the 124 infringement claims, and adopts that portion of the Report denying summary judgment with respect to the 7 remaining claims. This Court affirms and adopts the Report with respect to the illegal importation of counterfeit goods claim and the civil conspiracy claim. Accordingly, Book Dog's motion for summary judgment is denied in all respects except as to that portion seeking dismissal of the civil conspiracy claim. The Clerk of Court is directed to close the motion pending at ECF No. 266.

Dated: March 29, 2016
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record via ECF.*