**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOHN WILEY & SONS., et al.,

             Plaintiffs,

     -against-

BOOK DOG BOOKS, LLC, et al.,

             Defendant.

Case No: 13 Civ. 816 (WHP)

<u>**DEFENDANTS' MEMORANDUM OF LAW**</u>
<u>**IN SUPPORT THEIR MOTION FOR RECONSIDERATION**</u>

MANDEL BHANDARI LLP
Evan Mandel
Rishi Bhandari
Robert Glunt
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600
F:  (646) 964-6667

*Attorneys for Defendants Book Dog*
*Books, LLC and Philip Smyres*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................... 1

STANDARD OF REVIEW ............................................................................................... 3

ARGUMENT .................................................................................................................... 5

    I.     THE ORDER RESTS UPON INCORRECT STATEMENTS, INADMISSIBLE
          EVIDENCE, AND MERE ALLEGATIONS NOT SUPPORTED BY
          PROFFERED EVIDENCE ....................................................................... 5

          A.    Defendants Did Not Destroy "Documents" or "Records" ......................... 5

          B.    A Jury Cannot Infer Liability from Defendants' Supposed
                "History of Dealing in Pirated Textbooks" ............................................... 6

          C.    Prior "Accusations" Against Defendants' Suppliers Are Not
                Evidence of Anything ............................................................................... 7

          D.    Defendants' "Record-Keeping" Is Normal within the Industry ................ 8

    II.    PLAINTIFFS HAVE NOT SUBMITTED EVIDENCE FROM WHICH A
          FACTFINDER COULD CONCLUDE THAT DEFENDANTS SOLD
          INFRINGING COPIES OF EACH WORK AT ISSUE ..................................... 11

          A.    Books for which No Counterfeit Copy Exists ......................................... 12

          B.    Books in Defendants' Suppliers' Inventory .............................................. 13

          C.    Books in Defendants' Inventory ................................................................ 16

          D.    Books in Defendants' Customers' Inventory ............................................ 19

          E.    Works for which there is Combined Evidence ......................................... 21

CONCLUSION ................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................ 4

*Apex Oil Co. v. Di Mauro*,
   822 F.2d 246 (2d Cir. 1987) .......................................................................... 12

*Banner Indus. of N.E., Inc. v. Wicks*,
   71 F. Supp. 3d 284 (N.D.N.Y. 2014) ............................................................ 18

*Banner Indus. of N.E., Inc. v. Wicks*,
   Case No. 14 Civ. 4647, 2016 U.S. App. LEXIS 1151
   (2d. Cir. January 25, 2016) ............................................................................ 17

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
   380 F. Supp. 2d 334 (S.D.N.Y. 2005) ........................................................... 17

*Bever v. Cnty. of Nassau*,
   524 F.3d 160 (2d Cir. 2008) ............................................................................ 4

*Bickerstaff v. Vassar College*,
   196 F.3d 435 (2d. Cir. 1999) ......................................................................... 14

*Doe v. New York City Dep't of Social Services*,
   709 F.2d 782 (2d Cir. 1983) ............................................................................ 3

*Donini Int'l, S.P.A. v. Satec (U.S.A.) LLC*,
   Case No. 03 Civ. 9471 (CSH), 2006 U.S. Dist. LEXIS 11416
   (S.D.N.Y. Mar. 16, 2006) ................................................................................ 9

*Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*,
   Case No. 09 Civ. 6707 (ER), 2013 U.S. Dist. LEXIS 73992
   (S.D.N.Y. Mar. 28, 2013) .............................................................................. 17

*Fendi Adele s.r.l. v. Ashley Reed Trading, Inc.*,
   Case No. 06 Civ. 243, 2010 U.S. Dist. LEXIS 13934
   (S.D.N.Y. Feb. 16, 2010) ............................................................................... 10

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*,
   507 F. Appx. 26 (2d Cir. 2013) ................................................................... 9, 10

*Flaherty v. Beach.com, LLC*,
   Case No. 15 Civ. 7695, 2016 U.S. Dist. LEXIS 34241
   (S.D.N.Y. Mar. 15, 2016) ................................................................................ 4

*Fujitsu Ltd. v. Fed. Express Corp.*,
    247 F.3d 423 (2d Cir. 2001).......................................................................... 9

*Gottlieb v. County of Orange*,
    84 F.3d 511 (2d Cir. 1996)............................................................................ 8

*Harlen Assocs. v. Inc. Vill. of Mineola*,
    273 F.3d 494 (2d Cir. 2001).......................................................................... 12

*Kaytor v. Elec. Boat Corp.*,
    609 F.3d 537 (2d Cir. 2010).......................................................................... 11

*Kelly v. L.L. Cool J.*,
    145 F.R.D. 32 (S.D.N.Y. 1992) .................................................................... 4

*Kerzer v. Kingly Mfg.*,
    156 F.3d 396 (2d Cir. 1998).......................................................................... 4

*Lapham v. Porach*,
    Case No. 06-Civ-6861 (CM), 2007 U.S. Dist. LEXIS 30751
    (S.D.N.Y. Apr. 24, 2007)............................................................................. 18

*Lichtenberg v. Besicorp Group Inc.*,
    28 Fed. Appx. 73 (2d Cir. 2002) .................................................................. 4

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)........................................................... 15

*MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc.*,
    Case No. 02 CIV. 3691, 2004 U.S. Dist. LEXIS 2485
    (S.D.N.Y. Feb. 23, 2004)............................................................................. 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................... 4

