UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOHN WILEY & SONS, INC. et al.,                  :

                                                 :

                      Plaintiffs,                :        REPORT AND
                                                          RECOMMENDATION
                                                 :
            -v.-
                                                 :        13 Civ. 816 (WHP) (GWG)
BOOK DOG BOOKS, LLC et al.,

                                                 :

                      Defendants.                :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiffs John Wiley & Sons, Inc., Cengage Learning, Inc., and Pearson Education, Inc.

have filed this suit against Book Dog Books, LLC ("BDB") and Philip Smyres, its owner and

chief executive officer, alleging claims primarily of copyright and trademark infringement.  The

plaintiffs now move for partial summary judgment striking certain defenses asserted by the

defendants.[1]  For the reasons stated below, plaintiffs' motion should be granted.

---

        [1]  See Plaintiffs' Motion for Summary Judgment on Defendants Affirmative [sic]
Defenses, filed Sept. 24, 2015 (Docket # 301) ("Pl. Mot."); Plaintiffs' Memorandum of Law in
Support of Motion for Summary Judgment on Defendants' Affirmative Defenses, filed Sept. 24,
2015 (Docket # 302) ("P. Mem."); Declaration of Jessica Stitt, filed Sept. 24, 2015 (Docket
# 303) ("Stitt Decl."); Declaration of Richard P. Essig, filed Sept. 24, 2015 (Docket # 304)
("Essig Decl."); Declaration of Lisa Suarez, filed Sept. 24, 2015 (Docket # 305) ("Suarez
Decl."); Declaration of Matthew J. Oppenheim, filed Sept. 24, 2015 (Docket # 306)
("Oppenheim Decl."); Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts in Support of
Plaintiffs' Motion for Summary Judgment on Defendants' Affirmative Defenses, filed Sept. 24,
2015 (Docket # 307) ("P.R.56.1"); Defendants' Memorandum of Law in Opposition to
Plaintiffs' Motion for Summary Judgment, filed Oct. 26, 2015 (Docket # 319) ("D. Opp.");
Defendants' Response to Plaintiffs' Rule 56.1 Statement of Facts, filed Oct. 26, 2015 (Docket
# 320) ("D.R.56.1"); Declaration of Philip R. Smyres, filed Oct. 26, 2015 (Docket # 321)
("Smyres Decl."); Declaration of Tiffany C. Miller, filed Oct. 26, 2015 (Docket # 322) ("Miller
Decl."); Plaintiffs' Reply in Support of Motion for Summary Judgment on Defendants'
Affirmative Defenses, filed Nov. 9, 2015 (Docket # 337) ("P. Repl. Mem."); Declaration of Julie
C. Chen, filed Nov. 9, 2015 (Docket # 338) ("Chen Decl.").

I.   BACKGROUND

    A.   Facts

    The claims in this case are recounted in a prior Report and Recommendation and a

Memorandum and Order.  See John Wiley & Sons, Inc. v. Book Dog Books, LLC, 2015 WL

5724915 (S.D.N.Y. Sept. 30, 2015), adopted in part and rejected in part, Memorandum and

Order, filed Mar. 29, 2016 (Docket # 352).  Essentially, the claims center on allegations by the

publishers of textbooks that the defendants have sold numerous counterfeit copies of their

textbooks.

    The dispute between the parties has a history.  In 2007, plaintiffs and other publishers

sued defendants asserting claims similar to those in this lawsuit.  See Complaint, filed Oct. 2,

2007 (Docket # 1 in Cengage Learning Inc. et al. v. Buckeye Books et al., No. 07 Civ. 8540

(S.D.N.Y.)), ¶¶ 98-185; P.R.56.1 ¶ 1; D.R.56.1 ¶ 1.  The case was settled pursuant to a July 11,

2008, settlement agreement in which, among other things, defendants agreed to disclose the

suppliers of counterfeit books and to not infringe again.  See Settlement Agreement and Mutual

Releases, dated July 11, 2008, annexed as Exhibit A to Oppenheim Decl. ("2008 Settlement

Agreement"), ¶¶ 5-10; P.R.56.1 ¶ 2; D.R.56.1 ¶ 2.  In August 2011, counsel for plaintiffs notified

defendants of plaintiffs' belief that they had infringed plaintiffs' intellectual property.  P.R.56.1

¶ 10; D.R.56.1 ¶ 10; Letter from Matthew J. Oppenheim to Philip Smyers [sic], dated Aug. 5,

2011, annexed as Exhibit E to Oppenheim Decl.  This litigation followed in 2013.

See Complaint, filed Feb. 4, 2013 (Docket # 1).

    Discovery proceeded apace and lasted for two years.  At the conclusion of discovery,

after plaintiffs had filed one motion for summary judgment, see Plaintiffs' Motion for Partial

Summary Judgment, filed Jan. 26, 2015 (Docket # 200), and days before the due date of

plaintiffs' second motion for summary judgment, plaintiffs filed their Second Amended

Complaint ("SAC"), see Second Amended Complaint, filed May 27, 2015 (Docket # 263).  This

filing was agreed to by defendants and, indeed, came about because "Defendants have requested

that Plaintiffs amend the Complaint to specifically enumerate the 140 works now at issue and as

set forth in Plaintiffs' revised Roadmap."  Letter from Julie C. Chen and Tiffany C. Miller, filed

May 6, 2015 (Docket # 257), at 2.[2]  In response, the defendants filed an answer that raised 20

affirmative defenses, including at least 15 new defenses that had not been pled in defendants'

previous answer.  Compare Answer to Second Amended Complaint, filed June 10, 2015 (Docket

# 264) ("Answer") ¶¶ 111-30, with Answer to Amended Complaint, filed July 1, 2013 (Docket

# 25), at 14-15.

   The plaintiffs then requested permission to make a motion to strike the affirmative

defenses.  See Letter from Matthew J. Oppenheim, filed June 24, 2015 (Docket # 274).  In this

request, the plaintiffs argued that the affirmative defenses should be stricken in part because their

inclusion at this late stage of the case would require the re-opening of discovery.  See id. at 3.

