L43MWIL1                                                                    2490

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      JOHN WILEY & SONS, INC.,
 3    ET AL,

 4                   Plaintiffs,

 5            v.                              13 CV 816 (WHP)

 6    BOOK DOG BOOKS, LLC, ET AL,

 7                   Defendants.

 8    ------------------------------x
      CENGAGE LEARNING, INC., ET AL,
 9
                     Plaintiffs,
10
              v.                              16 CV 7123 (WHP)
11
      BOOK DOG BOOKS, LLC, ET AL,
12
                     Defendants.             TRIAL
13
      ------------------------------x
14
                                             New York, N.Y.
15                                           April 3, 2018
                                             8:55 a.m.
16
      Before:
17
                        HON. WILLIAM H. PAULEY III,
18
                                             District Judge
19                                            and a jury

20                            APPEARANCES

21    OPPENHEIM ZEBRAK
            Attorneys for Plaintiffs
22    BY:  MATTHEW J. OPPENHEIM
           JEFFREY M. GOULD
23         COREY M. S. MILLER

24

25
```

1                        APPEARANCES (continued)

2    MANDEL BHANDARI
          Attorneys for Defendants
3    BY:  EVAN MANDEL
          RISHI BHANDARI
4         ROBERT A. GLUNT

5    ALSO PRESENT:  JOSH DUBIN, ESQ.
                    RHONDA HOOPER, Paralegal
6                   DEREK COLE, Technician
                    ANDREW KLEIN, Technician

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Counsel, are there any issues that you

3     want to raise this morning?

4          MR. BHANDARI:  We are planning to play a video clip of

5     Bill Sampson, the 30(b)(6) witness for Cengage.  There are some

6     objections that the other side lodged in the pretrial order.

7     We sent them a pared-down version of the designations last

8     night.  They said they need a little bit more time to review

9     whether or not they are going to be standing by those

10     objections.  I wanted to raise them with you potentially after

11     lunch, right at the tail end of lunch, so they would have some

12     additional time to review that so we can get a ruling on the

13     objection.  Perhaps if we can come back it a little early from

14     lunch and get a ruling on these objections.

15          THE COURT:  That's fine.

16          MR. OPPENHEIM:  From a timing perspective it's fine.

17     The very first time they indicated anything about using the

18     Sampson designations was an e-mail that we got about 9:00 last

19     night, so we are working on it, your Honor.

20          The whole purpose of offering the Sampson testimony is

21     for the purpose that your Honor rejected yesterday, which is

22     they want to try to demonstrate to the jury that we should have

23     known about the infringement prior to the statute of

24     limitations.  I think it's an unnecessary playing of the

25     designations, but I guess we won't object on that ground.  We

 1    should at least have a chance to review it.

 2            MR. BHANDARI:  Since they are not objecting, I am not

 3    going to say anything else.  It was in the pretrial order and

 4    we have been mentioning this for a while, that we are going to

 5    read these designations.

 6            MR. OPPENHEIM:  That's not true.

 7            MR. BHANDARI:  It is true.  What's not true is you

 8    saying you got it at 9:00.

 9            THE COURT:  Gentlemen, it's early in the day.

10            I don't know if you've had a chance to think about

11    further what the evidence is going to be today and whether or

12    not we might conclude the taking of evidence today.

13            MR. OPPENHEIM:  One other issue to flag for you before

14    we get to that, your Honor.  This morning we were given

15    demonstratives for Mr. Quintero's testimony, defendants' expert

16    on profitability.  We are just looking through it.  It includes

17    areas that we don't believe were ever in his report.  We are

18    looking at it right now.  We are going to need a few minutes

19    before Mr. Quintero takes the stand to speak to your Honor

20    because we believe his testimony need to be pared down and

21    limited to what the conclusions are in his report.  We are just

22    looking at it now, your Honor.

23            MR. MANDEL:  We obviously disagree.  Everything he is

24    going to testify to is within his report, and he is a rebuttal

25    expert.  He is just responding to everything Mr. Steinmetz

2494

1    testified about.

2          THE COURT:  Back to my question because I'd like to

3    give the jury some sense as to where we are in the case.

4          MR. MANDEL:  Our hope is we will rest today, your

5    Honor.  I think it's more likely than not that we will.

6          THE COURT:  I think the jury will be happy to hear

7    that.  If that's the case, we will complete any issues relating

8    to the charge before you go home for the evening so that both

9    sides know exactly what the Court is going to tell the jury in

10   its final instructions.

11         In terms of timekeeper recaps for yesterday, the

12   plaintiffs utilized two hours and 15 minutes and the defendants

13   used three hours and 15 minutes.

14         Any other matters that you want to raise?

15         MR. OPPENHEIM:  Just so it's on the Court's radar

16   screen, we have at least one designation for a witness I don't

17   think they are calling, Mr. Davenport.  Is that correct?

18         MR. MANDEL:  Correct.

19         MR. OPPENHEIM:  We will have that to put in at the

20   conclusion of the defendants' case.  I am not sure if there is

21   one other or not.  We will check.

22         THE COURT:  If all of that is the case, and you folks

23   are the best judges of when the defendant is going to rest and

24   how long this rebuttal reading is, if we need to truncate

25   slightly the luncheon recess, I'm sure the jury would do that

 1   to complete the taking of evidence.  On the other hand, if

 2   there is just one little piece that remains to be done, it can

 3   be done tomorrow morning before we move to closing arguments.

 4           MR. OPPENHEIM:  Can we figure that out when they have

 5   finished putting their case on?

 6           THE COURT:  Yes.  We will figure it out later.

 7           With your permission I am going to let the jury know

 8   this morning at the outset that the end is in sight, that we

 9   likely will have closing arguments and charge to them tomorrow.

10           We are just waiting for someone.  It's not juror no. 1

11   today.  As soon as they are here we will start.

12           MR. OPPENHEIM:  Can we just ask, given that the

13   defendants have just indicated they think they are going to

14   conclude today, if there is any change in the lineup of

15   witnesses today.

16           MR. BHANDARI:  Not since what we sent you last night.

17           MR. GOULD:  I asked if Mr. Bhandari could confirm the

18   same order of witnesses that he had told us last night.  I just

19   want to make sure we have a plan for the day.

20           MR. BHANDARI:  Yes.  It's the same as yesterday and so

21   we are clear on what that is, in case there is any confusion,

22   it is MacFarland, Quintero, Womeldorph, Hiller, Higbie.  And we

23   may not call Mr. Hiller.  It depends how certain evidence comes

24   in.  If he gets called, it will be before Higbie.

25           MR. MILLER:  Does that mean you have no plans to call

I43MMTL1.1

2496

```
 1    Cox, Davenport, or Brady?

 2              MR. MANDEL:  They are not here.  There is no mystery

 3    here.  We don't expect to call them.  If something is

 4    surprising to happen today --

 5              THE COURT:  The jury is all here.

 6              Ms. MacFarland, come on up, ma'am.

 7              Let's bring in the jury.

 8              (Jury present)

 9              THE COURT:  Good morning, members of the jury.

10              ALL JURORS:  Good morning.

11              THE COURT:  Members of the jury, thanks so much for

12    being here early so we can start early.  We are all ready to

13    go.

14              I think that we might complete the taking of evidence

15    today.  So I think that tomorrow you will hear closing

16    arguments and my charge to you and this case should be in your

17    capable hands for deliberations sometime in the middle of the

18    day tomorrow.  It's in part attributable to the exceptional

19    work of the lawyers in this case in trying to present this case

20    efficiently and clearly to you.  I figured I would give you

21    that report on where we are in the case.

22              We are going to resume now where we left off yesterday

23    evening with Mr. Glunt's continued direct examination of

24    Ms. MacFarland.

25              Ms. MacFarland, do you understand, ma'am, that you
```

1  continue to be sworn as a witness under oath in this proceeding

2  now on trial?

3          THE WITNESS:  Yes, I do.

4          THE COURT:  You may proceed, Mr. Glunt.

5          MR. GLUNT:  Thank you, your Honor.

6  BARBARA MacFARLAND, resumed.

7  DIRECT EXAMINATION (cont'd)

8  BY MR. GLUNT:

9  Q.  Good morning, Ms. MacFarland.

10 A.  Good morning.

11 Q.  When we wrapped up yesterday I think we were looking at a

12 document, Defendants' Exhibit 40.

13         MR. GLUNT:  Can we put that back up, please.  This has

14 been admitted.  Make it a little bigger than that.

15 Q.  Can you remind us, Ms. MacFarland, what this was?

16 A.  It was a procedures manual for the buyback department.

17         MR. GLUNT:  Can we turn to the last page of this.  Can

18 we highlight the section that says fraud books.

19 Q.  Again, can you just remind us, Ms. MacFarland, why was this

20 fraud books section put in there?

21 A.  It was our first attempt at trying to recognize

22 questionable books, counterfeit books.

23 Q.  And was the buyback manual ever updated after this was put

24 in?

25 A.  Oh, yes.

1     MR. GLUNT:  Can we take a look at Defendants' Exhibit

2     39, which has not been admitted yet.  We would offer that into

3     evidence at this time.

4         THE COURT:  Any objection?

5         MR. OPPENHEIM:  No.

6         THE COURT:  Defendants' Exhibit 39 is received in

7     evidence.

8         (Defendants' Exhibit 39 received in evidence)

9         MR. GLUNT:  Can we publish this.

10        THE COURT:  You may.

11    Q.  Ms. MacFarland, what is Defendants' Exhibit 39?

12    A.  I believe it's the manual, the buyback manual that followed

13    the previous one.

14    Q.  Let's take a look at page 14 of this document.  What is

15    page 14?

16    A.  We made an entire page for the no value and counterfeit

17    books, which we changed to questionable at a later point

18    because we couldn't decide beforehand that the book was

19    counterfeit, so we called it questionable to assign it a value,

20    you know.

21    Q.  Let's just be absolutely clear.  As a policy does Book Dog

22    Books sell counterfeit books?

23    A.  No, we do not.

24    Q.  And does it sell questionable books?

25    A.  No, we do not.

I43MWIL1                    MacFarland - direct                    3499

1    Q.  Now, what factors does this manual tell employees to look

2    for in determining whether a book may be questionable?

3    A.  It tells them to look for poor printing, as it says there,

4    and poor quality, picture quality, and binding quality.  Those

5    are the three basics that we came up with trial and error just

6    comparing books and that's what we came up with.

7    Q.  And what does the manual tell the associates to do with a

8    book if they find one that they think may be questionable?

9    A.  If they determine that it's questionable, they set it aside

10   and it's supposed to be turned over to their supervisor.

11   Q.  Now, you said that the poor printing and picture quality

12   and binding quality were the first factors you identified.  Has

13   the company since identified other factors that may indicate

14   that a book is questionable?

15   A.  Yes, we have.

16   Q.  Let's take a look at Defendants' Exhibit 4.

17            MR. GLUNT:  We would offer Defendants' Exhibit 4 into

18   evidence.

19            THE COURT:  Any objection?

20            MR. OPPENHEIM:  No objection.

21            THE COURT:  Defendants' Exhibit 4 is received in

22   evidence, and you may publish it.

23            (Defendants' Exhibit 4 received in evidence)

24   Q.  Ms. MacFarland, what is Defendants' Exhibit 4?

25   A.  This is a training for questionable books that includes

1   different characteristics to look for.

2   Q.  Let's take it a piece at a time.  Can you look at the

3   definition of issue section.

4          MR. GLUNT:  Can you blow that up, please.

5   Q.  What is the definition of issue section?

6   A.  It's just describing what subpar books are in the industry.

7   Q.  And then the next section says process.  Can you just read

8   for me the first line of that process section.

9   A.  It says:  In your given activity in operations, be on the

10  lookout for questionable product.

11  Q.  Can you read the first bullet, please.

12  A.  Buybacks, bulk check-in, shipment QC, bulk shipments,

13  wholesaling, picking, or shelving.

14  Q.  Now, does a single warehouse associate do all of the

15  different jobs you just read there?

16  A.  No.

17  Q.  Do different warehouse associates perform each of those

18  responsibilities?

19  A.  Yes.

20  Q.  Are they all expected to keep a lookout for counterfeit

21  books?

22  A.  Yes.

23  Q.  Are they all trained to identify counterfeit books?

24  A.  Yes.

25          MR. GLUNT:  Can we go back to the main document,

 1    please.

 2    Q.  The next section says what to look for.  Let's take a look

 3    at that for a second.  What was the purpose of this what to

 4    look for section?

 5    A.  It's very difficult to tell a counterfeit book or

 6    questionable book, so these are characteristics that were

 7    developed to discover whether it was a questionable book or

 8    counterfeit book or not.

 9    Q.  Were these characteristics given to the warehouse

10    associates?

11    A.  Yes.

12    Q.  Why were they given to the warehouse associates?

13    A.  So that they could identify counterfeit books.

14              MR. GLUNT:  Can we go back to the main document.

15    Q.  When is this document dated, Ms. MacFarland?

16    A.  Looks like April of 2013.

17    Q.  So this is a list of factors that defendants were using

18    five years ago, is that right?

19    A.  Um-hum.

20    Q.  Have there been updated versions of the buyback manual or

21    training material since then?

22    A.  Yes.

23              MR. GLUNT:  Let's take a look at one of them.  Can we

24    pull up DX 8 for identification.

25              We would offer DX 8 into evidence at this time.

```
 1              THE COURT:  Any objection?

 2              MR. OPPENHEIM:  No objection.

 3              THE COURT:  Defendants' Exhibit 8 is received in

 4    evidence, and you may publish it, Mr. Glunt.

 5              MR. GLUNT:  Thank you, your Honor.

 6              (Defendants' Exhibit 8 received in evidence)

 7    Q.  So, Ms. MacFarland, what is Defendants' Exhibit 8?

 8    A.  It looks like it's the 2015 training manual for buybacks.

 9    Q.  Once again, just so we are clear, does this only talk about

10    counterfeit books?

11    A.  No, of course not.

12    Q.  What other kind of information are in the buyback manual?

13    A.  Identifying -- procedures for how to buy books.

14    Q.  It's what the buyback associates need to know to do their

15    job?

16    A.  Exactly.

17              MR. GLUNT:  Can we take a look at page 5 of this

18    document, please.

19    Q.  What is page 5 of this document?

20    A.  Page 5 is the questionable book listing of characteristics.

21    Q.  Again, why are these characteristics put in the buyback

22    manual?

23    A.  So that they can identify whether a book is counterfeit.

24              MR. GLUNT:  Let's take a look then at Defendants'

25    Exhibit 233.
```

 1              We would offer Defendants' Exhibit 233 into evidence

 2     at this time.

 3              MR. OPPENHEIM:  No objection.

 4              THE COURT:  Defendants' Exhibit 233 is received in

 5     evidence, and you may publish it.

 6              MR. GLUNT:  Thank you, your Honor.

 7              (Defendants' Exhibit 233 received in evidence)

 8              MR. GLUNT:  Can you publish this, please.

 9     Q.  What is the Defendants' Exhibit 233?

10     A.  That's the 2017 buyback training manual.

11              MR. GLUNT:  Let's take a look at page 17 of that

12     manual, please.  Can we see 18 as well.

13     Q.  Once again, what are pages 17 and 18?

14     A.  This is the questionable book characteristics listing.

15     Q.  This is the more modern version of it?

16     A.  I believe it's the most modern version.

17     Q.  So this is the version that's provided to buyback

18     associates today?

19     A.  Yes.

20     Q.  Are you the person who would prepare updates to this

21     section of the buyback manual?

22     A.  No, I'm not.

23     Q.  Who would be the person who prepared those updates?

24     A.  It was and maybe is David Dimm.

25     Q.  Now, what are buyback associates today expected to do if

1   they find a counterfeit book or potentially counterfeit book?

2   A.  They are asked to set it aside.

3   Q.  And who reviews it after it's set aside?

4   A.  It's reviewed by the inventory management department.

5   Q.  Now, does everyone who handles books receive counterfeit

6   book training today?

7   A.  Yes.

8   Q.  And how often is that training conducted?

9   A.  Twice a year.

10  Q.  Now, we talked about your job as chief of operations at

11  Book Dog Books yesterday.  Are you still the chief of

12  operations of Book Dog Books?

13  A.  No, no longer.

14  Q.  And what is your current position?

15  A.  I'm the facilities manager -- facilities and supplies

16  manager.

17  Q.  What do you do now as the facilities and supply manager?

18  A.  I make sure that the two facilities that we have are -- get

19  proper maintenance, that the equipment within those facilities

20  is maintained, and I also do the ordering of supplies, from

21  boxes to Band-Aids to coffee.

22  Q.  Do you have any current responsibilities concerning

23  detecting counterfeit books?

24  A.  No, I don't.

25  Q.  I think you testified on Monday that you've been with the

 1    company for about 10 years, is that right?

 2    A.  Yes.

 3    Q.  Does Book Dog Books have a policy concerning counterfeit

 4    books?

 5    A.  Yes.

 6    Q.  What is that policy?

 7    A.  We don't buy and we don't sell counterfeit books.

 8    Q.  In your 10 years at the company have you adhered to that

 9    policy?

10    A.  Yes, I have.

11    Q.  Thank you, Ms. MacFarland.  I have no further questions at

12    this time.

13           THE COURT:  Cross-examination.

14    CROSS-EXAMINATION

15    BY MR. OPPENHEIM:

16    Q.  Good morning, Ms. MacFarland.

17    A.  Good morning.

18    Q.  You and I met several years ago.  Isn't that right?

19    A.  Yes.  I think it was three or four years ago.

20    Q.  Briefly.  Right.

21    A.  Um-hum.

22    Q.  Ms. MacFarland, I think you testified that you managed a

23    university college textbook store, is that correct?

24    A.  Yes.  Off campus.

25    Q.  On campus?

1   A.  Off campus.

2   Q.  You did that for about 10 years?

3   A.  Yes.

4   Q.  Over the course of that 10 years, did you ever travel to

5   Thailand to buy U.S. edition books for your bookstore?

6   A.  No.

7   Q.  Did you send employees to live in Thailand to buy books for

8   your bookstore?

9   A.  No.

10          THE COURT:  Ms. MacFarland, if you would pull the

11   microphone a little closer to you.

12   Q.  Now, I believe you just testified that you are no longer

13   the chief of operations, is that correct?

14   A.  That's correct.

15          MR. OPPENHEIM:  Mr. Cole, can we pull up the

16   demonstrative, please.

17   Q.  This is a demonstrative PD11, Ms. MacFarland.  Is this the

18   TextbookRush website?

19   A.  Yes.

20   Q.  And is that a picture of you right there at the bottom,

21   Barbara?

22   A.  Yes.

23   Q.  And does it say chief of operations?

24   A.  Yes.

25          MR. OPPENHEIM:  Mr. Cole, is it possible to go to the

1  bottom of this page.  We don't have the very bottom.

2  Q.  Isn't it in fact true that if we could look at the very

3  bottom of this page right now it would show that this website

4  was updated in 2018, because it has a copyright notice of 2018?

5  A.  I have no idea.

6  Q.  Ms. MacFarland, in 2007, Follett terminated Mr. Smyres'

7  selling privileges because he had been selling counterfeits to

8  them, correct?

9  A.  Yes.

10 Q.  But you weren't aware of that when I took your deposition

11 in 2014, correct?

12 A.  Correct.

13 Q.  And you also weren't aware that in 2007 MBS had raised

14 serious concerns about counterfeits with Mr. Smyres, correct?

15 A.  Correct.

16 Q.  Now, you knew that Book Dog Books had been sued or the

17 defendants had been sued for selling counterfeit books in 2007,

18 correct?

19 A.  Correct.

20 Q.  And you testified yesterday the defendants did not -- it

21 was your opinion that the defendants did not intentionally sell

22 counterfeits.  Was that your testimony yesterday?

23 A.  Yes.

24 Q.  But you in fact never conducted any internal analysis or

25 investigation about the facts surrounding those claims

1   whatsoever, did you?

2   A.  Not me personally.

3   Q.  You never took any steps to determine whether or not BDB

4   had sold counterfeit books in 2007, did you?

5   A.  No.

6   Q.  No, you didn't take any steps?

7   A.  No, I didn't take any steps.

8   Q.  So you gave an opinion about what you believe had happened

9   without having conducted an investigation, right?

10  A.  Correct.  All of that happened before me, before I was

11  there.  The suit happened right around when I was starting work

12  there.

13  Q.  You were aware that there was a settlement, however, right?

14  A.  Yes.

15  Q.  In 2008.

16  A.  Yes.

17  Q.  But you weren't aware of any of the terms of that

18  settlement, were you?

19  A.  No.

20  Q.  You weren't aware that there was a term of that settlement

21  that said that the defendants shall neither import nor sell

22  pirated textbooks nor assist anyone else to import or sell

23  pirated textbooks, correct?

24  A.  Correct.

25  Q.  You also weren't aware that there was a provision within

I43MMIL1                          MacFarlane1 - cross                    3509

1   that settlement that said that the defendants could send

2   suspect books to the publishers for them to confirm whether or

3   not they were authentic, were you?

4   A.  I wasn't aware.

5   Q.  And you, in fact, never told any of your employees, boy, we

6   don't know whether this book is counterfeit or not, maybe we

7   should send it to the publishers and have it checked, right?

8   A.  I did not.

9   Q.  You testified that after the 2008 settlement that there was

10  some training that took place, correct?

11  A.  Correct.

12  Q.  Now, that training, you testified, took place in the

13  buyback department, correct?

14  A.  Correct.

15  Q.  Now, that training did not take place in the bulk receiving

16  department, correct?

17  A.  Not that I'm aware of.

18  Q.  But all of the counterfeits from Best Books World and the

19  Blackerbys came in through bulk receiving, right?

20  A.  I don't know.

21  Q.  And you testified that Mr. Schrader, Bruce Schrader,

22  conducted that training, is that right?

23  A.  I think it was Rob Bailey mainly conducted that training in

24  the beginning and then it followed -- after Rob Bailey it was

25  Bruce Schrader.

 1   Q.  Do you remember in your deposition in 2014, Ms. MacFarland,

 2   I asked you the question on page 27, line 15 proceeding through

 3   line 10 on page 28:

 4   "Q.  And who did the training?

 5   "A.  The buyback manager, Bruce Schrader.

 6   "Q.  And what did Bruce Schrader know about identifying a

 7   counterfeit book?

 8   "A.  I don't recall that.  I don't know.  I don't remember the

 9   specifics of the training.  I was --

10   "Q.  I'm sorry.

11   "A.  Just seeing that it happened.  I believe that he probably

12   received the training from -- I don't know this for a fact, but

13   I believe he received the training from inventory control.

14   "Q.  And who at inventory control would he have received the

15   training from?

16   "A.  Whoever was in charge then.  I think it was probably

17   Britt.

18   "Q.  Britt Wood?

19   "A.  Probably."

20          Was that your testimony back then?

21   A.  Sounds familiar.

22   Q.  Are you changing your testimony now?

23   A.  Yes, I guess, I am because I remember that the manuals that

24   we were shown here were from Rob Bailey.

25   Q.  And did Rob Bailey get his training from Britt Wood as

1   well?

2   A.  Possibly.  That I don't know.  I think he kind of developed

3   it on his own, actually.

4   Q.  And are you aware that Britt Wood testified that he doesn't

5   know what a counterfeit book is?

6   A.  No.  I wasn't aware.

7   Q.  You agree that it would be useful for Book Dog Books or the

8   defendants to know which sellers had previously sold to the

9   defendants counterfeit books, right?

10  A.  Yes.

11  Q.  It would help the defendants avoid buying from those

12  sellers again, correct?

13  A.  Sure.

14  Q.  But as of 2014, you were unaware of whether the defendants

15  even had a list of who had sold counterfeit books to the

16  defendants, right?

17  A.  Yes, correct.

18  Q.  And even as of today the defendants do not track who sends

19  counterfeit books in, correct?

20  A.  I don't know that.

21  Q.  In 2008 to 2009, if a suspicious book came in through

22  buyback it was set aside and put into a bin, correct?

23  A.  Yes.

24  Q.  And then at some point in 2009 you conferred with

25  Mr. Smyres and decided that those books should be destroyed,

 1   correct?

 2   A.  Correct.

 3   Q.  And so in 2009 you helped destroy those books by ripping

 4   the covers off of them and putting them into a recycle bin,

 5   correct?

 6   A.  Correct.

 7   Q.  And you kept absolutely no records of what books you were

 8   destroying, correct?

 9   A.  Correct.

10           MR. OPPENHEIM:  Can we introduce PX 205, please.

11           MR. GLUNT:  No objection.

12           THE COURT:  Plaintiffs' Exhibit 205 is received in

13   evidence, and you can publish it.

14           (Plaintiffs' Exhibit 205 received in evidence)

15           MR. OPPENHEIM:  Can you pull down just a little, Mr.

16   Cole.

17   Q.  Ms. MacFarland, this is an e-mail that you sent to

18   Mr. Doenges in September of 2011, is that correct?

19   A.  Correct.

20   Q.  And this e-mail sets forth that you were destroying

21   counterfeit books as of that time, correct?

22   A.  No, it doesn't say that.

23   Q.  Ms. MacFarland, didn't you in fact say --

24   A.  Yes.  It says get rid of the books, but that doesn't mean

25   destroy them, necessarily.

1   Q.  Is it your testimony now that when you said get rid of the
2   correct books and put the others back in inventory that that
3   means something other than destroy the books?
4   A.  Yes.  Probably meant to set them aside somewhere.
5   Q.  So you believe that when somebody says, get rid of
6   something that that means to keep that thing?
7           MR. GLUNT:  Objection, your Honor.
8           THE COURT:  Overruled.
9   A.  I guess so.
10  Q.  Your testimony is get rid of means to keep?
11          MR. GLUNT:  Objection, your Honor.
12          THE COURT:  Overruled.
13  A.  I am trying to think what I meant then.  I meant to get --
14  mainly to get the good books out of there.  This is at the very
15  beginning of the collection of these books.  The reason why we
16  destroyed the first -- the original books was because they were
17  the first batch of books that we found that were questionable.
18  We destroyed books, I'm sure, that were actually not
19  counterfeit books because we were still learning about what
20  to -- what was a counterfeit book.  We were still learning
21  about it.  And this is an accumulation of the books that had
22  been set aside, I'm assuming, and we were trying to figure out
23  what to do with them.  As far as getting rid of the correct
24  books, maybe, but I don't think we had a policy at that time on
25  what to do with them other than setting them aside.

1  Q.  Let's break that down, Ms. MacFarland.  First off, you say,

2  we can't tell what's a counterfeit or not.  So if you got a

3  pile of books, some of them could be counterfeit, some could

4  not, right?

5  A.  Right.

6  Q.  It's also true that the books that were left in inventory,

7  some could be counterfeit and some could not, because you can't

8  tell, right?

9  A.  Correct.

10 Q.  What I want to dig in on is this language in 2009 where you

11 said you were getting rid of books.  I want to know what you

12 think get rid of means because I have never heard get rid of to

13 mean to keep.

14         MR. GLUNT:  Objection, your Honor.

15         THE COURT:  Sustained.

16 Q.  Ms. MacFarland, is it your testimony that even though you

17 said you were going to get rid of books in 2011 that you meant

18 you were going to keep them?

19 A.  No.

20 Q.  And this is on September 13, 2011, well over a month after

21 the publishers had sent a cease and desist letter to the

22 defendants with a request that the defendants preserve

23 evidence, correct?

24 A.  I don't know that.

25         MR. OPPENHEIM:  Can we pull that up, please.

1   Q.  Ms. MacFarland, do you see the date on this letter, August

2   5, 2011?

3   A.  Yes.

4           MR. OPPENHEIM:  For the record, this is Plaintiffs'

5   Exhibit 199, PX 199.  If you could scroll down, Mr. Cole.

6   Q.  Do you see where it says, I write on behalf of a group of

7   textbook publishers that include Pearson and Cengage, among

8   others.  These book publishers have gathered evidence

9   indicating that you engaged in the illegal and improper

10  distribution of infringing textbooks.  Do you see that?

11  A.  Yes.

12  Q.  As the chief of operations, were you ever made aware that

13  the defendants had received a cease and desist letter from the

14  publishers on August 5 of 2011?

15  A.  No, not that I recall.

16          MR. OPPENHEIM:  Can we pull up PX 225, please.

17  Q.  A moment ago, Ms. MacFarland, I believe you said there was

18  no written policy on destruction in 2011, correct?

19  A.  Correct.

20  Q.  So you were destroying them, but you didn't have a written

21  policy, right?

22          MR. GLUNT:  Objection, your Honor.  Mischaracterizes

23  testimony.

24          THE COURT:  Overruled.

25  A.  What was that again?

1   Q.  In 2011, even though you didn't have a written policy, you

2   had destroyed some counterfeit books, correct?  Or

3   potentially --

4   A.  Previously, yes.

5   Q.  Now, have you ever seen the e-mail set forth in Plaintiffs'

6   225?

7   A.  No.

8   Q.  You see where this is an e-mail you received from

9   Mr. Smyres on August 8, 2013, isn't that right, Ms. MacFarland?

10  A.  Yes.

11          MR. OPPENHEIM:  And in this e-mail, if we look at the

12  third paragraph, the last two sentences, please.

13  Q.  Look at the last couple of sentences.  Let's talk about

14  bulk receiving.  It says:  If the book does not compare

15  positively, they are set aside and destroyed.  Do you see that?

16  A.  Yes.

17          MR. OPPENHEIM:  And then let's go down to the buyback

18  section, please.  The same language, please, in the next

19  paragraph, in the online buyback area.

20  Q.  So that as of 2013, Mr. Smyres was saying, we simply

21  destroy these books as we do not know if they are or are not

22  counterfeit.  Do you see that?

23  A.  Yes.

24  Q.  This is the written policy of the company as of April 8,

25  2013?

 1          MR. GLUNT:  Objection, your Honor.  She says she has

 2   never seen this before.

 3   Q.  Do you understand this to have been --

 4          THE COURT:  Overruled.  Put a question.

 5          MR. OPPENHEIM:  I'll ask again, your Honor.

 6   Q.  Do you understand that the policy set forth in Plaintiffs'

 7   Exhibit 225 is in fact the policy of the company as of April of

 8   2013?

 9   A.  Well, it's the first I've seen of it or heard of it.

10   Q.  Now, you were never instructed by anybody as of your

11   deposition in 2014 to preserve evidence of any kind, were you?

12   A.  No, I wasn't.

13   Q.  And you never communicated to all of the employees that you

14   oversaw at the company that they had an obligation to preserve

15   evidence, did you?

16   A.  No.  And I was never told to destroy evidence either.

17   Q.  But you discussed with Mr. Smyres destroying books, did you

18   not?

19   A.  Just the first time.  That's the only time I was ever

20   involved with destroying books.

21   Q.  We just went through a 2011 e-mail that said you were going

22   to get rid of potentially counterfeit books, correct?

23   A.  But I didn't participate in that and I don't know what

24   happened after that e-mail.

25   Q.  Now, Ms. MacFarland, you went through in your direct

1    testimony with Mr. Glunt a series of buyback operations

2    manuals, correct?

3    A.  Yes.

4    Q.  Isn't it true that when I took your deposition in 2014, you

5    testified that you didn't know anything about the buyback

6    operations manual?

7    A.  I don't remember that.

8    Q.  Ms. MacFarland, at your deposition on July 8, 2014,

9    starting at page 62, line 5, I asked you the following

10   questions and you gave the following answers:

11   "Q.  Ms. MacFarland, this document has a number of different

12   components to it, so I'd like to kind of go through them one by

13   one.  The first page is called questionable book operations

14   training.  Do you see that?

15   "A.  Yes.

16   "Q.  Have you ever seen this page before?

17   "A.  Probably, but I can't swear to it.

18   "Q.  Did you author this?

19   "A.  No.

20   "Q.  Do you know when you first saw this?

21   "A.  Let me ask you this.  Does page 2 go with it?

22   "Q.  You tell me.

23   "A.  I don't recall.

24   "Q.  You don't recall ever seeing the second page, the ethical

25   purchase certification?

```
 1    "A.  No, I don't recall that at all.

 2    "Q.  Turning to the third page, which is titled questionable

 3    books for fraud team processes, have you ever seen this

 4    document before?

 5    "A.  I don't think so."

 6          Was that your testimony in 2014?

 7          MR. GLUNT:  Objection, your Honor.  Can we see the

 8    document that this is referring to?  Because it doesn't

 9    resemble what we went over with her.

10          MR. OPPENHEIM:  The testimony speaks for itself, your

11    Honor.

12          THE COURT:  Overruled.

13    A.  I don't know what document we are talking about there.  I

14    don't remember.

15    Q.  When you were shown a document that was produced at the

16    time which is titled questionable books for fraud team

17    processes, you said that you didn't think you had ever seen it

18    before, correct?

19    A.  I guess -- I don't recall that conversation.

20          MR. OPPENHEIM:  No further questions.

21    A.  I remember digging up the manual and finding it.

22    Q.  But at your deposition, Ms. MacFarland, you had no

23    knowledge of the background of the document other than the fact

24    that it had been in your files, correct?

25    A.  Correct.
```

 1          THE COURT:  Redirect examination, Mr. Glunt.

 2          MR. GLUNT:  Thank you, your Honor.

 3   REDIRECT EXAMINATION

 4   BY MR. GLUNT:

 5   Q.  Ms. MacFarland, do you recall being shown a website a few

 6   moments ago?

 7   A.  Yes.

 8   Q.  Ms. MacFarland, are you pretty confident as to what your

 9   job title actually is?

10   A.  Yes.

11   Q.  Even if an out-of-date screenshot from a website says

12   otherwise?

13   A.  Yes.

14   Q.  You were asked a few moments ago about investigations that

15   you may or may not have done.  To be clear, were you the chief

16   investigator at Book Dog Books?

17   A.  No, I was not.

18   Q.  Was it your job to conduct internal investigations?

19   A.  No.  I wasn't even involved in fraud.

20   Q.  But you were in charge of warehouse operations, correct?

21   A.  Yes, I was.

22   Q.  And you were in charge of warehouse operations for many

23   years, correct?

24   A.  Yes.

25   Q.  In all your time running warehouse operations, did you ever

1   come across any evidence that defendants were deliberately

2   selling counterfeit books?

3   A.   Absolutely none.

4   Q.   Now, you were asked about a document, PX 205.

5        MR. GLUNT:  Can we put that up, please.

6   Q.   Do you recall being asked a lot of fairly aggressive

7   questions about this document?

8   A.   Yes, I do.

9   Q.   Now, Ms. MacFarland, did you destroy counterfeit books in

10  2011?

11  A.   No.

12  Q.   Do you have any recollection of anyone else destroying

13  counterfeit books in 2011?

14  A.   No, I do not.

15  Q.   What do you think was done with the books after they were

16  identified?

17        MR. OPPENHEIM:  Objection.

18        THE COURT:  Sustained.

19  Q.   What was the practice at the time in dealing with books,

20  counterfeit books that were identified?

21  A.   They were just set aside.

22        MR. GLUNT:  We can pull this down.

23  Q.   Do you recall being asked a few moments ago about whether

24  you had ever seen a buyback manual?

25  A.   Yes.

1   Q.  You recall having your deposition read back to you?

2   A.  Yes.

3   Q.  Now, do you know what document you were looking at in that

4   deposition?

5   A.  I'm not absolutely sure, but it might have been one of the

6   ones on the screen previously.

7   Q.  But you don't know one way or the other?

8   A.  No.

9   Q.  In either case, Ms. MacFarland, do you know what a buyback

10  manual is?

11  A.  Yes, I do.

12  Q.  Do you know what it's used for?

13  A.  Yes, I do.

14        MR. GLUNT:  Finally, let's take a look at PX 225.

15  Q.  Do you recall being asked questions about this document?

16  A.  Yes.

17  Q.  Do you recall being asked if this was the policy concerning

18  counterfeit books?

19  A.  Yes.

20  Q.  To be clear, have you ever seen this document before it was

21  shown to you a moment ago?

22  A.  No, I did not.

23  Q.  Would you expect, as warehouse operations manager, that if

24  this were a policy document that you might have seen it before?

25  A.  Yes, I would think so.

1    Q.  Finally, can you read the last sentence of the second

2    paragraph, please.

3            MR. OPPENHEIM:  Objection.

4            THE COURT:  Overruled.

5            MR. GLUNT:  The top one here.

6    Q.  Beginning as we know.

7    A.  As we know, the publishers were duped and have sent out

8    fake books into the retail stream as well.

9            MR. OPPENHEIM:  Objection.

10           MR. GLUNT:  No further questions.

11           MR. OPPENHEIM:  May we approach, your Honor?

12           THE COURT:  Come on up.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (At the side bar)

 2          MR. OPPENHEIM:  Your Honor, you have repeatedly

 3    prohibited them from putting this into the record.  They know

 4    it.  For him to have read it when you had already ruled on

 5    this, after you had told them they couldn't put that in the

 6    record, it needs to be corrected.

 7          MR. GLUNT:  Your Honor, this document is in evidence.

 8    They put it in evidence.  Any portion of a document that's in

 9    evidence can be read by the jury, can be considered by the

10    jury.  If they didn't want this document in evidence, they

11    should not have moved it into evidence.

12          We couldn't have gotten it into evidence.  It would

13    have been excluded as an e-mail because it wasn't a business

14    record.  It's not a business record.  It's not a policy, as

15    Mr. Smyres testified.  It was a communication with a lawyer

16    about developing a policy.

17          But regardless of that, it is a document in evidence

18    and the rules are very, very clear that you can read from a

19    document in evidence.  If they didn't want it in evidence, they

20    should not have moved it into evidence.  That's their problem.

21          MR. OPPENHEIM:  You can't make arguments that you

22    don't have a basis for, and they are well aware that they have

23    absolutely no factual basis for that allegation.

24          What they are putting forward, under Rule 11, are not

25    allowed to put forward.  Your Honor has ruled on this.  They
```

1  tried to read that part of the document before, but your Honor

2  did not allow them to do it.  Mr. Glunt just ignored your prior

3  ruling.

4            MR. GLUNT:  There was no ruling about whether that

5  document could be read from, and I also don't think it would be

6  proper for a document to be received into evidence, shown to

7  the jury, they can read it with their own two eyes, and, yet,

8  it can't be read by a witness.  That's not a ruling.

9            If they wanted that ruling, they should have requested

10  it, they should have prepared a redacted version of that

11  document for introduction, and they should have sought an order

12  from the Court accepting the redacted version of that document.

13  They did none of those things.

14            They put the entire document into evidence.  It's been

15  on the screen in front of the jury.  Mr. Oppenheim put it on

16  the screen in front of the jury just a few moments ago.  They

17  can read it with their own two eyes.  The suggestion that a

18  witness can't read it when the jury can is frankly absurd.

19            MR. OPPENHEIM:  There are things that as a lawyer you

20  are not allowed to do, and he crossed the line.

21            MR. BHANDARI:  This is not just true at all.

22            MR. GLUNT:  Pot kettle back about ethics, my friend.

23            Regardless, I think that the argument is very clear

24  here.  This is in evidence.  They put it in evidence.  They

25  never sought a limiting instruction.  They never produced a

3526

1    redacted version of this document.  They put it in front of the

2    jury not five minutes ago.

3        MR. BHANDARI:  Also, your Honor, just to be perfectly

4    honest, their position is, this is somehow the policy.  They

5    are claiming that this document was somehow the policy of Book

6    Dog Books.  This is obviously not a policy document when it

7    contains a statement in there saying that the publishers get

8    duped.  We have a right to say, but remember when they were

9    being asked if this is a policy document.  Of course, it's not

10   a policy document.  He has matters of opinion in there that are

11   not even part of this case.

12       MR. OPPENHEIM:  Can I get a word in and not be

13   tag-teamed?

14       MR. BHANDARI:  Because you guys never do double

15   objections.

16       THE COURT:  Mr. Bhandari, stop, please.  Everybody

17   better slow down or you are going to get out your checkbooks.

18       MR. OPPENHEIM:  They can make their arguments that

19   that was or wasn't the policy.  That's fine.  They are welcome

20   to do that.  We have had a robust discussion on that.  The

21   Court has found that there is zero evidence that the publishers

22   distributed counterfeit books.  That was a finding of this

23   Court.

24       We have raised this issue repeatedly with the Court

25   and the Court has ruled that they are not permitted to put that

1    argument forth.  That is exactly what Mr. Glunt did.  The fact

2    that it's in the document doesn't suddenly give him leeway to

3    ignore the rulings of the Court and put forward an argument for

4    which they have zero evidence.  The jury should be instructed

5    that the Court has found there is no evidence to support the

6    allegation that the publishers distributed counterfeit books.

7         MR. GLUNT:  Your Honor, to the extent this is a policy

8    document and to the extent that it contains information about

9    what the Book Dog Books believed to be the state of the

10   industry, then that opinion about the state of the industry

11   informed what policies they had.

12        In fact, if you read the document itself, the reason

13   they have such strict and rigorous processes is because they

14   say, as you know, even the publishers get duped.

15        To the extent they want to argue this is our policy

16   document and it contains information explaining why that policy

17   takes place and what the motivations were for that policy, it

18   is obviously relevant.

19        But, your Honor, I don't even see why we would have

20   that discussion.  I didn't make an argument.  All I did was

21   have a witness read from a document in evidence, and a document

22   they put into evidence in unredacted form that they have shown

23   to the jury a million times so the jury can read for

24   themselves.

25        I would love to see authority for the proposition that

1   a document that they put into evidence and have shown to the

2   jury and the jury can read with their own two eyes can't be

3   read by a witness.

4        THE COURT:  Look.  I'm going to overrule the

5   objection, Mr. Oppenheim, because a witness can read from a

6   document that's in evidence and it was displayed to the jury.

7   That's why I overruled the objection earlier before the

8   conference.

9        Yes, I'm aware of what my ruling was and I'm prepared

10  to give some curative instruction, but it was permissible for

11  the witness to read from a document that the plaintiffs put

12  into evidence.

13       MR. OPPENHEIM:  Will you give that curative

14  instruction now, your Honor?

15       THE COURT:  Yes.

16       MR. OPPENHEIM:  And also preclude them from arguing it

17  at closing.

18       THE COURT:  We will get to that.

19       (Continued on next page)

20

21

22

23

24

25

```
 1               THE COURT:  Members of the jury, first, the objection
 2   to the witness reading a sentence in the email is overruled.
 3   However, members of the jury -- because it's permissible for a
 4   witness to read from a document that's in evidence.  However, I
 5   instruct you that there is no evidence in this case that the
 6   publishers were duped or that the publishers put counterfeit
 7   books into the stream of commerce.
 8               Any further questions, Mr. Glunt?
 9               MR. GLUNT:  No, your Honor.
10               THE COURT:  Anything further, Mr. Oppenheim?
11               MR. OPPENHEIM:  Very briefly, your Honor.
12               THE COURT:  Okay.  Recross.
13   RECROSS EXAMINATION
14   BY MR. OPPENHEIM:
15   Q.  Ms. MacFarland, you've been asked repeatedly whether you're
16   aware of any facts indicating that the defendants have
17   distributed counterfeit books.  Do you recall those questions?
18   A.  Yes.
19   Q.  And you keep testifying that you're not, right?
20   A.  Correct.
21   Q.  That you're not aware of any such facts, right?
22   A.  Yes.
23   Q.  But you've conducted no investigation, right?
24   A.  Correct.
25               MR. OPPENHEIM:  No further questions.
```

I43VWIL2                                                               3530

1                    MR. GLUNT:  Nothing further, your Honor.

2                    THE COURT:  All right.

3                    Ms. MacFarland, you're excused as a witness.

4                    You may step down.

5                    (Witness excused)

6                    THE COURT:  Would the defendants call their next

7    witness.

8                    MR. MANDEL:  Defendants call Ronald Quintero.

9                    MR. MILLER:  Your Honor, before defendants --

10                   THE COURT:  All right.  Let's get the witness in here

11   and we'll deal with it at the sidebar.

12                   Mr. Mandel, in anticipation of the sidebar, do you

13   have a copy of these demonstratives for me?

14                   MR. MANDEL:  Yes, your Honor.

15                   THE COURT:  Mr. Bhandari, just have the witness take a

16   seat in the gallery for a moment.

17                   Come on up to the sidebar.

18                   (Continued on next page)

19

20

21

22

23

24

25

```
 1                    (At sidebar)

 2                    THE COURT:  Go ahead, Mr. Miller.

 3                    MR. MILLER:  Your Honor, there are a number of issues.

 4      The first one pertains to this demonstrative titled

 5      "Defendants' GAAP."

 6                    THE COURT:  What slide number.

 7                    MR. MILLER:  Page 4.

 8                    There are two issues here.  The first is that they

 9      have a column entitled "Consolidation Required by GAAP."

10      Mr. Quintero was very clear in his report and his deposition

11      that he did not conduct any independent analysis of which

12      entities GAAP requires to be consolidated.  The auditors did

13      that analysis.  Mr. Quintero relied on the auditors'

14      conclusions, but that he hadn't done any of his own analysis.

15                    In the report they have a similar chart headed

16      "Included and Combined Audited Financial Statements."  We think

17      this is misleading and is suggesting that Mr. Quintero did his

18      own analysis of which entities GAAP requires to be consolidated

19      and the jury will be confused about that.

20                    MR. OPPENHEIM:  They should use the language they

21      originally used.

22                    MR. MANDEL:  So the objection here is as to the

23      heading on the column?

24                    THE COURT:  Right.

25                    MR. MANDEL:  It is extremely similar to the one that
```

 1   is in his report.  He was asked extensively about his opinion

 2   as to what was and was not required under GAAP.

 3        And if you look in the column here, this is his expert

 4   report I'm showing your Honor.  It's Exhibit 3 of his amended

 5   expert report.  It states RWH regards as VIE.  VIE is this

 6   exact issue, is consolidation required by GAAP; it hinges in

 7   large part on whether it's what's known as a VIE.  And here

 8   he's saying VIE not required.  What this column is doing is

 9   precisely outlining what, in his opinion, is and is not

10   required included in GAAP.

11        If they want to inquire and say, Did you do an

12   independent analysis; to what extent did you do an independent

13   analysis; to what extent did you rely on the auditors' report,

14   those are perfectly fine cross-examination questions.  But he

15   absolutely in his report disclosed what he felt should and

16   should not have been consolidated under GAAP, and that was the

17   basis for his entire analysis.  And he was questioned about it

18   extensively at his deposition.

19        MR. MILLER:  He was questioned about it extensively,

20   at which point he made clear that he did not conduct any

21   independent analysis and he relied solely on the auditors'

22   conclusions.  If I were just looking at this demonstrative

23   without knowing that, I would think he did his own analysis.

24        THE COURT:  It sounds, Mr. Miller, like it will be

25   great cross-examination, okay.

3533

 1              Are there any other objections?

 2              MR. MILLER:  Yes.

 3              So on this chart it says, "K-12 Book Source

 4     consolidation required by GAAP, yes."  In his report he says

 5     "K-12 Book Source included, no."  He's changing his opinion

 6     now.  If he wanted to update his opinion, he needed to amend

 7     the report.

 8              MR. MANDEL:  This was covered extensively in the

 9     deposition, they asked about it.

10              THE COURT:  Well, his report says no, this slide says

11     yes.  The yes is out.  You can't change your report unless you

12     supplement it.  So that objection is sustained to that line on

13     slide four.

14              MR. MANDEL:  So we're going to cross out the yes under

15     consolidation required by GAAP under K-12?

16              THE COURT:  Right, because he said no.

17              MR. MILLER:  And then if you turn to page 6, profits

18     and salary per book.  There are a couple of issues here.

19              The first one is that, well, in his report

20     Mr. Quintero does do a similar calculation to this.  The

21     calculation is done in a completely different way.  In

22     particular, the salary line that's on this demonstrative is not

23     included in the calculation that he does in his report.  So it

24     appears to me that he's now doing some new analysis that was

25     never disclosed in his reports.

1            THE COURT:  What about that, Mr. Mandel?

2            MR. MANDEL:  That's just false.  They know perfectly

3    well that we served an amended Exhibit 14 prior to his

4    deposition; and that that amended Exhibit 14 did a

5    profits-per-book calculation and a salary-per-book calculation.

6            Now, it is true that instead of doing two separate

7    calculations, we've added those two numbers together.  But that

8    is simple arithmetic.  That's not a basis for an objection.

9    Instead of presenting two numbers, we are presenting one

10   number.

11           Similarly with Mr. Steinmetz, they had one row.  They

12   showed really when Mr. Steinmetz --

13           THE COURT:  All right.

14           MR. MILLER:  Your Honor, I have no recollection of

15   ever having received this amended Exhibit 14.  It's possible

16   I've just forgotten about it, but this is the first I can -- do

17   you ever remember receiving --

18           MR. OPPENHEIM:  I don't.

19           THE COURT:  Okay.  As to that objection, overruled.

20           MR. MILLER:  The other issue with this page is that it

21   includes data for 2011 and 2012.  The 2011 and 2012

22   calculations are not in the report.  We don't know where these

23   numbers came from.  The salary numbers appear to come from the

24   stipulation, but the adjusted net income numbers, from my

25   review of the stipulation, are not there.  There's no source

1    for where these numbers are derived from; it's this new

2    analysis that they can't just spring on us at the last minute.

3             MR. MANDEL:  I am extremely troubled by this

4    objection.

5             Both parties served expert reports that covered the

6    period 2013 through 2016, because expert discovery was only

7    conducted in *Book Dog Books II*.

8             They had Mr. Steinmetz stand up and testify as to the

9    numbers going all the way back to 2008.  Even more amazingly,

10   they didn't use -- Mr. Steinmetz didn't use the numbers in the

11   stipulation that the parties had agreed to.

12            Instead of wasting the Court's time, I didn't object;

13   I just let them offer their testimony from 2008 to 2012, even

14   though it was completely outside of Mr. Steinmetz's report.

15   And this is a rebuttal expert.  They cannot stand up here and

16   complain about conduct that they just engaged in themselves.

17   This happens every single day in this case.

18            MR. MILLER:  Your Honor, may I respond to that?

19            A couple of things.

20            Mr. Steinmetz included the 2012 numbers from the

21   financial statements in his report, and that's where they came

22   from when he testified.  Anything that was not -- besides the

23   2012 numbers that he took directly from the audited financial

24   statements, all the 2008 to 2011 numbers were taken directly

25   from the face of the stipulation which we requested in motion

3536

 1    *in limine* briefing Mr. Steinmetz be allowed to do and

 2    defendants said they had no objection.

 3            These adjusted net income numbers, I can't find them

 4    in the stipulation anywhere.  I don't know where they came

 5    from; defendants haven't told us where they came from.  If they

 6    came from somewhere else, that's clearly outside of what's

 7    permitted.

 8            THE COURT:  Right.

 9            If the adjusted net income figures did not come from

10    the stipulation for 2011, 2012, where did they come from?

11            MR. MANDEL:  They were supposed to come from the

12    stipulation.  This is the first I'm hearing --

13            MR. MILLER:  This is the first I ever saw --

14            THE COURT:  If they are not in the stipulation, they

15    are out.

16            Next.

17            So that objection is sustained.

18            Next.

19            MR. MANDEL:  To be clear, our position is they are in

20    the stipulation.  We'll inquire.

21            MR. MILLER:  Similarly, the inbound books numbers for

22    2011 --

23            MR. OPPENHEIM:  I'm sorry, what does that mean "we'll

24    inquire"?

25            THE COURT:  I don't know, all right.

1          How much longer is this going to take?  Should I send

2    the jury into the jury room?

3          MR. MILLER:  This is the last issue.

4          THE COURT:  Okay.

5          MR. MILLER:  Similarly, the 2011 and 2012 inbound

6    books numbers are definitely not in the stipulation; we don't

7    know where those came from.

8          THE COURT:  If they are not in the stip --

9          MR. MANDEL:  They are in the document that -- we

10   produced one document that showed our statistics of what we

11   bought and sold.  They are in that document.  They have

12   introduced that document in evidence; we've used that document

13   in evidence.  There's one document on this issue; it is

14   completely undisputed.  This is basic arithmetic.

15         Mr. Steinmetz was permitted to use basic arithmetic.

16   He took all these numbers from the stipulation that were

17   outside of his expert report and he added them up.  We are

18   doing the exact same thing under our per book analysis, whereas

19   they did it in the aggregate.

20         MR. MILLER:  Your Honor, the inbound books numbers for

21   2011/2012 were not in the report.  Everything Mr. Steinmetz

22   testified to was either in the stipulation or in this report.

23         THE COURT:  Are they in the stip?

24         MR. MILLER:  No.

25         MR. MANDEL:  The stip -- number of books sold -- or

143VWI12                                                              3538

1    incoming or outgoing books was not the subject of the

2    stipulation.  The stipulation related to financials.

3           My point is Mr. Steinmetz was allowed to stand up and

4    add up all these numbers from 2008 to 2011.  All we are doing

5    is precisely the same thing, adding up these same numbers.  The

6    numbers we are adding are done on a per-book basis.  There is

7    nothing about the calculation they don't understand, because

8    it's the precise same calculation he did from 2013 to 2016.

9           There's nothing about the data that they don't

10   understand, because there's only been one spreadsheet in the

11   whole history of both cases ever produced that addresses

12   incoming book number, and both parties have used it in their

13   examinations during this case.  What they are objecting to is

14   Mr. Steinmetz dividing -- excuse me, Mr. Quintero dividing a

15   number that's in the stipulation by another number that's on a

16   spreadsheet, and they know he's been relying on that

17   spreadsheet the entire time.

18           MR. OPPENHEIM:  May I add a thought, your Honor.

19           If you look at this demonstrative, what we were

20   presented with in the report were these numbers and these

21   numbers.  As you can see, the first two years, the 2011 and

22   2012 numbers are dramatically different.  If we had been shown

23   that they intended to use those, we may have dealt with this in

24   an entirely different way.  And to put that forward the morning

25   of Mr. Quintero's testimony is improper.

1            There's a huge distinction between what we did and

2      what they did.  All we did was take the stipulation and add the

3      numbers in.  They are doing calculations to come to some

4      analysis which, frankly, I don't even know what the relevance

5      of the adjusted net income per book is.  But leaving that

6      aside, it is clearly intended to show the jury a number which

7      is dramatically lower than anything that was in the report.

8            MR. MANDEL:  Your Honor, that's just not even remotely

9      correct.  We are not going to be making some elaborate --

10           THE COURT:  Show me in Mr. Quintero's report where he

11     makes any reference to inbound books for 2011 and 2012.

12           MR. MANDEL:  He does not do that.  He's responding

13     to -- Mr. Steinmetz had no testimony in 2008 through 2011 in

14     his report, he had nothing in his report on those years; but he

15     was permitted to testify on the stand about those years.

16           THE COURT:  You didn't object to it.

17           MR. MANDEL:  It's fine.

18           THE COURT:  You didn't object.

19           MR. MANDEL:  This is a rebuttal expert.  Whatever

20     their expert says, we are allowed to respond to it.  They

21     cannot offer testimony that falls outside their expert report

22     and then object when we provide testimony that responds to it.

23     It is 100 percent responsive to what they offer.  We didn't

24     object to it because we don't stand up and object to every tiny

25     thing.  There's a lot of things --

I43VWIL2                                                      8540

1          THE COURT:  You didn't object because you were laying

2     a trap for the unwary.

3          MR. OPPENHEIM:  Mr. Steinmetz did not testify anything

4     about a per book basis.  There's no such discussion.  So the

5     notion that this is rebuttal to that is false.

6          MR. MANDEL:  The parties disagree, as the Court is

7     aware, as to what is relevant.  There's a disagreement as to

8     the jury instruction and there's going to be a disagreement to

9     the closing statements.

10          We believe that you have to tie the profits to the

11     infringement.  The mere fact that someone has $100 profits has

12     no impact whatsoever on a statutory damages award.  What's

13     relevant is if you sold ten counterfeit books, what are your

14     profits associated with the sale of those ten books.

15          And literally --

16          THE COURT:  The adjusted net income for inbound books

17     for 2011 and 2012 is out.

18          MR. MILLER:  I think that's everything, your Honor.

19          Thank you.

20          (Continued on next page)

21

22

23

24

25

1           (In open court)

2           THE COURT:  All right.

3           Mr. Quintero, come on up.

4    RONALD GARY QUINTERO,

5         called as a witness by the Defendants,

6         having been duly sworn, testified as follows:

7           THE COURT:  All right.  You may inquire, Mr. Mandel.

8           MR. MANDEL:  Thank you, your Honor.

9    DIRECT EXAMINATION

10   BY MR. MANDEL:

11   Q.  Mr. Quintero, what do you do for a living?

12   A.  I'm a certified public accountant, management consultant,

13   and financial advisor.

14   Q.  Could you just briefly describe your educational and

15   professional background please.

16   A.  Yes, sir.

17           I have 43 years of professional experience in my

18   field, initially at Peat Marwick Mitchell & Company, now called

19   KPMG, one of the large CPA firms.  At Peat Marwick I started in

20   the audit staff, moved into our mergers and acquisitions

21   department, and wound up starting -- running our corporate

22   finance consulting services, which was a combination of merger

23   and acquisition work, valuations of businesses, and a number of

24   other financially oriented projects.

25           After Peat Marwick I went to work for Zolfo Cooper &

1   Company, which is one of the principal firms that provides

2   accounting and consulting services on behalf of financially

3   troubled companies and their creditors.  Then I joined the

4   investment banking department of Bear Stearns, one of the large

5   investment banks.

6          And ultimately in 1988, I started two firms of which I

7   have been continuously employed by since then; those being

8   Chartered Capital Advisors and RG Quintero & Company.

9   Chartered Capital Advisors provides financial advisory services

10  in my fields of expertise, that is mergers and acquisitions,

11  valuations of businesses, investigations of businesses, and a

12  variety of other financially oriented projects.  And RG

13  Quintero & Company is a specialty CPA firm that does consulting

14  and accounting work in connection with the various areas that I

15  just described.

16          I have an undergraduate degree with concentrations in

17  economics and Spanish literature from Lafayette College; a

18  master of science in accountancy from the New York University

19  Stern School of Business, and an advanced professional

20  certificate in investment management, it is an intermediate

21  degree, between an MBA and a Ph.D.  I also earned that from

22  NYU.

23          And in connection with my ten professional licenses

24  and certifications, they have continuing education requirements

25  of up to 40 hours per year.  I've always vastly exceeded that

 1   since I earned my first license in 1977.

 2   Q.  Do you ever do any training or teach any classes or

 3   anything like that?

 4   A.  Quite routinely.  I do it across the country and throughout

 5   the world.  In fact, I've done it for all affiliates of the

 6   publishers involved in this matter.

 7         The areas in which I get involved are a variety of

 8   financially oriented areas, including ones that are germane to

 9   this matter.

10   Q.  Have you ever done any training or work in connection with

11   the publishers in this case?

12   A.  Yes, sir, for all three and/or affiliated entities of them.

13   And one of them is -- has been my publisher in the past.

14   Q.  Have you done any training -- withdrawn.

15         What is the CFA certification?

16   A.  CFA, chartered financial analyst, is the principal

17   designation that is sought after by investment managers,

18   portfolio managers, and security analysts.  I've been the most

19   active trainer in the world of CFA candidates over the last 25

20   years.

21   Q.  Could you just give the jury a few of your representative

22   clients whose names they might have heard before?

23   A.  I've served over one thousand clients during the course of

24   my career.  Ones that are well-known include, for example,

25   JPMorgan Chase, Citicorp, Exxon, IBM, United States Department

1   of Justice, just to name a few.

2   Q.  Did you analyze defendants' profits in this case?

3   A.  I did.

4   Q.  How did you go about doing that?

5   A.  I reviewed the audited financial statements of the

6   defendant companies for the five years ended December 31st,

7   2016.  I reviewed various other unaudited financial information

8   of affiliated entities, as well as stipulations filed with the

9   Court that contains financial information pertaining to the

10  defendants.  And I reviewed various other financial

11  information.

12          MR. MANDEL:  Your Honor, at this time we respectfully

13  submit that Mr. Quintero possesses specialized knowledge that

14  would aid the jury and request for him to offer testimony under

15  Rule 702.

16          THE COURT:  I'll permit him to testify, Mr. Mandel.

17          MR. MANDEL:  Thank you, your Honor.

18  BY MR. MANDEL:

19  Q.  Did you prepare a demonstrative that explained your

20  analysis of the defendants' profits?

21  A.  I did.

22          MR. MANDEL:  I would ask that Defendants' Exhibit 414

23  be shown to the jury -- excuse me, be shown to the witness.

24  Can we turn to page 3.

25  Q.  Do you recognize this document, Mr. Quintero?

1    A.  Yes, I prepared this document.

2    Q.  And what is it?

3    A.  It is an analysis of the defendants' profits during the

4    four years ended December 31st, 2016, as calculated on an

5    adjusted basis.

6            MR. MANDEL:  Your Honor, we would ask permission to

7    use Defendants' Exhibit 414 as a demonstrative.

8            MR. OPPENHEIM:  One of the issues we just addressed at

9    the sidebar, your Honor, involving K-12 Book Source has not

10   been addressed in the document; it still remains in there.

11           MR. MANDEL:  This is a novel objection and it's

12   meritless, your Honor.

13           THE COURT:  Come on up to the sidebar for a moment.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MR. OPPENHEIM:  Your Honor, we just discussed the fact

3     that Mr. Quintero did not include the entity K-12 Book Source

4     in his expert report.  And your Honor ruled if he didn't

5     include it in his expert report, it's out.  And they took it

6     out, I presume, on one page, but didn't take it out on the

7     other page.  So they intend to continue to offer an opinion by

8     Mr. Quintero on defendants' profits inclusive of K-12 Book

9     Source even though your Honor ruled it's out.

10             MR. MANDEL:  That's false on every level.

11             Exhibit 14, which we served, and possibly even the

12    original report, I don't recall, included two separate

13    analyses; one included K-12 Book Source in the profits and one

14    did not.  Instead of offering both slides, we're only offering

15    one of those slides.  But there is 100 percent profits

16    calculation in his expert report that includes K-12 Book

17    Source.

18             MR. BHANDARI:  Second of all, your ruling, as you

19    recall, was that an entry for K-12 Book Source that said yes,

20    which is obviously included in the report, should say no.  That

21    was an adjustment.  This argument that we didn't include K-12

22    Book Source in the report obviously makes no sense.  And that's

23    the reason why you made your previous ruling.

24             MR. OPPENHEIM:  You've ruled that it's out.  And then

25    they are leaving it in.

1          MR. MANDEL:  There has been no ruling about dollars

2    involved in K-12 Book Source.  What your Honor ruled was that

3    Mr. Quintero couldn't offer an opinion as to whether GAAP -- an

4    independent opinion as to whether GAAP required K-12 Book

5    Source to be consolidated.  This is a totally separate issue

6    about numbers; it has nothing to do with GAAP.

7          THE COURT:  In his report, does he include information

8    about profits from K-12 Book Source?

9          MR. MANDEL:  Yes, in Exhibit 14.

10         MR. MILLER:  Your Honor, that's incorrect.  In his

11   amended report that he served in February, Mr. Quintero started

12   with the profits -- I think I'm reading this correctly.  He did

13   not include the profits for K-12.

14         MR. MANDEL:  Like I said, there are two separate

15   analyses in the report; one excluded it and one included it.

16   If what they are saying is he's required to offer both opinions

17   that were offered in his report, I mean we can address -- if

18   that's their objection, we can address it, but that's actually

19   not a valid objection.

20         What they are looking for is preclusion.

21         THE COURT:  Overruled.

22         Let's go.

23         (Continued on next page)

24

25

 1                 (In open court)

 2                 THE COURT:  The objection is overruled.

 3                 You may proceed.

 4                 MR. MANDEL:  May I publish Defendants' Exhibit 414 to

 5     the jury as a demonstrative?

 6                 THE COURT:  As a demonstrative, you may.

 7     BY MR. MANDEL:

 8     Q.  Okay.  Before we left off, Mr. Quintero, we were talking

 9     about page 3 of Defendants' Exhibit 414.

10                 Could you just explain for the jury one more time what

11     this document is?

12     A.  Yes, sir.

13                 This is my calculation of the adjusted profits of the

14     defendant entities, as well as various affiliated entities of

15     the defendants for the four years ended December 31st, 2016.

16     Q.  Now, the first line of this document says "audited

17     financials pre-tax income," and then has numbers for the years

18     2013 through 2016.  From where did you obtain those numbers?

19     A.  From the audited financial statements of the defendant

20     entities as prepared on a consolidated basis; in other words,

21     combining all of their net incomes.

22     Q.  Okay.  So the corporate defendants in this case are Apex

23     Media, Book Dog Books, and Robert William Management.  Are

24     those three entities' profits included in the consolidated

25     audited financial statements?

1    A.  Yes, they are.

2    Q.  So then all three of those entities' profits would be

3    included in the first line of this page; correct?

4    A.  Yes, on a pre-tax basis.

5    Q.  Let's talk about audited financial statements for a moment.

6            What is an audited financial statement?

7    A.  An audited financial statement is a set of financial

8    statements -- as well as associated footnotes -- that have been

9    subjected to a review process and an audit process by an

10   independent CPA firm applying what's known as Generally

11   Accepted Auditing Standards -- or GAAS -- to audit the

12   financial statements.

13   Q.  Is it customary for accountants to rely upon audited

14   financial statements?

15   A.  In terms of the preparers or third parties reviewing

16   audited financial statements?

17   Q.  Do third parties rely upon audited financial statements?

18   A.  Yes, in my profession it is common for us to rely on

19   audited financial statements, unless there is substantial

20   reason to believe that there is fraud.

21   Q.  In this case did you see any evidence of fraud?

22   A.  None whatsoever.

23   Q.  Now, did you rely upon any information in this case other

24   than the audited financial statements?

25   A.  I did.

1   Q.  What types of other information did you review in forming

2   your opinion?

3   A.  There's a document that summarizes information that I

4   relied upon, not only the audited financial statements covering

5   the period reflected in this exhibit, but also unaudited

6   financial information, excerpts from tax returns, various

7   documents that were filed in connection with this litigation,

8   some agreements and miscellaneous other information.

9           MR. MANDEL:  Could we turn to page 1 of Defendants'

10  Exhibit 414.

11  Q.  What is this page here?

12  A.  This is the first of two pages summarizing financial

13  information and certain other documents that are relied upon in

14  connection with this matter.

15          MR. MANDEL:  Can we see page 2 of this document.

16  A.  This is a continuation of page 1, summarizing the type of

17  data that I just described.

18          MR. MANDEL:  Okay.  If we could go back to page 3

19  please.

20  Q.  Were the audited financial statements for the defendants in

21  this case prepared in accordance with -- let me back up for a

22  second.  Withdrawn.

23          Have you heard the term "GAAP" before?

24  A.  Yes, sir.

25  Q.  What is GAAP?

1    A.   It is an acronym for Generally Accepted Accounting

2    Principles.

3    Q.   And were the defendants' audited financial statements

4    prepared in this case prepared in accordance with GAAP?

5    A.   Yes, with the exception of one factor that was a basis for

6    qualifying the financial statement opinion.

7    Q.   And what was that one factor?

8    A.   There are four entities that are referred to as variable

9    interest entities.  These are entities that are not owned by

10   the defendant companies, but there are affiliates that meet

11   certain arcane applications of GAAP that, to get an unqualified

12   opinion, would require that they also be consolidated in the

13   audited financial statements of the defendant entities.

14   Q.   Does this page here identify any of those entities which

15   are required to be consolidated under GAAP, but which were

16   excluded from the audited financials?

17   A.   Yes, it does.

18   Q.   Which entities are those?

19   A.   The four entities that are under the heading of pre-tax

20   income of GAAP affiliates, that being Anaid Holdings LLC, GEKR

21   Holdings LLC, SPL Management LLC, and K-12 Book Source, Inc.

22   Q.   How did you factor in those four entities into your

23   analysis of defendants' profits?

24   A.   For purposes of this analysis, I chose to add those as well

25   into profits of defendant entities.

 1   Q.   Why did you decide to do that?

 2   A.   To remove one area of friction that has come up, to be

 3   conservative in favor of the publishers by including all

 4   entities, even though none of these entities are selling or

 5   renting books provided by the publishers.  I chose, for

 6   purposes of conservatism to show profits on the high side, to

 7   add those into my analysis.

 8   Q.   Am I correct that you submitted two reports in this case?

 9   A.   I did.

10   Q.   Did you include all of these entities in all of your profit

11   calculations that were in those reports?

12   A.   Not in the first report, because they really should not be

13   provided -- reflected in the analysis; they are not defendant

14   entities.

15        In the second one I included all but K-12.  I didn't

16   include K-12 because it was a very small entity, but also they

17   sell textbooks for kindergarten to 12th grade, which, as I

18   understand, are not part of this proceeding.

19        But for purposes of preparing this exhibit, I chose to

20   also add K-12 in it, which increased the profits that were

21   reflected on a pre-tax basis.

22   Q.   So let me just make sure this is crystal clear.

23        Is Anaid Holdings a defendant in this case?

24   A.   No.

25   Q.   But you included Anaid Holdings' profits in your analysis

1   of defendants' profits?

2   A.   I did.

3   Q.   Why did you do that?

4   A.   Again, for the purposes of avoiding friction, for the

5   purposes of conservative on the high side, I decided to put

6   everything that was -- that could have been consolidated into

7   the financial statements of the defendant entities based on

8   GAAP.  So these four are all what I described as variable

9   interest entities.

10  Q.   And if I ask you the same questions about GEKR, SPL, and

11  K-12 that I asked you about Anaid, would your answers be the

12  same?

13  A.   It would be.

14  Q.   Okay.  And let's just turn to page 4 of this exhibit.

15            What is page 4 of this exhibit?

16  A.   Page 4 summarizes the various entities that I had

17  considered for purposes of preparing the previous exhibit.

18  Q.   Okay.  So is there any entity that's in any way affiliated

19  with the defendants that has to be consolidated with the

20  defendants under GAAP that you excluded from your analysis?

21  A.   No.

22  Q.   Just to be clear, actually K-12 Book Source here, there's

23  nothing in the column under "consolidation required by GAAP,"

24  but did you include K-12 Book Source in your analysis of

25  defendants' profits?

1    A.  I did.

2    Q.  So whether or not K-12 Book Source needs to be consolidated

3    under GAAP, you included it; correct?

4    A.  I did.

5            MR. MANDEL:  Okay.  If we could go back to page 3

6    please.

7    Q.  So now there's a "total" line in the middle of page 3.

8            What does that total line represent?

9    A.  Pre-tax -- oh, with respect to the four variable interest

10   entities, it's their aggregate pre-tax or -- in the case of

11   K-12 -- after-tax earnings for the four years ended December

12   31st, 2016.  And that's the total on the right-hand side and

13   the total in the row.  In each of the four rows for 2013, '14,

14   '15, and '16, the total reflects their aggregate earnings for

15   the applicable year.

16   Q.  Okay.  And then the next line says "pre-tax income of all

17   GAAP entities."  What's that line?

18   A.  Well, with the exception of K-12, all of these entities are

19   non-income tax-paying entities; they are what is referred to as

20   pass-through corporations.  They don't pay taxes; rather, the

21   owner or the shareholder pays taxes.  And so this reflects

22   their aggregate earnings, which, with the exception of K-12,

23   are all on a pre-tax basis.

24   Q.  So if Book Dog Books has a dollar of income, who pays taxes

25   on that dollar of income?

1    A.  The owner of Book Dog Books.

2    Q.  And you understand that to be Mr. Smyres?

3    A.  That's correct.

4    Q.  What is the last line on this page, exhibit -- page 3 of

5    Exhibit 414?

6    A.  The last line shows the after-tax earnings of all of these

7    entities after I made a provision for both federal and state

8    income taxes that the owner would have to pay.

9    Q.  How did you calculate the taxes that Mr. Smyres would have

10   to pay?

11   A.  I used in each of the applicable years the marginal income

12   tax rate or the tax rate that would be applicable to

13   Mr. Smyres' income level on both a federal basis and a state

14   basis, making one further adjustment, that state income taxes

15   are deductible for federal purposes.  So this shows a slightly

16   lower net tax rate that would be the sum of the applicable

17   state and federal tax rates.

18   Q.  Did you see Mr. Smyres' tax returns?

19   A.  I saw excerpts from his tax returns.

20   Q.  Okay.  And if you saw only excerpts from his tax returns,

21   how do you know if you correctly calculated the taxes?

22   A.  First of all, the excerpts made me recognize that he was on

23   the maximum tax rate.  Moreover, just based on his salary alone

24   in these years, he would be taxed at the maximum tax rate for

25   also adding to his taxable income the earnings of these

3556

1   entities.

2   Q.  Let's talk about Garrison and Stonehenge for a moment.

3        Could you please remind the jury who Garrison and

4   Stonehenge are?

5   A.  Yes, sir.

6        Garrison is a lender to the defendant entities that

7   made a loan that enabled the defendant entities to enter into

8   its agreement with Amazon to rent books via the Amazon website.

9   Q.  Am I correct that some of the payments that the defendants

10  made to Garrison and Stonehenge were calculated on the basis of

11  certain profits that defendants had?

12  A.  That is correct.

13  Q.  Okay.  So how did you treat those profits -- excuse me.

14  Withdrawn.

15       How did you treat those profit-based payments to your

16  analysis?

17  A.  The way they are required to be reflected under Generally

18  Accepted Accounting Principles and the tax law, that being they

19  are fees associated with the loan, and that's also the way they

20  are reflected in the loan agreement.

21  Q.  Could you give the jury an analogy of maybe a type of loan

22  arrangement that they are familiar with that these payments are

23  similar to?

24  A.  Yes, sir.

25       For example, if somebody has an adjustable rate

1   mortgage that the interest that's paid is going to change on a

2   periodic basis based on changes in interest rates.

3   Q.  Did you have an opportunity to observe Mr. Steinmetz, the

4   plaintiffs' expert in this case, testify?

5   A.  I did.

6   Q.  Did you observe that he testified that these payments to

7   Garrison should be treated as the defendants' profits?

8   A.  I saw him say that.

9   Q.  Do you agree with him?

10  A.  It is wrong.

11  Q.  Why is it wrong?

12  A.  Because they unequivocally are not profits.  These are fees

13  and costs associated with this loan.

14  Q.  How did defendants' independent auditors treat these

15  payments to Garrison?

16  A.  As also costs of the loan.

17  Q.  Did you see anything in any of the documents that you

18  reviewed that suggests it should be treated as anything other

19  than costs of the loan?

20  A.  I did not.

21  Q.  Do you understand that John Glass is a former executive of

22  the defendants?

23  A.  I do.

24  Q.  What types of compensation did Mr. Glass receive in

25  exchange for the work that he did for Book Dog Books?

 1   A.  Salary, incentive compensation, and then eventually it

 2   became consulting income to him or entities that he owned.

 3   Q.  Now, was some of the compensation that Mr. Glass received

 4   tied to distributions that the defendants made?

 5   A.  In terms of the way that it was calculated, yes, that's

 6   correct.

 7   Q.  Okay.  And in calculating defendants' profits, how did you

 8   treat the distribution-based payments to Mr. Glass?

 9   A.  In the same way that they were reflected in the companies'

10   audited financial statements under Generally Accepted

11   Accounting Principles and on the tax returns, that being these

12   were compensation and/or fees payable, and that were paid to

13   Mr. Glass and/or entities that he owned.

14   Q.  Did you hear Mr. Steinmetz testify that he treated these

15   payments to Mr. Glass as profits?

16   A.  I did.

17   Q.  And did you agree with that opinion?

18   A.  I do not.

19   Q.  Why not?

20   A.  Because it is wrong.  These are clearly compensation and

21   fees that were paid to Mr. Glass for the reasons I previously

22   described.

23   Q.  Okay.  Could you please remind the jury who Diana Smyres

24   is?

25   A.  It is the ex-wife of Philip Smyres.

1    Q.  And in 2016, did the defendants make a $2.5 million payment

2    to Ms. Smyres?

3    A.  Yes, they did.

4    Q.  What was that payment in exchange for?

5    A.  For both retiring an option that she had to buy a ten

6    percent interest in the defendants' entities, as well as also

7    to terminate annual payments that she was receiving from

8    defendants' entities.

9    Q.  How did you treat that payment to Ms. Smyres?

10   A.  In the same way it was reflected in the companies' -- or

11   the defendants' financial statements under Generally Accepted

12   Accounting Principles, that being it was an expense of 2016.

13   Q.  And why did you treat it that way?

14   A.  Because it is correct according to both GAAP, as well as

15   the tax law and the companies' independent auditors.  A major

16   midwest accounting firm would have had full access to any

17   information they would need to come to that opinion.

18   Q.  Did you calculate the defendants' profits on a per book

19   basis?

20   A.  I did.

21           MR. MANDEL:  Could we now turn to page 6 of

22   Defendants' Exhibit 414.

23   Q.  What is page 6?

24   A.  This is my analysis of the profits per book of defendant

25   entities, considering both the profits of the defendant

 1   entities and the pre-tax salary of Mr. Smyres over the

 2   four-year period ended December 31st, 2016.

 3   Q.  Why don't you just walk the jury through how you did this

 4   calculation.

 5   A.  Certainly.

 6        The first row shows the adjusted net income that I

 7   previously described for each of the applicable years.  The

 8   second row reflects Mr. Smyres' salary on a pre-tax basis

 9   during this four-year period.  So I took the sum of those two

10   to reflect the total benefit that Mr. Smyres would have

11   received from these entities, as well as from the others that I

12   said that I included in net income over this four-year period,

13   again, without making an adjustment for taxes on his salary.

14        So that gives me the third row of numbers, the total.

15   I divided it by the inbound books received by defendants'

16   entities and affiliates over this four-year period.  So inbound

17   books is the books that they took in or they received over this

18   four-year period.

19        So I divided the total income by the number of inbound

20   books to be able to calculate the adjusted net income per book

21   over this four-year period.  So it ranged from $1.99 per book

22   in 2014 to $2.84 per book in 2015.

23   Q.  Can you just read, just so the record is clear, the 2013

24   and 2016 per book calculations?

25   A.  Yes, sir.

1           2013 per book adjusted net income was $2.11, and the

2    2016 adjusted net income per book was $2.42.

3    Q.  Why did you use incoming books as opposed to outgoing

4    books?

5    A.  Because with incoming books, they provide the best basis

6    for determining what the defendants were earning from these

7    books.  Because remember that a large portion of these books

8    were rented out.  So one book coming in could be rented out

9    two, three, or four times.  And so the incoming books data

10   shows from all the books that the defendants received how much

11   was being earned on an after-tax basis from those books;

12   whereas outgoing books would be a less reliable way of doing

13   that analysis, because that would reflect basically what was

14   being sold and would not capture the value of the rentals.

15   Q.  Why did you subtract taxes from the profits when you were

16   conducting your analysis of the defendants' profits?

17   A.  It is normal in analyzing businesses and characterizing

18   their net income to adjust for income taxes, because income

19   taxes reduce the pre-tax income.

20           Now, because almost all of these entities are

21   pass-through entities that do not pay income taxes, in order to

22   determine the net income or the true after-tax income of the

23   entities, since taxes are paid by Mr. Smyres, a provision for

24   income taxes has to be made in order to reliably reflect any

25   benefit that Mr. Smyres might have realized from owning these

 1  entities.

 2          MR. MANDEL:  Let's just show slide five for a moment.

 3  Q.  What is slide five?

 4  A.  Slide five demonstrates the source of the incoming

 5  textbooks that I used in order to calculate the per book

 6  adjusted net income.

 7          MR. MANDEL:  All right.  We can take that down.

 8  Q.  Are you aware that a tax document issued to Mr. Smyres

 9  stated that $25,000 was distributed to him when, in fact, $7

10  million was distributed to him?

11  A.  Yes, sir, I've seen that document.

12  Q.  What impact, if any, did that $7 million correction have on

13  the taxes that Mr. Smyres owed?

14  A.  None whatsoever.

15  Q.  Why not?

16  A.  Because taxes are assessed based on Mr. Smyres' share of

17  the pre-tax income of the related entities.  The distributions

18  has no bearing -- have no bearing whatsoever on the taxes that

19  Mr. Smyres would have had to have paid.

20  Q.  Can you trust an auditor that makes a $7 million mistake?

21  A.  Well, this mistake was one of no consequence.  It was not a

22  mistake in the audited financial statements; it was not a

23  mistake in the tax returns that would have been filed by

24  Mr. Smyres.  It's more of the nature of a typographical error,

25  which such errors occur routinely.  It's not unusual; it's not

3563

1  unique to this case.

2  Q.  Why do you say it was a typographical error?

3  A.  Because of the fact that it doesn't affect any of the tax

4  calculations.  So it's something that, in a world where we are

5  all human, we sometimes make mistakes.  Sometimes in a review

6  process reviewers focus on things that are of significance and

7  sometimes they may miss something like that.  Typically, these

8  returns are prepared by a machine, and it's the result of an

9  input error --

10            MR. OPPENHEIM:  Objection.

11            THE COURT:  Sustained.

12  Q.  Let me ask a slightly different question, Mr. Quintero, as

13  fascinating as tax computers are to all of us.

14            This $7 million error, was there a $7 million error in

15  any of defendants' audited financial statements?

16  A.  No.

17  Q.  So the $7 million error was on some tax document that's

18  separate and apart from the financial statements, right?

19  A.  Yes, sir.

20  Q.  Were the auditors at all confused as to the right

21  calculation -- I'll withdraw the question.

22            Is there anything -- withdrawn.

23            In the audited financial statement, did the auditors

24  get the distribution figure correct?

25  A.  Yes, sir.

1   Q.  Okay.  And then -- I'll withdraw the question.

2          How are you being compensated for your work here

3   today?

4   A.  Based on my normal hourly rate as it existed in 2017, when

5   I was hired.

6   Q.  Is your compensation in any way dependent upon the outcome

7   of this case?

8   A.  No, sir.

9   Q.  Are you familiar with the defendants' corporate structure?

10  A.  Yes, sir.

11  Q.  Could you please describe it.

12  A.  There are a network of affiliated entities that directly or

13  indirectly own the defendant entities.

14  Q.  Is there anything unusual about defendants' corporate

15  structure?

16  A.  No, this is quite routine for many companies.

17  Q.  Have you seen -- withdrawn.

18          Does the corporate structure in any way suggest that

19  Mr. Smyres is doing anything illegal or inappropriate?

20          MR. OPPENHEIM:  Objection.

21          THE COURT:  Sustained.

22  Q.  I just want to go back to 414, Defendants' Exhibit 414, to

23  page 4.

24          Now, you used a term in your testimony here today

25  that's VIE or -- does it stand for "variable interest

 1    entities"?

 2    A.   It does.

 3    Q.   I want to draw your attention to 1401 West Goodale and 999

 4    Kinnear.   What are those two companies?

 5    A.   Those are two entities that own real estate.

 6    Q.   Do you understand it to be owned by Mr. Smyres?

 7    A.   Yes, sir.

 8    Q.   Were they included in the audited financial statements?

 9    A.   They were not.

10    Q.   Does GAAP require them to be included in the audited

11    financial statements?

12    A.   It does not.

13    Q.   Okay.   Are they technically variable interest entities or

14    VIEs?

15    A.   Yes.

16    Q.   Is it fair to say that under GAAP there are certain VIEs

17    that don't need to be consolidated?

18    A.   That's correct.

19    Q.   That is what 1401 West Goodale and 999 Kinnear fall into?

20    A.   Yes.

21    Q.   And just to be clear, further down on the same page, it

22    identifies Matasa Agilia Holdings, Garrison Commercial Funding,

23    Stonehenge Capital, Diana Smyres, and payments to John Glass.

24         Are payments to any of those entities required to be

25    consolidated with the defendants' profits under GAAP?

I43VMIL2                  Quintero33 - Direct

1   A.  No, and they were not.

2   Q.  Now, turning your attention back to page 1 of Defendants'

3   Exhibit 414.  Am I correct that you reviewed a whole host of

4   documents related to the defendants' financial situation other

5   than the defendants' audited financial statements?

6   A.  Yes.

7   Q.  Were any of those documents that you reviewed inconsistent

8   with the audited financial statements?

9   A.  Nothing was inconsistent.

10  Q.  That concludes the 702 portion of your testimony.

11          Have you reviewed a spreadsheet that shows books that

12  the publishers audited a check?

13  A.  Yes, I have.

14          MR. MANDEL:  Okay.  I'd now ask that the witness be

15  shown Plaintiffs' Exhibit 341B, which is in evidence already.

16          MR. OPPENHEIM:  I don't believe it is in evidence,

17  your Honor.

18          MR. BHANDARI:  It is, your Honor.  341 is the PDF and

19  341B is the Excel spreadsheet.  They are exactly the same.

20          MR. OPPENHEIM:  One moment.  Can we check?

21          Based on our records, your Honor, it's not in.

22          MR. MANDEL:  We asked Mr. Essig extensively about this

23  document, your Honor.  So not only is it in evidence, but we've

24  already inquired as to other witnesses about it.

25          MR. OPPENHEIM:  I believe Mr. Essig's testimony was he

I43VWIL2                      Quintero - Direct                    3567

 1   had never seen the document before.

 2           MR. BHANDARI:  Your Honor, we'd like to have a quick

 3   sidebar or I can explain to you -- you recall the ruling that

 4   was in the morning.

 5           THE COURT:  Come on up.

 6           (At sidebar)

 7           MR. BHANDARI:  So your Honor, this is the Chegg

 8   spreadsheet, that was 341.  Your Honor ruled in the morning

 9   before the jury came in that this spreadsheet, Chegg 341, is

10   coming into evidence; because it was cited in the February 6th

11   letter by the plaintiffs as being authenticated by Chegg.  And

12   having no reason whatsoever for being questioned, it was

13   probative and it was relevant.  They cite it over 20 times in

14   their roadmap.  That was your Honor's ruling in the morning.

15           341 is a PDF; 341B is just simply the Excel.  You

16   probably recall that ruling.

17           THE COURT:  I do.

18           MR. BHANDARI:  And Mr. Oppenheim said we object, but

19   we understand the Court's ruling on this.

20           THE COURT:  But the point is it hasn't been offered.

21           MR. BHANDARI:  It was entered -- you said it was

22   allowed to be entered into evidence.

23           MR. GOULD:  Our position all along as an element of

24   our roadmap is that it is admissible.  And we explained the

25   reasons for that, and that's why it's permissible to use

3568

I43VWIL2                     Quintero - Direct

1    elements of it within the roadmap.

2           As your Honor just said, it has not been offered, it

3    has not been admitted, and it's improper for this witness to

4    testify about it on that basis.

5           MR. BHANDARI:  You already ruled.

6           THE COURT:  But it's an admissible business record,

7    right?

8           MR. BHANDARI:  Yes, that was your ruling.  So he's

9    asking questions about that.  Now it's being offered.

10          MR. GOULD:  As of now there's no foundation nor

11   testimony in the record about what anything in the document

12   means.  They haven't put forth any testimony on it; they

13   haven't treated the Chegg subpoena --

14          MR. BHANDARI:  We never would.  They said in their

15   February 6th letter that it's admissible, it is authenticated

16   by Chegg deposition testimony, they relied on it in their

17   roadmap.  So the Court ruled based on the fact that they've

18   relied on it, they are judicially estopped now from being able

19   to argue it's not a business record.

20          So the Court has ruled on this.  He can ask questions

21   about a document that the Court has ruled is admissible, and it

22   is being offered now.

23          MR. GOULD:  Their expert, their summary witness, or

24   whatever he's testifying about on this part, to give an opinion

25   or summary testimony about what the document means, there's got

143VHIL2                   Quintero - Direct                  3569

1  to be some foundation in the record besides his say-so about

2  what it means.

3           THE COURT:  Let's see if he can establish some

4  foundation; but otherwise, I agree and I'll just strike his

5  testimony.

6           MR. BHANDARI:  He's just going to do --

7           THE COURT:  What's he going to do?

8           MR. BHANDARI:  A calculation -- arithmetic.  He's

9  going to look at the document and explain what it is.

10          THE COURT:  Let him do arithmetic.

11          MR. OPPENHEIM:  Sorry.  One other issue.

12          I thought we also had established you were going to

13 provide a limiting instruction not to confuse the testimony

14 that he's about to give as his opinion testimony, because he's

15 now giving something different than what you certified, can we

16 address that?

17          THE COURT:  That's fine.

18          MR. OPPENHEIM:  Thank you, your Honor.

19          (Continued on next page)

20

21

22

23

24

25

I43VWIL2                Quinteros - Direct                    3570

1                     (In open court)

2                THE COURT:  Exhibit 341 is received.  You may publish

3     it.

4                (Plaintiffs' Exhibit 341 received in evidence)

5                THE COURT:  Members of the jury, I don't know what

6     this witness is going to say about Exhibit 341, but whatever he

7     says, it's not opinion testimony based on any specialized

8     knowledge; so we'll find out.

9     BY MR. MANDEL:

10    Q.  Am I correct that you testified that you reviewed a

11    spreadsheet that shows books that the publishers audited a

12    check?

13    A.  Yes, I did.

14                MR. OPPENHEIM:  Objection.

15                THE COURT:  Sustained.

16    Q.  Have you reviewed this document before?

17    A.  Yes, I have.

18    Q.  Okay.  I'm really going to be focused on asking you about

19    two columns in this document, the source column and the finding

20    column.  I'd just like to start at the very beginning by going

21    all the way to the bottom of the spreadsheet, so you can see

22    how many rows there are on the spreadsheet.

23                How many rows are there on the spreadsheet?

24    A.  64,125 rows.

25    Q.  Okay.  So now if we go to the top of this spreadsheet, are

1    you familiar with filtering on Excel?

2    A.  I am.

3    Q.  What does filtering on Excel do?

4    A.  It provides a means for extracting certain data from a

5    large spreadsheet based on filtering criteria that are applied.

6    Q.  So if we could filter this by a finding of suspect under

7    the finding column.  So we want to look at just all of those

8    rows on this spreadsheet that were found to be suspect.

9             MR. OPPENHEIM:  Objection.

10            THE COURT:  Sustained.

11            What does "suspect" mean?  Does this witness know?

12            MR. MANDEL:  We're just going to do arithmetic at this

13   point, your Honor.  I think your Honor has previously ruled

14   that -- he's not going to opine as to the meaning of this; he's

15   going to do simple arithmetic based on a document that is

16   already in evidence.

17            THE COURT:  It may be in evidence, but what does it

18   mean?

19            MR. MANDEL:  Other witnesses have already testified to

20   that, your Honor.

21            THE COURT:  Which witness has testified to what

22   "suspect" means in Exhibit 341, which was just admitted in

23   evidence?

24            MR. BHANDARI:  Your Honor, their witness John Garry

25   testified that this spreadsheet was the one that was referenced

 1   in the roadmap, in order to highlight the particular books that

 2   are supposedly potentially counterfeit that were provided by

 3   Chegg.

 4          THE COURT:  Counsel, it's admissible in evidence, but

 5   you can't have this witness offer to the jury something that's

 6   "suspect" that he didn't prepare it, he doesn't know what it

 7   is, and there's no testimony in the record as to what it is.

 8          So if you're going to have him do arithmetic, if

 9   that's the -- let him do some arithmetic, but the jury can draw

10   no conclusion from what "suspect" means.

11          MR. MANDEL:  Understood.

12          We'll proceed with the arithmetic, your Honor.

13   BY MR. MANDEL:

14   Q.  So how many rows on this spreadsheet was there a suspect

15   finding for?

16   A.  I would have to see the total from the filter.

17   Q.  Can you see the lower left-hand corner of the screen?

18   A.  Is that the -- based on what I see on my screen, the last

19   one that comes about from the filtering process?  There's

20   nothing after that one?

21   Q.  Do you see on the bottom left-hand corner of your screen

22   where it says "ready 10"?

23   A.  Oh, excuse me.  I do see it.

24          Yes, it says there are 10,949 that passed through this

25   filter using the criterion "suspect."

 1    Q.   Okay.  Do you have a calculator with you?

 2    A.   I do.

 3    Q.   So what percentage of the records on this spreadsheet are

 4    suspect?

 5    A.   17.1 percent.

 6             MR. MANDEL:  Okay.  Now, let's get rid of the filter

 7    with respect to finding; let's look at all 64,000 records

 8    again.

 9             And now let's just look at the records that were

10    sourced from first class books.  So we'll filter under source

11    for just first class.  And now let's go back to just -- let's

12    just look at the number of suspect records under first class

13    books.

14    Q.   So how many records are there where the source is first

15    class books where the finding is suspect?

16    A.   804.

17    Q.   Okay.  And now let's look at the total number of first

18    class books records.

19             What's the total number of first class book records?

20    A.   10,762.

21    Q.   So what percentage of the first class books records were

22    suspect?

23    A.   7.5 percent.

24    Q.   7.5 percent.  Thank you.

25             MR. MANDEL:  Let's turn to MBS next.

1              Let's look at the lines on this chart that came from

2     MBS.  So let's filter by just MBS, and let's look at just the

3     suspect ones now.

4     Q.  How many records on this chart from MBS were suspect?

5     A.  211.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Let's look at the total number of records on this chart

2   from MBS.  What number is that?

3   A.  2,858.

4   Q.  What percentage of the records or books sourced from MBS

5   were suspect?

6   A.  7.4 percent.

7          MR. MANDEL:  Now let's look at Texas Books.

8   Q.  What number of books from Texas Books were suspect?

9   A.  20.

10  Q.  What was the total number of books from Texas Books?

11  A.  669.

12  Q.  What percentage of the books sourced from Texas Books were

13  suspect?

14  A.  3 percent.

15  Q.  Let's look at buybacks.  What number of books that came in

16  through buybacks were suspect?

17  A.  6,728.

18  Q.  Let's look at the total number of books that came in from

19  buyback.  What is the total number of books that came in

20  through buyback?

21  A.  19,309.

22  Q.  And what is the percentage of books that came in through

23  buyback that were suspect?

24  A.  34.8 percent.

25         MR. OPPENHEIM:  Object.

1          THE COURT:  Sustained.

2          MR. OPPENHEIM:  Move to strike.

3          THE COURT:  Stricken.

4   Q.  What percentage of the lines on this spreadsheet that were

5   sourced from buyback were suspect?

6          MR. OPPENHEIM:  Sourced from buyback?

7          THE COURT:  Sustained.

8   Q.  What percentage of the books that on this spreadsheet that

9   have source in column C were listed in column E as being

10  suspect?

11         MR. OPPENHEIM:  Your Honor --

12         THE COURT:  Sustained.

13         MR. OPPENHEIM:  This whole line of questioning --

14         THE COURT:  Sustained.  Move on to something else.

15         MR. MANDEL:  Can I do one more?  May I rephrase, your

16  Honor?

17         THE COURT:  I guess you can rephrase.  To be posing

18  these questions to this witness, it's improper.

19         MR. MANDEL:  I'll briefly rephrase.  We are almost at

20  the end of this line of inquiry.

21  Q.  With respect to the rows on this spreadsheet, what

22  percentage of the rows on this spreadsheet were found to be

23  suspect that have source in column C?

24         THE COURT:  Sustained.

25         MR. OPPENHEIM:  Objection.  We would move to strike

1    this entire line of questioning.

2              THE COURT:  Application granted.

3              MR. MANDEL:  May we be heard?

4              THE COURT:  This witness wouldn't know if these are

5    fish or books or anything that's on this spreadsheet.

6              MR. MANDEL:  I agree, your Honor.  We are going to

7    have to get that in through a different witness.

8              THE COURT:  You have larded your questions with what

9    portion are suspect.  I have already told you, and I'm telling

10   the jury, he has no idea what suspect means, none.  So this

11   testimony is not relevant and it's misleading.  It's stricken.

12   Q.  Mr. Quintero, do you know what suspect means on a

13   spreadsheet?

14             MR. OPPENHEIM:  Objection.  He has no foundation.

15             THE COURT:  Sustained.  He's an accountant.

16             MR. MANDEL:  The issue we have, your Honor, is that we

17   weren't allowed to show this document to our client.

18             MR. BHANDARI:  Your Honor, may we quickly have a side

19   bar on this?  I think there is a misunderstanding.

20             THE COURT:  We will let the jury have a break and we

21   will discuss it.

22             Members of the jury, we will take a recess.  Keep an

23   open mind.  But this testimony is stricken.  Forget about this

24   arithmetic.

25             Please recess the jury.

3578

```
 1                    (Jury not present)

 2            MR. BHANDARI:  Your Honor.

 3            THE COURT:  Go ahead, Mr. Bhandari.  You are trying to

 4    do exactly what I told you you could not do with the summary.

 5            MR. BHANDARI:  Your Honor, I'm sorry if there is a

 6    misunderstanding.

 7            THE COURT:  Mr. Quintero, you are excused.  Step

 8    outside.

 9            MR. BHANDARI:  Your Honor, I'm sorry if there is a

10    misunderstanding on this.  We are simply trying to get the

11    number of things in different columns.

12            You are right that he is not a witness who can testify

13    what suspect means.  He's not a witness who can testify about

14    what buyback means.  Those things have to come in through some

15    other mechanism.

16            I am not, off the top of my head, certain of precisely

17    what all of the testimony was from any of the witnesses that

18    have gone thus far.  But from our perspective, obviously, it's

19    important to make sure that somebody with some knowledge is

20    able to explain what these things are.  But at the very end

21    connecting it --

22            THE COURT:  He has no knowledge of what these things

23    are.

24            MR. BHANDARI:  He has no knowledge.  He is simply

25    doing the math so when we have testimony, if there is testimony
```

1   that permits us to connect these things that we say, when there

2   is the column of suspect --

3        THE COURT:  What testimony is going to connect these

4   things?

5        MR. BHANDARI:  Your Honor, I don't want to represent

6   that to the Court yet because I don't know, because I think

7   there is three possibilities of what that testimony is.  One

8   is, I think, Mr. Garry testified about how certain elements of

9   the roadmap were put together and why 341 is referenced over 20

10  times in the roadmap by calling it potentially counterfeit.

11       MR. GLUNT:  Your Honor, there is one additional source

12  that could come in for this in addition to whatever Mr.

13  Bhandari was about to speak about.  That is Harjit Singh from

14  Chegg was deposed in this action and was questioned about this

15  document and he also talked about what these columns mean.  In

16  particular, he says:

17  "Q.  And then we have talked about the next column, which is

18  suspect.  That means a book that was determined to be

19  counterfeit, according to what information the publishers

20  provided to you, correct?

21  "A.  Correct.  And let me also say that in some cases suspect

22  books were -- after they went through an additional audit from

23  the publishers were returned back to us in some cases and moved

24  over to cleared."

25       He also testified later in that deposition that that

1   happened in only a handful of cases.  That would be the

2   testimony we would also be introducing.

3          Mr. Singh was questioned about this document and, if

4   you will recall, your Honor, the reason the publishers were

5   able to put this document into evidence is because they

6   represented, I believe, from Mr. Singh's transcript.  If I'm

7   misremembering that, I apologize.  But my recollection is they

8   cited deposition testimony to authenticate many of the

9   documents in the roadmap.  There is testimony in here in which

10  he authenticated this document.  He talked about what it means.

11  To the extent that that testimony would be introduced through a

12  designation, there have been designations of the Chegg

13  testimony, we think, that would be able to give the jury the

14  grounds to find what those columns mean and connect the dots,

15  as Mr. Bhandari said, as to what kind of judgments could be

16  drawn from that specific document?

17         MR. OPPENHEIM:  Your Honor, the first thing is, this

18  document I think Chegg asserted was highly confidential.  I

19  believe that this Court ruled that it would not be shown to the

20  public.  It's been up there.  It shouldn't be up there, I don't

21  believe.

22         THE COURT:  It's being shown to the public?

23         MR. OPPENHEIM:  Yes.

24         THE COURT:  That's defendants' problem.

25         MR. BHANDARI:  Your Honor, we didn't realize that,

I43MWIL3                    Quintero-direct                    3581

 1  obviously.  We have taken that down.

 2         MR. OPPENHEIM:  I don't remember all of the

 3  protections the Court had articulated were going to be used for

 4  Chegg.  We haven't followed them.  That's No. 1.

 5         2, the defendants subpoenaed Chegg, which was opposed.

 6  Chegg, as of last night, was still asking what the status of

 7  their motion to quash was.  They have not been updated.

 8         The defendants, if they wanted to bring Chegg in, they

 9  had to do that before.  They chose not to.  They made a

10  strategic decision not to pursue it.  Now they are putting

11  forward for the first time certain testimony from the Singh

12  transcript.

13         I will tell you that that Singh transcript was a very

14  long one.  I sat through a very lengthy and painful deposition

15  there.  I can probably, if given time, pull out plenty of other

16  excerpts that say that he doesn't know what certain things in

17  here are.

18         As to Mr. Garry's testimony, it has nothing to do with

19  the finding.  The only thing Mr. Garry looked at was the SKU

20  numbers and matching them up and that's the only thing that he

21  testified for the roadmap.  This findings category is an

22  entirely different beast.

23         So the defendants have indicated that they have five

24  witnesses left.  We finished MacFarland.  She is not going to

25  testify about it.  Mr. Quintero can't testify about it and

I43MWIL3                     Quintero - direct                     3582

 1    neither can either of the remaining three.  They have no basis

 2    to put this in.

 3            So the testimony on this should be foreclosed at this

 4    point.  They are attempting to do exactly what your Honor told

 5    them they couldn't do.  They put forward a Chegg summary.  You

 6    said it's out, it's prejudicial.  They put a witness up to

 7    essentially give that same prejudicial testimony, after I sent

 8    repeated e-mails to defense counsel saying I'd like to know

 9    what you intend to do with respect to the Chegg summary so we

10    can address it in advance.

11            With respect to the witnesses, it was never forecasted

12    that this is what they were going to do.  I think this is

13    improper.  The entire thing should be gone at this point.  Yes,

14    the spreadsheet is in.  They have no foundation for describing

15    anything about what finding means, let alone the source

16    columns.

17            MR. GLUNT:  Your Honor, this is the second time today

18    that Mr. Oppenheim has claimed that he is first hearing about

19    deposition designations that were specifically identified in

20    the pretrial order.  Frankly, your Honor, it's getting a little

21    old.  We identified these.  There were objections.  There were

22    counterdesignations and the entire point of doing so, your

23    Honor, was so that an attorney could not stand up right now and

24    say, I have never heard of this witness before.  They

25    designated things from Chegg.  We designated things from Chegg.

3583

 1    It is valid and entirely proper for us to choose to offer that

 2    testimony, and Mr. Oppenheim's suggestion otherwise, frankly,

 3    is absurd.

 4              MR. OPPENHEIM:  They designated, frankly, the entire

 5    continent of North America.  I don't doubt that.  They haven't

 6    put it forward before they put the witness on.  So the jury

 7    doesn't know anything.

 8              THE COURT:  I don't know what's in the Singh

 9    deposition.  It hasn't been offered.

10              MR. BHANDARI:  Yes, your Honor.

11              THE COURT:  How can somebody sit up on the stand who

12    is not from Chegg and purport to explain what 341 is.  The

13    answer is obvious.  They can't.  And I previously ruled that

14    the percentage of books found in the summary that you offered

15    from defendants or other suppliers was fundamentally misleading

16    because different criteria were used for each one.

17              And so having said that the summary is out, I'm not

18    going to have you have Mr. Quintero sit here and regurgitate

19    verbally the summary to the jury.

20              MR. BHANDARI:  Your Honor, you're a hundred percent

21    right.  We are not looking to revisit that issue at all.

22              Mr. Quintero is not going to say what he thinks

23    suspect is.  Mr. Quintero is not going to say what he thinks

24    buyback means.  Mr. Quintero is not going to say why he thinks

25    the percentages --

1          THE COURT:  Your colleague, Mr. Mandel, throws

2    questions.  He says, so what number of books were suspect?  I

3    listened to his questions.  I was waiting for an objection.

4          MR. BHANDARI:  Yes.  Your Honor, that's true.  I think

5    that you made your decision on this, so I am not going to

6    belabor the point.  I would like to be as clear as I can.

7          THE COURT:  If you've got some deposition testimony

8    that you think lays a foundation for this that you previously

9    designated in the joint pretrial order, show it to me, read it.

10          MR. BHANDARI:  Great.  Can we do that right now?

11          THE COURT:  Go ahead, Mr. Oppenheim.

12          MR. OPPENHEIM:  Even if they come up with some

13    testimony that somehow lays a foundation for the document, it

14    doesn't change the issue that you addressed with respect to the

15    Chegg summary, and that is, that there were different criteria

16    applied.  So we can go through the exercise of reading a lot of

17    Chegg designations and maybe the Court finds that there is a

18    foundation for the document.  It doesn't change what they are

19    ultimately trying to do, which is improper and misleading.  I

20    think we should start with that question instead of spending a

21    lot of time, while the jury is here, on the issue of Chegg

22    designations.

23          MR. BHANDARI:  Your Honor, there is two totally

24    different issues, as this Court knows.

25              One is whether or not Mr. Quintero can simply say what

1    the numbers are for suspect columns, buyback column, MBS

2    columns.  He is saying what the numbers are.

3           Second, we have to be able to connect it.  We are

4    pulling up the Chegg deposition testimony that's been

5    previously designated to show how we are going to connect it.

6           Third, the question is, can we make an argument based

7    on the Chegg deposition testimony, the numbers he has put in.

8    We can't put in a Rule 1006 summary.  I understand, your Honor.

9    You did not think that that was a fair and totally impartial

10   way to describe the evidence.

11          But we are able to make arguments and to say this is

12   what we think it is, and the opposing counsel will be able to

13   say, well, you heard the Chegg testimony and you heard

14   something about numbers, but there was no reason for you to

15   believe that the two are relevant in any way whatsoever.

16   That's an argument for them to make.  All we are saying is we

17   want two isolated pieces of evidence to come in.

18          Mr. Mandel doesn't have to say the word suspicious.

19   He doesn't have to say the word buyback, although I don't think

20   it matters because Mr. Quintero, you've said it very clearly,

21   we agree wholeheartedly, the jury should be told, he does not

22   know what those words mean.  He is simply saying, in those

23   columns, those designations have the following percentages.

24          Then there will be different testimony that will be

25   read to the jury as a designation where Mr. Singh will explain

3586

1    what the columns mean and we will make the arguments that we

2    are going to make, your Honor.  It's different than a Rule 1006

3    summary.  We don't expect you to revisit that issue.

4         THE COURT:  Is Quintero going to provide the

5    percentages listed on the Chegg summary?

6         MR. BHANDARI:  No.  He is going --

7         THE COURT:  Are you going to refer to those

8    percentages in closing?

9         MR. BHANDARI:  In closing what I'm planning to do, if

10   we are talking about it, is to simply pull up this document in

11   evidence and to say, Mr. Quintero talked about this.  And when

12   he did the math on it, there was a column for first class

13   books, there was a column for MBS, there was a column for

14   buybacks.  The percentages that you saw were this when he did

15   the math for things that were suspect that were in these

16   columns.

17        What does suspect mean?  You heard the testimony of

18   Mr. Singh.  He said it means potentially counterfeit books.

19   I'll say now, it's not the same books that they selected from

20   everyone.  To be very clear, they asked for all of the books

21   from the defendants, but they did not ask for all of the books

22   from these other entities.  These are not the same books at

23   all.

24        But what you can see is for this analysis to see what

25   percentage we had, when they pulled all of our books, it was 1

1    percent.  For the books that they thought were the highest

2    likelihood from the other side, these were the percentages.

3            THE COURT:  It is so misleading.

4            MR. BHANDARI:  Your Honor, there is one more thing

5    which makes it not misleading at all.

6            THE COURT:  What's the relevance if you are going to

7    tell the jury that there were different criteria for every

8    supplier?

9            MR. BHANDARI:  Sure.  Because then we have DX 371.  DX

10   371, which was also admitted into evidence as a party admission

11   by the plaintiffs, there was questions on it for Mr. Garry,

12   that's the selection of books.

13           Looking at DX 71, there are certain books that were

14   exactly the same that were selected for every single one of the

15   entities.  All of our books of that title were pulled.  All of

16   the books from MBS of that title were pulled.  All of the books

17   from first class books of that title were pulled because they

18   were priority titles.  So everything that Chegg had in its

19   inventory of those titles were pulled.

20           We can use that to say, guess what, the numbers there

21   are even better.  For us it's a lower percentage of these

22   high-likelihood probability books or high-likelihood

23   counterfeit books compared to everybody else.

24           No matter how you slice and dice it, if they take all

25   of our books, this is the number and our number matters

 1    particularly because there is certain criteria where they say

 2    if it's less than 1 percent, then they are more conscientious

 3    and it shows they are more reliable sellers.

 4            All of our books are pulled and you see that the

 5    number comes to less than 1 percent of potentially counterfeit

 6    books.  That's a different argument which we are making from

 7    the spreadsheet, even if there is not a comparison to anyone

 8    else.

 9            But when we compare, we are going to do it in a very

10    apples-to-apples way.  We are going to say, here, it was not

11    the same.  In the priority spreadsheet, DX 371, there was -- I

12    can't remember -- 12 or 15 or 20 titles that were pulled from

13    us and everybody else, and we get to see the percentages for

14    those.  Then you'll see in every way you slice and dice it --

15            THE COURT:  It's all just based on your assertions.

16    It's not apples to apples.  It's not apples to oranges.  It's

17    apples to penguins.  That's what it is.

18            MR. BHANDARI:  Your Honor, the second one is apples to

19    apples when you look at DX 71.  They pulled the same titles for

20    every one.  They pulled all of the titles from MBS.  All we are

21    doing is comparing in DX 71 the same titles.  When you look at

22    the same titles, we have a lower percentage of counterfeits

23    than anybody else with the same titles.  That's apples to

24    apples in the clearest possible way.

25            I hear what you are saying, your Honor.  You don't

 1    find this argument persuasive.  You find this argument
 2    misleading.  You don't like this argument.

 3         What I'm saying is, we are going to not say anything
 4    that's untrue about it.  We want to be able to present it for
 5    what it is which is when you pull all of our books, the number
 6    is still less than 1 percent of a potential counterfeits that
 7    are at issue in this case based on everything that was pulled.
 8    And you should see, when other companies had their books
 9    pulled, they are just totally different percentages.  There are
10    a lot of books that got pulled here.  That's it.  We are not
11    going to say anything that's misleading.  We are not going to
12    claim this is apples to apples, but it doesn't preclude the
13    evidence from coming in.

14         MR. OPPENHEIM:  Mr. Bhandari should become a
15    congressman.  He would master the filibuster.  It doesn't
16    suddenly make something that this Court ruled inadmissible
17    admissible because he repeats it 20 different times different
18    ways.  What he explained to you, your Honor, is exactly what's
19    in the Chegg summary, no different.

20         Here is one of the things.  He doesn't get this.  He
21    says, well, we can reduce and change the numbers based on some
22    calculation.  Under the best practices, the way an audit is
23    conducted, different books are looked at for different
24    suppliers based on that.  It's provision, I think, 7D of the
25    best practices.  He hasn't incorporated that.  He can't

1   incorporate it.

2          So he is trying to do exactly what your Honor

3   prohibited, but now -- so he is saying two things, as I

4   understand it.  One is, we are not going to actually offer the

5   summary.  We are just going to have Mr. Quintero give the

6   numbers.  That's the summary, your Honor.  There is no doubt in

7   my mind what they are trying to do with Quintero is the

8   summary.

9          Secondly, he says, we can argue it to the jury.  I

10  want to address this.  The Second Circuit law in this is quite

11  clear.  In the absence of explanatory testimony by a witness,

12  the jury would be unable to understand the documents without

13  representations by counsel or speculation, either of which

14  would be improper.  And I cite to the Court *U.S. v. Gupta*,

15  Second Circuit 2014.  They cannot argue in front of the jury

16  something which they cannot explain by witness to the jury.

17         THE COURT:  He just made a new argument a moment ago.

18  What about offering the percentages based on specific titles?

19         MR. OPPENHEIM:  Your Honor, I have to say, I feel like

20  he finds 20 different ways to appeal the issue without

21  appealing it.  Now we have a new argument on titles.  We still

22  don't know what was pulled from whom and how much because of

23  the 7D calculation, and there is no foundation for that.  And

24  the last day of trial is not the time to introduce that, is it?

25  Suddenly a new argument on the last day of trial?

 1                MR. BHANDARI:  Your Honor, of course we are allowed to

 2     make arguments at any point during the trial, and we are not

 3     supposed to preview all of our arguments.  These are facts.

 4     It's whether or not the thing should get into evidence.

 5                One other thing, your Honor.  If you do not want the

 6     comparison to be made based on this Chegg spreadsheet, one, we

 7     will do it only based on the apples to apples of the same

 8     titles being pulled.  That's the first thing.

 9                Second of all, this spreadsheet shows a different bit

10     of information.  The buyback number, showing that out of

11     buybacks 34 percent of them were suspect is a very strong

12     indication of two things.  One, that's what happens when you

13     have no inspection of books.  When no one is looking to see

14     what they are selling, the buybacks are coming from individual

15     students, they are coming from folks who are not professional

16     sellers.  Typically you get something like 35 percent.

17                Second, the possibility that in the MBS inventory or

18     the Follett inventory there are other counterfeits that didn't

19     come from us is, in fact, influenced by the fact that our

20     number of counterfeit books when you look at all of ours is in

21     like the 1 percent range versus the possibility, when you look

22     at all the buybacks and you look at other things, there is a

23     high percentage that they are getting from other sources.  We

24     can make that argument.  In MBS, don't assume that it is us,

25     because they could be getting counterfeit books from many other

 1   sources.

 2        MR. OPPENHEIM:  There is no foundation to describe

 3   what the buybacks means.  What is buybacks?  Is it defendants'

 4   buybacks?  Is it Chegg's buybacks?  And what is included in

 5   buybacks?  We don't know.  We don't know how they looked at it.

 6   We don't know whether they were inspected, which is something

 7   that Mr. Bhandari is suggesting happened.  I don't know.  So

 8   there is no foundation to explain the information here, your

 9   Honor.

10        Mr. Bhandari keeps spinning facts, but I don't see

11   them.

12        THE COURT:  We are taking five minutes.

13        (Recess)

14        MR. OPPENHEIM:  May I raise one issue?

15        THE COURT:  Yes.

16        MR. OPPENHEIM:  I don't have the exact numbers.  I

17   believe there are roughly 4400 books that have the

18   TextbooksRUs.com source.  We don't know that that's just the

19   defendants' source.  But that's at least what the Textbooks R

20   Us source is.

21        The defendants want to make the argument that that is

22   a representative sample of what they were selling.  There is no

23   evidence to support that, zero, and in fact, they would not let

24   us get in to see a broader scope of their inventory.

25        So they are now trying to get in evidence that they

 1    think is favorable to them without any basis to say it is a

 2    representative sample.  It is misleading.  It is misleading to

 3    the jury to suggest that.

 4         Leave aside all the other points and whether this is

 5    admissible, the point they are driving at is improper.  It is

 6    wholly improper.  They can't on the one hand say, we are not

 7    going to let you look more broadly at our inventory and then,

 8    on the other hand, say, we are going to take this spreadsheet

 9    and use it as a representative sample and put it in front of

10    the jury as to how much of our inventory is counterfeit.

11    That's improper and it's misleading to the jury, your Honor.

12         MR. BHANDARI:  Your Honor, with regard to Harjit

13    Singh --

14         THE COURT:  You are going to show it to me over the

15    luncheon recess and I'll rule on it.

16         But the fact of the matter is, for now no further

17    inquiry of this witness with these percentages, it's out, and

18    move on to something else.  That's it.

19         MR. BHANDARI:  Can we call him back after the Harjit

20    Singh, if you rule on that?

21         THE COURT:  You can call him back.

22         MR. BHANDARI:  Thank you.

23         THE COURT:  Let's bring in the witness and bring in

24    the jury.

25         Why you need him to use a calculator on the witness

  1    stand is beyond me.

  2              (Jury present)

  3              THE COURT:  Counsel, Mr. Mandel, please move on to

  4    another line of inquiry with this witness.

  5              MR. MANDEL:  Thank you, your Honor.

  6              I'll just rest on that.  We have no further questions,

  7    your Honor.  Thank you.

  8              THE COURT:  Cross-examination.

  9              MR. OPPENHEIM:  Yes, your Honor.

 10    CROSS-EXAMINATION

 11    BY MR. OPPENHEIM:

 12    Q.  Good morning, Mr. Quintero.

 13    A.  Good morning.

 14    Q.  We have not met before.  It's a pleasure to meet you.

 15    A.  You, too.

 16    Q.  You have a great voice, by the way.  You should be a

 17    television broadcaster, I think.

 18    A.  Thank you.

 19    Q.  Mr. Quintero, I want to focus on the things we agree on

 20    first, if I may.

 21              MR. OPPENHEIM:  Can I pull up PD14, please.

 22              Can we plug that back in?  I think this can be shown.

 23    Q.  Mr. Quintero, this is a demonstrative showing the

 24    defendants' revenues from 2008 to 2016, including the related

 25    entities, right?

1    A.  Yes, sir.

2    Q.  And you were in the courtroom when Harry Steinmetz

3    testified about this, right?

4    A.  I was.

5    Q.  And you don't disagree that this is an accurate calculation

6    of the defendants' revenues based on both the audited financial

7    statements and the information in the stipulation by the

8    defendants, correct?

9    A.  Just to confirm this, since these are very precise numbers,

10   I would have to review the source information, which I have in

11   my report.  From 2012 to 2016, it doesn't look dissimilar to my

12   recollection of the numbers, but I can't affirmatively testify

13   that those are the correct numbers.  And 2008 to 2011, again,

14   I'd have to look at the source information to confirm these

15   numbers.

16   Q.  But you are not prepared to testify that this is

17   inaccurate, are you?

18   A.  I have no basis to testify affirmatively either way.

19   Q.  Your testimony is not that Mr. Steinmetz was incorrect on

20   this revenues figure, correct?

21   A.  Correct.  That was with respect to revenues.

22   Q.  On the revenues figure you are not here opining that

23   Mr. Steinmetz was wrong?

24   A.  I'm not.

25          MR. OPPENHEIM:  Let's turn to PD15, please.

1   Q.  This shows the salary and distributions paid to Mr. Smyres

2   between 2008 and 2016, right, including noncash distributions,

3   right, and it shows a sum of $47,314,606, right?

4   A.  That is correct.

5   Q.  And you are not testifying today that Mr. Steinmetz's

6   calculation of the salary and distributions paid to Mr. Smyres

7   here is incorrect, right?

8   A.  As I previously testified, to affirmatively confirm these I

9   would have to look at the source data, but I have no basis

10  right now for asserting that they are wrong.

11  Q.  You're a rebuttal witness, right?

12  A.  To my understanding.

13  Q.  You know what that is because you've seen courtrooms a lot,

14  right?

15  A.  Yes, sir, I have.  Over the last 38 years, yes.

16  Q.  As a rebuttal witness you look at the conclusions of the

17  expert that you are rebutting and you decide where you are

18  going to agree with him and where you are going to disagree,

19  correct?

20  A.  That is correct.

21  Q.  And nothing in any of your testimony or any of your reports

22  indicates that this number is incorrect, right?

23  A.  I have not indicated any such conclusion, that is correct.

24  Q.  So you are not here disagreeing with the $47 million

25  number?

2597

 1   A.  That is correct.

 2   Q.  Now, let's talk about how many times you've been in a

 3   courtroom.  You've actually been retained as an expert witness

 4   over 200 times, haven't you?

 5   A.  Approximately, that is correct.

 6   Q.  And you've actually testified in court over 100 times,

 7   right?

 8   A.  No, that's not correct.

 9   Q.  Well, in court, in mediations, right?

10   A.  Between courts, arbitrations, mediations, as well as

11   deposition testimony, since 1980, I have testified a little bit

12   less than 100 times.

13   Q.  Slightly less than a hundred times.  This is not new for

14   you, right?

15   A.  That is correct.

16   Q.  This is what you largely do, right?

17   A.  No, that's not correct.

18   Q.  You only spent three years of your career as an independent

19   auditor rendering opinions on financial statements, correct?

20   A.  With respect to audits of financial statements for

21   rendering opinions, that is correct.

22   Q.  And you have not participated in any independent audit

23   since 1978, correct?

24   A.  No.  I routinely do audit work, but not for purposes of

25   rendering an audit opinion.

1   Q.  Mr. Quintero, I know you can hear my question, but I'll ask

2   it again so you can answer my question, which is, you have not

3   participated in an independent audit since 1978, correct?

4   A.  That's incorrect.

5           MR. OPPENHEIM:  I'm going to move on while we pull up

6   the transcript.

7   Q.  Mr. Quintero, in reaching the conclusions that you

8   testified to about the profits of the defendants' companies,

9   you relied extensively on the audited financial statements that

10  you were provided, correct?

11  A.  That was one source of information, that is correct.

12  Q.  It was the main source of the information, correct?

13  A.  If main means in terms of magnitude of the amounts, that is

14  correct.

15  Q.  But you know that management doesn't always disclose

16  information that's relevant to the auditors for purposes of an

17  audited financial statement, right?

18  A.  If they failed to do so, then the auditors will ask for

19  additional information.

20  Q.  Auditors sometimes don't know to ask for additional

21  information because it's withheld by the audited company,

22  correct?

23  A.  It depends on the information about which you are

24  referring.

25  Q.  There are instances where companies withhold information

1   from their auditors and they get an audited financial statement

2   that's incorrect, isn't that right?

3   A.  That can happen.

4   Q.  Enron is an example, maybe?

5   A.  That is correct.

6   Q.  And WorldCom, right?

7   A.  That is correct.

8   Q.  Bernie Madoff?

9   A.  Yes, that is correct.

10  Q.  So audited financial statements may or may not be accurate,

11  correct?

12  A.  That is possible.

13  Q.  It's also possible that even if the audited company

14  provides all the information that the auditors make a mistake,

15  correct?

16  A.  Hypothetically, that is correct.

17  Q.  Well, not just hypothetically; you are actually aware of

18  auditors making mistakes, correct?

19  A.  It has occurred.

20  Q.  You are aware of it occurring, correct?

21  A.  Yes, sir.

22  Q.  And sometimes it's not just that the company withholds

23  information; sometimes the company misleads the auditors,

24  correct?

25  A.  That can happen.

L42MMIL3                    Quintero...              2600

1   Q.  And, in fact, management will sometimes direct an auditor

2   to a particular conclusion they want, correct?

3   A.  That can happen.

4   Q.  If information is withheld or misleading information is

5   provided, the auditor could unknowingly issue an opinion where

6   there is no basis for it, right?

7   A.  It is possible.

8   Q.  And your objective in this case was not to review what the

9   auditors were provided by the defendants, correct?

10  A.  That is correct.

11  Q.  In fact, you saw the audited financial statements and you

12  haven't looked at any of the work papers that were provided to

13  the auditors, correct?

14  A.  That is correct.

15  Q.  So you are not here opining that those audited financial

16  statements are accurate, right?

17  A.  I am not.

18  Q.  You are just saying, I'm assuming they are accurate, right?

19  A.  It would be more precise to say, I have no basis to believe

20  that they are not.

21  Q.  But you haven't conducted any investigation whatsoever to

22  know whether there is a basis in their accuracy, right?

23  A.  The information that I've seen does not cause me to have a

24  reason to suspect that they are not inaccurate.

25  Q.  You weren't asked to look to see if there was a reason to

1   believe that the statements were inaccurate, correct?

2   A.  That is correct.

3   Q.  So when you say you have no basis, that's just because you

4   haven't looked, right?

5   A.  No.  I could have a basis just from reviewing information

6   to believe that it is wrong.

7   Q.  But in this instance you haven't looked for information to

8   determine if it's wrong, correct?

9   A.  I looked at information the way I routinely do, with a

10  degree of professional skepticism, and with that view there is

11  nothing that would cause me to believe that anything was

12  incorrect.

13  Q.  Normally, though, if you were going to opine on the

14  accuracy of an audited financial statement, you would want the

15  underlying work papers, right?

16  A.  Yes, sir.

17  Q.  And, in fact, you are so experienced in this, my guess is,

18  you would never opine on the accuracy of audited financial

19  statements without having done that homework of looking at the

20  underlying work papers, correct?

21  A.  That is correct.

22  Q.  You're aware of all the documents that were produced in

23  this case by the defendants, they never produced the underlying

24  work papers, correct?

25          MR. MANDEL:  Objection.

```
 1            THE COURT:  Overruled.
 2   A.  I'm not aware of that having been produced.
 3   Q.  And so you are not in a position to reach an independent
 4   conclusion about whether the auditors, in fact, fully complied
 5   with GAAP, are you?
 6   A.  I am not.  Actually, to be more precise with GAAS, not
 7   GAAP.
 8   Q.  I am not going to put the jury to sleep and go through
 9   that.  I'll take your word for it.
10   A.  I previously testified on it.
11   Q.  In the hundreds of cases where you've served as an expert
12   witness, there are times where you haven't agreed with an
13   independent auditor's conclusion, right?
14   A.  I don't have a specific recollection.  It is possible.
15   Q.  In fact, it's not your practice to simply agree with an
16   audited financial statement, right?
17   A.  Again, it depends upon the case, what I'm called upon to do
18   on the case or project.
19   Q.  So in this case or project you were asked to just defer to
20   the auditors' financial statements?
21   A.  No, nobody had ever such request of me.
22   Q.  And it's not your practice to just defer to the audited
23   financial statement, is it?
24   A.  It depends on what is involved in the project.
25   Q.  But in this project you weren't asked to do that?
```

 1   A.  No.  There was no specific discussion or request to do so.

 2   Q.  Now, the audited financial statements, each of them is over

 3   20 pages in length, right?

 4   A.  I don't recall the page count, but that would be

 5   approximately correct.

 6   Q.  You want me to pull them up so we can look at them or you

 7   just want to go with, it's more than 20 pages?

 8   A.  If you want me to respond precisely, you have to show it to

 9   me.  I have no reason to dispute your assertion.

10   Q.  We will go with that then.

11          When the auditors certify a financial statement, they

12   are not certifying everything in that 20-plus-page document,

13   are they?

14   A.  Well, the certification is very specifically that the

15   financial statements, taken as a whole, comply with generally

16   accepted accounting principles.  However, to reach that

17   conclusion, they have to review the footnotes and, in fact,

18   they quite commonly, particularly with privately held

19   companies, even prepare those footnotes.

20   Q.  The auditors are opining on four specific areas of

21   information in the report, correct?

22   A.  That is the audit opinion.  That is correct.

23   Q.  But you relied on information beyond those four things that

24   the auditors are certifying, correct?

25   A.  The auditors certified with respect to the financial

1   statements taken as a whole and, as you previously asked me,

2   that was certainly a material portion of the information that

3   was reflected in my analysis.

4   Q.   There are four things within the report that the auditors

5   are certifying and then there is a lot of other stuff, correct?

6   A.   There is other information they reviewed to be able to

7   render their opinion.

8   Q.   But you are not disagreeing with what I asked you, are you?

9   A.   Again, let's me hear the statement or your question, make

10  sure I'm responding correctly.

11  Q.   Within an audited financial statement, there may be a lot

12  of information, but there are four specific things that the

13  auditors are certifying, correct?

14  A.   That is correct.

15  Q.   You are relying in your opinion on things beyond just those

16  four things that the auditors are certifying, correct?

17  A.   Yes, that is correct.

18  Q.   Including some of the footnotes or notes of the audited

19  financial statement, correct?

20  A.   Yes, that's correct.

21  Q.   And those notes are not certified by the auditors, correct?

22  A.   No.  It's not required.

23  Q.   Now, I believe you testified earlier that the defendants'

24  auditors amended a K-1 during the course of the litigation,

25  right?

1    A.  That is my recollection, yes, sir.

2    Q.  And that the original 2016 tax form showed a $25,000

3    distribution, correct?

4    A.  Yes, that's my recollection.

5    Q.  Can you describe for the jury what a K-1 is.

6    A.  A K-1 is a document that is provided both to the taxpayer

7    in a passthrough entity such as the defendant companies, as

8    well as to tax authorities, such as the Internal Revenue

9    Service and state and city taxing authorities, that indicates

10   the basis for determining what the taxpayer will be liable for

11   in terms of income taxes.  So in this case it was generated by

12   the company's independent auditors.

13   Q.  Mr. Quintero, the K-1 is essentially like a W-2, but it

14   shows profits, in laymen's terms?

15   A.  That's correct.

16   Q.  In November of 2017, the auditors whose opinions you relied

17   on amended Mr. Smyres' 2016 K-1, correct?

18   A.  That is my recollection.

19   Q.  And they amended it from 25,000 to over $7 million, right?

20   A.  With respect to distributions, that is correct.

21   Q.  Now, that's over 28,000 percent different, right?

22   A.  I haven't done the calculation.  It sounds like a

23   reasonable order of magnitude.

24   Q.  And your testimony is, it's of no consequence?

25   A.  That is correct.  Because that doesn't impact the taxes.

L42MMIL3          Quintero - cross          2606

1   Q.   And you realize that that amendment was done after the

2   plaintiffs identified an omission, correct?

3          MR. MANDEL:  Objection.

4          THE COURT:  Overruled.

5   A.   I have no personal knowledge as to what caused the

6   amendment.

7   Q.   Is it your testimony that the government doesn't care if

8   what's reported on a K-1 is wrong by 28,000 percent?

9   A.   Well, the government, in terms of the IRS has been my

10  client before, and my experience is they are concerned about

11  what creates the basis for a tax liability.  The amendment that

12  you just described has no impact upon tax liability.

13  Q.   Let me just be clear, Mr. Quintero.  You are not here

14  testifying on behalf of the IRS, are you?

15  A.   I am not.

16  Q.   And you are not authorized to speak on behalf of the IRS,

17  are you?

18  A.   Not for this matter, no, sir.

19  Q.   But it's your testimony, based on your opinion, that a

20  misreporting of something between 25,000 and $7 million is

21  inconsequential for purposes of the government?

22  A.   For these purposes, yes.  It would result in no incremental

23  taxes or penalties.

24  Q.   Why do we issue K-1s whatsoever then, Mr. Quintero?

25  A.   Well, just like on a personal income tax returns, there is

1   many lines worth of data, so that's just one of the lines of

2   data.

3   Q.  There is a reason that K-1s are issued, right?

4   A.  Yes, sir.

5   Q.  They are required to be issued, right?

6   A.  That is correct.

7   Q.  And the obligation to issue a K-1 is an obligation to issue

8   an accurate K-1, correct?

9   A.  Yes, sir.

10  Q.  You are not allowed to say, I am going to issue an K-1, but

11  I am going to be off by 28,000 percent, right?

12  A.  That is correct.

13  Q.  So the auditors made a fairly substantial or, using your

14  terms, material mistake in the K-1, correct?

15  A.  I would say no.

16  Q.  And you say no because it doesn't have a tax liability?

17  A.  That's correct.

18  Q.  But you are not saying that the auditors were right in

19  issuing a $25,000 K-1?

20  A.  No.  As evidenced by the fact that they amended it.

21  Q.  Good thing the plaintiffs caught it then, isn't it?

22          MR. MANDEL:  Objection.  Mischaracterizes the record.

23          THE COURT:  Sustained.

24  Q.  You testified about the defendants' corporate structure a

25  bit, didn't you?

1   A.  I did.

2          MR. OPPENHEIM:  Can we pull up PD16, please.

3   Q.  You've seen this demonstrative before, right?

4   A.  Yes, I have.

5   Q.  And you are not here testifying that this organizational

6   chart is inaccurate, correct?

7   A.  I have no basis to deliver such testimony.

8   Q.  You saw this chart in Mr. Steinmetz's report and you

9   offered a rebuttal expert testimony, but you are not testifying

10  that this is wrong, correct?

11  A.  That is correct.

12  Q.  Now, you issued two reports in this case, is that right?

13  A.  Yes, sir.

14  Q.  Your opinions changed between the first and second reports,

15  right?

16  A.  What do you mean by, my opinions changed?

17  Q.  In the first report you excluded certain companies that you

18  then later included in your second report, correct?

19  A.  Yes, sir.

20  Q.  And the entities that you excluded from your analysis are

21  required under GAAP, correct, to be included?

22  A.  That is correct.  That is variable interest entities, as I

23  previously described and testified.

24  Q.  And you testified that you had excluded those entities

25  because, in your opinion, those entities were not involved in

1   the sale of books, correct?

2   A.  For the most part, and specifically sale of books that I

3   understand to be relevant to this litigation.

4   Q.  How do you know what's relevant to this litigation,

5   Mr. Quintero?

6   A.  Well, for example, some of those entities don't sell books

7   at all.  K to 12 don't sell the types of textbooks that, as I

8   understand, are relevant to this litigation, so those were

9   criteria that I considered.

10  Q.  Mr. Quintero, you think they teach precalculus in high

11  school?

12  A.  Yes.

13  Q.  You think they teach biology in high school?

14  A.  Yes.

15  Q.  So you really have no basis to say that the books that are

16  sold through the K-12 division don't include some of the books

17  at issue in this case, do you?

18  A.  If they did, then K to 12 would have been a defendant.

19  They are not.  So I only surmised your client came to that

20  conclusion.

21  Q.  So your opinion is based on what I'm thinking?

22  A.  No.  Based on the litigation filed by your client.

23  Q.  Have you evaluated what decisions the plaintiffs made in

24  who to sue?

25  A.  I have not.

 1   Q.  Have you ever even spoken to me before as lead counsel?

 2   A.  No, sir.

 3   Q.  You really have no idea why I, on behalf of the publishers,

 4   or my clients on their own decided to sue whomever they sued,

 5   right?

 6   A.  I only know by seeing the caption in this case.

 7   Q.  Now, you also excluded GEKR Holdings, right?

 8   A.  Yes, sir.

 9   Q.  And you don't actually know one way or the other if GEKR

10   Holdings sells books, do you?

11   A.  At this point I believe they do not.

12   Q.  At this point you believe they do not?

13   A.  Yes.

14   Q.  What is the basis for that conclusion?

15   A.  From having looked at the financial statements, and my

16   recollection is there is no revenues or profits for GEKR in

17   2016.

18   Q.  Have you looked at the plaintiffs' notices to the

19   defendants of infringement in the last six months that show a

20   sale of a book by GEKR to MBS that was counterfeit?  Did you

21   look at that?

22              MR. MANDEL:  Objection.

23              THE COURT:  Overruled.

24   A.  No, sir, I have not seen that document.

25              (Continued on next page)

1   BY MR. OPPENHEIM:

2   Q.  If such a document existed, it would disprove your claim

3   that GEKR doesn't sell books; correct?

4   A.  Again, that's not a material assumption of my analysis;

5   I've concluded GEKR in my analysis.

6   Q.  But Mr. Quintero, you excluded GEKR initially because you

7   said they don't sell books, and you really have no basis for

8   saying that.  Right?

9   A.  From looking at the financial statements, the revenues from

10  sales and rentals over the relevant period were largely from

11  two entities; and they were both included in my analysis, and

12  they were both included in the consolidated financial

13  statements of the defendants.

14  Q.  In the finance and accounting world, the term "equity"

15  refers to an ownership interest; correct?

16  A.  Quite commonly, that is correct.

17  Q.  You would agree that the term "equity participation"

18  suggests payments that bear some relationship to payments that

19  are available to the owners; correct?

20  A.  It may.

21  Q.  So you testified that the payments to Mr. Glass that -- let

22  me strike that and back up.

23          You heard Mr. Steinmetz testify that certain payments

24  to John Glass should be viewed as profit distributions;

25  correct?

L42YMIL4                    Quintero - Cross                    2612

1   A.  I heard that testimony.

2   Q.  And you disagree with that testimony; correct?

3   A.  Yes, sir.

4   Q.  You disagree with that testimony because you've reviewed

5   the documents; correct?

6   A.  And also based on my experience, routinely such

7   arrangements are made that are payments that may be based on

8   equity holder payments, but are in the form of incentive

9   compensation or incremental payment to other third parties that

10  are not equity holders.  So it's both consistent with my

11  experience and all the information that I see, it has been

12  subjected to third-party scrutiny in this matter, specifically

13  the auditors.

14  Q.  So Mr. Quintero, let me break that down.

15          You've got your background and experience, and then

16  the things you looked at in this case, right?

17  A.  Yes, sir.

18  Q.  So if we take out the things that you looked at in this

19  case and all you were opining on in your background and

20  experience, you'd have no basis to opine on this issue in this

21  case, right?  You have to actually look at the underlying

22  documents in this case in order to be able to opine on the

23  issue; correct?

24  A.  That's not correct.

25  Q.  So you could not look at the agreements whatsoever and you

2613

1    could take the stand and testify under oath that payments made

2    to a certain individual were profits or not profits?

3    A.  I can.

4    Q.  You could.

5           Now, you would agree that Mr. Smyres could enter into

6    an agreement with Mr. Glass where he would agree to give him 20

7    percent of the profits, right?

8    A.  Yes, sir.

9    Q.  And in fact, companies do that all the time, right?

10   A.  Many companies do so, yes, sir, that's correct.

11   Q.  So your background and experience says that sometimes

12   companies have compensation structure where it's salary and

13   bonus, but sometimes it's salary, bonus, and profits, right?

14   A.  Well, to be more precise, the bonus or incentive

15   compensation can be based on profits, and that's routine.

16   Q.  But it's also routine that you actually distribute profits

17   to somebody; correct?

18   A.  It can be for a variety of reasons, yes, that's correct.

19   Q.  So your experience shows that it could be any which way;

20   that Mr. Smyres could have entered into an agreement with

21   Mr. Glass that either would have paid him a profit distribution

22   or not paid him a profit distribution, right?

23   A.  Subject to what the agreement is, that is correct.

24   Q.  Okay.  So let's look at that agreement.

25           MR. OPPENHEIM:  Can we pull up PX-1394 please.  It's

2614

```
 1   in evidence, so can we publish please.

 2             THE COURT:  You can.

 3   Q.  So Mr. Quintero, this is a September 27th, 2012, employment

 4   and equity participation agreement; correct?

 5   A.  Yes, sir.

 6   Q.  Now, it says "draft" at the top, right?

 7   A.  That is correct.

 8   Q.  But if we go to the last page, it's signed by all the

 9   parties; correct?

10   A.  Could you show me the last page just to confirm that?

11   Q.  It's initialed on the bottom of the first page, right?

12   A.  I do see that.

13   Q.  Maybe second.  There we go.

14             Those are signatures, right?

15   A.  Yes, sir.

16   Q.  So based on your review of this right now, this is a final

17   executed agreement; correct?

18   A.  It is a signed draft agreement.

19   Q.  It's a signed agreement; correct?

20   A.  Yes, a signed draft agreement, to be more precise.

21   Q.  Okay, Mr. Quintero.

22             So let's take a look at the bottom of page -- excuse

23   me.

24             So earlier you did testify that you understood that

25   "equity" generally refers to an ownership interest, right, and
```

1    this is called an equity -- an employment equity participation

2    agreement; correct?

3    A.  You'd have to read back my testimony.

4         As I understand the question or as I recall it, you

5    were asking me about equity frequently being associated with

6    ownership.  And so to be very precise, it can be and it cannot

7    be.  And sometimes agreements are not precisely worded.

8    Q.  But earlier I asked you the question.  I said, in finance

9    and accounting, is "equity" frequently -- generally used as a

10   term that refers to an ownership interest, and you said yes.

11   A.  Yes.  So in accounting, that is correct.  Frequently or

12   generally is true.  Generally doesn't mean always; it just

13   means frequently and generally, as you asked the question.

14   Q.  And this agreement says "equity" in the title; correct?

15   A.  That is correct.

16        MR. OPPENHEIM:  So let's turn to page 4 please.

17        Actually, you know what?  I apologize.  Let's do page

18   2 first.  The jury should see more of this agreement just

19   quickly.

20   Q.  So on page 2 there's a section B at the bottom that shows

21   what his annual salary would be, right?

22   A.  Yes, sir.

23   Q.  Okay.  And that's in B1, I believe; is that right?

24   A.  That is correct.

25   Q.  And then in B2 and 3 it shows some bonus incentive-type

L42VMIL4                    Quintero - Cross
2616

1  compensation that you were discussing earlier; correct?  And

2  actually 4 as well, right?  It says:  He may receive -- in 2 it

3  says:  Glass may receive a bonus to be paid in installments

4  based on the following.  Right?

5  A.  That is correct.

6  Q.  That's incentive compensation that you were describing

7  earlier?

8  A.  That is bonus compensation; correct.

9  Q.  And then in 3 it talks about additional bonuses; correct?

10 A.  Yes, that is correct.

11 Q.  And then in 4 it talks about more bonuses; correct?

12 A.  That is correct.

13       MR. OPPENHEIM:  Can you scroll down a little further,

14 Mr. Cole, please.

15 Q.  And then in 6 it talks about more bonuses; correct?

16 A.  Yes, sir.

17 Q.  Okay.  Then we get to section C.  Do you see that it says

18 "equity participation"?  Do you see that it says "equity

19 participation"?

20 A.  I do.

21 Q.  That's separate from the incentive compensation and the

22 salary that we saw before; correct?  It's a different section?

23 A.  That is correct.

24 Q.  And if we look -- it says in that section:  Glass shall

25 have an equity participation and equity interest in members of

2617

1   the Smyres groups as follows.  Isn't that what it says?

2   A.  Yes, sir.

3   Q.  And then it says:  Glass shall be issued a nonvoting member

4   interest in the nature of a profits interest in GEKR.  Right?

5   A.  Yes.

6   Q.  And then it refers to 20 percent; correct?

7   A.  Yes.

8   Q.  And you agree that this means that the defendants intended

9   to give Mr. Glass an equity interest; correct?

10  A.  I do not agree with that assertion.

11  Q.  You agree that the intent here was that Mr. Glass would

12  have some form of equity participation and equity interest in

13  the members of the Smyres group in the way described on this

14  page; correct?

15  A.  From reviewing similar agreements, this looks like

16  Mr. Glass was to receive --

17  Q.  Mr. Quintero, could you answer my question please?

18  A.  Okay.  It's not a yes-or-no question.

19  Q.  It is, actually, because it's exactly your testimony

20  several weeks ago.  Would you like me to read it back to you?

21  A.  Then please repeat the question.

22  Q.  Isn't this, in fact -- wasn't it, in fact, the intent of

23  the parties here that Mr. Glass would have some form of equity

24  participation and equity interest in the members of the Smyres

25  group in the way that is described in the pages of this

142YMIL4                Quintero - Cross                2618

1    document?

2    A.  As I understand the question right now, my response is that

3    it says that he should be receiving payments that are

4    structured in this fashion.

5    Q.  That's not what you said at your deposition less than a

6    month ago, is it, Mr. Quintero?

7    A.  I don't recall, but I may not have understood the question

8    properly.

9    Q.  Well, you seem like a smart guy, Mr. Quintero.  Let's try

10   it.

11             So on page 186, lines 12 through 19, you were asked:

12             "What do the written words mean to you?"

13             Your answer:  "Well, this would say that the intent at

14   the time was that Mr. Glass would have some form of equity

15   participation and equity interest in the members of the Smyres

16   group in the way that is described in the subsequent page or

17   pages."

18             That was your testimony then, right?

19   A.  Well, I can't confirm without seeing it, but I have no

20   reason to dispute that that was what I testified.

21   Q.  Are you changing your testimony today?

22   A.  Well, I'm testifying, as I just said, that --

23   Q.  Are you changing your testimony?  Are you disagreeing with

24   what you said before, Mr. Quintero?

25   A.  I am seeking to be as precise as I can.  And so to be very

1   precise, I see payments that are structured in this fashion;

2   but neither then nor now have I seen units being awarded to

3   Mr. Glass.  And so to be more precise, I don't see that the

4   intent was to issue equity in the entities, but rather to make

5   payments that are similar to what he would have had he been an

6   equity holder.

7   Q.  So your testimony now is that the intent -- your testimony

8   now is different than what you testified a month ago?

9   A.  It is.  It's more precise.

10  Q.  So you were not precise in your deposition, is that your

11  testimony?

12  A.  I was as precise as I could, given that it was a nine-hour

13  deposition.

14  Q.  Mr. Quintero, if there's anybody in this courtroom who's

15  probably handled a nine-hour deposition before, it's you, isn't

16  it?

17  A.  I have.

18         MR. OPPENHEIM:  Let's turn to page 5 here.

19  Q.  Now, you agree that -- so when you did your analysis, you

20  were not aware one way or the other whether Mr. Glass actually

21  received the payments equal to 20 percent of the profit

22  distributions; correct?

23  A.  I never confirmed the calculations.  I'm aware that he

24  received payments.

25  Q.  You know who Sheryl Cox is; correct?

 1   A.  I do.

 2   Q.  She's the chief financial officer for the defendants'

 3   entities; correct?

 4   A.  Yes, that is correct.

 5   Q.  And you read numerous depositions of her testifying in this

 6   case; correct?

 7   A.  Yes.

 8   Q.  And you're aware that she testified that these were

 9   distributions from the profits; correct?

10   A.  I don't recall the exact words that she used.

11   Q.  Okay.  Well, let's --

12          MR. OPPENHEIM:  Mr. Cole, can we play this portion of

13   Ms. Cox's testimony please, page 637.

14          MR. MANDEL:  Can I see this please.

15          MR. OPPENHEIM:  Page 637.

16          MR. MANDEL:  I don't have Ms. Cox's transcript.

17          MR. OPPENHEIM:  I don't have it here.

18          MR. MANDEL:  We'll dig it up.  Give us a minute.

19          Which transcript?

20          MR. OPPENHEIM:  It's page 637.

21          THE COURT:  All right.  So page 637.

22          MR. OPPENHEIM:  Starting at line 24, going through

23   638, line 10 please.

24          THE COURT:  Let's go.

25          MR. OPPENHEIM:  Why don't I just read it.  That will

1   be easier.  Technology.

2   Q.  Ms. Cox was asked:  "And was he paid 20 percent of

3   distributions?

4   "A.  From RWM.

5   "Q.  And was he paid and were those distributions from the

6   profits of RWM's rental business?"

7               MR. MANDEL:  We have an objection to this, your Honor.

8               THE COURT:  Let's go.  Keep reading.

9               Overruled.  All right?

10  "A.  There were distributions.  John Glass received 20 percent

11  of any distributions relative to RWM."

12              And then continuing on on page 674, lines 7 through

13  11, Ms. Cox was asked the following question and gave the

14  following answer:

15              "And this concludes that under the RWM distribution

16  provisions of Mr. Glass's various agreements, he was paid

17  $3,209,296.52; is that correct?

18  "A.  That is correct."

19              Did you review that testimony in coming to the

20  conclusion that Mr. Glass's payments shouldn't be

21  distributions?

22  A.  Yes.

23  Q.  Now, in your testimony, direct testimony, you indicated

24  that subsequent conduct is important in deciding whether or not

25  there really was a profit distribution; correct?

2622

1    A.  I would agree with that statement.  And if I made it, I

2    would agree with the statement that I made.

3    Q.  I don't think you put it in those exact words.  I'm

4    probably not as well-spoken as you are.

5              MR. OPPENHEIM:  So let's go to PX-1401 please.

6              MR. MANDEL:  Objection.  There's no foundation.

7              MR. OPPENHEIM:  Party admission, your Honor.

8              THE COURT:  Overruled.

9              MR. OPPENHEIM:  May we publish please?

10             THE COURT:  You may.  It's received.

11             (Plaintiffs' Exhibit 1401 received in evidence)

12   BY MR. OPPENHEIM:

13   Q.  Now, Mr. Quintero, I'd like to focus on the bottom half of

14   this email in 1401.  It's from John Griffo.  Do you see that?

15   A.  I do.

16   Q.  Do you understand who John Griffo was?

17   A.  I'm not positive.  Is he the controller of the entity?

18   Q.  He was the former chief financial officer before Ms. Cox.

19   A.  All right.

20   Q.  Does that refresh your recollection?

21   A.  Vaguely.

22   Q.  Okay.  And you see that he sent this email on April 21st,

23   2015; correct?

24   A.  Yes.

25   Q.  And he sent it to John Glass, who we've been talking about,

2623

```
 1   right?

 2   A.   Yes.

 3   Q.   And he copied Mr. Smyres, right?

 4   A.   Yes.

 5   Q.   And he copied Christ Gaetanos, do you see that?

 6   A.   Yes, he's a controller.

 7   Q.   No, Christ Gaetanos, I believe is general counsel; isn't

 8   that right?

 9   A.   Oh, I thought -- yeah, I saw something that said he was

10   controller.  So he's general counsel.  Okay.  I accept that.

11          MR. OPPENHEIM:  I'm sorry, can I see the whole

12   document for a minute, please, Mr. Cole?  Sorry.

13   Q.   At the beginning of this email he says -- Mr. Griffo says:

14   This is a letter amendment to the September 12th, 2012

15   employment agreement.  Right?  That's the beginning of the

16   email?

17   A.   Yes.

18   Q.   And that 2012 employment agreement is the one we were just

19   looking at a moment ago, right?

20   A.   I believe so.

21   Q.   It says:  That primarily removes the word "allocation" to

22   make it clear that you are only taxable when you actually

23   receive a distribution, right?

24   A.   Yes.

25   Q.   And then he says:  We are working on replacing the 2012
```

1    agreement with a new agreement effective January 21, '15 to

2    eliminate the word "allocation," replace "equity interest" with

3    "profits interest," and to make other changes concerning how

4    you will be paid going forward, right?

5    A.   Yes.

6    Q.   And then he says:  For now, please let me know if you have

7    any questions on the letter.  If you are okay, I will have Phil

8    sign it and get it over to you for signature.  It is important

9    to get it to the auditors right away in order to complete the

10   audit, as it was our goal to get a deduction for income taxes

11   and to not have it treated as an expense for the audited

12   statements, so the income statement is more appealing to

13   lenders.

14            Do you see that?

15   A.   Yes.

16   Q.   Now, your testimony is that it was appropriate for the

17   defendants to treat Mr. Glass's profits distribution or 20

18   percent payment, whatever you want to call it, as an expense,

19   right?

20   A.   That's how it's reflected in the audited financial

21   statements and the tax returns.

22   Q.   And in your analysis, that's what you did, right?  You

23   excluded the 20 percent paid to John Glass that Harry Steinmetz

24   included, right?

25   A.   I'm sorry, what do you mean I excluded?

1    Q.  Well, you saw that Mr. Steinmetz added the 20 percent

2    profit distribution back into the profits of the company in his

3    analysis; correct?

4            MR. MANDEL:  Objection.

5            THE COURT:  Overruled.

6    A.  Yes, I saw that.

7    Q.  Okay.  But you disagree with Mr. Steinmetz on that because

8    you believe that that 20 percent payment should be treated as

9    an expense, right?

10   A.  I defer to the audited financial statements.  And so if the

11   audited financial statements didn't treat it as an expense,

12   then it would not need to be treated as an add-back to increase

13   net income.

14   Q.  Let's just put the audited financials out of this

15   discussion for a moment.

16           Your opinion is that it should -- that is, that it

17   should be treated as an expense; correct?

18   A.  Based on my understanding of the audited financial

19   statements, yes.

20   Q.  And this email says they didn't want it treated as an

21   expense; correct?

22   A.  Yes.  And I don't know if this email wound up affecting any

23   modification of the treatment on the audited financial

24   statements.  Auditors frequently make adjustments to companies'

25   financial statements before reaching a conclusion with respect

1   to the audit.

2   Q.  Had you read this email before today, Mr. Quintero?

3   A.  I may have.  I don't recall.

4   Q.  You certainly didn't mention it in your report, expert

5   report, did you?

6   A.  I did not.  I may have listed it as a source, I don't

7   recall.

8   Q.  But you would agree that if we just look at this email,

9   that we would not treat those payments as an expense; correct?

10  A.  No, just -- well, looking at this, this says, number one,

11  these payments are unequivocally compensation; and number two,

12  given that I've reviewed the companies' financial statements

13  and I don't see any payments of the order of magnitude that

14  were made to Mr. Glass as being other than expenses of the

15  company, I have no reason to believe that they are not included

16  in the expenses of the company.

17  Q.  You say that this email says that they are unequivocally

18  compensation.  Show me where it says "unequivocally

19  compensation," Mr. Quintero.

20  A.  Certainly.  In the last paragraph it says:  It is my

21  understanding the last payroll amount should have been made

22  payable to an entity that you control.

23        So if he's receiving payments as part of payroll, that

24  says that these are not distributions to equity holders of the

25  company, this is compensation that goes through payroll.

1    Payroll payments are given to individuals who are employees or,

2    in this case, in some cases, independent contractors.

3    Q.  Mr. Quintero, you don't know that that reference to the

4    payroll is a reference to the 20 percent payments; that could

5    have just been a reference to the salary and bonus

6    distributions that are also in the agreement.  It doesn't say

7    one way or the other, right?

8    A.  All of these are consistent with that category.

9         Again, I have looked at a lot of documents that have a

10   bearing on this.  And there's nothing suggests, notwithstanding

11   this letter, that these payments were anything other than

12   expenses of the relevant companies.

13   Q.  You think that this email does not show an intent to the

14   parties to make sure that those payments were not treated as an

15   expense, that's your -- that is your testimony today?

16   A.  That may be an intent; but again, just because people have

17   intents doesn't mean that auditors agree with those intents.

18        Ultimately, it's the audited financial statements and

19   the tax returns that indicate the ultimate resolution.  And the

20   tax returns all reflect these payments as taxable income to

21   Mr. Glass or entities that he controlled.  And the financial

22   statements do not reflect payments of the order of magnitude

23   that were made to Mr. Glass as being anything other than

24   expenses.

25   Q.  Let me see if I can say that in less words.

1          You just think the audited financial statements must

2     be right, but you haven't looked at the underlying documents to

3     them?

4     A.  I have looked at underlying documents.  There's nothing

5     that says to me that they indicate the audited financial

6     statements are not correct.

7     Q.  Doesn't this indicate that the audited financial statements

8     might be incorrect?

9     A.  No, sir, because this is just an email from Mr. Griffo to

10    Mr. Glass.

11    Q.  Mr. Quintero, if all you had was an agreement called

12    "Employment and Equity Participation Agreement" and this email,

13    you would say it's a 20 percent profit distribution; correct?

14    If that's all you had, that's what you would assume; correct?

15    A.  I would not.

16    Q.  You never looked at the underlying work papers of the

17    auditors and you'd never spoken to the auditors about their

18    financial statements, have you?

19    A.  That is correct.

20          MR. OPPENHEIM:  Let's go to 1402 please.

21          We'd move.

22          MR. MANDEL:  No objection.

23          THE COURT:  1402 is received in evidence and you may

24    publish it.

25          (Plaintiffs' Exhibit 1402 received in evidence)

```
 1   Q.  Mr. Quintero, have you ever seen this email exchange

 2   before?

 3   A.  I may have; I don't have a specific recollection.

 4   Q.  Okay.  Well, let's look at the bottom email here.  It's on

 5   Monday, September -- there we go.  September 12th, 2016.

 6           Do you see that?

 7   A.  Yes.

 8   Q.  Now, that's sent by John Glass, right?

 9   A.  Yes.

10   Q.  And it's addressed to Phil, right?

11   A.  That is correct.

12   Q.  And Phil you would understand to be Mr. Smyres; correct?

13   A.  Yes, sir.

14   Q.  And this email is subsequent to the 2012 agreement;

15   correct?

16   A.  Yes, sir.

17   Q.  Let's read the first couple of sentences here,

18   Mr. Quintero.  It says -- this is Mr. Glass speaking.  He says:

19   I can only do what I am comfortable with, not what Jamie thinks

20   may or may not be standard.

21           Let me pause there for a moment.

22           Do you know who Jamie is?

23   A.  I'm not certain.

24   Q.  You don't have an understanding that that's Mr. Smyres'

25   counsel in Columbus, Ohio?
```

```
 1   A.  No, sir.
 2   Q.  Okay.  Then he goes on.  He says:  If RWH -- and you
 3   understand that to be Robert William Holdings; correct?
 4   A.  Yes.
 5   Q.  And that's the parent entity to Robert William Management?
 6   A.  Yes.
 7   Q.  So if RWH is enriched unfairly, that has nothing to do with
 8   my distributions from RWM; correct?
 9   A.  That's what it says.
10   Q.  In fact, it would be enriched at -- excuse me.  In fact, it
11   would enrich you at my expense, since I participate in the
12   profits of RWM, but not RWH; correct?
13   A.  That's what it says.
14   Q.  So when Mr. Glass wrote this, he clearly believed, if
15   you're trying to look at the subsequent intent of the parties,
16   that he was participating in the profits of RWM; correct?
17   A.  That is correct.
18   Q.  Let's move on to the issue of Garrison, Mr. Quintero.
19           You concluded that the distributions or the payments
20   made to Garrison and Stonehenge should not be added into the
21   defendants' profits; correct?
22   A.  Yes, sir.
23   Q.  And you're aware that Mr. Steinmetz believes to the
24   contrary, right?
25   A.  Yes, sir.
```

1   Q.   So the two of you are of differing opinions on this issue,

2   right?

3   A.   That is correct.

4   Q.   And you recall Mr. Steinmetz being showed the Garrison

5   agreement; correct?  One of the Garrison agreements; correct?

6   You were in the courtroom when that happened?

7   A.   I recall.  I don't recall that specific thing, but he may

8   have been shown the agreement.

9   Q.   In fact, Mr. Mandel, right, your client here, showed it to

10  Mr. Steinmetz; correct?

11  A.   Again, I don't recall that, but I have no reason to dispute

12  it.

13  Q.   Now, in reaching your opinion in this case, you didn't even

14  read the Garrison agreement; isn't that right?

15  A.   I read parts of it.

16  Q.   You read parts of it after you reached your opinion;

17  correct?

18  A.   I don't recall the chronology.

19  Q.   You, in fact, don't think that the contractual agreement

20  between the parties is relevant to determining the

21  relationship, do you?

22  A.   Yes, sir.

23  Q.   You do think that the contracts are relevant?

24  A.   Well, "relevant" means it is a consideration in

25  understanding the nature of the arrangement.

```
 1                MR. OPPENHEIM:  Let's pull up 1385, please.  I believe
 2   this is already in evidence.
 3   Q.  This is the document that you saw for the first time at
 4   your deposition; correct?
 5   A.  Again, I don't recall, but it may be the first time I saw
 6   it.
 7   Q.  In fact, Mr. Quintero, if I were to show you your expert
 8   report, Exhibit 1, and the documents you relied upon, nowhere
 9   in that list of documents would we see any of the Garrison
10   agreements, would we?
11   A.  Again, I don't recall, because in my rebuttal report I make
12   reference to some by Bates numbers, so I don't have specific
13   recollection.
14                MR. OPPENHEIM:  Use this as a demonstrative, your
15   Honor.  It's from Mr. Quintero's report.
16   Q.  This is an exhibit to your expert report, is it not,
17   Mr. Quintero?
18   A.  It is.
19                MR. OPPENHEIM:  May we publish, your Honor?  Just as a
20   demonstrative.
21                THE COURT:  You may publish the demonstrative.
22   Q.  So that's what's in -- you relied upon -- do you know
23   whether any of the documents in there include the Garrison and
24   Stonehenge agreements?
25   A.  Well, again, this is what I relied on in connection with my
```

1   second report.  I'd have to see the Bates number of what you

2   just produced just to confirm -- to respond to your question

3   correctly.

4   Q.  So you want -- okay.

5           MR. OPPENHEIM:  Can we toggle back to the agreement.

6   Q.  I think the Bates number is BDBCEN5316, all right?

7   A.  Yes, sir.

8   Q.  Let's go back now.

9           Do you see that document here, Mr. Quintero?

10          In fact, even by category you don't list Garrison as a

11   category here, right?  You list BDB financial statements, you

12   list Glass, you list Matasa, you list Smyres income tax returns

13   and distributions, and then other documents, but you never list

14   anything related to Garrison or Stonehenge, do you?

15   A.  I do not.

16   Q.  You didn't rely or look at the Garrison or Stonehenge

17   agreements when you entered your opinion; correct?

18   A.  I would believe not.

19   Q.  "I would believe not" as in I'm correct?

20   A.  Yes, sir.

21   Q.  Just make sure that we've got our negatives right.

22          And you heard Mr. Steinmetz testify that he included

23   the Garrison and Stonehenge payments in his analysis because he

24   had reviewed the agreements; correct?

25   A.  Yes.

L42YMIL4                      Quintero - Cross        2634

1    Q.  Let's turn to the issue of Diana Smyres.

2            You're aware that Diana Smyres, Mr. Smyres' former

3    wife, once loaned him money so that he could start his book

4    enterprise?

5    A.  I am.

6    Q.  And you're aware that after that loan had been paid back,

7    Mr. Smyres continued to make payments to her; correct?

8    Annually?

9    A.  Yes, sir, for some period of time.

10   Q.  And you're aware that Mr. Smyres testified in his

11   deposition that these payments were distributions; correct?

12   A.  I understand that he may have said that.

13   Q.  And you were in the courtroom when Mr. Steinmetz testified

14   on this issue; correct?

15   A.  Yes.

16   Q.  You also understand that Ms. Smyres had an option to buy

17   ten percent of the defendant Book Dog Books?

18   A.  Yes, sir.

19   Q.  And then in 2016, the company paid her two and-a-half

20   million dollars to buy back that ten percent option; correct?

21   A.  Yes.

22   Q.  And they cancelled that option; correct?

23   A.  They did.

24   Q.  And by eliminating that option, it removed the possibility

25   that Mr. Smyres would lose ten percent interest in his company;

1   correct?

2   A.   It removed the possibility that ten percent would be

3   provided to Ms. Smyres based on the option agreement.  The ten

4   percent could eventually be applied to somebody else such as

5   amazon.com in connection with the warrant.  So all it did was

6   it cancelled that option agreement.

7   Q.   Let's put aside the warrants, let's put aside Glass.

8        If Mr. Smyres hypothetically owns 100 percent of an

9   entity, and somebody has an option and exercises that option

10  for ten percent, Mr. Smyres loses ten percent of the company

11  that he owns; correct?

12  A.   That is correct.

13  Q.   So by getting rid of that option, it eliminated the

14  possibility that Mr. Smyres would be diluted; correct?

15  A.   No, it only eliminated the possibility that it would be

16  diluted to Ms. Smyres in connection with the transaction.

17  Q.   But we're not looking at any other possible dilutions;

18  we're just saying that by buying back that option, Mr. Smyres

19  didn't have to worry about losing ten percent of the company to

20  his ex-wife.  Correct?

21  A.   That is correct.

22  Q.   And that benefited Mr. Smyres; correct?

23  A.   It may have.

24  Q.   It's not "it may have," it did, didn't it?

25  A.   Well, it benefited the company; that's why the company paid

2636

1    the proceeds.

2    Q.   The company doesn't actually care who owns it, does it?  I

3    mean the company is just a company; it could be owned by Mickey

4    Mouse, it wouldn't care, right?

5    A.   Are we talking about Mickey Mouse now or are we talking

6    about the company?

7    Q.   You understand the point I'm making, don't you?

8    A.   Well, again, the company is an entity.  The entity now is

9    not in position to have to honor an obligation to Ms. Smyres.

10   But the company can reissue that equity or the options to some

11   other party.  So the meaty effect of the transaction is that

12   the option was cancelled, as well as the ongoing payments to

13   Ms. Smyres for other purposes.

14   Q.   The company doesn't care as an entity who owns it, right?

15   It cares about whether it's capitalized, those kinds of things.

16   But whether it's owned by Mr. Smyres, Mr. Dimm, or Mickey Mouse

17   doesn't matter, or Ms. Smyres.  It just doesn't matter to the

18   company.  It's owned by somebody, right?

19   A.   That is correct, there is an owner to the company.

20   Q.   For the record, I did call Mickey Mouse somebody, not just

21   a character.

22          So Mr. Smyres benefits because he no longer is going

23   to be diluted.  Now, I'm not asking you about what else might

24   happen.  At that moment that they paid Ms. Smyres, Diana

25   Smyres, for that option, that was a benefit at that moment to

1   Mr. Smyres; correct?

2   A.  Well, it's a two-edged sword.  He was harmed in the sense

3   that two and-a-half million dollars went out of the company,

4   and potentially benefited by virtue of the fact that that

5   dilution that you're referring to was not going to occur as a

6   result of that option.

7   Q.  But he benefited because he didn't have to worry about

8   being diluted, and so for that reason it is a benefit to

9   Mr. Smyres; correct?

10  A.  That is one of the aspects of that transaction, but not the

11  only one, as I just testified.

12  Q.  Now, you reviewed the financial statements really

13  carefully, right?

14  A.  Well, I reviewed them.  I don't know what you mean by

15  "carefully."  I went through the financial statements during

16  the periods that I just described.

17  Q.  Well, your opinions are based almost entirely on the

18  financial statements, right?  I mean you've said that that was

19  the starting point, right?  So I presume that you reviewed them

20  carefully, right?

21  A.  That was the starting point.

22  Q.  Now, the payment to Diana Smyres was in which audited

23  financial statement, do you recall?

24  A.  Yes.

25  Q.  Which one was it?

2638

A.  The audited financial statements for the year ended

December 31st, 2016.

Q.  Was there any reference in the audited financial statements

for 2012, 2013, 2014, or 2015 to the option that Diana Smyres

had?

A.  I don't recall having seen it.

        MR. OPPENHEIM:  Can we pull up the defendants'

demonstrative please.  I think it was DX-1414.

        MR. MANDEL:  414.

        MR. OPPENHEIM:  Okay.  Can we turn to the next page

please.  Can we go to the second page please.  Oh, yes, then

the third page.  Apologies.

Q.  Okay.  So you prepared this, Mr. Quintero?

A.  I did.

Q.  Okay.  Now, you've got here in the first column audited

financials pre-tax income, right?

A.  Yes.

Q.  Now, all of the corporate entities that you reviewed here

are pass-through entities, right?

A.  Almost all of them, that is correct.

Q.  So you say pre-tax.  You could do post-tax for these

companies and it would be the same numbers, right, because the

companies don't pay taxes, right?

A.  From the standpoint of the entities, with the exception of

a couple, that is correct.

1    Q.  Okay.  So you put in pre-tax income here; it really is just

2    income, right?

3    A.  Well, it is precisely pre-tax income.  But for a

4    nontax-paying entity, what's commonly referred to as net income

5    is a pre-tax net income.  So I'm trying to clarify what it

6    really is.

7    Q.  If you had put in post-tax income for these entities, the

8    numbers would be the same; correct?

9    A.  That is correct, with respect to these entities.

10   Q.  Right.

11          Nowhere in the audited financial statements is there a

12   reference to taxes paid by the entities in those statements;

13   correct?

14   A.  I don't recall having seen anything.

15   Q.  So you then -- you come to the conclusion that all of the

16   entities, the income was 31 million; correct, 31-317?

17   A.  Yes, on a pre-tax basis, that is correct.

18   Q.  But again, it could be post-tax; it doesn't make a

19   difference, right?

20   A.  With respect to these entities, this reflects what they

21   earn without any tax deductions being applied to them.

22   Q.  They didn't pay taxes, right?

23   A.  That is correct.

24   Q.  Okay.  So it could be pre-tax, it could be post-tax,

25   $31,317,573 are the profits of the defendants' entities and the

1   related entities; correct?

2   A.   Before providing for income taxes, that is correct.

3   Q.   But they don't pay income tax; correct?

4   A.   No, the owners pay the tax.

5   Q.   They don't pay the income tax.  The profits of those

6   entities is 31 million; correct?

7   A.   Yes.

8   Q.   Okay.  Now, you didn't actually review all of Mr. Smyres'

9   income taxes, right?

10  A.   That is correct.

11  Q.   So you applied a percentage just based on your review of

12  the front cover and knowing what the top rate is for somebody

13  who's earning a boatload of money, right?

14  A.   Well, also I looked at his salary.  Based on his salary,

15  based on knowing he has other sources of income, I have no

16  reason to believe that -- without regard to any other tax

17  benefits he may have independent of these entities, I have no

18  reason to believe he is not at the maximum tax bracket.

19  Q.   You have no basis to opine that Mr. Smyres paid $13.1

20  million in taxes, do you?

21  A.   That is correct.  I have not seen what he personally paid.

22  Q.   For all you know, he hasn't paid a dime, right?

23  A.   But that would be for reasons having nothing to do with the

24  earnings of these entities.

25  Q.   But you don't know whether he paid taxes.  And if he paid

1    taxes, you have no idea how much, right?

2    A.  That is correct.

3    Q.  So you're just saying, yeah, he made 31 -- the companies

4    made $31 million, and, well, boy, after taxes, that could be a

5    lot less, right?

6    A.  Well, that is what is customarily done in my profession

7    when we are dealing with analyzing the financial results of

8    pass-through entities.

9    Q.  Do you pay taxes?

10   A.  I do.

11   Q.  Do you think I pay taxes?

12   A.  I don't know.

13   Q.  The judge?  The jury?  Everybody pays taxes, right?  Or

14   should, right?

15   A.  Well, income taxes, I believe 46 percent of the population

16   pays income taxes.

17   Q.  Okay.  Everybody is supposed to pay their income taxes,

18   right?

19   A.  That is correct.

20   Q.  Okay.  So Mr. Smyres, you're just saying he should have

21   paid some taxes on all the money he was making, right?

22   A.  Yes, unless he has an offsetting benefits that would cause

23   him to not pay taxes.

24   Q.  I want to wrap this up, Mr. Quintero.

25           You indicated that you're getting paid hourly for your

1  testimony here today; is that correct?

2  A.  Yes, sir.

3  Q.  And what is your hourly rate?

4  A.  Well, I testified that I was charging based on my 2017

5  hourly rate, which was $525 an hour.

6  Q.  Now, you're not saying that you're charging $300 an hour

7  post-tax, right?

8  A.  No, sir.

9         MR. OPPENHEIM:  No further questions.

10         THE COURT:  Redirect?

11         MR. MANDEL:  Thank you, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. MANDEL:

14  Q.  Do you recall Mr. Oppenheim asking you about two tiny

15  snippets from Sheryl Cox's deposition transcript?

16  A.  Yes.

17  Q.  Do you recall that Mr. Oppenheim's questions and the two

18  tiny snippets suggested that Ms. Cox testified that payments to

19  John Glass were profit distributions?

20  A.  Yes.

21  Q.  Okay.  I'd now like to read pages 636, 14 through 639, 14

22  of Ms. Cox's transcript.  Excuse me, it begins at line 13.

23         MR. OPPENHEIM:  I'm sorry, what's the purpose of this?

24         MR. MANDEL:  It's the rule of completeness.

25         THE COURT:  Go ahead.

 1   Q.  (Reading)

 2   "Q.  Do you see further down it says Glass shall be allocated

 3   profits for federal and state income tax purposes equal to 20

 4   percent of the aggregate rental distributions allocated and

 5   distributed to Glass or the 'Glass equity in cash through

 6   GEKR.'  Do you see where it says that?

 7   "A.  Uh-huh.

 8   "Q.  Was Glass actually allocated profits as described in that

 9   sentence of the agreement?

10   "A.  As I interpret profits, no.

11   "Q.  Was he given payments described however you like to equal

12   20 percent of the aggregate rental distribution as the term is

13   defined in the agreement?

14   "A.  He was not.  Aggregate rental distributions -- if you're

15   defining aggregate rental distributions as -- let me see, is

16   that defined?

17   "Q.  Is that a defined term?

18   "A.  Where is it?"

19        And then there's some back-and-forth.

20   "A.  Okay.  And distributions, allocations and distributions

21   from GEKR, 20 percent of the total distributions aggregate

22   rental distributions, I would -- I would say that 20 percent

23   shall include any distribution made through RWM.  I just take

24   exception to the profits interest.  And it does say 20 percent

25   of the total distributions.  If you eliminate from the profits

2644

L42VMIL4                    Quintero - Redirect

```
 1    of the rental business, I would be fine with that.  But the

 2    economics of his payments of his bonus was 20 percent of

 3    distributions.

 4    "Q.  And was he paid 20 percent of distributions?

 5    "A.  From RWM.

 6    "Q.  And was he paid -- and were those distributions from the

 7    profits of RWM's rental distributions?"

 8            There's an objection.

 9    "A.  There were distributions.  John Glass received 20 percent

10    of any distribution relative to RWM.

11    "Q.  And distribution of profits; correct?

12    "A.  You don't have to have profits to have a distribution.

13    That's where my exception comes in.

14    "Q.  Well, but the 20 percent of the distribution --

15    distributions that Glass was receiving, I mean if it's not

16    distributions of profits, what is it distributions of?"

17            Objection.

18    "A.  Distributions could be of cash, it doesn't have to be

19    profits.

20    "Q.  So what -- whenever Robert Williams Management distributed

21    cash to its owners, Glass was entitled to payments equal to 20

22    percent of whatever those distributions were?

23    "Q.  Is that correct?

24    "A.  That is the economics."

25            What's the difference between profits and
```

 1   distributions?

 2   A.  Profits pertains to the earnings of the relevant entities

 3   during the relevant period.  Distributions is just money that

 4   is paid out to those entities that may or may not be based on

 5   profits.

 6   Q.  Okay.  So if you got Acme Company, and Acme Company has one

 7   shareholder, and Acme Company pays $100 to its shareholder, is

 8   that a profit or a distribution?

 9   A.  That's a distribution.

10   Q.  Okay.  Does the fact that Acme paid $100 to its shareholder

11   mean that Acme had any profits?

12   A.  No.

13   Q.  Okay.

14           MR. MANDEL:  Could we pull up the plaintiffs'

15   demonstratives from Mr. Steinmetz, the one on distributions.

16           For the record, this is plaintiffs' demonstrative --

17   no, there's a different one.  Let's take this down.

18           So for the record, this is Plaintiffs' Demonstrative

19   15.  Did you not introduce this?

20           MR. OPPENHEIM:  That's fine.

21           MR. MANDEL:  Had this already been introduced?

22           MR. OPPENHEIM:  Yeah, it's all yours.

23           MR. MANDEL:  Okay.

24   BY MR. MANDEL:

25   Q.  This states that Mr. Smyres received $43 million in

L42YMIL4          Quintero - Redirect          2646

1    distributions from various companies, it's not clear from this,

2    between 2008 and 2016.  Does that mean that Mr. Smyres had $43

3    million in profits during that period of time?

4    A.  No.

5            MR. MANDEL:  We can take that down.

6    Q.  In your analysis, did you analyze distributions paid to

7    Mr. Smyres?

8    A.  I did.

9    Q.  I'll withdraw the question.

10            Let's talk about Mr. Glass for another minute.

11            Do you recall being asked a whole series of questions

12   about Mr. Glass's agreement with the company?

13   A.  I do.

14   Q.  What is the difference between a K-1 and a W-2?

15   A.  A K-1 is a form filed with taxing agencies such as the

16   Internal Revenue Service, as well as to the owner of an

17   interest in a pass-through entity so that the owner can pay

18   their taxes for which they are liable.  And the IRS or other

19   taxing authorities can confirm that the owner has indeed paid

20   the taxes applicable to the income that is being allocated to

21   the owner.

22   Q.  And what's a W-2?

23   A.  A W-2 is a document that is issued to an employee of an

24   entity.

25   Q.  And does that report wages and salary and bonuses and all

1    of that stuff?

2    A.  That is correct.

3    Q.  Okay.  So if you're an employee of a company, you get a

4    W-2; and if you're an owner of a company, you get a K-1.  Is

5    that correct?

6    A.  That is correct.

7    Q.  The defendants issued a W-2 to Mr. Glass; correct?

8    A.  They did.

9    Q.  Did they issue any K-1s to Mr. Glass?

10   A.  No.

11   Q.  So the defendants told the Internal Revenue Service that

12   Mr. Glass was an employee as opposed to an owner; correct?

13              MR. OPPENHEIM:  Objection.  No foundation.

14              THE COURT:  Sustained.

15   Q.  Do W-2s and K-1s get sent to the IRS?

16   A.  They do, as well as other taxing authorities and the

17   employee.

18   Q.  So the defendant -- I'm sorry.

19   A.  Yeah, or owner.

20   Q.  So when the defendants issued the W-2 for Mr. Glass to the

21   IRS as opposed to a K-1, what were they telling the IRS?

22   A.  Well, my recollection --

23              MR. OPPENHEIM:  Objection.

24              He can't speculate as to what the --

25              THE COURT:  Sustained as to form.

1  Q.  When an employer transmits a W-2 as opposed to a K-1 to the

2  IRS, what does that indicate?

3  A.  W-2 indicates that the individual is an employee of that

4  entity.

5  Q.  Have you seen any document or email or contract or anything

6  at all that suggested that Mr. Glass ever objected to the

7  defendants sending a W-2 for his compensation to the IRS?

8  A.  No, sir.

9  Q.  And how did the defendants' outside auditors treat those

10  payments to Mr. Glass?

11  A.  Well, my understanding is the outside auditors were

12  actually the generators of those K-1s, and so they treated --

13  and W-2s.  They treated them, the compensation to Mr. Glass, as

14  compensation.

15  Q.  And in the audited financial statements, were those

16  payments to Mr. Glass treated as payments to an owner or

17  profits or as payments to an employee?

18  A.  To either employee or an independent contractor.

19  Q.  Have you seen anything at any of the company's financial

20  documents that suggested either Mr. Glass or the company ever

21  treated the payments to Mr. Glass as anything other than

22  bonuses?

23  A.  No, sir.  Bonuses or, again, consulting income.

24  Q.  Similarly, you were asked a lot of questions about

25  Garrison.  How did the audited financial statements treat the

1   payments to Garrison?

2   A.  As costs of the financings.

3   Q.  Did they treat it as a distribution of profits?

4   A.  No, sir.

5   Q.  Did they treat it as a distribution of profits to the

6   owner?

7   A.  No, sir.

8   Q.  Have you seen any document whatsoever that suggests that

9   any of the payments that the defendants made to Garrison or

10  Stonehenge were treated as anything other than expenses?

11  A.  I have not.

12  Q.  Have you seen any document at all that suggests that any of

13  the payments that the defendants made to Garrison were treated

14  as profits?

15  A.  I have not.

16          MR. MANDEL:  If we could turn to Defendants' Exhibit

17  414 please, page 3.

18  Q.  Do you recall being asked some questions about the pre-tax

19  income line of this document?

20  A.  I do.

21  Q.  And you calculated that between 2013 and 2016, the

22  defendants had pre-tax income of $31 million and change?

23  A.  Yes.

24  Q.  Did Mr. Smyres get to keep that $31 million?

25          MR. OPPENHEIM:  Objection.

 1          THE COURT:  Sustained.

 2  Q.  Was any of that $31 million paid to the government?

 3          MR. OPPENHEIM:  Objection.

 4          THE COURT:  Sustained.

 5  Q.  Have you seen redacted versions of the defendants' -- of

 6  Mr. Smyres' tax returns?

 7  A.  I have.

 8  Q.  Do those indicate that he paid taxes?

 9          MR. OPPENHEIM:  Objection.

10          He testified he didn't see the entire --

11          THE COURT:  Overruled.  We'll find out.

12          THE WITNESS:  Yes, your Honor, they do.

13  Q.  Okay.  So did you see the adjusted -- withdrawn.

14          On the redacted versions of those tax returns that you

15  saw, did you see the adjusted gross income that Mr. Smyres

16  reported?

17  A.  I recall it being substantial.  I don't recall the numbers,

18  yes, sir.

19  Q.  But just was there a number for adjusted gross income?

20  A.  My recollection is that there were numbers.

21  Q.  And then was there a number for how much in taxes

22  Mr. Smyres owed?

23  A.  I don't recall that number.  My recollection is that there

24  were such numbers.

25  Q.  When you say you don't recall the number, you don't recall

1    what the specific numbers were; correct?

2    A.   That's correct.  I was looking at those documents for

3    purposes of seeing that there was substantial taxable income.

4    Q.   Okay.  And did you see substantial taxable income?

5    A.   Yes, sir.

6    Q.   In the United States, can you make $31 million and not pay

7    taxes on it?

8              MR. OPPENHEIM:  Objection.

9              THE COURT:  Sustained.

10   Q.   Why, again, did you calculate the taxes that were owed on

11   the $31 million of income that the defendants had?

12   A.   Because for purposes of analyzing the profitability of

13   these entities, a tax burden has to be applied; and it is

14   customarily done by financial analysts in my profession.

15   Q.   Are you familiar with high-margin businesses and low-margin

16   businesses?

17   A.   Yes.

18             MR. MANDEL:  Could we just go to the --

19   Q.   What's the difference?

20   A.   High-margin businesses have high levels of profits in

21   relationship to total revenues.  So example, a company might

22   have $100 in revenues, and have $20 in profits.  That's a

23   high-margin business.

24   Q.   So for these years, you calculated that the defendants'

25   after-tax profits were $18 million and change; correct?

 1   A.   That is correct.

 2           MR. MANDEL:   Let's go to the Steinmetz demonstratives

 3   on revenue please, PD-14.

 4   Q.   Is it possible for a company to have $783 million in

 5   revenue and only $18 million in profits?

 6           MR. OPPENHEIM:   Objection.

 7           THE COURT:   Sustained.

 8   Q.   Would a company that had $18 million in profits on $783

 9   million in revenue be a high-margin business or a low-margin

10   business?

11   A.   It would --

12           MR. OPPENHEIM:   Objection.   It's misleading because

13   the two figures are for different periods of time.

14           THE COURT:   Sustained.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   Q.  For the period of 2013 through 2016, am I correct that this

2   document suggests that the defendants' revenue was in the

3   ballpark of $500 million?

4   A.  Yes, sir, that is correct.

5   Q.  Is a company that has $500 million of revenue over a

6   four-year period and only $18 million in after-tax profits a

7   high-margin business or a low-margin business?

8           MR. OPPENHEIM:  Objection.  The companies don't pay

9   taxes.  He keeps misleading the jury on this issue.

10          THE COURT:  Overruled.

11  A.  That is a lower-margin business.

12          MR. MANDEL:  No further questions.  We reserve the

13  right to call Mr. Quintero, subject to your Court's ruling

14  earlier.

15          MR. OPPENHEIM:  I know it's lunchtime, but if we have

16  got three minutes.

17          THE COURT:  You've got three minutes.

18          MR. OPPENHEIM:  Pressure is on.

19  RECROSS EXAMINATION

20  BY MR. OPPENHEIM:

21  Q.  Mr. Quintero, usually I ask you questions I know the

22  answers to.  This one I don't.  Mr. Glass is actually located

23  in the Cayman Islands, correct?

24  A.  I don't know where he's located.

25  Q.  In the agreements you reviewed he's located in the Cayman

1    Islands.  Would he have received K-1s and W-2s since he is in

2    the Cayman Islands?

3    A.  My recollection is he did.

4    Q.  So with respect to Garrison, they loaned a certain amount

5    of money, right?

6    A.  That is correct.

7    Q.  And they got 12 percent interest for it, right?

8    A.  Yes, sir.

9    Q.  And once that loan was repaid the defendants no longer paid

10   the 12 percent interest, right?

11   A.  That is correct.

12   Q.  But they continued to pay additional payments based on the

13   profits from certain books, correct?

14   A.  Pursuant to the fees contained within the agreement, that

15   is correct.

16   Q.  So loan is repaid, but they are still being payments made,

17   correct?

18   A.  Correct, the fees.

19   Q.  You keep saying they are fees.  Obviously you and

20   Mr. Steinmetz disagree on this, right?

21   A.  Apparently.

22   Q.  I just want to be clear, there was a 12 percent interest

23   paid on the loan and then what you are actually disagreeing

24   about is everything after the loan was repaid, correct?

25   A.  That's correct.  The auditors and I refer to them as

1  expenses of the loan.

2          MR. OPPENHEIM:  Can we pull up PD15, the

3  demonstrative.

4  Q.  Mr. Quintero, a moment ago you were asked the difference

5  between profits and distributions, right?  I think you just

6  testified a moment ago that the $47 million number is not a

7  profits number, correct?

8  A.  That is correct.

9  Q.  This would be the amount of money that Mr. Smyres actually

10  received, actually received, correct?

11  A.  It is not.

12  Q.  It's not?

13  A.  No.

14  Q.  This is what was paid to him or on his behalf, correct?

15  A.  Actually, that's not correct either.

16  Q.  The distribution is what he gets the benefit of, correct?

17  A.  That is not entirely correct.

18  Q.  The difference between a profit and a distribution is that

19  the distribution is that you are actually getting something or

20  the benefit of something, correct, whereas the profit is a

21  profit, right?

22  A.  Generically, that is the case.  It's not the case with

23  these numbers.

24  Q.  But you agree that the $47 million number, you don't

25  disagree that this was the salary and distribution paid to

1   Mr. Smyres, correct?

2   A.   If we want to use a misleading indication of distributions,

3   correct.

4           MR. OPPENHEIM:  I'm done.

5           MR. MANDEL:  Very briefly, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. MANDEL:

8   Q.   Why is PD15 misleading?

9   A.   Because it indicates $43.5 million in distributions.

10  Approximately 30 -- using round numbers, approximately 37

11  million was cash distributions, another 6 million was noncash

12  distributions.

13  Q.   And would any of this money have gone to taxes?

14  A.   Yes.  A very large portion of it would have been applicable

15  to taxes.

16          MR. MANDEL:  No further questions, except for our

17  reservation of our rights.

18  RECROSS EXAMINATION

19  BY MR. OPPENHEIM:

20  Q.   Mr. Quintero, the noncash distribution was an investment in

21  a new company, correct?

22  A.   I actually don't know what the noncash distributions were.

23  Q.   You don't know that it was a transfer of inventory that

24  Mr. Smyres got the benefit of into a new company, correct?

25  A.   You are right, I do not know.

2657

```
 1              MR. OPPENHEIM:  No further questions.

 2              THE COURT:  Anything else, Mr. Mandel?

 3              MR. MANDEL:  No, thank you, your Honor.

 4              THE COURT:  Mr. Quintero, you are excused as a

 5    witness.  You can step down.

 6              (Witness excused)

 7              THE COURT:  Members of the jury we are going to take

 8    our luncheon recess at this time.  Keep an open mind.  Please

 9    don't discuss the case.  Let's see if we can resume at 2:00.

10              Please recess the jury.

11              (Jury not present)

12              MR. BHANDARI:  For the Singh transcript.

13              THE COURT:  Let's deal with Mr. Singh.

14              MR. BHANDARI:  In Mr. Singh's November 11, 2016

15    deposition he testified at length about this document.  That's

16    Plaintiffs' Exhibit 341B.  It was provided by Chegg and it was

17    Chegg Exhibit 000022, but it's the same document that is 341B

18    and it's referenced by the number of lines on the spreadsheet

19    as 64,125 lines.

20              THE COURT:  How was it marked in the deposition?  If I

21    am going to look at transcript?

22              MR. BHANDARI:  It's referred to as the Chegg exhibit,

23    as I said, and then also Chegg Exhibit 8, I believe, is how it

24    was marked.

25              MR. GLUNT:  Your Honor, it's marked as 8 and 22 and
```

 1   there is a reference in the deposition that Chegg 22 was

 2   previously marked as Chegg 8.

 3          MR. BHANDARI:  So the entire document is discussed

 4   between pages 193 and pages 222 of Mr. Singh's deposition.  But

 5   the section that explains what suspect books are very clearly,

 6   which is the only explanation we need to be provided to the

 7   jury, could be found between pages 209, line 8 through 212,

 8   line 22.  It explains essentially what it says.

 9          THE COURT:  Can you provide me with a copy that I can

10   look at over --

11          MR. BHANDARI:  I unfortunately only have an electronic

12   copy.  We can give it to you on a flash drive.

13          MR. OPPENHEIM:  Can I read the relevant portion and

14   put this poor cow down?

15          THE COURT:  We are only talking about two and a half

16   pages.  Read it to me.  This is from the deposition transcript

17   of Mr. Singh.

18          MR. BHANDARI:  Yes.  Starts at line 8:

19   "Q.  What is the finding column?

20   "A.  It was the result of the audits.

21   "Q.  Did Chegg play any role?"

22          MR. OPPENHEIM:  Where are you starting?  Go ahead.

23   Sorry.

24          MR. BHANDARI:  "QUESTION:  Did Chegg any play role in

25   the determining what the result of the audit was?

2659

```
 1   "A.  No, we did not.

 2   "Q.  So am I correct that the information listed in the finding

 3   column came entirely from the higher education publishers?"

 4          And I'm skipping objections.

 5          MR. OPPENHEIM:  No, no, no.  I think it's important to

 6   put the objections in, please.

 7          MR. BHANDARI:  Your Honor, what would you like?

 8          THE COURT:  Let me hear the objections.

 9          Why don't you come over and get closer to the

10   microphone and talk a little bit slower.

11          MR. BHANDARI:  Sure.

12          I don't know what's up here.

13          Objection from Chegg's lawyer.  Calls for speculation.

14   17, the answer:  "It would be based on their feedback to us on

15   their designation of a specific book."

16   "Q.  How did the higher education publishers provide Chegg with

17   that feedback?

18   "A.  Via e-mail.

19   "Q.  When Chegg received --

20   "A.  I'm sorry.  Let me clarify that.  For books that were

21   cleared, they were provided as part of the audit.  If they were

22   not identified as suspect, then the books that were not

23   identified as such were flagged as clear.

24   "Q.  OK.  And who selected which books were identified as

25   suspect?"
```

2660

```
 1              Then there is an objection.  I should read all the
 2    objections, your Honor?
 3              THE COURT:  Go ahead.  These are objections by Chegg's
 4    attorney?
 5              MR. BHANDARI:  No.  This is Mr. Oppenheim:
 6    "Objection.  Asked and answered."
 7    "A.  Publishers.
 8    "Q.  Am I correct that the only two" --
 9              Mr. Oppenheim interrupts and just says the word
10    categories.  Mr. Mandel says thank you.
11    "Q.  Am I correct that the only two categories in this column
12    are clear and suspect?
13    "A.  There is another category in there called pending further
14    review that is a fairly small subset.  My understanding is that
15    came out of the last audit where they were not necessarily
16    flagged as suspect, but there was additional validation that
17    the publishers wanted to do.  I would have to dig into it a
18    little bit further around that, but it was a relatively small
19    subset.
20    "Q.  Can you check to see if there is anything on Chegg Exhibit
21    8 that is pending further review?
22    "A.  There are.
23    "Q.  There are?
24    "A.  There are.  There's approximately 70 or so.
25    "Q.  Do you know why those approximately 70 were flagged as
```

1  pending further review?

2  "A.  I do not know.

3  "Q.  What information is contained in the audit date column?

4  "A.  Just the location and date of the audit.  Then there is

5  some stuff that's not related to suspect.  I can skip that, if

6  it's possible.  Then I can go to page 212.

7           MR. OPPENHEIM:  Hold on.

8           MR. BHANDARI:  I'll read the whole thing.

9           I'm now on page 211, line 11:

10  "Q.  Can you describe the process that the higher education

11  publishers went through as they were inspecting the books?

12           "MR. OPPENHEIM:  Objection.

13  "A.  I don't know their parameters for inspection.  We provided

14  the books.  They inspected them.  Books that they identified as

15  suspect, we boxed and sent to them.  Books that were identified

16  as cleared, we scanned back into the system and made them

17  available again.

18  "Q.  Did Chegg have an opportunity to observe the higher

19  education publishers inspecting the books?

20  "A.  For the most part, no.

21  "Q.  To some extent did Chegg have an opportunity to observe

22  the higher education publishers inspecting the books?

23           "MR. OPPENHEIM:  Objection.

24  "A.  Incidentally, if we came to help them move the books

25  around, carts around or to take carts out of the room.

2662

1   "Q.  If the plaintiffs identified a book as suspect, what would

2   happen to that book?

3   "A.  It was --

4   "Q.  Withdrawn.  If the higher education publishers identified

5   a book as suspect, what would happen to that book?

6   "A.  It was placed on a separate cart that was reserved for

7   suspected books.  As the cart filled up, it was wheeled out of

8   the room.  The Ingram folks, as well as the Chegg folks, we

9   would box those up.  And after the audit all those would be

10  shipped over to the individual publishers.  They would be

11  placed into specific -- they were placed -- as they were

12  identified, they were on specific carts for each publisher and

13  then they were boxed up and sent to that publisher.

14           Your Honor, he describes in detail what it means for a

15  book to be described as suspect and those books were shipped to

16  the publishers.  We have testimony from Mr. Essig, from

17  Ms. Peirano, from Mr. Jensen that Chegg -- that they conducted

18  audits of Chegg, that Chegg sent them the potentially

19  counterfeit books, and so, therefore, the books that were going

20  to be boxed up that were identified as suspect are obviously

21  the potentially counterfeit books that the publishers

22  identified, and then Chegg entered into this spreadsheet that

23  was created by Chegg based on information that was provided to

24  them by the publishers.

25           There is another comment by Mr. Singh in relation to

 1    another document where he talks about the phrase suspect and

 2    that is in his deposition in 2017.  There is a question, again,

 3    it's about a different document.  But it's on page 151 of

 4    Mr. Singh's October 4, 2017 deposition, starting at line 6:

 5    "Q.  You just said that some books -- let me try to get this --

 6    a clear record on it.  In some cases the publishers, after an

 7    audit, identified a certain book as being counterfeit,

 8    according to the publishers, correct?

 9    "A.  So I think.

10    "Q.  I'm going to just take it small.  I am trying to do it

11    like small pieces.

12    "A.  I understand.  So I am going to clarify here for you.

13    "Q.  OK.

14    "A.  I think the wording here is suspect, in that they are

15    suspecting them to be counterfeit.

16    "Q.  OK.  So that's not a determination that there were 818

17    books that the publishers determined were, in fact,

18    counterfeited?

19    "A.  This is based off the initial designation.  In some cases

20    they could switch categories and move over to cleared."

21            Again, his understanding of suspect, I think it's been

22    described in detail related specifically to the Chegg 22

23    document, which is that those were the books that got shipped

24    to the publishers.  We have testimony from the publishers

25    saying that the books that were shipped to them by Chegg were

2664

1   the books that they considered to be potentially counterfeit

2   and at a later deposition he says, I think suspect means

3   suspected counterfeit.  I believe that lays whatever foundation

4   is necessary for us to be able to then make arguments about

5   what the Chegg spreadsheet means.

6          MR. OPPENHEIM:  I disagree with what he pulls out of

7   this.  First off, he read from two different depositions, one

8   in 2016, one in 2017.  They actually involve different

9   surrender and audits.  The 2017 related to a subsequent audit

10  and the 2016 to an earlier one.  What he read in the first

11  instance was 2016.  And Mr. Singh testifies he doesn't know

12  what it means and he says, with respect to one of the

13  categories, he would have to dig into it further.  He doesn't

14  know what it means.

15         But there is a more fundamental problem here.  It's

16  not just what these terms mean.  It's what was selected because

17  the issue here is whether it's apples to oranges or apples to

18  penguins, as your Honor said.

19         I believe that Mr. Singh testified on that issue.  he

20  said -- I don't know which deposition this is.  This was just

21  handed to me.  This is the 2016 deposition.  On page 221, I

22  believe it is, line 4:

23         And what conclusions did Chegg draw from that

24  analysis?  He is talking about the analysis of the numbers.

25  Objection.  It's beyond the scope.  And then the answer:

1    Again, that they there were varying rates.  We still had the

2    same issues of what the sample size was.  Some vendors supplied

3    a lot more books than others.  It also could be a mix of which

4    titles are audited, so, again, there is high-level analysis we

5    can do based on that.

6        He clearly doesn't know what it was the publisher

7    selected, how they selected it, and whether it was a relative

8    sample for the various distributors.  We don't know what

9    buybacks means.  There is so much we don't know about this

10   spreadsheet and they have not laid a foundation for that.  All

11   they have pointed to is, well, Mr. Singh thinks, based on what

12   the publishers did, that suspect means blank, and he doesn't

13   know what one or the other categories means.

14       MR. BHANDARI:  Your Honor, Mr. Singh describes

15   specifically what was done with the books that were suspect,

16   which is they got boxed up, shipped to the publishers.  Then we

17   have the publishers' testimony.

18       Your Honor, I think you understand.  Obviously suspect

19   means what we all think it means, which is that they were

20   flagged as being potentially counterfeit.  This testimony

21   certainly corroborates that.  If they want to make an argument

22   that the jury shouldn't be reading it that way, Mr. Singh's

23   testimony has some kind of holes in it, I guess they can make

24   whatever crazy arguments they want to make to the jury.

25       But at the end of the day, this is argumentation.

2666

 1    These are inferences that can be drawn from otherwise

 2    admissible testimony, and they said specifically, this is the

 3    basis.  Mr. Singh's testimony is the basis for admitting this

 4    as a business record.  Now they are claiming he doesn't know

 5    what these business records mean, because it's convenient for

 6    them to do that, but they can't have it both ways, your Honor.

 7         We ask that we be able to read this in and we are not

 8    going to ask Mr. Quintero to opine at all about what suspect

 9    means.  But for just the ease that the jury is able to

10    understand how these numbers work, we are going to ask him to

11    do some basic arithmetic.  The arguments we make in closing are

12    the arguments we will make in closing.  Mr. Oppenheim has

13    already objected to them, wants us to preview the arguments.  I

14    have done that for you.  And if you are going to make a ruling

15    that I can't say certain things or I have to phrase them a

16    certain way in my closings, if you want to make rulings about

17    that, your Honor, of course, that's within the Court's purview

18    to do.  You know our position, which is we should be allowed

19    wide latitude to make arguments, and they will have a rebuttal,

20    and they can explain why we are total fools and idiots for

21    drawing the inferences that we are drawing from the data that's

22    already admitted into evidence.  Thank you, your Honor.

23         I know that we can keep going back and forth forever.

24    I won't speak again after Mr. Oppenheim, unless you ask me a

25    specific question.

2667

```
 1                MR. OPPENHEIM:  My last and final comment, your Honor.

 2     Leaving aside the foundational issue, it doesn't deal with the

 3     prejudice issue, that this is prejudicial because it's apples

 4     and penguins.

 5                THE COURT:  Come back at five minutes to 2.  I'll give

 6     you my ruling.

 7                MR. GLUNT:  Your Honor, I hesitate to raise another

 8     issue because it relates specifically to cross-examination that

 9     we just heard of Mr. Quintero.  I apologize for raising it now.

10     I think there is no other appropriate time.

11                In the cross-examination of Mr. Quintero, I'm sure the

12     Court heard this, too, Mr. Oppenheim made specific references

13     to Enron and WorldCom and Bernie Madoff as a manner of

14     comparing those things to the defendants.  I know Mr. Oppenheim

15     thinks that's a joke, but it's actually very prejudicial.  It's

16     tantamount to accusing the defendants of criminal misconduct,

17     and not just any criminal misconduct, criminal misconduct that

18     hurt ordinary people like the jurors in New York City.  I think

19     that's really inappropriate and I think that's something that,

20     frankly, might even merit an instruction.

21                THE COURT:  It's not necessary to respond to it, Mr.

22     Oppenheim.

23                It doesn't warrant any instruction.  It was referring

24     to something that anybody who has lived in the United States

25     would recognize is a problem with audited financial statements.
```

1    That's all.  Just something that the jury could relate to.

2    It's not prejudicial.

3              I'll see you at five minutes to 2.

4              (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      AFTERNOON SESSION

 2                         1:55 p.m.

 3          THE COURT:  Counsel, having considered Singh's

 4   deposition testimony and counsel's proffer, in my view, what

 5   the defendants seek to do here is very prejudicial to have a

 6   financial expert run calculations on a spreadsheet that he has

 7   no familiarity with, to deduce certain percentages that no

 8   witness familiar with the data has ever run so that defense

 9   counsel, in closing, can offer percentages that he personally

10   came up with, when no one ever testified to them, is

11   prejudicial.  As the Second Circuit said in United States v.

12   Gupta, 747 F.3d 111, 138 (2d Cir. 2014):  "In the absence of

13   explanatory testimony by a witness, the jury would be unable to

14   understand the documents without representations by counsel or

15   speculation."

16          The colloquy that counsel have engaged in over the

17   last two days on this issue demonstrate clearly to the Court

18   that this is all speculation.  There is no foundation from a

19   witness.  It will all be conjecture.  I'm not going to permit

20   the expert to be recalled to perform arithmetic calculations.

21          MR. BHANDARI:  Understood, your Honor.  We can play

22   the Singh deposition?

23          THE COURT:  You can.

24          MR. BHANDARI:  In its entirety.  Understood.  We will

25   play that as soon -- we will either read it or if we can play
```

1    it, we will play it.

2              THE COURT:  If you can play it, it would be better for

3    the jury, I think.

4              MR. BHANDARI:  Understood, your Honor.

5              MR. OPPENHEIM:  One moment, your Honor.

6              The testimony they want to play, your Honor, they had

7    the witness, I believe, do the calculations.  He didn't know.

8    He is just running calculations for them without him knowing

9    what it is he is calculating, I believe, if this is what they

10   are going to play.  They are going to essentially do the exact

11   same thing that is prejudicial.  Again, I objected.  For

12   instance, there is a question by Mr. Mandel:  What was BDB's

13   suspect book rate?  Objection.  Witness:  Again, I think that's

14   in the data set.  I believe it was 50 out of 4,000 or so,

15   approximately 2 percent.

16             I objected that the question was improper.  There is

17   no foundation as to what it is.  We have seen the testimony

18   that says that he doesn't know what those various categories

19   mean, and so they are essentially, by playing this testimony,

20   trying to backdoor what the Court has ruled now twice is

21   prejudicial.  I would object to the playing of this testimony.

22             MR. BHANDARI:  Your Honor, he obviously knows what

23   these categories mean.  He was speaking on behalf of Chegg on

24   the business record.  He was doing the calculations and he said

25   in the portion that was read back to you that while there was

142MMIL5                                                    2671

 1    some sample size issues, there is high-level analysis that

 2    could be done from these numbers.

 3              We would be able to elicit that testimony from him in

 4    court.  We can play that testimony or read.  As it turns out,

 5    unfortunately, we don't have that video.  We are going to have

 6    to read it.  We can read it in court, your Honor.  He's a

 7    person with familiarity with the document.

 8              They can make whatever arguments they want to make

 9    about why he should be disregarded or why it shouldn't carry a

10    lot of weight.

11              But to say that a witness who authenticated this

12    document, the basis for it being used in their roadmap is

13    Harjit Singh's own testimony, cannot make then high-level

14    analyses of these things.

15              THE COURT:  What is the relevance, given the fact that

16    I've ruled at least twice that the percentages were out?

17              MR. BHANDARI:  Your Honor, as we said, the relevance

18    over here is so we can show what our percentages of all the

19    books that came in from us.  That is something that is an

20    apples-to-apples comparison.  We are simply saying, out of

21    everything that Chegg had, and they requested everything that

22    we sent to Chegg was audited here.  They did that analysis and

23    approximately 1 percent of that was not -- was found to be

24    questionable or suspect.

25              Your Honor, that matters.  This is information.  It's

2672

1    a data point.  It might not be the end all.  Mr. Oppenheim

2    might say, why didn't we do a calculation based on this data

3    set or that data set or another data set, or their inventory,

4    or their warehouse.  Those are fine arguments, but there was an

5    analysis done here.  We didn't choose what books were selected.

6    We didn't choose to do the inspection.  We weren't the ones

7    that came up with what is suspect.  That analysis is something

8    that is relevant to the jury.  We can say, this is what you

9    know about everything that Chegg had of our books.  That's what

10   was pulled and those were what the numbers are.

11        MR. OPPENHEIM:  Your Honor, let's just step back.  If

12   a defendant in a case like this wants to present evidence of

13   what their counterfeit rate is, there is a way to conduct that

14   analysis.  You hire an expert who comes up with a sampling.

15   You can look at all of the inventory, if possible.  You can

16   hire an expert to come up with a statistical model and then you

17   go and you create a paradigm for doing the analysis and then

18   you have somebody testify on it.  There are lots of ways to do

19   what the defendants are seeking to do that might actually be

20   accurate.

21        In fact, in a lot of copyright cases, that has been

22   done.  It was done in the *Grokster* case that went up to the

23   Supreme Court and it was a pivotal part of the analysis in the

24   *Grokster* case.  But, your Honor, what they are doing is not a

25   valid method of measuring counterfeit rate.

2673

```
1              Mr. Singh, the question and answer right before what
2    Mr. Bhandari read makes this clear.  He is asked the question:
3    And what conclusions did Chegg draw from that analysis?
4    Mr. Page, who was Chegg's counsel at the time, said:  Object.
5    It's beyond the scope.
6              "THE WITNESS:  Again, that they were varying rates.
7    We still had the same issues of what the sample size was.  Some
8    vendors supplied a lot more books than others.  It also could
9    be a mix of which titles are audited.  Again, there is a
10   high-level analysis we can do based off of that."
11             He is clearly saying there is an issue with looking at
12   the data this way.
13             Now, they asked him to run percentages based off of
14   the spreadsheet, to have him do exactly what they were going to
15   have Quintero do.  It's no different coming out of Mr. Singh's
16   mouth than it was coming out of Mr. Quintero's mouth.
17             MR. BHANDARI:  Totally different, your Honor.  Of
18   course because Mr. Singh has knowledge of this particular
19   document and he is the one whose company put it together and he
20   was testifying about what it meant, which is the reason why it
21   was introduced as a business record.
22             There are four different ways that this is relevant,
23   your Honor.
24             1, putting in just the Book Dog Books percentage, as I
25   said before, is relevant.  Mr. Oppenheim just gave a bunch of
```

 1   different types of expert analysis that could be done to do

 2   sample size and those would be potentially very compelling

 3   arguments that could be made.  We can't do that.  What we can

 4   do is opine about what the facts of this case show and what the

 5   pieces of evidence show.  This was an audit.  These were audits

 6   conducted by the publishers.  They were told from Chegg to

 7   pull -- they told Chegg to pull all of the books.

 8           The percentage of our books that were found to be

 9   suspect in that is an important data point.  They might not

10   like what it indicates.  They might say there is other data

11   points that will be bad, but they can argue that.  That's one.

12           2, the percentage from other distributors for those

13   particular books, again, goes to willfulness.  We are arguing

14   here, it is impossible, absolutely impossible -- Mr. Mandel

15   wants me to make it clear that's a separate bases.  It's a

16   separate way of doing it.  Which is to put in the other

17   distributors' numbers.

18           Third, we are going to put in an apples-to-apples

19   comparison based on the 32 titles reviewed for all parties.

20           Fourth, you have heard our argument in terms of

21   comparing the percentage of different distributors to Book Dog

22   Books.  Again, it's a data point that exists in this document.

23           If you are going to limit my argument in closing

24   statement to not be able to compare those things without a

25   disclaimer and without explaining precisely what I'm doing, I

```
 1   understand that.

 2             THE COURT:  Is the jury here?

 3             THE DEPUTY CLERK:  Yes.

 4             THE COURT:  It's almost beyond me the way arguments

 5   are sort of made up as we go along.  All the discussions that

 6   we have had about the Chegg summary, I never heard about the

 7   Singh deposition until today and now I hear that Singh -- you

 8   actually asked the questions of Singh with the percentages.

 9             MR. BHANDARI:  Yes, your Honor.

10             THE COURT:  I am going to let you read the Singh

11   deposition testimony, but I'm telling you right now, you cannot

12   make any percentage argument to the jury in closing based upon

13   that testimony because it's misleading.  That will be a line

14   you can't cross.

15             MR. BHANDARI:  I understand, your Honor.

16             THE COURT:  Days of argument in a three-week trial.

17   This issue was circling before the trial.  Days of argument and

18   you wait until after lunch today to raise Singh's testimony and

19   it's only right before lunch that you suddenly rediscover the

20   Singh deposition.

21             MR. BHANDARI:  Your Honor, it seems so obvious --

22             THE COURT:  It's so on the fly.  You make the job of a

23   district judge very challenging.

24             MR. BHANDARI:  Sorry, your Honor.  I understand and

25   I'm sorry.
```

 1          Can we get our witness?

 2          THE COURT:  Get your witness.

 3          Bring in the jury.

 4          (Jury present)

 5          THE COURT:  Good afternoon, members of the jury.

 6          ALL JURORS:  Good afternoon.

 7          THE COURT:  We pretty much had a working lunch, but we

 8    are going to keep going right now.

 9          Would the defendants call their next witness.

10          MR. BHANDARI:  Yes, your Honor.  The defendants call

11    Jason Womeldorph.

12          THE COURT:  Come on up, sir.

13    JASON WOMELDORPH,

14        called as a witness by the Defendants,

15        having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MR. BHANDARI:

18    Q.  Good afternoon, Mr. Womeldorph.

19    A.  Good afternoon.

20    Q.  Who do you work for?

21    A.  I work for Book Dog Books.

22    Q.  How long have you worked for Book Dog Books?

23    A.  Going on 11 years.

24    Q.  So you started in 2006, is that right?

25    A.  Yes, more or less.

L42MWIL5                    Womeldorph - direct                    2677

1  Q.  We will go through your work history in a few minutes.

2  Before we do that, what is your current position in Book Dog

3  Books?

4  A.  I am the team lead of inventory management.

5  Q.  And when did you start holding that position?

6  A.  I started holding that position sometime within the last

7  year or so.

8  Q.  And before you held your current position, you were the

9  acting antipiracy director, is that correct?

10 A.  That's correct.

11 Q.  And approximately when did you have responsibilities for

12 antipiracy?

13 A.  I had responsibilities in antipiracy from around 2013 to

14 2016.

15 Q.  And all the time --

16 A.  '17.  Sorry.

17 Q.  No problem, Mr. Womeldorph.

18          From 2013 until about 2016 or 2017, is that right?

19 A.  Yes.

20 Q.  All the time you have worked at Book Dog Books, have you

21 ever intentionally sold or bought a counterfeit book?

22 A.  No.

23 Q.  Are you aware of anyone at Book Dog Books who has

24 intentionally bought or sold a counterfeit book?

25 A.  No.

 1   Q.  Let's talk about a little bit about your background.  When

 2   did you graduate from high school?

 3   A.  I graduated from high school in 1999.

 4   Q.  What was your educational background after high school?

 5   A.  After high school, I went to Ohio State University for

 6   about a year or two, and then I reenrolled in college at Ohio

 7   Dominican where I graduated in 2012.

 8   Q.  Was it 2012 or 2013?

 9   A.  I was just trying to remember.  2013.  I was married in

10   '12.

11   Q.  Mr. Womeldorph --

12             THE COURT:  You can't forget that.

13             THE WITNESS:  That's how I remember it.

14   Q.  You've said it under oath.  You are good to go.

15             When you graduated from Ohio Dominican University,

16   what did you get your degree in?

17   A.  I got my degree in business administration with a focus in

18   management.

19   Q.  Did you get any honors when you were there?

20   A.  I graduated summa cum laude.

21   Q.  What does that mean?

22   A.  It means if I have above a 3.9 grade point average, that's

23   what you're awarded.

24   Q.  Going back in time, you went to Ohio State for a little

25   while?

```
 1   A.  Yes.

 2   Q.  Then you stopped, correct?

 3   A.  That's right.

 4   Q.  What was your first full-time job after you left Ohio State

 5   University?

 6   A.  My first full-time job, I worked at a bar and restaurant

 7   called Bernie's Bagels in Columbus, Ohio.

 8   Q.  What were you doing there?

 9   A.  I booked shows, like rock shows, I managed the restaurant,

10   I did the door, I cleaned up after hours.

11   Q.  What were the years when you were working at Bernie's

12   Bagels, approximately?

13   A.  Approximately mid 2000 to some point in 2004.

14   Q.  From around 2000 to 2004 you were working at Bernie's

15   Bagels?

16   A.  Yes.

17   Q.  Did you have any other jobs during that time period as

18   well?

19   A.  I did.  I did various temp jobs in that time for temp

20   agencies.  I also worked at Long's Bookstore, which it was a

21   college bookstore at Ohio State.

22   Q.  When did you start working at Long's Bookstore?

23   A.  I started working at Long's Bookstore in either 2000 or

24   2001.

25   Q.  Is Long's Bookstore an independent bookstore or is it owned
```

 1   by some chain?

 2   A.  It's currently owned by Barnes & Noble.

 3   Q.  Was it owned by Barnes & Noble at the time you were there?

 4   A.  It was in transition at the time I was there.  They were

 5   buying out Long's, actually, as I was working there.

 6   Q.  In 2004, you stopped working at Bernie's Bagels.  What did

 7   you do then?

 8   A.  After that, I was in a band, and we decided to go on tour

 9   and we would live wherever we broke down, and we broke down

10   outside Spokane, Washington, so we decided we didn't want to

11   live in Spokane, so we got towed to Seattle, Washington, where

12   I ended up living.

13   Q.  How long did you live in Seattle?

14   A.  I lived in Seattle for about a year.

15   Q.  That was around 2004, 2005, is that right?

16   A.  Yes.

17   Q.  What did you do after being in Seattle for a year?

18   A.  After being in Seattle, I moved back to Columbus in late

19   2005.

20   Q.  What were you doing right after you moved back to Columbus

21   immediately in 2005?

22   A.  Right after I moved back to Columbus in 2005, excuse me, I

23   started working at bars again.  I worked at Bernie's Bagels and

24   another bar called the High Five for a little while.

25   Q.  At some point after working at Bernie's Bagels again in

1  2005, did you change jobs again?

2  A.  I did.

3  Q.  What was that transition?

4  A.  I began working at some point in 2006, I began working for

5  Buckeye Books.

6  Q.  What is Buckeye Books?

7  A.  Buckeye Books was a college bookstore, independent college

8  bookstore that was owned by Book Dog Books.

9  Q.  And you said you were in a band in 2004?

10 A.  Yes.

11 Q.  Are you still in a band?

12 A.  I am.

13 Q.  Is it the same band or different band?

14 A.  It's a different band.

15 Q.  I don't think we are going to go into too much detail on

16 that.

17 A.  OK.

18 Q.  You started working for Buckeye Books.  How did you start

19 working at Buckeye Books?

20 A.  I started working at Buckeye Books because before I worked

21 for Book Dog Books in any official capacity, I rented a house

22 from Phil Smyres, the owner of Book Dog Books in the early

23 2000s.  And one of my roommates was his handyman.  And he told

24 me, hey, I have this opportunity to make some money, and all

25 you have to do is hand out some flyers like on the Ohio State

 1   campus.  I'm like, sure, I can use money.  He is like, Phil

 2   Smyres, our landlord, he owns this bookstore.  And so I started

 3   with this project and then when the bookstore would need help I

 4   would occasionally go in and help for a day or two here if they

 5   really needed it in a period before 2004.

 6   Q.  Is Phil Smyres still your landlord?

 7   A.  No, he's not.

 8   Q.  You started working at Buckeye Books in 2006.  Were you

 9   working there during the slow season or during the rush?

10   A.  When I started, I came on during a rush period, during when

11   the classes would start, which is generally when the stores are

12   the busiest.

13   Q.  What were you doing at Buckeye Books when you first started

14   there?

15   A.  When I first started, I was helping out as a temporary

16   employee, but I was promoted to project manager pretty quickly.

17   Q.  What did you do when you were a project manager?

18   A.  When I was project manager, I did a litany of things.  You

19   know, I would install door hinges, I would do runs -- we had a

20   van that would run from the store to our warehouse.  I would

21   help the textbook manager with whatever they needed, like

22   shelving, directing temps, whatever odd jobs came up.

23   Q.  And then did there come a certain point when you stopped

24   being the project manager at Buckeye Books?

25   A.  Yes.

L42MWIL5                    Womeldorph - direct                    2683

 1    Q.   What did you do then?

 2    A.   Then I was promoted to assistant textbook manager.

 3    Q.   What does assistant textbook manager mean?

 4    A.   Assistant textbook manager helps with many of the roles and

 5    responsibilities of the textbook manager, such as ordering

 6    books, shelving books, helping direct staff, and it also was

 7    helping with this flyer project that I had done previously.

 8    Q.   Did there come a time when you stopped being the assistant

 9    textbook manager at Buckeye Books?

10    A.   Yes.

11    Q.   What role did you have?

12    A.   I became the textbook manager.

13    Q.   What does the textbook manager do?

14    A.   The textbook manager -- I may add that I was also the

15    assistant store manager.  In addition to my roles before I was

16    helping open and close the door, I was directing staff

17    directly, I was ordering the books from publishers, wholesalers

18    and the like, so that we would have the necessary books for

19    school and for our students who shop there.

20    Q.   This was all between 2006 and around 2011, is that correct?

21    A.   Yes.

22    Q.   When did you first hear that there was such a thing as

23    counterfeit books?

24    A.   I first heard of it when our Follett account was closed.

25    They are a wholesaler.  And I heard that our account was closed

```
 1   because we were allegedly selling them counterfeit books.

 2   Q.  What happened after Follett allegedly said that counterfeit

 3   books were being sold?

 4   A.  We were no longer able to order any books from them.

 5   Q.  Do you recall when that happened, approximately, what year?

 6   A.  I feel like that was around 2011.

 7   Q.  And when did you move to the TextbookRush side of the

 8   business?

 9   A.  I moved to TextbookRush at some point in 2012.

10   Q.  Why did you move to TextbookRush?

11   A.  I wanted more opportunities to be able to advance.  I

12   wanted to get out of retail.  But my friend Kevin Doenges put

13   in a good word for me, I assume, and I was asked to come up to

14   the warehouse, to TextbookRush.

15   Q.  What was your first role at Book Dog Books after leaving

16   Buckeye Books, when you started on the TextbookRush side of the

17   business in 2012?

18   A.  When I first came up to TextbookRush, I was basically

19   trying to learn the ropes for a couple of months, like learning

20   the systems and how it all worked, but then I was quickly put

21   on a project.

22   Q.  What project were you put on?

23   A.  I was put on a project, our company started an FBA rental,

24   textbook rental program, and we were to supply books for it,

25   yes.
```

2685

```
 1   Q.  And FBA means filled by Amazon?

 2   A.  It does.  Thank you.

 3   Q.  Approximately when were you working on acquiring books for

 4   the fulfilled by Amazon rental program?

 5   A.  I was doing that sometime in early summer, maybe June

 6   through August or September of 2012.

 7   Q.  And how did you set up the fulfilled by Amazon program?

 8   A.  My role was, we had rented out another warehouse where I

 9   was ordering books from various online marketplaces, such as

10   Amazon.  To get the books necessary for our rental program,

11   they would come into the warehouse, we would check them in, and

12   send them out.

13   Q.  When you say check them in, what was the process for

14   checking in the fulfilled by Amazon rental books that you were

15   acquiring?

16   A.  I guess I should add that we also were ordering from

17   wholesalers, publishers, not just marketplaces.

18   Q.  Can I pause you there for a second.  Do you need some

19   water, Mr. Womeldorph?

20   A.  That would be great.

21           MR. BHANDARI:  May I approach, your Honor.

22           THE COURT:  Yes.

23   A.  My throat is a little scratchy.  I apologize.

24   Q.  That's OK.  Singing in the band?

25   A.  No, not anymore.
```

1   Q.  You just said that you acquired books from wholesalers and

2   marketplaces and what else?

3   A.  And publishers and different marketplaces.  Did you say

4   that?

5   Q.  Yes.

6   A.  Yes.

7   Q.  We all know what publishers are in this case.  Can you give

8   me examples of who wholesalers are?

9   A.  Wholesalers would be MBS, Nebraska, at the time Tichenor,

10  Texas Book Company, Follett would be one.

11  Q.  You said you acquired books from different marketplaces,

12  correct?

13  A.  That's correct.

14  Q.  One of them is Amazon, obviously?

15  A.  Yes.

16  Q.  Are there any other marketplaces that you guys were

17  acquiring books from?

18  A.  Sure.  Primarily, we were getting books from Alibris and

19  Half.com, AbeBooks, but also Amazon.

20  Q.  When the books would come in, you said they would get

21  checked in, right?

22  A.  Yes, sir.

23  Q.  How would you check in the books that were coming in for

24  fulfilled by Amazon program?

25  A.  We would place -- there would be purchase order numbers

1    somewhere on the box.  They would come in, somebody would open

2    them inspect the books, scan them into a system, which put them

3    onto a shipment, and then they would be reboxed and labeled and

4    sent out from there.

5    Q.  Where would they be sent to?

6    A.  That would be determined exactly by Amazon, by one of their

7    fulfillment centers.

8    Q.  So the fulfilled by Amazon program meant that TextbookRush

9    acquired a large number of books and then -- withdrawn.  It

10   meant that Book Dog Books acquired a large number of books to

11   start the rental program, right?

12   A.  Yes.

13   Q.  Then those books got checked in by Book Dog Books, correct?

14   A.  Yes.

15   Q.  And then they were shipped to Amazon, correct?

16   A.  Yes.

17   Q.  So Amazon had various different warehouses around the

18   country?

19   A.  That's correct.

20   Q.  When the books were being checked in, what were they being

21   checked for?

22   A.  They were being checked for condition.  They were being

23   checked for accuracy.  They were being checked to make sure

24   that everything -- they were on the right shipments,

25   authenticity.

1   Q.  Do you recall if any of the folks who were grading books

2   that were coming in ever approached you with books that they

3   thought might be questionable?

4   A.  I do remember one instance.  I can't remember the employee

5   or the book, but I do remember somebody brought a book to me

6   and said, hey, this doesn't look like and I was like, OK.

7   Yeah.

8   Q.  Do you recall what happened with that questionable book?

9   A.  I know it was set aside and held, but I couldn't tell you

10  anything more than that.

11  Q.  Now, you said you worked on this project from about June

12  until August or September of 2012, is that right?

13  A.  Yes.

14  Q.  What did you do after that?

15  A.  When I came back, I -- I'm trying to remember.  I know when

16  I came back, again, I was trying to relearn the ropes because I

17  was thrust back into the role I was starting before I was

18  ordering all these books.  I tried ordering a lot of books for

19  our normal sales avenues of TextbookRush.  And then soon after

20  I was learning the ropes, I was pulled in by David Dimm to help

21  to investigate books that may be inauthentic.

22  Q.  Can you please describe in general terms the project that

23  you started working on with David Dimm in late 2012 or early

24  2013?

25  A.  Yes.  We were examining many titles to see what traits they

1   had and to try to determine if they were authentic or possibly

2   counterfeit.

3          MR. BHANDARI:  Can we take a look at a exhibit that's

4   been previously marked as Defendants' Exhibit 122.  Can we zoom

5   in on that, please.

6   Q.  This is an e-mail from Darrell Burton to Jeff Brady and you

7   are copied on this e-mail, correct?

8          MR. GOULD:  Excuse me.  Before there is any more

9   information about it, we would object.  Hearsay.

10          MR. BHANDARI:  Your Honor, I would like to try to lay

11   a foundation.

12          THE COURT:  You can proceed.

13          MR. BHANDARI:  Thank you.

14   Q.  This is an e-mail from Darrell Burton to Jeff Brady and

15   various other people, including yourself, correct?

16   A.  Yes.

17   Q.  And the date is May 2, 2013, correct?

18   A.  Yes.

19   Q.  And this e-mail says:  As you know --

20          THE COURT:  Don't read it.

21          MR. BHANDARI:  Fair enough, your Honor.

22   Q.  Does this e-mail lay out what the policy was for Book Dog

23   Books in terms of what they were trying to do with regard to

24   questionable books?

25          MR. GOULD:  Objection to foundation.

L42MBIL5                    Womeldorph - direct                    2690

```
 1              THE COURT:  Sustained.
 2   Q.  Do you recall receiving this e-mail, Mr. Womeldorph?
 3   A.  No.
 4   Q.  So I am going to --
 5              MR. BHANDARI:  Your Honor, I will ask some questions.
 6   Q.  Don't look at the e-mail, Mr. Womeldorph.  Try and answer
 7   them as best you can.  If you need to refresh your
 8   recollection, we will put it back up on the screen.  For now I
 9   am going to see if I can ask you.
10              In 2013, did Book Dog Books have any sort of policy in
11   terms of what they were doing with regard to questionable
12   books?
13   A.  Yes.
14   Q.  And what was that policy?
15   A.  We don't buy them and we don't sell them.
16   Q.  And what was Book Dog Books' doing internally to try to
17   determine whether any books that it had received from sellers
18   were questionable?
19   A.  We were examining them at every step of the process.
20   Q.  And was that policy communicated to various people at Book
21   Dog Books?
22   A.  Yes.
23   Q.  And were there e-mails reflecting that policy?
24   A.  Yes.
25   Q.  And were e-mails reflecting the policy regarding
```

L42MMIL5                    Womeldorph - direct                    2691

1  questionable books sent in the regular course of Book Dog

2  Books' business?

3  A.  Yes.

4  Q.  And did they memorialize policies that you guys were

5  developing relatively close to the time that you developed

6  those policies?

7  A.  Yes.

8          MR. BHANDARI:  Your Honor, I would like to offer

9  Defendants' Exhibit 122 as a business record memorializing the

10  Book Dog Books policy on questionable books.

11          MR. GOULD:  We would object.  Clearly, it's just an

12  e-mail, and Mr. Womeldorph has testified what he remembers was

13  happening at the time.  That's a sufficient basis --

14          THE COURT:  Sustained.

15  Q.  Now, there were certain books that you determined were

16  questionable, correct?

17  A.  Yes.

18  Q.  Why did you call books questionable or substandard instead

19  of counterfeit?

20  A.  Because we don't know for a fact that they are or are not,

21  and we question their authenticity, so we call it questionable.

22  Q.  Now, in May of 2013, were you and Aaron Higbie inspecting

23  various books that you believe might have been questionable?

24  A.  Yes.

25  Q.  When did you start doing that?

 1   A.  Started doing that sometime late 2012, early 2013.

 2   Q.  Why were you reviewing the questionable books?

 3   A.  Because we wanted to make sure that anything that we found

 4   questionable wasn't entered into the back stream.

 5   Q.  Did you continue to inspect questionable books after May of

 6   2013?

 7   A.  Yes.

 8   Q.  Now, by June of 2013, was there process in place for

 9   checking questionable books?

10   A.  Yes.

11   Q.  What was that process?

12   A.  Any books that were found or determined to be questionable,

13   they were set aside for me to examine, or David Dimm.

14   Q.  And what would you do when books were set aside?

15   A.  I would look at them, for traits that we had and that could

16   be problematic, and at the time I was working very closely with

17   David Dimm to determine this based on what we knew or we

18   thought we knew.  And if we didn't feel comfortable with it, we

19   would set it aside.

20   Q.  Was that process in place sometime before June of 2013?

21   A.  There were processes, but I'm not aware of the details

22   before that.

23   Q.  I'd like to show you an e-mail to potentially refresh your

24   recollection.

25              MR. BHANDARI:  Can we take a look at Defendants'

1   Exhibit 122.  Can we just show this to the witness.

2   Q.  Can you take a moment to read this e-mail, Mr. Womeldorph.

3        Does this refresh your recollection about whether or

4   not there were processes in place to detect questionable books

5   prior to June of 2013?

6   A.  Yes.

7   Q.  And once you and Aaron Higbie had completed inspection of a

8   questionable book, you would return the book --

9        MR. GOULD:  Objection.  Leading.

10        THE COURT:  Sustained.

11        MR. BHANDARI:  Let me rephrase the question.

12   Q.  What would you do when you would find a potentially

13   questionable book?

14   A.  I would -- if I thought it was potentially questionable, I

15   would put it aside for further review.  If after further review

16   I had questions still about it, we would make sure it didn't

17   enter our inventory.

18   Q.  Did there come a time when you were working as the

19   antipiracy director or acting antipiracy director when you

20   conducted classroom trainings?

21   A.  Yes.

22        MR. BHANDARI:  If we can pull up Defendants' Exhibit

23   4, which is already in evidence.

24   Q.  Looking at Defendants' Exhibit 4, can you please describe

25   what this document is?

1  A.  This document is a draft of our handout for our classroom

2  training sessions for questionable books.

3  Q.  Who created this document?

4  A.  David Dimm and myself.

5  Q.  And if you can look to the very bottom of this there

6  appears to be a date.  It says 2013.04.30.  Do you have any

7  understanding of what that date means?

8  A.  That would means it would be from April 30, 2013.

9  Q.  Is that when the first classroom training sessions were

10  conducted by you and Mr. Dimm?

11  A.  That sounds like the approximate start date, yes.

12  Q.  Starting in April of 2013, how frequently were classroom

13  trainings held?

14  A.  We would have classroom trainings biyearly, including

15  refreshers, or whenever we had new staff hired on.

16  Q.  So it would be twice a year for regular staff and as needed

17  for new staff, is that right?

18  A.  That's a better way of putting it, yes.

19  Q.  Was this document ever updated?

20  A.  Yes.

21  Q.  Why was it updated?

22  A.  As we discovered more and we learned more, we updated this

23  document to incorporate those changes.

24          MR. BHANDARI:  If we can take a look at Defendants'

25  Exhibit 5, please.

L42MWIL5                Womeldorph - direct                2695

 1   Q.  Do you recognize this document, Mr. Womeldorph?

 2   A.  Yes.  This is a draft of the handout from the questionable

 3   training.

 4   Q.  What's the date on this draft?

 5   A.  This is May 13, 2013.

 6           MR. BHANDARI:  Your Honor, we would like to have

 7   Defendants' Exhibit 5 entered into evidence.

 8           THE COURT:  Any objection?

 9           MR. GOULD:  No objection.

10           THE COURT:  Defendants' Exhibit 5 is received in

11   evidence, and you may publish it.

12           (Defendant's Exhibit 5 received in evidence)

13   Q.  Looking at Defendants' Exhibit 5, you see that the title is

14   questionable books characteristics, correct?

15   A.  Yes.

16   Q.  Can you please read the first sentence after that.

17   A.  Bookstores.com and associated companies have a

18   zero-tolerance policy when it comes to possible fake product in

19   the marketplace.

20   Q.  What is bookstores.com?

21   A.  Bookstores.com is one of our selling sites.  We go under

22   TextbookRush and bookstores.com.  We sell and buy and rent

23   under both of those.

24   Q.  What did you mean when you said that there was a

25   zero-tolerance policy?

1    A.   What I mean is or what we meant, rather, was that we don't

2    allow any possible fake product.  We have no tolerance

3    whatsoever.  We don't buy them or sell them.

4             MR. BHANDARI:  If we can pull up the next document for

5    identification purposes only first, Defendants' Exhibit 7.  Are

6    these already in?  Defendants' Exhibit 7, it's already in.

7             Can we pull up Defendants' Exhibit 4 and Defendants'

8    Exhibit 7 side by side.  Is it possible to do that.

9    Q.   Mr. Womeldorph, if I could direct your attention to

10   Defendants' Exhibit 7, do you see that?

11   A.   Yes.

12   Q.   What's the date of this particular document?

13   A.   That would be October 14, 2014.

14   Q.   What does that signify?

15   A.   That signifies that is when this draft was saved.

16   Q.   Was this document, Defendants' Exhibit 7, handed out at

17   trainings that were conducted at Book Dog Books?

18   A.   Yes, it appears so.

19   Q.   What are some of the differences between Defendants'

20   Exhibit 7, the October 2014 characteristics list, and the

21   Defendants' Exhibit 4, which is the April 2013 characteristics?

22   A.   The draft from 2013 incorporates, it has -- it looks like

23   the main -- I'm seeing that the definition of issue is fleshed

24   out in the 2014 version.  The 2014 version has taken out the

25   process, which seems to be oriented around giving a macro view

1    of the whole process.  But there is also additional notes that

2    are added.

3    Q.  What are some notes that were added in Defendants' Exhibit

4    7?

5    A.  I see that we say we went from print quality may be

6    substandard, to print quality may be substandard, blurry, or

7    pixelated.  We added the bullet point:  Paper stock may feel

8    too light or be see through.

9         MR. BHANDARI:  If you could highlight that third

10   bullet point in Defendants' Exhibit 7, the third one,

11   Mr. Klein, third bullet point.  The very beginning of the

12   third.  If you can get that whole third one.  Great.

13   Q.  Is that what you were reading, from that bullet point that

14   starts open the book and look through it?

15   A.  That's correct.

16   Q.  Why were there some additional bullet points added to

17   Defendants' Exhibit 7?

18   A.  We added notes and bullet points when we discovered new

19   things.  We found possible ways to be able to better detect

20   possibly counterfeit product.

21   Q.  Why was it reworded?  Why was the process taken out and

22   some other stuff removed that was originally in Defendants'

23   Exhibit 4?

24   A.  We adjusted and revised these documents in our training as

25   we learned more and ways that we thought would be better suited

1   to training classrooms, for one.

2          MR. BHANDARI:  If we can pull up Defendants' Exhibit

3   9.  Keep 7 on there, please.  Can we put 7 and 9 next to each

4   other.  I believe Defendants' Exhibit 9 is also in evidence.

5   Is that correct?

6          Your Honor, there is no objection to Defendants'

7   Exhibit 9.  If it's not already in evidence, we would ask.

8          THE COURT:  Defendants' Exhibit 9 is received, and you

9   may publish.

10         (Defendant's Exhibit 9 received in evidence)

11  Q.  Looking at Defendants' Exhibit 9, what is the date on

12  Defendants' Exhibit 9?

13  A.  The date would be April 21, 2015.

14  Q.  What does that signify?

15  A.  That would signify that draft was completed and saved on

16  that date.

17  Q.  Are there any differences between the October 2014 draft of

18  questionable book characteristics and the April 2015 draft of

19  questionable book characteristics?

20  A.  From the page shown, I see that the order has been

21  completely redone.  To begin with, how a normal staff member

22  would look at a book, they would start looking at the outside

23  and they would work their way inside on the second large point

24  there.  I see that right off the bat.  I see many more details

25  added in this draft.  We have an entire section related to

L42MWIL5                    Womeldorph - direct                    2699

1  cloth added, like all the bullet points there.  I'm trying to

2  see here where that's even present in the previous.  Entire

3  section there on cloth, for example.

4  Q.  Again, why were these updates made?

5  A.  As we discovered more and more things, we incorporated it

6  into our training to better educate our staff.

7      MR. BHANDARI:  If we can clear these and then pull up

8  Defendants' Exhibit 13.

9  Q.  This is another copy of the questionable training materials

10  and this one is from questionable book training materials,

11  correct?

12  A.  Yes.

13  Q.  What's the date on this one?

14  A.  That would be November 30, 2015.

15  Q.  And this says it's page 1 of 2, correct?

16      MR. BHANDARI:  Is it possible to pull up both pages?

17  Q.  You remember seeing Defendants' Exhibit 9 just a few

18  moments ago?  That was the April 2015 questionable books

19  training sheet, right?

20  A.  Yes.

21  Q.  That was just one page, correct?

22  A.  Yes.  That I saw.  I didn't see page 1 of 2.

23  Q.  It didn't indicate that it was page 1 of 2, correct?

24  A.  Yes.

25  Q.  Looking at Defendants' Exhibit 13, why is it so much

 1    longer?

 2    A.  We had got a lot of new information between those two

 3    periods from either our research -- from our research.

 4              MR. BHANDARI:  I'd like to pull up Defendants' Exhibit

 5    18.  Two pages, if you can pull them both up.

 6              If it's not already in evidence, your Honor, we move

 7    to have Defendants' Exhibit 18 entered into evidence.

 8              MR. GOULD:  No objection.

 9              THE COURT:  Defendants' Exhibit 18 is received in

10    evidence.  You may publish.

11              (Defendant's Exhibit 18 received in evidence)

12    Q.  Looking at this document, what's the date of this one?

13    A.  The date on this one is April 12, 2017.

14    Q.  This was updated about a year ago, correct?

15    A.  About a year, yeah.

16    Q.  And do you have any understanding as to how information was

17    received that caused the questionable book training materials

18    to be updated in 2017?

19    A.  Anything we got in that period we would be getting from our

20    own research and seeing books that came in and comparing them

21    on the others, ordering.  Yeah.  From our own research.

22    Q.  Now, the litigation with the publishers, did the litigation

23    with the publishers ever result in you getting information that

24    was incorporated into the questionable books training?

25    A.  There was some prior litigation that we got some

 1  information about, trace on certain textbooks.

 2  Q.  Is it your understanding that that information was received

 3  from the discovery process in the litigation?  Is that correct?

 4  A.  I guess I don't understand discovery process.

 5          MR. GOULD:  Objection.

 6  A.  We did receive the information -- yes.  Yeah.  We did

 7  receive information from the outcome of that on a few titles,

 8  yes.

 9          MR. BHANDARI:  If we can pull up Defendants' Exhibit

10  19, please.

11  Q.  What is this document, Mr. Womeldorph?

12  A.  This appears to be a draft of the first page of our slide

13  show for questionable book classroom training.

14          MR. BHANDARI:  If we can go to the next page, please.

15  Q.  Again, can you read the first bullet point on this?

16  A.  Yes.  It says:  TextbookRush.com and associated companies

17  have a zero-tolerance policy when it comes to possible fake

18  books in the marketplace.

19  Q.  Is this the Power Point presentation you would use when

20  conducting trainings?

21  A.  It looked like this, yes.

22  Q.  And was this Power Point also updated periodically?

23  A.  Yes.  It would be updated along with our handout so that

24  the two would watch.

25  Q.  I am not going to go through every one of the Power Points,

1    but, generally speaking, what was the relationship between the

2    Power Points and the questionable book documents that we saw a

3    few moments ago?

4    A.  They would be one in the same.  They would be spaced out so

5    we could easily explain point by point with exemplars in the

6    classrooms or in our classes so they could see and feel those

7    books as it went through.

8    Q.  Who put this up?  Who put these Power Points together?

9    A.  I did with the help of David Dimm.

10   Q.  How did you get the information that was contained in this

11   presentation?

12   A.  I got the information, apart from the discovery, from our

13   own research and what we found.

14   Q.  And how frequently would this information be conveyed to

15   employees of Book Dog?

16   A.  We would show this every time we went through a training

17   session, whether it be an initial training or a refresher

18   training.

19   Q.  What were the differences between the initial training and

20   the refresher training?

21   A.  The initial training -- almost all of our training sessions

22   were an hour and the initial we would go slide by slide,

23   handing out books, describing the characteristics of different

24   books.  Almost all copies had a good and also had a potentially

25   counterfeit copy where it would show the differences between

1    two of the same titles.

2            When we did the refresher courses, we would go through

3    the Power Point without the books, but then we would take them

4    to another room where we would do a game show.  That's what we

5    called it, the game show, where we would have three rounds and

6    have our staff work as a team.  There would be like four or

7    five times and they would go through and try and determine

8    whether the books were good, whether they are potentially

9    counterfeit or they didn't know, and the best team got a prize.

10   Q.  Mr. Womeldorph, you are no longer in the antipiracy group

11   at Book Dog, correct?

12   A.  I am not currently in the group.

13   Q.  Do you sometimes consult with them still?

14   A.  I do.  I talk to them.  Luke Thomas, our current director,

15   and Carla and Amber, they all call to me with questions and ask

16   for my advice on things concerning questionable books to this

17   day.

18   Q.  Do you have to go to the training sessions yourself now?

19   A.  I still have to do refreshers.

20   Q.  Are you allowed to participate in the game show?

21   A.  I can participate, but I can't win a prize.

22   Q.  Sounds less fun.

23   A.  Yeah.

24   Q.  Are you familiar with something called the master list?

25   A.  I am.

 1    Q.   What is the master list?

 2    A.   The master list is a complete list of all the ISBNs of

 3    titles that we examine on a regular basis for authenticity.

 4    Q.   How does the master list allow employees to flag books?

 5    A.   My understanding is right now the master list is

 6    incorporated into our system so that it automatically throws

 7    books off for somebody from antipiracy to look at before they

 8    are entered in the inventory.

 9    Q.   When was the master list created, to the best of your

10    knowledge?

11    A.   To the best of my knowledge, the master list was created so

12    we could know which books could be potentially problematic.

13    And in my capacity I was using it so that on a weekly basis I

14    would review all books with those ISBNs that enter our

15    inventory over the course of a week.

16    Q.   And when was the master list created, to the best of your

17    knowledge?

18    A.   It was created sometime before I entered the role in 2012,

19    2013.

20    Q.   Is the master list updated from time to time?

21    A.   It is updated any time we receive a new title or find a new

22    title that we have questions on.

23    Q.   Do you know how many titles are on the master list right

24    now?

25    A.   I haven't looked at it in a few months, but it's definitely

1    over a thousand.

2    Q.  And you described an alert system, correct?

3    A.  An alert or an auto flagging, yes.

4    Q.  Have the alert system and the master list changed since you

5    worked as the antipiracy director in 2013?

6    A.  Yes.  They were changed several times, many times.

7    Q.  How were they changed?

8    A.  There were improvements made and the depth of which it

9    went -- got more and more sophisticated and covered more books.

10   By the time I was out of the role, I know we were throwing

11   them -- every book that was on the master list out.

12   Q.  I'd like to talk a little bit about the inspection process.

13   Are you familiar with the inspection process that existed at

14   Book Dog Books for questionable books?

15   A.  Yes.

16           MR. BHANDARI:  Can we pull up the demonstrative which

17   has been marked for identification purposes as DX 411.

18           Can we publish this to the jury, your Honor?  I am

19   going to ask some questions about it.

20           THE COURT:  You may.

21   Q.  Mr. Womeldorph, can you describe the current inspection

22   process?  And if you can, use this diagram to help kind of

23   explain what steps are happening.

24   A.  Sure.  So boxes in various departments come in.  As I said,

25   they are unloaded, scanned and weighed, depending on where they

```
 1    come in through, whether it is our buybacks department, our
 2    receiving department.  And then the master list books are
 3    automatically flagged as soon as they are checked in or
 4    attempted to be checked in by our system.
 5    Q.   Can I stop you there for a second?
 6    A.   Yes.
 7    Q.   You said the master list books are flagged right away?
 8    A.   Yes.
 9    Q.   What happens to books, over a thousand books on the master
10    list, when they get flagged?
11    A.   As soon as they are scanned in, they are put aside for
12    somebody from our antipiracy team to look at.
13    Q.   What happens to the other books, the ones that are not
14    flagged as having been previously counterfeited?
15    A.   Any other books are examined using the training that our
16    staff have gotten to determine whether they believe they are
17    questionable or not.
18    Q.   What happens to the books that the staff independently
19    decide may be questionable?
20    A.   They are put aside for an antipiracy staff member to
21    examine.
22    Q.   There is the buyback department?
23    A.   Sure.
24    Q.   And bulk receiving department, correct?
25    A.   Sure, yes.
```

2707

1    Q.   And books are set aside in both those departments?

2    A.   Yes.

3    Q.   Let's just say there is a pile of books that comes up every

4    single day, correct?

5    A.   Sure.

6    Q.   Are books in the bulk receiving department automatically

7    flagged?

8    A.   Yes.

9    Q.   What happens to those piles of books that have stacked up

10   in the bulk receiving department and the buyback department?

11   A.   The ones that are set aside to be examined?

12   Q.   Yes.

13   A.   An antipiracy staff member will look through them, examine

14   them.  Whether they are flagged or they were determined by an

15   associate would be questionable.  They are looked at.  If they

16   are deemed to be not questionable, they are entered in

17   inventory.  If they continue to be considered questionable,

18   they are set aside and quarantined.

19   Q.   You see in this chart that's Defendants' Exhibit 411, do

20   you see that in the center, there is like a little circle with

21   a man wearing suspenders and looking at a bunch of books?

22   A.   Yes.

23   Q.   Is that supposed to be you inspecting books that have been

24   pulled aside by the buyback department --

25   A.   I don't have any suspenders, so no.

1   Q.  That's the part in the process when it would happen,

2   correct?

3   A.  Yeah.  It looks likes they have been put aside.  We have V

4   cards.  They are put on cards for inspection.

5   Q.  Some of the books that are reviewed for inspection are

6   found to be perfectly fine and authentic, correct?

7   A.  Yes.

8   Q.  What happens to those books?

9   A.  Those books, the person who looks at them scans them back

10   into the system and marks that they are acceptable, and then

11   they are shelved and available for sale.

12   Q.  Once a book is available for sale, that's the end, right,

13   there is no more inspections after that?

14   A.  No.  There is also inspection on when people pull the book,

15   say for a sale and when it is shipped out.

16   Q.  What happens?  The book is already on the shelf, it's been

17   put on the shelf.  When is there another inspection of books

18   that are already on the shelf?

19   A.  Well, if it sold, for example, the person who picks the

20   book will examine it for questionability.  And if it gets to

21   the order processing, that department will also inspect it.

22        Additionally, if there is -- this is, I believe the

23   next point.  If it is on the master list, then it will be

24   reinspected within a week, as soon as it becomes active.

25   Q.  Is that called a shelf check?

1    A.  I called it a shelf check, yes.

2    Q.  And then after the shelf check, you just said sometimes if

3    you're lucky that these books get sold, correct?

4    A.  Yes.

5    Q.  What happened after a book is sold?

6    A.  I guess I skipped ahead.  That's where the order processing

7    and picking staff would examine it at that point for

8    potential -- for questionability.

9    Q.  The inspection process that we see on this slide wasn't

10   exactly the same as when you first started working on

11   counterfeiting work in 2013, was it?

12   A.  It's not exactly the same.

13   Q.  What are some changes between the time when you first

14   started and during the process, from what you can remember?

15   A.  From what I can remember, it was -- I would inspect the

16   books weekly early on, but we didn't flag every book like we

17   do.  We didn't have nearly as many titles in the master list at

18   that point either.  I am trying to think of -- I know the alert

19   system got more robust as time went on as well, and it became

20   easier for staff to see and with the advent of bulk receiving

21   that incorporated that.  Because that was a newer program that

22   we got between 2013 and 2016.

23   Q.  Why were these changes made between 2013 and today?

24   A.  We made changes to try to streamline and improve our

25   processes and to try, in this case, better identify and look at

1    these books that may be questionable.

2    Q.   Do you expect the inspection process to continue to change?

3    A.   I believe it will continue to improve.

4    Q.   Why do you think that?

5    A.   That's what we have been doing.  We have been trying to

6    improve our processes as we go forward with this.

7    Q.   And have you heard of a company called Noram?

8    A.   I have.

9    Q.   What is Noram?

10   A.   Noram is a company that, to my knowledge, they work with

11   companies such as Amazon to receive books in, process them, and

12   send them to Amazon or other companies.

13   Q.   Did you ever provide any training to people at Noram?

14   A.   I did.

15   Q.   When was that?

16   A.   I'm trying to think exactly.  Either '14 or '16.  But it

17   was a couple of years ago.

18   Q.   Definitely not 2015?

19   A.   I don't know.  It's somewhere -- I'm trying to base it on

20   how old my kid was.  Sorry.  He might have been around a year

21   old at that point.  2015 could be right.  I really don't know

22   for sure.  I know it was a couple of years ago.

23   Q.   What was the training that you were providing to Noram?

24   A.   The training I provided was, I went down with David Dimm,

25   Chuck Cuddihy, and we went and basically took them through our

L42MWIL5                    Womeldorph - cross                         2711

 1    inspection process, and we brought lots of examples of books

 2    and how we do it.  And I worked closely with Pam Hopping, who

 3    was their antipiracy person.  I don't know what her role was

 4    exactly.  Right off the bat, you see this, oh, my God.  We

 5    started talking.  It was just funny.  I was like, you spotted

 6    that DSM?  Wow.

 7              Basically, we got together and like went through all

 8    these things, went through our training and spent an hour just

 9    like trading notes and examining how they did their processes

10    and they examined our books.  It was kind of fun.  I don't

11    know.

12    Q.  Thank you very much, Mr. Womeldorph.  I don't have any more

13    questions at this time.

14    A.  Thank you.

15              THE COURT:  Cross-examination, Mr. Gould.

16              MR. GOULD:  Thank you, your Honor.

17    CROSS-EXAMINATION

18    BY MR. GOULD:

19    Q.  Good afternoon, Mr. Womeldorph.  My name is Jeff Gould.  We

20    met before at your deposition in September, is that correct?

21    A.  That is correct.

22    Q.  Nice to see you again.

23    A.  Nice to see you.

24    Q.  I want to clear up something before we begin.  In fact,

25    you've never had a title of antipiracy director, correct?

1   A.   That was never my title.

2   Q.   And you've never had a title of acting antipiracy director,

3   correct?

4   A.   That was not my title.

5   Q.   In fact, the entire time you were working on counterfeit

6   related issues, your title was inventory specialist, correct?

7   A.   I didn't really have a title that I knew of.  I made up

8   inventory specialist.

9   Q.   Do you recall testifying under oath in your deposition that

10  your title during those years was inventory specialist?

11  A.   I don't recall.

12  Q.   Would it refresh your recollection to hear or see that

13  deposition testimony?

14  A.   Sure.

15       MR. GOULD:  Page 181, lines 17 through 20.

16  Q.   Were you asked these questions and did you give these

17  answers:

18  "Q.   During the period that you occupied responsibilities

19  pertaining to the identification of questionable books, what

20  was your job title?

21  "A.   I was inventory specialist."

22       Does that refresh your recollection, sir?

23  A.   Yes.

24  Q.   You are not giving different testimony today, are you?

25  A.   No.

1  Q.  You said you met Mr. Smyres, you were living in a house

2  that he owned, is that correct?

3  A.  Yes.

4  Q.  Do you know if he owns other properties?

5  A.  Today?

6  Q.  Sure.

7  A.  I'm not sure.

8  Q.  You don't know either way?

9  A.  No.

10  Q.  You started working for Mr. Smyres in one of his brick and

11  mortar bookstores in 2006, 2007, correct?

12  A.  I was hired then, yes.

13  Q.  As a temp or seasonal employee?

14  A.  Yes.

15  Q.  That was at Buckeye Books, correct?

16  A.  Yes.

17  Q.  And you worked at Buckeye Books until sometime in 2012,

18  correct?

19  A.  Yes.

20  Q.  And during that time, those five or so years, you had no

21  exposure to or involvement in issues related to counterfeit

22  books, correct?

23  A.  Can you repeat the question.

24  Q.  During that time, from roughly 2007 to 2012, working at

25  Buckeye Books, you had no exposure to or interaction related to

 1   counterfeit books, correct?

 2   A.  I knew of them.

 3   Q.  Do you recall Mr. Womeldorph, being asked this question and

 4   giving this answer during your deposition on page 19, lines 21

 5   through 24:

 6   "Q.  During that time, 2007 to 2012, working at Buckeye Books,

 7   did you have any exposure to or interaction related to

 8   counterfeit books?

 9   "A.  No."

10         Are you changing your testimony today, sir?

11   A.  I'm not.  I'm just saying the Follett incident -- I knew

12   that they existed, but I did not.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1    BY MR. GOULD:

 2    Q.   So you had heard they exist, but you had no exposure to or

 3    interaction with those issues; correct?

 4    A.   Correct.

 5    Q.   One of the things you did do at Buckeye Books though was

 6    work on the old-fashioned kind of buybacks, right, where a

 7    student walks in and actually sells a book?

 8    A.   Yes.

 9    Q.   The old-school way, just a person walks in with a book and

10    sells it back to the bookstore; correct?

11    A.   Yes.

12    Q.   Not only back to the bookstore, but to the bookstore.

13    Sometimes when you were doing that, you would get a feeling

14    that someone was trying to sell you something that maybe they

15    shouldn't be selling you; correct?

16    A.   Yes.

17    Q.   Maybe a stolen book or some other reason, you just -- it

18    didn't sit right with you, right?

19    A.   Yes.

20    Q.   And in those instances you would exercise some judgment and

21    make observations about the person selling the book; correct?

22    A.   Yes.

23    Q.   Certain things might put up a red flag that this is a

24    suspicious sale or just something didn't sit quite right;

25    correct?

 1    A.  Yes.

 2    Q.  Maybe someone looked nervous or shifty-eyed?

 3    A.  Yes.

 4    Q.  Maybe someone couldn't stop talking really fast, nervous

 5    talking, that kind of thing?

 6    A.  That happened.

 7    Q.  Maybe they are sweating heavy, but it's a really cold day

 8    and they are hot under their collar?

 9    A.  Sure.

10    Q.  And when you saw someone trying to sell a book that was

11    exhibiting those types of behaviors, you would try to ferret

12    out more information about the customer, the book, the sale;

13    correct?

14    A.  Yes, generally.

15    Q.  Maybe you'd ask a few more questions.  If they were selling

16    a psychology book, you'd ask about psych 101, for example,

17    right?

18    A.  That's a good example.

19    Q.  So let's shift gears to online buybacks for a minute.

20           You understand, of course, that the defendants buy

21    millions of books through online buyback, right?

22    A.  That could be.

23    Q.  You pause because of the number; is that right?

24    A.  That's correct.

25    Q.  So on any given year it might be hundreds of thousands, but

 1   over time certainly it's millions, right?

 2   A.  I can't say.

 3   Q.  It's a big number?

 4   A.  That's fine.

 5   Q.  Quite unlike your experience in the Buckeye Books, you

 6   can't actually see the customer who's -- or the supplier who's

 7   bringing in to sell the book, right?

 8   A.  Yes.

 9   Q.  Often don't know their real name or address; correct?

10   A.  Sometimes.

11   Q.  And you can't see if that person is sweating under the

12   collar?

13   A.  No.

14   Q.  And you can't tell if they are talking nervously in the

15   background, right?

16   A.  No.

17   Q.  So all those judgment tools that you had at your disposal

18   and that you used in your course of business in buying books

19   from buyback suppliers in the brick-and-mortar store, those

20   simply don't apply to the millions of online buybacks; correct?

21   A.  Can you rephrase?

22   Q.  Sure.

23        You exercised some judgment utilizing these tools

24   we've just described in trying to assess whether a supplier

25   selling you a book in a brick-and-mortar was something that

 1    should raise a red flag for you, do you recall that?

 2    A.   Yes.

 3    Q.   You agree with that?

 4    A.   Yes.

 5    Q.   When an online buyback occurs, those tools and that dynamic

 6    simply is not at play; correct?

 7    A.   Correct.

 8    Q.   Now, you said you first heard of counterfeit books in

 9    around 2011, when Follett cancelled the defendants' account;

10    correct?

11    A.   Yes.

12    Q.   And that was the first time you had really heard of

13    counterfeit books?

14    A.   That I can recall.

15    Q.   And then in the spring of 2012, so sometime the next year,

16    you moved over to the online portion of the defendants'

17    business; correct?

18    A.   Online portion of the --

19    Q.   You moved from Buckeye Books over to TRU, to the website?

20    A.   Oh, yes.

21    Q.   And you hadn't had any counterfeit training of any kind at

22    that point; correct?

23    A.   I have not.

24    Q.   And starting in the fall of 2012, you became in charge of

25    dealing with counterfeit book issues; correct?

 1   A.  I -- I was helping coordinate that.

 2   Q.  So you and David Dimm together -- maybe you weren't the

 3   number one, but you and David Dimm together were in charge of

 4   dealing with counterfeit book issues; correct?

 5   A.  We were.

 6   Q.  Yes?

 7   A.  Yeah.

 8   Q.  And you remained in that position -- let me -- withdrawn.

 9   Let me state it differently.

10         Over the next four years, into 2016, that remained one

11   of your primary responsibilities; correct?

12   A.  Yes.

13   Q.  So within a year of first learning that counterfeit books

14   exist and becoming one of the primary people dealing with

15   counterfeit book issues for the defendants -- strike that.

16         Let me try it again.

17         It was about a year between the time you first learned

18   of the existence of counterfeit books on the one hand and the

19   time that you became one of two people in charge of counterfeit

20   book issues for the defendants; correct?

21   A.  More or less, yes.

22   Q.  And you're not aware of anyone having had that

23   responsibility for the defendants before you; correct?

24   A.  I know there were people doing it before me, but I don't

25   know exactly how they were doing it.

 1   Q.  You're not aware of someone occupying your position on

 2   dealing with counterfeit issues before you; isn't that correct?

 3   A.  Not that I'm aware of.

 4   Q.  Does that mean I'm correct?  I got confused.

 5            Not aware of someone before you; correct?

 6   A.  Wait.

 7   Q.  Your attorney is not going to help you here.

 8            THE COURT:  Sustained.

 9   Q.  Are you aware of someone prior to you occupying the

10   position that you had at the defendants with respect to

11   counterfeit books?

12   A.  I am not.

13   Q.  Now, I think we touched on this.  You didn't have any prior

14   experience working with counterfeits before occupying that role

15   at the defendants; correct?

16   A.  Possible counterfeits, but yes.

17   Q.  I'm sorry.  You had a role working on possible counterfeits

18   before you worked on possible counterfeit issues with the

19   defendants?

20   A.  No, no.  I was saying possible counterfeits, not

21   counterfeits.

22   Q.  Understood.

23            Prior to your work on possible counterfeit issues for

24   the defendants, you had no prior experience or training on

25   those matters; correct?

```
 1   A.  No.

 2   Q.  Did you have any prior training or experience working on

 3   counterfeit or possible counterfeit book issues prior to

 4   occupying that role with the defendants?

 5   A.  No.

 6   Q.  And you had no prior experience working for a commercial

 7   printer or publisher; correct?

 8   A.  No.

 9   Q.  And you had no -- so all your training on these matters

10   occurred on the job, right?

11   A.  Yes.

12   Q.  During those years, 2012 through, I think it was about

13   April 2016, you have other responsibilities in addition to

14   those related to counterfeit books; correct?

15   A.  Yes.

16   Q.  That was part of your inventory specialist, many hats,

17   right?

18   A.  Yes.

19   Q.  And that included purchasing books for the defendants'

20   inventory; correct?

21   A.  Yes.

22   Q.  In fact, you still do some purchasing for the defendants'

23   inventory; correct?

24   A.  I do.

25   Q.  Now, one of the things you talked about with Mr. Bhandari
```

1  was a brief period of time, I think it was June to August 2012,

2  where you talked about purchasing books for the defendants' FBA

3  inventory.  Do you recall that?

4  A.  Yes.

5  Q.  You understand, sir, that the defendants' FBA inventory

6  is -- it's another way of saying the Apex Media store on

7  Amazon; correct?

8  A.  Yes.

9  Q.  So from June to August 2012, part of your work included

10  buying books that would go into the Apex Media inventory for

11  sale through Amazon; correct?

12  A.  Yes.

13  Q.  And you talked about a process where you'd buy from

14  different sources, bring them into the Ohio warehouse, take a

15  look at them, and send them over to Amazon, right?

16  A.  Yes.

17  Q.  And you have some familiarity today with the way that the

18  Apex Media inventory is supplied; correct?

19  A.  I have some familiarity.

20  Q.  And you understand, sir, that a substantial portion of that

21  inventory is filled by purchases through a program called the

22  Amazon trade-in program?

23  A.  Yes.

24  Q.  And so in fact, today and for many years before today, Apex

25  Media receives its inventory in maybe a few different ways, but

2723

```
 1   two large different buckets, right?  Correct?
 2            MR. BHANDARI:  Objection.
 3            THE COURT:  Sustained.  Sustained as to form.
 4   Q.  One of the large categories of books that enter Apex Media
 5   inventory is through the Amazon trade-in program; correct?
 6   A.  Correct.
 7   Q.  Those books never go through the Ohio warehouse; correct?
 8   A.  Initially?
 9   Q.  At all.
10   A.  Currently --
11   Q.  I mean at least since 2012.
12   A.  Well, they do initially go there, yes.
13   Q.  Your testimony, sir, is that when the defendants buy books
14   through Amazon trade-in, all of that goes to the defendants'
15   warehouse in Ohio?
16   A.  I was saying initially.
17   Q.  So initially in 2011, when you first started in the Amazon
18   trade-in program?
19   A.  Books in Amazon trade-in initially will go to Amazon
20   fulfillment centers.
21   Q.  So it sounds like we are in agreement.
22            The books purchased in Amazon trade-in do not go to
23   the defendants' local warehouse for inspection; correct?
24   A.  Initially, no.
25   Q.  But they never go there, do they?
```

1   A.  They do.  Not all of them, sir.

2   Q.  Mr. Womeldorph, in your September -- did I pronounce it

3   wrong?  I apologize.  The FBA inventory includes inventory that

4   never comes into the Book Dog warehouse; correct?

5   A.  Yes.

6   Q.  And if a book never comes into the warehouse, you certainly

7   have no access to inspect it; correct?

8   A.  Correct.

9   Q.  So is it correct that some other portion of the Amazon Apex

10  inventory may go through the Ohio warehouse, but the trade-in

11  stuff does not, right?

12  A.  Some portion of it comes in through the trade-in and is

13  removed for inspection by the Ohio warehouse.

14  Q.  How can the Ohio warehouse remove inspection -- remove in

15  inspections books that go directly to Amazon and don't come

16  through Ohio?

17  A.  If they are available and they were -- my understanding,

18  the best of my knowledge, is that books on the master list or

19  certain books were being pulled back for inspection by the Ohio

20  warehouse and then sent back if it were maybe sent back.

21  Q.  Sir, do you recall in your deposition at page 277, lines 9

22  through 13, I asked you this question, you gave this answer:

23  "Q.  Is there someone at Book Dog Books who has access to FBA's

24  physical inventory to enable an inspection of a book on receipt

25  of a notice like this?

2725

1     "A.  Not that I'm aware of."

2             You're not aware of anyone having access to that

3     inventory; correct?

4     A.  That said upon receipt.  I apologize, it's a little

5     different.

6     Q.  All right.  I think we got the gist.  Let's move on.

7             You've testified in your examination with Mr. Bhandari

8     that part of the way you are able to build out those training

9     materials over time was by incorporating information received

10    from the publishers, do you recall that?

11    A.  Yes.

12            MR. GOULD:  If we could pull up PX-227.  And I'd like

13    to pull up an unredacted version of this one.

14            Your Honor, this is an exhibit that was previously

15    admitted in redacted form, and I think the door has been

16    squarely opened to it.

17            I'm not publishing to the jury yet.  With permission,

18    I hope to do so.

19            THE COURT:  Let's show the unredacted to the witness.

20            MR. GOULD:  Your Honor, I have a copy showing the

21    redactions on a highlighted version for you.

22            Your Honor, I'd move 227 into evidence to show notice

23    to the defendants of the many things --

24            MR. BHANDARI:  Objection.

25            You don't have to explain the document.

```
 1                    I object.  It's hearsay.

 2                    There's no basis for this coming in.

 3                    MR. GOULD:  It shows notice.

 4                    MR. BHANDARI:  It's attorney argument, your Honor.

 5                    It's not received by this witness.  It does not

 6      provided --

 7                    MR. GOULD:  I apologize.

 8                    THE COURT:  The redacted form of this letter is

 9      already in evidence, is it not, for notice?

10                    MR. GOULD:  Yes, portions of it, your Honor.  There

11      are portions that identify additional elements that we think

12      are relevant and directly rebut the testimony; in particular,

13      on page 2, at a minimum, the bottom three paragraphs and the

14      top two paragraphs on page 3.

15                    MR. BHANDARI:  This doesn't rebut any of the testimony

16      that was just given.

17                    THE COURT:  I'm sorry, I can't hear you, Mr. Bhandari.

18                    MR. BHANDARI:  Your Honor, this does not rebut any of

19      the testimony that was just given.  You'll see that.

20                    THE COURT:  Sustained.  Let's move on.

21                    MR. GOULD:  Let's put up a redacted copy of 227

22      please.

23      BY MR. GOULD:

24      Q.  Mr. Womeldorph, you testified receiving information from

25      the publishers that you'd incorporated into training documents.
```

1    Do you recall that?

2    A.  Yes.

3    Q.  Let's take a look at some of the feedback and information

4    that the publishers provided to the defendants regarding ways

5    to avoid dealing in counterfeits.

6         This is a letter to the defendants' attorney, April

7    26, 2013.  And I direct your attention to the bottom paragraph

8    on page 1 and the top paragraph on page 2.

9         It says:  First you ask what your clients can do to

10   reduce the likelihood that they buy counterfeit books.  As we

11   have indicated previously, it is extremely important that

12   distributors understand the true source of the books that they

13   buy for resale.  In other words, in order for your clients to

14   change their ways, they are going to have to make sure that

15   when they purchase inventory, they do the same diligence any

16   other legitimate business would do in any other contexts.

17        Now, let's pause there for a minute.  Actually, let me

18   read the rest.

19        Your clients should not be surprised that they

20   obtained pirate product when they purchase books from companies

21   that have a history of providing infringing material.  Your

22   clients should not be surprised that they obtained pirate

23   product when they buy books from unknown sources at below

24   market prices.  Among other prudent steps that your clients can

25   take, a sound practice is to ask the supplier to provide

1  documentation that demonstrates the legitimacy of the product

2  being sold.  Of course that documentation should be credible

3  and verifiable, not some sham to check a box that the paperwork

4  has been supplied.

5          Mr. Womeldorph, have you seen this letter before?

6  A.  No.

7  Q.  Has anyone from the defendants, Book Dog Books or related

8  companies, ever shared that information with you?

9  A.  Not -- from this letter?

10 Q.  Well, either from the letter or in concept, that you

11 should -- let's take some of that.

12         Understanding the true sources of the books, does

13 anyone -- let me ask it a different way.

14         No one at the defendants has ever instructed you in

15 your work as a book buyer to understand the true source of the

16 books that you buy; correct?

17 A.  No.

18 Q.  And that's not something that you incorporated into any of

19 the handful of training documents that Mr. Bhandari showed you

20 that are designed to help avoid counterfeits; correct?

21 A.  No.

22 Q.  Sir, for clarity of the record, if I ask a question and I

23 say "am I correct," if I am correct, if you could say yes; if

24 not, please say no.

25         MR. BHANDARI:  Objection.

 1              MR. GOULD:  Just trying to clarify for the record.

 2              THE COURT:  Overruled.

 3   Q.  You've never been -- you do some book buying; correct?

 4   A.  I buy books, yes.

 5   Q.  And one of the entities or people you buy books from is Tom

 6   Cahill and his company Zxbi Trading or ZX Trading; correct?

 7   A.  I buy from ZX.

 8   Q.  You understand Tom Cahill is associated with ZX Trading?

 9   A.  Yes.

10   Q.  You understand that Tom Cahill was responsible for selling

11   books to the defendants from the Blackerbys for a number of

12   years?

13   A.  I don't know.

14   Q.  Has anyone ever told you not to buy books from Tom Cahill

15   because he previously sold counterfeit books?

16   A.  No.

17              MR. GOULD:  Could you leave that up please.

18              MR. BHANDARI:  Objection, your Honor.

19              There's no questions about this; leaving it up serves

20   no purpose.

21              THE COURT:  Overruled.  There's about to be.

22   BY MR. GOULD:

23   Q.  Mr. Womeldorph, you've never been told not to buy books

24   from unknown sources at below market prices; correct?

25   A.  No.

1   Q.  In fact, you buy books from Zxbi Trading predominantly, new

2   books; correct?

3   A.  Yes.

4   Q.  98 to 99 percent of the books you buy from ZX Trading are

5   new books, right?

6   A.  Yes.

7   Q.  And typically they are priced below the publishers'

8   published prices; correct?

9   A.  Typically, yes.

10  Q.  And typically they are priced below the U.S. wholesalers'

11  prices; correct?

12  A.  I don't know.

13  Q.  It may vary, but they are often below the U.S. wholesale

14  price; isn't that right?

15  A.  I don't know.

16  Q.  It varies, fair to say?

17  A.  Yes.

18  Q.  And you've never been advised that a sound practice is to

19  ask a supplier to provide documentation that demonstrates the

20  legitimacy of the product being sold; correct?

21  A.  Correct.  Yes.

22  Q.  And you don't ask Mr. Cahill or anyone else you buy books

23  from to provide that sort of documentation; correct?

24  A.  Yes.

25  Q.  I want to touch briefly --

L42MWIL6                Womelsdorph - Cross                2731

 1              MR. GOULD:  You can pull that down, Mr. Cole.

 2     Q.  -- touch briefly on a couple of the inspection procedures

 3     you mentioned.

 4              You talked about the master list; correct?  And you

 5     said that there's a process whereby every title on the list is

 6     automatically diverted to the team that does review of

 7     questionable books; correct?

 8     A.  Yes.

 9     Q.  And that process of automatically diverting those books

10     only began in 2016; correct?

11     A.  I'm not exactly sure when.

12     Q.  Sound about right?

13     A.  Can you repeat exactly what you're saying?

14     Q.  That process of automatically diverting those books for

15     questionable review began sometime in 2016?

16     A.  I believe so.

17     Q.  You talked about a shelf check whereby someone on the

18     anti-piracy group goes to the shelves to take a second look at

19     the books on the master list each week, do you remember that?

20     A.  Yes.

21     Q.  And for the time that process has been in place, it's

22     typically the same person going to the shelf to look at the

23     book who previously looked at it on initial review; correct?

24     A.  When I did it typically, yes.

25     Q.  And even as of your September deposition; correct?

 1   A.  Yes, as of my September --

 2   Q.  So essentially that person is checking your own work?

 3   A.  Could be.

 4   Q.  You talked about a training at Noram and you couldn't

 5   recall if it was 2014 or 2016.  I wanted to take a look at your

 6   deposition and see if we could clear that up.

 7        On page 269, at 3 to 15, do you recall being asked

 8   these questions and giving these answers:

 9   "Q.  And at some point you were asked to assist in training

10   individuals at Noram; is that correct?

11   "A.  I was asked to assist.

12   "Q.  And assist in training people at Noram on what?

13   "A.  On how to identify questionable books.

14   "Q.  And did you participate in that training?

15   "A.  I did.

16   "Q.  Was that roughly April 2016?

17   "A.  It -- yeah, it would have been after.  I can't tell

18   exactly in April, but it would have been in April, it appears,

19   2016."

20        Does that refresh your recollection it was 2016 and

21   not 2014?

22   A.  Yeah, that -- that could be right.

23   Q.  Mr. Womeldorph, you're aware of at least one instance in

24   which Book Dog Books destroyed potentially counterfeit books?

25   A.  Yes.

1   Q.  That was sometime in 2013?

2   A.  I don't recall exactly when.

3   Q.  Does that sound about right?  I think we talked about this

4   before too.

5   A.  Yes, but I can't remember today.

6   Q.  And Mr. Smyres or Mr. Dimm asked you to destroy those

7   counterfeit books; correct?

8   A.  Yes.

9   Q.  It was --

10  A.  Potentially.

11  Q.  Potentially counterfeit books, my apologies.

12          And it was roughly 30 to 60 books you said?

13  A.  It was about two carts.

14  Q.  And you said two carts in this context was roughly 30 to 60

15  books; correct?

16  A.  Yeah, my best guess.

17  Q.  You understood that all of those books had been deemed

18  potentially counterfeit?

19  A.  Yes.

20  Q.  And you personally destroyed them yourself?

21  A.  Yes.

22  Q.  Ripped them apart with your own two hands?

23  A.  Yes, sir.

24  Q.  And at that time you knew that the defendants were involved

25  in a lawsuit regarding counterfeit books; correct?

 1   A.  Yes, but none of the books were from publishers involved in

 2   the lawsuit at that time.

 3   Q.  You made no list of what books were destroyed in that

 4   episode, did you, sir?

 5   A.  I made no list, but I was told specifically to not destroy

 6   any books from the publishers in this lawsuit.

 7   Q.  And certainly if we had a list, we might be able to test

 8   that; correct?

 9           MR. BHANDARI:  Objection.

10           THE COURT:  Overruled.

11   A.  Potentially, yes.

12   Q.  But we have no list so we can't test that; correct?

13   A.  Correct.

14   Q.  I want to shift gears a little bit and talk about warnings

15   to suppliers who may send in a counterfeit or potentially

16   counterfeit book.

17           From time to time the defendants give warnings to

18   buyback sellers, right, buyback suppliers who send in a

19   potentially counterfeit book; correct?

20   A.  I did, yes.

21   Q.  And you understand that the defendants from time to time

22   issue such warnings?

23   A.  Yes.

24   Q.  And for many of those warnings, you don't actually tell the

25   supplier that it's a counterfeit or a potentially counterfeit

1    book, you say, It does not meet our purchasing standards;

2    correct?

3    A.  Yes.

4    Q.  But on the insider parlance, that means potentially

5    counterfeit books, right?

6    A.  Yes.

7    Q.  But you don't issue warnings to every customer that sends

8    in a potentially counterfeit book, right?

9    A.  No.

10   Q.  And you don't issue warnings every time you receive a

11   potentially counterfeit book; correct?

12   A.  No.

13   Q.  Let's take a look at some of those warnings and see how

14   that process unfolds.

15           MR. GOULD:  If we could pull up PX-279 please.

16           I would offer this into evidence.

17           THE COURT:  Any objection?

18           MR. BHANDARI:  Just a moment.

19           No objection.

20           THE COURT:  Plaintiffs' Exhibit 279 is received in

21   evidence.

22           (Plaintiffs' Exhibit 279 received in evidence)

23           MR. GOULD:  May I publish, your Honor?

24           THE COURT:  You may.

25   Q.  Mr. Womeldorph, this is an email chain that you were

1    included in from in October -- let's see, September through

2    November 2015, regarding some warnings to a buyback supplier.

3    Do you recall this email chain?

4    A.  I remember a seller, but not this email.

5           MR. GOULD:  Let's go to page 2, please, if you could

6    scroll down to the beginning of the email chain.

7    Q.  This starts on September 22nd, 2015, right there, with an

8    email from yourself to Jeff Brady.  Jeff Brady runs the

9    customer service or customer care group; correct?

10   A.  Yes.

11   Q.  He communicates with customers and buyback suppliers from

12   time to time?

13   A.  Yes.

14   Q.  And you say to Mr. Womeldorph:  Please send this customer a

15   warning email all copies are unacceptable.

16          MR. OPPENHEIM:  To Mr. Brady.

17   Q.  To Mr. Brady.

18          Correct?

19   A.  Yes.

20   Q.  You wanted to warn -- you wanted to send a warning to this

21   supplier about sending potentially counterfeit books; correct?

22   A.  Yes.

23          MR. GOULD:  And if we scroll up a little bit.

24   Q.  So then Mr. Brady replies sending you a link.  And then you

25   reply sending Mr. Brady a link at the top right here, again, on

 1   September 22nd.  You send another link and you say:  Associated

 2   with Connor Graves.  Do you see that?

 3   A.  Yes.

 4   Q.  You understood at the time that the two accounts you are

 5   identifying through these links were associated?

 6   A.  Can you go lower?  Can I read more -- which accounts are we

 7   talking about?

 8   Q.  They would be the accounts that are identified through

 9   these links.

10   A.  I am not sure.

11   Q.  Let me see if I can refresh your recollection.

12          We looked at this document in your deposition and I

13   asked you this question on page 184, lines 11 through 14.  I

14   asked:  "Do you believe at the time you sent this email you had

15   an understanding of why you thought these accounts were

16   associated?

17   "A.  I'm sure I had a good reason."

18   A.  That applies today.

19   Q.  So you had a good reason at the time to think that these

20   two accounts were associated.

21          MR. GOULD:  And if you scroll up a little bit further.

22   Q.  Mr. Brady asks:  Do you want me to send the same email?

23   And you understood that to mean he was asking if you wanted to

24   send the same warning to the associated account; correct?

25   A.  That is my understanding.

1  Q.  So by this point you now sent two potentially counterfeit

2  book warnings to two separate accounts that you thought were

3  associated with one another; correct?

4  A.  Yes.

5          MR. GOULD:  And if you scroll up a little bit further

6  to the bottom of the first page.  That's good.

7  Q.  Now, the prior emails we were looking at were September

8  22nd, 2015.  And now a little time has passed and we're here

9  October 28, 2015, so about five weeks have passed, give or

10  take.  And you send another email to Mr. Brady and say:  Hi,

11  Jeff.  I need another warning email sent to this customer

12  Connor Graves, second warning.  Correct?

13  A.  Yes.

14  Q.  It's actually a third warning, right, because you had two

15  to different accounts, and now this second one to Mr. Graves;

16  correct?

17  A.  Yes and no.

18  Q.  Certainly three warnings were sent and you had a good

19  reason at the time to believe that the accounts were linked?

20  A.  Yes.

21          MR. GOULD:  Let's scroll up a little bit farther.

22  Q.  Mr. Ward also in customer service; correct?

23  A.  Yes.

24  Q.  Asks you whether this is it, what type of warning this is.

25  And you tell him my warnings are always about questionable

1   books; correct?

2   A.   I see that above, yes.

3   Q.   Now, let's go way to the top.  And now a few days later in

4   November, so this is about five days after you requested the

5   third warning, you said:  I don't see the warning attached to

6   the buyback system below.  Correct?

7   A.   Yes.

8   Q.   Do you know if the third warning was ever sent?

9   A.   I don't.

10  Q.   Let's take a look at Defendants' Exhibit 45.  Let's see if

11  we can figure out what happened with Mr. Graves after these two

12  or three warnings in September and October 2015.

13          MR. GOULD:  Defendants' Exhibit 45 is already in

14  evidence, so I'd like to publish it to the jury please.

15  Q.   All right.  We're going to have some fun with a

16  spreadsheet.

17          Mr. Womeldorph, this is a spreadsheet that the

18  defendants produced purporting to show all of its purchases and

19  sales for all copies of the titles in one of the two cases

20  here, in the second case.

21          MR. BHANDARI:  Objection.  Lacks foundation.  He can't

22  ask him this.  He can't testify.

23          MR. GOULD:  Mr. Dimm already testified about what this

24  is.

25          MR. BHANDARI:  Mr. Dimm should have been the person

```
 1   who got asked questions about this.  There's no foundation for

 2   this witness.

 3   Q.  Let's try a different way.

 4              THE COURT:  Why don't we take a break.

 5              Members of the jury, we'll take a short recess.  Keep

 6   an open mind, come to no conclusions.  Please recess the jury.

 7              (Jury not present)

 8              THE COURT:  You can step down, sir.

 9              You are excused for a few minutes.

10              THE WITNESS:  Okay.  Thank you.

11              (Witness not present)

12              THE COURT:  All right.  Everyone can be seated.

13              All right.  What's the problem with this spreadsheet?

14              MR. BHANDARI:  There's no foundation for this witness

15   having any knowledge about what the spreadsheet means.

16   Mr. Gould testifying about what it is is not an appropriate way

17   to lay a foundation.

18              THE COURT:  It's in evidence, isn't it?

19              MR. BHANDARI:  Yeah.  So he can ask questions; he

20   can't testify about what -- I understand, your Honor.  Just

21   like we didn't have -- you ruled that there were foundation

22   issues where we couldn't tell Mr. Quintero what certain things

23   meant, even though the document is in evidence.  Mr. Gould

24   can't testify about what certain things mean.  He can ask.  And

25   if the witness knows, he knows; and if he doesn't, he doesn't.
```

```
 1    If he's an appropriate witness for these questions, great; if

 2    he's not, then he's not.

 3              THE COURT:  All right.

 4              MR. GLUNT:  Your Honor, one additional thing, just so

 5    the Court is aware.

 6              As the Court is aware, the Court reserved decision on

 7    certain issues related to the charge and to the verdict form

 8    last night.  We had some of our colleagues at the office do

 9    some legal research into those issues, and they've submitted a

10    letter sort of detailing their findings.  I wanted the Court to

11    be aware that we had submitted that letter so it could have the

12    benefit of it if it chose to look at it at any point either

13    this afternoon or in advance of the charge conference.

14              THE COURT:  All right.  Thanks for the heads-up.

15              We'll take five minutes.

16              (Recess)

17              THE COURT:  I've got a copy of the defendants' letter.

18    I've made a copy for plaintiffs' counsel.

19              MR. OPPENHEIM:  Thank you, your Honor.

20              Appreciate that.

21              THE COURT:  Let's bring in the jury.

22              MR. BHANDARI:  Should we get the witness?

23              THE COURT:  Yes, let's get the witness.

24              How much more do you have, Mr. Gould?

25              MR. GOULD:  Five to eight minutes, hopefully, maximum.
```

```
 1            THE COURT:  I think it's a matter of diminishing
 2   returns.  We're chopping chicken liver.
 3            MR. BHANDARI:  I won't tell Mr. Womeldorph that's what
 4   you said about him.
 5            THE COURT:  It wasn't directed at him.
 6            (Witness present)
 7            (Jury present)
 8            THE COURT:  Members of the jury, we'll resume with
 9   Mr. Gould's continued examination of Mr. Womeldorph.
10   Cross-examination, I should say.
11   BY MR. GOULD:
12   Q.  Mr. Womeldorph, you have some familiarity with the
13   defendants' computer systems in tracking customers?
14   A.  Yes.
15   Q.  You're aware that a buyback supplier's transaction history
16   can be identified?
17   A.  Yes.
18            MR. GOULD:  Thank you.
19            I call up D-45.  Derek, could you click on the buyback
20   tab and filter the customer name Graves.  Just type in
21   "Graves."
22   Q.  Sir, do you recall we just looked at a document where you
23   had given two to three warnings to Mr. Graves for sending in
24   potentially counterfeit books in September and October 2015?
25   A.  Yes.
```

1   Q.  Do you see here the third and fourth entries show buybacks

2   from Mr. Graves in January of 2016?

3   A.  Yes.

4   Q.  Does it surprise you at all that Mr. Graves was able to

5   sell additional buybacks to the defendants after receiving two

6   to three warnings for counterfeit books?

7            Do you know what?  Withdrawn.  We'll move on.

8            MR. GOULD:  I'd like to look at one more document,

9   PX-273.  And I move admission and publish.

10            THE COURT:  Any objection?

11            MR. BHANDARI:  Can we see it?

12            MR. GOULD:  Sure.

13            MR. BHANDARI:  No objection.

14            THE COURT:  Plaintiffs' Exhibit 273 is received and

15   you may publish it.

16            (Plaintiffs' Exhibit 273 received in evidence)

17   BY MR. GOULD:

18   Q.  Mr. Womeldorph, this is an email chain from June and July

19   2015 involving a discussion with a buyback supplier named

20   Daniel Freink, F-R-E-I-N-K.  And it starts at the bottom down a

21   couple pages.  And in the first email at the bottom, the second

22   paragraph with all of those digits, Mr. Freink sends an email

23   to Drew.  And that's Drew Paddock, he works in buybacks; is

24   that correct, or did at the time?

25   A.  He worked in inventory management.

 1    Q.   Okay.  So this buyback supplier sends Mr. Paddock an email

 2    saying:  My question is regarding buybacks.  And he lists six

 3    buyback transactions.  Do you see that?

 4    A.   Yeah.

 5    Q.   He says:  For all these buybacks I sent in brand-new copies

 6    of these books.  And all books were exact ISBN matches.  They

 7    were all rejected and no reason other than they did not meet

 8    our purchasing standard was specified.

 9          You understand those books -- those six buybacks were

10    rejected as being potentially counterfeit; correct?

11    A.   That is my understanding.

12    Q.   If you go up a little bit further, Mr. Freink sends another

13    email two days later, towards the bottom.  Update.  And he

14    identifies two more buybacks and he says the same thing

15    happened.

16          Do you understand that shows two additional buybacks

17    rejected as being potentially counterfeit?

18    A.   Yes.

19    Q.   And then the two gentlemen have a back-and-forth over the

20    course of this email.  And Mr. Paddock -- in the middle of this

21    page -- yup, if you could highlight that email.  You see

22    Mr. Paddock tells this supplier:  The books you sent in may not

23    be authorized copies.  I am not able to give you any additional

24    details regarding the books that we weren't able to buy.  I

25    would suggest getting copies of the books directly from the

 1  U.S. publisher and then comparing them with the books you are

 2  sending in.  Hopefully then you will be able to see the

 3  differences.

 4          Do you see that?

 5  A.  I see that.

 6  Q.  You understand that Mr. Paddock was suggesting that he buy

 7  a genuine copy to make a comparison?

 8  A.  I understand that he was suggesting to buy a copy from a

 9  U.S. publisher.

10  Q.  And the email chain continues as you go up a bit.

11          MR. GOULD:  A little more.  You can go actually all

12  the way.

13  Q.  And then in the middle -- that email, yes, with the one two

14  points, Mr. Freink comes back to Book Dog Books and says,

15  towards the end of number one:  I ceased all contact with the

16  supplier and I apologize for inadvertently sending these books

17  in.  Do you see that?

18  A.  Yes.

19  Q.  And then in the next paragraph he says:  I have three

20  copies of this lengthy ISBN.  Would you be able to override the

21  number limits and can I sell these in; correct?

22  A.  Yes.

23  Q.  And then if we go up a little bit further, here Mr. Paddock

24  forwards this chain to you.  And with that history --

25          MR. GOULD:  Actually, why don't you bring up the whole

```
 1    rest of the top.
 2    Q.  He forwards this to you, right, and he says, after this
 3    lengthy back-and-forth:  I'm okay with him sending in three
 4    copies.  What do you think?  As long as he doesn't
 5    inadvertently send in any questionable copies, that is, what a
 6    douche.  Do you see that?
 7    A.  Yes.
 8    Q.  Obviously not a very appropriate way to talk about a
 9    customer, I think you'd agree, right?
10    A.  I could agree with that.
11    Q.  And then you respond and say you'd advertently accept
12    three.  Do you see that?
13    A.  I see that.
14    Q.  "Advertently," you were kind of riffing on his claim that
15    he had inadvertently sent the four; is that correct?
16    A.  That would be my understanding.
17    Q.  But there's a lot going on in this chain, so let's just
18    recap briefly.
19            This is in the summer of 2015.  And in the course of
20    this email, we've seen Book Dog Books rejecting eight buybacks
21    from this customer as potentially counterfeit; correct?
22    A.  I'm sorry, I wasn't counting.
23    Q.  Okay.  Well, there was six in the initial email in the
24    bottom, and then two more in the subsequent email.  We can
25    scroll back down if you want to count.
```

1    A.  That would be eight.

2    Q.  So you would agree that in the course of this June and July

3    2015 email, Book Dog Books rejected eight buybacks from this

4    supplier as potentially counterfeit; correct?

5    A.  To clarify, we rejected books from eight buybacks.

6    Q.  Mr. Womeldorph, you recall you looked at this document at

7    your deposition?

8    A.  I don't recall at this time.

9    Q.  Okay.  Why don't we take a look.

10           In your September 2017 deposition at page 233, lines

11   11 to 14, I asked you this question and you gave this answer:

12           "In the course of this email chain, we've seen eight

13   buybacks rejected by Mr. Freink for being questionable books;

14   correct?

15   "A.  I count eight."

16   A.  Buybacks, not books.  I was just clarifying.

17   Q.  The defendants declined to purchase eight books, eight

18   buybacks from this customer because they believed they were

19   questionable books?

20   A.  Yes.

21   Q.  And then your colleague Drew Paddock tells him he might

22   want to go buy one from a publisher to figure out some

23   differences or if they are questionable, right?

24   A.  That's my understanding.

25   Q.  And then he calls the customer a name internally; correct?

```
 1   A.  Yes.

 2   Q.  Neither of you makes any mention in this email chain of

 3   closing this guy's account; correct?

 4   A.  No.

 5   Q.  And then you immediately authorize buying three more

 6   buybacks from him; correct?

 7   A.  No.

 8   Q.  That's not correct?

 9   A.  Not three more buybacks.

10   Q.  You just said you would authorize him sending in three more

11   copies, right?

12   A.  Books.  Sorry, sir.

13   Q.  You're going to buy three books from him, right?

14   A.  Yes, sir.

15            MR. GOULD:  No more questions.

16            THE COURT:  Redirect, Mr. Bhandari.

17            MR. BHANDARI:  Yes.  Thank you, your Honor.

18            (Continued on next page)

19

20

21

22

23

24

25
```

1   REDIRECT EXAMINATION

2   BY MR. BHANDARI:

3   Q.  Good afternoon again, Mr. Womeldorph.

4   A.  Good afternoon, sir.

5   Q.  We will start with the hard questions.  Do you remember

6   there was a section of your deposition testimony that was read

7   back to you about how you came up with the title for yourself

8   as inventory specialist?

9   A.  Yes.

10  Q.  Do you recall being asked the following questions and also

11  giving the following answers at your deposition on September

12  13, 2017:

13  "Q.  Who handles -- what is this?  Are you talking about the

14  warnings?

15  "A.  The position -- the position which is now the antipiracy

16  director, the responsibilities of that role.

17  "Q.  Who holds that role now?

18  "A.  Carla Stewart.

19  "Q.  Was there a period when you were the antipiracy director?

20  "A.  That was never my title, but the responsibilities were the

21  same.

22  "Q.  What years did you have the responsibilities of antipiracy

23  director?

24  "A.  I don't know the exact start date, but 2012 or 2013 until

25  March or April of 2016."

L42MAIL7                      Womeldorph - redirect                      2750

```
 1          Do you recall being asked those questions and giving

 2   those answers?

 3   A.  Yes.

 4   Q.  Are those things true?

 5   A.  Yes.

 6   Q.  Were you essentially acting as the antipiracy director for

 7   those years?

 8   A.  Yes.

 9   Q.  Do you recall being asked a bunch of questions a few

10   moments ago about the Amazon FBA program?

11   A.  Yes.

12   Q.  And Mr. Gould asked you a bunch of questions:  And isn't it

13   true that no trade-in books ever make it to the local warehouse

14   in Ohio?  Do you recall those questions?

15   A.  Yes.

16   Q.  And what was your response to that?

17   A.  My response is that some do, but I was -- initially they do

18   not.

19   Q.  And the ones that do, you know of a certain number of books

20   that were originally sent to an Amazon warehouse pursuant to

21   the trade-in program that were later sent to the local

22   warehouse in Ohio, is that correct?

23          MR. GOULD:  Objection.  Leading.

24          THE COURT:  Sustained.

25   Q.  Do you know one way or another if any books were sent
```

L42MWIL7                  Womeldorph - direct

2751

 1    initially to the Amazon warehouse which were later sent to a

 2    local warehouse in Ohio?

 3    A.   Some books were sent from -- we were discussing trade in.

 4    Some books from trade in, to the best of my knowledge, have

 5    been pulled, re-examined, and I believe some have been sent

 6    back in after inspection.

 7    Q.   Was it your understanding that 10 Gaylords worth of

 8    books --

 9              MR. GOULD:  Objection.  Leading.

10              MR. BHANDARI:  I can ask my question.

11    Q.   It was your understanding that 10 Gaylords worth of

12    books --

13              MR. GOULD:  Objection, your Honor.

14              THE COURT:  Let him finish the question, Mr. Gould.

15    Q.   Is it your understanding that at some point 10 Gaylords

16    worth of books were pulled from an Amazon FBA facility and

17    delivered to a local Ohio facility?

18    A.   Yes.

19              MR. GOULD:  Objection.

20              THE COURT:  Sustained.  The witness' answer is

21    stricken.

22    Q.   What is a Gaylord?

23    A.   A Gaylord is basically a large box the size of a pallet

24    that holds many books.

25    Q.   Are Gaylords sometimes shipped from one warehouse facility

1   to another warehouse facility?

2   A.  Yes.

3   Q.  When, if ever, were Gaylords shipped from an Amazon

4   warehouse facility to a local Ohio facility?

5   A.  Sometimes, depending on how they were shipped.  That was

6   sometimes how they shipped.  Sporadically, I guess.

7   Q.  Do you recall that there was a time when a certain number

8   of titles were pulled from an Amazon FBA facility?

9   A.  Yes.

10  Q.  Sitting here today, do you remember the number of titles

11  that were pulled?

12  A.  I remember we pulled 24 titles and all copies of those

13  books.

14  Q.  Are you aware that there was a lawsuit filed by the

15  publishers in this case for a certain number of titles?

16  A.  Yes, I'm aware.

17  Q.  And was there any relationship between the books that were

18  pulled from the FBA warehouse and a lawsuit that was filed by

19  the publishers?

20          MR. GOULD:  Objection.  Foundation.

21          THE COURT:  Overruled.

22          If you know.

23  A.  I believe so.

24  Q.  What was that relationship?

25  A.  Those were all books that we were -- I believe, to the best

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2753

1    of my knowledge, we were accused of having sold potentially

2    counterfeit copies.

3    Q.  Was that information that was provided to you by the

4    publishers that you used for part of your antipiracy efforts?

5    A.  Yes.

6    Q.  How did you use the fact that you were sued by the

7    publishers in connection with the antipiracy efforts that you

8    were undertaking?

9    A.  I'm sorry.  Can you repeat that one more time, sir.

10   Q.  Sure.  The information that you gained from a lawsuit that

11   there were 24 titles, how was that information used by you in

12   connection with antipiracy efforts?

13   A.  The details from -- on these titles, these 24 titles that

14   were given from that lawsuit enabled me to know some of the

15   traits that were said to be indicative of counterfeits for

16   those titles.  With that, we expanded that to other titles

17   which were not covered in that as possible -- possibly

18   counterfeit trades.

19          MR. BHANDARI:  Thank you.  I have no further

20   questions, Mr. Womeldorph.

21          THE COURT:  Recross, Mr. Gould.

22   RECROSS EXAMINATION

23   BY MR. GOULD:

24   Q.  Sir, you described this one incident of taking books out of

25   Amazon's inventory.  That's the only incident you're aware of,

1    correct?

2    A.   We have been pulling books since my deposition, to the best

3    of my knowledge, to examine from FBA.

4    Q.   Mr. Bhandari asked you questions about when you've pulled

5    books out of Amazon, and you described one for him and now you

6    are saying that there are others?

7    A.   There is another -- we were discussing trade-in.

8    Q.   As of September 2017, which is just six months ago, the

9    incident you described to Mr. Bhandari is the only one as of

10   that date that you're aware of, correct?

11   A.   Yes.

12   Q.   And are you aware of any recorded results of any

13   inspections that occurred with respect to those books?

14   A.   Can you resay that?

15   Q.   You testified that books were pulled out of Amazon

16   inventory.  Are you aware of any inspection results or recorded

17   results with respect to those books?

18   A.   I'm not sure that I have that.

19   Q.   Are you aware of whether results of such an inspection have

20   been recorded somewhere?

21   A.   I'm not sure.

22   Q.   Does that mean no, you either are or you're not.  You're

23   aware of results regarded or you're not aware of results

24   recorded?

25              MR. BHANDARI:  Objection.

1    A.  I can't recall.

2    Q.  You can't recall if you're aware?  I don't understand the

3    answer.

4             MR. BHANDARI:  Objection.

5             THE COURT:  Sustained.

6    Q.  Let me ask it again.  Are you aware of any recorded results

7    with respect to inspections of the books you testified were

8    pulled from Amazon inventory?

9    A.  I don't know.

10   Q.  Did you inspect those books?

11   A.  Yes.

12   Q.  Were some of them counterfeit?

13   A.  Some of them were possibly counterfeit.

14            MR. GOULD:  No further questions.

15            THE COURT:  Anything further?

16            MR. BHANDARI:  I'm sorry, your Honor.  I have

17   forgotten to ask one question I was supposed to before.  It's

18   based on the original cross.  Sorry.

19   REDIRECT EXAMINATION

20   BY MR. BHANDARI:

21   Q.  Mr. Womeldorph, you were asked a bunch of questions about

22   whether or not you asked the vendors who sell books to Book Dog

23   Books about what their ultimate sources are.  Do you remember

24   those questions?

25   A.  Yes.

2756

Higbie - direct

 1   Q.  Why do you not ask the vendors of Book Dog Books who their

 2   ultimate sources are?

 3   A.  That's not something that I've been told to ask and that's

 4   also -- to the best of my knowledge, it would be priority

 5   proprietary information.

 6   Q.  What do you mean proprietary information?

 7   A.  Where people get books from is how they make money, to the

 8   best of my knowledge.

 9            MR. BHANDARI:  Thank you.

10            THE COURT:  Anything further?

11            MR. GOULD:  Nothing further, your Honor.

12            THE COURT:  Mr. Womeldorph, you are excused as a

13   witness, sir.  You may step down.

14            (Witness excused)

15            THE COURT:  Will the defendants call their next

16   witness.

17            MR. GLUNT:  Yes, your Honor, the defendants call Aaron

18   Higbie to the stand.

19   AARON HIGBIE,

20        called as a witness by the Defendants,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. GLUNT:

24   Q.  Good afternoon, Mr. Higbie.

25            How do you know the defendant, Book Dog Books?

1  A.  That's my employer.

2  Q.  How long have you worked for Book Dog Books?

3  A.  About 11 years.

4  Q.  Why have you stayed with the company for 11 years?

5  A.  Well, I've been through -- with it since it was a smaller

6  company, so I've gotten to watch it grow over the time and

7  that's been interesting to me.  My job position has changed

8  regularly, so the work has been interesting.  And I enjoy the

9  part where we offer a lower-cost books to students.

10  Q.  In all the time that you've worked at Book Dog Books, have

11  you ever personally bought or sold a counterfeit book, to the

12  best of your knowledge?

13  A.  I have not.

14  Q.  Are you aware of anyone at Book Dog Books who has ever

15  intentionally bought or sold a counterfeit book?

16  A.  No.

17  Q.  What was your first job at Book Dog Books?

18  A.  I was hired as seasonal help just picking and packing

19  orders.

20  Q.  What do you mean by picking and packing?

21  A.  Pulling the books from the shelves that have been sold and

22  then packaging them for shipment.

23  Q.  How long were you doing picking and packing for Book Dog

24  Books?

25  A.  It would have been a little over a year.

 1   Q.   What did you do next?

 2   A.   I worked with the internationals department.

 3   Q.   What was the internationals department?

 4   A.   It was the department which purchased and shelved the

 5   international editions of textbooks.

 6   Q.   What you doing in the internationals department?

 7   A.   I was basically checking in shipments and getting them on

 8   to our shelves.

 9   Q.   Were you personally placing orders for the international

10   editions?

11   A.   I was not.

12   Q.   To be clear, what are international editions?

13   A.   They are lower-cost editions of textbooks sold in the U.S.

14   Q.   Do they typically have the same content as U.S. textbooks?

15   A.   They do.

16   Q.   Are international editions authentic textbooks?

17   A.   Yes.

18   Q.   Are they printed and sold by the same publishers?

19   A.   Yes, they are.

20   Q.   Why did the company buy international editions?

21   A.   As I said, they were lower-cost editions.

22           MR. MILLER:  Objection, your Honor.  Foundation.

23           THE COURT:  Overruled.

24   Q.   You can answer the question.

25   A.   They were lower-cost editions of the textbooks so we could

1    purchase them for cheaper and obviously sell them to students

2    for a lower price.

3    Q.  Are you still working in the internationals division?

4    A.  No, I am not.

5    Q.  Where did you move next after internationals?

6    A.  I worked with our buybacks department.

7    Q.  What were you doing in the buybacks department?

8    A.  I was processing buybacks, books that customers would sell

9    to us.

10   Q.  Are you still in the buybacks department?

11   A.  I am not.

12   Q.  What did you end up doing next?

13   A.  I worked in the returns department.

14   Q.  What did you do in the returns department?

15   A.  That was just processing returns that customers would send

16   to us, books that they no longer wanted.

17   Q.  Why, in your experience, would people return books?  What

18   reasons did they give you?

19   A.  Variety of reasons.  Mistaken orders, they did not want the

20   book anymore, dissatisfied with the quality of the copy that

21   they received.

22   Q.  In the time that you worked in returns, did you ever see

23   anyone return a book because they stated that they thought it

24   was counterfeit?

25   A.  I did not.

1   Q.  And how long did you work in the returns department?

2   A.  It would have been a little over a year, I believe.

3   Q.  After you were working in the returns department, what did

4   you do next?

5   A.  I was moved into the fraud department.

6   Q.  Is that where you're working now?

7   A.  Yes, it is.

8   Q.  Let's talk about what you do now.  Who do you report to

9   currently?

10   A.  Jeff Brady.

11   Q.  Who is Jeff Brady?

12   A.  He's our customer service manager who also oversees the

13   fraud department.

14   Q.  What are your responsibilities with the fraud department?

15   A.  I monitor our incoming and outbound orders for any signs of

16   fraudulent activity.

17   Q.  When you say signs of fraudulent activity, what kind of

18   fraudulent activity are you looking for?

19   A.  On orders that customers would place.  It would be things

20   like credit card fraud.

21   Q.  Let's talk about credit card fraud.  Do people try to buy

22   books from Book Dog Books using stolen credit cards?

23   A.  Yes, they do.

24   Q.  And what other kinds of schemes do you see with stolen

25   credit cards?

1  A.   We will get customers who rent books from us or from other

2  vendors and then attempt to sell them.  They will rent them on

3  stolen credit cards and attempt to sell them to us through our

4  buybacks program for a profit.

5  Q.   If a customer rents a book and then tries to sell it to

6  you, aren't they going to get charged when they don't turn the

7  book back in?

8  A.   The card that they used will be charged, but it's generally

9  not their card in these cases.

10 Q.   What other kind of fraudulent schemes do you see in your

11 work in the fraud department?

12 A.   We see -- on the order end, that really is about it with

13 buybacks.  We see customers attempting to sell us library

14 books.

15 Q.   People will take textbooks out of a library and then try to

16 sell them to you?

17 A.   Yes, they will.

18 Q.   Isn't it really obvious when they come in that they are

19 library books?

20 A.   It tends to be, yes.

21 Q.   People still do it?

22 A.   Yes.

23 Q.   How often do people try to sell the company library books?

24 A.   I would say it happens at least once a month.

25 Q.   What do you do when someone sends in a library book?

1   A.  When we get library books, I will contact the library and

2   try to establish whether it has been legitimately removed from

3   their collection.

4   Q.  Any other kinds of schemes that you recall seeing in your

5   work in the fraud department?

6   A.  Well, nothing specific, I suppose.

7   Q.  Let's talk about how you go about trying to prevent fraud.

8           MR. GLUNT:  Can we show for identification purposes PX

9   320.

10  Q.  Mr. Higbie, is this an e-mail that you received?

11  A.  Yes, it is.

12  Q.  And is it an e-mail that you received in the course of your

13  work for the fraud department?

14  A.  Yes.

15  Q.  Can you tell me what the purpose of this e-mail was?

16  A.  This was an e-mail that Jeff Brady, my manager, was sending

17  to me.  It's a description of my job.  I think it was just for

18  my verification that this is how I do the process.

19  Q.  Was this e-mail created in order to document what precisely

20  your job responsibilities were?

21  A.  Yes.

22  Q.  Did the company then keep this e-mail in its records as a

23  record of that?

24  A.  They would have, yes.

25          MR. GLUNT:  Your Honor, we would move Plaintiffs'

1   Exhibit 320 into evidence.

2           MR. MILLER:  No objection, your Honor.

3           THE COURT:  Plaintiff's Exhibit 320 is received, and

4   you may publish it.

5           (Plaintiff's Exhibit 320 received in evidence)

6           MR. GLUNT:  Can we publish this.

7   Q.  Let's start at the top, Mr. Higbie.  At the top it says:

8   Buybacks are flagged by the system when created or by the

9   buyback team when a buyback is received.

10          What do you understand the system to mean in this

11  context?

12  A.  The system would just be our in-house network, the

13  computers that we use.

14  Q.  Under what circumstances does the company's in-house

15  computer system flag a buyback as potentially fraudulent?

16  A.  For buybacks it's run through a series of fraud filters

17  which identifies suspicious characteristics of the buybacks.

18  Q.  Were these filters in place when you started?

19  A.  They were, yes.

20  Q.  Have those filters been updated since then?

21  A.  Yes.

22  Q.  How often are they updated?

23  A.  They are constantly updated.

24  Q.  Who is responsible for updating these fraud filters?

25  A.  At this point it's primarily myself.

1   Q.  What kind of information is filtered by these filters in

2   the computer system?  What are they pulling out?

3   A.  Things like customer -- physical mailing addresses or IP

4   addresses, which is the computer that they use; their e-mail

5   addresses; the PayPal payment method that they would be using

6   that e-mail address would be flagged.  It's just things that we

7   have seen in the past which have been problematic with

8   customers.

9   Q.  If someone is found to be committing fraud, are they added

10  to these filters?

11  A.  Yes, they are.

12  Q.  Can the system ever tell if someone you've done business

13  with tries to create a new account?

14  A.  It can tell if they are using the same information that

15  they have used previously, yes.

16  Q.  Now, you mentioned filters based on address location.  If

17  the company cancels a person's account and then they try to

18  open up a new account and have books either sent or received by

19  the same address, can the system detect that?

20  A.  Yeah.

21  Q.  And if they tried to open up a new account but use the same

22  computer with the same IP address, is that something that

23  system can detect as well?

24  A.  Yes, the system, yes.

25  Q.  And does the system ever automatically associate two

1    accounts so that the person looking at it can see that they are

2    associated accounts?

3    A.   It doesn't automatically do it, but it does do it if I ask

4    it to take a look for me.

5    Q.   In addition to the filters we just talked about, does the

6    system do anything else to spot potential fraud?

7    A.   On buybacks there is not, no.  For orders there is also a

8    fraud score.

9    Q.   Let's talk about that fraud score.  What is the fraud score

10   for orders that are placed into the Book Dog Books?

11   A.   There is an algorithm that we use which uses some variables

12   to generate a number to give us an idea of whether an order may

13   or may not be fraudulent.

14   Q.   When you say it generates a number, what does that number

15   fall between?

16   A.   It's between negative 30 and 30, I believe.

17   Q.   What does the score between negative 30 and 30 indicate to

18   you when you are looking at it?

19   A.   If it's -- if it's a very negative number or high number,

20   it tends to be possibly fraudulent.

21   Q.   Do you review all of the orders that have a fraud score

22   that is sufficiently high?

23   A.   Yes.

24   Q.   Now, you said that it's a formula.  What kind of

25   information goes into that formula?

1   A.  As far as I know, it's mostly geolocation data where the

2   customer lives, their address, versus where it's being shipped

3   to and the cost of the book itself.

4   Q.  Have you found that fraud score to be an effective tool for

5   flagging potentially fraudulent transactions?

6   A.  I would say it tends to be, yes.

7   Q.  Once an order is flagged by the system as potentially

8   fraudulent, what do you do?

9   A.  I review the order personally just to see if there anything

10  that my eyes can see that the computer couldn't see that would

11  make it look questionable.

12  Q.  And do you do any personal investigation of the seller?

13  A.  From time to time I do.

14  Q.  What kind of investigation do you do?

15  A.  It tends to be social media accounts or LinkedIn, past

16  employment history, that sort of thing.

17  Q.  What kind of information can you glean from social media

18  accounts?

19  A.  In this instance it would be whether they have any

20  affiliation with the book industry or whether they are

21  students, you know, whether they should be selling us books in

22  the first place, essentially, or buying books from us.

23  Q.  Have you ever used any specialized tools to investigate

24  potential sellers?

25  A.  In the past we used a tool called ArkOwl.

1    Q.   What is ArkOwl?

2    A.   It's an e-mail verification tool.

3    Q.   You say e-mail verification tool, what kind of information

4    can ArkOwl give you about an e-mail address?

5    A.   Primarily, it was confirmation that the e-mail address

6    actually does exist and also date of creation was the main

7    thing we looked at.

8    Q.   And why does the date of creation of an e-mail address give

9    you useful information?

10   A.   Well, it seems that when a customer creates an e-mail

11   address and immediately opens an account on our website to sell

12   us high-valued books, that seems suspicious to me.

13   Q.   Most people don't start a new e-mail address just to sell

14   their books back in?

15   A.   Correct.

16   Q.   Now, if you decide that a buyback order looks fishy, what

17   do you do?

18   A.   I flag it to my attention so when it physically arrives at

19   our location I can manually review it.

20   Q.   What do you do when the books arrive?

21   A.   I look in the package that we have received to see if there

22   is anything that set off any red flags for me.

23   Q.   What kind of things have you seen in packaging that have

24   set off red flags for you?

25   A.   Address labels that don't make sense for a variety of

1   reasons or things like rental invoices or purchase invoices

2   where they have paid recently far more than we are paying them

3   for the book.

4   Q.  If you see a purchase invoice that suggests that someone

5   bought the book for more than they are selling it to you, what

6   does that indicate to you?

7   A.  That they are going to lose money or that they did not

8   spend their money to begin with.

9   Q.  Does that indicate that they may have used a stolen credit

10  card, or something of that like?

11  A.  I would guess that, yes.

12          MR. MILLER:  Objection, your Honor.  Speculation.

13          THE COURT:  Sustained.

14  Q.  And you mentioned rental invoices.  What do rental invoices

15  placed in the packaging indicate to you?

16  A.  That they have rented a book which should be returned to

17  another vendor, but instead they are selling it to us.

18  Q.  So people will rent books, send them into the company, and

19  leave the actual rental documentation on them?

20  A.  It does happen from time to time.

21  Q.  Do you look for any signs that a book has come from a

22  library?

23  A.  Yes.  Sometimes we will see library markings on the books

24  themselves.

25  Q.  If you find that someone has sold library books to you,

2769

1   what do you do with them?

2   A.   We get in contact with the library to verify that the books

3   should or should not be sold to us.

4   Q.   That's buybacks.  What do you do if a purchase order looks

5   fishy when you investigate it?

6   A.   We will cancel the order.

7   Q.   Mr. Higbie, do you currently inspect books to determine

8   whether they may be counterfeit?

9   A.   I don't personally.

10  Q.   Have you been trained to do so?

11  A.   I have.

12  Q.   Why were you trained to do that?

13  A.   All of our employees are trained.

14  Q.   How frequently do you receive training in your current

15  position?

16  A.   Every six months.

17  Q.   Even though you don't personally review the books for

18  counterfeit?

19  A.   Correct.

20  Q.   Have you ever come across potentially counterfeit books

21  during your employment at Book Dog Books?

22  A.   I have, yes.

23  Q.   Under what circumstances have you come across potentially

24  counterfeit books?

25  A.   They have come in through buybacks.

 1    Q.  When you've got an order that has been flagged in buyback

 2    that you need to look at for some other reason, you may have

 3    come across a book that is questionable as well?

 4    A.  Yes.

 5    Q.  What do you do when you come across books that are

 6    questionable or potentially counterfeit?

 7    A.  I pass those onto our questionable books team.

 8    Q.  Who is on the questionable books team?

 9    A.  Carla Stewart is the lead.

10    Q.  Have you ever done any other projects relating to

11    counterfeit book inspection?

12    A.  For a period of time I was reviewing the inventory that was

13    already on our shelves with Jason Womeldorph to make sure that

14    they were legitimate copies or appeared to be.

15    Q.  Why were you involved in that project with Jason

16    Womeldorph?

17    A.  I would say it was primarily because of the time I had

18    spent with the company.  I dealt with books physically quite a

19    book, I knew what they were supposed to feel like, what they

20    were supposed to look like.

21    Q.  To be clear, Mr. Higbie, are you claiming that you're an

22    expert in detecting counterfeit books?

23    A.  No.

24    Q.  But you had some experience with what books were supposed

25    to look like?

 1    A.  Yes.

 2    Q.  What kind of factors were you looking for in reviewing

 3    those books on the shelf with Mr. Womeldorph?

 4    A.  It would have been assorted elements of the paper quality,

 5    glossiness, print quality, the built-in quality of the binding

 6    itself, construction of the spine, various sort of factors.

 7    Q.  Are those some of the same factors that you review every

 8    six months in training?

 9    A.  Yes, the same ones.

10    Q.  What did you do at the time if one of those books appeared

11    to be questionable or counterfeit?

12    A.  I would it aside for further review.

13    Q.  Are you still involved in that project with Mr. Womeldorph?

14    A.  No.

15    Q.  When did that project end?  What caused your involvement to

16    cease?

17    A.  That would have been around the time that Carla Stewart

18    took over with the questionable book department.

19    Q.  Mr. Higbie, you've been at the company for over 10 years.

20    Does Book Dog Books have a policy about buying and selling

21    counterfeit books?

22    A.  We don't do it.

23    Q.  Have you adhered to that policy in your time in the

24    company?

25    A.  I have.

2772

Higbie - cross

1  Q.  Thank you, Mr. Higbie.  I have no further questions.

2        THE COURT:  Cross-examination, Mr. Miller.

3        MR. MILLER:  Yes, your Honor.

4  CROSS-EXAMINATION

5  BY MR. MILLER:

6  Q.  Good afternoon, Mr. Higbie.

7  A.  Good afternoon.

8  Q.  You said that you started at Book Dog Books in 2006?

9  A.  It would have been around that time, yes.

10 Q.  When you started you were picking books off the shelves to

11 fill orders?

12 A.  That was primarily what I did, yes.

13 Q.  And at that point, when you were picking and packing, you

14 were not doing any review of the books to determine whether

15 they were potentially counterfeit, correct?

16 A.  Correct.

17 Q.  And then in 2007 you shifted to the international

18 department?

19 A.  Around that time, yes.

20 Q.  You said on direct in that department you were shelving

21 orders of international editions, correct?

22 A.  Correct.

23 Q.  But you also shelved U.S. editions of textbooks from

24 international sources, didn't you?

25 A.  We did, yes.

1   Q.  And you were in that department for two years, from 2007 to

2   2009?

3   A.  About that, yes.

4   Q.  And from 2007 to 2009, when you were checking in books from

5   international suppliers, you never reviewed any of those books

6   to see if they were counterfeit, did you?

7   A.  No.

8   Q.  From 2007 to 2009, when you were checking in books from

9   international suppliers, you never received any training on how

10  to identify a counterfeit book, did you?

11  A.  No.

12  Q.  And you had never received any training before that on how

13  to identify a counterfeit book, had you?

14  A.  No.

15  Q.  You've been in the fraud department since 2011, correct?

16  A.  It might have been a little after 2011, but around that

17  time, yes.

18  Q.  And in the fraud department you talked a little bit on

19  direct about the procedures you used for investigating fraud,

20  correct?

21  A.  Correct.

22  Q.  But the fraud department isn't involved in investigating

23  potentially counterfeit books, is it?

24  A.  Not specifically, no.

25  Q.  All those procedures you described on direct examination,

1   none of those procedures applied to investigating potentially

2   counterfeit books, do they?

3   A.  Not directly, no.

4   Q.  When you are looking for fraud you mentioned some of the

5   things you are looking for, people selling stolen library

6   books, rental books.  Sometimes people just send in stolen

7   books, don't they?

8   A.  I would guess that's the case, yes.

9   Q.  And you also are looking for sellers who are exceeding your

10  quantity caps by selling too many books, correct?

11  A.  That's part of what I do, yes.

12  Q.  And when you are looking for fraud you're mostly looking at

13  buybacks, isn't that true?

14  A.  I would say that's not true.  The bulk of my job tends to

15  be involved with orders, with orders that customers are placing

16  with us, books we are selling.

17  Q.  On the buying side you review a lot of buybacks, correct?

18  A.  Yes.

19  Q.  And you don't check to see if any of the buyback sellers

20  are actually students, do you?

21  A.  From time to time I do, yes.

22  Q.  But not as a general matter?

23  A.  I would say that's true, yes.

24  Q.  For purposes of fraud reviews you said the computer system

25  will identify potentially problematic transactions for you to

1  review, correct?

2  A.  Correct.

3  Q.  And then you look more closely at the entries the computer

4  system flags for anything that seems wrong to you, correct?

5  A.  Correct.

6  Q.  And when you look more closely at the entries in the

7  computer system, you look at the seller's name?

8  A.  Yes.

9  Q.  You look at the e-mail address?

10  A.  Yes.

11  Q.  You look at the IP address?

12  A.  Yes.

13  Q.  You look at the phone number, if there is one?

14  A.  If there is one, yes.

15  Q.  You look at the physical address on the order?

16  A.  Yes.

17  Q.  You'll look at the physical address the book was actually

18  shipped from?

19  A.  Yes.

20  Q.  And you keep a database of seller names, addresses, IP

21  addresses, and ISBNs that you've had problems with in the past,

22  correct?

23  A.  Yes.

24  Q.  And you update that database regularly as you identify new

25  names that are problematic?

```
 1   A.   Correct.

 2   Q.   And then the computer system automatically compares new

 3   orders to all that information in your database to flag

 4   potential orders for your review, correct?

 5   A.   Yes.

 6   Q.   And the reason you have the computer system flag the names

 7   in your fraud database is so that Book Dog Books won't purchase

 8   books from those sources again, correct?

 9   A.   That's one of the reasons we would do it, yes.

10   Q.   Once those orders are flagged for your review, you use your

11   intuition and analysis to follow up and investigate those words

12   that have been flagged?

13   A.   I would say that's true, yes.

14   Q.   When you do your investigation you look at the names and

15   addresses on the shipping label?

16   A.   Yes.

17   Q.   You look at whether the books are coming from overseas?

18   A.   Yes, I would say so.

19   Q.   You look at whether the name on the return address matches

20   the name on the order?

21   A.   I look at that, yes.  That's something we look at.

22   Q.   Then you'll physically examine the books as well, also,

23   correct?

24   A.   Generally speaking.

25   Q.   When you identify someone selling stolen books, you close
```

1   their account immediately, correct?

2   A.  In most cases, yes.

3   Q.  You don't pay for the book?

4   A.  That varies by situation.  If we can -- if we are very

5   certain that there are stolen books, we generally do not.

6   Q.  When you identify a stolen book in some cases, if the

7   seller is willing to pay return shipping, you'll send it back

8   to them?

9   A.  If we can't guarantee that they are stolen, we will

10  sometimes send them back if the customer pays, yes.

11  Q.  You will return suspected stolen property to somebody who

12  you believe may be a criminal?

13  A.  If we don't know for sure we do, yes.

14  Q.  If the seller won't pay the shipping, the company just

15  keeps the book?

16  A.  Yes.

17  Q.  And in that case you often don't pay the seller for the

18  book, right?

19  A.  If we have chosen not to buy the book from the customer,

20  then, no, we won't.

21  Q.  Then sometimes you will just put those stolen books into

22  inventory?

23  A.  After a period of time, if they are sitting around and they

24  have not paid return shipping, we will.

25  Q.  So the company will take what it believes to be stolen

1   books and resell them?

2   A.  It's happened, I suppose.

3   Q.  Book Dog Books deals with sellers who sell potentially

4   counterfeit books very differently from sellers who sell

5   potentially stolen books, doesn't it?

6   A.  I don't deal with those people.  I can't really say.

7   Q.  You've been involved in the process of reviewing

8   potentially counterfeit books before, haven't you?

9   A.  Yes.  But not in the resolution of those situations.

10  Q.  And you've been through the counterfeit training program

11  several times, correct?

12  A.  Yes.

13  Q.  So aren't you familiar with Book Dog Books'

14  anticounterfeiting policies?

15  A.  What we do with books is not covered in the training.

16  That's just how to identify potentially questionable books.

17  Q.  You've talked about how you track the sellers who sell

18  potentially stolen books, correct?

19  A.  Yes.

20  Q.  And how you use that information to prevent the company

21  from purchasing from those sellers again?

22  A.  Correct.

23  Q.  But you don't do that for potentially counterfeit books, do

24  you?

25  A.  I do not, no.

1   Q.   You're not aware whether the company does it, are you?

2   A.   I'm not necessarily aware, no.

3   Q.   In fact, you are willing to keep buying books from sellers

4   who have sold potentially counterfeit books, aren't you?

5   A.   It depends on the case, but sometimes.

6   Q.   In determining whether a book has been sold fraudulently,

7   you look at the seller's history, correct?

8   A.   Yes.

9   Q.   And you investigate the seller?

10  A.   Yes.

11  Q.   When you are looking at whether a book is potentially

12  counterfeit, you don't do any of that, do you?

13  A.   I don't look to see if books are counterfeit, so, no, I

14  don't.

15  Q.   Haven't you said that you have participated in reviewing

16  books to determine whether they are potentially counterfeit

17  before?

18  A.   Those are books on our shelves that were not associated

19  directly with orders in my case.

20  Q.   When you are reviewing a book on a shelf to see if it's

21  potentially counterfeit, do you look at who sold the book?

22  A.   I do not.

23  Q.   When you are reviewing the book to determine whether it's

24  potentially counterfeit, do you have any idea who sold the

25  book?

1  A.  Not during the time I was -- when I was looking at the

2  books with Jason, I was not.

3  Q.  When you do your fraud review you'll often even go online

4  and do research on the seller, correct?

5  A.  Correct.

6  Q.  But when you were reviewing books to determine whether they

7  were potentially counterfeit, you were not doing that kind of

8  research on the seller?

9  A.  I was not doing that kind of research on the seller, no.

10  Q.  When you suspect a book may be fraudulent, you will

11  sometimes ask the seller for proof that they own the books,

12  correct?

13  A.  From time to time.

14  Q.  But you never ask a seller of a potentially counterfeit

15  book for proof that they own the books?

16  A.  I did not, no.  I personally did not do that.

17  Q.  A few minutes ago you described how you use a computer

18  algorithm based on geolocation and cost to identify the

19  likelihood that a book is fraudulent.  Do you remember that?

20  A.  Yes.

21  Q.  Geolocation is where the book is coming from, right?

22  A.  It would be the customer's billing and shipping addresses,

23  yes.

24  Q.  For fraud you look at where in the world is the book coming

25  from and how much does it cost, correct?

 1   A.  Yes.

 2   Q.  And if the price is too good to be true, that's a red flag

 3   that suggests to you this book might be fraudulent, correct?

 4   A.  Yeah, that would be true.

 5   Q.  When you are looking at whether books are potentially

 6   counterfeit, you never look at where the book came from

 7   geographically, do you?

 8   A.  I do not do that because it was never my job to do that,

 9   correct.

10   Q.  When you are looking at whether a book is potentially

11   counterfeit, you don't look at what the price of the book was,

12   do you?

13   A.  I do not.  Other people do, to my knowledge.  As far as the

14   customers go, not the price necessarily.

15   Q.  You said you started at Book Dog Books in 2006, correct?

16   A.  I believe so, yes.

17   Q.  But you never received any training on identifying

18   counterfeit books until 2013, correct?

19   A.  Not to my knowledge.

20   Q.  And that training only started in response to Book Dog

21   Books having been sued for distributing counterfeit books,

22   correct?

23   A.  I can't say why it started.  I don't know.

24   Q.  You don't know why it started?

25   A.  I don't know the direct reason why it started, no.

L42MBIL7                    Highie - cross                       2782

 1  Q.  Do you recall having your deposition taken in this case?

 2  A.  I do.

 3  Q.  Were you under oath at that deposition?

 4  A.  Yes.

 5  Q.  Did you give the following questions and answers at that

 6  deposition, starting on page 69, line 22 through page 70, line

 7  21:

 8  "Q.  Do you know why in 2013 you were asked to attend

 9  counterfeit training?"

10          There is an objection.

11  "A.  I know there was some sort of lawsuit.  That's really all

12  the information I had.

13  "Q.  Did you discuss that with somebody?

14  "A.  Probably.  I don't remember a specific discussion, but I

15  found out about it one way or another.

16  "Q.  About the lawsuit?

17  "A.  Yes.

18  "Q.  In 2013?

19  "A.  Around that, around that time.

20  "Q.  So somewhere around 2013 you learned that Book Dog Books

21  had been sued for distributing counterfeit books and that was

22  why you understood that you were asked to attend counterfeit

23  book training.  Is that accurate?

24  "A.  I knew that there was a lawsuit.  I did not know the exact

25  nature, but that was my understanding of what led us to have

2783

```
 1   these trainings, yes."

 2              Is that testimony accurate?

 3   A.  Yes.

 4   Q.  Are you changing that testimony today?

 5   A.  No.

 6   Q.  Your training in 2013 only started in response to Book Dog

 7   Books having been sued for distributing counterfeit books,

 8   correct?

 9   A.  Well, I think, as I said in my deposition, I wasn't certain

10   about that, but it's a good possibility.  It's a solid reason

11   for it to happen, yes.

12              MR. MILLER:  No further questions, your Honor.

13              THE COURT:  Redirect.

14              MR. GLUNT:  Very briefly, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. GLUNT:

17   Q.  Mr. Higbie, you were asked some questions about how the

18   computer system automatically flags purchases or sales from

19   problematic sellers.  Do you remember that?

20   A.  Yes.

21   Q.  And does the computer system care why a seller has been put

22   in a filter or not?

23   A.  Not at all.

24   Q.  Does the computer system care whether they have been banned

25   for selling stolen books or counterfeit books?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  No.

2    Q.  Does the system work the same way no matter how they get

3    placed in that filter?

4    A.  Correct.

5    Q.  You were also asked a number of questions that began, when

6    you are looking at whether books are potentially counterfeit.

7    To be clear, Mr. Higbie, is that something that you do as part

8    of your job right now?

9    A.  No, not specifically.

10   Q.  Is there, in fact, a separate team that's responsible for

11   anticounterfeiting at Book Dog Books right now?

12   A.  There is.

13           MR. GLUNT:  Nothing further, your Honor.

14           THE COURT:  Anything else?

15           MR. MILLER:  No further questions.

16           MR. GLUNT:  Your Honor.

17           THE COURT:  Mr. Higbie, you are excused as a witness.

18   You may step down.

19           (Witness excused)

20           THE COURT:  Would the defendants call your next

21   witness.

22           MR. BHANDARI:  Your Honor, we would like to play the

23   deposition designation of William Sampson.  The plaintiffs have

24   two objections to some of the clips, if we could briefly be

25   heard at side bar.

2785

```
 1                    (At the side bar)

 2               THE COURT:  What's the objection?

 3               MR. MILLER:  So the first is that Mr. Sampson was

 4      asked --

 5               THE COURT:  Show me the transcript.

 6               MR. MILLER:  Mr. Sampson was asked:  What does the

 7      legitimate seller mean to you?  He defined it as somebody who

 8      is selling a legitimate copy of a Cengage textbook.

 9               That's not what we are objecting to.  We are objecting

10      to, there are a series of answers that defendants want to read

11      in about whether other distributors are legitimate.

12               So using that --

13               THE COURT:  Can I just see the questions.

14               MR. MILLER:  Using that definition, is MBS a

15      legitimate seller?  Has MBS ever sold a counterfeit textbook?

16      If you turn the page, your Honor, there are further questions

17      about whether Cengage has ever sued a legitimate seller.

18               MR. BHANDARI:  There was no objection on the record to

19      these.  The questions are what they are and now there is no

20      objection to form at the time.

21               MR. MILLER:  Our objection, your Honor, is that

22      Mr. Sampson's definition of legitimate seller is unusual and

23      idiosyncratic and reading the testimony about whether

24      legitimate sellers have been sued is confusing, will mislead

25      the jury, and is prejudicial.
```

2786

```
1              In addition, there has already been plenty of evidence
2    developed in the record about the publishers' suits against
3    other distributors.  If they are introducing it only to show
4    that certain publishers have in the past sued MBS and Follett,
5    there has already been a lot of testimony about that.  We don't
6    need to hear from Mr. Sampson about that.
7              The only reason they would want introduce this is to
8    confuse the jury about whether the publishers sued
9    quote/unquote legitimate sellers.  We think that's misleading
10   and prejudicial.
11             MR. BHANDARI:  Your Honor, idiosyncratic definition of
12   a 30(b)(6) witness is not a basis for saying we can't ask
13   questions about what he meant.
14             THE COURT:  The objection is overruled.  What's next?
15             MR. MILLER:  There is one further.  Turn the page.
16   It's this designation on page 290.
17             MR. BHANDARI:  Which one is this?
18             MR. MILLER:  The witness is shown a document that
19   discusses the counterfeit rates at other distributors, it
20   appears.  Some of the document is then read to the witness.
21   The witness says, I don't have any recollection.
22             THE COURT:  Your objection to this question and answer
23   at page 290 is sustained.
24             MR. BHANDARI:  Which one are we knocking out?
25             MR. MILLER:  290, 10 to 25.
```

 1             MR. OPPENHEIM:  Did you say no charge conference

 2    today?

 3             THE COURT:  No.  We are going to keep going.  I said

 4    we would be time limited, but I've already told the people that

 5    I have to meet with that I might be late.

 6             (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2              MR. BHANDARI:  Your Honor, our understanding is that
 3    this is 19 minutes of designations.  There is technically 16
 4    minutes left in the day.
 5              THE COURT:  Let's go.  It's all right with juror no.
 6    1, right?  We will go four minutes past 5:00.  I know we are
 7    into the baseball season.
 8              For the record, who is being deposed, and where are
 9    they being deposed, and when was the deposition conducted?
10              MR. BHANDARI:  Sure.  William Sampson, the head of
11    antipiracy at Cengage, who was testifying as the 30(b)(6)
12    witness on behalf of Cengage, September 12, 2017, in New York
13    City.
14              MR. OPPENHEIM:  To be clear, he is global antipiracy
15    counsel.  He is not head of antipiracy.  Make sure we are
16    accurate.
17              MR. BHANDARI:  September 8, 2017.
18              THE COURT:  September 8, 2017.  Let's play it.
19              (Video played)
20    "Q.  Do you understand that you are here as a 30(b)(6) witness
21    on behalf of Cengage?
22    "A.  I do, yes.
23    "Q.  And what is your understanding of what a 30(b)(6) witness
24    is?
25    "A.  My understanding of what a 30(b)(6) witness is is a
```

 1   representative who testifies on behalf of the corporation and

 2   its activities, knowledge of a given certain matter.

 3   "Q.  What is your title?

 4   "A.  My title is global antipiracy counsel.

 5   "Q.  You are a lawyer?

 6   "A.  Yes, sir.

 7   "Q.  Who is the biggest customers that Cengage has for its

 8   academic textbooks?

 9   "A.  Our largest customers would consist of some of the

10   well-known or better-known wholesalers and distributors.

11   "Q.  Can you give me their names?

12   "A.  Yes.  Follett.

13   "Q.  OK.

14   "A.  Barnes & Noble.

15   "Q.  Um-hum.

16   "A.  Amazon.  MBS.  Chegg.  I believe that's about it.

17   "Q.  What does legitimate sellers mean to you?

18   "A.  Well, it can be defined a lot of different ways, I guess.

19   "Q.  How would you define it?

20   "A.  Somebody who is selling a legitimate copy of a Cengage

21   textbook.

22   "Q.  Earlier in this deposition, just a few moments ago,

23   actually, you gave me your definition of what you thought a

24   legitimate seller was, correct?

25   "A.  Right.

L42MMIL7                  "Sampson"

1    "Q.  So using that definition, is MBS a legitimate book seller?

2    "A.  Yes.

3    "Q.  Has MBS sold counterfeit copies of Cengage books?

4    "A.  I don't know.

5    "Q.  Has Cengage ever accused MBS of selling counterfeit books?

6    "A.  Yeah, I believe we have.

7    "Q.  Does Cengage sell books to any companies that it considers

8    not to be legitimate book sellers?

9    "A.  Yeah.  I don't know.

10   "Q.  So it's possible that Cengage sells books to companies

11   that are illegitimate book sellers, correct?

12   "A.  Yeah.  I don't know.

13   "Q.  Has Follett ever sold a counterfeit copy of any Cengage

14   title?

15   "A.  I don't know.

16   "Q.  Has Cengage ever sued Follett?

17   "A.  Yes.

18   "Q.  When did Cengage sue Follett?

19   "A.  Probably about four weeks ago.

20   "Q.  Was it for selling counterfeit books?

21   "A.  Yes.

22   "Q.  Let me -- instead of asking you about your previous

23   testimony, has Follett ever sold counterfeit copies of any

24   Cengage book titles?

25   "A.  I believe so, yeah.

L42MMIL7                "Sampson"                           2791

1   "Q.  You testified just a few moments ago that Cengage sells

2   books to Follett, correct?

3   "A.  Correct.

4   "Q.  And you just testified a few moments ago that Cengage sued

5   Follett approximately four weeks ago for selling counterfeit

6   books, correct?

7   "A.  Correct.

8   "Q.  So let me ask you again, does Cengage believe that Follett

9   is a legitimate book seller, yes or no?

10  "A.  Yes.

11  "Q.  So according to your testimony, it is possible for a

12  legitimate book seller to occasionally sell counterfeit Cengage

13  book titles, correct?

14  "A.  Sure.

15  "Q.  Now, how many copies of Cengage book titles are you

16  alleging were counterfeit that were sold by Follett?

17  "A.  I don't know off the top of my head.

18  "Q.  What is your best estimate?

19  "A.  I don't have an estimate.

20  "Q.  Does Cengage believe that the defendants have manufactured

21  any counterfeit copies of Cengage titles?

22  "A.  No.

23  "Q.  Who has manufactured counterfeit copies of Cengage titles,

24  to the best of Cengage's knowledge?

25  "A.  We know that the individual I referred to earlier, Wirat

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2792

1    Wanna, has made counterfeit copies.

2    "Q.  Anybody else?

3    "A.  That's the only one we have confirmed.

4    "Q.  Sorry.  So let me walk it through.  You said total revenue

5    for Cengage is about 1.5 billion, correct?

6    "A.  Yes.

7    "Q.  You said digital revenue is approximately 60 percent.

8    "A.  Correct.

9    "Q.  Looking at section 7D, there's the exception in 7D(i).  Do

10   you see that?

11   "A.  Yes.

12   "Q.  And that exception has something to do with 50,000

13   textbooks being supplied to a textbook distributor and less

14   than 1 percent of the textbooks being identified as

15   counterfeit.  Do you see that rule?

16   "A.  Yes.

17   "Q.  Why does that rule exist?

18   "A.  I think as an indicia or indication that -- that that

19   seller or that textbook distributor is more reliable in

20   sourcing books that would lead to less counterfeits in the

21   distribution process.

22   "Q.  What techniques to detect counterfeits, if any, do you

23   believe that the more reliable book suppliers engage in?

24   "A.  They're buying from sources that they have verified or

25   have done business with for a long time and have had fewer

1  counterfeits as a part of the books that have been sold to

2  them.  I mean, that really is one of the key things, is knowing

3  who their suppliers are.  Maybe doing more frequent

4  inspections.

5  "Q.  And, in fact, this best practices document lays out

6  various criteria for doing inspections, correct?

7  "A.  Correct.  Yes.

8  "Q.  What else?  Doing more frequent inspections, buying from

9  sources that a company has done business with before.  What

10  other factors can make it so that a company is more reliable

11  and sells fewer counterfeits?

12  "A.  If they're buying at highly discounted prices, that should

13  be a red flag that that's a suspect book.

14  "Q.  So if a price is too good to be true, that should be a red

15  flag, is that correct?

16  "A.  It should be a red flag.

17  "Q.  But the defendants in this case have been cut off from

18  having a Cengage account, correct?  So they don't have any way

19  of knowing what the net price is for those books, correct?

20  Sorry.  Those are a bunch of questions all embedded.

21           The defendants in this case do not have Cengage

22  accounts, correct?

23  "A.  They do.

24  "Q.  They do have Cengage accounts?

25  "A.  Yes.

2794

L42MMIL7                           "Samples 2"

1    "Q.  So Cengage still sells books to the defendants in this

2    case?

3    "A.  Well, I don't know the answer to that.  What I know is

4    that Phil Smyres has opened three accounts during the course of

5    this year.  We don't know why.

6    "Q.  And has Cengage sold any books to any Phil Smyres-related

7    entity in 2017?

8    "A.  There have been some orders placed and returns.  I haven't

9    looked at them in detail, but there has been account activity.

10   "Q.  And it would be best practices, in fact, for the

11   defendants in this case to have a Cengage account so that they

12   could learn the net price of the books that they're selling,

13   correct?

14   "A.  Yeah, it would be helpful.

15   "Q.  And it would be best practices for the defendants in this

16   case to buy exemplar copies of Cengage textbooks so they can

17   compare them against used books that may or may not be

18   counterfeit, correct?

19   "A.  That would help, yes.

20   "Q.  But Cengage is attempting to not sell any exemplars to the

21   defendants in this case, correct?

22   "A.  Correct.

23   "Q.  Are international editions that contain the exact same

24   text as the American editions sold for the exact same price as

25   the American editions or are they sold for different prices?

2795

L42MHIL7                    "Sampson"

1   "A.  We no longer sell international editions where the text is

2   the same as the U.S. edition.

3   "Q.  So in order to know if a price is too good to be true,

4   it's important to know what price Cengage is selling the books

5   for, the new books for, correct?

6   "A.  Correct.

7   "Q.  Is there a relationship between the price of a used book

8   and the price of a new book?

9   "A.  I'm not quite sure what you're trying to get at.

10  "Q.  Is there like a rule of them to say like, oh, a used book

11  in like new condition should cost this percentage of a new

12  book, or a used book in good condition should cost that

13  percentage of a new book?  Is there any sort of rule of thumb

14  where a textbook distributor should have in their mind the

15  ratio of a used book price to a new book price in order to

16  verify if the price is too good to be true?

17  "A.  The market fluctuates, so I would say there are no

18  established guidelines.

19  "Q.  Does Cengage publish any guidance about what prices used

20  books should sell for?

21  "A.  Not that I'm aware of.

22  "Q.  The floor for foreign sales of U.S. edition is lower than

23  the price of the floor of the U.S. edition sold within the

24  United States, correct?

25  "A.  That's correct.

1    "Q.  Do you have some approximation of how much lower the price

2    of books sold in foreign countries is than the price of the

3    same book sold in the United States?

4    "A.  I don't.

5    "Q.  Has Cengage put security labels on any of its textbooks?

6    "A.  Yes.

7    "Q.  What type of security labels?

8    "A.  We began using a label with our -- either 2016 copyright

9    year or 2017, and it was a label that was affixed to books that

10   had microprinting features to it, microprinting meaning that if

11   a scan was made, it would be hard to duplicate that

12   microprinting.  We've continued to investigate, and we are now

13   are looking at a different solution.

14   "Q.  What is the solution you're looking at now?

15   "A.  The different solution, we believe, is more -- more

16   effective because it includes certain features such as black

17   light characteristics and serialization characteristics that

18   would be hard to duplicate.

19   "Q.  And when you implement features such as the microprinting,

20   do you tell that to textbook distributors so that they can look

21   for those features in order to stop the distribution of

22   otherwise high-quality counterfeits?

23   "A.  We're formulating a policy now in terms of what to tell

24   the distributors.  On the one hand, we don't want to tell them

25   too much because there's always the chance that if that

 1    information is leaked and the counterfeiters find out, it might

 2    make it easier for them to duplicate those labels.

 3           But on the other hand, we want to help textbook

 4    distributors use certain features that are easily identifiable

 5    and make it easy for them to identify a counterfeit from a

 6    legitimate book, so we're formulating our policy at this point

 7    in terms of what we want to tell them.

 8    "Q.  Now, you said currently at Cengage there's four people in

 9    the antipirating group, correct?

10    "A.  Correct.

11    "Q.  And has Cengage worked with any outside parties or

12    contractors to assist with anticounterfeiting efforts?

13    "A.  No, not that I'm aware of.

14    "Q.  Do you know how many employees the defendants have who

15    inspect incoming inventory?

16    "A.  I don't.

17    "Q.  Do you know anything about the training that those

18    employees have received?

19    "A.  I do not.

20    "Q.  Do you know anything about the procedures that the

21    defendants have in place to identify counterfeits?

22    "A.  I do not.

23    "Q.  So you don't have any basis for knowing whether or not the

24    defendants are engaging in any specific practice to stop or

25    identify counterfeits, is that correct?

1   "A.  What we see are the results, you know.  Again, we have

2   multiple sources that indicate he's distributing textbooks.  So

3   if they have things in place, they're not -- they don't seem to

4   be working.

5   "Q.  Do you know if more than 1 percent of the defendants'

6   textbooks sold are allegedly counterfeit?

7   "A.  I don't know what the percentages are.

8   "Q.  So you have no idea if it's more than 1 percent or less

9   than 1 percent, correct?

10  "A.  No.

11  "Q.  When was the first time Cengage had reason to believe that

12  the defendants sold a copy of communication research?  Excuse

13  me.  Excuse me.  Let me withdraw and rephrase.

14          When was the first time Cengage had reason to believe

15  that the defendants sold a counterfeit copy of communication

16  research?

17  "A.  I didn't recall that from memory.

18          (Continued on next page)

19

20

21

22

23

24

25

L42YMIL8                       "Sampson"                          2799

```
 1    "Q.  Do you have any -- what document would you need to refresh
 2    your recollection about that?
 3    "A.  It would be test purchase documents or information from a
 4    distributor detailing the sources of books that we determined
 5    to be counterfeit.
 6    "Q.  So the answer is you do not know when Cengage discovered
 7    or had the ability to discover that the defendants allegedly
 8    sold a counterfeit copy of any of the seven titles in this
 9    case; correct?
10    "A.  Yeah, I don't have the date that I can --
11    "Q.  Do you have an estimate of any of those dates?
12    "A.  I don't have an estimate.
13    "Q.  So you don't know any of those dates; correct?
14    "A.  They would be in documents that I would have to refer to
15    to refresh my memory.
16           "Mr. Bhandari:  We'd like to make a follow-up request
17    for those documents.
18           "I'd like to have marked as Defendants' Exhibit 1026.
19    "Q.  Do you recognize this document that's been marked as
20    Defendants' Exhibit 1026?"
21           MR. BHANDARI:  Stop, stop, stop.  Sorry, your Honor.
22    This was the part you ruled should not be shown.
23           I'm sorry.  My fault.
24           MR. OPPENHEIM:  While they are figuring that out, your
25    Honor, I didn't realize that they were going to include in the
```

1  clip Mr. Bhandari's request for documents during the

2  deposition, which isn't a proper request.  The jury should just

3  be instructed that that's not a proper request.

4          THE COURT:  Members of the jury, just pay attention to

5  the questions and answers, not all the colloquy of counsel.

6          MR. BHANDARI:  Sorry, your Honor.

7          (Video clip played)

8  "Q.  Do you understand that you are here as a -- "

9          MR. BHANDARI:  All right.  I think that's -- I'm not

10 sure what happened.  I don't want to hold everything up.  I

11 know it's already a little bit after 5 o'clock.  From our

12 perspective, I know that there may be some other designations

13 the other side would like to come in.  We can make sure that

14 happens first thing tomorrow morning, but from our perspective

15 we don't want to hold up the Court.  Sorry about that.

16         THE COURT:  Counsel, come up to the sidebar for a

17 moment.

18         (Continued on next page)

19

20

21

22

23

24

25

1            (At sidebar)

2            THE COURT:  So the question is what's left in the

3    defendants' case?

4            MR. BHANDARI:  Just designations.  This one, Tichenor

5    and Singh.

6            THE COURT:  How long are Tichenor and Singh each

7    approximately.

8            MR. BHANDARI:  20 minutes each approximately.

9            MR. OPPENHEIM:  Your Honor, sorry.  I didn't mean to

10   interrupt.

11           With respect to Mr. Singh, once the jury has left,

12   we'd like to be heard on that again because new arguments were

13   raised today and I'd like to address that.

14           THE COURT:  All right.

15           MR. BHANDARI:  We have some exhibits we just want to

16   enter into evidence based on the business records exception

17   ruling at the end of this case.

18           THE COURT:  All right.  Is there any rebuttal case?

19           MR. OPPENHEIM:  We have that one designation by

20   Mr. Davenport that's left.

21           THE COURT:  How long is that?

22           MR. MILLER:  Not very long.  Under maybe 20 minutes,

23   I'd say.  We also have a few additional counter-designations

24   from Mr. Sampson's deposition.

25           THE COURT:  You'll deal with it overnight.

1          MR. MILLER:  We can deal with it overnight.

2          MR. GOULD:  We're going to dust off one or two of the

3    witnesses they had anticipated potentially calling that we

4    reserved our right on.

5          MR. OPPENHEIM:  I think where you're headed, your

6    Honor, we should, I think, based on what Mr. Bhandari said and

7    what we are saying, we should be able to conclude the offer of

8    proof in the morning so that we're prepared to do closings and

9    charge in the afternoon.

10          MR. BHANDARI:  Yes.

11          THE COURT:  All right.

12          That's what I want to tell the jury.

13          MR. OPPENHEIM:  The only question is whether we need

14    to give ourselves a little time in the morning to deal with the

15    charge issue before the jury arrives.

16          THE COURT:  We'll deal with that all in a few minutes,

17    as soon as I send them home.

18          (Continued on next page)

19

20

21

22

23

24

25

```
 1                 (In open court)

 2            THE COURT:  Members of the jury, we're going to

 3     suspend now for the evening.

 4            I think that the taking of evidence in this case will

 5     be completed in an hour and-a-half, maybe two hours tomorrow

 6     morning.  Of course, a trial is a dynamic event; you never know

 7     what's going to happen overnight.  Things all seem to happen

 8     overnight.  You wouldn't believe it.  It happens.

 9            So generally what I think is going to happen tomorrow

10     is we will complete the taking of evidence; we will take a

11     short recess; we may take an earlier lunch; and we will proceed

12     to closing arguments by counsel in the afternoon, and hopefully

13     my charge to you.  So that this case will be in your capable

14     hands by the close of business tomorrow.

15            But when you come to the courthouse tomorrow morning

16     though, there will be a decision for you to make in the jury

17     room when you arrive, and that is what you're going to have for

18     lunch.  Because menus will be there for you and you'll make out

19     your order before you come out so that we can handle it and

20     make the best use of our time tomorrow.

21            And of course, it's not a free lunch; you already paid

22     for it or will pay for it on April 15th.

23            So anyway, please, if we can start by 9:15 tomorrow or

24     even a few minutes earlier, it's better because we'll figure

25     out how the day goes.
```

2804

```
 1            In the meantime, keep an open mind, don't discuss the
 2    case with all those inquiring minds at home.
 3            Have a great evening and a safe trip home.
 4            Please recess the jury.
 5            (Jury not present)
 6            THE COURT:  Everyone can be seated.
 7            Now, first, I am going to circulate to you a revised
 8    jury charge and revised verdict sheet.  We worked on the
 9    verdict sheet last night.  We did some more research this
10    morning and at lunch.
11            I'm going to give you a quick précis now of what the
12    rulings are with respect to matters that I left open last night
13    and on which I have no doubts about now.
14            First with respect to the impeachment charge at page
15    11, I found no jury instruction that includes language on party
16    admissions either from other circuits or the Model Federal Jury
17    Instructions.  The current language matches those guides and
18    I'm not going to alter that charge.
19            With respect to the question of whether -- well, with
20    respect to the question about the defendants' new theory that
21    plaintiffs had to renegotiate after Kirtsaeng, and this is at
22    page 24 of the charge, as I think I said yesterday, Judge
23    Gorenstein rejected defendants' arguments and ruled that the
24    contract was valid and enforceable.  This Court adopted Judge
25    Gorenstein's report in full.
```

I42WIIL8

1        In any event, as counsel mentioned yesterday, the

2   settlement agreement explained that if the parties failed to

3   reach an agreement in negotiation, defendants could petition

4   the U.S. District Court for the Southern District of New York.

5   Defendants did not do so.  To argue now -- four years later --

6   that plaintiffs failed to negotiate in good faith without

7   following the contractual procedure set forth in the agreement

8   itself, to address such a situation is -- it's too late and

9   it's beyond the pale.  So I'm not going to alter the breach of

10  contract instruction.

11       With respect to the issue of whether statutory damages

12  need to be proven by a preponderance of the evidence, my

13  research confirms that statutory damages need not be proven by

14  a preponderance of the evidence.  A finding of infringement

15  means that the jury must award statutory damages according to

16  the factors that this Court will instruct them on.  To instruct

17  them that they must prove statutory damages is not the law.  So

18  I'm not going to insert a preponderance of the evidence charge

19  there.

20       Now, on the question of whether profits earned and

21  expenses saved should relate specifically to the infringing

22  activity, this is in the charge at pages 26 and 28.  I

23  independently reached the conclusion prior to receiving the

24  defendants' letter today that, in fact, the charge should be

25  amended to include that the jury should consider profits reaped

1    by defendants in connection with the infringements and revenues

2    lost by the plaintiffs as a result of the defendants' conduct.

3    So you'll see that in the charge.  And so I've revised that

4    charge.

5         On the issue raised by the plaintiffs regarding the

6    willful blindness instruction and the request that that be

7    included in addition to reckless disregard, having looked at

8    more relevant case law, this Court agrees with the plaintiffs

9    that both reckless disregard and willful blindness are relevant

10   standards for determining willfulness in trademark and

11   copyright infringement.

12        *See Tiffany NJ, Inc. v. eBay, Inc.*, 600 F.3d 93 at 109

13   (2d Cir. 2010); and Island Software and Computer Services, Inc.

14   v. Microsoft Corp., 413 F.3d 257 at 263 (2d Cir. 2005).

15        Finally, with respect to the issue on page 30

16   regarding the copyright symbol, this Court's September 19, 2016

17   opinion and order denied plaintiffs' motion for summary

18   judgment on the innocent infringement defense.  That is

19   different than ruling that the jury may not consider

20   plaintiffs' argument that defendants cannot claim innocent

21   infringement if they had access to one of plaintiffs' books

22   with a notice of copyright.  I'll note that this Court's

23   instruction matches the model instructions and is a correct

24   statement of the law.  See 17 U.S.C., Section 401(d), and so

25   I'm not changing it.

```
 1              I think these are the high points.

 2              With this in mind, you can consider this now.  We'll

 3    take a five-minute break and I'll hear the parties who want to

 4    be heard further with respect to any of this.  All right?

 5              My law clerk will circulate copies of the jury verdict

 6    sheet and this revised charge.  And we'll reconvene in a few

 7    minutes.

 8              (Recess)

 9              THE COURT:  Who wants to be heard?

10              MR. BHANDARI:  Your Honor, I guess we had a question.

11              The instruction on the adverse inferences, we had sent

12    a proposed instruction stating specifically the records that

13    supposedly we did not provide that violated the court order.

14    Did the Court consider that and reject it or has the Court not

15    considered that?

16              THE COURT:  I figured we'd take that up here.

17              MR. BHANDARI:  Okay.

18              THE COURT:  The only thing I really addressed in my

19    earlier remarks concerning your letter is the fact that your

20    legal research yielded the same result that my legal research

21    did on the question of damages.

22              MR. BHANDARI:  Okay.  So your Honor, on all of the

23    rulings you just issued, obviously we preserve our objections,

24    to the extent that we disagree with them.  We'd like for all of

25    our objections to remain on the record, so we are not
```

1    acquiescing.  But we understand you've put in a lot of time on

2    this; you've considered our arguments at length.  I assume you

3    don't want further argument on it; and if not, again, we just

4    preserve our objections to the extent we disagree with some of

5    the rulings that you made or would you like argument?

6            THE COURT:  It's the end of the case, and at some

7    point you've got to state exactly what your objection is to

8    what's here.

9            MR. BHANDARI:  Sure.

10           THE COURT:  Okay?  Because otherwise it's like the 760

11   objections that you lodged in the joint pretrial order.

12           So let's deal with your instruction regarding the

13   sanctions ruling.

14           MR. BHANDARI:  Okay.

15           THE COURT:  Why should I give specifics in the adverse

16   inference ruling?

17           MR. BHANDARI:  Because to the extent that there are

18   certain documents that weren't provided, those should be

19   explained to the jury; otherwise there could be an argument

20   that we didn't provide any number of documents.  The accounting

21   work papers should have been provided, or an inspection of the

22   warehouse.  Plaintiffs have mentioned it on numerous occasions.

23           We believe that there's no harm.  That was the ruling.

24   To the extent there's an adverse inference that's being drawn,

25   it's based on the fact that certain John Glass materials and

1   Matasa materials were not disclosed in a timely manner.  To be

2   clear, we disagree with the adverse inference; that's one of

3   the things we've argued about before.  We don't think that we

4   had an obligation to disclose it.

5        Pursuant to a clear court order, we tried our best to

6   comply with all of the discovery requests.  It's totally

7   immaterial.  They had the ability to cross-examine on these

8   issues with our witnesses on the stand, if nothing else.  But

9   you know those objections, your Honor; we've briefed them;

10  we've said them; and I don't expect you're going to change your

11  mind on adverse inference.

12       So that's why we're just saying, Lay it out for the

13  jury.  Let's be fair about what it was specifically that was

14  not provided.  And these things were talked about at length.

15  The jury knows what they are.  So we just want to make it clear

16  that to the extent that we violated a court order, it was

17  related to these two things, not expansively all document

18  production.

19       MR. OPPENHEIM:  So your Honor, we only know what we

20  know based on somebody dropping a dime or last-minute

21  information given to us.  So there well could be other things

22  we are not aware of.  We've already identified things outside

23  of John Glass and Matasa, as it's described in here.  So let me

24  just go through that.

25       So not included in the defendants' disclosures is that

2810

 1   they operate a very large bookselling entity on Amazon called

 2   UK Media Source.  Never disclosed.  No information provided.

 3   It sold lots and lots and lots of books.  Never got any

 4   information on it.  Another entity was Electron Orbit.  Now,

 5   defendants put in their papers, Well, Electron Orbit only sold

 6   consumer electronics.  We submitted to the Court what we could

 7   find online, which showed a book being sold by Electron Orbit

 8   online.  So it is not true that the only thing that was

 9   withheld were the things that described.

10          With respect to John Glass, it's not just the payments

11   made to John Glass.  When we learned all this information, and

12   we asked Ms. Cox in her deposition several weeks ago at the

13   last minute about it, we asked her, Well, what is Mr. Glass's

14   role with respect to Robert William Management?  And she said,

15   He was the key manager of Robert William Management.  They

16   never disclosed that.  We would have pursued additional

17   discovery on the merits with Mr. Glass.  Now, granted, he was

18   in the Caymans; it would have been difficult.  So it is not

19   limited to what they've described, your Honor.

20          THE COURT:  All right.

21          Let me put this matter to rest.

22          I am not going to specify any particular failure to

23   produce information by the defendants.  If I started clicking

24   off all of the failures, the charge would go on for a page

25   and-a-half.

1          Let me provide the reason why I'm sticking with the

2     charge as I modified it yesterday.

3          In September of 2013, this Court ordered the

4     defendants to produce "information relating to all business and

5     businesses and entities in whatever form and wherever located

6     that are engaged in commerce that relate to books in which

7     defendant Philip Smyres has or had since 2008 any interest or

8     relationship."

9          On May 4, 2017, Judge Gorenstein ordered defendants to

10    produce information pertaining to "any entity" through which

11    defendants conduct their business.  Judge Gorenstein held that

12    plaintiffs are entitled to know "any way in which defendants

13    order their business"; and that "if they are engaged in the

14    business here, we need to know what they are."  At the hearing,

15    defendants agreed to produce documents showing their beneficial

16    owners.

17         In September of 2017, Magistrate Judge Gorenstein

18    ordered defendants to produce their financials "in as

19    accessible and clear a form as possible," stating that "there

20    should be maximum disclosure on the financials."

21         In October 2017, Judge Gorenstein required defendants

22    to produce "all distributions or other payments from 2013 to

23    the present by any of the defendants to any other individual

24    and/or entities that received distributions or payment from

25    profits regardless of what name was used to describe or book

2812

1    those payments."

2           Weeks before trial, plaintiffs discovered that those

3    orders were not fully complied with.  Plaintiffs learned of

4    three entities involved in defendants' business operations that

5    were never disclosed, the most notable of which is Matasa

6    Agilia Holdings, which serves as the rental arm for Book Dog

7    Books.

8           On the eve of trial, defendants produced, one, a

9    document disclosing for the first time the defendants' employee

10   John Glass was granted a 20 percent equity interest in one of

11   defendants' businesses; and two, evidence that GEKR, an entity

12   long represented as merely a holding company, in actuality has

13   both revenue and expenses on its financial statements.

14          Under Rule 37(b)(2)(A), a court is permitted to

15   rectify noncompliance with a discovery order through issuing

16   further just orders.  A district court has broad discretion in

17   fashioning an appropriate sanction under its inherent power to

18   manage its own affairs.  *Residential Funding Corp. v. DeGeorge*

19   *Financial Corp.*, 306 F.3d 99 at 106-107 (2d Cir. 2002).

20          In determining sanctions, this Court considers the

21   noncomplying party's willfulness, duration of noncompliance,

22   and whether the party has been warned of the consequences of

23   noncompliance.  *See Nieves v. The City of New York*, 208 F.R.D.

24   531, 535 (S.D.N.Y. 2002).

25          A party seeking an adverse inference instruction must

1    show the noncomplying party had an obligation to produce the

2    discovery in question, the party failed to produce it with a

3    culpable state of mind, and the missing evidence is relevant to

4    the moving party's claims or defenses.  *Residential Funding*,

5    306 F.3d at 107.

6          After thoroughly reviewing the parties' briefing and

7    the history of this litigation, this Court finds that some form

8    of sanctions in the form of adverse inference instructions are

9    warranted to remedy prejudice the plaintiffs caused by

10   defendants' actions.  Defendants knew of their obligation to

11   produce all business and entities engaged in book-related

12   commerce in which Philip Smyres has any interest or

13   relationship since this Court's order in September 2013.  And

14   in May 2017, defendants were again ordered to reveal any entity

15   through which they conduct their business.

16         Defendants' contention that they believe that they

17   were only required to reveal their "affiliates" is baseless.

18   Defendants focus in on one word used by Judge Gorenstein, but

19   he went on to order disclosure of "any way in which defendants

20   order their business."

21         Matasa is no mere affiliate.  It works out of Book

22   Dog's warehouse, has one employee, and acts as the rental arm

23   of Book Dog's business.  Defendants' just-revealed employment

24   agreement clearly grants John Glass a 20 percent equity

25   interest in one of defendants' businesses.  The document itself

1    is called "Employment and Equity Participation Agreement" and

2    dates back to 2012.  Clearly this should have been produced

3    under Judge Gorenstein's order to reveal all profit

4    distributions and defendants' own promise on the record to

5    reveal defendants' beneficial owners.

6        Finally, plaintiffs' discovery that GEKR has revenue

7    and expenses on its financial statements severely calls into

8    doubt defendants' representations that GEKR is merely a holding

9    company.  The staggering number of times that this Court and

10   Magistrate Judge Gorenstein had to order defendants to produce

11   further discovery leads this Court to conclude that defendants'

12   omissions were not accidental.  This is also unlikely, based

13   upon the sheer volume of information that plaintiffs just

14   discovered or that defendants just recently revealed.

15       Finally, this information is unquestionably relevant

16   to plaintiffs' claims, as it bears on understanding the extent

17   of defendants' counterfeiting activities and defendants' level

18   of profits.  Accordingly, that's why I am giving the adverse

19   inference instructions that I circulated yesterday.

20       Now, I don't want to hear this issue raised again.

21       What other issues do you want to raise with respect to

22   the charge?

23       MR. OPPENHEIM:  Are you asking specifically about that

24   provision, your Honor?

25       THE COURT:  No.  We're done with that provision.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1              MR. OPPENHEIM:  Okay.  I was just going to suggest if
2     we could just flip through the relevant ones one by one.
3              MR. BHANDARI:  Oh, then I have something on this.
4              So your Honor, just so we can be clear, I understand
5     your ruling --
6              THE COURT:  Please stay seated so that we can hear
7     you.
8              Throughout the whole trial, every court reporter has
9     asked you to speak louder when you're standing there, okay.  By
10    now, in the third week, it should dawn on you that you've got
11    to get closer to the microphone.  It's not just me who's having
12    trouble hearing you.  Both court -- actually, all three court
13    reporters have asked you to get close to the microphone.
14             So take a hint.
15             Generally, when a court reporter told me something
16    like that as a trial lawyer, I made sure that I was speaking
17    loud enough, that I could be heard not just by the court
18    reporter, but by the judge and the jury.
19             So what do you want to raise, Mr. Bhandari?
20             MR. BHANDARI:  Just wanted to make sure that to the
21    extent that there is an allegation that we did not turn over
22    working papers, and that turning over working papers somehow
23    constitutes one of the bases of this violation of the court
24    order, we would object to that.  We would ask the Court just to
25    issue a ruling that specifically the working papers related to
```

L42YMIL8                                                                      2816

 1   the auditors' work is not something that we improperly
 2   withheld, because it wasn't requested in the first instance.
 3   So we just want to clarify that.
 4              I suppose there's a very good chance that
 5   Mr. Oppenheim is not going to make that argument, but we just
 6   wanted to surface that.  It was one of the reasons why we
 7   wanted clarity in terms of what supposedly had not been
 8   produced, which was the basis of your order.  So we'd just like
 9   that clarification that there will be no argument by not
10   producing working papers related to the audited financials, we
11   violated a court order.
12              THE COURT:  What about that, Mr. Oppenheim?
13              MR. OPPENHEIM:  So the term "working papers" is a very
14   vague term.  But they put an expert on the stand who testified
15   that he relied entirely --
16              THE COURT:  I got all that.
17              His point is were the working papers ever part of the
18   rulings that the defendants did not comply with?  I'm taking it
19   from Mr. Bhandari's comment that they weren't.  So if that's
20   the case, I'm not going to permit you to say that the working
21   papers had any connection to the adverse inference instruction.
22              MR. OPPENHEIM:  So weeding through all of the
23   different hearings and requests and everything we had on the
24   financial papers to figure out whether the working papers were
25   requested or not would be difficult.  But so let me try to make

 1    this easy.

 2              While we may dispute the reliance, the blind reliance

 3    on the audited financial statements by the expert, we don't

 4    intend to argue to the jury that they failed to comply with the

 5    court order by failing to produce work papers.

 6              THE COURT:  That's fine.

 7              MR. OPPENHEIM:  Does that take care of it?  Okay.

 8              THE COURT:  Mr. Bhandari, what's your next issue?

 9              MR. BHANDARI:  That's it, your Honor.  Thank you.

10              THE COURT:  I've taken care of your argument regarding

11    the preponderance of the evidence.  I've dealt with all the

12    issues in your letter.

13              So what issues do the plaintiffs have regarding the

14    charge?

15              MR. OPPENHEIM:  Yes, your Honor.

16              So just for purposes of the record, we'll renew our

17    objection on the failure to include language about oral

18    testimony on proof of transfer of copyright ownership and

19    trademark ownership.  Just for the record, we'll renew that

20    objection.

21              With respect to the change that's now been made to the

22    statutory damages provision in instruction 23, so that now --

23    that change, as I understand it, you've now added that the

24    revenue -- the profits earned and expenses saved is in

25    connection with the infringement; and the revenue lost as a

        1    result of defendants' infringement, that then has a ripple

        2    effect.  Because one of the factors that a jury is allowed to

        3    consider in statutory damages for purposes of deterrence is the

        4    defendants' profits and revenues.  Because there's case law on

        5    this, but it's really much easier to understand in the context

        6    of an example.

        7          If Apple Computer is subject to a million-dollar

        8    award, it doesn't move the needle for them; it's not going to

        9    deter them one way or the other.  So a jury, when they are

       10    considering deterrence, has to know whether or not -- what

       11    amount -- they have to be able to consider what amount will

       12    have a deterrent effect on the defendant.  So now by limiting

       13    the jury's consideration of profits earned and expenses saved

       14    and revenues lost to just the infringement, you've now taken

       15    away from the jury the right to consider something they have to

       16    consider for purposes of deterrence.

       17          So we'd like the opportunity to provide some suggested

       18    language on the deterrent effect that one of the factors that

       19    the jury can consider in considering deterrence is the

       20    defendants' revenues and profits.  We didn't suggest this

       21    originally because we thought it was taken care of by the prior

       22    issues -- the prior factors, sorry.

       23          MR. GLUNT:  So your Honor, this is an issue that the

       24    Court indicated earlier that this is one of the issues over

       25    which it had no doubts.  We don't think the Court should have

2819

```
1   any doubt over this issue.  This is model language; it mirrors

2   not just language in model instructions, but the language the

3   Second Circuit has used and the language frankly other circuits

4   have used in assessing the factors.

5           With respect to statutory damages, deterrence is one

6   of those factors, that's absolutely correct.  But I would

7   encourage the Court not to try to create some bespoke

8   instruction on the factors for statutory damages which it only

9   invites appeal, it only invites error to try to tamper -- not

10  tamper, but to try to tinker with the model instructions on

11  what factors the parties can consider.  So we would urge them

12  to just use deterrence.  Deterrence obviously includes what

13  would be necessary to deter these defendants.  That is what

14  deterrence is.  But trying to, again, rewrite what deterrence

15  is in order to include some language helpful -- I apologize.

16          THE COURT:  I'm just indicating that counsel can

17  remain seated.

18          MR. GLUNT:  In any event, your Honor, not to belabor

19  the point, this is an issue the Court had no doubts about.  I

20  don't think anything Mr. Oppenheim said, respectfully, should

21  raise any doubts about the propriety of using model language in

22  this regard.

23          MR. OPPENHEIM:  Your Honor, the case law with respect

24  to factors two and three include those limitations.  There's no

25  doubt that the case law also -- and I haven't had an
```

2820

 1    opportunity to compile it for your Honor, but happy to do so

 2    overnight -- is clear that in considering the deterrence in

 3    statutory damages, that the jury gets to consider the

 4    defendants' ability to pay their resources.

 5            THE COURT:  Why can't you argue that?

 6            MR. OPPENHEIM:  Because I have no doubt now what's

 7    going to happen is the defendants are going to get up and they

 8    are going to say, You know all those profits you saw and all

 9    those revenues you saw?  They are only relevant if the

10    plaintiffs can connect them to the infringement.

11            And that's not true.

12            So we've now limited -- we have this financial

13    discovery which is critical for understanding what we need from

14    a deterrence perspective.  Deterrence is a huge issue in this

15    case.  This case calls for more than probably any other case

16    that I've litigated in quite some time.  We have a lawsuit in

17    2007, we have more notices of infringement just this month,

18    right.  So for ten years ongoing infringement.  Deterrence is a

19    critical issue.

20            If it's not made clear to the jury that they are

21    permitted to consider revenues and profits, and they are given

22    these limitations, then the defendants are going to argue, You

23    shouldn't pay any attention to whether it be 33 million or 53

24    million, because that's not relevant, because we as plaintiffs

25    can't connect it to the infringement, which, by the way, is

 1    partially because of a lack of records.

 2            So the jury has to be told that they are allowed to

 3    consider revenues and profits for purposes of deterrence.

 4            MR. GLUNT:  Your Honor --

 5            MR. OPPENHEIM:  Sorry, one last point.  I apologize.

 6            This formulation they came up with, their expert did,

 7    they only make $2 per book in profit, and they want to apply

 8    that to the 161 titles and argue for some tiny number, we need

 9    to be able to say to the jury, These defendants have been

10    infringing for ten years and they are still infringing.  And

11    the jury needs to consider what award will have a deterrent

12    effect on them.  And we need to not have the defendants say,

13    You're not allowed to consider that.

14            MR. GLUNT:  Your Honor, Mr. Oppenheim just gave a very

15    eloquent description of the importance of deterrence in this

16    case.  He is obviously able to make those arguments tomorrow in

17    his closing.

18            But I don't think that the Court can adopt the notion

19    that Mr. Oppenheim is somehow deprived of an argument if the

20    Court doesn't explicitly preview and endorse that argument in

21    the instructions.  He's able to argue about deterrence, about

22    the need for deterrence, and what they could properly consider

23    in awarding an award concerning deterrence.  That doesn't mean

24    the Court needs to amplify that argument by taking what is a

25    model instruction that is definitely in accordance with the

2822

```
 1   rules, and then tinkering it with, as Mr. Oppenheim suggests,

 2   something that might not be in accordance with the law or might

 3   invite error.  I don't think there's any reason the Court

 4   should revise what it had no doubts about a few moments ago and

 5   alter this instruction.

 6        Mr. Oppenheim can make his arguments, but the Court

 7   doesn't need to amplify them and doesn't need to adopt them for

 8   him to be able to make those arguments.

 9        MR. OPPENHEIM:  Your Honor, it's not just an issue of

10   what arguments I make and what your Honor instructs; it's also

11   an issue of what the defendants say.  If the defendants get up

12   and say, You're going to hear the judge.  And he's going to

13   tell you that the only relevance of profits and revenues is as

14   it can be connected to the infringement.  If they make that

15   argument and then they hear your instruction, they are going to

16   take a natural inference from it.

17        Now, you show me a case where there's ten years of

18   infringement, and the plaintiffs want to argue deterrence and

19   they are not permitted to argue that the profits and revenues

20   of the infringing party are relevant.  I don't believe there

21   probably is such a case.

22        THE COURT:  But doesn't the instructions say that the

23   jury can consider all relevant facts and circumstances?

24        MR. OPPENHEIM:  I just want to make sure that if we're

25   going to leave it as-is, that the defendants are not going to
```

1   argue to the jury that they can only consider profits and

2   revenues if it's connected to the infringement.

3           THE COURT:  What about that, Mr. Bhandari?

4           MR. BHANDARI:  We would argue that the revenue lost by

5   the plaintiffs can only be considered in connection with the

6   infringement; and the profits the defendants earned and

7   expenses that they save can only be considered in connection

8   with the infringement.  We will not say anything about that

9   with regard to deterrence.  We will focus on exactly what the

10  instruction is, the way that the law expects us to do.

11          MR. OPPENHEIM:  That is precisely my concern, your

12  Honor.

13          MR. BHANDARI:  That's the law.  His concern is with

14  the law; it's not with our arguments, your Honor.  He wants a

15  special instruction that is different than the case law.

16          MR. OPPENHEIM:  Respectfully, that's not true.

17          The case law is clear that in considering deterrence,

18  juries are allowed to consider what award is necessary to have

19  a deterrent effect.  And I'm just asking for what the case law

20  permits, your Honor.  Looking at other cases where deterrence

21  is not a critical issue for purposes of this instruction is not

22  helpful.  You have to look at the cases where deterrence is an

23  issue.  This is a case where deterrence is among the most

24  important issues.

25          MR. GLUNT:  Your Honor, briefly, one last thing on

2824

1     this.

2          So firstly, deterrence is an issue in every single

3     case; that's why it's one of the enumerated factors.  Moreover,

4     the defendants are not going to argue that the profits or

5     revenues of the defendants can't be considered with respect to

6     deterrence.  But the defendants should be permitted to argue,

7     as is the law, that when considering factor two, which

8     describes the profits saved, that that is, in fact, limited to

9     the profits that are attributable to the infringement.  And

10    defendants should be allowed to argue that because it's the

11    law, your Honor.  And that's why this Court came to the same

12    conclusion that the defendants did when doing the legal

13    research, because that is genuinely the law.

14         Now Mr. Oppenheim says, Well, the defendants are going

15    to confuse the law; they are going to make a mockery of it

16    because they are going to argue with respect to factor two,

17    that the only profits that should be considered are the profits

18    related to infringement; and with respect to the expenses of

19    the plaintiffs, the only expenses that should be considered are

20    the expenses relating to the infringement.  But again, that's

21    the law, your Honor.

22         Mr. Oppenheim's problem is a problem with the law, and

23    that's why he's arguing with model instructions.

24         THE COURT:  But it's not the law that the jury cannot

25    consider profits in general.

1          MR. GLUNT:  Absolutely, your Honor.

2          With respect to deterrence, they can consider profits

3    in general.  We are not going to argue that with respect to

4    deterrence they can't consider profits.

5          MR. BHANDARI:  Exactly.  Any more so than you would

6    have to give instructions saying, For deterrence you should

7    consider how bad Mr. Smyres' business will do after there's a

8    judgment over here.  You should also consider deterrence on

9    whether or not other people will do business with him.  You

10   should also consider what his profits are.

11         That's not the way that a jury instruction works, your

12   Honor.  They'll make whatever arguments they want of

13   deterrence.  We will not say that it's impermissible and

14   against the law for you to consider profits or expenses, of

15   course we won't.  I can guarantee you we will not say those

16   things.  That's why this instruction is crafted this way for a

17   reason.  You don't need to spell out all the different

18   potential factors, some of which militate in favor of a bigger

19   award, some of which militate in favor of a smaller award when

20   you're talking about deterrence.

21         MR. OPPENHEIM:  So I hate to keep going back and

22   forth.

23         The question is whether Mr. Bhandari gets up and he

24   says, You will hear Judge Pauley instruct you regarding the

25   factors.  And when you look at profits, you should only

2826

 1     consider them, da, da, da, da, da.  And as soon as he includes

 2     the word "only" or he references the instructions, the clear

 3     message to the jury will be that that's the only time it's

 4     relevant.

 5               So I'm now arguing against the instruction, even

 6     though the law provides that the profits are relevant for

 7     purposes of considering deterrence.  And there is no model

 8     instruction for purposes of the Second Circuit.  But the law on

 9     this is clear.  The law on this is very clear.

10               THE COURT:  Look, give me something responding to that

11     point in defense counsel's letter.  We'll consider it tomorrow

12     morning at 8:45.

13               MR. OPPENHEIM:  Very well.

14               THE COURT:  Anything else with respect to the charge?

15               MR. OPPENHEIM:  We had one other issue, your Honor.

16               I believe on the issue of instruction 26, the

17     instruction now is limited to BDB1.  I believe the evidence

18     that has now come forth during the course of this trial is that

19     there was destruction of books of titles at issue in BDB2 in

20     2016.  So we believe that this should not be limited at this

21     point to BDB1 based on the evidence that's come in.

22               MR. MANDEL:  We disagree.  This issue has already been

23     litigated.  There's a ruling on this issue.  The evidence that

24     they are referring to is that a title in BDB2 was destroyed

25     long before there was any cease-and-desist letter, long before

1     there was any notice of any claim whatsoever with respect to

2     BDB2.  That, I think, is the evidence that they are referring

3     to.

4            MR. OPPENHEIM:  No.  No.

5            THE COURT:  Wasn't there testimony today that in

6     2016 --

7            MR. MANDEL:  Is this the Bookfari evidence?

8            Oh, the Bookfari issue is those books didn't belong to

9     us; they were not ours.  We could have returned them to

10    Bookfari.  Someone -- we were essentially some sort of -- I

11    don't know if the word is "bailee," but we were providing a

12    warehouse service where someone sent us a book, we inspected

13    the book, we gave them the option of getting the book back or

14    destroying the book, and they instructed us to destroy the

15    book.

16           It was their book.  We never had the right to control

17    it, to do anything with it.  If we refused to destroy the book,

18    we would have had to have sent it back to them because under

19    property law it does not belong to us.

20           It cannot be the case that the Federal Rules of Civil

21    Procedure impose a series of obligations that are inconsistent

22    with property laws in this country.  The federal rules can't do

23    that; that's not what they are meant to do.  The fact that some

24    third-party's books were destroyed -- I would also add this is

25    not a new issue; we've described in detail this Bookfari

1    declaration approximately eight months ago.  They had documents

2    on it prior to the depositions.  They asked all the witnesses

3    about it in depositions.

4         But I would also say the way I read your Honor's

5    ruling on spoliation is that the defendants had the option of

6    maintaining the books or destroying the books and keeping

7    records of the destruction so that plaintiffs would have access

8    to those records.  And what happened to Bookfari is we kept a

9    contemporaneous record of precisely what we were destroying and

10   now they can use that evidence for whatever purpose they want.

11        THE COURT:  Let me say this:  I'm just going to cut it

12   off.  It's too late, just like it was too late yesterday when

13   Mr. Mandel proposed an adverse inference instruction.

14        So I'm going to keep it as-is.

15        Anything else?

16        What about the jury verdict sheet?

17        I can tell you first that we need from you which books

18   are in BDB1 and which books are in BDB2 for a column that we

19   put in the chart.

20        MR. OPPENHEIM:  Sorry, I was looking at an old one.

21        Your Honor, on that issue, that's something that by

22   title number in the roadmap is readily ascertainable.  It's

23   plaintiffs' roadmap, but they can correct me if I'm incorrect,

24   but titles 1 through 140 are all on BDB1; and titles 141

25   through 161 are all on BDB2.

2829

 1          THE COURT:  So then maybe it's not needed.  Maybe I'll

 2    take that column out.

 3          Say what?

 4          MR. BHANDARI:  We should just put it in.  It's easy to

 5    do.  That way the jury, when they are considering the books,

 6    will know which ones are what.  They might not draw the same

 7    conclusion; they might forget that instruction, just like the

 8    Court didn't notice it even though this roadmap has been in

 9    evidence for three weeks.  It's just an easy thing to have in

10    there; it's easy to add.

11          THE COURT:  Fine.

12          Based on Mr. Glunt's representation, we'll just put in

13    BDB1 or Mr. Gould can email a new version of this to us with

14    BD -- we'll give you a Word version and you can send it back to

15    us.

16          MR. GOULD:  Sure.

17          MR. OPPENHEIM:  So your Honor, one of the things that

18    I think may decrease the likelihood of juror error on this form

19    is if in the table we give them the damage range for each of

20    the categories; so when they fill out damages award, they've

21    got a point of reference, they don't have to go back to the

22    verdict form.  Maybe we can take a shot at doing that in the

23    next version, in a parenthetical.

24          THE COURT:  In a parenthetical sounds like a pretty

25    good idea to me.

I42WMIL8                                                                    2830

1                MR. GLUNT:  We have no objection to that, your Honor.

2       We think it might be difficult to implement, but if they can do

3       it, then that would be fantastic.

4                MR. OPPENHEIM:  We'll try and we'll see how it looks.

5                THE COURT:  All right.  What else?

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GLUNT:  Your Honor, two things.  First, I

2    understand the Court has already heard us with respect to

3    question 3 and permitting the jury to simply award a lump sum

4    per trademark -- not a lump sum, but an amount for each

5    trademark.

6          Similarly, with respect to question 6, allowing the

7    jury to award one amount for every copyright.  We understand we

8    have already been heard on that issue at length.  If the Court

9    wants additional argument on it, we are happy to make it.  We

10   obviously would object to that.  We think that giving them what

11   I characterized yesterday as the straight-ticket option makes

12   it a little too easy to take the simple approach and find in

13   favor of the plaintiffs rather than doing the cumbersome

14   analysis to look work by work, as they are required to do under

15   the law.  I understand the Court has made a determination on

16   that.

17          THE COURT:  You have your objection with respect to

18   that.

19          MR. GLUNT:  Understood.

20          With respect just to clarify, my concern going through

21   this is the jury doesn't skip questions or do anything that

22   would lead to an inconsistent verdict form.

23          In question 1, the answer choices, this is for the

24   trademark infringement and they have a choice of all, some, or

25   none.  For all, they are told to go to question 2.  For none,

2832

1   they are told to go to Section 2.  For some, they are told to

2   mark the liability column of table 1, which we think is fine,

3   but we think there should then be an instruction, and then move

4   on to question 2 because my concern is they are going to go to

5   that table, they are going to fill out the table with the

6   information for question 1, and then they are going to go right

7   to what follows the table, and they are never going to answer

8   question 2.

9          I am just looking for ways for this to go wrong.  Not

10  trying to make it go wrong.  I'm trying to find ways to avoid

11  it going wrong.

12         MR. OPPENHEIM:  Plaintiffs have no objection to that

13  proposal, your Honor.

14         Just in the interest of making it simpler for the

15  jury, plaintiffs have no objection to taking out the column

16  addition if the defendants don't.  We think that there is

17  plenty of other references to figure out what it is, and that

18  simplifies the verdict form and gives us a little more

19  landscape to work with.

20         THE COURT:  You want to take out addition.

21         MR. OPPENHEIM:  Easier.

22         THE COURT:  Less is always more.

23         MR. GLUNT:  We have no problem with taking out

24  addition, your Honor.

25         MR. OPPENHEIM:  I think we can do that both trademark

2833

1        and copyright, correct?

2                MR. GLUNT:  No objection to it.

3                The same comment with respect --

4                THE COURT:  Is there any reason for it to include the

5        publisher?  I'm talking about the copyright claims.

6                MR. OPPENHEIM:  On the trademark we have already got

7        the trademark.

8                MR. MANDEL:  One of the factors is the profits lost by

9        the publisher.  I think they need to understand whose evidence

10       they are considering on each of these claims.

11               MR. GLUNT:  Also, your Honor, not to have two

12       different attorneys, but the conduct and attitude of the

13       parties is one of the factors in statutory damages.  There has

14       been evidence adduced that some of the plaintiffs in this case

15       have very rigorous anticounterfeiting operations, some

16       significantly less so.  These are all factors the jury can

17       consider in awarding damages, and there is no other place for

18       them to find this information.

19               MR. OPPENHEIM:  Roadmap.  They can find it in the

20       roadmap.  It's not worth a fight on the issue.

21               THE COURT:  Now, I trust that the parties have been

22       completing a list of exhibits that are received in evidence

23       because it will be a joint list that I'll ask you to agree

24       upon, and it will be that list that will be sent into the jury

25       room and then the jury can request exhibits.

L42MMIL9                                                                2634

1          Anything else?

2          What I will do after I charge the jury is, I will

3   review with them line by line the jury verdict sheet and I'll

4   give each of them a copy of the jury verdict sheet.

5          MR. GLUNT:  Your Honor, on question 4 it's just the

6   same point that I made with respect to question 1.  We would

7   like an addition that makes it clear that after they fill out

8   the liability column of table 2, they then proceed to question

9   5, so we don't have something inconsistent.

10          MR. OPPENHEIM:  Question 4.

11          MR. GLUNT:  Question 4 follows:  If you answered some

12   to question 3, please mark the copyrights that you find

13   defendants infringed in the liability column of table 2 and

14   then proceed to question 5.

15          MR. OPPENHEIM:  What page are you on?

16          MR. GLUNT:  I'm on page 5.

17          MR. GOULD:  Column 2.  Then proceed to question 5?

18          MR. GLUNT:  Yes.

19          THE COURT:  I think that's good.

20          MR. GLUNT:  Exceedingly minor point, on page 7 in the

21   chart on table 2, this is a typographical error.  Willful has

22   two Is.

23          THE COURT:  Close enough for government work.

24          MR. GLUNT:  Understood, your Honor.  If edits are

25   being made anyway.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1               MR. OPPENHEIM:  I think Nintendo has a trademark on

 2      that.

 3               THE COURT:  What else, counsel?

 4               MR. GLUNT:  I have nothing else, your Honor.

 5               THE COURT:  Anything else from the plaintiffs?

 6               MR. OPPENHEIM:  There is an outstanding issue on the

 7      RFA admissions.  Sorry.  The admissions in BDB 1 that the

 8      plaintiffs own certain marks and copyrights, the defendants --

 9      we have not been able to connect on it yet.

10               MR. GOULD:  Trying to come to a meeting of minds and

11      how that will be handled here.  Last night we provided them

12      with a list of what we understood to be the admissions and they

13      have asked us for the copy of their discovery responses, which

14      it was a while back.  We have asked someone in our office to

15      dig them up and can provide them to them tonight.  I guess they

16      didn't have them at their fingertips.  As of now, we haven't

17      heard whether they are agreeing to stipulate to the admissions

18      on ownership that they made.

19               MR. BHANDARI:  Mr. Gould, it is not our response we

20      need.  It's your request.

21               MR. GOULD:  I can get that to you.

22               THE COURT:  Work it out.  I'll see you.

23               MR. OPPENHEIM:  On the Chegg issue, a new issue had

24      been raised regarding the Singh deposition that had not been

25      previously raised.

1          Now that we have had an opportunity to look at this

2   testimony, I believe, your Honor, that there is testimony from

3   the Singh deposition that makes it very clear that it's

4   entirely inappropriate for this transcript to be played for the

5   jury, and I would like to be able to submit to your Honor the

6   pages that are relevant to that so your Honor can look at it

7   and consider it and decide whether or not, based on your

8   Honor's prior decision on the Chegg summary, whether these

9   designations should be read to the jury.

10          THE COURT:  Submit it sometime tonight.

11          MR. OPPENHEIM:  We will, your Honor.  Thank you.

12          MR. GLUNT:  Your Honor, one last request.  Once this

13   charge and jury form are finalized, can we have an electronic

14   copy of that?

15          THE COURT:  We are going to e-mail it to you.  We will

16   e-mail the charge and the verdict sheet.  And the only issue on

17   the charge is the issue that plaintiffs' counsel raised with

18   respect to revenues and expenses and deterrence.

19          I'll see you all tomorrow morning at 8:45.  Have a

20   good evening.

21          (Adjourned to April 4, 2018, at 8:45 a.m.)

22

23

24

25

2837

INDEX OF EXAMINATION

Examination of:                                    Page

BARBARA MacFARLAND

Direct By Mr. Glunt . . . . . . . . . . . .2497

Cross By Mr. Oppenheim . . . . . . . . . .2505

Redirect By Mr. Glunt . . . . . . . . . .2520

Recross By Mr. Oppenheim . . . . . . . . .2529

RONALD GARY QUINTERO

Direct By Mr. Mandel . . . . . . . . . . .2541

Cross By Mr. Oppenheim . . . . . . . . . .2594

Redirect By Mr. Mandel . . . . . . . . . .2642

Recross By Mr. Oppenheim . . . . . . . . .2653

Redirect By Mr. Mandel . . . . . . . . . .2656

Recross By Mr. Oppenheim . . . . . . . . .2656

JASON WOMELDORPH

Direct By Mr. Bhandari . . . . . . . . . .2676

Cross By Mr. Gould . . . . . . . . . . . .2711

Redirect By Mr. Bhandari . . . . . . . . .2749

Recross By Mr. Gould . . . . . . . . . . .2753

Redirect By Mr. Bhandari . . . . . . . . .2755

AARON HIGBIE

Direct By Mr. Glunt . . . . . . . . . . . .2756

Cross By Mr. Miller . . . . . . . . . . . .2772

1  Redirect By Mr. Glunt  . . . . . . . . . . . .2783

2                         PLAINTIFF EXHIBITS

3  Exhibit No.                                    Received

4   205  . . . . . . . . . . . . . . . . . . . .2512

5   341  . . . . . . . . . . . . . . . . . . . .2570

6   1401  . . . . . . . . . . . . . . . . . . .2622

7   1402  . . . . . . . . . . . . . . . . . . .2628

8   279  . . . . . . . . . . . . . . . . . . . .2735

9   273  . . . . . . . . . . . . . . . . . . . .2743

10  320  . . . . . . . . . . . . . . . . . . . .2763

11                        DEFENDANT EXHIBITS

12  Exhibit No.                                   Received

13  39  . . . . . . . . . . . . . . . . . . . . .2498

14  4  . . . . . . . . . . . . . . . . . . . . .2499

15  8  . . . . . . . . . . . . . . . . . . . . .2502

16  233  . . . . . . . . . . . . . . . . . . . .2503

17  5  . . . . . . . . . . . . . . . . . . . . .2695

18  9  . . . . . . . . . . . . . . . . . . . . .2698

19  18  . . . . . . . . . . . . . . . . . . . . .2700

20

21

22

23

24

25