*McDonald v. K-2 Indus.*,
    108 F. Supp. 3d 135 (W.D.N.Y. 2015) .......................................................... 4

*Ottaviani v. State University of New York*,
    875 F.2d 365 (2d Cir. 1989).......................................................................... 14

*Outley v. New York*,
    837 F.2d 587 (2d Cir. 1988).......................................................................... 7

*Pollis v. The New School for Social Research*,
    132 F.3d 115 (2d Cir. 1997).......................................................................... 14

*Saenger v. Montefiore Med. Ctr.*,
    706 F. Supp. 2d 494 (S.D.N.Y. 2010) ............................................................. 14

*Scott v. Harris*,
    550 U.S. 372 (2007) ........................................................................................ 4

*Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.*,
    Case No. 03 CV 1414 (MP), 2003 U.S. Dist. LEXIS 22655
    (S.D.N.Y. Dec. 16, 2003) ............................................................................... 17

*Tencza v. Tag Court Square, LLC*,
    Case No. 10 Civ. 3752 (PAE), 2013 U.S. Dist. LEXIS 79843
    (S.D.N.Y. June 6, 2013) ................................................................................... 7

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
    182 F.R.D. 97 (S.D.N.Y. 1998)
    *aff'd* 241 F.3d 135 (2d Cir. 2001) .................................................................. 3

*United States v. Garcia*,
    291 F.3d 127 (2d Cir. 2002) ........................................................................... 19

*United States v. Gubelman*,
    571 F.2d 1252 (2d Cir. 1978) ........................................................................... 6

*United States v. Henderson*,
    303 Fed. Appx. 30 (2d Cir. 2008) .................................................................... 6

*Welch-Rubin v. Sandals Corp.*,
    Case No. 03 Civ. 481 (MRK), 2004 U.S. Dist. LEXIS 22112
    (D. Conn. Oct. 20, 2004) ................................................................................. 8

## **Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 4

Fed. R. Evid. 404(b) .................................................................................. 6, 7, 20

Fed. R. Evid. 701 ............................................................................................... 19

## **Treatises**

Fed. R. Evid. 404(b) Advisory Committee Notes ................................................. 7

## PRELIMINARY STATEMENT

Plaintiffs John Wiley & Sons, Inc. ("Wiley), Cengage Learning, Inc. ("Cengage"), and Pearson Education, Inc. ("Pearson") have accused Defendants Book Dog Books, LLC ("Book Dog") and Philip Smyres of infringing the copyrights and trademarks of 133 textbooks[1], by distributing counterfeit copies purchased from third parties. To prevail at trial, Plaintiffs must present admissible evidence from which a jury could conclude, with respect to each work, that Defendants distributed at least one counterfeit copy. The copyright act bars the infringement of individual works, and a party can no more be held liable for "generally being an infringer" than he or she may be summarily incarcerated as "a common and notorious thief."

In accordance with this principle, Magistrate Judge Gorenstein reviewed the record evidence with respect to the 124 works about which Defendants moved for summary judgment. His carefully sourced and extremely detailed 44-page report and recommendation sets forth the limited – and in many cases utterly absent – evidence allegedly supporting Plaintiffs' individual infringement claims. With respect to 117 of the 124 works, Judge Gorenstein found that Plaintiffs had not identified admissible evidence, either direct or circumstantial, from which a factfinder could reasonably conclude that Defendants had infringed the work.

In rejecting this report and recommendation, the March 29, 2016 Memorandum & Order [Dkt. 352] (the "Order") eschewed an analysis of the individual claims against Defendants. It instead labeled them "serial litigants" with "a history of dealing in pirated textbooks" whose general guilt could be found on the basis of "the presence of infringing texts in the inventories of

---

[1]  With respect to 7 of these 133 titles, Plaintiffs claim that Defendants sold two versions of the title. Plaintiffs use the multiple versions of these 7 titles to assert that there are 140 "works" at issue in this case. However, where there are two versions of a single title, the two versions are sufficiently similar that they constitute a single "work" under copyright laws. This dispute is immaterial to the instant motion, which involves 117 titles.

Book Dog or its counterparties, Book Dog's inventory practices, and Book Dog's destruction of documents." On this basis, the Order denied Defendants' motion for partial summary judgment, even with respect to works for which there was no evidence that any counterfeit copies existed.

For several reasons, the Court should reconsider this decision, as it overlooks controlling law and misstates the factual record. *First*, the Order bases its holding, in part, on the "fact" that Defendants destroyed "documents" and "records" evidencing counterfeit sales. This is simply incorrect. There is absolutely no evidence that Defendants destroyed sales records. Nor have Plaintiffs accused Defendants of such behavior. Prior to the filing of this case, Defendants disposed of suspicious books that they received from sellers, but Defendants never destroyed actual records of purchases or sales.

*Second*, the Order bases its holding, in part, on the "fact" that the books at issue were "sourced from alleged counterfeiters." This is also incorrect. Less than half of the works at issue in this case were purchased from entities "previously accused" of counterfeiting. Nor would mere "allegations" or lawsuits against Defendants' suppliers be admissible to show that Defendants distributed counterfeit works. It is black letter law that the allegations in a complaint are not admissible evidence of wrongdoing. Plaintiffs cannot rely on prior lawsuits to prove either that the books sold by third parties were counterfeit or that Defendants sold the counterfeit books at issue in this case.