Following a telephone conference, and to aid it in determining whether the affirmative defenses

would require the re-opening of discovery, the Court ordered defendants either to "state the

factual contentions that support" each defense or to agree that they would not be seeking a jury

---

[2]  The "Roadmap" gives information on each of 133 titles that are the subject of this
action.  See Revised Roadmap appended as Exhibit 3 to Miller Decl.  The Roadmap lists, for
each of the works at issue, identifying information about the book (such as title, author, ISBN,
and publisher), whether any counterfeit exemplars of that work either were discovered at
defendants' premises or were obtained from third parties, the source of any such counterfeit
exemplars, the suppliers to defendants of the work where known, and information about the sales
of that work.  The list totals 140 "works" because some of the titles appear in more than one
edition.  See generally John Wiley & Sons, Inc. v. Book Dog Books, LLC, 2015 WL 5724915, at
*1 (S.D.N.Y. Sept. 30, 2015).

instruction with respect to that defense.  See Order, filed July 2, 2015 (Docket # 280) ("July 2 Order").  The Court further ordered that "if defendants state their factual contentions in support of a defense, defendants shall be precluded from asserting at trial differing factual contentions to support that defense."  Id.  The reasoning behind this order was that the Court would allow new affirmative defenses to remain provided the Court was assured that the new defenses relied on facts that had already been the subject of discovery between the parties.  On the other hand, if the new defenses were going to rely on facts that required the re-opening of discovery, it was unlikely the Court would permit them.

The defendants complied with the July 2 Order by submitting their "Notice of Factual Contentions that Support Defendants' Affirmative Defenses," filed July 20, 2015 (Docket # 283) ("Contentions").  In these Contentions, the defendants provided factual contentions for nineteen of the twenty defenses in their Answer to the plaintiffs' Second Amended Complaint, see id. at 16, though they withdrew three of the defenses shortly thereafter, see Letter from Matthew J. Oppenheim, filed July 31, 2015 (Docket # 285), at 3.[3]

In its effort to determine whether plaintiffs' proposed motion to strike defenses or re-open discovery was potentially meritorious, and because it was not clear to the Court that all of the affirmative defenses were truly affirmative defenses (which would require jury instructions), as opposed to mere descriptions of how defendants would oppose plaintiffs' claims factually, the Court issued an order directing the defendants to "provide, for each purported affirmative defense, their proposed jury instruction for that defense" accompanied by supporting legal authority.  See Order, filed Aug. 3, 2015 (Docket # 286).  The defendants provided proposed

---

[3]  The defendants withdrew the following defenses: failure to state a claim, "Defendants do not owe Plaintiffs any duties," and "Plaintiffs have not been harmed."  Id.

jury instructions for nine of the remaining sixteen defenses.  See Proposed Jury Instructions for

Defendants' Affirmative Defenses, filed Aug. 10, 2015 (Docket # 288) ("Jury Instrs.").[4]

The plaintiffs requested that the Court "strike and dismiss with prejudice, or grant

summary judgment on, each and every one of Defendants' affirmative defenses."  Letter from

Matthew J. Oppenheim, filed Aug. 18, 2015 (Docket # 292), at 7.  The plaintiffs also requested

that the Court issue an Order to Show Cause for why defendants should not be sanctioned for

their actions relating to "this affirmative defense charade."  Id.

After reviewing defendants' Contentions, the Court ultimately found that the assertion of

the new affirmative defenses should not permit the plaintiffs to re-open discovery.  See Order,

filed Aug. 19, 2015 (Docket # 293), at 1.[5]  The Court also made clear that the defendants would

"be precluded from seeking a jury instruction with respect to any purported 'affirmative defense'

for which a jury instruction was not provided" in the defendants' filing.  Id.

The instant motion for summary judgment followed.  See Pl. Mot.  The plaintiffs initially

moved for summary judgment on nine of the defendants' affirmative defenses.  See P. Mem. at I.

In their briefing, defendants concede, see D. Opp. at 10-11, that their fraudulent inducement

defense is inconsistent with the Court's grant of summary judgment on plaintiffs' breach of

---

[4]  Defendants declined to seek jury instructions for "Corporate Shield Doctrine," "Alter Ego/Piercing the Corporate Veil," "Failure to Properly Plead Fraud," "Failure to Plead Infringement Claims with Particularity," "Prior Material Breach," and "Preemption."  Id. at 2, 3, 15, 16.

[5]  In their briefing on this motion, the plaintiffs seemingly interpret the July 2 Order as affecting the "evidence" that may be offered at trial.  E.g., P. Mem. at 7 ("Defendants have set forth and are bound by their Factual Contentions; pursuant to the Court's instruction, they cannot offer further evidence.").  While the Order limits defendants to the factual allegations supporting the defense, it does not address the nature of the evidence that could be used to support those allegations.

contract claim, see John Wiley & Sons, Inc. v. Book Dog Books, LLC, 2015 WL 4154112, at *4-7 (S.D.N.Y. July 10, 2015), adopted by 2016 WL 1216583, at *3 (S.D.N.Y. Mar. 25, 2016). Additionally, the defendants fail to address the plaintiffs' argument for summary judgment as to their failure of consideration defense.  See P. Repl. Mem. at 1 n.1.  Consequently, summary judgment should be granted to plaintiffs as to these two defenses.

Defendants also fail to respond to a number of the plaintiffs' arguments regarding the "Fifteenth Defense," which stated that "Plaintiffs' claims are barred, in part or full, by the doctrines of laches, waiver, release, promissory estoppel, unclean hands, bad faith, and/or equitable estoppel."  See Answer ¶ 125.  Specifically, the defendants do not make arguments regarding promissory estoppel, equitable estoppel, or waiver.  See P. Repl. Mem. at 1 n.1.  Thus, plaintiffs are entitled to summary judgment on these aspects of the "Fifteenth Defense."

Finally, while defendants' "Fourteenth Defense" asserted misuse of both copyrights and trademarks, Answer ¶ 124, defendants' brief addresses only copyright misuse, D. Opp. at 17-20. Thus, plaintiffs are entitled to summary judgment on the trademark misuse defense.

Accordingly, we discuss only the remaining defenses: (1) first sale; (2) good faith/innocent infringer; (3) statute of limitations; (4) copyright misuse; (5) laches, release, and unclean hands/bad faith; (6) substantial performance; and (7) fair use.

## II.  GOVERNING LAW

The Second Circuit has addressed motions for summary judgment that seek to strike affirmative defenses as follows:

> Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense — on which the defendant bears the burden of proof at trial — a plaintiff "may satisfy its Rule 56 burden by showing 'that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'"  DiCola v. SwissRe Holding (North America), Inc.,

6

996 F.2d 30 (2d Cir. 1993) (quoting Celotex, 477 U.S. at 325) (brackets in original).  While whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Celotex, 477 U.S. at 323 (emphasis in original).  After all, in cases where there is an absence of evidence to support an essential element of a defense, with respect to that defense "there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the [defendant's affirmative defense] necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.  In sum, we will affirm an award of summary judgment striking an affirmative defense if de novo review of the record in a light most favorable to the defendant reveals the absence of evidence supporting an essential element of the defense.