*Third*, the Order bases its holding, in part, on "lax record-keeping by Book Dog, its suppliers, and its customers," noting that Book Dog "failed to maintain records that would confirm or dispel suspicions that their inventory contained counterfeits." This improperly shifts the legal burden – Book Dog had no obligation to keep such records and is not required to "prove its innocence." A factfinder may not infer the sales of specific infringing works simply because

there is no direct evidence that such sales did not occur.  Moreover, there is no evidence that Defendants' record-keeping practices deviated from other companies in the industry.  Indeed, the evidence is to the contrary.

*Last*, the Order improperly concludes that **any action** taken by a used book dealer that discovers a counterfeit book in its inventory would either constitute copyright infringement or give rise to an inference of copyright infringement.  If the dealer sells the discovered book, that constitutes copyright infringement.  If the dealer quarantines the book in inventory, that would give rise to an inference of copyright infringement.  And if the dealer destroys the infringing book, that that would also give rise to an inference of copyright infringement.  In essence, the Order creates a new form of copyright liability – possession of a counterfeit work.  This manner of violation is neither countenanced by the copyright act nor the authorities interpreting it.

For the reasons set forth below, Defendants respectfully request that the Court reconsider the March 29, 2016 Order and adopt Magistrate Judge Gorenstein's Report and Recommendation [Dkt. 308] in all respects.

## STANDARD OF REVIEW

"[A] motion for reconsideration or reargument under Local Civil Rule 6.3[] provides the Court with an opportunity to correct manifest errors of law or fact, hear newly discovered evidence, consider a change in the applicable law or prevent manifest injustice."  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 182 F.R.D. 97, 100 (S.D.N.Y. 1998) *aff'd* 241 F.3d 135 (2d Cir. 2001); *see also Doe v. New York City Dep't of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983) (reconsideration appropriate "to correct a clear error or prevent manifest injustice").  A motion for reconsideration should be granted where the court "overlooked controlling

-3-

decisions or factual matters that were put before the Court on the underlying motion."

*Lichtenberg v. Besicorp Group Inc.*, 28 Fed. Appx. 73, 75 (2d Cir. 2002).

A motion for summary judgment should be granted if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Bever v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). All factual ambiguities are resolved and all inferences are drawn in favor of the non-moving party. *See Liberty Lobby*, 477 U.S. at 255. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

"With respect to claims of direct copyright infringement, a plaintiff must allege and ultimately demonstrate, (1) which specific original works are the subject of the copyright claim, (2) that plaintiff owns the copyrights in those works, (3) that the copyrights have been registered in accordance with the statute, and (4) by what acts during what time the defendant infringed the copyright." *McDonald v. K-2 Indus.*, 108 F. Supp. 3d 135, 139 (W.D.N.Y. 2015). Accordingly, claims cannot be pled or proven collectively and a plaintiff must provide evidence showing infringement of the "specific original works [that] are the subject of the copyright claim." *Flaherty v. Beach.com, LLC*, Case No. 15 Civ. 7695, 2016 U.S. Dist. LEXIS 34241, at *5 (S.D.N.Y. Mar. 15, 2016); *accord Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992) ("A

properly plead copyright infringement claim must allege 1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright").

## ARGUMENT

**I.     THE ORDER RESTS UPON INCORRECT STATEMENTS, INADMISSIBLE EVIDENCE, AND MERE ALLEGATIONS NOT SUPPORTED BY PROFFERED EVIDENCE**

The March 26, 2016 Memorandum and Order acknowledges that there is no direct evidence that Defendants distributed infringing copies of the 117 works in question.  Order at 7.  Instead, the Order held that a reasonable jury could "infer[]" the unlawful distribution from existing facts.  *Id.*  However many of the facts allegedly supporting this inference are either false or not supported by admissible evidence.

### A.     Defendants Did Not Destroy "Documents" or "Records"

In several places, the Order states that Defendants "destroyed" evidence of sales, which the Order alternatively characterizes as "records" and "documents."  Order 7-8.  However, no party has ever suggested that Defendants destroyed sales records and Plaintiff submitted no evidence that would support such a conclusion.  A factfinder cannot not infer liability based upon misconduct that never occurred and for which no evidence exists.

Plaintiffs have complained that, prior to the commencement of this action, Defendants disposed of a pallet of suspected counterfeit works that they identified in an inventory inspection.  [Dkt. 169].  While Defendants were not certain that the books were counterfeit, Defendants pulled the suspected books from inventory and stored them off-site to remove them from circulation.  [Dkt. 241-40 at 104:25-107:11].  To ensure that the suspicious books would never

be sold, Defendants ultimately sent them to a garbage dump. [Dkt. 241-23 at 54:4-56:10]. This was not an unreasonable manner to dispose of potentially illegitimate books. Indeed, Plaintiffs had previously instructed Defendants to destroy counterfeit books that entered their possession.[2]

These actions took place well-before this action was commenced, and were carefully scrutinized in an Opinion and Order dated March 2, 2015. [Dkt. 309]. In that order, Judge Gorenstein held that the Defendants had no legal duty to retain the books and denied Plaintiff's request for sanctions. *Id.* Accordingly, to the extent the Order considered Defendants' "destruction" of "documents" or "records" in denying summary judgment, such analysis constitutes a "clear error" of law.