Fed. Deposit Ins. Corp. v. Giammettei, 34 F.3d 51, 54-55 (2d Cir. 1994) (emphasis in original).

We note that defendants here do not contest that they bear the burden of proof at trial on each of the challenged defenses.

## III.  DISCUSSION

### A.  First Sale

In their Answer, the defendants asserted the "First Sale Doctrine" as a defense, claiming that the doctrine "permits the owner of a particular copy of a copyrighted work to sell or otherwise dispose of the possession of that copy."  Answer ¶ 111.[6]  The first sale doctrine is

---

[6]  The defense reads in full as follows:

Plaintiffs' claims are barred, in full or in part, because all the materials that were imported by or for the account of Defendants were lawfully made under Title 17 pursuant to a license agreement(s) with each applicable Plaintiff; said license(s) authorized the reproduction of the applicable Plaintiff's copyrighted material and the use of the applicable Plaintiff's trademarks; and Defendants were entitled to import and re-sell the subject textbooks without the copyright owner's permission because the copyright owner's exclusive distribution rights (17 USC § 106(3)) were exhausted by virtue of the "First Sale Doctrine," which permits the owner of a particular copy of a copyrighted work to sell or otherwise dispose of the possession of that copy.

codified in the Copyright Act at 17 U.S.C. § 109(a) as follows:

> [T]he owner of a particular copy or phonorecord lawfully made under this title
> . . . is entitled, without the authority of the copyright owner, to sell or otherwise
> dispose of the possession of that copy or phonorecord.

In Kirtsaeng v. John Wiley & Sons, Inc., 133 S. Ct. 1351 (2013), the Supreme Court held that

the first sale doctrine applies to works protected by the Copyright Act that are manufactured

overseas and subsequently resold in the United States.  See id. at 1358-60.  However, the

Supreme Court interpreted the phrase "lawfully made under this title" in 17 U.S.C. § 109(a) to

mean that the first sale protection only applies to works that are "not pirated."  Id. at 1361

("[O]ne who owns a copy will receive 'first sale' protection, provided, of course, that the copy

was 'lawfully made' and not pirated.") (emphasis omitted); accord Memorandum and Order,

filed Mar. 29, 2016 (Docket # 352), at 6 n.6 ("[T]he 'first sale' doctrine does not protect persons

who resell pirated works.") (citing Kirtaseng, 133 S. Ct. at 1361).

The plaintiffs assert that the First Sale Doctrine does not apply to counterfeited works

like those allegedly at issue in this case.  P. Mem at 8.  The defendants do not contest plaintiffs'

argument, countering instead with the undisputed proposition that "the first-sale doctrine applies

to legitimate works sold abroad by plaintiffs."  D. Opp. at 6 (capitalization omitted).  Defendants

also do not contest that they bear the burden of showing the applicability of the "first sale"

doctrine, see Adobe Sys. Inc. v. Christenson, 809 F.3d 1071, 1079 (9th Cir. 2015) ("[T]he party

asserting the first sale defense bears the initial burden of satisfying the statutory requirements"),

and indeed defendants themselves characterize it as an "affirmative defense[]," Answer at 13.

Defendants, however, point to no evidence that plaintiffs have made any copyright claims in this

---

Answer ¶ 111.

case alleging infringement with respect to non-counterfeit books.[7]  Plaintiffs, for their part, assert

that they have no such claim.  P. Mem. at 8-9.  Thus, the defendants cannot show that the "First

Sale" defense applies to any claims in this case.  Accordingly, plaintiffs are entitled to summary

judgment striking this defense.

B.  Innocent Infringement

The third "affirmative defense" asserted in the Answer is that defendants "exercised good

faith, acted in a commercially reasonable manner, had reasonable grounds for their actions, and

acted . . . with the care that an ordinarily prudent person or company in a like position would use

under similar circumstances."  Answer ¶ 113.  Defendants' memorandum of law makes clear

that this "defense" is intended to assert the applicability of the portion of 17 U.S.C. § 504(c) that

reads as follows:

In a case where the infringer sustains the burden of proving, and the court finds,
that such infringer was not aware and had no reason to believe that his or her acts
constituted an infringement of copyright, the court in its discretion may reduce
the award of statutory damages to a sum of not less than $200.

See D. Opp. at 8.  This provision is sometimes referred to as the "innocent infringement

defense."  As the text of the statute makes clear, it is a limitation on damages, not a defense to

liability.

As an initial matter, we reject plaintiffs' argument, see P. Mem. at 10, that defendants

have failed to provide evidence that might allow a jury to conclude that they met the

requirements of this provision — that is, that they were not aware and had no reason to believe

---

[7] As plaintiffs note, P. Repl. Mem. at 6, the defendants' citation to to SAC ¶¶ 103-09, see
D. Opp. at 7, 18, for the proposition that there are such claims is irrelevant because these
paragraphs relate to the plaintiffs' claim for conspiracy to commit fraud, not their claims for
copyright infringement.

that their sales constituted acts of infringement.  Specifically, defendants have submitted an affidavit from defendant Philip Smyres, the person in control of the corporate defendant, providing evidence that the defendants made efforts to avoid selling counterfeit books.  See Smyres Decl. ¶¶ 8-13.

Plaintiffs, however, point to a separate provision of the Copyright Act, P. Mem. at 10, which places a limitation on the availability of the section 504(c) "defense."  This provision states:

> If a notice of copyright in the form and position specified by this section appears on the published copy or copies to which a defendant in a copyright infringement suit had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages . . . .

17 U.S.C. § 401(d).

Plaintiffs assert that "[n]otices of copyrights are contained in each of the works at issue in this case."  P.R.56.1 ¶ 8.  The apparent inference that plaintiffs wish to draw from this assertion is that defendants had "access" to these notices in the 140 works at issue within the meaning of section 401(d).  In support of this assertion, plaintiffs provide affidavits from individuals attesting that notices of copyrights are contained in "all" of the textbooks from the plaintiff publishers, and thus are contained in each of the works at issue in this case.  See Stitt Decl. ¶¶ 6-8; Essig Decl. ¶¶ 5-7; Suarez Decl. ¶¶ 5-7.  In response to this factual assertion, the defendants cite to no affidavits suggesting that the works at issue lack copyright notices.  D.R.56.1 ¶ 8.  Nor have they argued that the copyright notices are not in the "form or position" specified by section 401(d).  See, e.g., Elsevier, Inc. v. Comprehensive Microfilm & Scanning Servs., Inc., 2014 WL 7140003, at *5 (M.D. Pa. Dec. 12, 2014) (upholding jury's rejection of the applicability of section 401(d) on the ground that the notices might not have been "properly affixed to each

work.").  Instead, defendants point to the fact that for a number of works at issue, "no exemplar exists" and thus argue that "there is no evidence that the textbooks, if any, purchased and sold by [defendants] contained a copyright notice."  D.R.56.1 ¶ 8.  Based on their reference to the books "purchased and sold" by defendants, it appears defendants are arguing that there is no evidence that any <u>counterfeit</u> copy of the work defendants sold contained the copyright notice.