### B. A Jury Cannot Infer Liability from Defendants' Supposed "History of Dealing in Pirated Textbooks"

The Order also suggests that Defendants' liability could be inferred based upon their "history of dealing in pirated textbooks." Order at 7. This is incorrect. Pursuant to Fed. R. Evid. 404(b)(1) "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Even if prior acts of infringement by Defendants were admissible for some purpose, such as motive or intent, they would not be admissible to prove that Defendants subsequently sold infringing goods. That is "precisely the inference" that Rule 404(b) precludes. *United States v. Gubelman*, 571 F.2d 1252, 1256-57 (2d Cir. 1978); *see also United States v. Henderson*, 303 Fed. Appx. 30, 35 (2d Cir. 2008) ("In short, the defendant is protected against the inference that he has a propensity to commit crimes, and therefore committed a crime in the instant case.");

---

[2]   Smyres I Dep. at 169:13-23 (After the 2008 settlement, "[t]he counterfeit [copies] [the publishers] said just throw away, so that's what we did…. We took them to the dump and watched them be churned over.")

*Outley v. New York*, 837 F.2d 587, 593 (2d Cir. 1988) ("evidence of other . . . acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it.") (*quoting* Fed. R. Evid. 404(b) Advisory Committee Notes).

To the extent that the Order relied upon evidence that Defendants committed other acts of copyright infringement in denying summary judgment as to the 117 works in question, such reliance constitutes a "clear error" of law.

### C.    Prior "Accusations" Against Defendants' Suppliers Are Not Evidence of Anything

The Order repeatedly claims that Defendants' liability could be inferred from the fact that "it was sourcing books from alleged counterfeiters," made "purchases from suppliers dealing in counterfeit textbooks" and "continued to do business with them." Order at 9.  There are numerous problems with this inference.  As a threshold matter, even *if* Plaintiffs could prove that Defendants' suppliers had sold counterfeit works in the past, that would not permit a jury to conclude that other books sold to Defendants were counterfeit.  Fed. R. Evid. 404(b); *see* Section I(B) *supra*.

But even if that inference were permissible, mere **allegations** that Defendants' suppliers had sold counterfeit works in the past would not be admissible to show that such misconduct occurred.  The Order concludes that the Blackerbys were "sellers dealing in counterfeit books" from the fact that a lawsuit was filed against them.  Order at 2 ("The Blackerbys had been sued previously for importing and distributing counterfeit textbooks").  But it is well-established that the allegations in a complaint or the fact of a lawsuit are not admissible evidence of wrongdoing. *Tencza v. Tag Court Square, LLC*, Case No. 10 Civ. 3752 (PAE), 2013 U.S. Dist. LEXIS 79843, at *24 (S.D.N.Y. June 6, 2013) ("'Allegations in a complaint are not evidence,' and a party cannot defeat a motion for summary judgment by relying on allegations in the pleading");

*Welch-Rubin v. Sandals Corp.*, Case No. 03 Civ. 481 (MRK), 2004 U.S. Dist. LEXIS 22112, at *3 (D. Conn. Oct. 20, 2004) ("allegations in a complaint are not evidence … [a] party opposing summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible'") (*quoting Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)).  Moreover, the suit against the Blackerbys was settled **without a finding of infringement**.  *See Cengage Learning v. D Knight Inc.*, Case No. 11 Civ. 7578 (N.D. Ill.) at [Dkts. 102; 102-1].

If there were evidence that Defendants knew about the lawsuit against the Blackerbys, that fact might – at best – be probative of Defendants' mental state and whether Defendants intentionally bought books of questionable providence.  But as the Report and Recommendation noted, there is no evidence that Defendants were even aware of the suit against the Blackerbys. [Dkt. 308 at 7].  And regardless of Defendants' mental state, unrelated misconduct by the Blackerbys is not evidence that the Defendants made specific infringing sales.

To the extent that the Order relied upon Defendants' alleged "sourcing books from alleged counterfeiters" as a basis of denying summary judgment, such analysis constitutes a "clear error" of law.

### D.    Defendants' "Record-Keeping" Is Normal within the Industry

The final basis upon which the Order "infers" Defendants' potential liability is "lax record-keeping by Book Dog," noting that "for many years, [Book Dog] failed to maintain records that would confirm or dispel suspicions that their inventory contained counterfeits." Order at 8-9.  This is problematic for several reasons.

***First***, Book Dog was under no obligation to keep such records or to "dispel suspicions" with affirmative evidence.  To the extent Plaintiffs demand relief from the Court, they bear the

burden of proving liability.  Absent some legal duty to preserve evidence, businesses are not required to fastidiously document their operations so that they may "prove their innocence" at some hypothetical future proceeding.  *Donini Int'l, S.P.A. v. Satec (U.S.A.) LLC*, Case No. 03 Civ. 9471 (CSH), 2006 U.S. Dist. LEXIS 11416, at \*26 (S.D.N.Y. Mar. 16, 2006) ("No duty to preserve arises unless the party possessing the evidence has notice of its relevance."); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation").[3]  It is Plaintiffs' burden to provide evidence of liability, not Defendants' burden to prove their innocence.

**Second**, no reasonable inference may be drawn from Book Dog's record-keeping practices.  As both the Order and Report and Recommendation noted, the largest dealers in the used book market, TBS, MBS Book Exchange, and Follett, do not keep records that would permit them to identify the origins of each individual book in their inventory.  Order at 8; [Dkt. 308 at 31-32]; *see also testimony from those entities* at [Dkt. 271-4 at 214]; [Dkt. 271-5 at 85]; [Dkt. 271-14 at 26-27].  These well-regarded dealers have record-keeping practices that are just as "lax" as those maintained by Defendants.  *Id.*  To the extent that any inference may be drawn from Defendants' record-keeping, it is that Defendants' records and practices are not unusual.