This assertion, however, is not relevant.  What is at issue is not whether the counterfeit books the defendants distributed bore the requisite copyright notice but rather whether "the published cop[ies]" — that is, the authentic copies — of the works to which defendants had "access" bore the requisite copyright notice.  17 U.S.C. § 401(d).  Given the evidence that the works were published in the marketplace and had the proper copyright notice, <u>see</u> Stitt Decl. ¶¶ 6-8; Essig Decl. ¶¶ 5-7; Suarez Decl. ¶¶ 5-7, the defendants were required to produce some evidence that they lacked access to these published works.  Having failed to provide such proof, they cannot show that section 401(d) is inapplicable.

Defendants make a separate argument.  They assert that section 401(d) applies only to a party "who <u>manufactures</u> copies of a work bearing a copyright notice" and not to "innocent parties that are <u>reselling</u> physical goods."  <u>See</u> D. Opp. at 9-10 (emphasis in original).  The defendants argue that "[t]he mere presence of a copyright notice does not inform a party that the work is infringing if that notice appears on a counterfeit work that appears completely legitimate."  <u>Id.</u> at 10.

This argument suffers from two defects.  First, the applicability of section 401(d) turns on access to a "published" — that is, authentic — version of the work.  Whether a copyright notice was contained in a counterfeit version is not relevant.  Second, defendants argument essentially rests on a policy argument that is not manifested in the statutory language.

Specifically, defendants' argument is based on a desire to avoid the application of section 401(d) in instances where a defendant inadvertently distributed a counterfeit work.  To be sure, there might be good reason to design the statutory scheme to allow innocent distributors to use the "innocent infringer" limitation and to deny the limitation only to persons who make copies of a work without having been bothered to note that the work bore an obvious notice that it was protected by copyright.  The problem with defendants' argument, however, is that section 401(d) fails to make this distinction.  It denies the innocent infringer limitation to any infringement of a work when the infringer had access to a copy of the work containing a proper copyright notice, regardless of how the infringement came about.

The cases defendants cite, D. Opp. at 10, do not support their argument.  D.C. Comics Inc. v. Mini Gift Shop, 912 F.2d 29 (2d Cir. 1990), found innocent infringement where the plaintiff admitted that the infringing works did not have copyright notices.  Id. at 32. ("licensing director" for plaintiff "determined that the goods were not licensed . . . based [in part] on the absence of proper trademark and copyright notices.") (internal quotations omitted).  Similarly, Denenberg v. LED Techs., LLC, 2013 WL 2153290 (D. Colo. May 17, 2013), denied a motion for summary judgment seeking to bar an innocent infringement defense because it was disputed whether a website that contained the copyright notice "provide[d] the kind of notice that precludes the defense of innocent infringement."  Id. at *2.

Accordingly, plaintiffs are entitled to summary judgment barring defendants from raising the innocent infringement limitation.

C.  Statute of Limitations

The defendants assert that the "Plaintiffs' claims are barred, in part or in full, by the applicable statutes of limitations."  Answer ¶ 121.

"Civil actions for copyright infringement must be 'commenced within three years after the claim accrued.'" Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 124 (2d Cir. 2014) (quoting 17 U.S.C. § 507(b)). Claims for copyright infringement accrue with "actual or constructive discovery of the relevant infringement." Id. at 125; accord Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992) ("A cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised.") (citations omitted), cert. denied, 508 U.S. 906.

The defendants argue that some of the plaintiffs' claims are untimely because (1) the titles the plaintiffs first alleged had been infringed in the SAC did not relate back to the filing of the first complaint; and (2) plaintiffs' copyright claims were not filed within three years of the accrual of their claim. See D. Opp. at 11.

As to the relation back issue, we note that the plaintiffs filed their initial complaint on February 4, 2013. Complaint, filed Feb. 4, 2013 (Docket # 1). This complaint referred to 79 titles. Exhibit A, appended to Complaint, filed Feb. 4, 2013. The complaint referred to this list as "a representative sample and is likely not complete." Complaint, filed Feb. 4, 2013 (Docket # 1), ¶ 50. The plaintiffs amended their complaint on April 24, 2013. First Amended Complaint, filed Apr. 24, 2013 (Docket # 16). This complaint also referred to a "representative sample . . . likely not complete," id. ¶ 50, of 79 titles, Exhibit A, appended to First Amended Complaint, filed Apr. 24, 2013 (Docket # 16). Finally, the plaintiffs filed the SAC on May 27, 2015, see SAC, which listed 133 titles, Exhibit A, appended to SAC. Again, the SAC described this list as a "representative sample . . . likely not complete" of works infringed by the Defendants. SAC ¶ 50. We find it unnecessary to determine whether the claims in the SAC relate back to the original complaint because, as we describe further below, the claims are timely

even if we assumed <u>arguendo</u> that defendants are correct in their argument, <u>see</u> D. Opp. at 11-13, that the relation back doctrine does not apply.

On the question of when the claims accrued, defendants argue that this Court should not follow the Second Circuit's holding in <u>Psihoyos</u> — permitting timeliness to be measured from "actual or constructive discovery of the relevant infringement" — and instead measure accrual from the date of the actual injury because it is "the better rule" and is supported by dicta in <u>Petrella v. Metro-Goldwyn-Mayer, Inc.</u>, 134 S.Ct. 1962, 1969 (2014) ("A copyright claim thus arises or 'accrue[s]' when an infringing act occurs."). <u>See</u> D. Opp. at 13. We reject this argument as we are bound to follow Second Circuit law unless it is overruled by the Supreme Court. <u>See</u> <u>Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC</u>, 23 F. Supp. 3d 344, 357 n.11 (S.D.N.Y. 2014) ("[A] suggestion that the Supreme Court may favor the injury rule, without more, does not trump Second Circuit precedent. For now, <u>Psihoyos</u> remains the law of this Circuit."); <u>accord</u> <u>Cooley v. Penguin Grp. (USA) Inc.</u>, 31 F. Supp. 3d 599, 611 n.76 (S.D.N.Y. 2014).