**Third**, even if a negative inference could be drawn, it would not be sufficient to demonstrate that infringing sales took place.  The Order cites *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. Appx. 26 (2d Cir. 2013) (Summary Order), for the proposition that an intentional failure to keep records may be evidence that counterfeit goods were sold.  *Fendi* is

---

[3]   And as the March 2, 2015 Memorandum and Order holds, Defendants were not on notice that litigation "was reasonably foreseeable" until at least August 30, 2011, and perhaps as late as February 4, 2013.  [Dkt. 309 at 16].

distinguishable in three respects.  First, the undisputed direct evidence of infringement in *Fendi* –
including the defendants' concession that it sold twenty items and an expert's unrebutted
testimony that all twenty items were counterfeit – proved that all as opposed to some of the
goods that the defendants sold were counterfeit.  *Id.* at *38; *Fendi Adele s.r.l. v. Ashley Reed
Trading, Inc.*, Case No. 06 Civ. 243, 2010 U.S. Dist. LEXIS 13934, at *12-14 (S.D.N.Y. Feb. 16,
2010).  Second, unlike the instant case, the circumstantial evidence supported a finding that all –
as opposed to some – of the goods sold by the defendants were counterfeit:  (a) the defendant
used the same procedures throughout the relevant period; (b) the invoices that the defendant had
received from its supplier suggesting that the goods were manufactured by the plaintiff were
forgeries; and (c) the defendant returned the goods at issue in the case to its suppliers **after** the
case was filed and did not keep any records concerning the return.  *Fendi*, 507 Fed. Appx. at 30-
31.  Third, in *Fendi*, the defendants destroyed invoices and other financial documents that
showed the source of the goods sold by the defendants.  *Fendi*, 2010 U.S. Dist. LEXIS 13934, at
*17-18.  In contrast, here, Defendants did not destroy any records; and there is no material
dispute regarding the suppliers from whom Defendants purchased their books.  Finally, *Fendi*
involved new goods whereas this case involves used goods.  The only information Defendants
can be accused of not having maintained was the exact source of each individual book in its
possession.  But, during the relevant period, as discussed above, major U.S. distributors of used
books did not maintain this information.[4]  There is no more reason for sellers of used books to
keep this information than there is for sellers of used clothing to maintain such information.
*Fendi* does not provide any support for the proposition that an inference can be drawn in this

---

[4]   Precisely because they do invest so many resources in detecting counterfeits and
removing counterfeits from circulation, Defendants do currently assign serial numbers to books
that they receive so the chain of title can be tracked.

case from the fact that Defendants treated the books it received as fungible as opposed to treating each book as a precious object that must be individually tracked.

To the extent that the Order considered Defendants' "fail[ure] to maintain records that would confirm or dispel suspicions that their inventory contained counterfeits" in denying summary judgment, such analysis constitutes a "clear error" of law.

## II.   PLAINTIFFS HAVE NOT SUBMITTED EVIDENCE FROM WHICH A FACTFINDER COULD CONCLUDE THAT DEFENDANTS SOLD INFRINGING COPIES OF EACH WORK AT ISSUE

As the Order states, the "Publisher's evidence is summarized in their 'Revised Roadmap,' a document designed to replace the voluminous evidence the Publishers would otherwise use to prove their claims."  Order at 3.  For the purposes of Defendants' summary judgment motion, the credibility and accuracy of the Roadmap is not at issue.  *See, e.g., Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("In reviewing the evidence and the inferences that may reasonably be drawn, the court "may not make credibility determinations or weigh the evidence. . . . 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

To be clear, the Roadmap contains factual errors, improper attorney argument, and other defects that Defendants may subsequently raise at trial.  Defendants respectfully disagree with the Order's statement that "Book Dog does not generally contest the accuracy of the evidence contained in the Revised Roadmap."  Order at 4.  Defendants absolutely contest the accuracy of the Revised Roadmap.

However, as described below, even when deemed accurate and accorded every favorable inference, the evidence contained in the Revised Roadmap still fails to present genuine factual disputes for trial.

A.      **Books for which No Counterfeit Copy Exists**

For six of the works in question (Roadmap Nos. 10a, 20, 50, 105, 131, and 133a), Plaintiffs offered no evidence that any counterfeit copies ever existed.  Their sole basis for claiming that Defendants distributed counterfeit copies of the books is that Defendants purchased – and then subsequently returned – copies of the same titles to Best Books World.  *See* Revised Roadmap [Dkts. 269-2, 269-3, 269-4]; *see also* Summary of Roadmap [Dkt. 269-5].  From this single fact, Plaintiffs would ask a jury to "infer" – without further evidence – that (i) the returned books were counterfeit; (ii) all other copies of the returned books were also counterfeit; and (iii) Defendants sold the definitely counterfeit copies of the books to customers rather than returning, quarantining, or destroying them.

This is improper.  "Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  A court ruling on summary judgment is permitted to draw inferences on the basis of evidence, not to presume guilt on the basis of nothing.  *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 253 (2d Cir. 1987) (assessment of evidence "is necessary in order to determine rationally what inferences are reasonable and therefore permissible" on summary judgment").

The Order dismisses such objections, arguing that Defendants take a "cramped approach to the chain of title for each allegedly infringing work."  Order at 8.  However, this is not a matter of using circumstantial evidence to fill in a "missing link" or to draw inferences about the source of an unambiguously counterfeit book.  There are no books, and the "chain of title" for these six works has no links at all.  Even if the Court were to hold that possession of a counterfeit work automatically gives rise to an inference of sale – which it should not – Plaintiffs cannot

even establish that Defendants or anybody else ever possessed a counterfeit copy.  Absent proof

that unauthorized copies existed, no reasonable jury could find by a preponderance of the

evidence that Defendants sold some – totally hypothetical – counterfeit books.