Thus, to survive summary judgment, the defendants must produce evidence showing that the plaintiffs knew or should have known about their claims before May 7, 2012, the date three years before plaintiffs filed the SAC. Defendants argue that five groups of works should be excluded as time-barred. These groups are: "Titles 3, 31, 54, 72, 89, and 96," D. Opp. at 14 ("The MBS Group"); "Title 74," D. Opp. at 16; "Titles 10A, 20, 50, 105, 122, 131, 133A," <u>id.</u> (the "10A Group"); "All Sales that Occurred in or Before August 2011," <u>id.</u>; and "All Best Books World Sales," <u>id.</u> at 17 (the "BBW Group"). We discuss each group in turn.

### 1. MBS Group

The common thread of this group is that, in 2011, a wholesaler called Missouri Book

Service ("MBS") returned counterfeit copies of these works to plaintiffs.[8]  D. Opp. at 14.
Defendants do not claim, however, that MBS informed plaintiffs at the time of the return that the
counterfeit copies of these works in their possession had come from defendants.  Instead,
defendants point to other pieces of evidence to argue that the plaintiffs should have known that
defendants had distributed the counterfeit works that came from the MBS Group.

Defendants argue that plaintiffs were investigating defendants in August and September
2011; that plaintiffs were "highly attuned to the possibility" that defendants were dealing in
counterfeit works; and that in August 2011, plaintiffs actually accused defendants of dealing in
counterfeit textbooks.  Id. (citing Miller Decl., Exs. 4-6).  Defendants' brief contends that
plaintiffs "actually identified Titles 3, 31, 72, and 96 as works that were being counterfeited."
Id. (citing Letter from Matthew J. Oppenheim to Neil Mooney, Esq., dated Aug. 30, 2011,
appended as Ex. 6 to Miller Decl. ("Aug. 30 Letter") at 7).  What defendants do not say,
however, is that in August 2011 plaintiffs asserted that defendants had sold counterfeit copies of
only 10 specific works and that the four works defendants list are not among these 10.   The four
works defendants list, by contrast, are contained on a list of approximately 100 works annexed to
a letter from plaintiffs' attorney.  See Aug. 30 Letter.  The letter stated that those 100 works had
"recently been found in the market" in counterfeit form and asked the defendants to voluntarily
provide information about their purchases and sales of such works.  Id. at 2, 5.  Defendants do
not assert that they ever provided any information to plaintiffs as to these works, let alone
informed plaintiffs about the returns of the four counterfeit works from MBS.

---

[8]  Defendants' brief, in the first line of the second paragraph, states that MBS returned
these counterfeit works to "Defendants."  D. Opp. at 14.  We assume that this is a typographical
error and that defendants meant "Plaintiffs."  If defendants actually meant "Defendants," it
would provide no evidence that plaintiffs had knowledge of any infringement.

Defendants also cite to emails between MBS personnel and plaintiffs' employees listing books MBS surrendered to plaintiffs and to deposition testimony from an MBS employee.  See D. Opp. at 15 (citing Email Exchange, appended as Ex. 4 to Miller Decl., and Excerpts from the Deposition of Lon Daniel, dated Nov. 18, 2014, appended as Ex. 7 to Miller Decl. ("Daniel Deposition")).  Defendants claim that these materials show that "Plaintiffs asked Missouri Book Service whether it had received counterfeit books from Defendants," that "Missouri Book Service provided Plaintiffs with lists of books that had been received from Defendants," and that MBS "voluntarily collaborate[d] with Plaintiffs'" investigation.  Id. at 14-15.

The evidence, however, fails to support this assertion.  The emails relate to MBS's efforts to return counterfeit titles to plaintiffs.  While the four titles listed by defendants (Titles 3, 31, 72, and 96) are contained in a much larger listing of counterfeit books in MBS's possession, see Email Exchange, appended as Ex. 4 to Miller Decl. at 5 (Titles 72 and 96); 9 (Title 3); 15 (Title 31), nothing in the emails connects any particular title to a sale by defendants.  The deposition testimony is also unhelpful.  It shows only that plaintiffs asked MBS about the activities of defendants (along with other book suppliers), Daniel Deposition at 87-88; and that MBS internally produced a list of counterfeit titles that MBS received from Smyres, id. at 74.  There is no evidence, however, that MBS ever informed plaintiffs that it had received these counterfeit titles from defendants.  The cases cited by defendants, D. Opp. at 15-16, all involved instances of infringement that were linked to a particular infringer, and are thus irrelevant.  Accordingly, we reject defendants' assertion that "a reasonable fact-finder could infer that, in the summer of 2011, Plaintiffs should have known about delivery of any alleged counterfeit exemplars to

[MBS]" by BDB.  D. Opp. at 15.[9]

### 2.  Title 74

It is unclear why defendants have treated this title differently from the others in the MBS group.  For evidence as to this title, they cite only to the Roadmap.  D. Opp. at 16.  But the Roadmap reflects only that MBS turned a counterfeit copy of Title 74 over to the plaintiffs in January 2012.  Roadmap Entry 74.  Once again, there is no evidence that plaintiffs had reason to know on that date that defendants had supplied this title to MBS.

### 3.  10A Group

With respect to this group, the defendants point to evidence that they acquired these titles in July 2008 and December 2009 from a seller called "Best Books World."  See D. Opp. at 16 (citing Roadmap Nos. 10A, 20, 50, 105, 122, 131, and 133A).  Defendants also cite to a portion of the Smyres Declaration in which Smyres states that in August 2008 he sent plaintiffs "copies of three books [defendants] had received from Best Books World" — specifically, titles 20, 50, and 10 — and that plaintiffs did not identify all of the exemplars as counterfeit and that they "acted as if they did not care what happened to the books they believed to be counterfeit." Smyres Decl. ¶ 16.  The citation to this evidence is puzzling.  Nothing in this evidence would allow a reasonable jury to find that plaintiffs knew or had reason to know that defendants had actually distributed copies of any of these works or would do so in the future.

---

[9]  While it is not necessary to reach the issue, there is virtually no evidence supporting a statute of limitations defense as to Titles 89 and 54.  MBS surrendered Title 89 to the plaintiffs in May 2013, less than three years prior to the filing of the SAC.  Roadmap Entry 89.  As for Title 54, the defendants have not pointed to any evidence indicating when MBS surrendered a copy of this title.