### B.      Books in Defendants' Suppliers' Inventory

With respect to 16 of the works at issue (Roadmap Nos. 11, 12, 21, 39b, 46, 47, 48, 65,

83, 85, 87, 95, 116, 121, 123, and 132), Plaintiffs have no evidence that Defendants or their

customers ever laid eyes on a counterfeit book.  The only evidence that Plaintiffs have that

counterfeit copies even exist are allegedly counterfeit books found in the inventory of Tichenor,

a third party who also sold books to Defendants.  However there is no evidence, or even

allegation, that these alleged counterfeits were ever in the possession of Defendants.

Plaintiffs contend that the mere availability of these books is sufficient to raise an

inference of liability.  They would ask a jury to conclude – in the absence of further evidence –

that (i) because some counterfeits were available from Tichenor that other counterfeits were also

available; (ii) that Defendants purchased such counterfeit books; and (iii) that Defendants then

sold those counterfeit books to its customers rather than returning them, quarantining them, or

discarding them.  Notably, Plaintiffs do not contend that that every book sold by Tichenor – or

even a majority – are counterfeit.

This is also improper.  A jury cannot reasonably conclude that Defendants violated the

copyright act simply because they might have had the "opportunity" to do so.  Plaintiffs must

offer evidence that actual books that Defendants purchased from Tichenor and subsequently

resold were counterfeit.  This is not, as the Order suggests, an argument that "Publishers cannot

rely on … circumstantial evidence."  (Order at 7).  Plaintiffs could have met their burden with

any form of admissible evidence.  For example, Plaintiffs could have introduced evidence that

Tichenor dealt exclusively in counterfeit books.  Or it could have offered evidence that for a particular work, all or a high percentage of the copies acquired by Tichenor from Morena were counterfeit.  But as the Report and Recommendation noted, "[t]here is almost no information regarding the nature of Morena's business and whether the counterfeit copies reflected the entirety, the majority, or a small percentage of the books that Morena distributed were counterfeit."  [Dkt. 308 at 35].

Because Plaintiffs have not provided the necessary figures, no reasonable inferences can be drawn concerning the likelihood that other Tichenor sales were counterfeit.  To support reasonable inferences of liability at the summary judgment stage, statistical evidence must be based on a sufficiently large sample size, account for all major variables and major alternative causes, be analyzed by an expert, and meet the criterion for statistical significance.  *See Bickerstaff v. Vassar College*, 196 F.3d 435, 449-50 (2d. Cir. 1999) ("[B]ecause the regression analysis failed to account for the major factors that Vassar considers in evaluating salary increases, the district could did not abuse its discretion in according the regression analysis no probative weight"); *Pollis v. The New School for Social Research*, 132 F.3d 115, 123 (2d Cir. 1997) ("If the plaintiff seeks to prove the discrimination by statistical evidence, however, the statistics must support reasonably the inference that the employer's adverse decision would not have occurred but for discrimination.  [Plaintiff's] statistical evidence is too scant and too flawed to support such an inference."); *Ottaviani v. State University of New York*, 875 F.2d 365, 371 (2d Cir. 1989) ("Not all disparities, however, are probative of discrimination. Before a deviation from a predicted outcome can be considered probative, the deviation must be 'statistically significant.'"); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515-16 (S.D.N.Y. 2010)

("For starters, statistical evidence, such as it is in this case, must be supported by expert analysis.").

Plaintiffs come nowhere close to this standard. Plaintiffs do not adduce what percentage of Defendants' suppliers' copies of these titles were counterfeit or how many legitimate copies Defendants purchased. If 40 in 1000 Tichenor books were counterfeit and Defendants purchased only one, there would be only a 4% chance that Defendants purchased an infringing copy. Even assuming that it were unlawful to purchase an infringing work (which it is not), a 4% chance of having violated the law would fall far short of statistical significance. The fact that Defendants' suppliers possessed one or more counterfeit copies of a title does not permit a reasonable jury to infer that Defendants sold a counterfeit copy of the title. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 643 (S.D.N.Y. 2007) (Excluding expert's statistical analysis in trademark infringement action because the "analysis [was] conducted without attempting to rule out obvious alternative causes" and the expert failed to explain how he defined statistical significance); *MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc.*, Case No 02 CIV. 3691, 2004 U.S. Dist. LEXIS 2485, at *28-29 (S.D.N.Y. Feb. 23, 2004) (in trademark infringement action, excluding statistical evidence with small sample size).

The Order's reasoning – that availability alone could give rise to an inference of infringement – could also threaten the entire used textbook industry. By design, counterfeiters most frequently replicate popular titles. Used textbook dealers buy and sell copies of these titles from each other at high volumes. If the mere presence of potential counterfeits in the inventory of one used distributor constitutes evidence that all of the counterparties of that distributor sold counterfeits, it is difficult to imagine how any used book distributor could plausible avoid ruinous litigation.

Absent direct evidence that Defendants acquired counterfeit books from Tichenor, or circumstantial evidence as to the probability that purchased books were counterfeit, no reasonable jury could find, by a preponderance of the evidence, that Defendants distributed infringing copies of the 16 Tichenor works.

### C.       Books in Defendants' Inventory

For 49 works[5] Plaintiffs' only evidence of infringement is allegedly counterfeit books that Defendants **took affirmative steps not to sell**.  *See* Revised Roadmap [Dkts. 269-2, 269-3, 269-4]; *see also* Summary of Roadmap [Dkt. 269-5].  Defendants' own screening procedures identified each book as suspicious.  [Dkt. 241-40 at 104:25-107:11].  While Defendants could not be certain whether the books were legitimate, out of an abundance of caution, they placed each copy in "quarantine" so that it could not be sold.  *Id.*  There is neither evidence nor an allegation that Defendants ever distributed the allegedly infringing copies in their possession.