4.  <u>Works Sold Prior to August 2011</u>

The defendants note that some sales of counterfeit works are alleged to have occurred before August 2011 "but were not claimed until the filing of the Second Amended Complaint in May 2015."  D. Opp. at 16 (citation omitted).  They argue that "[o]nce Plaintiffs were on notice that Defendants were allegedly infringing some of their works, they were obligated to conduct a reasonable investigation to determine what other books, if any, were also being counterfeited."  <u>Id.</u> (citation omitted).  They assert that the plaintiffs "failed to conduct a reasonable investigation" or that they did not file suit after "receiving actual notice of the alleged infringement."  <u>Id.</u> at 17.

Defendants, however, cite to no evidence whatsoever to support their argument that plaintiffs' investigation was not reasonable, or that they failed to file suit within three years of receiving "actual notice" of an infringement.  Thus, this argument must be rejected.[10]

---

[10]  While it could hardly cure the defendants' failure to cite evidence to support this defense, we note that the cases they cite, D. Opp. at 16-17, are not as broad as defendants assert.  In <u>Weber v. Geffen Records</u>, 63 F. Supp. 2d 458 (S.D.N.Y. 1999), the court expressly stated that it was "not holding that awareness of some number of violations necessarily yields constructive knowledge of all other violations by the same parties."  <u>Id.</u> at 465.  Rather, the court faulted plaintiff for his failure to read a public document that reflected infringement or to "take even a cursory look at the new, widely released album from a musical group that very recently had repeatedly infringed his musical compositions."  <u>Id.</u> at 466.  In <u>Fahmy v. Jay-Z</u>, 835 F. Supp. 2d 783 (C.D. Cal. 2011), the plaintiff alleged that a single copyright had been infringed multiple times by the same defendants.  <u>See id.</u> at 790.  <u>Fahmy</u> found that the plaintiff was under a duty to investigate whether other products put out by the same defendant "contained the same infringement."  <u>Id.</u> (citation omitted).  Defendants have marshaled no evidence that plaintiffs failed in this duty.  Likewise, <u>Kepner-Tregoe, Inc. v. Exec. Dev., Inc.</u>, 79 F. Supp. 2d 474 (D.N.J. 1999), <u>aff'd</u>, 276 F.3d 577 (3d Cir. 2001), "place[d] a duty . . . to monitor [defendant's] products" on the plaintiff.  <u>Id.</u> at 488.  The letter the plaintiffs sent to the defendants, <u>see</u> Letter from Matthew J. Oppenheim to Neil Mooney, Esq., dated Aug. 30, 2011, appended as Ex. 6 to Miller Decl., shows that the plaintiffs <u>were</u> monitoring the defendants after the 2008 Settlement Agreement.  Defendants have not explained how "act[ing] as if they did not care what happened to" individual copies of counterfeit books, Smyres Decl. ¶ 16, constitutes a breach of this duty.

5. BBW Group

The defendants argue that in the summer of 2008, they purchased counterfeit books from Best Books World and that plaintiffs "did not make any effort to determine what happened to those allegedly counterfeit books." D. Opp. at 17. They argue that as a result "all alleged [BBW] counterfeits are time-barred." Id. The only evidence they cite to support this argument is evidence also cited with regard to the "10A Group": a declaration from Smyres that plaintiffs were informed that defendants had in their possession counterfeit exemplars of three titles, that plaintiffs did not "ask [defendants] to destroy these books"; that "Plaintiffs did not tell [Smyres] to do anything with the books"; and that "Plaintiffs acted as if they did not care what happened to the books that they believed to be counterfeited." Smyres Decl. ¶ 16. Once again, this evidence does not show that plaintiffs knew that defendants had distributed any of these counterfeit works or that they intended to distribute those counterfeit works. There is even less evidence (if that were possible) that plaintiffs had reason to believe that defendants were distributing specific other works from Best Book World. Moreover, there is nothing to suggest that plaintiffs did not then make reasonable efforts to determine if defendants were distributing counterfeit works.

D. Copyright and Trademark Misuse

The defendants' fourteenth defense asserts that the "Plaintiffs' claims are barred, in part or in full, by their misuse of their respective copyrights and trademarks." Answer ¶ 124. As we have already noted, the defendants failed to address trademark misuse in their briefing and thus cannot meet their burden of proof to avoid summary judgment. As to the copyright misuse defense,

[t]he Second Circuit has not yet recognized the affirmative defense of copyright

19

misuse . . . Although copyright misuse has been acknowledged as a potential affirmative defense to an action for copyright infringement in at least five circuits, only a handful of decisions have ever applied it to bar an otherwise successful claim of copyright infringement.

Associated Press v. Meltwater U.S. Holdings, Inc., 931 F. Supp. 2d 537, 567 (S.D.N.Y. 2013) (citations omitted).  Where it has been applied, the defense "prevents a copyright owner from recovering for infringement where he has impermissibly extended the copyright monopoly in a manner which constitutes an unreasonable restraint of trade."  Coleman v. ESPN, Inc., 764 F. Supp. 290, 295 (S.D.N.Y. 1991) (footnote omitted).  While "[s]ome courts have indicated that the doctrine of copyright misuse applies only in the antitrust context," other courts "have taken a broader approach, holding that copyright misuse applies to any attempt to broaden the scope of a copyright monopoly that violates the public policy underlying copyright law."  Coach, Inc. v. Kmart Corps., 756 F. Supp. 2d 421, 428-29 (S.D.N.Y. 2010) (citations omitted).  "Whatever the metes and bounds of the defense, it is one that is applied sparingly.  Its focus is on the improper stifling of competition."  Associated Press, 931 F. Supp. 2d at 568 (internal quotation marks and citation omitted); see also Coach, 756 F. Supp. 2d at 428-29 (noting split in authority as to whether misuse occurs only when plaintiffs violate antitrust law).

The defendants, however, offer almost no evidence to support this defense.  They point to the paragraphs of the SAC alleging that the defendants engaged in fraudulent conduct, D. Opp. at 18 (citing SAC ¶¶ 6, 53-58, 103-09), and an allegation that defendants sold books that "are not permitted to be sold in the first instance in the United States," id. (citing SAC ¶ 107).[11]  They assert these allegations are "false," id. at 18, but marshal no evidence to support the assertion that they are "false."  Thus the claim that plaintiff made "false" allegations in this lawsuit —

_____

[11]  Defendants mistakenly refer to this paragraph as "¶ 106."

even assuming that such a claim would be relevant to a copyright misuse defense — carries no weight.