The Order holds that Defendants' possession of a counterfeit work, even one deliberately removed from circulation, would permit a jury to "infer" that Defendants (i) possessed other counterfeit copies of the same work; and (ii) chose to distribute other infringing copies of the same works to their customers rather than returning, quarantining, or destroying them.  Order at 9.  There are several problems with permitting this inference to be drawn.

*First*, this inference makes no logical sense.  Plaintiffs have offered no explanation as to why Defendants would sell some counterfeit copies of a particular work and remove others from circulation.  Plaintiffs' argument first requires a jury to "infer" that all acquired copies of a particular work are uniformly legitimate or counterfeit (*i.e.* if Defendants bought 200 copies of a

---

[5]      Roadmap Nos. 1, 2, 5, 7, 10c, 14, 19, 23, 34, 39a, 41, 43a, 45, 49, 52, 56, 59, 60, 62, 64, 66, 73, 77, 78, 79, 80, 81, 86, 88, 92, 93a, 93b, 97, 98, 99, 101, 102, 103, 106, 107, 108, 109, 112, 117, 122, 125a, 125b, 127, and 133b.

textbook from a supplier and 10 were counterfeit, so were the other 190). Plaintiffs offer no evidence to support this inference. But even if true, Plaintiffs' conclusion does not follow. If Defendants were acting in good faith to remove counterfeits from their inventory – either by returning, discarding, or quarantining them – they would not intentionally sell other copies of books that they knew to be illegitimate. And even if Defendants were selling books without regard for their legitimacy, they would not quarantine some copies of books that they could just as easily offer for sale. A jury may draw reasonable inferences from the evidence, but not illogical, irrational, or otherwise unreasonable ones. *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (a party opposing summary judgment "is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts."); *Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*, Case No. 09 Civ. 6707 (ER), 2013 U.S. Dist. LEXIS 73992 (S.D.N.Y. Mar. 28, 2013) ("Unreasonable inferences are insufficient to defeat a motion for summary judgment."); *Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.*, Case No. 03 CV 1414 (MP), 2003 U.S. Dist. LEXIS 22655, at *2 (S.D.N.Y. Dec. 16, 2003) ("The Court need not, however, 'credit unsupported factual allegations and innuendos,' nor make unreasonable inferences from circumstantial evidence proffered by nonmovant.") (internal citations omitted).

The law is clear that distribution cannot generally be inferred from mere possession. For example, the Second Circuit recently held that the fact that a defendant possessed a plaintiff's confidential information was insufficient circumstantial evidence to permit a fact finder to infer that the defendant misappropriated the information or transferred it to third-parties. *Banner Indus. of N.E., Inc. v. Wicks*, Case No. 14 Civ. 4647, 2016 U.S. App. LEXIS 1151, at *2 (2d. Cir. January 25, 2016) (Summary Order). The defendant was entitled to summary judgment despite

the fact that the defendant was working for the plaintiff's competitors and the confidential information at issue would have been useful to the competitors. *Banner Indus. of N.E., Inc. v. Wicks*, 71 F. Supp. 3d 284, 286, 292 (N.D.N.Y. 2014). The same is no less true here:  the fact that Defendants may have possessed counterfeit works cannot support an inference that Defendants distributed the works.

 **Second**, this inference, when taken together with the other inferences drawn by the Order, dramatically expands the scope of liability under the Copyright Act.  Under the statute, mere possession of a counterfeit work is not actionable as infringement.  *See, e.g.*, *Lapham v. Porach*, Case No. 06-Civ-6861 (CM), 2007 U.S. Dist. LEXIS 30751, at *15 (S.D.N.Y. Apr. 24, 2007) ("Defendant's mere possession of a copyrighted item does not infringe the copyright…[w]ithout evidence that defendant copied or disseminated plaintiff's [works], plaintiff has not demonstrated likelihood of success on a copyright infringement claim").  But under the Order's reasoning, a book seller who inadvertently purchases a counterfeit book may be held liable for copyright infringement no matter what action he or she takes.  If the dealer sells the discovered book, that constitutes copyright infringement.  If the dealer quarantines the book in inventory, that would give rise to an inference of copyright infringement.  Order at 9.  And if the dealer destroys the infringing book, that that would also give rise to an inference of copyright infringement.  *Id.*  In essence, the Order holds that the mere buying and selling of used books gives rise to an inference of copyright infringement. While this result is doubtlessly favored by Plaintiffs, it is not one permitted under the law.

 Absent some evidence that Defendants (i) possessed additional counterfeit copies of the titles that it quarantined; and (ii) sold those books rather than quarantine them, no reasonable jury could find that Defendants infringed those works.