Defendants point to the fact that an individual in another case entered into a settlement agreement with plaintiffs in which the individual agreed not to resell foreign editions of their works.  D. Opp. at 18 (citing Final Judgment and Permanent Injunction by Consent, dated Jan. 9, 2007, appended as Ex. 8 to Miller Decl.).[12]  Defendants argue that by entering into such an agreement the plaintiffs have "undermine[d] the first-sale doctrine" by claiming that books purchased abroad cannot be sold in the United States, by "requir[ing] third-parties to waive . . . this right [to resell foreign-made books domestically] as a condition of settling copyright infringement actions," and by "lev[ying] false allegations of fraud and copyright infringement . . . ."  D. Opp. at 18 (citations omitted).   The defendants assert that this "represents an attempt to extend Plaintiffs' copyrights and trademarks, affording them the ability to ban or geographically restrict subsequent sales, a monopolistic right not granted under the law."  Id.  The agreement cited, however, was signed before the Supreme Court's decision in Kirtsaeng v. John Wiley & Sons, Inc., 133 S.Ct. 1351 (2013), which held that the first sale doctrine applied to books manufactured outside the United States.  Id. at 1358-60.  Prior to that decision, the Second Circuit had held that the doctrine did not apply.  See John Wiley & Sons, Inc. v. Kirtsaeng, 654 F.3d 210, 216 (2d Cir. 2011).  Thus, it was plainly reasonable for plaintiffs to seek to bar sales of such foreign editions in the United States.  See, e.g., Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 428-29 (D.N.J. 2005) ("the fact of enforcing a valid copyright, without more,

---

[12]  Defendants also cite to a copy of an unexecuted settlement agreement that would have resolved the instant litigation.  See D. Opp. at 18 (citing Settlement Agreement, appended as Ex. 9 to Miller Decl.).  Defendants never explain the circumstances of the creation of this document, however, and thus it too carries no evidentiary weight.

simply cannot constitute copyright misuse").[13]

The only remaining piece of evidence centers on a paragraph of a declaration from

Smyres which reads in its entirety as follows:

> Since approximately 1995, I have had a business relationship with Cengage
> Learning, Inc. ("Cengage") and Pearson Education, Inc. ("Pearson").  During that
> relationship, with two exceptions, Cengage and Pearson continuously sold books
> to me and/or BDB.  The first exception occurred in 2007, when Cengage and
> Pearson both suddenly and simultaneously stopped selling books to BDB. At that
> time, Cengage and Pearson were jointly coordinating their relationship with
> Defendants through their then attorney, Cozen O'Connor.  Cengage and Pearson
> resumed selling BDB books in 2008. In July 2012, Cengage and Pearson again
> simultaneously and suddenly refused to sell BDB books. At that time, Cengage
> and Pearson were also jointly coordinating their relationship with Defendants
> through their attorney Matt Oppenheim.  Cengage and Pearson collectively
> control over 50% of the United States market for higher education textbooks.

Smyres Decl. ¶ 15.  Defendants also cite to letters by an attorney for the plaintiffs accusing

defendants of violating copyrights.  D. Opp. at 19 (citing Letter from Matthew J.  Oppenheim to

Philip Smyers [sic], dated Aug. 5, 2011, appended as Ex. 5 to Miller Decl.; Letter from Matthew

J. Oppenheim to Neil Mooney, Esq., dated Aug. 30, 2011, appended as Ex. 6 to Miller Decl.).

The letters address only defendants' alleged distribution of counterfeit works.  They do not say

anything about the plaintiffs' continued business dealings with the defendants.   For its part,

plaintiff Pearson has pointed to uncontroverted testimony that it was unaware of Cengage's

actions.  See P. Repl. Mem. at 24-25 (citing Transcript of TRO/Preliminary Injunction Hearing

Before the Honorable James L. Graham, United States District Judge, appended as Ex. 7 to Chen

Decl., at 108-09).

---

[13] The two cases cited by the defendant, D. Opp. at 19, qad. Inc. v. ALN Assocs., 770 F.
Supp. 1261, 1270 (N.D. Ill. 1991), and Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772, 793
(5th Cir. 1999), are irrelevant.  Both involve plaintiffs who tried to extend an existing copyright
over new material, not plaintiffs who tried to limit sales of copyrighted material.

This testimony from Smyres, in combination with the attorney letters, would be insufficient to allow a reasonable jury to apply a copyright misuse defense.  While defendants are entitled to the benefit of reasonable inferences, this testimony is too lacking in detail to conclude that the plaintiffs' decisions not to sell books to defendants was part of an "unreasonable restraint on trade" or otherwise violated public policy.  There are many proper reasons for two or more entities to decide to refuse to sell their copyrighted works to a book dealer — most obviously where the entities learn that the book seller has improperly been selling counterfeit versions of their works  — and it would not be surprising that the entities acting independently might reach the determination at the same time where they have both engaged the same law firm to pursue such allegations.  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), an antitrust case, the Supreme Court held that "at the summary judgment stage," a claimant's "offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."  Id. at 554 (citation omitted).  It also held that the conspiracy evidence must show more than "parallel conduct."  Id.  Because the defendants' evidence does not "tend to rule out the possibility that the defendants were acting independently," id., in deciding to stop doing business with an alleged counterfeiter, and because defendants have not shown any other violation of public policy, defendants have not provided evidence that would allow a factfinder to apply the defense of copyright misuse.

E.  Equitable Defenses

While defendants asserted a variety of equitable defenses as their fifteenth defense, Answer ¶ 125, we address only the remaining defenses at issue: laches, release, and unclean hands/bad faith.

1. <u>Laches</u>

The defendants assert laches against plaintiffs' trademark claims. D. Opp. at 20 ("The doctrine of laches applies to Plaintiffs' trademark claims."). They also assert it "to bar injunctive relief and disgorgement of profits" on their copyright claims. <u>Id.</u> (citation omitted).