### D.      Books in Defendants' Customers' Inventory

Plaintiffs have introduced evidence that certain third parties, including MBS, Follett, and TBC, obtained allegedly counterfeit copies of 19 works at issue (Roadmap Nos. 10b, 16, 17, 25, 26, 28, 42, 55, 57, 67, 69, 71, 72, 74, 75, 104, 110, 111, 115, 119, 129).  While each entity has purchased books from Defendants in the past, none could say with certainty that Defendants sold them the counterfeit books in question and none kept records that would support this conclusion. *See* [Dkt. 271-4 at 214]; [Dkt. 271-5 at 85]; [Dkt. 271-14 at 26-27].  Each entity had purchased multiple copies of the works in question from multiple sources and had comingled all of its copies within inventory.  *Id.*

The Order does not specify why a jury could "infer" that Defendants, rather than other suppliers, were the source of the allegedly counterfeit books.  In their papers, Plaintiffs relied upon testimony from Follett's corporate representative that he personally believed that it was an "absolute certainty" that Defendants supplied "some" of the counterfeit copies of an unrelated title, Roadmap 13, and that he had "no doubts" that at least "some" of the other counterfeit works were probably supplied by Defendants.  However, as the Report and Recommendation noted, no evidence has been offered to give the basis for that witness's subjective belief and absent this foundation an unsubstantiated lay opinion is inadmissible and of no evidentiary value.  [Dkt. 308 at 31] *see also* Fed. R. Evid. 701; *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) ("When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions").  And even if it were admissible evidence, absent some manner of determining which of the "some" books that

Follett allegedly received from Defendants, it could not give rise to liability for infringing a particular work.

As noted above, Plaintiffs could have met their evidentiary burden without recourse to direct evidence.  Had Plaintiffs introduced evidence of (i) the number of copies of each work purchased from each source; (ii) the percentage of books found in each supplier's inventory, including copies of the works in question, that were counterfeit; and/or (iii) the total volume of legitimate books sold by Defendants to each customer, a jury could use this circumstantial evidence to accurately estimate the probability that Defendants were the suppliers of the allegedly infringing works.  But absent this context, no reasonable jury could conclude that the probability exceeds 50%  – as would be necessary to find by a preponderance of the evidence that Defendants were the sources of the allegedly counterfeit books.

Nor could a jury rely on supposed "lax record-keeping by Book Dog" to infer that it was the source of the alleged counterfeits.  The uncertainty concerning the source of the suspicious books exists because **all of the relevant parties** "failed to maintain records that would confirm or dispel suspicions that their inventory contained counterfeits."  Had MBS, Follett, TBC, or the other suppliers maintained comprehensive records, there would be no doubt as to where the books came from.  A jury could not "infer" that Defendants are the guilty parties because Defendants kept their records in the same fashion as all other possible suspects.

The same problem precludes reliance upon "Book Dog's purchases from suppliers accused of dealing in counterfeit textbooks."  Even ignoring the problems associated with propensity evidence under Fed. R. Evid. 404(b), no evidence has been offered to show how other textbook suppliers sourced their books.  Absent admissible data from which a jury could compare the likelihood of obtaining a counterfeit book from Defendants' sources rather than the

sources of another supplier, no reasonably jury could conclude that books supplied by Defendants were "more likely" to be counterfeit, to say nothing of concluding that it was "more likely than not" that counterfeit books came from the Defendants.

Absent evidence – whether direct or circumstantial – that Defendants were the suppliers of the allegedly counterfeit books found in its customers' inventory, no reasonable jury could find that Defendants infringed those works.

### E.     Works for which there is Combined Evidence

Finally, with respect to 25 of the works at issue (Roadmap Nos. 4, 6, 9, 13, 18, 24, 27, 29, 30, 32, 33, 36, 37, 43b, 53, 58, 61, 68, 70, 82, 84, 91, 96, 114, 126), Plaintiffs have located allegedly counterfeit copies both quarantined in Defendants' inventory and in the inventory of either Defendants' suppliers or customers.  However no evidence has been submitted that Defendants actually distributed the allegedly counterfeit copies in question.

Plaintiffs argued that this "combination of evidence" makes an inference that Defendants distributed counterfeit copies of the works "stronger."  [Dkt. 317 at 17].  This is analytically unsound.  There is no allegation that Defendants manufactured counterfeit textbooks themselves. As such, it is hardly surprising that counterfeit books quarantined by Defendants could also be found in the inventory of at least one of their suppliers.  All of the suspicious books that Defendants removed from circulation had to come from somewhere. Precisely identifying where does not make it any more or less likely that Defendants distributed additional infringing copies of those works.

Moreover, the fact that Defendants quarantined potentially counterfeit copies of certain works makes it **<u>less likely</u>** that they were the source of counterfeit copies in their customers' inventory.  All of the books in question were sold by multiple participants in the used book

market.  All else equal, a bookseller, like Book Dog, that is aware that counterfeit copies of a particular title are in circulation and takes affirmative steps to prevent their sale is **<u>less likely</u>** to distribute counterfeit works than one who either lacks that knowledge or fails to take steps to act upon it.  And Plaintiffs have submitted no evidence that any other distributors of the 25 titles were more careful, more diligent, or otherwise less likely to be the source of the allegedly counterfeit works.  Absent this evidence, no reasonable jury could accurately determine the likelihood that Defendants distributed the allegedly counterfeit works.  Accordingly, no reasonable jury could conclude that it was more likely than not that Defendants violated the copyright act with respect to those works.

Since the "combined evidence" submitted by Plaintiffs is no stronger than the evidence with respect to the other challenged works, no reasonable jury could conclude that Defendants distributed infringing copies of the 25 works.

<b><u>CONCLUSION</u></b>

For the reasons set forth below, Defendants respectfully request that the Court reconsider its March 29, 2016 Memorandum & Order [Dkt. 352] (the "Order") and adopt Magistrate Judge Gorenstein's Report and Recommendation [Dkt. 308] in all respects.

**Dated:** New York, NY
April 12, 2016

Respectfully submitted,

MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600


By:   /s/ Evan Mandel
Evan Mandel

*Attorneys for Defendants*