Laches bars a claim for relief under federal trademark law where (1) the "plaintiff had knowledge of [the] defendant's use of its marks" and "inexcusably delayed in taking action," and (2) the "defendant will be prejudiced by permitting [the] plaintiff . . . to assert its rights at this time." <u>Saratoga Vichy Spring Co. v. Lehman</u>, 625 F.2d 1037, 1040 (2d Cir. 1980) (internal quotation marks omitted). The "burden of proving or rebutting the defense [of laches]" is determined by the "analogous [state] statutes of limitation." <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 191 (2d Cir. 1996) (internal quotation marks and citation omitted). "When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant" to demonstrate the applicability of the laches defense. <u>Id.</u> (internal quotation marks omitted). In New York, the analogous state statute is at least three years. <u>Id.</u> (six years for false advertising claim); <u>Charles Atlas, Ltd. v. DC Comics, Inc.</u>, 112 F. Supp. 2d 330, 334 n.7 (S.D.N.Y. 2000) (three years for trademark dilution claim).

Defendants cite to no evidence to support this defense, however, other than to refer to the section of their brief that made their statute of limitations arguments. <u>See</u> D. Opp. at 21. We have already explained why defendants have not shown that the three-year statute of limitations expired on any claims. Defendants' brief provides no evidence whatsoever on prejudice. Thus, they have not met their burden on this defense.

Assuming, <u>arguendo</u>, that a laches defense is even available as to the copyright claims in this case, the same burden applies. <u>See, e.g.</u>, <u>Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer,</u>

Inc., 452 F. Supp. 2d 382, 391 (S.D.N.Y. 2006) ("[L]aches bars a claim when a defendant has

suffered prejudice because of a plaintiff's unreasonable and inexcusable delay in bringing the

claim.") (internal quotation marks and citation omitted); In Design v. Lauren Knitwear Corp.,

782 F. Supp. 824, 831 (S.D.N.Y. 1991) ("The party asserting the laches defense must establish

(1) that the delay was unreasonable and (2) that the delay resulted in prejudice.") (citation

omitted).  Because defendants have shown no prejudice, plaintiffs are entitled to summary

judgment on this defense.

### 2.  Release

The defendants argue that ¶ 16(a) of the 2008 Settlement Agreement releases them from

claims relating to sales of counterfeit books prior to July 2008.  D. Opp. at 22 (citing to

Roadmap Entries 10A, 22, 131, and 133A).  The 2008 Settlement Agreement releases the

defendants from claims relating to "the alleged unlawful conduct raised in the Litigation, and

any allegedly unlawful conduct, known or unknown, taking place up until the Effective Date."

Settlement Agreement ¶ 16(a); P.R.56.1 ¶ 7; D.R.56.1 ¶ 7.  The "Effective Date" of the

Settlement Agreement was July 11, 2008.  Settlement Agreement at 1.[14]  Thus, any transactions,

"known or unknown," Settlement Agreement ¶ 16(a), that occurred prior to July 11, 2008,

cannot serve as claims in this litigation.

Plaintiffs do not contest this proposition.  Plaintiffs argue only that the examples that

defendants give of titles that had sales prior to July 11, 2008, are incorrect, and that the sales

occurred after that date.  P. Repl. Mem. at 27.  It is not necessary to resolve this issue.  Plaintiffs'

---

[14] The defendants incorrectly state that the "Settlement Agreement did not define . . . the 'Effective Date.'"  D. Opp. at 22.  In fact, the first sentence of the Settlement Agreement reads as follows: "This settlement agreement . . . is made this 11th day of July 2008 (the 'Effective Date') . . . ."  Settlement Agreement at 1; see also D.R.56.1 ¶ 2.

brief makes clear that they seek summary judgment striking the defense only as to sales that occurred after July 11, 2008.  Id.  Defendants state that they will only assert the defense as to "any pre-July 2008 conduct."  D. Opp. at 22.  Accordingly, plaintiff's motion for summary judgment barring the release defense as to any sales that occurred after July 11, 2008, should be granted.

### 3.  Unclean Hands/Bad Faith

The unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945).  In trademark suits, "the defense of unclean hands applies only with respect to the right in suit" — the trademark — rather than conduct in the litigation about the trademark.  Warner Bros. Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983); accord Coach, Inc., 756 F. Supp. 2d at 429.  The same principle holds for copyright claims: "[t]he defense of unclean hands in copyright actions is recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action."  Broadcast Music, Inc. v. Hearst/ABC Viacom Entm't Servs., 746 F. Supp. 320, 329 (S.D.N.Y. 1990) (internal quotation marks and citation omitted).

The only evidence defendants point to as support for this defense is the same evidence they marshaled in support of their copyright misuse defense.  See D. Opp. at 22.  But "the defense of copyright misuse" is merely "a species of unclean hands, and finds its origin in the equitable defense of unclean hands."  Saks Inc. v. Attachmate Corp., 2015 WL 1841136, at *13 (S.D.N.Y. Apr. 17, 2015) (citations omitted).  Because the evidence defendants supply does not support a copyright misuse defense, that same evidence is insufficient to serve as a predicate for an unclean hands defense.

26

F.   Substantial Performance

The defendants assert that they have "substantially performed their contract obligations,"
Answer ¶ 128, referring to the 2008 Settlement Agreement.  D. Opp. at 23.  They make this
defense to counter plaintiffs' breach of contract claims, id. (citing SAC ¶¶ 97-102), and clarify
they assert this defense only to defend against any nonmonetary relief plaintiffs might seek, see
id. at 23-24.  For their part, the plaintiffs "state that they are only seeking monetary damages for
their breach of contract claim."  P. Repl. Mem. at 29 (emphasis in original).

Because plaintiffs are seeking only monetary damages for the breach of contract claim,
and because defendants do not assert the defense as to claims for monetary damages, the defense
has no applicability in this action.  Accordingly, plaintiffs' motion for summary judgment on the
substantial performance defense should be granted.

G.   Fair Use

Finally, the defendants assert that "Plaintiffs' claims are barred, in full or in part, by the
doctrine of fair use."  Answer ¶ 130.  In their briefing, the defendants only make arguments
relating to trademark fair use — specifically, "nominative fair use."  D. Opp. at 25 ("[T]he facts
of this case put forth an . . . argument for nominative fair use.").  Thus, we do not consider any
arguments regarding fair use of plaintiffs' copyrights.

While at the time of the briefing of the motion, the Second Circuit had not ruled on the
availability of the doctrine, see, e.g., Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 102 (2d Cir.)
(describing the doctrine in dictum), cert. denied, 562 U.S. 1082 (2010), the Second Circuit has
now definitively held that "nominative fair use is not an affirmative defense to a [trademark]
infringement claim."  Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, —
F.3d. ----, 2016 WL 2893172, at *12 (2d Cir. May 18, 2016).  Accordingly, this defense must be

stricken.

IV. CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment striking affirmative defenses should be granted in its entirety.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. William H. Pauley III at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Pauley. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 6, 2016
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

28