I44VWIL1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      JOHN WILEY & SONS, INC.,
 3    ET AL,

 4                 Plaintiffs,

 5         v.                            13 CV 816 (WHP)

 6    BOOK DOG BOOKS, LLC, ET AL,

 7                 Defendants.

 8    ------------------------------x
      CENGAGE LEARNING, INC., ET AL,
 9
                   Plaintiffs,
10
           v.                            16 CV 7123 (WHP)
11
      BOOK DOG BOOKS, LLC, ET AL,
12
                   Defendants.          TRIAL
13
      ------------------------------x
14
                                        New York, N.Y.
15                                      April 4, 2018
                                        8:52 a.m.
16
      Before:
17
                    HON. WILLIAM H. PAULEY III,
18
                                        District Judge
19                                       and a jury

20                          APPEARANCES

21    OPPENHEIM ZEBRAK
           Attorneys for Plaintiffs
22    BY:  MATTHEW J. OPPENHEIM
           JEFFREY M. GOULD
23         COREY M. S. MILLER

24

25
```

I44VWIL1

1                         APPEARANCES (continued)

2   MANDEL BHANDARI
         Attorneys for Defendants
3   BY:  EVAN MANDEL
         RISHI BHANDARI
4        ROBERT A. GLUNT

5   ALSO PRESENT:  JOSH DUBIN, ESQ.
                   RHONDA HOOPER, Paralegal
6                  DEREK COLE, Technician
                   ANDREW KLEIN, Technician
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I44VWIL1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  I received two letters overnight from

 3    plaintiffs' counsel.

 4              Let's deal first with the Singh deposition excerpts.

 5              MR. BHANDARI:  Your Honor, for the Singh deposition

 6    excerpts, I think we might be able to do something that perhaps

 7    the Court would like better.  And I'm sure plaintiffs won't

 8    like it, because whatever we suggest they are going to assume

 9    is bad for them and they are not going to want it.

10              But my suggestion is we don't necessarily need to read

11    in the Singh transcript if we can do the following two things

12    in our closing statement:

13              One, if we can, using Plaintiffs' Exhibit 341, simply

14    show the fact that all of our books in the Chegg inventory were

15    pulled by the plaintiffs for inspection, that came to about 444

16    books.  And then out of those 444 books, a certain number of

17    those books were labeled "suspect."  And if we can just show

18    those numbers directly to the jury.  And I can make arguments

19    about what our percentage of 50 or so books out of 4400, which

20    is everything that Chegg had of our stuff in the inventory,

21    what conclusions I think the jury should draw from that.

22              So it's not going to be a comparison to anybody else;

23    we're not going to use the MBS or the -- Essig already

24    testified to that, so I think that's something that's already

25    in evidence in terms of the fact that we had 50 books that were
```

I44VWIL1

considered suspect out of the 4400, so if we can just do that.

And then second, to do a real apples-to-apples comparison of the 34 titles that were pulled for every single -- the 34 priority titles that the publishers instructed Chegg to pull for all books from every textbook distributor that Chegg had in its inventory.  We know those priority titles because of DX-371; and then we are able to figure out the results of those inspections based on PX-341.

So if we can do that apples-to-apples comparison, we've printed out a chart, which is just those 34 titles and what the numbers are, if we can use that in our closing, then we won't need to do Singh testimony.

Can I show that chart to your Honor and to opposing counsel?

THE COURT:  Yes.

Yes, Mr. Oppenheim.

MR. OPPENHEIM:  You can put a cat in front of a person and call it a dog, it's still a cat, your Honor.  That's the Chegg summary.  That's what's been excluded.  And I think the Singh testimony makes clear there were varying sample sizes, he didn't know what had been done.  And most importantly, under the *Gupta* decision, your Honor, that we've already discussed, the defendants are not allowed to put forward in concluding argument evidence which no witness has described, testified, or given meaning to.  And that's exactly what they are trying to

I44VWIL1

```
 1    do, and I believe it's prohibited.  We've been dealing with
 2    this issue since before the trial.
 3                THE COURT:  Let's turn to the Singh deposition
 4    transcript.
 5                MR. BHANDARI:  Okay.  So this is not acceptable, your
 6    Honor?  This is not from Chegg.
 7                THE COURT:  I understand.
 8                Plaintiffs object to it; I think that their objection
 9    is well-taken.
10                But let's address the Singh transcript because, quite
11    frankly, seeing the excerpts that are in Mr. Oppenheim's
12    letter, I assume that those excerpts would be played as part of
13    the Singh transcript; correct?
14                MR. BHANDARI:  Certainly, yes.
15                THE COURT:  Right.  So it seems to me, Mr. Oppenheim,
16    that Singh in his testimony makes the very arguments that you
17    wish to make, that the numbers are misleading.
18                MR. OPPENHEIM:  If it's prejudicial and misleading in
19    the first instance, it shouldn't come in so that we have to
20    rely on the testimony of the witness that it's misleading.
21                In particular here, your Honor, what's happening in
22    this testimony is defense counsel is doing a calculation,
23    asking it in a question, and the witness is saying it's in the
24    document.  The witness is not providing testimony that that's
25    the right number.  If the instruction that we give every jury
```

I44VWIL1

```
1    is correct, which is the question of the lawyer doesn't matter,

2    it's the answer, well, there is nothing in the answer; it's all

3    in the question.  So it should all not be before the jury.

4              THE COURT:  Look, that's great argument for the jury.

5    Quite frankly, I do not -- Singh is a Chegg witness.  I don't

6    see any reason why, given Singh's testimony, that the

7    defendants should not be permitted to play the Singh deposition

8    transcript.  Both sides can argue --

9              MR. OPPENHEIM:  So are we -- sorry.

10             THE COURT:  No, go ahead.

11             MR. OPPENHEIM:  Are we then going to allow the

12    defendants to put the Chegg summary before the jury in closing?

13             THE COURT:  No.  No.  No.

14             MR. OPPENHEIM:  If it's limited to playing the

15    deposition designations, we can live with that.  What I don't

16    want in closing is for that spreadsheet to be used in a way

17    they are attempting to use it, either visually or orally.

18             MR. BHANDARI:  Your Honor, one thing.  Unfortunately,

19    we don't have the video; we're going to have to read the

20    testimony in, but otherwise understood.

21             THE COURT:  It won't be the first time we've read

22    testimony in.  That's the way it used to always be done.

23             MR. BHANDARI:  Right.

24             MR. OPPENHEIM:  As I stand here today, this morning, I

25    haven't looked at the cross-designations on Singh.  I would
```

I44VWIL1

```
1    want to make sure that everything that's in our letter we can

2    include in the reading.

3             THE COURT:  Right.  That's why I asked Mr. Bhandari

4    whether everything that you've recited in your letter will be

5    included in the reading.

6             MR. BHANDARI:  I'm sorry?

7             THE COURT:  I want to ensure that everything that

8    Mr. Oppenheim cited in his letter relating to the Singh

9    deposition, that all of those passages are read in the course

10   of reading Singh's deposition.

11            MR. BHANDARI:  Okay, your Honor.  I think we just want

12   to confer with the other side in terms of making sure that

13   we've got all the --

14            THE COURT:  Cross-designations.

15            MR. BHANDARI:  I think it should be from 193 to 222 of

16   the Singh transcript, but let's just make sure that that covers

17   what they want as well.

18            Your Honor, the apples-to-apples comparison that I

19   just handed up we'd like to have marked for identification

20   purposes just as Defendants' Exhibit 415.  I understand the

21   Court's ruling; you think that it's not a fair apples-to-apples

22   comparison, but we would just like it to be in the record.

23            THE COURT:  We'll deem it marked as Defendants'

24   Exhibit 415 for identification.

25            MR. BHANDARI:  Thank you.
```

I44VWIL1

1           MR. OPPENHEIM:  We'll need to confer on the

2     designations.

3           THE COURT:  Fine.

4           MR. OPPENHEIM:  There's some lawyer colloquy we should

5     probably take out.

6           MR. BHANDARI:  One other thing, your Honor.

7           THE COURT:  Go ahead.

8           MR. BHANDARI:  We just want to, again, be clear that

9     the MBS business records that were entered into evidence at the

10    beginning are Defendants' Exhibit 287 and Defendants' Exhibit

11    288, that they are entered into evidence pursuant to the

12    902(11) certification.  So there needs to be no testimony; just

13    that those records are in evidence.  The certification, of

14    course, is not.  We just want to be clear that DX-287 and 288

15    are in evidence so we can point the jury to those if they want

16    to look at them.

17          MR. GOULD:  Before getting ahead of myself, I suppose

18    a fair question is do the defendants plan to make argument

19    based upon those documents in closing?  If not, I'm happy to

20    save my piece.  If so, I think I have something to add.

21          MR. BHANDARI:  No, we just simply want to say that

22    there's a bunch of records in evidence, including MBS records

23    287 and 288.  You're free to look at whatever it is you want,

24    if you want to satisfy yourself about what's happening with the

25    underlying evidence in this case.

I44VWIL1

1          MR. GOULD:  I take that as a representation that they

2      do not plan to argue what "bad books" means, how many books MBS

3      had in inventory from the defendants versus others, and what

4      any of that may or may not mean.

5          MR. BHANDARI:  We definitely don't intend to tie any

6      of those arguments to those documents.  We might say MBS had a

7      lot of books from lots of different publishers, and you can't

8      assume that the ones that came in from us, but I'm not going to

9      tie it to any documents.  We are of course going to make those

10     arguments, but not tie it to 287 or 288.

11         THE COURT:  All right.  Why don't you take five

12     minutes to confer right now on the Singh deposition excerpts so

13     that as soon as the jury is here, we can present the evidence.

14         Generally, about how much time do you think it's going

15     to take to play the various excerpts that either defendant is

16     playing or the plaintiff is playing in rebuttal?

17         MR. BHANDARI:  Just one moment, your Honor.

18         THE COURT:  Are we talking an hour in time or two

19     hours in time or --

20         MR. OPPENHEIM:  We have one, your Honor, which is

21     Mr. Davenport.  We think that's probably 20 minutes, maybe a

22     little less.  I don't know about the others.  We'll work on the

23     designations issue.

24         Do you want to take up the other --

25         THE COURT:  I will take up the charge -- your letter

1    with respect to the two points on the charge.  But I think I'd

2    first like to make sure you're all square on the deposition

3    designations.  But if your colleagues can work on it, we can

4    talk about your second letter.

5            MR. OPPENHEIM:  Designations are in more capable hands

6    than mine.

7            THE COURT:  All right.

8            So let's turn to plaintiffs' counsel's second letter

9    regarding two elements of the charge.

10           First the issue that we discussed yesterday -- well,

11   let me take one issue off the table straightaway:  Plaintiffs'

12   counsel's argument about confusion in counterfeit cases, I

13   think, is well-taken.  I'm going to eliminate the reference to

14   confusion in the context of a counterfeit case, having looked

15   at the cases that plaintiffs cited.  So we can take that issue

16   off the table.

17           But let's turn to the second issue.

18           MR. OPPENHEIM:  So your Honor, this is an issue I

19   raised yesterday about making sure that the jury understands

20   that they consider -- they can consider profits in the context

21   of deterrence.  And this issue arises because we limited in the

22   other factors what the consideration of profits could be.

23           So we're happy to go back to the original formulation;

24   but if we are not going to go back to the original formulation,

25   we believe that the case law makes clear that the profits

I44VWIL1

1     should be considered in the context of deterrence.  And we've

2     cited to the Court three cases, including one which basically

3     is a publisher case, which is interesting.

4          Your Honor, what we've offered in the instruction is

5     not changing the factors, but rather just adding a sentence at

6     the end of the factors.  And it would go into both the

7     trademark and the copyright one that says:  Well, one of these

8     factors focuses on defendants' profits from the infringement.

9     There is a separate factor concerning the deterrent effect of

10    the award on defendants and others.  Under that deterrence

11    factor, you are permitted to consider defendants' total

12    profits.

13         I think that's entirely in line with all the case law

14    and it is appropriate clarification for the jury.

15         THE COURT:  All right.

16         Mr. Glunt.

17         MR. GLUNT:  Your Honor, a few things.

18         Firstly, we are not going to tell the jury that they

19    may not consider profits when considering deterrence; we are

20    not -- frankly, I don't expect us to tell them that they may

21    not consider very much at all.  But we are not going to make an

22    argument that it is improper as a matter of law for them to

23    consider the total profits when considering deterrence.

24         My concern here though, your Honor, is it's in the

25    jury's hands to determine what the appropriate level of

deterrence is and what kind of -- and what kind of information

is necessary in order to consider that.  A jury may find that

the total amount of profits that the defendants earned over a

certain number of years is an appropriate consideration; they

might think revenues are an appropriate consideration; they

also might think the genuine benefit they received from selling

counterfeit books is something they should consider in awarding

an appropriate measure of deterrence, and that's not

unreasonable.

What I think would be unreasonable, your Honor, is for

the Court to weigh in on the appropriate measure of deterrence

by saying, Look, you need to look at this big profits number

when you evaluate deterrence.  Look at that big number that was

put forward by plaintiffs; that's the number you need to be

considering.

Obviously they are allowed to consider that, your

Honor.  But when the Court tells them and magnifies that

particular factor as a consideration, we think that frankly

it's putting the thumb a little bit on the scale.  These

default instructions, these model instructions, were carefully

crafted for a reason.  We don't think there's any reason to

tinker with them in a way which we think may prejudice the

defendants and may invite error.

As we said, we're not going to argue that something is

out of bounds, that they may not consider it.  And I think in

1        the absence of that, the argument that the model instructions

2        are confusing or misleading in some way is frankly not

3        well-taken.  They are supported by the law.  There is not

4        reason for a bespoke solution which magnifies a factor that the

5        plaintiffs wish to argue in their closing.

6                As I said yesterday, the fact that the plaintiffs

7        intend to argue something doesn't mean that argument has to be

8        specifically endorsed by the Court; and they are not precluded

9        from arguing something just because the Court didn't

10       specifically highlight it and magnify it in their instructions.

11               Moreover, there are a lot of factors that could be

12       considered in deterrence.  Calling out that one factor I don't

13       think would necessarily be appropriate.  We can talk about

14       over-deterrence, we can talk about impact on others.  There are

15       a whole host of other factors that you could call out of

16       deterrence.  We don't think it's necessary for the Court to do

17       so, particularly when they just call out the one factor which

18       the plaintiffs want to focus on.

19               MR. OPPENHEIM:  Your Honor, the defendants keep

20       referring to model instructions.  There are no model

21       instructions in this jurisdiction.  This jurisdiction, your

22       Honor, as you know, probably handles more copyright and

23       trademark cases than any jurisdiction in the country.  The case

24       law could not be more clear that one of the primary

25       consideration of deterrence is profits.

I44VWIL1

1          I'll leave it at that, your Honor.

2          THE COURT:  All right.

3          Look, in considering the parties' arguments and

4     reflecting on the colloquy that we had yesterday, I am

5     concerned about confusion in the jurors' minds.

6          Yesterday at page 2823, line 4, Mr. Bhandari said:  We

7     would argue that the revenue lost by the plaintiffs can only be

8     considered in connection with the infringement.  And the

9     profits the defendants earned and expenses that they save can

10    only be considered in connection with the infringement.  We

11    will not say anything about that with regard to deterrence.  We

12    will focus on exactly what the instruction is the way that the

13    law expects us to do.

14          That really, in my view, captures the problem here.

15          I think that the plaintiffs' proposed language is too

16    verbose.  At the end of the list of factors, I'm going to add

17    one sentence as follows:  In considering what amount would have

18    a deterrent effect, you may also consider defendants' total

19    profits.  I think that accurately captures the law and balances

20    the argument that each party can make during the course of

21    their closings.

22          MR. GLUNT:  Your Honor, may I be heard one final time

23    on this point?

24          We think that if that magnified instruction is added,

25    that the Court should also add that the jury may consider the

1   effect that an award may have on other sellers in the

2   marketplace.  As the Court knows, that's also a factor under

3   the law they may consider for deterrence.  We think that it's

4   only fair to include that as well.

5          THE COURT:  Any objection?

6          MR. OPPENHEIM:  I think it's kind of captured already

7   in the fourth factor, but I actually don't object to that.

8          THE COURT:  All right.

9          MR. OPPENHEIM:  So long as that's what the defendants

10   want and feel like that balances it out, we'll accept that

11   compromise.

12          THE COURT:  So the sentence will read as follows:  In

13   considering what amount would have a deterrent effect, you may

14   also consider defendants' total profits and the effect the

15   award may have on other sellers in the marketplace.

16          MR. GLUNT:  So your Honor, obviously we preferred it

17   as it was originally; but if the Court is inclined --

18          THE COURT:  You prefer it not at all.

19          MR. GLUNT:  We prefer it not at all.  But if the Court

20   has already ruled on that point, then we think that the

21   additional sentence does improve it.

22          THE COURT:  All right.  The jury is all here.

23          Are we ready to proceed?

24          MR. MANDEL:  I know your Honor has ruled, but we

25   object to the removal of the confusion language from the

I44VWIL1

1   trademark instruction.

2            Thank you, your Honor.

3            THE COURT:  All right.

4            Mr. Gould.

5            MR. GOULD:  I wanted to raise two things.

6            Despite many watchful eyes --

7            THE COURT:  Only one person can speak at a time.

8            Mr. Gould.

9            MR. GOULD:  Thank you.

10           Despite many close reads by many people, there are

11   still a few typos in the verdict form.  Happy to share those

12   with yourself or your clerk.

13           THE COURT:  Right.

14           MR. GOULD:  Secondly, there is a piece of the

15   instruction in number 17, copyright infringement, at lines 22

16   to 24, that discusses the concept that a copyright infringement

17   need not be intentional.  17, lines 22 to 24.

18           THE COURT:  Go ahead.

19           MR. GOULD:  A similar language should be added to the

20   trademark instruction because the same principle applies.  We

21   thought it was in there at one point; it appears not to be in

22   there now.

23           THE COURT:  All right.  This is what happens late at

24   night.

25           MR. GOULD:  Indeed.  We're familiar.

I44VWIL1

```
 1           THE COURT:  Any objection adding the instruction at
 2   lines 22 to 24 from copyright infringement into trademark
 3   infringement?
 4           MR. GLUNT:  Mr. Gould, can you just give me the page
 5   and line?
 6           THE COURT:  Page 20, line 22 to 24.
 7           What about timing on deposition reads?  I've got 20
 8   minutes or so from the plaintiff.  What's the defendant got
 9   approximately?
10           MR. GLUNT:  Your Honor, we intend to read from
11   Mr. Tichenor's deposition.  We haven't timed it out, so my
12   estimate would be maybe a half an hour.
13           THE COURT:  Total?
14           MR. GLUNT:  I think so; but, again, having not timed
15   it out, I apologize if it's over or under.
16           And then there's the Singh deposition.  We haven't
17   timed that out either, but I expect that to be relatively
18   short.
19           MR. BHANDARI:  So your Honor, just so we have clarity
20   on the closings, Defendants' Exhibit 287 and 288 are in
21   evidence; correct?
22           THE COURT:  You folks are supposed to be keeping
23   records of what's in evidence.
24           MR. BHANDARI:  This is the business record
25   certification, so I just want to make sure --
```

1          THE COURT:  We've already just discussed this.  287

2     and 288 are in evidence; correct?

3          MR. GOULD:  I'm not sure that's ever been clarified.

4     Obviously we've talked about it a lot.  Certainly they have a

5     decent position that the business records -- exception to

6     hearsay has been established, but we still dispute that there's

7     a foundation in the record to tell what it is to get past the

8     relevance threshold.

9          THE COURT:  Are they Chegg spreadsheets or MBS

10     spreadsheets?

11          MR. GOULD:  Two MBS spreadsheets.

12          MR. BHANDARI:  MBS spreadsheets.

13          MR. GOULD:  Mr. Hogan issue.

14          THE COURT:  They are business records.

15          MR. OPPENHEIM:  Right.

16          The only reason this is an issue for us is because to

17     the extent that they are going to somehow put it in front of

18     the jury, an argument on inferences about bad books, which

19     obviously would be contrary to everything that we've been

20     through 100 times, your Honor, that's the only reason we are

21     concerned about this.

22          THE COURT:  Right.  But he's going to walk wide around

23     that argument, right, Mr. Bhandari?

24          MR. BHANDARI:  Yes, your Honor.  I'm not making any

25     reference to those documents.

1          THE COURT:  They are deemed received in evidence.

2          (Defendants' Exhibits 287 and 288 received in

3     evidence)

4          MR. BHANDARI:  Okay.  Great.

5          And then the other thing is I wanted to just clarify

6     that for Chegg 341B -- excuse me, not Chegg, for Plaintiffs'

7     Exhibit 341B, we can reference the number of books that were

8     pulled that belong to the defendants, which is about 4400, and

9     then the number that were suspect, that is something that I can

10    reference in my closing.  I just want to get full clarity on

11    that.  It's from Essig's testimony; it's in evidence.  We

12    should be able to argue it, but I don't want that to be

13    something that is objected to in the middle of my closing.

14         MR. OPPENHEIM:  So this reference to Essig's testimony

15    is exactly what they had Mr. Singh do in the deposition.

16    Mr. Essig didn't know what the spreadsheet was.  They said,

17    Well, can you look at that calculation of the spreadsheet?  He

18    didn't know what it is; he had never seen it before.

19         So referencing Mr. Essig's testimony on it is the same

20    kind of misleading that this Court has addressed many, many

21    times.

22         MR. GLUNT:  Your Honor, we can pull up Mr. Essig's

23    testimony, if necessary.  But if I recall correctly, he was

24    shown it to refresh his recollection; and he testified --

25    perhaps ill-advised -- that it did refresh his recollection as

I44VWIL1

 1   to those numbers.

 2              THE COURT:  Let's bring the jury out and play the

 3   videos.

 4              MR. BHANDARI:  Readings.

 5              THE COURT:  By the way, timekeeper recaps:  Two hours

 6   and 40 minutes for the plaintiffs, and three hours and 40

 7   minutes for the defendants.

 8              MR. OPPENHEIM:  Do we get extra credit if we are under

 9   30 at the end, your Honor?

10              THE COURT:  You know what?  In every timed trial,

11   there's always time left.  It only happened once that -- I'll

12   tell you about it later.

13              (Jury present)

14              THE COURT:  Good morning, members of the jury.

15              THE JURY:  Good morning.

16              THE COURT:  Members of the jury, thanks again for your

17   punctuality.

18              We were working late last night to get ready for the

19   concluding phases of the trial, and we have been working hard

20   this morning as well.

21              But we are ready to go right now.  We are going to

22   continue with and conclude the taking of evidence in this case,

23   and then we'll take a very short recess, and we'll proceed to

24   closing arguments.

25              At this time, would the defendants call their next

1    witness.

2            MR. BHANDARI:  Your Honor, I believe there's going to

3    be a continued reading -- there's going to be a reading now

4    from the deposition testimony of William Sampson.  And it's

5    going to be done by the plaintiffs as their

6    counter-designations.

7            THE COURT:  All right.  Come on up.

8            MR. MILLER:  May I approach?

9            THE COURT:  Yes.  And if you'd set the stage for the

10   jury, Mr. Miller.

11           MR. MILLER:  Good morning.

12           Yesterday testimony from Mr. William Sampson's

13   deposition by video was played.  Mr. Sampson's deposition

14   continued at a later date.  There was no video of that second

15   deposition taken, so we're going to be reading from that

16   testimony today.  And that was on October 13, 2017, and that

17   was done telephonically, so there's not a specific location

18   specified.

19           THE COURT:  Okay.  It was done by telephone?

20           MR. MILLER:  Yes, your Honor.

21           THE COURT:  Okay.  And the defendant was located in

22   Farmington Hills, Michigan at the time of this deposition;

23   correct?

24           MR. MILLER:  Excuse me, your Honor.  It's not the

25   defendant, it's the witness --

1          THE COURT:  I'm sorry.  Mr. Sampson of Cengage was

2    located at Farmington Hills, Michigan when this deposition was

3    conducted; is that correct?

4          MR. MILLER:  Yes, I believe that's correct, your

5    Honor.

6          THE COURT:  All right.  Let's proceed.

7          (Reading from the deposition of William Sampson as

8    follows)

9    "Q.  Do you know whether defendants had ever asked Cengage if

10   they could purchase books from Cengage for defendants to

11   utilize for purposes of detecting counterfeits?

12   "A.  Not that I'm aware of.

13   "Q.  Do you believe that if defendants had asked Cengage

14   whether defendants could purchase exemplars to utilize for

15   purposes of detecting counterfeits that you would be aware of

16   such an inquiry?

17   "A.  Yeah.  Most of the Smyres matters or issues related to the

18   Smyres matters are funneled through either myself or Stevens or

19   Jessica, and I would have been aware of such a request.

20   "Q.  Even though defendants had their accounts terminated by

21   Cengage, was there anything stopping defendants from using a

22   credit card to buy textbooks from Cengage through Cengage's

23   website?

24   "A.  No.

25   "Q.  Do you believe that Wirat and Aim Discovery are the only

1    two that had ever manufactured counterfeit textbooks or is it

2    the case that they are just the only two that you're aware of?

3    "A.  They are the only two we are aware of; but we suspect that

4    there are many more than what we've been able to identify so

5    far.

6    "Q.  Mr. Sampson, for the seven allegedly infringed Cengage

7    textbooks listed in the second amended complaint, were you from

8    memory able to tell defendants' counsel the specific test

9    purchase distributor audit and/or distributor surrender

10   pursuant to which Cengage obtained a book that it says is a

11   counterfeit sold by defendants?

12   "A.  No.

13   "Q.  Do you know if there are any documents that identify the

14   specific test purchase distributor audit and/or distributor

15   surrender pursuant to which Cengage obtained a book that it

16   says is a counterfeit sold by defendants?

17   "A.  It's my understanding the documentation exists and was

18   provided to opposing counsel which demonstrates or shows what

19   type of source and which source the counterfeits came from.

20   "Q.  Okay.  So I'd like to switch to just one other area.

21        "You were asked questions about how many counterfeit

22   books Cengage alleges the defendants sold and what percentage

23   of defendants' business involves counterfeits.  Do you recall

24   that?

25   "A.  I do, yes.

I44VWIL1                      "Sampson"

1   "Q.  Is Cengage able to identify how many counterfeit textbooks

2   defendants have sold?

3   "A.  That's very difficult to do."

4            THE COURT:  Excuse me.

5   "A.  No, that's very difficult to do.  We've only seen, you

6   know, I think what you could say is a snapshot in time.  But

7   since we are not privy to Mr. Smyres' purchase and sales

8   records and, quite frankly, his inability to provide that for

9   us to look at makes it very difficult to estimate or judge how

10  many counterfeits he may sell in a given year.

11  "Q.  And so is it also the case that for the same reason

12  Cengage is not able to identify the exact percentage of

13  defendants' books that involves the sale of counterfeit?

14  "A.  Yes."

15            MR. MILLER:  That's all, your Honor.

16            THE COURT:  All right.  Members of the jury, that

17  concludes reading from the deposition of William Sampson of

18  Cengage Learning.

19            Would defendants call their next witness.

20            MR. GLUNT:  Yes, your Honor.

21            We would call by deposition designation Tim Tichenor.

22            THE COURT:  All right.  Come on up, Mr. Klein.

23            MR. GLUNT:  May I approach?  I have a copy for the

24  Court.

25            So your Honor, this is the deposition of Tim Tichenor

I44VWIL1                        "Tichenor"

 1    taken on June 3rd, 2015 in Indianapolis, Indiana.

 2              THE COURT:  You may proceed.

 3              (Reading of deposition of Tim Tichenor as follows)

 4    "Q.  Tell me a little bit about your role at Tichenor Books.?

 5    "A.  Okay.  I am the president of Tichenor College Textbook

 6    Company.  I took over that role in 2001, when the second

 7    generation purchased from the first generation, my parents, the

 8    Tichenor College Textbook Company.  My role is executive

 9    overseeing of the company.

10              "Tichenor College Textbook Company consists of the

11    wholesale textbook operation and one college bookstore in

12    Muncie, Indiana.

13    "Q.  What other bookstores or book-related businesses are

14    associated with Tichenor?

15    "A.  That's the only business.  We do sell on the Internet

16    under the name Book Emporium.

17    "Q.  What is the business of TCTC?  I think you said it owns

18    one college bookstore; correct?

19    "A.  Correct, in Muncie, Indiana.

20    "Q.  And you said it's in the wholesale business; is that

21    correct?

22    "A.  Yes.

23    "Q.  Can you describe what you mean by that?

24    "A.  So TCTC buys books from sources and sells college

25    bookstore -- excuse me, and sells to college bookstores, and

1   also sells through the Internet to consumers.

2   "Q.  Did you say it sells to college bookstores?

3   "A.  Correct.

4   "Q.  Does it also sell to other wholesalers?

5   "A.  Yes, it does, and other online entities.

6   "Q.  What do you mean by that?

7   "A.  People who deal directly with online consumers versus

8   having a physical college bookstore front.

9   "Q.  So you approve purchases?

10  "A.  Some higher level.

11  "Q.  Okay.  So let me just see if I understand this.  That

12  whenever a seller wants to sell a high volume of books or a

13  high volume of books to TCTC, your wholesale manager will get

14  your approval on the purchase?

15  "A.  Correct.

16  "Q.  Okay.  Where does TCTC source textbooks from?

17  "A.  College bookstores, independent buyers, and other

18  wholesalers, some distributors.

19  "Q.  When TCTC -- sorry.  You have listed four sources for --

20  "A.  I'm sorry.

21  "Q.  -- TCTC?

22  "A.  Internet from consumers and students, buybacks from

23  students.

24  "Q.  Are there any other sources from whom TCTC obtains

25  textbooks?

1    "A.  No.

2    "Q.  Okay.  So you listed five sources:  College bookstores,

3    independent buyers, wholesalers, distributors, and consumer

4    student buybacks; is that correct?

5    "A.  Yeah.  Correct.

6    "Q.  When TCTC sources textbooks from college bookstores, are

7    those buybacks?

8    "A.  Buybacks and overstock.

9    "Q.  And what is an independent buyer?

10   "A.  People that go around that buy from garage sales and other

11   bookstores, professors, wherever they can.

12   "Q.  So these are just individuals who purchase books and then

13   resell them back to TCTC?

14   "A.  Correct.

15   "Q.  When you describe that, you also -- TCTC also purchases

16   books from wholesalers, right?

17   "A.  Mm-hmm, yes.

18   "Q.  And who -- what -- what is a wholesaler?

19   "A.  Same business that we are of buying books and selling to

20   college stores and on the Internet.  An example would be Texas

21   Book Company, Missouri Book Services, Follett Wholesale.

22   "Q.  Would Book Dog Books be an example of a wholesaler?

23   "A.  I would consider them more of an online seller.  You're

24   saying do we buy books from them?  Yeah.  I wouldn't consider

25   them a wholesaler though.

I44VWIL1                          "Tichenor"

1   "Q.  What would you consider them to be?

2   "A.  An online retailer.

3   "Q.  So that would be a sixth category of sources of books, an

4   online retailer?

5   "A.  I guess, yeah.

6   "Q.  And what is a distributor?

7   "A.  I'm trying to think.  Ingram Books would be a distributor.

8   "Q.  Baker & Taylor?

9   "A.  Baker & Taylor would be a distributor.

10  "Q.  Does TCTC ever purchase books from the publishers?

11  "A.  Just recently.  The example is trying to compare books to

12  make sure we don't buy -- well, I take that back.  The

13  bookstore purchases books from the publishers, that's in TCTC.

14  Tichenor College Textbook Company did not purchase until

15  recently.  We were given sample copies to compare to make sure

16  we get legitimate copies.

17  "Q.  Putting aside sample copies for a moment --

18  "A.  Okay.

19  "Q.  -- has TCTC historically sourced books from the publishers

20  for the purpose of resale?

21  "A.  No.

22  "Q.  Why not?

23  "A.  The price was too high.

24  "Q.  Okay.  In the six categories that you listed for sources,

25  for the sources of textbooks for TCTC, what category would

I44VWIL1                        "Tichenor"

1    Morena fit into?

2    "A.   A distributor.

3    "Q.   Okay.   TCTC purchases both new books and used books; is

4    that right?

5    "A.   Yes.

6    "Q.   Does TC from time -- TCTC from time purchase books as new,

7    but then sell them as used?

8    "A.   Yes.

9    "Q.   Okay.   Why does it do that?

10   "A.   Because the demand for used books is much larger than new

11   books.

12   "Q.   And why is the demand for used books larger than for new

13   books?

14   "A.   They are less expensive.

15   "Q.   So TCTC will sell books as used in order to justify

16   pricing them at lower price point than they would price new

17   books; is that correct?

18   "A.   Please rephrase.   I got lost there.

19   "Q.   Is it fair to say that the reason that TCTC will sell a

20   new book as used is because TCTC wants to justify selling it at

21   a lower price point?

22   "A.   Justify?   I'm -- new books do not sell as fast.   So to

23   move inventory -- because books, in our opinion, are like

24   groceries, they have an expiration date.   As long as we can

25   make a profit on them, we sell some as used.

I44VWIL1                          "Tichenor"

1    "Q.  So here's what I don't understand:  If the reason you sell

2    a new book as used is because consumers want to buy it at a

3    cheaper price, why not just sell it as a new book, but price it

4    at a lower price?

5    "A.  And we have done that to consumers, bookstores.  They buy

6    books basically on a pricing tier set.  So a new book is sold

7    at the list price, used books are sold at 25 percent discount.

8    Bookstores that we sell to will order used only a lot of times.

9    And so for us to move that inventory, as long as we're still

10   making a profit or if we just need to return -- if we just need

11   to get a return of our money, if the book is going old edition

12   or out of print or new edition pending, we make them used

13   sometimes to sell them just to get rid of inventory.

14   "Q.  Does TCTC occasionally buy new books that are priced and

15   designated as used books?

16   "A.  I don't follow that at all.

17   "Q.  All right.  Does TCTC purchase books that, for all intents

18   and purposes, have never been used?

19   "A.  Okay.

20   "Q.  But in order to justify selling them at a lower price, the

21   seller has marked them as used, and so TCTC is buying them as,

22   quote/unquote, used books, even though they are new?

23   "A.  Yes.

24   "Q.  Does TCTC in some way distinguish between books that are

25   just priced as used, but are new, and the books that are

I44VWIL1                        "Tichenor"

1   actually used and priced as used?

2   "A.  No.

3   "Q.  So if you look within a TCTC inventory system and you see

4   that you have 100 copies used -- 100 copies, used copies of a

5   particular textbook, you can't tell whether all 100 are

6   actually new books that have never been used, or actually used

7   books that students have marked up; is that right?

8   "A.  Correct.

9   "Q.  Does TCTC purchase books from overseas suppliers?

10  "A.  Yes.

11  "Q.  Are you familiar with the company Morena?

12  "A.  Yes.

13  "Q.  And do you know what the complete name for Morena is?

14  "A.  I think it's Morena International Trading.

15  "Q.  And for our purposes, is it acceptable if we just refer to

16  that as 'Morena'?

17  "A.  Yes.

18  "Q.  Does Tichenor purchase books from Morena?

19  "A.  No longer.

20  "Q.  When did Tichenor stop purchasing books from Morena?

21  "A.  As soon as we were notified there may be counterfeit

22  books.

23  "Q.  Okay.  And when was that?

24  "A.  February sometime, January or February, January or

25  February of '15.

1    "Q.   2015?

2    "A.   Yes.

3    "Q.   Do you know when TCTC first began purchasing books from

4    Morena?

5    "A.   I think it was November of 2012.

6    "Q.   And the books that were purchased from Morena were new

7    books?

8    "A.   Yes.

9    "Q.   When the books were received, were they reviewed to

10   determine whether or not they are legitimate or not?

11   "A.   No.

12   "Q.   Did anybody at TCTC ever reject an order of books from

13   Morena?

14   "A.   No.

15   "Q.   Did anybody at TCTC ever raise questions about the

16   legitimacy of the books from Morena?

17   "A.   No.

18   "Q.   Did anybody at TCTC ever raise questions at to whether or

19   not the books from Morena were authentic?

20   "A.   No.

21   "Q.   The inspection process that was done for the books that

22   came in from Morena, was that the same inspection process that

23   was used for other book suppliers?

24   "A.   Yes.

25   "Q.   Has any customer ever passed TCTC to provide any written

I44VWIL1                          "Tichenor"

1    representations, warranties, or agreements regarding the

2    legitimacy or authenticity of the books that are being sold?

3    "A.  No.

4    "Q.  TCTC, I think, indicated earlier has sold a lot -- has

5    sold books to Book Dog Books, right?

6    "A.  Yes.

7    "Q.  And Book Dog Books has never asked TCTC to provide any

8    kind of information as to the source of the books that are

9    being purchased?

10   "A.  Not to my knowledge, no.

11   "Q.  And has Book Dog Books ever asked for any representations,

12   warranties, or other agreements of any sort indicating the

13   legitimacy or the authenticity of the books that TCTC is

14   selling?

15   "A.  Not to my knowledge.

16   "Q.  Has Book Dog Books ever asked for any representation,

17   warranty, or other affirmation of any sort from TCTC --

18   "A.  No.

19   "Q.  -- as to legitimacy or authenticity of the books being

20   sold?

21   "A.  No.

22   "Q.  And has Book Dog Books -- strike that.

23          "Has TCTC provided -- independent of any request from

24   Book Dog Books, ever provided any representation, warranty, or

25   affirmation to Book Dog Books regarding the legitimacy or

I44VWIL1                            "Tichenor"

1    authenticity of the books?

2    "A.   No.

3    "Q.   Was Book Dog Books ever not paid on an invoice that TCTC

4    sent them?

5    "A.   Not until recently.

6    "Q.   What happened recently?

7    "A.   They claim that some of those books may be counterfeit.

8    So at that time they had been advised not to pay us our

9    invoices.

10   "Q.   And when did that occur?

11   "A.   Those invoices would have been due March of 2015, so --

12   "Q.   Invoices were due in March of 2015?

13   "A.   Correct.

14   "Q.   And was TCTC made aware of Book Dog Books' refusal to pay

15   in advance of that due date or after the due date?

16   "A.   No, after the due date.

17   "Q.   So sometime after March of 2015, TCTC was told by Book Dog

18   Books that they weren't going to pay for certain books?

19   "A.   Yeah.

20   "Q.   How did they communicate that?  How did Book Dog Books

21   communicate that to TCTC?

22   "A.   Our accounting person contacted them when they hadn't paid

23   yet and they asked me.  So I talked to Mr. Smyres and just

24   asked him.  And he said he was advised by counsel not to pay

25   these until this issue was resolved.

I44VWIL1                        "Tichenor"

1    "Q.  And did you have that conversation with Mr. Smyres in

2    person?

3    "A.  On the phone.

4    "Q.  And was that the first time you ever spoken to Mr. Smyres?

5    "A.  No.

6    "Q.  So you -- you know who Mr. Smyres is?

7    "A.  Yes.

8    "Q.  And did Mr. Smyres call you or did you call him?

9    "A.  I called him.  He may have called me back, but I initiated

10   the phone call.

11   "Q.  And that was sometime after March of 2015?

12   "A.  Yes.

13   "Q.  At that point in time, you were already aware that the

14   publishers had concerns about some of these books being

15   counterfeit; correct?

16   "A.  Yes.

17   "Q.  So you weren't surprised by Mr. Smyres' refusal to pay?

18   "A.  No.

19   "Q.  Is that receivable still outstanding?

20   "A.  Yes.

21   "Q.  And do you know roughly how much that receivable is?

22   "A.  I think it's about 80,000, 81.

23   "Q.  And has -- and that receivable is associated with books

24   from Morena; is that correct?

25   "A.  It's all books that we sent to them.  Could be books from

1    Morena, could be books from others too.

2    "Q.  Has TCTC turned to anybody else to seek payment for these

3    counterfeit books?

4    "A.  The alleged counterfeit books, we even asked for payment

5    for people.  People have paid us because we don't know which

6    ones are and which ones are not.

7    "Q.  Let me back up.

8    "A.  Okay.

9    "Q.  The books that TCTC sold to Book Dog Books that are

10   counterfeit, Book Dog Books has refused to pay for them, right?

11   "A.  They are refusing to pay invoices until this gets

12   resolved.

13   "Q.  Until the dispute is resolved?

14   "A.  Correct.

15   "Q.  Okay.  And what did Morena's attorney communicate to TCTC

16   regarding legitimacy of the books?

17   "A.  That they think they are legitimate; that they are trying

18   their best to find invoices for those books; and that books,

19   even legitimate books, can be different between print runs and

20   copies of the books.

21   "Q.  And when did counsel for Morena provide that response?

22   "A.  May-ish.  April or May.

23   "Q.  In April or May of 2015?

24   "A.  Correct.

25   "Q.  And since that response, has he followed up with any other

I44VWIL1                        "Tichenor"

1  invoices or other documentation to demonstrate the legitimacy

2  of the books?

3  "A.  They have not as of yet.

4  "Q.  Has TCTC repeated or reiterated its request for that

5  documentation?

6  "A.  Yes.

7  "Q.  When counsel for Morena indicated that there be

8  verifications between print runs of books, did he provide

9  any -- any details or other information to support that claim?

10  "A.  No.

11  "Q.  And how did TCTC respond to Morena's indication that the

12  books were legitimate or that they thought the books were

13  legitimate?

14  "A.  We have continued to ask them to produce those invoices.

15  "Q.  Has TCTC threatened to assert claims against Morena for

16  the value of the books?

17  "A.  We have not.

18  "Q.  Why not?

19  "A.  We were hoping that they'll produce them in a friendly

20  atmosphere.

21  "Q.  Produce what?

22  "A.  Copies of the invoices that show they're legitimate books.

23  "Q.  Do you believe that Morena has invoices that will show

24  that the books are legitimate?

25  "A.  I don't know.  I'm hopeful, but I don't know.

I44VWIL1                          "Tichenor"

1    "Q.  So -- so you -- let me just understand this.

2          "You think that even though the publishers'

3    representatives have inspected the books and determined that

4    the books are counterfeit by looking at the paper, the color,

5    the glue, the binding, and all of those other factors, that the

6    publishers determined the books are counterfeit, but you're

7    still hopeful that Morena will be able to produce invoices that

8    show the publishers are wrong?

9    "A.  Correct.  Yes.

10   "Q.  Do you think that is realistic?

11   "A.  I don't know.  I'm not an expert on books when it comes to

12   counterfeit or not.

13   "Q.  Do you believe that Morena is an expert on books when it

14   comes to counterfeits?

15   "A.  No.

16   "Q.  Earlier I think you indicated that you know Philip Smyres;

17   is that correct?

18   "A.  Correct.

19   "Q.  How long have you known Mr. Smyres?

20   "A.  I met Phil maybe ten years ago, when I was over walking

21   the Ohio State campus and walked into his store.

22   "Q.  In the course of the relationship with Book Dog Books, has

23   Book Dog Books ever asked TCTC where they source their books

24   from?

25   "A.  When the issue came up of the counterfeit, they asked,

I44VWIL1                           "Tichenor"

1   Where did you get these books?  We need to know.

2   "Q.  Prior to 2015?

3   "A.  Not to my knowledge.

4   "Q.  Has -- did BDB ever ask TCTC where it sourced its books

5   from?

6   "A.  Not to my knowledge.

7   "Q.  And prior to 2015, did BDB ever ask TCTC whether the books

8   it was selling were authentic or legitimate?

9   "A.  Not to my knowledge.

10  "Q.  Prior to 2015, did Book Dog Books ever ask TCTC to warrant

11  or represent the authenticity or legitimacy of the books it was

12  selling?

13  "A.  Not to my knowledge.

14  "Q.  Has since, even up to today, has Book Dog Books ever asked

15  TCTC to warrant or represent or affirm the legitimacy or

16  authenticity of the books it sold?

17  "A.  Not to my knowledge.

18  "Q.  Have you had any communication -- strike that.

19        "You indicated earlier that you had a telephone call

20  with Mr. Smyres regarding the Morena books; is that correct?

21  "A.  Yes.

22  "Q.  And you -- I think you indicated that call was roughly in

23  March of 2015; is that correct?

24  "A.  Yes.

25  "Q.  Have you had any subsequent conversations with Mr. Smyres?

I44VWIL1                        "Tichenor"

1    "A.   Yes.

2    "Q.   And when were those conversations?

3    "A.   One was at the National Association of College Stores.  We

4    met with him and one of his associates to discuss how to

5    identify counterfeit books just because we were trying to

6    figure out how to do this and make sure we don't have this

7    problem.  They were gracious and shared some of the great

8    knowledge they had for us, and that was that conversation.

9    "Q.   Did they discuss with you the lawsuit that they are in?

10   "A.   He said he was in a lawsuit, yes.

11   "Q.   And the NACS meeting that you described, do you remember

12   roughly when this was?

13   "A.   End of February, February 20th, or sometime around there.

14   "Q.   So that was before you had the telephone conversation with

15   him regarding in March of 2015 or after?

16   "A.   The discussion was before the phone call.

17   "Q.   Okay.  So the meeting was set up because -- the meeting in

18   2015 was set -- February 2015 was set up because TCTC was aware

19   that the publishers had identified certain books from Morena

20   and TCTC as counterfeit, is that right?

21   "A.   They had books they suspected.  They had not inspected

22   them yet.

23   "Q.   And when you met with Mr. Smyres and Book Dog Books in

24   February 2015, what did they tell you about the lawsuit?

25   "A.   Just that they were in the middle of one; that it has been

1    a long time and protracted, but not much more than that.  I'm

2    trying to think if there was anything else.  We spent most of

3    the time talking about how to identify counterfeit books.

4    "Q.  So what exactly did you talk about?

5    "A.  How to identify counterfeit books, because that was our

6    biggest thing.  We have not had this issue.  I mean, I think

7    twice now we have been asked for samples of counterfeit books

8    and we've given samples for suspected counterfeit books, and we

9    have never gotten feedback from the publishers.  I think we

10   sent some to your office back in October.  Haven't heard back

11   anything.

12           "And so obviously when this came up again and it was

13   talking about a large amount of books, we're trying to figure

14   out how to identify those so we don't buy them.  I mean, we get

15   a lot of books in and they -- a lot of books from Morena that

16   came in publishers' boxes.  They came in from the publisher,

17   publishers' markings.  Everything matched up so, you know, the

18   majority of the books we got that way from Morena, so we

19   thought all the books were good.

20   "Q.  But you don't have any of those boxes you had the --

21   "A.  No, we do have some of those.

22   "Q.  You do have boxes, boxes that --

23   "A.  Books have come.

24   "Q.  -- Morena has shipped to you that showed the books came

25   from a publisher?

I44VWIL1                         "Tichenor"

1    "A.   So Morena sent us a lot of different books from different

2    publishers.  I do not have any of the boxes from the particular

3    ones on your list.  But other books that your partner and

4    associates and the publisher rep came in to look at, they saw

5    the boxes, they took pictures of the boxes, they cut out labels

6    of the boxes and took them with them.

7    "Q.   And what did Mr. Smyres tell you to do to identify

8    counterfeit books?

9    "A.   Well, it was actually the guy that was with him.  And he

10   said part of the thing you have to look at was the spine of the

11   book.  If it's flat, that's sometimes a telltale sign.

12   Obviously the book is blurry, obviously signs or the coloration

13   is really, really off compared to another copy that you have

14   that's at issue.  The color of the paper was different, but

15   that's about it.

16   "Q.   Did he have examples of books --

17   "A.   No.

18   "Q.   -- for you to look at?

19   "A.   No.  The guy didn't invite us to come over anytime so they

20   can show you what they did.  We have not done that.

21   "Q.   I'm going to hand you what's been previously marked as

22   Tichenor or TIS Exhibit 3.

23   "A.   Okay.

24   "Q.   The email from your counsel purports to provide

25   information to the publishers in response to a request from

1    them.  Is that -- is that an accurate statement as far as you

2    know?

3    "A.  Yes.

4    "Q.  And the first attachment appears to be a spreadsheet that

5    was, I believe, provided by TCTC; is that accurate?

6    "A.  Yes.

7    "Q.  Do you recognize this document?

8    "A.  Yes.

9    "Q.  And can you describe what this -- is this a document that

10   was created by TCTC?

11   "A.  Yes.

12   "Q.  And can you describe what it is?

13   "A.  So basically it's a history of the Krugman title and where

14   we received them from.

15   "Q.  Turning to TIS Exhibit 5, this is a -- contains some

16   emails between your counsel and -- and myself regarding these

17   counterfeit books.  Have you seen this document before?

18   "A.  Yes.

19   "Q.  And in providing the information here, did your counsel

20   provide information that he had obtained from you?

21   "A.  Yes.

22   "Q.  And looking at the -- this document, the emails appear to

23   contain a number of -- of what your counsel characterized as

24   just PDFs with information.  Do you see those documents?

25   "A.  Yes.

I44VWIL1                          "Tichenor"

1    "Q.  Can you describe what those -- the attached documents are?

2    "A.  So these are basically the receiving information from our

3    computer system per title that you have at the top there.  So

4    you have the title.  And it shows on the date who received them

5    from, the quantities received them from.

6    "Q.  Okay.  Just for referencing, TIS Exhibit 5 is BPSMY 026745

7    through 026775.  So are the documents attached to the emails

8    here documents that were created by TCTC?

9    "A.  Yes.

10   "Q.  And were these documents created based on TCTC's books and

11   records?

12   "A.  Yes.

13   "Q.  And were they kept in the ordinary course of business?

14   "A.  Yes.

15   "Q.  Mr. Tichenor, I'm going to hand you what's been marked as

16   TIS Exhibit 10.

17   "A.  Okay.

18   "Q.  All right.  So Mr. Tichenor, this is a document that was

19   created by the publishers aggregating information from the

20   spreadsheets that TCTC has produced.

21   "A.  Okay.

22   "Q.  Have you seen this document before?

23   "A.  Last night.

24   "Q.  And do you understand that this document purports to

25   determine whether or not for a certainty some of the books that

I44VWIL1                        "Tichenor"

1   were sold by TCTC to Book Dog Books had to have come from

2   Morena, is that how you read this?

3   "A.  Yes.

4   "Q.  Okay.  And if you look at the final column, do you --

5   strike that.

6            "Let's just kind of go through it.

7            "So obviously the list includes 24 titles and shows

8   the sales of each of those titles to Book Dog Books; correct?

9   "A.  Yes.

10  "Q.  The dates of those sales; correct?

11  "A.  Yes.

12  "Q.  And the quantity that TCTC had purchased from Morena prior

13  to the date of the sale to Book Dog Books, right?

14  "A.  Correct.

15  "Q.  And based on that, the spreadsheet seeks to determine the

16  percentage of books from Morena within TCTC's inventory before

17  the sale to Book Dog Books, right?

18  "A.  Yes.

19  "Q.  So for example, on the first title by Baird, B-A-I-R-D, it

20  shows that the time that five copies were sold to BDB on March

21  17th, 2014, 100 percent of the copies of that book within

22  TCTC's inventory had come from Morena; correct?

23  "A.  That's what it says, yes.

24  "Q.  And if we go back to Exhibit 5.

25  "A.  (Witness complies)

I44VWIL1                        "Tichenor"

1    "Q.  And we look at the Baird title.  So you see that as of --

2    well, that looking at this title, I guess, with the exception

3    of -- of one, the inventory adjustment on November 11th, 2014,

4    100 percent of the inventory for this book by Baird came from

5    Morena; isn't that right?  Because everything that is not

6    Morena for this title is listed as a return.

7    "A.  Yes.

8    "Q.  So if you know that 100 percent of the inventory came from

9    Morena, you know that, then looking at Exhibit 10, that the

10   books that Book Dog Books received from TCTC had to have come

11   from Morena; correct?

12   "A.  Yes.

13   "Q.  And that's why Exhibit 10 says 'true' in the final column

14   that BDB must have received a book from Morena?

15   "A.  Yes.

16   "Q.  Okay.  And have you had a chance to go through and to look

17   at the Exhibit 10 spreadsheet?

18   "A.  No, I mean not in detail and compared to anything.

19   "Q.  Do you have any reason to believe that the information

20   contained in Exhibit 10 is inaccurate or the analysis done in

21   Exhibit 10 is inaccurate?

22   "A.  I don't have any reason to believe it, no, that it is.  I

23   don't have any reason to believe it's not accurate.

24   "Q.  Is the way that we went about analyzing this question,

25   that is, whether or not the books TCTC had sold to Book Dog

I44VWIL1                         "Tichenor"

1   Books had come from Morena, is the way we went about analyzing

2   this the correct way to analyze it?

3   "A.  Yes.

4   "Q.  And you said, I believe, that you've been -- you had been

5   purchasing books from Morena since 2012.

6   "A.  November of 2012.

7   "Q.  Do you believe that from 2012 to whenever you ceased in

8   2015 buying from them, that you did buy many authentic books

9   from them?

10  "A.  Oh, yes.

11  "Q.  When you were speaking with Mr. Oppenheim before, he

12  pointed you, I think, to the first line.

13  "A.  Correct.

14  "Q.  And you accepted his proposition that if 60 copies of this

15  Baird book had been ordered before the sale to Book Dog Books,

16  and none -- and had not been bought from anyone else, that it

17  was true that any copies of those books sold to Book Dog Books

18  must have come from Morena.  Did I understand --

19  "A.  Correct.

20  "Q.  Okay.  Do you accept the proposition that every book that

21  you sold -- well, strike that.

22       "But do you also accept the proposition that all of

23  those books were necessarily counterfeits?

24  "A.  No.

25  "Q.  Okay.  Why not?

1  "A.  Through their inspection process and what we've learned so

2  far, some of the books looked so much like the other one, it's

3  almost impossible for us to tell.  And I know that when they

4  inspected, they had question marks on some of them.  They took

5  sample copies and went back for further research.  I don't know

6  what's done at that time.

7        "And until we got reports back to say these are all

8  different -- that these are all the differences in each book

9  they point out, that's how we have gone forward and created a

10  document that says, You need to look at numerous factors to see

11  if a book is -- could be counterfeit or not.

12  "Q.  Okay.  Let's -- let's step back a little bit into some of

13  those comments.  Let's go back to the conversation you said you

14  had with Mr. Smyres and one of his associates at a -- was it a

15  book fair?

16  "A.  A book -- it's a National Association of College Stores.

17  "Q.  Okay.  You said you had a conversation with him about how

18  to identify counterfeits; is that right?

19  "A.  Yeah, we were curious.

20  "Q.  Did you ask him to have that conversation with you?

21  "A.  Yeah, we scheduled a time; said we want to meet with you

22  all and ask these questions because he had volunteered at one

23  time for us to come over and talk to, and I don't recall the

24  gentleman's name who helps inspect books.

25  "Q.  So was this a conversation about what processes go on when

I44VWIL1                        "Tichenor"

1   books arrive at a warehouse and what to do with them?

2   "A.   What to look for.

3   "Q.   Okay.

4   "A.   Yes.

5   "Q.   What -- prior to that conversation, what was TCTC doing in

6   terms of reviewing books as books entered its warehouse?

7   "A.   So when books go in, depending if they come in from a

8   bookstore, and there are a bunch of used books, we do

9   inspection to see if they look like they've got all the pages,

10  any water damage, those types of things.  Books that come in

11  new in nature, we looked at them from the standpoint of did

12  they look like they were good copies, they -- because

13  previously we have seen people say -- and we've seen our

14  bookstores when they get them in.  We'll get copies that are

15  glaringly different, so much so that you can tell a book has

16  come in that doesn't even look -- it looks like somebody's

17  tried to counterfeit it.  You know, paper much larger and

18  looks -- looks like it's been photocopied.  Obviously we return

19  those or destroy them.

20        Some of the other things we've done is when they come

21  in boxes from the publishers, obviously we track.  So if it's

22  sold from Ohio to Australia to -- back into another Australian

23  thing back to us and we can track that on the labels of the

24  boxes, I mean we just want to make sure they look like they

25  were legitimate books.  I don't -- it's very, very hard for us

I44VWIL1                          "Tichenor"

1    to tell.  I mean I can -- conversations happen during the

2    inspection, even with the inspectors, of which one was the

3    counterfeit and which one was not.  You know, when I hear that,

4    well, these are all the experts, how am I supposed to be able

5    to tell?  That's what our staff said, the same thing.  Quote,

6    you're asking us to do something the inspector couldn't even

7    do.  End quote.

8    "Q.  So from your comments, it sounds like other than looking

9    for damaged books or did you receive all the copies you were

10   supposed to receive, your company was already engaging in at

11   least some effort to identify possibly counterfeit books; is

12   that right?

13   "A.  I mean we always have looked because there used to be what

14   we thought was a glaring difference.  This last set, with what

15   the publisher inspection showed us, it's very difficult.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

I44MWIL2                        "Tichenor"

1    "Q.  So when you were talking before about having the

2    conversation with Mr. Smyres and asking him what -- how Book

3    Dog Books handles things and you said something about, this has

4    never been an issue before in terms of trying to identify

5    counterfeits, and maybe I misunderstood?

6    "A.  We have never had a big issue with it before.  There has

7    been two other occasions where we have been asked to furnish

8    books to the publisher, one time with homeland security 12

9    years ago, and they came in and seized $17,000 worth of books,

10   and I asked them, "Can you guys tell the difference?"  They

11   said no.  And I said,  "Well, OK."

12          So they took the books, never paid for them or

13   answered.  We never got anything.  They just -- they just said

14   they were bad, so I wrote off $17,000.

15          This last, I think it was October or September we were

16   asked by someone in your offices to send a couple of copies of

17   two different books because we sent them and we had not heard

18   anything back, and I think Susan was the person we sent those

19   to in this situation here.

20   "Q.  Is this sort of the first time in recent memory that you

21   really had to deal with an allegation of buying counterfeits?

22   "A.  Yes.

23   "Q.  So is that what you meant by this has never -- maybe never

24   wasn't the right word -- been an issue before?

25   "A.  It has not been an issue for us before.  Two isolated

1    cases that we have never heard back from other than they took

2    some of the books, and we are still waiting on a reply back on

3    the other two titles that we sent back in October.

4    "Q.  And you said you've been in business since 1962?

5    "A.  Yes.

6    "Q.  You talked earlier about making contact with Morena or

7    perhaps it was your counsel contacted their counsel.  I am not

8    sure which it was.

9    "A.  So we originally contacted Amar Awad about this and then

10   Mazenal-Ali via e-mail to ask for proof of invoices from

11   publishers on these titles.

12   "Q.  Did you tell them the books stood accused of being

13   counterfeits?

14   "A.  Yes.

15   "Q.  And what was the response to that accusation?

16   "A.  They said -- they didn't believe they are counterfeit, and

17   they would do everything they could to try to get the copies of

18   invoices.

19   "Q.  And at the time were you talking with them about several

20   different titles or one particular title?

21   "A.  Well, the first thing we told them, we told them

22   everything, and then after the inspection we said it looks like

23   it's only a group of these publishers, Pearson, Cengage, and I

24   think maybe Wiley, I think.  And we asked for invoices and

25   copies of the invoices for them.  After our first initial

I44MWIL2                          "Tichenor"

1    couple of e-mails went out, we didn't get much of a reply, and

2    then their attorneys contacted us, and there have been

3    communications with our attorney asking for the same

4    information.

5    "Q.  OK.  Is TCTC in the business of purchasing counterfeit

6    books?

7    "A.  No.

8    "Q.  Would it purposefully set out to purchase counterfeit

9    books?

10   "A.  No.

11   "Q.  Not even to save money?

12   "A.  No.

13   "Q.  Does it believe that it has -- that it accidentally buys

14   them on a regular basis?

15   "A.  I would say counterfeit books get into inventory every

16   once in a while because obviously we could not tell the one we

17   received might be counterfeit.  I mean, they are getting so

18   good, so we try our best to inspect them.  But if you get a

19   shipment of a thousand different titles from a different

20   book -- from different books and you have one copy, we can't go

21   through each copy to inspect each and every copy to see, open

22   up the book, look at it numerous times.  But it's just one

23   copy.

24   "Q.  Referencing back to the Krugman title --

25   "A.  OK.

1    "Q.  -- because it's an easy example here.  So your normal

2    process relies upon receiving that shipment of -- shipments of

3    Krugman from Morena would be to do some sort of inspection, is

4    that right?

5    "A.  Yeah.  Look at the book, I mean the stacks of books.  OK.

6    Is that the title we ordered?  ISBN matches the quantity we

7    ordered.  It's not damaged books.  It's fine, yes.

8    "Q.  And I take it because you put those books in an inventory

9    for sale, you did not find them to be glaringly suspect

10   unauthentic?

11   "A.  Correct.  We did not think that.

12   "Q.  So at the time you sold them to Book Dog Books, you did

13   not believe them to be counterfeits, is that right?

14   "A.  Correct.

15   "Q.  In your other answers it sounds like you still have your

16   suspicions today that they might not be counterfeit?

17   "A.  I'm not an expert.  I can tell you by looking at the

18   reports we received that they were thorough looking at

19   different things.  I still can sometimes pick up a regular copy

20   and a new copy and try to see the differences they pointed out,

21   and I have a very hard time identifying those.

22   "Q.  How long was your discussion with Mr. Smyres and his

23   colleague at the book convention?

24   "A.  Maybe 30 minutes or 20.  I don't know.

25   "Q.  Did they give you any documentation?

1   "A.   No.

2   "Q.   What impression did you have in terms of, you know, how

3   well they had themselves set up to conduct inspections?

4   "A.   They did more than we did."

5   "Q.   He is going to object occasionally, but you still need to

6   answer.

7   "A.   OK.   They knew more than we did at that time.   That's why

8   we were asking questions, just to find out.   My impression is,

9   they obviously didn't want to get counterfeit books from us, no

10  more than we would want to sell counterfeit books, and we said,

11  "At this time we still don't know what might be counterfeit,

12  what might not be counterfeit.   We are just trying to figure

13  out what we can do to make sure it doesn't happen in the

14  future."   And that's what the conversation was really about.

15  "Q.   And this -- indeed this whole situation has caused you, at

16  least temporarily, to lose Book Dog Books' business, hasn't it?

17  "A.   Yes.

18  "Q.   Well, if you can't remember, you can't remember.   Earlier

19  you were talking about the past when -- when the books are

20  incoming at the warehouse and you are reviewing them, that

21  there have been instances where you had suspected books of

22  being counterfeit, is that right?

23  "A.   Very few.

24  "Q.   And what would you do with those books if a determination

25  was made?

I44MWIL2                        "Tichenor"

1    "A.  So either tell the person that we weren't going to buy it

2    and return the book to them, or we were going to destroy the

3    book.

4    "Q.  So you've done both destruction and returning of books?

5    "A.  Yes.

6    "Q.  So, for example, you would turn in Exhibit 5 to the

7    Krugman title, the page I had -- the page I had before.

8    "A.  Page 026759.

9    "Q.  Exactly.  Am I reading the TCTC chart correctly if I say

10   that only three used copies of the Krugman title were bought

11   from sources other than Morena?

12   "A.  Used copies you said?

13   "Q.  Correct.

14   "A.  Correct, yes.

15   "Q.  None of the new -- there was not a single new copy source

16   from anybody other than Morena, correct?

17   "A.  Correct.

18   "Q.  So if I then look at TIS Exhibit 6 and I turn to page 7 of

19   that exhibit --

20   "A.  (Witness complies.)

21   "Q.  -- and I look about two-thirds of the way down at the

22   Krugman title --

23   "A.  OK.

24   "Q.  -- it indicates that TCTC sold nine new copies of the

25   Krugman title to Book Dog Books on or around December of 2014,

1   right?

2   "A.  Correct.

3   "Q.  OK.  Based on --

4   "A.  December 12.

5   "Q.  December 12 of 2014.  Based on the purchase data, you

6   would have to conclude that those new copies came from Morena.

7   The new copies that were sold to Book Dog Books came from

8   Morena, correct?

9   "A.  Based on the timing.

10  "Q.  Well --

11  "A.  Yes.

12  "Q.  So you know for certainty that the copies that were sold

13  in December of 2014 to Book Dog Books had to have come from

14  Morena, right?

15  "A.  Correct.

16  "Q.  And we can similarly go through and identify all of the

17  purchases of new books, new Krugman books by Book Dog Books,

18  and come to the same conclusion, right, including, for

19  instance, the one on Tichenor, page 12, the four copies

20  purchased in December 22, 2014, so on and so forth, correct?

21  "A.  What page did you say?

22  "Q.  TICH 12.

23  "A.  OK, yes.

24  "Q.  If they bought new copies.

25  "A.  Yes.  Because that's the only place we got new copies

1    from.

2    "Q.   OK.   And we can go through and do the same kind of

3    analysis for each and every title, correct?

4    "A.   Correct.

5    "Q.   And that analysis is the analysis that is contained on

6    Exhibit 10, correct?

7    "A.   I believe it to be.

8    "Q.   Which is why, if you look at the Krugman title, which is

9    title 14 on Exhibit 10, under a column that says, BDB must

10   receive a book from Morena, it says true to all three purchases

11   of books of the Krugman title from TCTC.

12   "A.   Yes, I see that.

13   "Q.   You say that you see that, but you agree, right?

14   "A.   Yes.   I can see that we only purchased new titles from

15   Morena on Krugman and we sold new titles.   That's where they

16   came from."

17            MR. GLUNT:   That concludes the deposition of Tim

18   Tichenor, your Honor.

19            THE COURT:   Would the defendants call their next

20   witness.

21            MR. BHANDARI:   Your Honor, we are just finishing up

22   one thing.   We haven't asked the plaintiff if it's possible for

23   them to do their designation for Mr. Davenport, and then we

24   will do the final designation after that.

25            MR. OPPENHEIM:   Sorry, your Honor, we weren't quite

I44MWIL2                          "Davenport"

1    ready for that, but now we are.

2              MR. MILLER:  May I approach, your Honor.

3              THE COURT:  Yes.

4              MR. MILLER:  Now we are going to present the

5    deposition testimony of Mark Charles Davenport taken in

6    Columbus, Ohio on June 18, 2014:

7    "Q.  OK.  And so why is it that you don't use the company

8    e-mail address?

9    "A.  I'm not -- I wasn't comfortable with the format.  I

10   just -- I like mine better, and I didn't even have an e-mail

11   address until two years ago."

12             MR. OPPENHEIM:  I'm sorry, your Honor.  May I

13   interrupt.  It may be useful to tell the jury that this is

14   somebody who works for the defendants because I'm not sure we

15   introduced that issue yet.

16             THE COURT:  Right.

17             I take it, Mr. Bhandari, that Mark Charles Davenport

18   is employed or was employed by Book Dog?

19             MR. BHANDARI:  Yes and yes, your Honor.

20             THE COURT:  Let's go.

21             MR. MILLER:  Start that again:

22   "Q.  OK.  And so why is it that you don't use the company

23   e-mail address?

24   "A.  I'm not -- I wasn't comfortable with the format.  I

25   just -- I like mine better, and I didn't even have an e-mail

I44MWIL2                        "Davenport"

1    address until two years ago.

2    "Q.  So until 2012?

3    "A.  Yeah, that I used.  I just didn't use it because I didn't

4    like it.  I may have had one.  They changed them all two years

5    ago, but before that I never used it.

6    "Q.  When were you first employed by one of Mr. Smyres'

7    businesses?

8    "A.  2008.

9    "Q.  And is the SPC -- SBC e-mail address you described the

10   e-mail address you've used for that entire period of time?

11   "A.  Yes.

12   "Q.  And how far back do you maintain copies of e-mails you

13   have received and sent on that address?

14   "A.  In general, I believe most -- I leave them.

15   "Q.  And do you retain those e-mails on your own computer or

16   are they retained on a server somewhere outside of your

17   computer?

18   "A.  They are obtained on a server at Yahoo and at work on Book

19   Dog Books.

20   "Q.  So Book Dog Books retains copies of all your e-mails?

21   "A.  Well, my e-mail account is there.  I really don't know

22   exactly how that works.

23   "Q.  Is there a reason that your e-mail was not searched prior

24   to last week?

25   "A.  I didn't really need to.

1    "Q.  When did you first become aware of this lawsuit?

2    "A.  Probably about six months ago.

3    "Q.  So in roughly January of 2014 or December of 2013?

4    "A.  I don't know when I became aware of it.

5    "Q.  Were you aware that Book Dog Books filed a lawsuit in

6    Columbus, Ohio against Pearson Education and Cengage Learning

7    in December of 2012?

8    "A.  No.

9    "Q.  Prior to your employment in 2008 with Book Dog Books or

10   Textbooks R Us, had you worked in the book business?

11   "A.  No.

12   "Q.  What had you done in terms of employment prior to 2008?

13   "A.  I had built homes with Showcraft Fine Homes.

14   "Q.  That's an entity that is owned by Mr. Smyres, is that

15   correct?

16   "A.  We are partners.

17   "Q.  You are partners with Mr. Smyres in that company?

18   "A.  Yes.

19   "Q.  Can you please describe your educational background.

20   "A.  I have an industrial and systems engineering degree from

21   Ohio State.

22   "Q.  When did you receive that degree?

23   "A.  1989.

24   "Q.  And how were you employed after you received that degree?

25   "A.  Self-employed.

1    "Q.   And in what company was that?

2    "A.   Davenport Contracting.

3    "Q.   How did you meet Mr. Smyres?

4    "A.   We owned properties across the street from each other on

5    campus at OSU.

6    "Q.   And can you describe how you first got into business with

7    Mr. Smyres in Showcraft Fine Homes?

8    "A.   He had worked on a house, building a house with his exwife

9    and wanted to build homes, and I was doing contracting work and

10   I thought that I could -- that we could do it together and do

11   it and have a small business building homes.

12   "Q.   And why in 2008 did you decide to leave the business of

13   building homes?

14   "A.   Because the home building industry collapsed.

15   "Q.   Was it at that point that Mr. Smyres hired you to work for

16   one of his companies?

17   "A.   Yes.

18   "Q.   Are you still employed by Mr. Smyres?

19   "A.   Yes.

20   "Q.   In the book business?

21   "A.   Yes.

22   "Q.   Are you also employed as a contractor?

23   "A.   Yes.

24   "Q.   And by whom?

25   "A.   Book Dog Books.

I44MWIL2                          "Davenport"

1   "Q.  Are you still in the home building business?

2   "A.  No.

3   "Q.  Does Showcraft Fine Homes still exist?

4   "A.  Yes.

5   "Q.  And is that still business building homes?

6   "A.  No.

7   "Q.  What is that business doing?

8   "A.  Renting a few homes.

9   "Q.  Are you responsible for managing that company?

10  "A.  Yes.

11  "Q.  When in 2008 were you retained by Textbooks R Us or Book

12  Dog Books?

13  "A.  May, June, summer.

14  "Q.  At the time you were retained were you made aware of the

15  fact that there was a lawsuit brought by the publishers in 2007

16  against Mr. Smyres and Textbooks R Us for copyright

17  infringement?

18  "A.  No.

19  "Q.  Are you aware now that there was a lawsuit in 2007 for

20  copyright and trademark infringement against Mr. Smyres?

21  "A.  Yes.

22  "Q.  When did you become aware of that 2007 lawsuit?

23  "A.  I don't recall.

24  "Q.  Was it shortly after you were hired?  Was it within the

25  last year?  Do you have any sense of the time frame?

I44MWIL2                    "Davenport"

1    "A.   I think -- wait a minute.  I do have a notion there was an

2    issue earlier.  Yeah.  Probably 2008.  I need to change my

3    answer.

4    "Q.   OK.  Around the time that you were hired you were aware

5    that there was a lawsuit?

6    "A.   Yeah.

7    "Q.   Brought by the publishers for copyright infringement?

8    "A.   Yes.

9    "Q.   Do you recall now how you became aware of that?

10   "A.   Yes.  He asked me to get rid of some books.

11   "Q.   He is Mr. Smyres?

12   "A.   Yes.

13   "Q.   So in 2008, Mr. Smyres asked you to get rid of some books?

14   "A.   Yes.

15   "Q.   What do you mean by, get rid of some books?

16   "A.   Dispose of books that they needed to be disposed of.

17   "Q.   Can you describe why you were doing that?

18   "A.   It was time to get rid of the books.  They had what they

19   called bad books.  Gosh, that was so fuzzy I -- you know, think

20   back to that time.  They -- he had an issue with them and

21   needed to get rid of them, you know.  They didn't know what

22   they were, so he just said to get rid of them.

23   "Q.   Mr. Smyres, in 2008, asked you to get rid of bad books or

24   counterfeit books, is that right?

25   "A.   They weren't -- I don't think they knew what they were,

I44MWIL2                           "Davenport"

1   you know.

2   "Q.  You say they.  Who is they?

3   "A.  The company, Phil.

4   "Q.  Do you have any dealings with anybody other than

5   Mr. Smyres with respect to the destruction of books in 2008?

6   "A.  No.

7   "Q.  So why did Mr. Smyres ask you to get rid of these bad

8   books?

9   "A.  At the time I had space in my barn and a forklift, a

10  little bobcat with a skid loader.

11  "Q.  So explain to me why that was, why that was relevant.

12  "A.  Forks that could handle materials, you know.  They had

13  four pallets that needed thrown away.

14  "Q.  And where were the pallets of books when you were asked to

15  get rid of them?

16  "A.  In my barn.

17  "Q.  Why were they in your barn?

18  "A.  So they needed to get them out of the warehouse.

19  "Q.  OK.  So let's back up.  How did the bad books get into

20  your barn?

21  "A.  They brought them out on the little Textbooks R Us truck.

22  "Q.  Do you recall roughly when that was?

23  "A.  2008.

24  "Q.  Who is they?

25  "A.  I think I used the wrong term they.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I44MWIL2                         "Davenport"

1   "Q.   Who was driving the truck?

2   "A.   Gosh.   That was so long ago.   I think I did.   I don't

3   really remember, you know.   The books were there.   I did drive

4   that truck sometimes.   I hadn't been thinking, you know.

5   "Q.   Take your time.

6   "A.   What's the question?

7   "Q.   I'm trying to understand how and why the bad books got

8   from the warehouse to your barn.

9   "A.   On a truck that I don't remember who that -- golly.   Maybe

10  it was Phil, you know.   I can't think of.

11  "Q.   Was Britt Wood involved at all?

12  "A.   I have heard of Britt.   I know Britt or I used to know him

13  when he worked there.

14  "Q.   Do you know why Mr. Smyres wanted to move the bad books

15  from the warehouse to your barn?

16  "A.   The case -- I thought the case -- well, gosh, that was so

17  long ago.   They needed to get rid of them and get them out of

18  there so they wouldn't go online.

19  "Q.   Why not just take them directly to the dump or to a

20  recycler?

21  "A.   I think there was some question as to whether they were

22  good or not, and they needed to examine their sources.

23  "Q.   Do you know who was doing that?

24  "A.   No.

25  "Q.   How long were the books in your barn before you destroyed

I44MWIL2                    "Davenport"

1   them in 2008?

2   "A.  I don't remember that.

3   "Q.  You recall destroying them, the books?

4   "A.  Yes.

5   "Q.  And how did you go about destroying these bad books in the

6   2008 time frame?

7   "A.  We went to the same landfill as the last little bit.

8   "Q.  And is that the landfill in Grove City?

9   "A.  Yes.

10  "Q.  So -- and do you recall who helped you to dump the books

11  at the landfill at 2008?

12  "A.  Yeah.  My sons.

13  "Q.  How many sons do you have?

14  "A.  I have two.

15  "Q.  How old are they now?  Let's try that.

16  "A.  24 and 16.

17  "Q.  So at the time they were roughly 18 and 10?

18  "A.  Yeah.

19  "Q.  Does that sound right?  And they helped you unload the

20  books from a truck?

21  "A.  Yes.

22  "Q.  OK.  And did you say that there were roughly four pallets

23  of books in 2008?

24  "A.  Yes.

25  "Q.  And do you recall what the weather was like when you

I44MWIL2                        "Davenport"

1    unloaded the books?  Was it cold?  Was it hot?

2    "A.  It was hot and I don't know that it was 2008.  It could

3    have been 2009.

4    "Q.  OK.  So the books were moved into your barn in 2008 is

5    what you recall?

6    "A.  I really don't know that one.

7    "Q.  You recall whether or not you may have had any e-mails

8    with Mr. Smyres regarding this?

9    "A.  Nothing came up about it when I searched.  I don't recall

10   an e-mail.

11   "Q.  And who told you to destroy the books in 2008 or 2009?

12   "A.  Phil did.

13   "Q.  And did he tell you why?

14   "A.  They needed to be rid of.

15   "Q.  How did you go about destroying them?

16   "A.  I put them in the landfill and watched the bulldozer run

17   over them.

18   "Q.  And can you describe your current job responsibilities?

19   "A.  I work with K to 12 schools.  I go to schools and either

20   pick up books or introduce ourselves and introduce our company

21   to them so that we can buy and sell textbooks to schools.

22   "Q.  What do you mean you pick up books?

23   "A.  When they are disposing of books, we haul their old books

24   away or what we purchased from them.

25   "Q.  What do you do with the old books that you purchase from

I44MWIL2                          "Davenport"

1    them?

2    "A.  Bring them into the warehouse and let them receive them

3    and determine what to sell.

4    "Q.  And does Book Dog Books attempt to resell the old books?

5    "A.  Yes.

6    "Q.  Can you describe what that involves, generally?

7    "A.  Glueing a spine, putting on a sticker, maybe, maybe

8    disposing of it if they don't.  If they are not sold or

9    sellable, I should say.

10   "Q.  Has Book Dog Books ever put a new cover on an old

11   textbook?

12   "A.  No.

13   "Q.  Have you been in the Book Dog Books warehouse?

14   "A.  Yes.

15   "Q.  Do you know what the size of the Book Dog Books warehouse

16   is, roughly?

17   "A.  Yes.

18   "Q.  What is it?

19   "A.  40,000 square feet.

20   "Q.  Does the warehouse have racks on which pallets can be

21   placed?

22   "A.  Yes.

23   "Q.  Racks or shelving?

24   "A.  Yes.

25   "Q.  Which would you call it, pallet racking?

I44MWIL2                              "Davenport"

1    "A.  That's what I call it, yes.

2    "Q.  Have you ever received any training on how to identify a

3    counterfeit book?

4    "A.  I haven't received training.  I have been part of an

5    informal discussion about it.

6    "Q.  When was that?

7    "A.  A year ago.

8    "Q.  2013?

9    "A.  Roughly, yes.

10   "Q.  That was the first time you've had any dialogue with folks

11   at Book Dog Books about how to identify counterfeit books?

12   "A.  Yes.

13   "Q.  And who kind of conducted or set up that informal

14   discussion?

15   "A.  Kevin Doenges.

16   "Q.  Can you describe generally what he explained to you.

17   "A.  We just looked at a few examples of counterfeits, and he

18   showed, you know, the binding on one versus the binding on the

19   other, and one of them had different quality paper, you know, I

20   guess, compared the different qualities of paper.

21   "Q.  Was there any discussion about counterfeit books other

22   than how to identify them?

23   "A.  Yes.  They were trying to avoid getting them out in

24   circulation.

25   "Q.  You're aware that it's illegal to distribute counterfeit

I44MWIL2                          "Davenport"

1    books?

2    "A.  Yes.

3    "Q.  And presumably you were aware of that even before the 2013

4    meeting?

5    "A.  Yes.

6    "Q.  In 2008 or 2009, when you destroyed the bad books, did you

7    take a look at them to see what they looked like?

8    "A.  Yes.  I don't really remember what they looked like.  They

9    were just books and it didn't seem -- and I don't you know -- I

10   just wanted to be rid of them.

11   "Q.  So after 2008, 2009, did there come another instance where

12   counterfeit books were stored in your barn?

13   "A.  Yes.

14   "Q.  When was that next instance?

15   "A.  The latter part of or the early part of 2011 there was

16   books there.

17   "Q.  So can you describe for me the circumstances by which

18   books were sent to your barn in 2011?

19   "A.  I took them out of the warehouse and brought them to my

20   barn.

21   "Q.  Can you describe why you did that.

22   "A.  They were getting rid of them so they wouldn't be put

23   online, you know.  There was some concern about them getting

24   online and getting them sold.

25   "Q.  Who is they?

I44MWIL2                    "Davenport"

1   "A.  Kevin, Phil.  I don't think -- people in the office, you

2   know, the company, everybody.

3   "Q.  What books were these that you took to the barn?

4   "A.  I don't know.

5   "Q.  Who had gathered the books?

6   "A.  Kevin.

7   "Q.  And who asked you to take the books to your barn?

8   "A.  Phil.

9   "Q.  And did you do that by e-mail?

10  "A.  No.

11  "Q.  Can you describe for me what he told you when he asked you

12  to take them to the barn?

13  "A.  We have books of unknown origin, and we want to get them

14  out of here before we accidentally get -- you know, get them

15  online.

16  "Q.  He didn't use the phrase "unknown origin," did he?

17  "A.  No.  Probably questionable, I think is what they talk, you

18  know, the term they use.

19  "Q.  They call them questionable books?

20  "A.  Yes.

21  "Q.  They don't say bad books, they don't say counterfeit

22  books; they call them questionable books?

23  "A.  Yeah, exactly.  Because they don't know if they are

24  counterfeit for not.

25  "Q.  OK.  I'm sorry.  Can you describe for me again what he

I44MWIL2                          "Davenport"

1    told you and when he told you.

2    "A.   I don't know exactly when it was, but it was the early

3    part of 2011, Aprilish to, you know.  Kevin actually I believe

4    told me, you know.  I didn't really get it from Phil.  It was

5    just the -- Phil said get the books out of here.

6    "Q.   OK.  Were you already in the warehouse when Kevin talked

7    to you or were you already there?

8    "A.   Yes.

9    "Q.   You were already in the warehouse?

10   "A.   Can you get rid of these.

11   "Q.   That was roughly in April of 2011?

12   "A.   Yes.

13   "Q.   What does Kevin told you?

14   "A.   Get rid of them.  We need to put these books -- get them

15   out of here so we don't get them online.

16   "Q.   Does he tell you that Phil told him to ask you to get them

17   out of here?

18   "A.   Yes.

19   "Q.   I know it's a little awkward.

20   "A.   Yes.

21   "Q.   The process is, it's important that I finish my question

22   and I let you answer the question.

23        Do you know why Kevin Doenges asked you to take the

24   questionable books?

25   "A.   Because I move a lot of books with schools and I have a

I44MWIL2                    "Davenport"

1   truck capable of, you know, handling a pallet of books.

2   "Q.  And so --

3   "A.  And it was going to my warehouse or my barn garage.

4   "Q.  Why were the books going to your barn garage?

5   "A.  I think because there was no other place to put them.

6   "Q.  Why not just destroy them?

7   "A.  I thought they were trying to determine what they were

8   because they could have been good books.

9   "Q.  So there was still an ongoing investigation as to the

10  legitimacy of the books?

11  "A.  That was my -- that's why they were questionable.

12  "Q.  And you said that this was in roughly April of 2011, you

13  think?

14  "A.  Yes.

15  "Q.  And do you recall what the quantity of the books were

16  there?

17  "A.  It was a pallet of about 20 boxes.

18  "Q.  And how many books per box, roughly, would you think?

19  "A.  Fifteen.

20  "Q.  Do you recall anybody keeping an inventory or a list of

21  what the books were?

22  "A.  No.

23  "Q.  Well, how were they investigating whether or not the books

24  were illegitimate if they didn't even have a list of what the

25  books were?

I44MWIL2                          "Davenport"

1    "A.  Somebody may have had a list.  I suspect somebody does.

2    "Q.  You think somebody does.  You weren't asked to create a

3    list of the books that were taken out.

4    "A.  No.

5    "Q.  Were the boxes closed boxes?

6    "A.  Yes.

7    "Q.  At any time did you look at the content of the boxes?

8    "A.  Yes.

9    "Q.  You recall when you saw what you looked at them?

10   "A.  Normal-looking books.  They didn't seem bad.

11   "Q.  They didn't seem as though they were counterfeit to you?

12   "A.  I didn't examine them that well.

13   "Q.  Were they higher education books?

14   "A.  Yes.

15   "Q.  Do you recall what the subject of the books were?

16   "A.  No.

17   "Q.  You don't remember any of them?

18   "A.  No.

19   "Q.  Do you remember any of the authors' names?

20   "A.  No.

21   "Q.  Do you remember any of the publishers' names?

22   "A.  No.

23   "Q.  Do you remember seeing any trademarks on the book that

24   would have indicated who the publishers were?

25   "A.  No.  I didn't look at them that closely.

I44MWIL2                    "Davenport"

1   "Q.  You recall how many copies of each title were there --

2   strike that.  Were there multiple copies of each title within

3   the boxes?

4   "A.  Yes.

5   "Q.  It wasn't all just one-off books.  There were multiple

6   copies of books?

7   "A.  There were -- yes.  There were multiple copies.

8   "Q.  Do you remember whether there were lots of copies of each

9   title or only a couple of each title?  Do you have a sense of

10  that?

11  "A.  It seemed like there were batches of titles.

12  "Q.  Do you know who was doing the follow-up investigation to

13  determine whether the books were legitimate?

14  "A.  No.

15  "Q.  Were the books and the boxes organized in any particular

16  way?

17  "A.  No.  I mean --

18  "Q.  Sorry.  Go ahead.

19  "A.  I don't think so.  I didn't try to figure out a pattern.

20  "Q.  So how did you go about transferring them to your barn?

21  "A.  My truck.

22  "Q.  How big is your barn?

23  "A.  Well, the barn garage is like 10 by 20.

24  "Q.  And at the time you unload the questionable books, you

25  already had some K through 12 books in the barn, right?

I44MWIL2                          "Davenport"

1    "A.  Right.

2    "Q.  Were the boxes with the questionable books sealed?

3    "A.  Yes.

4    "Q.  The boxes didn't have any writing on them?

5    "A.  I don't recall.

6    "Q.  Were you involved in any way in deciding what books were

7    being stored as questionable?

8    "A.  No.

9    "Q.  Were you told what you were supposed to do with these

10   questionable books other than store them in your barn?

11   "A.  Wait for further instructions.

12   "Q.  That's what Mr. Doenges told you?

13   "A.  Yes.

14   "Q.  Did you ever speak directly to Mr. Smyres about these

15   books?

16   "A.  I must have.

17   "Q.  Do you recall?

18   "A.  Yeah.

19   "Q.  When?

20   "A.  Probably around this time.

21   "Q.  And do you recall roughly what you discussed?

22   "A.  Yeah.  The books.  What was -- you know.  Why they were

23   there, you know, that they were questionable books.

24   "Q.  And did you understand that these were very similar to the

25   books that you had been asked to store and destroy in 2008,

1   2009?

2   "A.  Right.

3   "Q.  Did Mr. Smyres tell you anything else about these books?

4   "A.  No.

5   "Q.  Did you discuss with him the recent problem at the time in

6   2011 of counterfeit books?

7   "A.  Just that they were trying to prevent it.

8   "Q.  Did Mr. Smyres discuss with you that they recently found

9   counterfeit books within the inventory?

10  "A.  Yes.

11  "Q.  What did he say along those lines?

12  "A.  That they are occasionally showing up and they are trying

13  to, you know, pull them out and get rid of them.

14  "Q.  Did he discuss with you in any way that there were

15  particular suppliers that were providing these counterfeit

16  books?

17  "A.  That they were bad suppliers, yes.

18  "Q.  Does the name Best Books World ring a bell to you?

19  "A.  No.

20  "Q.  Does the name Blackerby ring a bell to you?

21  "A.  No.

22  "Q.  Does the name Life Everest or Book's Value ring a bell to

23  you?

24  "A.  No.

25  "Q.  Mr. Smyres never discussed any of those suppliers with

I44MWIL2                              "Davenport"

1    you?

2    "A.   No.

3    "Q.   Did he ever describe that some of the bad suppliers were

4    coming out of Asia?

5    "A.   Yes.

6    "Q.   Tell me about that.

7    "A.   He had mentioned that some counterfeit books from Asia

8    came through.

9    "Q.   And Mr. Smyres mentioned this to you in the 2011 time

10   period, as you recall?

11   "A.   I don't recall.

12   "Q.   You don't remember when he said this?

13   "A.   Exactly.

14   "Q.   Would it have been before you had stored the books in your

15   barn or after?

16   "A.   During.

17   "Q.   While you were storing the books.  Is that what you are

18   saying?

19   "A.   (Indicates affirmatively.)

20   "Q.   I need a verbal answer, please.

21   "A.   Yes.

22   "Q.   Thank you.

23            Is your barn locked?

24   "A.   No.

25   "Q.   Does the born have a front door?

I44MWIL2                        "Davenport"

1    "A.  A garage door.

2    "Q.  Do you keep that garage door shut?

3    "A.  Yes.

4    "Q.  The garage door isn't itself locked?

5    "A.  Correct.

6    "Q.  How long did you keep these books in your barn?

7    "A.  I don't recall exactly, but four, three or four months.

8    "Q.  And at any time did you ask Mr. Doenges or Mr. Smyres or

9    anyone else at Book Dog Books about what you should do with

10   these books?

11   "A.  I -- no.  I thought they might be good books and they

12   would put them back online.  I thought they were waiting to see

13   from sources if they were bad.

14   "Q.  What happened next with respect to these books?

15   "A.  Next after what?

16   "Q.  The books aren't in your barn anymore, right?

17   "A.  Now?

18   "Q.  Right.

19   "A.  Correct.

20   "Q.  OK.

21   "A.  They are all gone.

22   "Q.  So at some point you took them out of the barn.

23   "A.  Oh, absolutely.

24   "Q.  And you destroyed them?

25   "A.  Yes.

I44MWIL2                    "Davenport"

1   "Q.  OK.  And you did that at Mr. Smyres' direction?

2   "A.  Yes.

3   "Q.  When was that?

4   "A.  July of 2011.

5   "Q.  Mr. Davenport, I have asked the court reporter to mark and

6   hand to you Exhibits 197, 198, and 199.  Are these documents

7   that you produced in response to the subpoena that you were

8   served with?

9   "A.  Yes.

10  "Q.  And can you please describe what Exhibit 197 is.

11  "A.  That's a receipt for book disposal.

12  "Q.  And what is Exhibit 198?

13  "A.  An expense report for that amount -- that includes that

14  amount.

15  "Q.  That's an expert report that you submitted to Book Dog

16  Books?

17  "A.  Yes.

18  "Q.  What is Exhibit 197 -- excuse me -- 199?

19  "A.  A picture of the books being disposed."

20          MR. MILLER:  Can we please publish Plaintiffs' Exhibit

21  195, which is already in evidence.

22          THE COURT:  You may.

23          MR. MILLER:  Thank you.

24  "Q.  OK.  All three of these are documents that you kept in the

25  ordinary course of your business and produced in response to

I44MWIL2                          "Davenport"

1    the subpoena?

2    "A.  Yes.

3    "Q.  With respect to Exhibit 197, does this exhibit help you

4    refresh your recollection on the date on which you disposed of

5    the books?

6    "A.  Yes.

7    "Q.  And what is that date?

8    "A.  July 1, 2011.

9    "Q.  Can you tell me the circumstances under which you took the

10   books to the Grove City dump to destroy the books?

11   "A.  I spoke to Phil and he said it was time to get rid of the

12   books.

13   "Q.  And did you speak to him in person or on the telephone?

14   "A.  I don't really recall, but I think the phone.

15   "Q.  And did he tell you to get rid of all the books?

16   "A.  Yes.

17   "Q.  And did he tell you why you were getting rid of the books?

18   "A.  So they wouldn't creep back into circulation.

19   "Q.  There was more to it than that, wasn't there?

20   "A.  Well, fear of, you know, impending issues, you know, fear

21   of lawsuit, you know.  It was time to destroy the books so that

22   we didn't have any -- so that we are not associated with that.

23   "Q.  He didn't -- he wanted to make sure that the evidence of

24   the counterfeit books was gone, is that right?

25   "A.  He didn't -- he didn't refer to them as evidence.

I44MWIL2                        "Davenport"

 1   "Q.  OK.  How did he refer to them?

 2   "A.  Books that needed to be thrown away.

 3   "Q.  But why did they need to be thrown away?

 4   "A.  Because -- because of the suspicion of being counterfeit.

 5   "Q.  And he was -- there was a specific reason he was concerned

 6   that these books would get back into the marketplace, right?

 7   "A.  Yes.  Because they were questionable, you know.

 8   "Q.  Mr. Davenport, was there an issue with respect to your

 9   sons and the books?

10   "A.  Yes.

11   "Q.  You want to describe that for me, please.

12   "A.  As they were stored in my barn, the pallet was uneven.  It

13   had a couple of boxes that made it unlevel.  So I set those

14   aside and I had a little table.  And I was working on my

15   chainsaw on top of the table.  I remember -- and they got --

16   you know, a couple of boxes got misplaced out of the group of

17   books.

18   "Q.  So describe that for me a little bit more, if you would.

19   "A.  One or two boxes just got mixed in with the other books.

20   "Q.  With your K through 12 books?

21   "A.  Yeah, yes.  And with the other boxes in my garage of

22   miscellaneous things.

23   "Q.  What kinds of books were those?

24   "A.  Book boxes.

25   "Q.  Other higher ed. books?

I44MWIL2                        "Davenport"

1   "A.  No.  Clothes, pictures, Christmas stuff.

2   "Q.  Book boxes that had your own personal things in them?

3   "A.  Yes.

4   "Q.  But there was an issue with your sons potentially taking

5   some of the books, right?

6   "A.  Yes.

7   "Q.  You want to describe that for me, please.

8   "A.  He and his friend had gotten into the books and tried to

9   sell a few at one of the bookstores.

10  "Q.  Was this both of your sons or just one of them?

11  "A.  Just the one son.

12  "Q.  Was this the younger son or the older son?

13  "A.  The older son.

14  "Q.  So at this point in time your son was 22 years old?

15  "A.  21, 22, yeah.

16  "Q.  And was he living at home?

17  "A.  He was going to school and living at home sometimes, but I

18  think at that time he's probably living at home.  That's why he

19  was there.

20  "Q.  I'm sorry.  What's his name?

21  "A.  Noah.

22  "Q.  So Noah Davenport?

23  "A.  Yes.

24  "Q.  And had Noah helped you unload the books from your trunk

25  to put them in your garage in the first place?

I44MWIL2                            "Davenport"

 1    "A.   No.

 2    "Q.   But Noah had access to the garage on a regular basis, I

 3    take it?

 4    "A.   Yes.

 5    "Q.   Had Noah ever worked in the book business at all prior to

 6    this date?

 7    "A.   Just helping me load and unload books, but not working the

 8    business.

 9    "Q.   Had you paid him to help you?

10    "A.   No.   Just father expectation.

11    "Q.   I know well.

12          So your son is roughly 21 or 22 years old and you

13    catch wind that he is selling some of the books to a bookstore,

14    is that right?

15    "A.   Yes.

16    "Q.   Which bookstore was he trying to sell them to?

17    "A.   I believe it was UBX.

18    "Q.   And --

19    "A.   Ironically.

20    "Q.   How did you find out he was trying to sell these to a

21    bookstore?

22    "A.   An e-mail from Barb MacFarland.

23    "Q.   From Barb MacFarland?

24    "A.   Yes.

25    "Q.   What did Barb say to you?

I44MWIL2                          "Davenport"

1   "A.  Suspicious book buyers.  Does anyone know these guys?  You

2   know.  Is this your son?  And it's like, yeah, that's my boy.

3   "Q.  How did Barb become aware these books were counterfeit?

4   "A.  Employees of the bookstore.

5   "Q.  What do you mean you don't know?

6   "A.  I don't know if there is was a group e-mail or not.  I

7   know I got one and I thought that everyone might have gotten

8   one.

9   "Q.  And then you received a second e-mail which was kind of

10  directed just to you inquiring --

11  "A.  I don't know if there was a second e-mail or not.

12  "Q.  You believe there was a picture attached to one of these

13  e-mails?

14  "A.  Yeah.  Because the question was, is that your son?

15  "Q.  And did the picture or the e-mail indicate what books they

16  were trying to sell?

17  "A.  No.

18  "Q.  What did you do when you got this e-mail?

19  "A.  I've had a lot of problems with him, so you can only

20  get --

21  "Q.  With e-mails or with your sons?

22  "A.  I'm sorry.  With my son.  And you can only get so mad so

23  often, you know, so I was mad again.

24  "Q.  Let's break this down.  Did you respond to Barb first or

25  did you talk to your son first?

I44MWIL2                          "Davenport"

1    "A.   I talked.

2    "Q.   I'm assuming you went and talked to your son?

3    "A.   I talked to Phil.

4    "Q.   You talked to Phil before you did anything else.

5    "A.   I believe so, because that happened and Noah wasn't there

6    at home.

7    "Q.   When you got the e-mail Noah wasn't around?

8    "A.   Correct.

9    "Q.   So you called Phil?

10   "A.   I don't remember all these details.

11   "Q.   But you think you called Phil?

12   "A.   Yes.

13   "Q.   And can you describe that conversation?

14   "A.   Very similar to this conversation, a very uncomfortable

15   conversation about the books that were supposed to be thrown

16   away that weren't thrown away, that were still in my barn, and

17   that Noah got into and tried to sell, you know.

18   "Q.   And at that point in time, though, had you been told to

19   destroy the books?

20   "A.   Yes.  I had been told -- this was way after, nine months

21   or something after I had been told to destroy the books.

22   "Q.   Was this after July 1 of 2011?

23   "A.   Yes.

24   "Q.   When you took the books to the dump on July 1, 2011, you

25   didn't take all the books to the dump?

I44MWIL2                    "Davenport"

1   "A.  I thought I did, but some of them had been misplaced.

2   "Q.  And it was the misplaced books that your son was trying to

3   sell?

4   "A.  Yes.

5   "Q.  What did you tell Phil?

6   "A.  Some of the books I was supposed to throw away broke

7   containment, and Noah tried to sell some at UBX.

8   "Q.  What did Phil say?

9   "A.  How did that happen, you know, and I said, they got

10  separated and Noah dug through them.

11  "Q.  What did Phil tell you to do?  At this point Phil was not

12  a father, right?

13  "A.  Right, exactly.

14  "Q.  So --

15  "A.  I don't really recall.

16  "Q.  I think you said it was nine, roughly nine months after

17  you were told to destroy the books.  Does that mean it was

18  roughly nine months after July 1, 2011?

19  "A.  Yes.

20  "Q.  So I guess really the first question I should ask you is

21  when you were told to destroy the books, this was on or around

22  the time that you did destroy them?

23  "A.  Yes."

24          MR. MILLER:  Can we put PX 195 back up, please.

25  "Q.  Describe what you did to destroy them.

1    "A.  You can't see it here, but there is -- there it is.  If

2    you look here on 199, there is a loader and there is actually

3    another picture that I had provided that the --"

4              MR. MILLER:  Continue on the top.

5    "A.  OK.  The second picture is the books being run over by

6    earth-moving equipment.

7    "Q.  How did you take this picture?

8    "A.  With my phone.

9    "Q.  Why did you take this picture?

10   "A.  To prove we were destroying the books.

11   "Q.  But all you did was to unload the books at the dump and

12   watch them got run over?

13   "A.  Yes.

14   "Q.  Mr. Davenport, you've been handed what's been marked as

15   Exhibit 200.  Can you describe what this is, please.

16   "A.  This is the destruction process that I used to destroy the

17   books.

18   "Q.  So this is a photo that you took and retained in the

19   ordinary course of business?

20   "A.  Correct.

21   "Q.  And it shows the destruction of the books that are

22   contained in Exhibit 199?

23   "A.  Correct.

24   "Q.  In terms of sequence, which of the two photos was taken

25   first?

1    "A.   199."

2              MR. MILLER:  Can we leave PX 195 up, please.

3    "Q.  As I look at 199, there appears that there are books on

4    the right and books on the left and a big trench in the middle

5    where it appears as though a truck may have gone through?

6    "A.  Correct.  That's where I parked.

7    "Q.  You parked in the middle and you offloaded to the right

8    and left?

9    "A.  Most -- exactly.  I didn't realize this was going to be

10   evidence in a court.  It just -- it was just like covering our

11   rears at the time.  It seemed like just to make sure it

12   happens.  It didn't seem like -- otherwise, I would have

13   watched.  I would have proved it with a better photograph.

14   "Q.  So you took the picture so you would have some evidence

15   that the books had been destroyed?

16   "A.  Yes.

17   "Q.  And did you do that -- were you told to do that?

18   "A.  No.  It was my idea partly because I was too, you know --

19   because I didn't do the water.  I was like, see, this will

20   work.  It's easier, quicker.

21   "Q.  Did you send the photos to Mr. Smyres afterwards?

22   "A.  I don't recall honestly if he saw them or not.  My guess

23   is I did because I thought it was kind of cool.

24   "Q.  At the time you destroyed the books in July of 2011, were

25   you suspicious that maybe you hadn't gotten all the books?

1    "A.  No.

2    "Q.  Did you open up the books and look inside of them before

3    you took them to be destroyed?

4    "A.  No.

5    "Q.  Were the books physically on a pallet in your garage?

6    "A.  Yes.

7    "Q.  So did you load the pallet in and out of your garage using

8    a pallet loader or a forklift?

9    "A.  No.

10   "Q.  When you put them into your truck, you didn't put them on

11   a pallet, you just put them into your truck?

12   "A.  Yes.

13   "Q.  You received an e-mail from Barb MacFarland in, you said

14   it was roughly nine months or so after July of 2011?

15   "A.  Yes.

16   "Q.  Was that roughly in March or April of 2012?

17   "A.  Yes.

18   "Q.  And you said that your first response is to call Phil

19   Smyres?

20   "A.  Yes.

21   "Q.  And at that time what did Phil Smyres tell you to do?

22   "A.  Phil was upset and asked me, you know, about the

23   circumstances, and I told him no.  I had grabbed a few books

24   and tried to cash them in at UBX.  He is pretty familiar with

25   the issues I've had with Noah, you know.  He asked about the

I44MWIL2                    "Davenport"

1    books and I told him that, you know, he just had a few.  I told

2    him a few books got left behind.  He was upset, you know,

3    because, so --

4    "Q.  Mr. Smyres was upset?

5    "A.  Yes.

6    "Q.  Really upset?

7    "A.  For Phil.

8    "Q.  He doesn't get upset easily?

9    "A.  He's not a yeller.

10   "Q.  But he yelled on this call?

11   "A.  He was upset.  I don't recall yelling or not yelling, but,

12   you know, this wasn't a good circumstance to tell your

13   employer.

14   "Q.  So what did he say?  I mean, how did he manifest that

15   upsetness?

16   "A.  Well, he asked about the circumstance, you know, and how

17   did this happen.  And mea culpa, my bad.  I just, you know --

18   and he asked, you know, about Noah, and I just told him he

19   wasn't there, you know.

20   "Q.  Did you know the number of books at this point that Noah

21   had taken?

22   "A.  I didn't.

23   "Q.  So you really didn't know during this conversation the

24   extent of the problem?

25   "A.  Exactly.

I44MWIL2                          "Davenport"

1    "Q.  Did Phil ask you to go figure that out?

2    "A.  Yes.

3    "Q.  What happened next?

4    "A.  Well, I waited for Noah to come home, and he had already

5    thrown the books away, and I didn't tell Phil about the boxes

6    of books.  I threw them away on my own, you know.  I wanted

7    this to not be true, so I didn't say anything about the books,

8    the boxes of books that got left behind, and I just waited

9    until trash day and threw them in the trash.

10   "Q.  When you talked to Phil, did he tell you there was already

11   an ongoing lawsuit?

12   "A.  Yes.  That's why he was upset.

13   "Q.  And did he tell you that he had sued the publishers?

14   "A.  No.

15   "Q.  But he had told you that the publishers had sued him?

16   "A.  Yes.

17   "Q.  Over counterfeit books?

18   "A.  Yes.

19   "Q.  Did he tell you that he wanted to make sure that the books

20   had been destroyed because of the lawsuit?

21   "A.  That's why we were destroying the books, you know, back in

22   July.

23   "Q.  So tell me about the conversation with your son.  How did

24   that go down?

25   "A.  You are going to got me fired, dude, you know.  This is

I44MWIL2                    "Davenport"

1    the kind of thing that is irresponsible behavior you've been

2    doing.  I remember jumping up and down, you know, because I was

3    so upset, you know.  I knew this wasn't supposed to happen.

4    "Q.  What did he say?  Did he deny it?

5    "A.  No.  I mean, we had him on tape.  He's, you know -- no.  I

6    didn't ask him if he did it or not.  Like it had already been

7    demonstrated.

8    "Q.  So how did you know that there were books -- I said

9    garage, but I meant barn.

10   "A.  Yeah.  It's a barn garage.  I have like a little garage

11   door in a barn, whatever.

12   "Q.  How did you know there were more books -- more of the

13   counterfeit books in the barn?

14   "A.  Where did you get the books?  In the barn.

15   "Q.  Did you ask him to show you?

16   "A.  Yeah.

17   "Q.  So you walked out there with him?

18   "A.  Yeah.

19   "Q.  How many boxes were left?

20   "A.  Two.

21   "Q.  Were they two full boxes?

22   "A.  More or less, yeah.

23   "Q.  And did you look in them?

24   "A.  Yeah.

25   "Q.  So -- and so had he taken probably a third box?  Is that

1    what happened?

2    "A.  No.  He just reached in and grabbed a few.

3    "Q.  And did you keep a list of the books that were left in

4    those boxes?

5    "A.  No.

6    "Q.  Take a picture of them?

7    "A.  No.  I threw them away.

8    "Q.  When did you throw them away?

9    "A.  Next available trash day.

10   "Q.  And why did you throw them away?

11   "A.  Because I didn't -- I was embarrassed of the whole

12   situation and I didn't want any part of this, and I didn't want

13   to even admit that there were more than a couple of books.  I

14   was trying to contain it into a couple of books got misplaced

15   and --

16   "Q.  But you knew that there was a lawsuit about them?

17   "A.  Yeah.

18   "Q.  Was there any punishment for your son?

19   "A.  I mean, there is nothing left to punish.  He lost his

20   license now.  I was mad.  Punishment was just continued anger.

21   "Q.  Did you have a follow-up discussion with Mr. Smyres about

22   all of this?

23   "A.  I haven't really talked about it much with him.  It wasn't

24   something I wanted to talk about, you know.  I mean, we have

25   talked about it since and, you know, recanting the story.

I44MWIL2                    "Davenport"

1  "Q.  Well, as I understand it, at the time that you first spoke

2  to Mr. Smyres you didn't know the extent of the issue because

3  you hadn't yet spoken to your son, right?

4  "A.  Right.

5  "Q.  He tells you -- I thought he had said he had told you to

6  go figure that out?

7  "A.  Yeah.

8  "Q.  You confront your son.  The two of you walk into the barn.

9  You realize there are a couple of books, counterfeit books

10  there, still there.  Did you ever report back to Mr. Smyres or

11  have a follow-up discussion with him or send him an e-mail at

12  all about any of this?

13  "A.  Yeah.  I told him soon, soon around when this happened,

14  you know, I told him that Noah threw the books away.

15  "Q.  And did you tell him that by telephone, in person?

16  "A.  Telephone.

17  "Q.  But that wasn't true?

18  "A.  It was true.

19  "Q.  Well --

20  "A.  Noah threw his books away.

21  "Q.  But not all the books?

22  "A.  Correct.

23  "Q.  And you didn't tell Mr. Smyres there were other books?

24  "A.  Correct.

25  "Q.  And what did Mr. Smyres say?

1  "A.  He said -- I mean, they were supposed to be thrown away

2  anyway.  I mean, they were supposed to be thrown away.

3  "Q.  Was he happy that they had finally been thrown away?

4  "A.  That they were destroyed, as they were supposed to be in

5  the first place, yeah.

6  "Q.  He was happy with that result?

7  "A.  Yes.

8  "Q.  He didn't ask you where they had been thrown away?

9  "A.  No.  I mean, he might have and I just said campus.  That

10  was all we knew.

11  "Q.  But nobody tried to go and find the books?

12  "A.  No.

13  "Q.  When you disposed of the two boxes of counterfeit books in

14  March or April of 2012, how did you do that?

15  "A.  The trash truck.

16  "Q.  That came to your house?

17  "A.  Yes.

18  "Q.  Did you do anything to actually physically destroy the

19  books other than putting them in the trash truck?

20  "A.  No.

21  "Q.  OK.  Have you at any time been told by anybody at Book Dog

22  Books that there was a need to preserve evidence related to the

23  publishers' lawsuit?

24  "A.  I was told that by Tiffany.

25  "Q.  OK.

1    "A.  No.

2    "Q.  So the only person who told you to preserve evidence was

3    Ms. Miller?

4    "A.  Yes.

5    "Q.  And was that in writing?

6    "A.  No.

7    "Q.  So in 2009, when you destroyed, you first destroyed

8    counterfeit books, do you recall whether or not you ever

9    discussed the propriety of that destruction?

10   "A.  I don't recall discussing it.

11   "Q.  In 2011, when you destroyed the counterfeit books, did you

12   have a discussion with anybody as to whether it was proper to

13   destroy them?

14   "A.  No.  I was told to do it, so I was expecting it was

15   proper.

16   "Q.  You were told to do it by Mr. Smyres, is that right?

17   "A.  Yes."

18           MR. MILLER:  Nothing further, your Honor.

19           THE COURT:  Members of the jury, that completes the

20   reading of deposition testimony of Mark Charles Davenport.

21           Would defendants call their next witness.

22           MR. BHANDARI:  Your Honor, we have designated the

23   portions of the Singh transcript that should be read.  I think

24   the plaintiffs might have some issues with it.  May we approach

25   or may we take a short break to sort this out?

I44MWIL2

1          THE COURT:  We will take a five-minute recess, members

2     of the jury.  Keep an open mind.  Don't discuss the case.

3          Please recess the jury.

4          (Jury not present).

5          MR. OPPENHEIM:  Your Honor, I think what the problem

6     is here is that the defendants have added significant

7     additional designations that weren't originally provided, so we

8     are now, just this morning, after our conference with you, your

9     Honor, trying to go through those additional designations,

10    check Them.  There are a lot of objections.  We haven't looked

11    at them before.  I don't think it's frankly proper, but I don't

12    know what to do about it.  I think that they should be limited

13    to their prior designations.  It was what was in the pretrial

14    report.

15         THE COURT:  What's going on, Mr. Bhandari?

16         MR. OPPENHEIM:  They did provide us yesterday the

17    list.  I apologize.  It wasn't this morning.  It was yesterday.

18    But it's new designations.  We are working through it.

19         THE COURT:  We have been at this for almost two hours.

20    What's the big deal with looking at the designations?

21         MR. BHANDARI:  I don't know, your Honor.

22         MR. OPPENHEIM:  I'm catching up.  We did get a list

23    yesterday.  They have added to that list that we got about a

24    half hour ago.  We are just looking at it for the first time

25    and those designations we have never looked at.  There were

1    three lawyers there, lots of objections in that deposition.  We

2    didn't counterdesignate for these new ones.  Frankly, your

3    Honor --

4              THE COURT:  What are all the new designations, Mr.

5    Bhandari, in the last half hour?

6              MR. BHANDARI:  There aren't new designations, your

7    Honor.

8              You will remember when I spoke yesterday, I said that

9    we intended to designate between 193 and 222 and then I read

10   you a short excerpt saying, this is the reason why it's all

11   going to be relevant.  These are the 193, so I think it goes

12   until 229, as opposed to 223, because some of the stuff they

13   wanted was outside of the 223 range.  And so it was what I said

14   yesterday.  It's just that 25-page section that -- we are not

15   reading the whole thing.  This is -- in fact, we cut it down

16   dramatically within there.  We want to take out the colloquy as

17   well.  So I don't think there should be an issue, but I can't

18   speak to what the issue is with the plaintiffs.  Maybe there is

19   not an issue.

20             MR. OPPENHEIM:  It's six additional pages, at least,

21   beyond what we were looking at yesterday.

22             MR. BHANDARI:  Based on your additions.  That's the

23   reason it goes beyond.

24             THE COURT:  Complete the review right now.

25             MR. BHANDARI:  Are there objections that you want to

I44MWIL2

 1    take to the judge?  Because it looks like you have completed

 2    your review.  I am not sure what your comments mean.

 3              THE COURT:  Are there objections that need to be

 4    resolved by the Court to any of the readings?

 5              MR. MANDEL:  So far we have one substantive objection.

 6    Mr. Singh was asked who the defendants are and he said they

 7    might be textbooks.com.  It's undisputed we are not

 8    textbooks.com.  We wish we were textbooks.com.  We don't own

 9    that website.  For them to suggest to the jury that we are

10    textbooks.com is incredibly misleading.

11              MR. OPPENHEIM:  Your Honor, Mr. Mandel asked the

12    question:

13    "Q.  To the best of your knowledge, are you aware of any

14    information, any source in any way related to BDB that is on

15    this list other than Textbooks R Us?

16    "A.  I think based on our previous discussion, textbooks.com

17    may also be related.

18    "Q.  Textbooks.com?

19    "A.  I believe, but I may be wrong about that."

20              It goes to exactly the issue that we are putting

21    forward, which is this witness doesn't know what this is.  Mr.

22    Mandel asked the question.  He got the answer.  Now he doesn't

23    like the answer.  He doesn't want it read in.

24              THE COURT:  Overruled.

25              Any other objection?

I44MWIL2

1          MR. MANDEL:  They would like to read in a series of

2     objections that the lawyers made.  We think that's

3     inappropriate.

4          THE COURT:  It is.  We are not going to read in any

5     objections.

6          MR. MANDEL:  Then I believe they have a series of

7     objections.  We have no further objections, your Honor.

8          MR. OPPENHEIM:  I was just asking opposing counsel,

9     where are the objections.

10         MR. MANDEL:  I will hand them back to you so you can

11    make whatever objections you would like to make.

12         MR. GOULD:  Your Honor, would this be a helpful time

13    to hand up the verdict form with a couple of typos?

14         THE COURT:  Hand them to my law clerk.

15         MR. OPPENHEIM:  We are fine with not reading those

16    objections in or raising the objections.

17         THE COURT:  One other instruction.  When this

18    transcript is read, it's not necessary to read false starts.

19    Spare the court reporter and the jury reading false starts.

20    Just go to the question.

21         MR. MANDEL:  We will do our best, your Honor.

22         THE COURT:  Are we ready to go?

23         Mr. Bhandari, approximately how long is this reading?

24         MR. BHANDARI:  We haven't timed it.  I think it's

25    probably about 20 to 30 minutes.

I44MWIL2

```
 1              THE COURT:  We will take five more minutes for our own
 2     for a break and then let's go.
 3              (Recess)
 4              MR. OPPENHEIM:  If I can briefly read a section that I
 5     think is not relevant, was objected to and should be omitted.
 6     "Q.  After the higher education publishers' inspections, did
 7     Chegg stop purchasing from any of its suppliers other than
 8     Springfield Gardens and South Florida Groups which you have
 9     already testified about earlier today?"
10              Objection.
11              "THE WITNESS:  We continue to do business with our
12     wholesale partners.
13     "Q.  Am I correct that you testified earlier that Chegg
14     continues to do business with BDB, correct?
15     "A.  Yes."
16              I'm fine with that.
17              Then it goes on:
18     "Q.  And Chegg continues to purchase books from BDB because
19     Chegg believes BDB is a good supplier, correct?"
20              Objection.
21     "A.  We continue to buy books from BDB."
22              That should be out.
23              Then it goes on:
24     "Q.  If you concluded that BDB was a bad supplier, would you
25     continue to buy books from BDB?"
```

I44MWIL2

```
 1              Objection.
 2     "A.  We continue to do business with BDB."
 3              That should be out.
 4     "Q.  Why does Chegg continue to do business with BDB?
 5     "A.  We have an established relationship with BDB.  They are an
 6     efficient provider of books to us.  They are a partner on our
 7     side where they buy books from us as well."
 8              That's fine.
 9              And then last one:
10     "Q.  If Chegg believed that BDB was indirectly supplying Chegg
11     with counterfeit books, would Chegg continue to do business
12     with BDB?"
13              Objections all around.
14              "THE WITNESS:  We would not."
15              That should be out.
16     "Q.  Very simple question.  Are you continuing to do business?
17     Fine.  Start characterizing the nature of the relationship
18     good, bad."
19              That should be out, your Honor.
20              MR. MANDEL:  They have offered extensive evidence in
21     this case as to which distributors stopped doing business with
22     us.  They have mentioned I'm guessing on more than a dozen
23     occasions the fact that Follett stopped doing business with us.
24     This is a deposition transcript in which Chegg is being asked,
25     are you continuing to do business with us and why?  They have
```

I44MWIL2

1   opened the door to testimony surrounding who is doing business

2   with us, who is not doing business with us.  It was at a

3   deposition.  It's a hundred percent admissible, your Honor.

4            MR. OPPENHEIM:  I have no objection, your Honor, to

5   that portion where they say they are continuing to do business

6   with them.  My objection --

7            THE COURT:  I know what your objection is to.  The

8   objection is overruled.

9            Let's bring in the jury.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I44VWIL3

 1              (Jury present)

 2              (At sidebar)

 3              THE COURT:  What's the problem now?

 4              MR. BHANDARI:  Your Honor, we spent all morning

 5    highlighting two copies of these, kindly given to us by the

 6    plaintiffs in this case because we only had electronic copies.

 7    The two highlighted copies are the only copies we have of this.

 8    So we either need to have the two highlighted copies so one

 9    person can read the answers and one person can read the

10    questions, or one of the plaintiffs can read the questions and

11    we can give the answers if they want to follow along and keep

12    their copy.  But there's only two highlighted copies that have

13    to be used.

14              MR. OPPENHEIM:  Your Honor, this isn't our reading.

15    We're not going to read; we're not going to put a witness on

16    the stand for it because it's not us, that's number one.

17              Two, we brought two copies, we gave them one of them.

18    We need to have the other to follow along.  If they didn't

19    bring copies -- and I try to be as hospitable as possible, but

20    this is not our problem.

21              THE COURT:  Give me the document.

22              Go make a copy.  I think the highlighting should show

23    up.

24              MR. BHANDARI:  Thank you, your Honor.

25              MR. GLUNT:  Thank you very much, your Honor.

I44VWIL3

1          MR. OPPENHEIM:  Thank you, your Honor.

2          THE COURT:  This is really verging on the absurd.

3          (In open court)

4          THE COURT:  I just found out we need another copy of

5     what's going to be read.  It's not many pages; it's being

6     Xeroxed at the moment, if I can use the trademark term

7     "Xeroxed" in a trademark case.

8          After this portion of testimony is read, it's my

9     belief that the parties will be resting.  We'll then take a

10    very short recess and we'll turn to closing statements.  So

11    we're making progress.

12         I told you that a trial is always dynamic; you never

13    know exactly how things are going to break or what arguments

14    are going to be raised by counsel.  Generally, the closer you

15    get to the end of the trial, the more arguments are raised by

16    counsel, which is why we spent a lot of time together last

17    night and throughout this recess and other times.  So just bear

18    with us for a moment.

19         I understand there could be some big thunderstorms

20    coming through here around lunchtime.  But you don't have to

21    worry about that because you'll be having lunch here.

22         One of the things that I will extract from you is that

23    we will be taking a shorter lunch break, okay, probably like

24    just a half-hour lunch break, because you'll be in the jury

25    room.  And then we'll complete closing arguments and I'll

I44VWIL3                        "Singh"

1    deliver my charge to you.  And then we'll review the jury

2    verdict sheet, which will be an exercise for us for a few

3    minutes.

4              And so that we've set the stage at this point, would

5    the defendants call their next witness.

6              MR. GLUNT:  Yes, your Honor.  We call Harjit Singh by

7    deposition.  This is the deposition that was taken on November

8    11th, 2016 in San Jose, California.

9              THE COURT:  And in the first question and answer will

10   Mr. Singh be revealing to us who he is and what entity he's

11   affiliated with or do you want to just tell us right now so the

12   jury has that in mind?

13             MR. GLUNT:  Yes, your Honor.  He was a representative

14   of Chegg, C-H-E-G-G.

15             THE COURT:  All right.  So whoever is going to take

16   the witness stand, why don't -- all right.  Mr. Klein, come on

17   up.

18             Are we good to go?

19             MR. GLUNT:  I believe so your Honor.

20             THE COURT:  All right.  Let's proceed.

21             (The deposition of Harjit Singh was read as follows)

22   "Q.  Is this -- does this document list all of the Chegg books

23   that the higher education publishers inspected?

24   "A.  I can't confirm.  This is, like you said, 3,000 pages.

25   There were approximately 64,000 books that were inspected, so

I44VWIL3                    "Singh"

1    this equals 64,000, and it matches up to that list.  The answer

2    would be yes; but, again, I can't go through all these and

3    validate that it is an accurate representation here.

4    "Q.  Would it be easier if I gave you this document in Excel?"

5             THE COURT:  I'll tell you what, here's how we're going

6    to do it.  Give the page and line number that you start with

7    each series, that way the parties will know.

8             MR. GLUNT:  Sure.

9             So on page 195, beginning on line 19.

10            MR. KLEIN:  That is not highlighted on mine, just to

11   be clear.

12            THE COURT:  I understand.

13            Once again, here's what we're going to do:  You have a

14   highlighted copy, right?

15            MR. GLUNT:  He has the original.  Let's switch copies.

16            THE COURT:  Switch copies.

17            MR. GLUNT:  Thank you very much, your Honor.

18            THE COURT:  Now, at the beginning of each reading,

19   Mr. Glunt, you'll call out the page and line number that you're

20   starting the question with.

21            MR. GLUNT:  Absolutely, your Honor.

22            THE COURT:  Thank you.

23            MR. GLUNT:  So now beginning on page 196, line 11.

24            (Reading)

25   "Q.  I'm going to show you what is also contained -- an Excel

I44VWIL3                          "Singh"

1   file, which is also contained on Chegg Exhibit 8, and this is

2   also a document that has been Bates stamped Chegg 22.  It is

3   the same as the PDF I just sent you except in Excel format.

4          "And I would ask you to take a look at that, validate

5   that to the extent that you have -- that you wanted.  But I

6   need to get clarity on the issue of whether this is an accurate

7   list of all the books, all the Chegg books that the higher

8   education publishers inspected in 2016."

9          THE COURT:  Question, line 2.

10          MR. GLUNT:  Sorry, my apologies.

11          Question, line 2:  "Let's do this.  Let me back up.

12   Does this list also include Ingram Books?

13   "A.  It does."

14          MR. GLUNT:  Question, line 8, on page 197:  "Is Chegg

15   Exhibit 8 a list of all the Chegg and Ingram Books that the

16   higher education publishers inspected in 2016?

17   "A.  Correct.

18          MR. GLUNT:  Question, line 12 --

19          THE COURT:  You don't have -- you can continue to just

20   keep reading questions, if it's consecutive; you don't have to

21   call out every line number.

22          MR. GLUNT:  Understood, your Honor.  But having seen

23   the copy, it's sometimes very difficult to tell, so I just

24   wanted to make it very clear.

25   "Q.  Have the higher education publishers inspected any Chegg

1    books in calendar year 2016 that are not identified on Exhibit

2    8?

3    "A.  Only the ones where we identified them as part of

4    purchases and that we sent over for validation prior to taking

5    into our inventory.

6    "Q.  Were any BDB books sent to the higher education publishers

7    for purposes of validating them prior to entering them into

8    Chegg's inventory in 2016?

9    "A.  I don't believe so.

10   "Q.  Have the higher education publishers inspected any Chegg

11   books any time prior to January 1st, 2016?

12   "A.  Not to my knowledge.

13   "Q.  Now, I would like to walk through each of the columns on

14   this."

15          MR. GLUNT:  Then continuing on page 199, on line 14:

16   "Q.  Turning your attention, Mr. Singh, to the first column

17   EAN.  What does 'EAN' mean?

18   "A.  It's the ISBN.

19   "Q.  And what is an ISBN?

20   "A.  It's a unique identifier for a book.

21   "Q.  What information is contained in the title column?

22   "A.  The title of the book.

23   "Q.  What information is contained in the source column?

24   "A.  Where we purchased or how we acquired that book.

25   "Q.  How does Chegg track the source of its books?

I44VWIL3                         "Singh"

1  "A.   In our systems when books are received in, we identify how

2  we procured that book.

3  "Q.   How accurate is Chegg's source information?

4  "A.   It's a system that we rely on.

5  "Q.   How is BDB described in the source column?

6  "A.   It will be described as 'prebuy underscore TRUS,' as well

7  as, I believe, TextbookRush.

8  "Q.   I would ask you to take a look a closer look at that

9  spreadsheet.  Am I correct that the only way that BDB is

10  identified in Chegg Exhibit 8 is by Textbooks R Us?

11        "Are you accustomed to using Excel, Mr. Singh?

12  "A.   There's Textbooks R Us and pre-buy.  I was mistaken when I

13  said TextbookRush.  It was -- I was mistaken when I said

14  TextbookRush, it was Textbooks R Us.

15  "Q.   Pre-buy is on this document?

16  "A.   I think actually I believe what we did was we -- to

17  simplify it, we changed pre-buy to be Textbooks R Us.  That way

18  it would not be listed on here with two separate names.

19  "Q.   Okay.  But am I correct that the -- well, let me just step

20  back for a second.  Other than Textbooks R Us, is BDB

21  represented on this list with any other name?

22  "A.   You know, the names that we have in here are the sources

23  that we purchased the books from.  If there are other entities,

24  you know, that were identified that are also related to BDB,

25  then they would be in here as well, called that with that name.

I44VWIL3                        "Singh"

1    "Q.  To the best of your knowledge, are you you aware of any

2    information, any source, in any way related to BDB that is on

3    this list other than Textbooks R Us?

4    "A.  I think based on our previous discussion, textbooks.com

5    may also be related.

6    "Q.  Textbooks.com?

7    "A.  I believe, but I may be wrong about that."

8            MR. GLUNT:  On page 202, line 3.

9    "Q.  Am I correct that an earlier version of this document

10   identified in part BDB as pre-buy TRUS?

11   "A.  In our source system it would be listed as pre-buy TRUS.

12   "Q.  Why in your source system is it listed as 'pre-buy TRU'?

13   "A.  It's when -- it's a system limitation for that channel.

14   Every vendor is listed as pre-buy, underscore, a designation.

15   "Q.  And that channel is the merchant buyback channel?

16   "A.  No, it is the pre-buy channel.

17   "Q.  The pre-buy channel.

18          "And is the pre-buy -- turning your attention to Chegg

19   Exhibit 1, do you have Chegg Exhibit 1 there?

20   "A.  Yes.

21   "Q.  Is the pre-buy channel books that BDB procures for Chegg

22   under Chegg Exhibit 1?

23   "A.  They are not.

24   "Q.  Which books -- do you know what agreement governs the

25   pre-buy relationship between Chegg and BDB?

I44VWIL3                     "Singh"

1    "A.   There is a pre-buy specific contract that we have in

2    place."

3              MR. GLUNT:   Turning to page 204, line 10.

4    "Q.   Mr. Singh, how is this document created?

5    "A.   We have a database that we are keeping of the -- of the

6    books that have been reviewed as part of these audits.   And so

7    we did a query of that database to pull this data.

8    "Q.   And does that database identify books that Chegg obtained

9    from BDB through the pre-buy relationship as pre-buy TRUS?

10   "A.   I believe it does.   I would have to confirm with the team

11   on that."

12             MR. GLUNT:   So moving then to page 207, the question

13   beginning on line 4.

14   "Q.   With respect to Chegg Exhibit 8, which -- through which --

15   with respect to the books on Chegg Exhibit 8 that Chegg

16   procured from BDB, through which channels did Chegg procure

17   these -- those books?

18   "A.   Are you talking about each individual book?

19   "Q.   Was one of the channels through which Chegg acquired books

20   from BDB that are listed on Chegg Exhibit 8?   I don't want to

21   go, not quite yet.   I want to just start with the basic

22   question.   Were all -- it seems that pre-buy -- the pre-buy

23   channel was one of the channels through which Chegg acquired

24   books from BDB that are listed on Chegg Exhibit 8; is that

25   correct?

I44VWIL3                          "Singh"

1    "A.  Sure.

2    "Q.  So generally, what other channels did Chegg obtain books

3    from BDB with respect to books that are listed on Chegg Exhibit

4    8?

5    "A.  Two main channels will be the pre-buy program that we

6    talked about, as well as customer direct fulfillment.  So that

7    is what we previously talked about where we have an order that

8    goes directly to Book Dog Books to fulfill on our behalf

9    directly to a student.  Those are the two primary channels.

10   "Q.  To Chegg's internal systems identify which channel these

11   books came from?

12   "A.  Yes.

13   "Q.  To the best of your knowledge, with respect to the books

14   that are listed on Chegg Exhibit 8 that Chegg obtained from

15   BDB, were any of them obtained from a channel other than the

16   pre-buy channel or the customer direct fulfillment channel?

17   "A.  We talked previously about the merchant buyback program.

18   That is a relatively small channel for us.  There may be some

19   books that came through that channel.  Without doing a deep

20   analysis, I could not say one way or the other whether any

21   books came through that channel.

22   "Q.  Remind me, is the customer direct fulfillment channel a

23   rental channel?

24   "A.  It is a rental channel, as well as a purchase channel.

25   But obviously a purchased book goes directly, and we do not

I44VWIL3                        "Singh"

1    generally get those back.

2    "Q.  So you would expect that at least with respect to those

3    BDB books that are listed on Chegg Exhibit 8, if they fall

4    within the customer direct fulfillment channel, they were most

5    likely rentals?

6    "A.  Yes.

7    "Q.  Turning your attention to the SKU column, what is the SKU?

8    "A.  It is the unique identifier that Ingram assigns.

9    "Q.  And that's the unique identifier you testified about

10   earlier today?

11   "A.  Correct.

12   "Q.  What is the finding column?

13   "A.  It was a result of the audits.

14   "Q.  Did Chegg play any role in determining what the result of

15   the audit was?

16   "A.  No, we did not.

17   "Q.  So am I correct the information listed in the finding

18   column came entirely from the higher education publishers?

19   "A.  It would be based on their feedback back to us on their

20   designation of a specific book.

21   "Q.  How did the higher education publishers provide Chegg with

22   that feedback?

23   "A.  Via email.

24   "Q.  When Chegg received --

25   "A.  I'm sorry, let me clarify that.

1              "For books that were cleared, they were provided as

2     part of the audit and they were not identified as suspect.  And

3     the books that were not identified as such were flagged as

4     clear.

5     "Q.  Okay.  And who selected which books were identified as

6     suspect?

7     "A.  Publishers.

8     "Q.  Am I correct that the only two -- categories, thank you,

9     categories in this column are clear and suspect?

10    "A.  There is another category, and they are called 'Pending

11    Further Review.'  That is a fairly small subset.  My

12    understanding is that that came out of the last audit where

13    they were not necessarily flagged as suspect; but there was

14    additional validation that the publishers wanted to do.  I

15    would have to dig into it a little bit further around.  But it

16    was a relatively small subset.

17    "Q.  Can you check to see if there is anything on Chegg Exhibit

18    8 that is pending further review?

19    "A.  There are.

20    "Q.  There are?

21    "A.  There are.  There's approximately 70 or so.

22    "Q.  Do you know why it is those approximately 70 were flagged

23    as pending further review?

24    "A.  I do not know.

25    "Q.  What information is contained in the audit date column?

1    "A.   Just location and the date of the audit.

2    "Q.   Can you describe the process the higher education

3    publishers went through as they were inspecting the books?

4    "A.   I don't know their parameters for inspection.  We provided

5    the books; they inspected them.  Books that they identified as

6    suspect we boxed and sent to them.  Books that were identified

7    as cleared, we scanned back into the system and made them

8    available again.

9    "Q.   Did Chegg have an opportunity to observe the higher

10   education publishers inspecting the books?

11   "A.   For the most part, no.

12   "Q.   To some extent did Chegg have an opportunity to observe

13   the higher education publishers inspecting the books?

14   "A.   Incidentally, if we came in to help them move books

15   around, carts around, or to take carts out of the room."

16            MR. GLUNT:  Beginning on page 212, the question on

17   line 12.

18   "Q.   If the higher education publishers identified a book as

19   suspect, what would happen to that book?

20   "A.   It was placed on a separate cart that was reserved for

21   suspected books.  As the cart filled up, it was wheeled out of

22   the room.  The Ingram folks, as well as Chegg folks, we would

23   box those up.  And after the audit, those would all be shipped

24   over to the individual publishers.  They would be placed into

25   specific -- they were placed -- as they were identified, they

I44VWIL3                        "Singh"

1    were on specific carts for each publisher and then they were

2    boxed up and sent to that publisher.

3    "Q.  Were there any books that the higher education publishers

4    flagged as suspect that were not shipped to the publishers?

5    "A.  That were flagged as suspect, we shipped all of them that

6    were on the carts that were provided to us.

7    "Q.  And were there any books that were not flagged as suspect

8    that were then shipped to the publishers?

9    "A.  Only if they were miscategorized on a cart.

10   "Q.  Do you have any knowledge of any books being

11   mischaracterized during this inspection process?

12   "A.  There were a few books that were.  There were a few books.

13   "Q.  When you say "a few books," are you talking about less

14   than ████ or less than ████?

15   "A.  I'm talking about ███ to ██████, from my knowledge.

16   "Q.  How many books did the higher education publishers flag as

17   suspect?

18   "A.  It was approximately ██████.

19   "Q.  And how many of those ██████ were Chegg books?

20   "A.  I don't have that data.  We have not -- we considered this

21   to be one pool of inventory; we have not necessarily broken it

22   out that way.

23   "Q.  Why?

24   "A.  Just from a business perspective, we as an operation, that

25   is one set of inventory that we look at.

 1  "Q.  Didn't Chegg want to know how many of its -- of its books

 2  in inventory the higher education publishers flagged as

 3  suspect?

 4  "A.  We haven't gone to -- I mean we haven't necessarily broken

 5  it out that way.  Again, we focused on fixing any system issues

 6  that we have had that preclude -- that we have that preclude us

 7  from this.  We have focused in on identifying, you know, where

 8  our sources of fraudulent books, sources of counterfeit books

 9  and filling those holes.  At some point or other, sure, we

10  would do that analysis.  But for right now, we focus on making

11  improvements.

12  "Q.  Did the higher education publishers say anything to Chegg

13  about which books they were flagging as suspect?

14  "A.  There was no discussion around the books that were

15  identified.  There were carts that were clear, carts that were

16  identified as suspect.

17  "Q.  Did the higher education publishers represent to Chegg

18  that the books that they were flagging as suspect were actually

19  counterfeit?"

20          MR. GLUNT:  I apologize.  Beginning on page 215, line

21  18.

22  "Q.  Did the higher education publishers represent to Chegg

23  that the books they were flagging as suspect were actually

24  counterfeit?

25  "A.  Coming out of that process, there was no formal

I44VWIL3                        "Singh"

1   designation that these were indeed counterfeit.  Some books

2   were returned back to us and is cleared, and when we have put

3   those back into inventory.

4   "Q.  How many books were returned to Chegg as cleared?

5   "A.  I don't have the exact number.  I would say it's between

6   ███ and ███.

7   "Q.  And were any of those BDB books?

8   "A.  I don't know.

9   "Q.  How many Ingram Books were returned to Ingram as cleared

10  after they were initially sent to the higher education

11  publishers?

12  "A.  That number that I mentioned earlier is a joint number.

13  For my purposes I'm considering it one pool of inventory.  We

14  are not necessarily breaking these out across ownership lines.

15  "Q.  Did Chegg or Ingram refuse to ship any books that the

16  higher education publishers flagged as suspect to the higher

17  education publishers?

18  "A.  We did not.

19  "Q.  Were the ███ to ███ books that were returned as cleared

20  from a single publisher or from multiple publishers?

21  "A.  Multiple publishers.

22  "Q.  Which publishers?

23  "A.  It was -- it would be from all three:  McGraw-Hill,

24  Cengage, and Pearson.  One thing, I think to clarify earlier,

25  we defined the group as being publishers, and there were four

1  publishers.  These audits were only with three publishers, the

2  ones I just mentioned.

3  "Q.  Why did the other higher education publishers not

4  participate?

5  "A.  I have no idea.

6  "Q.  What did Chegg and Ingram do with the books that the

7  higher education publishers inspected but cleared?

8  "A.  We scanned them back into inventory and made them

9  available.

10  "Q.  What, if anything, did the higher education publishers say

11  to Chegg about such books?

12  "A.  That they are clear.

13  "Q.  Did the higher education publishers tell Chegg that those

14  books were authentic books?

15  "A.  I don't think that's the terminology that was ever used.

16        MR. GLUNT:  So continuing on page 222, the question

17  beginning on line 3.

18  "Q.  How about Texas Books?

19  "A.  I don't know offhand what their rate was."

20        MR. OPPENHEIM:  Hold on.  I'm sorry.

21        MR. GLUNT:  Am I missing a page?  Oh, yeah, 219.

22  Sorry.  It was turned around.

23        So bottom of 219 on 24.  Actually, no, no, I'm sorry.

24  218 on line 17.

25  "Q.  Did the higher education publishers advise Chegg or Ingram

I44VWIL3                         "Singh"

1  that Chegg and/or Ingram should inspect any of the cleared

2  books before selling them?"

3            MR. KLEIN:  I apologize.  I don't have 218.

4            THE COURT:  Just flip --

5            MR. GLUNT:  Flip the page.  I think it was turned

6  around.

7            MR. KLEIN:  Yes, I'm sorry.

8            MR. GLUNT:  So on page 218, beginning on line 17.

9  "Q.  Did the higher education publishers advise Chegg or Ingram

10 that Chegg and/or Ingram should inspect any of the cleared

11 books before selling them?

12 "A.  I'm not familiar with a conversation like that.

13 "Q.  Did the higher education publishers advise Chegg and/or

14 Ingram that they could sell the cleared books without any

15 further inspection?

16 "A.  The books were identified as cleared, and so we put them

17 back into inventory and made them available for additional

18 transactions."

19            MR. GLUNT:  Continuing on page 219, question beginning

20 line 24.

21 "Q.  Sure.  What percentage of books that the higher education

22 publishers inspected from Chegg and Ingram were flagged as

23 suspect?

24 "A.  I think that's available in this file here.  If you just

25 do an analysis on that, I believe it was less than ■ percent.

I44VWIL3                         "Singh"

 1   "Q.  Does ▇ percent sound about right?

 2   "A.  That sounds about right.

 3   "Q.  Did Chegg do any analysis to see the suspect book rates

 4   for any of its suppliers?

 5   "A.  We did.

 6   "Q.  And what did it learn from that analysis?

 7   "A.  That there were varying -- "

 8             THE COURT:  Line 17.

 9             MR. GLUNT:  I think it's highlighted on line 13

10   continues the answer.

11   "A.  That there were varying rates of suspected books by

12   publisher -- sorry, by partner.

13   "Q.  What was the range of rates?

14   "A.  Anywhere from ▇ to -- I can't recall the high.  I want

15   to say probably in the ▇ percent range.  Again though, the

16   sample size varied dramatically across different -- it may have

17   even been ▇ percent.  For somewhere there were ▇ or ▇

18   books.  It's a hard thing to compare across because of sample

19   size.

20   "Q.  Let's focus for a second on wholesalers.  Did Chegg look

21   at the suspect book rates for wholesalers?

22   "A.  We did do analysis on that.

23   "Q.  And what conclusions did Chegg draw from that analysis?

24   "A.  Again, that they were varying rates.  We still had the

25   same issues of what the sample size was.  Some vendors supplied

1   a lot more books than others.  It also could be a mix of which

2   titles are audited.  So again, there's a high-level analysis we

3   can do based off of that.

4   "Q.  What was BDB's suspect book rate?

5   A.  Again, I think that's in the data set.  I believe it was ███

6   books out of ██████, so approximately ███ percent or so.

7   "Q.  Does ███ books out of █████ sound about right?

8   "A.  It does.

9   "Q.  Does ████ percent sound about right?"

10         MR. GLUNT:  Question on page 222, line 3.

11   "Q.  How about Texas Books?

12   "A.  I don't know offhand what their rate was.

13   "Q.  Does ████ percent sound right?

14   "A.  If that is what the data says.  Again, I don't have that

15   data in front of me right now.

16   "Q.  How about Missouri Books?

17   "A.  Again, saying there's technical --

18   "Q.  Does ████ percent sound right?

19   "A.  Again, I don't know what the exact number was.  The data

20   is there and it looks like you've done the calculation."

21         MR. GLUNT:  So continuing with the question beginning

22   on page 225, line 2.

23   "Q.  So if supplier A supplies Chegg with seven times more

24   counterfeit books than supplier B, that won't affect Chegg's

25   decision going forward as to whether it buys books from

1   supplier A or supplier B?

2   "A.  Based on the representative books that were selected, it

3   is hard to make conclusions around the overall rate.

4   "Q.  Why is that?

5   "A.  Some books may have a higher rate of counterfeits than

6   other books have.  And if we specifically sourced or we -- or

7   the sample included more of those books, then the results would

8   be skewed and it may not be representative of the overall

9   performance of that partner."

10          MR. GLUNT:  So continuing on page 226, the question on

11   line 12.

12   "Q.  Sure.  At this time do you know whether this data is or is

13   not representative?

14   "A.  I can't know that.  I would have more data if I knew that.

15   "Q.  What data would you need to know that?

16   "A.  That is an assessment we have to do to determine that."

17          MR. GLUNT:  So the question beginning on page 227,

18   line 23.

19   "Q.  After the higher education publishers' inspection, did

20   Chegg stop purchasing from any of the suppliers other than

21   Springfield Gardens and south Florida groups which you have

22   previously testified about earlier today?

23   "A.  We continue to do business with our wholesale partners.

24   "Q.  And am I correct that you testified earlier that Chegg

25   continues to do business with BDB; correct?

```
1    "A.  Yes.

2    "Q.  And Chegg continues to purchase books from BDB because

3    Chegg believes BDB is a good supplier; correct?

4    "A.  We continue to buy books from BDB.

5    "Q.  If you concluded that BDB was a bad supplier, would you

6    continue to buy books from BDB?

7    "A.  We'd continue to do business with BDB.

8    "Q.  Why does Chegg continue to do business with BDB?

9    "A.  We have an established relationship with BDB.  They are an

10   efficient provider of books to us.  They are a partner on our

11   side where they buy books from us as well.

12   "Q.  If Chegg believed that BDB was indirectly supplying Chegg

13   with counterfeit books, would Chegg continue to do business

14   with BDB?

15   "A.  We would not."

16          MR. GLUNT:  That completes the Chegg deposition, your

17   Honor.

18          THE COURT:  All right.

19          Do the defendants have any other evidence to offer the

20   jury?

21          MR. GLUNT:  We do not, your Honor.

22          THE COURT:  Do the defendants rest?

23          MR. GLUNT:  Yes, your Honor.

24          THE COURT:  Do the plaintiffs have any further

25   evidence to offer the jury?
```

I44VWIL3

1          MR. OPPENHEIM:  Your Honor, just one thing.

2          One of the witnesses that were on their list that they

3    didn't call, didn't appear, we would just offer a document by

4    that witness as a party admission.  We'd introduce and offer

5    PX-254.  If you could bring that up for the Court please.

6          THE COURT:  Any objection?

7          MR. GLUNT:  No objection, your Honor.

8          THE COURT:  All right.

9          Plaintiffs' Exhibit 254 is received in evidence.

10         (Plaintiffs' Exhibit 254 received in evidence)

11         MR. OPPENHEIM:  Rather than show it to the jury now,

12   we'll just use it in the closing, your Honor.

13         THE COURT:  You can publish it if you'd like.

14         MR. OPPENHEIM:  Let's publish it.

15         THE COURT:  Publish it.

16         MR. OPPENHEIM:  Let's go ahead and publish it.  And

17   could you, Mr. Cole, focus in on the middle email from Jeff

18   Brady.

19         Is it all right if I read it to the jury?

20         THE COURT:  You can read it.

21         MR. OPPENHEIM:  From Jeff Brady to Kay Haddox.

22         That is fine.  I also manage our fraud department

23   here.  It was a shock to me when I started, but fake textbooks

24   is big business.  There are operations overseas that make

25   thousands of copies of a single textbook and flood the market,

1      dropping prices and costing the publishers millions of dollars.

2      The ironic thing is that in some cases the quality of the books

3      are better than the originals, so we can't just go on quality

4      alone.  We have some proprietary processes to validate books,

5      but we don't want those to be made public.

6            In this case we determined that the item was likely a

7      copy; but since we cannot prove it, we sent it back to the

8      consumer.  In the two years I've worked here, I have dealt with

9      the FBI, Secret Service, NYPD, campus police, USPS postal

10     inspectors and others on fraudulent stolen textbooks.  Who knew

11     it was such a popular activity.  Thanks again.  Jeff.

12            THE COURT:  Anything further from plaintiffs?

13            MR. OPPENHEIM:  No, your Honor.

14            THE COURT:  Do the plaintiffs rest?

15            MR. OPPENHEIM:  We do, your Honor.

16            THE COURT:  All right.

17            Members of the jury, we've come to a crossroads in

18     this case; the taking of evidence is now complete.

19            We're going to take a very short recess, and then

20     you'll return to the courtroom to hear closing arguments.

21            Please recess the jury.

22            (Jury not present)

23            THE COURT:  Any issues?

24            MR. OPPENHEIM:  Not from plaintiffs.  I just need a

25     few minutes to get organized, if that's all right.

I44VWIL3

```
1          THE COURT:  We'll take five minutes.

2          We'll move the podium.

3          Your time is an hour and ten minutes on your principal

4    closing.  I'll give you a five-minute warning and gently ask

5    you to begin to conclude your summation.  All right?

6          MR. OPPENHEIM:  Yes.

7          THE COURT:  And then we will take a half-hour luncheon

8    recess, and we'll then proceed with the defendants' closing.

9    And then we will take a ten-minute break between the

10   defendants' closing and the plaintiffs' rebuttal.  All right?

11         So we'll take just a few minutes.

12         (Recess)

13         THE COURT:  I gave you at least ten minutes.

14         Are you ready?  All right.

15         MR. GOULD:  One point, your Honor.

16         The Chegg transcript is highly confidential and we

17   just ask that that portion of the transcript be sealed.  I

18   would say Chegg would want that, I would suspect, and we have

19   no objection.

20         MR. BHANDARI:  We have no objection.

21         MR. OPPENHEIM:  It's actually not our request; we just

22   recall that Chegg had asked for that.  So we put it forward to

23   the Court to deal with however it sees.

24         THE COURT:  We'll deal with it later.  It just didn't

25   seem like there's much that's confidential in that at all.  But
```

I44VWIL3                    Summation - Mr. Oppenheim

1    I'll direct the court reporter to redact from the public

2    transcript the numbers and percentages.

3              Let's bring in the jury.

4              (Jury present)

5              THE COURT:  Members of the jury, we're going to turn

6    to one of the concluding phases in any trial, closing

7    arguments.  Remember, they are arguments, they are not

8    evidence; they are attorneys' summations.  The attorneys will

9    describe to you what they believe has been proved or not proved

10   in the course of this trial that we've all been participating

11   in over the last three weeks.

12             So at this time, members of the jury, I ask that you

13   give your undivided attention to Matthew Oppenheim, Esquire, as

14   he delivers his closing argument on behalf of the plaintiff

15   publishers.

16             MR. OPPENHEIM:  Thank you, your Honor.

17             Good morning.

18             THE JURY:  Good morning.

19             MR. OPPENHEIM:  Almost three weeks ago, I stood up in

20   front of you and I said -- sorry.  Let's try this again.  And I

21   said that this is a case about a bookseller swarming with

22   counterfeits; a bookseller who had been caught, sued, and

23   settled; a bookseller who had ignored the settlement and

24   ignored the law.  And during the course of the last two

25   and-a-half weeks, I believe we have demonstrated for you each

I44VWIL3                    Summation - Mr. Oppenheim

1    and every bit of what I said we would demonstrate.

2            While opposing counsel advocated vigorously on behalf

3    of their clients, their arguments don't withstand scrutiny.

4    Their story is false because they simply can't change the

5    facts.  They can deny them, they can ignore them, they can lie

6    about them, and they can distract you from them; but the

7    underlying facts are what they are.

8            My goal during the course of the next hour or so is to

9    discuss eight topics with you:  One, the defendants' conduct;

10   two, the defendants' dishonesty; three, the defendants'

11   practices or lack thereof; four, the legal claims; five, the

12   elements of the legal claims; six, the roadmap; seven, damages;

13   and last but not least, let's take a look at the verdict form

14   that you're going to get.

15           I know that it's already been a long two and-a-half

16   weeks, and I will endeavor as best I can to move swiftly

17   through these issues.  But I also recognize that this case is

18   critical for the educational publishing community.  The issues

19   presented in this case have been festering for literally ten

20   years.  And I want to make sure that I equip you with as much

21   critical information as possible before you deliberate.

22           So what are the facts?

23           Defendants have a long history of buying, importing,

24   and selling counterfeits.  And unfortunately for the

25   publishers, history seems destined to repeat itself.  To this

1    day, defendants are still selling counterfeits.  Defendants

2    have repeatedly and recklessly purchased from known counterfeit

3    sellers.  They purchased U.S. editions in bulk from overseas

4    sources at too-good-to-be-true prices.

5            Unlike any normal business, they refuse to ask their

6    suppliers where the inventory is coming from or engage in any

7    due diligence to understand who the supplier really is or if

8    those books are lawfully obtained.  The defendants willfully

9    closed their eyes and adopt the mantra "I know nothing."  We

10   have seen through the course of this trial how this story has

11   played out with respect to Best Books World and the Blackerbys,

12   as well as the Morena books.  But we know that it's not just

13   limited to those sellers.  We know that the defendants continue

14   to import in bulk from overseas, even now, and they take no

15   steps to know their sources.  Indeed, they avoid knowing their

16   sources.

17           Even outside of their mass importation, they've

18   created a business model that encourages counterfeit sales

19   right here in the United States.  Whether it's through their

20   buyback websites or the Amazon trade-in program, they again

21   close their eyes to who they are buying from.

22           In the case of the Amazon program, which constitutes a

23   million or so books a year, they never even look at the books.

24   They don't look to see whether the books are counterfeit.  And

25   those that are purchased through their own websites, when they

1   do catch a book that they call questionable, they package it up

2   and they ship it back out again, so that seller can then sell

3   it again.  They do this even though their own policy says that

4   they can keep that counterfeit book and not pay for it.

5        So what is defendants' response to all of these

6   accusations?  They deny and lie about what they have done; they

7   hide and destroy evidence; they violate court orders

8   instructing them to turn over information.  And they tell the

9   world that what they are doing is everything possible; that

10  they are better than almost everybody else out there in terms

11  of fighting counterfeiting.  And they claim that it's just

12  inevitable, that counterfeits are not their fault.

13       And why do they engage in this reckless behavior?  For

14  money, lots and lots of money.

15       Make no mistake about it, this is not a victimless

16  crime.  Publishers, their employees and authors, are all hurt

17  when dirty -- to use the MBS CEO's term -- dirty distributors

18  like defendants decide that it's okay to import and sell

19  counterfeit copies of books into the U.S. marketplace.  It

20  hurts students because students don't want books that are going

21  to fall apart; students don't want books that have missing

22  pages; and students don't want books that have wrong

23  question-and-answer sections.

24       It hurts the public, including you, ladies and

25  gentlemen, because without the protection that the law provides

1   and proper incentives to create educational materials, we all

2   lose out on advancements in research, sciences, and the arts.

3   It's also unfair to other distributors, those distributors who

4   are trying to do the right thing, who are, in fact, doing the

5   right thing, end up having to compete on an unfair, unlevel

6   playing field.

7          Apologies.  I've been losing my voice over the course

8   of the last two weeks.

9          Once Mr. Mandel and I or Mr. Bhandari and I are done

10  with our closing arguments, Judge Pauley is going to read you a

11  set of instructions on the law.  In this case you're going to

12  hear something extraordinary.  The judge is going to tell you

13  that during the course of this case, the defendants violated

14  court orders requiring them to provide information about their

15  businesses.  The Court will tell you then that you may infer

16  that the evidence that was withheld would have been unfavorable

17  to the defendants.  And you may assume that the defendants'

18  profits were higher than what you saw and heard in this Court.

19  Indeed you can assume that the information generally would have

20  been disadvantageous to the defendants.

21         Ladies and gentlemen, please understand, this is a

22  very serious instruction from the Court.  But you will also

23  hear Judge Pauley tell you that during the trial there was

24  evidence that defendants destroyed evidence relevant to the

25  case and failed to maintain records about it.  Judge Pauley

1    will tell you that you may consider that, and that defendants'

2    destruction practices and failure to maintain records is

3    critical.  Judge Pauley will tell you that you may consider

4    them when determining whether or not the defendants infringed

5    on the plaintiffs' trademarks.

6            Ladies and gentlemen, please understand, this

7    instruction is also exceedingly rare.  The fact that the Court

8    will be giving both of these instructions -- one on destruction

9    of evidence and two on the failure to abide by court orders --

10   is an event that does not typically happen in federal courts.

11   This speaks volumes about the defendants themselves, about the

12   way they conduct themselves and their business.  It also speaks

13   volumes about their effort to prevent the plaintiffs from

14   learning about their conduct.

15           Defendants should not get the benefit of having

16   destroyed evidence.  Defendants should not get the benefit of

17   hiding information and not complying with court orders.  It is

18   up to the jury to listen to the Court's instructions in terms

19   of adverse inferences and make certain that the defendants do

20   not reap the benefit from their improper activities.

21           So let me turn to the next issue.

22           The defendants knew that they should not be doing

23   business with these suppliers.  From day one the relationship

24   with Best Books World was fishy.  Defendants knew that they

25   were buying books, brand-new U.S. editions, in bulk from

Thailand, and they were buying at too-good-to-be-true prices.

Defendants told Best Books World that they would pay her less

for brand-new books than they would pay students for used

books.  Think about that for a minute.  Does that make any

sense to you?  We're going to pay you less for a new book than

we'll pay a student for a used book.  That's not normal.

        They also right away recognize these books didn't look

right.  Their own email says in 2006:  You are sending us

internationally printed books which have a lesser paper quality

and poorer binding than the ones printed here in the United

States.  Did they ever ask a question?  No.  They knew the

books didn't look right and they just went forward and did

business.

        While the jury heard that the defendants had been

called on the mat for selling counterfeits by both Follett and

MBS in the spring and summer of 2007, that's not something the

publishers knew at the time that they filed their lawsuit in

October of 2007.  Notably, four days after that lawsuit was

filed, there was a critical email sent by Mr. Smyres.  Four

days after being sued, Mr. Smyres says to Best Books World:  We

would like to buy more books from you, but at this time the

legal issues surrounding the books from Thailand are creating

some problems.

        Why is this important?  The lawsuit itself doesn't say

anything about Best Books World, the 2007 lawsuit.  It doesn't

say anything about Thailand.  Mr. Smyres knew that when he was

sued on October 2nd, it was Best Books World that was the cause

of those counterfeits.  And that's what he was telling Best

Books World.

Literally -- next slide please -- six weeks later,

after being sued and after telling Best Books World that he

didn't want to buy anymore books from them, they start buying

more books.  A fair question is, Well, what happened in that

six-week period?  They said they weren't going to buy books and

now they are saying they are going to buy books.  They did

nothing to determine if the books were legitimate.  They didn't

get a contract; they didn't ask BBW for its source.  They just

bought the books.  At this point the lawsuit has just been

filed; it's just underway.

So Mr. Smyres says to Britt Wood, who works for him,

that they will not be able to sell the books wholesale.  Well,

why is that?  Well, that's because MBS and Follett, his

wholesale buyers, had already complained to him about buying

counterfeit books.  So he knows if he buys these books and he

tries to sell them to MBS and Follett, they are going to turn

him in; they are going to catch him.  And he knows that won't

work.

So what does he do?  He says, Oh, let me sell them

where somebody won't catch them.  So he tells Britt Wood, Buy

them, but we're going to be able only to sell these on the

I44VWIL3                    Summation - Mr. Oppenheim

1    Internet.

2          This email could not be more incriminating.

3    Mr. Smyres knew exactly what he was doing.  He was shrewdly

4    trying to find a way to continue to profit from counterfeit

5    U.S. edition books coming out of Thailand.  He knew that if he

6    sold the books where he had been selling them before, he was

7    caught.  So his solution wasn't to stop buying them; his

8    solution was to sell them where he didn't think he'd get

9    caught.

10         Well, the litigation goes on.

11         And just days before the settlement, the settlement

12   that you guys have seen many, many times, Mr. Smyres decides

13   he's going to buy more books from Best Books World.  So on the

14   eve of inking a settlement that says that he's not going to

15   import or sell counterfeit books, he's buying more books from

16   Best Books World.

17         Well, when those books come in -- next slide please.

18   When those books come in, there is no doubt about what the

19   defendants say about these books.  Here are just three of the

20   emails.

21         Mr. Smyres:  We now doubt that any of the books you

22   recently have sent are legitimate copies.  No equivocation

23   there.

24         Then he says:  We will send all of your books back

25   because I cannot trust that any of them are authentic books.

I44VWIL3                    Summation - Mr. Oppenheim

1  Again, no equivocation there.

2          And then he says to his colleague:  Tell her she must

3  pay first; tell her these books are counterfeit.  Again, no

4  equivocation.

5          He's not saying some of them could be legit; he's not

6  saying, Oh, I don't know.  He's saying they are counterfeit.

7  And the reason he tells his colleague Mikeal Van Cleave that

8  she has to pay first is because he doesn't trust her; because

9  he knows what she is.  He knows exactly what she is.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. OPPENHEIM:  Next slide, please.

2          On September 10, he does disclose, as he is required

3     to, the publishers, that Best Books World appears to be the

4     source of most, if not all, of the pirated books.

5          What does he do then a year later?  She comes to him

6     and says she wants to sell books to him again.  What does he

7     say?  I welcome doing business with you.  We are always looking

8     for more books.  This is the seller he has repeatedly

9     identified as giving him counterfeit books.  I welcome doing

10    business with you.  Is that what you do if you are trying to

11    avoid counterfeits?

12         Well, let's talk for a moment about the concept of due

13    diligence.  It's a legal term.  It's an unfortunate one.  It's

14    often defined as the care that a reasonable person exercises to

15    evaluate whether they are going to buy something or do business

16    with somebody.  For a normal person, the way you kind of think

17    about that is, I am going to take a look under the hood before

18    I buy the car, right.

19         So the question is, Mr. Smyres, he's a sophisticated

20    businessman.  What due diligence did he do about Best Books

21    World?  Well, let's see on the first line, it should say May

22    26, 2006.  Do we have our dates right here?  Mr. Smyres says:

23    In Thailand, might be good to meet and talk re increasing

24    business.  Well, the response by Best Books World:  Unconvinced

25    to me you because I am oversea.  I would like to to business

1   with you big lot.  Hope to meet you in the next time.  He is

2   thwarted the first time.

3          Then he tries to call her.  The number he has doesn't

4   work.  That should have been a sign.  Next time in November of

5   2006 he says he will be in Bangkok until the 18th for an entire

6   week.  I buy lots of international editions and would be

7   interested in having an additional supplier.  No reply.

8          Next slide.  OK.  September 2009.  I apologize.  We

9   have got our dates wrong here.  If you look at the blue arrows,

10  that's right.  Mr. Smyres says:  I welcome doing business with

11  you once again.  Maybe we can meet.  One of my agents will be

12  arriving today.  Maybe he can meet you in the next couple of

13  weeks.  No response.

14         A month later, I'm in Frankfurt, October 12 through

15  15, attending the Frankfurt book fair.  Maybe we can meet.  No

16  response while he's there.  And she responds:  Now, I am not

17  here in Thailand.  In the next time maybe meet you.

18         Well, October 13:  I am currently in Frankfurt.  If

19  you are here at the book fair, let's meet.  No response.

20         November 5.  I will be in Thailand for 10 days.  Let's

21  meet so we can talk about how we can do more business.  No

22  response.

23         April 24, 2010.  Are you in Bangkok?  I would like to

24  meet?  Her response:  Sorry.  I cannot meet you now.  I am not

25  in Bangkok.

1          June 2010, I will be in Thailand this coming week.  I
2     would like to meet if we are going to do more business.
3     Response:  Will let you know again for appointment.  I am not
4     sure the certainly time.  Again, they don't meet.
5          June 1, 2010.  I would like to meet you this week in
6     Bangkok.  Response:  Sorry.  I am inconvenience to meet you.
7          The next year they are at the Frankfurt book fair
8     again.  I would like to meet.  Her response:  I am very busy
9     with my business.
10          October 8, I'm in the Frankfurt book fair.  Are you
11     here?  If so, maybe we could meet.  Response:  I must
12     apologize.  I'm not in the Frankfurt book fair.
13          November 9, I'm in Bangkok today.  Can we meet for a
14     cup of coffee?  November 9, sorry.  Now I'm not in Bangkok.
15     Finally, where are you?
16          At some point along the way don't you think Mr. Smyres
17     should have said, huh, maybe this person isn't a legitimate
18     business?  I can't meet with them.  They don't have a working
19     phone number.  They are always conveniently not there.  You
20     think Barnes & Noble does business this way?
21          Five months later, April 2011, they are going through
22     their inventory at the defendants' warehouse.  And Mr. Doenges,
23     who testified, says:  I checked out what we got from Ple sales
24     and all of that inventory is long gone.  Keep mum about this.
25     Keep mum about this.  What normal business sends e-mails around

1    saying keep mum about something?  A business that knows that

2    they have sold counterfeit inventory.

3           In 2011, the defendants tell Ple at Best Books World,

4    there is a lot of talk about counterfeits coming out of

5    Thailand.  If you can produce a publisher invoice, I will

6    consider buying from you.

7           Well, really?  How many times did he get counterfeits

8    from her?  If she suddenly comes up with something that she

9    says is a publisher invoice that he is going to do business

10   with her again?  This is not how a normal business operates.

11   It is the definition of reckless.

12          Let's turn to the Blackerbys.  We have talked about

13   the Blackerbys.  You have heard evidence.  The defendants

14   purchased U.S. editions in bulk from them coming from southeast

15   Asia.  They bought them at too good to be true prices.  Here,

16   too, they did zero due diligence.

17          What did Mr. Smyres say on the stand?  He said, well,

18   the Blackerbys told me that they had been selling a hundred

19   million dollars, or something like that, to Follett.  Wow.

20   That's the kind of boast that you hear with kids in a locker

21   room.  That's not how people do due diligence.  They don't just

22   listen to somebody and say, I do a hundred million dollars

23   worth of business with Follett and take somebody's word for it.

24   But that's what Mr. Smyres did.  That's not due diligence.  But

25   he kept buying from them.

1              And he bought from them with an internal name that was

2     a code name, ABB, Aussie Book Buyers.  We have talked about

3     this.  The Blackerbys were boys from Alabama, not from

4     Australia.

5              Why did they use a code name?  Well, the defendants

6     claim that the reason they were using a code name was because

7     they didn't want Follett to find out that the defendants were

8     selling to them or that the Blackerbys were selling to them.

9              Let's pause for a minute and let's talk about that.

10    You heard both -- I think it was Mr. Dimm and Mr. Smyres

11    testify that they don't reveal sources.  In their industry

12    suppliers don't tell their customers where they got their

13    books.  OK.

14             Let's for a moment take that at face value, though

15    it's an absurd proposition.  Let's take that at face value.  If

16    that's the case, Follett is never going to ask the defendants

17    where they are getting their books, and certainly the

18    defendants are never going to tell Follett where they are

19    getting their books, so there is no need to use a code name

20    internally.  You could put the Blackerbys on it.  Follett is

21    not going to find out.  You use a code name because you don't

22    want other people internally to know that you are dealing with

23    a supplier who was previously sued for distributing counterfeit

24    books.

25             Well, in February of 2011, the walls finally come

1    crashing in on the defendants.  One of their customers returns

2    some counterfeit books and the defendants immediately know that

3    those counterfeit books had been sourced from the Blackerbys.

4         Now, at this point in time the defendants did not have

5    a system in place which uniquely identified every book.  So

6    they couldn't look at the book, scan some bar code say, we got

7    these from the Blackerbys.  They just knew that they had got

8    them from the Blackerbys.  That's how book distributors and

9    book sellers know where they source their books.

10        And they immediately sent an e-mail to the Blackerbys

11   acknowledging that they had counterfeit books and it was more

12   than just the 20 books that that one customer had sent back.

13   They discovered that there are way more.  This is just one of

14   the e-mails that you saw talking about their shipping

15   counterfeit books back to the Blackerbys.  Multiple titles.

16   They don't equivocate here.  They don't say, well, maybe they

17   are counterfeit.  They say they are counterfeit.  They say they

18   compared them to original Cengage copies and determined that he

19   were counterfeit.

20        In fact, you may recall that one of the witnesses

21   said, well, at first he didn't realize they were counterfeit.

22   They looked legit.  You actually saw e-mails on this.  I think

23   the books are legit.  But then he orders legitimate copies from

24   Cengage, does a comparison.  Oh, yes, they are counterfeit.

25   Does that multiple times.  Really demonstrates the value of

1   using an exemplar.

2          Anyways, the defendants simply ship these books back

3   to the Blackerbys.  And you heard from the Mark Blackerby

4   testimony that was read to you what Mark Blackerby with those

5   books when he got them back.  He said he sold them.  He went

6   online and he sold them.  That's why book distributors should

7   not ship counterfeit books back to their supplier.

8          Well, having received lots and lots of counterfeit

9   books from the Blackerbys, what do the defendants decide to do?

10  Do they say, oh, I am going to stop doing business?  No.  They

11  double down.  Here is their e-mail from Mr. Cahill where he

12  says:  Perry is planning to increase the quantity of books

13  coming to us this year.  He says that he's working with the IT

14  department to make ordering faster.

15         Now, the defendants testified, well, it wasn't of the

16  plaintiff publisher's books.  Look at this e-mail.  The e-mail

17  says:  Pearson, McGraw-Hill, and Cengage.  All three of them

18  are plaintiffs here.  And, in fact, they did continue to do

19  business with the Blackerbys, even after receiving counterfeit

20  books from them.

21         Then what did they do?  Well, then they decide that

22  they are going to hatch a secret deal with the Blackerbys.

23  They send this e-mail that they have acknowledged that they are

24  trying to limit the amount of people that know about the people

25  and they suggest, maybe we should use false names in the deal.

1              I ask you again, is this what a normal business does,

2       or is this a business that's trying to hide what it's doing?

3              The defendants' response in their testimony to this

4       was, no, no, no.  We were just trying to sell books and not

5       have Follett know who was selling them.  Even if that's true,

6       which doesn't appear from the e-mail that it is, they are still

7       deceptively trying to hide who is selling books to who.  Again,

8       that is not what a normal business does.

9              The defendants know that they have been shipping

10      counterfeits and, in fact, one of the e-mails that just slaps

11      you in the face about this is one that was sent by Mike

12      Ingledue.  In June of 2011, talking about Texas Books, he says

13      to Mr. Smyres, I do have a really good shipment going to them

14      next week.  I mean, really good, no counterfeit.

15             He knows that some shipments are counterfeit and some

16      aren't.  The defendants' testimonial response to this e-mail

17      is, no, no, no.  Really good meant it was going to be

18      profitable, make a lot of money.  I have no doubt that it was.

19             But that doesn't change the fact that Mr. Ingledue

20      recognized that this was a shipment that wasn't going to have

21      counterfeits.  If you are a business that thinks you don't ship

22      counterfeits, why would you ever have to have an e-mail that

23      says no counterfeits?  Because the assumption would be they

24      always have no counterfeits.  But, in fact, they know when they

25      are shipping counterfeits and they know when they are not

1    shipping counterfeits, and that's exactly what Mike Ingledue

2    was saying in this e-mail.  We have a shipment now.  This one

3    doesn't have counterfeits.  Can we send it?

4         How does Mr. Smyres feel about this issue of

5    counterfeits?  He made that clear in his e-mail.  Mr. Smyres'

6    view is that this is just an unfortunate problem that from time

7    to time occurs in this business.

8         This is emblematic of the issue, ladies and gentlemen.

9    This is not just an unfortunate problem.  This is illegal.

10   This is improper.  You don't get to just say, oh, it happens.

11   The defendants have an obligation to not import or sell

12   counterfeit books, period.  They don't get to say, well, it

13   just happens from time to time.

14        The guy who is selling TVs out of the back of a van,

15   if he gets caught, do you think he gets to say, it just happens

16   from time to time that the TVs are stolen?  He doesn't.  When

17   you engage in illegal conduct you have an obligation to stop

18   it, and Mr. Smyres doesn't understand that.

19        Let's talk about Mr. Smyres and the defendants'

20   dishonesty.  You will recall that the 2008 settlement agreement

21   requires the defendants to disclose that they had sourced

22   counterfeit books.  We have talked about these disclosures at

23   length.  I want to dig in on this for a minute because that

24   first disclosure was sent on August 11, and that first

25   disclosure says nothing about Best Books World.

1              But we just saw in e-mails a moment ago Mr. Smyres

2       sending e-mails to Best Books World repeatedly saying that the

3       books that he had received from them were counterfeit.  So

4       weeks before he sends this disclosure to the plaintiffs, he is

5       already telling Best Books World that he is getting counterfeit

6       books from them yet again and, yet, his first disclosure to the

7       publishers doesn't mention Best Books World as a source of

8       counterfeit books.

9              So the publishers come back and say -- you can see

10      right here, the August 1, 2008 e-mail predates the August 11

11      e-mail.  He knew absolutely that he was getting counterfeits

12      from Best Books World.

13             Let's turn to the second disclosure.  So after the

14      publishers complain about the first disclosure as being

15      inadequate, defendants send the second disclosure and he says

16      Best Books World source most, if not all, of the pirated books.

17      We heard testimony during the proceeding that Mr. Smyres

18      thought that Wirat was also sending counterfeit books.  But

19      Wirat in this disclosure is not disclosed as a source of

20      counterfeit books.  They just said there are no more invoices

21      provided.  If Wirat was a source of counterfeit books, he

22      should have disclosed it.

23             Let's turn to the third disclosure, the unsent

24      disclosure.  Mr. Smyres testified that this unsent disclosure

25      should have been sent.  He said, I don't know 100 percent, but

1   I assume so, about it's being sent.  But you heard John Garry,

2   Lisa Suarez, and Richard Essig all testify unequivocally that

3   the publishers had never received this disclosure.  It was only

4   found during the course of this litigation.

5        What is the defendants' explanation for buying books

6   from Best Books World in 2008, in July of 2008?  So what

7   Mr. Smyres said is, well, he had just signed an agreement and

8   it gave him the right to send copies of the books to publishers

9   to have them checked out.  And he said he thought that they

10  would be able to inspect them as well.

11       Well, before he ever sends anything to the publishers

12  he says to Best Books World, we now doubt that any of the books

13  that you recently sent are legitimate copies.  So he knows

14  absolutely that the books that he had received in July 2008

15  were counterfeit.  And, yet, his response to Best Books World

16  is, I am going to send them back -- I am going to send them to

17  the publishers unless you agree to give us a refund.  Best

18  Books World says, well, no.

19       What does he do?  He sends them to the publisher, but

20  he only sends three.  He only sends three out of nine titles.

21  Two are confirmed counterfeit.  The third he is told it's

22  likely counterfeit.

23       And what does Mr. Smyres do?  He doesn't send all of

24  them back.  He only sends part of them back.  And Mr. Smyres'

25  explanation for that on the stand during this trial was, well,

 1    I thought some of them were authentic.  That's what he said.

 2    That's what he testified to.  That's entirely contrary to his

 3    e-mails where he repeatedly said he didn't think any of the

 4    books were authentic.  So that's just a new story that he has

 5    put forward now.

 6           Then we heard another witness get up and say,

 7    sometimes we don't get the number of books shipped that we

 8    ordered.  The orders are often not fulfilled the way they are

 9    supposed to be.  Did we see a single e-mail during the whole

10    course of all these e-mails, all the back and forth on this

11    July 2008 e-mail, did we see a single e-mail which said, by the

12    way, you didn't ship us what you told us you were going to ship

13    us?  No.  Not a single one.

14           Let's turn to the Blackerbys.  Mr. Smyres testified

15    that he never knew that the Blackerbys had been sued by the

16    publishers for selling counterfeits.  The testimony is right

17    here:

18    "Q.  You knew he was sourcing from overseas, but you never

19    asked him from whom you were getting the books, right?

20    "A.  No, I never did that.

21    "Q.  And he never told you from whom he was getting the books?

22    "A.  No.

23    "Q.  And you never bothered to check whether the Blackerbys had

24    been sued, is that right?

25    "A.  No, I didn't check."

1              Well, let's compare that to Mark Blackerby's testimony

2     that was read to you; Mark Blackerby, who doesn't have a stake

3     in this litigation:

4     "Q.  So you knew that Mr. Smyres had previously been sued for

5     copyright infringement by the book publishers?

6     "A.  At some point during our relationship that came out.

7     "Q.  And, similarly, he was aware that you and your brother,

8     Perry Blackerby, had been sued along with a bunch of others by

9     the book publishers for copyright infringement?

10    "A.  At some point during our relationship that came up.

11    "Q.  So you knew that the other had been sued at some point in

12    time for copyright infringement?

13    "A.  That is correct, sir."

14             Those two sets of testimonies, one of them is not

15    right.

16             After the publishers send a cease and desist letter to

17    the defendants, what do they do?  They deny, deny, deny.  You

18    saw each of the different letters that were sent by defendants'

19    counsel to the publishers.  They knew they had counterfeits

20    they had been pulling off their shelves, they had customer

21    complaints, they had been terminated by their wholesalers.

22    They knew all about this.

23             What do they say to the publishers?  My client is

24    unaware of selling or otherwise distributing any pirated or

25    otherwise unauthorized copies of any books whatsoever.

I44MWIL4                    Summation - Mr. Oppenheim

1    Couldn't be more false.  Their own e-mails say they imported

2    them.  They sold them.  And they did that not once, but four

3    times.

4          Mr. Smyres then testified, well, we don't actually

5    import the books.  Well, let's think about that.  Mr. Smyres

6    was then showed a PIERS report.  And that PIERS report shows

7    his company, S Rock Paper Imports, which he indicated in his

8    testimony was created exclusively for the purpose of importing

9    books, repeatedly was importing books from Bangkok during the

10   period of time of 2008 to 2010.  And this is just one snapshot.

11   So Mr. Smyres' testimony that they are not importing is not

12   true.

13         We heard testimony about Follett terminating the

14   defendants' accounts.  But what was the defendants' response to

15   Follett?  Well, they had a phone call.  And during that phone

16   call Mr. Gordon said:  Our account, as well as Buckeye's, is

17   being cancelled.  I told him, Follett, probably didn't know

18   that they were counterfeit.  He seemed to question that, since

19   other buyer had sent them books that they supposedly got from R

20   us, Textbooks R Us, that were also counterfeit.

21         Their response to Follett is, we probably didn't know

22   they were counterfeit.  Did Follett believe that?  No.  Well,

23   they then have a formal back and forth, more lawyerly.  Both

24   Follett and Texas Book had sent legal letters, reached out to

25   the defendants to say, you had sent counterfeit books.

1           What did the defendants say in response to that?

2     Mr. Smyres wrote the e-mail.  He says, I was dismayed by your

3     remarks.  Dismayed?  Again, he knew he had been selling

4     counterfeits.  He pulled them off his shelves.  He had imported

5     them.  He had returned them.  And he tells Follett in Texas

6     Books, I was dismayed.

7           Then he says, we vigorously examine every shipment of

8     purchased books before distribution in order to determine the

9     product's quality and origin.  Well, we heard lots of testimony

10    about the defendants' inspections and we are going to talk

11    about that in a few minutes.  But just recognize, this e-mail

12    was sent, this letter was sent July 5, 2011.  And defendants

13    testified that they didn't even start the formal inspection

14    process until 2013.  So here he is telling Follett and Texas

15    Book, we inspect everything.  But that wasn't true.

16          Mr. Smyres at this point says to Best Books World, we

17    can track each and every book you sold to Textbooks R Us.  This

18    is an interesting claim because, again, they don't have any

19    identifiers on the books.  Let's take him for his word at it.

20    And what was the response by Ple?  Next slide, please.  You buy

21    books from many sellers.  I cannot responsible, but I am sure

22    all my books are not responsible.

23          Well, she is saying, well, you could have gotten those

24    from other people.  This is key because this defense by Best

25    Books World is exactly what Mr. Smyres and the defendants have

1   said to Texas Book, has said to Follett, that has said to this

2   jury in this court.  He didn't buy it when it came from Best

3   Books World and you shouldn't buy it when it comes from him.

4            Let's talk about destruction.  The 2008 settlement,

5   Mr. Smyres' testimony was that there was leftover inventory

6   after the 2008 settlement and he was told by the publishers to

7   destroy that inventory, and that's why he destroyed inventory

8   later in time.  That was interesting testimony because Richard

9   Essig, who took the stand, the gray-haired gentleman from

10  Pearson who has been with the company for 460 years, I think.

11  Joking.  Mr. Essig says:

12  "Q.  Do you recall ever telling a distributor to destroy

13  counterfeit testimony?

14  "A.  No, I don't recall.

15  "Q.  To your knowledge, have you or the publishers with whom

16  you worked together on enforcement ever instructed the

17  defendants to destroy books in their possession that are

18  counterfeit?

19  "A.  No, not to my knowledge."

20            One of these two individuals is telling the truth.

21            Let's turn to the larger issue of the destruction of

22  evidence.  There are five different destruction events.  I know

23  you have heard a lot about destruction during this trial, but

24  let me try to break it down for you.

25            The first one is July 2011 destruction of the books

1    that had been put in the barn.  The second is May 2012, the

2    destruction of the books that had been leftover in the barn.

3    You heard about that from Mr. Davenport's deposition this

4    morning.  There is the early 2013 destruction of two carts of

5    books.  There is the April 2013 policy that they are just going

6    to destroy.  And then there is destruction of a book at issue

7    in the case in October 2016.

8           Let me break those down quickly for you.  In July of

9    2011 -- it's important to understand how this evidence comes

10   together here, and this is one of those instances where you

11   hear evidence from different people and the timeline doesn't

12   necessarily come out clearly.  Let's put it together here now

13   because it's very clear.

14          The defendants claim they destroyed the evidence, the

15   books, the counterfeit books, on July 11, 2011, and they say

16   that they had not been on notice yet.  They didn't know.  Well,

17   that's not true because on June 29, two days before the

18   destruction, they get an e-mail from Mark Blackerby saying that

19   Perry Blackerby is meeting with the publishers about

20   counterfeit books and that Follett had turned him in.

21          The defendants know that Follett has counterfeit books

22   from them.  Follett has raised the issue with them.  What did

23   the defendants think?  It's obvious what they think.  Follett

24   is going to turn us in.  Perry Blackerby is going to turn us

25   in.  We have got all these books that we have put in the barn.

1   We better get rid of them.  And that's what they did.

2              What their testimony was, well, we didn't want them to

3   be sold, so that's why we destroyed them.  The books were

4   already in the barn.  They weren't selling out of the barn.

5   Why did they have to then destroy them?  We could reasonably

6   ask the question, why did they put them in the barn in the

7   first place, which is a question I will ponder for many years.

8   I expect that what happened is, they wanted to hide them.  But

9   we don't know.  What we do know is their excuse for taking them

10  to the dump and destroying them does not hold any water.

11             Mr. Mandel in his opening statement said, look at

12  these pictures.  Is this something that a business would do if

13  they were trying to hide it?  I suppose.  But that's not what

14  Mr. Davenport said in his testimony.  You heard this morning, I

15  took the pictures because I was destroying the books in a way

16  different than what Mr. Smyres had told me to do.  Mr. Smyres

17  had told him to pour water over the books, and he had decided

18  instead to take them to a dump and run over them.  That's why

19  he took the pictures of them, not because they wanted to have a

20  record that they had done something that was righteous.

21             The defendants receive the cease and desist letter

22  from the plaintiffs in August of 2011 and they know they have

23  to preserve evidence.

24             What happens then?  We heard about this this morning

25  from Mr. Davenport.  Roughly eight months after the cease and

1    desist letter comes, Davenport testifies that when he is called

2    by Mr. Smyres -- excuse me.  The defendants realize that they

3    have failed to destroy all the books.  Several boxes of the

4    books were left in the barn.  We heard the unfortunate story of

5    Mr. Davenport's son trying to sell some of them back to

6    Mr. Smyres' store.

7         But what happens then is really interesting.  Because

8    Noah Davenport didn't take all the books to the bookstore, so

9    there were still boxes left in the barn.  They know --

10   Mr. Davenport testified he knows that they at this point have

11   been sued.  He doesn't mean sued.  He really means they

12   received a cease and desist letter.  He knows there is a

13   litigation threat from the publishers.  He testified to that.

14        What does he do with those two boxes of books?  He

15   throws them away.  Now, does he do this without talking to

16   Mr. Smyres?  No.  He testified that he called Mr. Smyres and

17   Mr. Smyres' reaction was, he was really upset and he was really

18   upset because of the publishers.  That's what Mr. Davenport

19   said.  Mr. Smyres knew that the publishers had sent a cease and

20   desist letter and he realized that the fact that those books

21   had not been destroyed was a problem for him.  And then

22   Mr. Davenport testified that Mr. Smyres was happy when he

23   learned that the rest of the books, those extra boxes, had been

24   thrown away.

25        So in 2013, the defendants actually articulate what

1    their destruction policy is.  They basically say whether

2    buyback or bulk, if it looks counterfeit, they set it aside and

3    destroy it.  That's what they have in writing.

4           They took the stand and they said something different.

5    They say, no, no, no, we don't really mean that.  That wasn't

6    really our policy.  But there are no e-mails to support that.

7    It's just them orally getting up and saying that.  What we do

8    have is written testimony.  Remember what I said at the

9    beginning of this case.  This case is about what the defendants

10   did, not what they say.  This e-mail is what they did, not what

11   they say.

12          There were then two other instances of destruction.

13   In 2013, you saw an e-mail where the defendants had a very fake

14   book and Mr. Cahill says, can you keep it?  I want to see it.

15   The response is, it's already been disposed of.  That's long

16   after the publisher's cease and desist letter.

17          Then in 2016, they actually destroyed a title which is

18   at issue in this case.  Their response is, oh, it was somebody

19   else's, some company called Bookfari, whoever that is.

20          Do you think if it's in their possession and they have

21   been sued for counterfeits on that title that they should be

22   permitted to just destroy it and say, oh, it wasn't ours?

23          Why does destruction matter?  Destruction matters

24   because that's evidence, evidence that the defendants denied

25   the plaintiffs, evidence regarding the potential importation

1    and sale of counterfeits.  We don't know what they destroyed.

2    We can't.  They didn't keep a log.  By the way, who does that?

3    You've got a complex inventory system.  You've got to know

4    what's on your shelves if you are running a business like this.

5            If you are pulling books off the shelf and destroying

6    them, what are you doing in your computer system?  You can't

7    just take hundreds and hundreds and hundreds of books out of

8    your inventory system, not put it in your computer and think

9    that's going to work.  But they say they kept no logs, so we

10   have no record of what was destroyed.  They believe, well,

11   that's too bad.  That's why there is an adverse inference

12   instruction being given to you because you get to presume that

13   they denied us critical evidence.

14           I want to talk about their training.  The defendants

15   have made a big deal about training.  Frankly, I can't figure

16   out what their story is.  On the one hand they say, we can't

17   tell if a book is counterfeit.  We are not experts.  How many

18   times did we hear that over and over again?  That's why we

19   called them questionable.  We are not experts.  If a

20   counterfeit book got through, it's not our fault because how

21   could we possibly tell?  Mr. Mandel stood up in front of you in

22   the opening statement and said, can you tell?  He couldn't

23   possibly tell.  Then Mr. Dimm gets up and he literally gave you

24   a lesson on how to identify a counterfeit book.  Which is it?

25   Can you tell or can't you tell?

1          It's convenient for them to have both stories because

2     the first story let's him say, it's not our fault if it gets

3     through.  And the latter story that they do know is we do

4     everything possible.  You can't have it both ways.

5          Let's skip ahead, please, to slide 53, outreach.  I'm

6     apparently running short on time.

7          Defendants claim that they reached out to the

8     plaintiffs and they really, the Blackerbys, they really wanted

9     help.  They offered to let us into their warehouse.  They

10    wanted help, they wanted help, they wanted help.  We heard that

11    over and over from Mr. Smyres.

12         You heard several things here.  One is in a settlement

13    agreement that a right to send books and to be identified as

14    counterfeit.  They did that once.  Once.  Never again.  They

15    had the right to do it even outside of the settlement agreement

16    because you heard all kinds of other distributors do that all

17    the time.

18         And then you saw a critical letter from the plaintiffs

19    that the defendants didn't show you and that was this April 26,

20    2013 e-mail to their counsel.  This is literally a step-by-step

21    process of the things the defendant should be doing to avoid

22    counterfeits.  They should understand the true source of the

23    books they buy.  They should do due diligence, like any

24    legitimate business.  They should not be surprised when they

25    get pirate product when they buy at below-market pricing.  They

I44MWIL4                    Summation - Mr. Oppenheim

1    should ask suppliers for documentation to demonstrate the

2    legitimacy of the product.  Nothing is shocking in here.  But

3    to the extent that the defendants are saying they got no

4    guidance, it's here.  If they had followed these instructions,

5    they probably wouldn't have the problems they have now.

6          Now, the defendants say, you know, the best practices

7    are a recent occurrence.  We are going to talk about the best

8    practices in a minute.  But these principles in this letter in

9    2013 are very similar to the best practices.  The defendants

10   were told what to do.  And, by the way, the defendants were

11   told that the plaintiffs would be happy to come to work with

12   them in their warehouse if they would start by identifying

13   their overseas shipments for us to inspect first.  The

14   defendants didn't want to do it that way.

15         Let's turn to the defendants' practices.  The

16   defendants do have policies and procedures on how they should

17   deal with counterfeits.  It's PX 288.  It's got their masthead

18   and how to tell it's counterfeit.  It starts with the sentence:

19   These policies and procedures clarify and memorialize the

20   company's existing policies and procedures.

21         Let's talk about those policies and procedures for a

22   minute, please.  The policies and procedures say they should

23   remove questionable books from the book stream.  They don't do

24   that.  The policies and procedures say they should make a

25   good-faith effort to know from whom they are buying.  They

1     certainly don't do that.  It says that they should maintain

2     true name and address of sellers.  They don't do that.  It says

3     they should exercise due diligence to avoid purchasing from

4     sellers likely to sell counterfeits.  Boy, they don't do that.

5     It says that they should inspect books upon arrival if from a

6     source other than the publishers.  They try to do that.  They

7     don't do it right because they don't compare to an exemplar

8     when it comes in, but they try.  It says they should ask

9     sellers questions to be comfortable with their sourcing.  They

10    don't do that.  They should obtain a certificate of marketable

11    title or agreement.  Books are legitimate.  The defendants'

12    testimony on that was, that's not a useful document because if

13    somebody is going to sell any counterfeit books, they are going

14    to send in counterfeit books, whether they sign it or not.

15    That may be true, but this is their policy.  We didn't write

16    this.  They did.  They are not abiding by their own policy.

17    They say their own policy doesn't make sense.  And then it says

18    consult the publishers if in doubt.  They don't do that.

19            Let's turn to the best practices.  Best practices.

20    The publishers have worked with the rest of the industry to

21    promulgate it.  Almost everybody else you have heard is getting

22    on board and adopting the best practices.  They are simple

23    concepts in these best practices.  The defendants will not

24    adopt them.  Simple things that says, because of the risk of

25    obtaining counterfeit increases when acquiring inventory from

 1   anonymous sellers, you should require accurate identifying

 2   information.  You heard that this counterfeiting problem is

 3   continuing and you saw the letters that have been sent

 4   recently.

 5          I'd like to turn to the legal claims, please.  So,

 6   there is a breach of contract claim in this case.  The Court

 7   has already found there is a binding contract.  The issue is

 8   whether or not defendants violated their promise not to import

 9   or sell or assist others to import or sell pirated editions of

10   plaintiffs' textbooks.  I believe this one will be easy for

11   you, ladies and gentlemen.

12          You are also going to be asked to come to a verdict on

13   copyright and trademarks trademark claims and the elements that

14   the plaintiffs have demonstrated is, we own -- the Blackerbys

15   own or have exclusive license to all of the copyrights or

16   trademarks.  They have registered them and shown that the

17   defendants have imported or sold counterfeit copies of these

18   titles or reproduce their trademarks.  We do not have to prove

19   that they had knowledge or intent with respect to these claims.

20          You will be asked to decide whether their infringement

21   was innocent, normal or willful on the copyright side or just

22   normal or willful on the trademark side.  There is no such

23   thing as innocent infringement on the trademark side.

24          The innocent infringer provision, you will find out,

25   does not even apply in the copyright situation.  Because if the

1    copyright owners put a registration mark on the book and the

2    defendants had access to it under the law, they don't get the

3    benefit of innocent infringer defense.  So that will be easy

4    for you.

5           The question is whether their conduct was willful.  I

6    think that you will find this is easy because willfulness is

7    defined as did they act intentionally, did they act with

8    reckless disregard, or did they act with willful blindness?

9    And I think all three of those are met.

10          The statutory damages ranges that you will be allowed

11   to assess from the copyright side will be between 750 to

12   $30,000 per title.  Not per book, not per case; per title.  And

13   if you find that it's willful, that $30,000 ceiling goes up to

14   150,000.  If you find it's innocent, you can go down to 200.

15   On the trademark side you get to assess between a thousand and

16   200,000.  And if you find that it's willful, it goes up to $2

17   million per mark.

18          I believe that there will be little doubt in your mind

19   that the plaintiffs have demonstrated that they own the

20   copyrights and trademarks in this case.

21          Let's turn to the roadmap, please.  The evidence of

22   defendants' infringement is extensive.  Plaintiffs have put

23   forward evidence that includes direct purchases from the

24   defendants, defendants' own inventory, defendants' wholesale

25   customers, defendants' individual customers, and defendants'

 1    suppliers.

 2              The defendants will erroneously want you to look just

 3    at the specific books in this case.  Those books are just

 4    examples.  The question is, did they distribute a counterfeit

 5    copy of that title?  The plaintiffs could succeed on their

 6    claims without having a single book in this courtroom if we had

 7    evidence to show that it was more likely than not that the

 8    defendants had distributed a counterfeit copy of that title.

 9              Let's talk about more likely than not.  The Court has

10    already and will instruct you more on the issue of

11    circumstantial versus direct evidence, but understand this.

12    There is no greater weight to direct evidence than there is to

13    circumstantial evidence.  Where there is smoke there is fire.

14    Smoke is as much evidence as fire is.  If the defendants say,

15    they can't show a sales receipt or they can't show a witness

16    who saw a book being distributed, we don't need that direct

17    evidence.

18              We have talked about the preponderance of evidence

19    standard.  It means more likely than not.  Do we have a

20    feather's worth more evidence than the defendants.

21              Let's go to the buckets, please.  The defendants put

22    forward roadmap buckets.  They had five different buckets.

23    Here is what's interesting about this is that they have these

24    five buckets and they have got all their evidence.  Did you

25    hear a single witness for the defense get up and say, we did

1    not import or distribute a counterfeit copy of that book?  Let

2    me say that again.  They didn't have a single witness testify

3    that they didn't do it.  So all they want to do is say, you

4    didn't see a receipt for this, you didn't see a receipt for

5    that.

6            Let's go through it.  Let's start at their fifth

7    bucket.  When they first put this on in their opening statement

8    and they called it titles with any evidence, I didn't

9    understand what they meant.  What they really mean is titles

10   with evidence.  They are acknowledging for these 43 titles,

11   there is evidence.

12           Let's just move on.  Let's go to the second bucket.

13   Excuse me.  The fourth bucket.  These are titles that are found

14   in multiple inventories.  There are 35 titles in this bucket.

15   Slide 93, please, or thereabouts.  Let's look at a couple of

16   examples of this.  Let's start with title 20.  This is an

17   example of one of these books.  This is a book, International

18   Economics, where two plaintiffs -- there are two purchases by

19   the plaintiffs from the defendants.

20           Are we at Title 20, please.

21           Child Family School Community Socialization and

22   Support.  There is three critical pieces of information here.

23   MBS turned over a copy, counterfeit copy of this book.  Follett

24   indicated they had received a counterfeit copy of this book

25   from the defendants.  And the defendants had a copy in their

1    possession.  You see that Best Books World sold them 638 copies

2    and sold them new for 37.31, pretty low price.  Here, they

3    reported that they purchased 652, but they sold 808.  That

4    doesn't make a lot of sense, but let's move on.

5         Let's go to another title, please.  Title 45.  This is

6    another example of this bucket.  Here, again, there were books

7    found in the defendants' possession and Mr. Blackerby, who had

8    been selling the books to the defendants, had counterfeit

9    copies in his possession.  By the way, there are e-mails,

10   defendants' customer identified and returned 20 alleged

11   counterfeits purchased from defendants.  They have e-mails

12   where their own customer returned counterfeit copies.  So they

13   want to say, there is not a shred of evidence here.  Their own

14   e-mails show it.  Again, they bought copies from Blackerby.

15   who we all know at this point was a counterfeit source.

16        Let's go to the next bucket, please.  Titles found in

17   third-party inventory.  Let's look at a couple of examples of

18   this.  These were books that were turned over from their

19   customers.  So MBS turns over a book.  It's a counterfeit copy.

20   Let look at this.  So they bought from Best Books World, Ple

21   sales, and Blackerby large quantities.  That alone is enough.

22   They imported from a known counterfeit source this book.  But

23   then you see that they sold it to MBS, right, shortly after the

24   purchase, and then MBS turned it over to us.  They want to say,

25   you can't show it was the exact same book.  Is it more likely

1   than not that that book came from the defendants?  I think

2   there is no question that it is.

3          Next.  Let's look at another one, Modern Radio

4   Production.  This one was turned over also by MBS and this is a

5   book that -- Blackerby, when he settled with the plaintiffs,

6   turned over counterfeit copies.  Here it shows they bought from

7   both Best Books World and Blackerby, and they bought on

8   December 23, 2010.  They sold three months later to MBS.  MBS

9   turns over a counterfeit copy.  Defendants want to say, there

10  is no receipt that shows that specific book.  It came from the

11  defendants.  Is it more likely than not?  Of course it is.

12         Let's go to the next bucket, please.  Let's take a

13  moment.  Let's talk about what Follett said.  You heard

14  Follett's testimony.  And that Follett testimony was telling.

15  Follett was asked:

16  "Q.  So you know for a certainty, at least, that many came from

17  used book exchange were counterfeit?

18  "A.  Yes.

19  "Q.  Was there a past history of significant infringement?

20  "A.  Yes.

21  "Q.  And beyond the history of infringement, you know for

22  certainty that some of the counterfeits book that you had

23  received in 2011 had come from the defendants' accounts, is

24  that right?

25  "A.  Yes."

1            Is it more likely than not that these books came from

2    the defendants?  Of course.

3            Let's talk about what MBS said.  They were asked the

4    question:

5    "Q.  Mr. Daniel, you know for a certainty that Mr. Smyres and

6    his companies have provided some counterfeit books to MBS,

7    right?

8    "A.  I believe that is true, yes.

9    "Q.  And that's why you viewed Mr. Smyres and his business as a

10   risky buyer, risky suppliers, right?

11   "A.  Correct.

12   "Q.  And the reason that Mr. Schuppan thought that Mr. Smyres

13   was dirty was because of those facts, right?

14   "A.  I believe so.

15   "Q.  And when Mr. Schuppan used the term dirty, you understood

16   that to mean that Mr. Smyres and his companies were likely

17   supplying counterfeit books, right?

18   "A.  Possibly supplying counterfeit books, yes."

19           Let's go to the second bucket.  These are the books

20   that were found in defendants' possession that were

21   counterfeit.

22           Let me give you an image for a minute.  I just bake a

23   batch of cookies.  I put them in a cookie jar.  I leave them

24   out.  I have a kid.  Kid got a sweet tooth.  Kid has got a past

25   history of stealing cookies.  I go down to the cookie jar and

1    the kid is sitting there.  There are only two cookies left in

2    the cookie jar and there are crumbs all over the kid's face.

3    What am I going to think?  I know my kids.  My kid ate the

4    cookies.

5             Mr. Smyres and the defendants are sitting in

6    counterfeit books and they want to say, well, we didn't

7    distribute them.  You saw the records.  Did they buy those

8    counterfeits in ones and twos?  No.  They bought them in bulk.

9    If there was one, two, even 10 left, that was not all they

10   imported and all they sold.

11            THE COURT:  Mr. Oppenheim, please begin to conclude

12   your summation.

13            MR. OPPENHEIM:  The five books for which there is no

14   counterfeit book, those are the best.  Those are the ones where

15   the e-mails show Mr. Smyres sending the counterfeit books back

16   to Ple in July 2008.  So defendants say there is not a shred of

17   evidence.  I think when you admit that you imported, sold, and

18   then sent back counterfeit books, that's a shred of evidence.

19            We had a classic battle of the experts in this case.

20   We had two financial guys get up and disagree about numbers.

21   They agreed about two numbers, however.  One, they agreed on

22   the defendants' revenues.  For the period 2008 to 2016,

23   revenues of $783 million.  That's a boatload of money.  This is

24   not a mom-and-pop shop.  This is a business that can't say, you

25   know, we don't have policies and procedures.  We don't do

1    things that way.  You make that kind of money, you got to run a

2    legitimate business.

3            The other figure that they didn't dispute was

4    Mr. Smyres' salary and profits, $47 million between 2008 and

5    2016.  Experts didn't disagree on that.  As you consider what a

6    just amount of damages is, we ask that you consider whether

7    it's appropriate for Mr. Smyres to do business the way he does,

8    destroy evidence, flout court orders, and still walk away

9    having put $47 million in his pocket for that period of time.

10           Now, the experts did disagree on how much money the

11   defendants as a whole made.  Our expert said 53 million.  Their

12   expert said 31 million.  I have no doubt our expert was right.

13   And you saw the cross-examination of their expert and hopefully

14   you agree that Mr. Steinmetz was correct and Mr. Quintero was

15   not.  But does it really make a difference, 31, 53 million?

16   They are making a ton of money off of these counterfeits.

17           Among the factors that you will be asked to consider

18   is deterrence.  This is the most critical factor in this case,

19   I think because in this case the publishers have done

20   everything they can do.  They sued them in 2007.  They settled.

21   They got an agreement.  They wouldn't do it again.  They said,

22   send us books if you don't think they are counterfeit.  They

23   did once.

24           They find them again.  They send a cease and desist

25   letter.  They get lied to over and over again.  They finally

I44MWIL4                     Summation - Mr. Oppenheim

1   sue them again.  They are in litigation.  They keep getting

2   counterfeits.  We have to sue them again.  That's why we have

3   two cases together here.  We are still in litigation and we are

4   still getting counterfeits, and you see we are still sending

5   cease and desist letters to them.

6           Deterrence.  There has to be a time and a way to send

7   a message to the defendants, enough is enough.  This isn't just

8   about the defendants making money.  Our educational system

9   relies on this.  Our academics rely on this.  These are

10  American companies that do critical things for us.  We have an

11  obligation to protect intellectual property, not to steal from

12  it.

13          There are 142 copyrights and 10 trademarks at issue in

14  this case.  We believe that the evidence we have presented is

15  unequivocal, and even to the extent that the defendants argue

16  there might be a lack of evidence here or there.  You have the

17  benefit of the adverse instructions that the judge is going to

18  tell you about and you get to say, well, maybe the plaintiffs

19  don't have a little piece of evidence there or a little piece

20  of evidence there, but the reason is the defendants not only

21  destroyed evidence, but they refused to abide by court orders

22  to turn over information.

23          So you get to consider all that and we think that

24  there is no doubt, no doubt whatsoever that the defendants not

25  only infringed all of these copyrights and all of these

1    trademarks, but they did it willfully.  Look at the e-mails.

2    Look at their course of conduct, not what their lawyers say.

3    Look at what they did.

4            We believe that an award at the highest end of the

5    spectrum is appropriate because anything less will send a

6    message to the defendant, OK, it's just the cost of doing

7    business.  It's just something that unfortunately happens from

8    time to time.  We would ask that you think long and hard about

9    what message needs to be sent to the defendants.

10           THE COURT:  Mr. Oppenheim.

11           MR. OPPENHEIM:  Can I just say thank you?

12           THE COURT:  Yes.

13           MR. OPPENHEIM:  On behalf of the authors, the

14   employees, the shareholders and the publishers, and my whole

15   team, we want to thank you and the Court.  It's been a long two

16   and a half weeks.  We appreciate all of the time and energy

17   you've put into this and your patience.  So thank you very

18   much.

19           THE COURT:  Members of the jury, we have concluded the

20   first of the closing arguments that you are going to hear

21   today.  After you have a luncheon recess you are going to hear

22   from Mr. Bhandari on behalf of the defendants, and then you

23   will hear a brief rebuttal from Mr. Oppenheim.

24           For now, keep an open mind and come to no conclusions.

25   You are going to have lunch together.  You can talk about

I44MWIL4

```
 1   anything except this case, the odd start to the baseball
 2   season, and there is somebody who is sort of an expert on the
 3   jury in that regard.  Who knows whether the games will even be
 4   played today.  But just don't talk about this case.
 5            We are going to reconvene in about 30 minutes, and we
 6   will bring you back out and you will hear the next closing
 7   argument.  Then we will take our short recess.
 8            Please recess the jurors.
 9            (Jury not present)
10            THE COURT:  Are there any issues counsel want to
11   raise?
12            MR. GLUNT:  None from us, your Honor.
13            THE COURT:  Why don't we plan to reconvene at 1:30 and
14   we will proceed from there.
15            Have a good but quick lunch.
16            (Luncheon recess)
17
18
19
20
21
22
23
24
25
```

I44VWIL5

```
 1                      A F T E R N O O N   S E S S I O N

 2                             1:31 P.M.

 3             THE COURT:  Everyone please be seated.

 4             Any issues before we bring the jury out?

 5             MR. BHANDARI:  No, your Honor.

 6             THE COURT:  Anything, Mr. Gould?

 7             MR. GOULD:  I think Mr. Oppenheim would appreciate one

 8    extra minute to join us.  I think he's very, very close.

 9             THE COURT:  Are there any issues?

10             MR. GOULD:  Not that I'm aware of.

11             THE COURT:  Fine.

12             MR. OPPENHEIM:  Your Honor, with your permission, my

13    colleague Scott Zebrak is going to join us at the table.

14             THE COURT:  That's fine.  Let's bring in the jury.

15             (Jury present)

16             THE COURT:  Good afternoon, members of the jury.

17             THE JURY:  Good afternoon.

18             THE COURT:  Members of the jury, I bet you're glad

19    that I decided to get you lunch today in the jury room.  I

20    assume you just saw that wall of water that came through from

21    the west.

22             In any event, we are going to turn now to the closing

23    argument for the defendants.  And so I ask that you give your

24    undivided attention to Rishi Bhandari, Esquire, as he delivers

25    his closing argument on behalf of the defendants.
```

1              MR. BHANDARI:  Thank you, your Honor.

2         All right.  Good afternoon, ladies and gentlemen of

3    the jury.

4              THE JURY:  Good afternoon.

5              MR. BHANDARI:  I hope you enjoyed your lunch.  I'm

6    going to be speaking for a little while.  And the reason for

7    that is at the end of this case, when I finish and you hear 20

8    more minutes of rebuttal from Mr. Oppenheim, you guys are going

9    to be back in the jury room; and you guys are going to be asked

10   to do three things when you're back in the jury room:

11             First, you're going to be told to answer certain

12   questions that Judge Pauley gives to you guys.  Second, you're

13   going to be told to follow the law that Judge Pauley explains

14   to you.  And third, before you answer those questions, each of

15   you is going to have to explain to each other why you are

16   answering the questions the way that you are.

17             So in this closing statement I'm going to spend the

18   next few minutes to go through some of the information you'll

19   need in order to explain the answers that you're giving to your

20   other jurors when you're in the deliberation room.

21             Now, the first question that probably a lot of you

22   have right now is why did the publishers bring this case?  Why

23   did they decide to sue Book Dogs?

24             You heard a lot of testimony and you heard

25   Mr. Oppenheim's closing argument just a few minutes ago.

1    Mr. Oppenheim talked for a little bit over an hour, and out of

2    that little bit over an hour, about 40 minutes or 45 minutes of

3    it or so was spent talking about things that happened between

4    2006 and 2011.  He just kept talking about 2006, there was some

5    activity that Mr. Smyres entered into with Ple and Book Dogs;

6    2008, there was more communications with Best Books World and

7    Book Dogs; in 2011 there was a counterfeit book that was

8    discovered from the Blackerbys.  And I'm going to address that

9    stuff.  I am going to address those specific allegations about

10   Best Books World and the Blackerbys a little bit later in my

11   closing statement.

12           But the real question you're probably asking yourself

13   is why are we here in 2018 hearing about a bunch of stuff that

14   happened in 2006 to 2011?  Probably another reason you guys are

15   asking that question is because you heard there was a lawsuit

16   in 2007.  So why on earth would the stuff that was settled in

17   2008 be things that Mr. Oppenheim is talking about here today?

18           And the answer to that question, when people ask you,

19   Why did the publishers bring this case?  When you're back done

20   with your jury service, people say, What on earth was that case

21   about?  You'll be able to tell them, Well, the publishers have

22   a business strategy of trying to make sure that used

23   booksellers get slowed down in every way possible.  The

24   publishers want to make sure that the used book industry is

25   hobbled as much as it could possibly be hobbled.  So they sue

1   people.  They sue people all the time; they sue people even

2   when they don't have reasonable cases at all.

3        A third thing I'm going to do in this closing is I'm

4   going to talk about the proof that the publishers actually need

5   to provide to you in order for there to be liability for Book

6   Dogs.  You'll see that there is very little.

7        Mr. Oppenheim tried to dance around that by saying two

8   things:  First he said, Imagine a scale.  And on a scale, the

9   person who wins just has to be a feather more than the other

10  side.  Because Mr. Oppenheim knows and the book publishers

11  know, they barely have a feathers of evidence at all.  They are

12  not going to be able to prove a lot of the things that they

13  need to prove.

14        So why did they bring this case, when over an hour he

15  didn't spend one minute talking about the books that are

16  supposedly counterfeit, and he spent only a handful of moments

17  talking about the titles at issue?

18        And the answer to that is what you saw when the expert

19  testimony was on -- when Ron Quintero was on the stand

20  yesterday.  When Mr. Quintero was on the stand, you saw the

21  profits per book that Book Dog Books makes on all of its books.

22  It makes about $2 to $3 per book.  That's the profits per book.

23        Now, it doesn't matter if the publishers lose this

24  case; they've already forced Mr. Smyres to sit here for three

25  weeks.  You can imagine how long -- how much time it's taken

1    out of Book Dogs' operations, to spend five years litigating

2    this case.  You've heard about various discovery orders,

3    documents that had to be produced, his tax returns had to be

4    produced, he had to get audited by the publishers.  They have

5    already slowed down Book Dogs' operations.  And they know that

6    if Book Dogs is only making $2 per book, then how are they

7    going to do this every single time?  How can they possibly

8    continue to be in the used book business if they make $2 to $3

9    per book?  But the publishers can bring a lawsuit like this

10   anytime they want and it forces you guys to spend weeks of your

11   life listening to testimony in this case and it forces Book

12   Dogs to be much slower.

13           Here are some facts we know about Book Dogs:

14           As Mr. Mandel told you in the opening statement, since

15   2008, Book Dogs has sold 1,081,432 titles.  It might be a

16   little bit higher today; it's been three weeks since this trial

17   started.

18           And what do we know about this case?  There are 161

19   questionable titles that are at issue in this case.

20           Book Dogs is not manufacturing counterfeit books.

21   Book Dogs is not intentionally distributing any counterfeit

22   books.  Book Dogs is a very, very successful used bookseller.

23   You saw the reviews that were up on the stand when Mr. Essig

24   was there.  There were 400-and-something-thousand reviews of

25   customers who were 95 percent positive reviews.  There was Apex

1    sellers which had another 400-something-thousand reviews where

2    it was 96 percent positive reviews.

3         Book Dog Books is a very successful used bookseller.

4    And if you want to talk about the educational system, school is

5    expensive.  Books are expensive.  And for the reasons you heard

6    the publishers talk about, they make sure the price of books

7    keeps being high.  How do they do that?

8         Well, can you guys think of any other products where

9    you don't really get to pick the book that you're going to use

10   for a classroom; an instructor picks the book.  And you heard

11   the testimony from Mark Dorman, the advisor to the CEO of

12   McGraw-Hill, that one of their major marketing activities is

13   just trying to get the professors to adopt books.  Because once

14   they convince a professor that a book is going to be assigned,

15   students have to buy it.  When you're told you have to buy a

16   book, the price can be $300, $400 for a book that only costs

17   $12 to publish.

18        We also heard from the booksellers -- from the

19   publishers that the cost of books overseas is considerably

20   less.  What other industry is exactly like that?  The

21   healthcare industry.  You don't get to pick what drugs a doctor

22   decides to prescribe to you.  And when you have to get a drug,

23   you have to get a drug.  So drug prices in the United States

24   are sky-high.  Drug prices in other countries are not so high,

25   because the government over there is trying to make sure that

1     their people don't get -- don't have to pay those sky-high

2     prices or they can't afford those prices in other countries.

3            The booksellers do the exact same thing.  They know

4     that in other countries the educational systems won't pay that

5     amount, won't pay for the books for their students, won't pay

6     that amount, or they know the students can't afford it.  So

7     that is why they are bringing this case.

8            Since 2011, Book Dogs has sold or rented approximately

9     14 million books.  Out of those 14 million books, there are

10    approximately 500 to 700 books here in this courtroom.  The

11    percentages are staggeringly small.  But they've told you

12    repeatedly this is just the tip of the iceberg.  If you only

13    knew how bad Book Dogs is when they are really acting -- when

14    they are acting in their regular course of business, if you

15    only knew how bad they were, then you would want to punish Book

16    Dogs.

17           Well, there was one document that we saw that was an

18    audit report that was put into evidence, it is Plaintiffs'

19    Exhibit 341.  You heard testimony from Mr. Singh about it

20    today; you heard Mr. Essig talk about it a few days ago.  And

21    that was the publishers got to choose all the books that they

22    wanted to audit from Chegg.  They did several audits of 64,000

23    books.  Out of the 64,000 books that the auditors picked, they

24    said we want all of Book Dogs' books; pick every single one of

25    the Book Dogs' books that you have in your inventory, Chegg,

1    and let's see how many of them are counterfeit.

2            This is what they found out.

3            All the Book Dog Books were examined.  Richard Essig

4    testified that the Chegg spreadsheet refreshed his recollection

5    that 4400 Book Dog books were audited, and 50 of the books were

6    originally flagged as suspect.

7            Now, you might remember or you can verify it yourself

8    with the evidence if you want, but ten of those books were *The*

9    *Art of Public Speaking*.  You might also remember that Steven

10   Rosenthal from McGraw-Hill said *The Art of Public Speaking* is

11   not in this case.

12           One of those books was *Campbell Biology in Focus*.  You

13   might remember that Diane Peirano -- Richard Essig said Diane

14   Peirano made a mistake when she said that *Campbell Biology in*

15   *Focus* was potentially counterfeit, so that book is not in this

16   case.

17           So the result of the Chegg audit showed that 39 out of

18   4400 books were suspect according to the publishers.  That's

19   .886 percent.

20           Now, why is that?  How can it be so low?

21           The reason it's so low is because you've heard the

22   testimony from all of these Book Dog employees.  They have a

23   culture where they take weeding out counterfeits really, really

24   seriously.  Everybody receives the training.  The training

25   manuals are updated frequently.  They develop these materials

1    on their own.  They do the classroom refresher courses twice a

2    year playing those games.  They purchase exemplars, they

3    respond to concerns from buyers, they flag and ban potential

4    sellers.  They update the master list, they've trained the

5    people who do the inspections for Amazon, those Noram people,

6    they do shelf checks.  They are constantly improving their

7    policies.  They reject counterfeits every single time.

8            That's an important point.  Every email you've seen in

9    this case regarding counterfeits is someone at Book Dogs

10   saying, We don't want counterfeits.  That is not evidence of

11   counterfeits; that is evidence of a culture that is very much

12   against counterfeits.

13           They invited the publishers to come and be on their

14   fraud operations team to try and weed out books.  There is a

15   culture of stopping counterfeits.

16           So when the publishers say actions speak louder than

17   words, that's exactly what this case is about.  Book Dogs'

18   actions speak very loudly.

19           You guys have all worked at different offices.  You

20   know when there's a company culture that encourages certain

21   things or is willing to turn a blind eye to certain things.

22   Some places say, Hey, we've got a diversity sensitivity

23   training, and then they'll give you a piece of paper and you

24   won't ever go back for ten years while you're working there.

25   Other places might say, Listen, we want to make sure that every

1    whistleblower in this company comes forward and speaks freely,

2    but then they don't have any trainings about it.

3         This company says, We want to weed out counterfeits.

4    And what do they do?  They have trainings twice a year and they

5    do all the other things we've said.

6         So if anybody asks you -- and as you know from the

7    testimony you've seen, these are all the different steps that

8    get taken in the current inspection process.  That's how the

9    rate of counterfeits that are getting through is so low for

10   Book Dogs.

11        Now, at the end of the day, here's the other piece of

12   information that you know:  It is impossible to stop all

13   counterfeits from getting through.  You remember the testimony

14   of Richard Essig which was played for you at the beginning.

15        Whoops.  Let's see if I can get that back.

16        (Video played)

17        MR. BHANDARI:  Ladies and gentlemen of the jury, you

18   heard that repeatedly from every single one of the publisher

19   witnesses who testified.  There is no book distributor out

20   there that can 100 percent weed out counterfeits.

21        I know what you're thinking.  Some of the people on

22   the jury are going to say, Well, it's not the publishers'

23   problem if you can't follow the law.  Why on earth should the

24   publishers be punished?  You should have to follow the law.

25   And you should have to do what needs to be done.

1                Ladies and gentlemen of the jury, we agree with that.

2     We agree with that 100 percent.  When the publishers were

3     talking about the fact that the legitimate booksellers are the

4     ones who are hurt by counterfeit distributions, that's Book

5     Dogs.  Book Dogs turns away counterfeits anytime it finds them;

6     it has to eat the cost of thousands and thousands of

7     counterfeits each year.  We want nothing more than for

8     counterfeits to be eliminated from the system.

9                But this case, there's two issues.

10                First of all -- and I'm going to get to this very

11    soon -- the publishers have not met their burden of proof with

12    regard to the 161 titles at issue in this case.  And I'll

13    explain that in a little bit more detail.

14                But second of all, even if you find that for some

15    small percentage of them they had, you know that Book Dogs has

16    been doing everything that it could possibly do to eliminate

17    counterfeits.

18                I'm going to give you an example.  Everybody in here

19    probably hates mosquitoes.  I know I hate mosquitoes.  No one

20    is going to say mosquitoes are a good thing.  So what do we do

21    when we are out in a park during the summer, or we're in

22    someone's backyard during the summer, eating a nice picnic, a

23    bunch of mosquitoes show up or you know that there's mosquitoes

24    in the area, you might use some bug spray, you get rid of some.

25    You might use a lot of bug spray.  You might use a zapper, you

1   get rid of some.  You might put up a mosquito net.

2              But you know what?  No matter what you do, no matter

3   how many precautions you take, there's not a single person in

4   here who can say you're never going to get bit by a mosquito.

5              And the idea that a company can be put out of business

6   or they should have to pay significant penalties because,

7   despite their best efforts to stop counterfeits from getting

8   through, a couple may have gotten through, it's a terrible idea

9   for the students, it's a terrible idea for the educational

10  system, and it is not what the copyright laws and the trademark

11  laws intend for people to do.

12             As Mr. Oppenheim talked about, there's a huge range of

13  damages.  The damages could go from $200 per book to $150,000

14  per book -- per title, excuse me.  $200 per title to $150,000

15  per title for copyright infringement.

16             Now, the things at the higher end of that are

17  obviously designed for the people who are manufacturing the

18  counterfeit books, the people who are really injecting them

19  into the system to begin with.  The medium amount will be for

20  people who are intentionally trying to do it.  The lowest

21  amounts are for the people who do everything they could

22  possibly do to stop counterfeits, and yet a couple of them

23  still go through.

24             Out of 161 titles you're going to see there's a tiny

25  fraction of them that it's even possible to argue that there's

1   some evidence.  If you were to find on those small number of

2   counterfeits going through, the damages must be on the lower

3   side, because there's nothing that can be done to eliminate the

4   problem altogether.

5        So understanding that, what were the arguments that

6   the publishers made at the beginning of this case?  First they

7   said, you know, it's true.  They understand.  There was no way

8   that you could say everybody who has counterfeit that slips

9   through their inspection process has to be hit with significant

10  damages or is even worth suing.  They know that's true.

11  There's no student -- even the students frequently send in

12  counterfeit books that they buy inadvertently.  No students --

13  according to the publishers, they cannot recall suing any

14  students.  You can't sue everybody for minor infractions.

15       But here they came up with this theory.  They said,

16  You know what Book Dogs is really doing?  Yeah, they have a

17  bunch of inspection processes in place, but they were buying

18  books at too-good-to-be-true prices.  Defendants were buying

19  $20 bills for $10 apiece.

20       That was probably a very convincing argument to a lot

21  of you during opening statement.  Everyone has probably been to

22  Canal Street and you see when there's Coach bags over there

23  being sold for $20, you know that there's something counterfeit

24  about those.  You know when you're buying a $20 bill for $10

25  there's something very counterfeit about it.

1          But let's look at what the truth is about books.

2     Books are different than $20 bills and different than Coach

3     bags.

4          We saw the testimony of Richard Essig, when he was

5     asked, How much cheaper are the Indian editions of those books

6     on average?  He said they cost about $12, for a book that would

7     cost about $100 in the United States.

8          What price is too good to be true for that?

9          Mark Dorman, the advisor to the CEO of McGraw-Hill,

10    gave the same testimony:  Is India one of the countries that

11    gets books for a lot cheaper?

12         Certainly is, yes.

13         And you also heard from Mr. Sampson yesterday, when he

14    was giving his video deposition:  Is there any rule of thumb

15    about how much a book should cost -- a used book should cost in

16    relation to a new book?

17         And he said no, there's no rule of thumb.

18         There is no evidence whatsoever of too-good-to-be-true

19    pricing in this case.

20         So ladies and gentlemen of the jury, when somebody

21    says to you, Well, of course Book Dogs knew that they were

22    buying counterfeits; they were buying it at too-good-to-be-true

23    prices, you will have to say to them, There's no evidence of

24    that at all.  Nobody even knew what the prices should be.

25         And the prices you saw, there was one email that came

1    in yesterday or last week -- sorry, it's a little bit of a blur

2    for me.  But there was one email that came in that said Book

3    Dogs was paying $128,000 to Best Books World in 2010 for a big

4    shipment of books.  That's not nothing.  This was like a

5    significant purchase of a big amount of money for books that

6    they thought were legitimate books and were very upset when

7    they found out they weren't.  They tried to return them to get

8    their money back.  There's literally no evidence in this case

9    that they knew that the prices were too good to be true for a

10   single title at issue in this case, for any book, let alone a

11   title at issue in this case.

12            So then this was amazing.  At the opening statement,

13   you heard Mr. Oppenheim say:  The defendants may say, Oh, the

14   publishers don't like used booksellers.  You will hear the

15   evidence that is not true, because used textbooks didn't start

16   out as used textbooks; they started out as new textbooks.  So

17   the publishers have no issue with used textbooks.  What they

18   have an issue with are counterfeits.

19            Then you heard Mr. Dorman say:  How do the publishers

20   view used books?

21            We like used books.

22            That's actually what he says under oath right in front

23   of you.

24            And then, about 80 pages later in the transcript --

25   that was on pages 125 of the transcript, about 80 pages later

1   you'll remember I was cross-examining him.  I said:  Did you

2   say that?

3           He said, Yes, I did.

4           Then we went through the McGraw-Hill annual report

5   where they have measure after measure designed to cut down on

6   the used book market.  And after he saw that and he realized

7   they've been telling one thing to investors and another thing

8   to the jury over here, this is how he answered that question:

9           McGraw-Hill does not like the sale of used books;

10  correct?

11          Correct.

12          So you do not like used books; correct?

13          They are competition, yes.

14          So again, when somebody asks you after this case is

15  all over, Why did the publishers sue if Book Dogs wasn't bad at

16  all?  Why did the publishers bring this giant case and you have

17  to sit through a three-week trial if Book Dogs didn't actually

18  do anything wrong?

19          Your answer is right here:  They don't like used

20  books.  And they lied about it.  They've lied about it under

21  oath.  Mr. Oppenheim misled you in his opening statement.  And

22  the reason they did that is they couldn't tell you the truth.

23  If they came in here and said, Listen, we are suing them

24  because we want to slow down the used book industry, you would

25  have to throw the case out.  There's no law that says you can't

1    sell used books.

2              So that's why they gave this testimony also:

3              How does Pearson decide whether to sue a distributor?

4              It is the last resort when everything else has failed.

5              Then you might remember Mr. Glunt went through a bunch

6    of lawsuits that the publishers had filed.  And at the end he

7    said:  The fact is we can name a lot of other lawsuits, could

8    we not, sir?

9              And Mr. Garry said:  You could name more.

10             And, in fact, the names that have come out in this

11   case alone are they sued Lindsay Bache, the Blackerbys,

12   Follett, Texas Book Company, Tichenor.  They threatened

13   lawsuits against Amazon, Barnes & Noble, Chegg, eCampus,

14   Ingram, MBS.

15             Their goal is to slow down the sale of used books.

16   This is a business strategy.  And they pretended that it

17   wasn't; they pretended they were reluctant to sue, but now you

18   know why they do it.

19             Lisa Suarez made the same point when Mr. Glunt asked

20   her:  What major distributor can I buy my books from if I want

21   to buy from someone who's never been accused of selling

22   counterfeit books?

23             And you might remember her testimony.  She was very

24   clear; she spoke loudly.  She said:  Look, I -- I mean I don't

25   know the answer to that.  Yes, they've been accused; but again,

I44VWIL5                    Summation - Mr. Bhandari

1   you have to look at what you're buying and make sure what

2   you're buying is legitimate.

3        The answer is there is nobody they haven't accused,

4   and there are many people who they have already sued.

5        Publishers are devious.  They have various different

6   measures.  And again, they lied about the used books and said,

7   The only reason we make revisions to the textbooks is for

8   pedagogical reasons and when the subject matter changes.

9        And then again on cross-examination Mr. Dorman

10  admitted, Yes, revisioning is a strategy we use in order to cut

11  down on the sale of used books.  They have a revision cycle

12  where they come up with an idea that they are going to revise

13  the book in two years, regardless of whether or not there have

14  been subject changes, because by doing that they reduce the

15  sale of used books.

16       This lawsuit is a business strategy.

17       The publishers have already accomplished their goal of

18  slowing Book Dog Books down.  And whether or not you throw this

19  case out, they are going to try and threaten to sue many other

20  people and explain that they were willing to take this case to

21  trial.

22       So remember, when people ask you why this lawsuit was

23  brought, if there was nothing to it, this is the reason.

24       So that brings me to the instructions you're going to

25  be hearing in this case.  So we can actually talk about the

1    titles in this case.

2            You will hear from Judge Pauley that you must

3    determine whether defendants are liable for infringing

4    copyrights belonging to the plaintiffs and, if so, how many.

5    This must be determined individually on a

6    copyright-by-copyright basis.

7            So when Mr. Oppenheim said, Don't worry about the

8    books in this case; there's plenty of other things you can

9    think about, like what happened in 2006 or some letters that

10   they sent that have no proof whatsoever supporting them, he was

11   wrong.  He once again misled you.

12           The instruction you're going to hear is that you must

13   consider this on a copyright-by-copyright basis.  And of

14   course, you must decide by a preponderance of the evidence that

15   they have proven it.

16           Similarly, the trademarks that you have to decide have

17   to be determined on a trademark-by-trademark basis.  So out of

18   the 162 titles at issue in this case, they've divided 142 of

19   them as copyright claims and ten of them as trademark claims.

20           Now, think about this trial for a second.  I'm going

21   to take you all the way back to the beginning.  How many books

22   do you think that they show you in this case?  The books have

23   been sitting there this entire time.  You remember Diane

24   Peirano said out of the 78 Pearson titles at issue in this case

25   she did an examination of two of them.  For Rosenthal, I think

1   he did an examination of one or two of them.  For Mr. Tesoro,

2   he did an examination of one of them.  They showed you

3   somewhere between maybe five and ten books out of 161.  For

4   everything else they said, Trust us.  Listen, we've got a

5   roadmap here and you can trust us.  If you just follow this

6   roadmap, then you'll be able to figure out everything in this

7   case.

8           Now, what would you expect to see -- what kind of

9   testimony would you expect to see if there was a roadmap that

10  was all of the evidence for almost all of the titles at issue

11  in this case?  You probably expect to hear this, right:

12  Somebody would get on the stand, maybe one person, maybe two

13  people, maybe one from each publisher, four people.  And every

14  single one of those four people would get up on the stand and

15  say, Hey, this roadmap, I believe this roadmap.  I put this

16  roadmap together.  I double-checked it, I triple-checked it.  I

17  swear under oath that you can trust this roadmap.  This is our

18  evidence.  While we are not showing you a lot of books, you can

19  believe our roadmap.

20          Now, is that what actually happened in this case?

21          No.  Nobody from Cengage, Wiley, or McGraw-Hill was

22  willing to put their names on the roadmap.  You probably

23  remember testimony from Mr. Essig being like, Hey, I know what

24  the roadmap is, but I didn't create it, I don't really know.

25  No one from McGraw-Hill said that they believed in that

1    roadmap.

2         No, there was only one witness who even tried to

3    testify about the accuracy of the roadmap.  And you guys might

4    remember that was John Garry.  And you'll remember that that

5    testimony -- Mr. Glunt cross-examined him for several hours,

6    and he walked through all of the omissions, the errors, the

7    exaggerations and lies in that roadmap.  You'll remember this,

8    this board, where Mr. Glunt was crossing out each title when it

9    turned out that there was no real evidence to support that

10   title.

11        You'll remember Mr. Glunt poking 116 holes in the

12   roadmap while Mr. Garry sat on the stand.  And this is how it

13   went.  This is an example of one of the holes that was poked in

14   the roadmap or several holes.

15        If you look at plaintiffs' roadmap, title 78,

16   *Contemporary Issues in Curriculum*, there were four different

17   things that supposedly provided the source of the counterfeit

18   books.  One, it was a wholesale turnover from Texas Book

19   Company; second, the wholesale turnover documents were

20   supposedly shown in Plaintiffs' Exhibit 42; third, the

21   inspection of the books in defendants' possession was one copy;

22   fourth, there was a summary of the defendants' inventory

23   disclosures.  Every single one of those things was wrong.

24        First, the wholesale turnover document from Texas Book

25   Company.  You look at Exhibit 42, and it was not, as you can

1   see from the testimony of John Garry.  Title 78 is another book

2   that was allegedly turned over by the Texas Book Company.

3            "And again, PX-42 doesn't show the turnovers from the

4   Texas Book Company?

5   "A.  No, sir.

6            "So again, the roadmap is just wrong about that?

7            "Yes."

8            Then the testimony from Texas Book:

9            "Hypothetically, let's say you wanted to figure out

10  from among these, say, 100 books which one you received from

11  Buckeye Books, would you be able to find these books?

12           "No."

13           That's the testimony from Texas Books, representative

14  Thomas Steele.

15           And then there was supposedly the inspection of the

16  books in the defendants' possession.  This is the quarantine

17  books, right?

18           Now, you have to ask yourself -- Mr. Oppenheim

19  claimed, do you know what the quarantine books are?  It's just

20  like cookies being taken out of a cookie jar and your kid has

21  crumbs all over his face, and you walk in and you're like,

22  Where are all the cookies?  Why do you have crumbs on your

23  face?  He ate the cookies.

24           That is not how the quarantine room works at all.  The

25  quarantine room are books that are taken out of the inventory

1   and they are stored in a locked room so that they don't go into

2   the inventory and they don't get sold.  So the only thing we

3   know about the books in the quarantine room is we definitely,

4   100 percent did not distribute them.

5         What it would be like -- and this is impossible, to be

6   perfectly honest, to take this analogy in real life.  But what

7   it would be like is if Mr. Oppenheim's kid saw those cookies,

8   realized that some of them looked like they might have raw eggs

9   on them or something was wrong with them, and then they took

10  those cookies and they put them in a safe or someplace where no

11  one would eat them by accident.  And then Mr. Oppenheim gets

12  home and he's like, I'm going to assume you ate all the cookies

13  because -- and then the child is like, No, I put them away so

14  that no one would eat them because I think they are dangerous.

15  And he's like, That's ridiculous.  Anybody who would put

16  cookies away to keep them safe would obviously be the kind of

17  person who just gobbles them up too.  So you're in trouble.

18  You're grounded.

19        That's the analogy of the quarantine room.  It

20  literally makes no sense.

21        If you think about it, there was no possible way that

22  Book Dogs could do anything with those books.  Because they say

23  if you destroy the books, well, then, that's destruction of

24  evidence.  If you quarantine the books, then obviously that's

25  evidence that you have more.

1          I'll come back to that, but there's literally -- it

2     makes no sense.  The books that are in quarantine obviously

3     cannot be considered books that were distributed.  They were

4     books that were taken out of circulation because there was

5     something wrong with them.

6          So if someone says to you, Hey, isn't it true that

7     they were caught red-handed with a bunch of books that were in

8     their possession?  You would say to them, Those were the

9     quarantine books.  The quarantine books are obviously not books

10    that were being distributed; they don't violate the copyright

11    law; they don't violate the trademark law.  And that's

12    important.  Because people are going to say, What about these

13    43 books?

14         The testimony from John Garry supports that, as he

15    said:  "When the roadmap refers to books, those books were

16    already identified as suspect; correct?

17         "That is correct, sir."

18         The summary of the inventory disclosures.  Mr. Garry

19    claimed, Well, these inventory disclosures, the numbers don't

20    match up.  But then when he looked at it more closely and he

21    saw that the single copies were not included in the sales

22    disclosures, he admitted that if a student sold a single copy,

23    the data would not be included in the roadmap.

24         The roadmap does not contain accurate information.

25         And so what did Mr. Garry do at the very end of that

1    cross-examination?  Mr. Glunt asked him point-blank:  This is

2    your roadmap, right, Mr. Garry?

3            And he says:  So I'll say again, this is the Court's

4    roadmap.  We prepared it pursuant to the federal rules of civil

5    procedure.  This is not my roadmap.  This is the world's

6    roadmap.

7            You remember that?

8            And then the Court had to step in and say:  Hold on,

9    ladies and gentlemen.  First of all, this is not the Court's

10   roadmap.  The Court had nothing to do with preparing this

11   roadmap.

12           And nobody wanted to take credit for this garbage

13   roadmap because it's riddled with errors and it was shown to be

14   just totally unreliable in every way.  This is the clearest

15   indication of that.  Not one person was willing to get up there

16   and swear under oath, Yes, this roadmap is something I

17   prepared, I double-checked it, triple-checked it, you can rely

18   on this, everything is accurate.

19           And that will be fine.  They don't have an obligation

20   to prepare a roadmap for you; they are not mapmakers.  That's

21   not what they do.  They could have come in here and actually

22   shown you the books.  They could have said, Here is the

23   evidence we have that this book was sold by the defendants.

24   Here is the evidence we have that that book was sold by the

25   defendants.  Here's the evidence we have that the distribution

1   happened on this date or that date.  They could have totally

2   done that.  That's probably how any reasonable person would put

3   on a case where they had evidence.

4           Instead they are giving you a roadmap that is just

5   full of errors, 116 errors pointed out by Mr. Glunt, and that

6   nobody from their side is willing to swear to is accurate.

7           Mr. Oppenheim showed you this, you probably remember

8   it from opening statement.  The roadmap is inaccurate because

9   it claims that there's evidence for a bunch of books that

10  there's no evidence for whatsoever.

11          Let's start with the five titles that are missing.

12          Mr. Oppenheim said, This is the best part.  There are

13  five titles that were basically things that were bought from

14  Best Books World.  These are really strong.  We've got really

15  good evidence for that.  Because, think, they bought stuff from

16  Best Books World, and then they didn't return all of them, so

17  we can assume that some of the ones of these five titles are

18  obviously counterfeit.  We don't have a copy of it, but it's

19  more likely than not, right, ladies and gentlemen?

20          And the answer is of course not.  There is no evidence

21  whatsoever that Best Books World was only selling counterfeit

22  books.  I'm going to get to that a little bit later, but what

23  kind of company that is selling counterfeit books then agrees

24  to give a refund when someone tries to return some of those

25  books?

I44VWIL5                    Summation - Mr. Bhandari

1          Yes, Best Books World probably had a bad source or

2    supplier themselves.  But a company that is trying to actually

3    sell the counterfeit books, when you succeed -- let's say you

4    go to Times Square and someone's like, Hey, anybody want some

5    *Hamilton* tickets?  I've got some *Hamilton* tickets; $50 for some

6    *Hamilton* tickets.

7          And you're like, Great.  Yes.  I'll take those.  That

8    sounds wonderful.

9          And he's like, Sorry.  I know it's cheap, but I've got

10   to run and I've got to go.  I'm not able to see it and I just

11   want to get rid of it to a big fan.

12         You buy the tickets.  One minute later you're like,

13   Oh, wait a second, this is for yesterday's show.

14         You run after the person.  You're like, Excuse me,

15   sir?  Excuse me, sir?  This is for yesterday's show.

16         They are like, Oh, sorry, yes, let me give you your

17   $50 back.  I thought it was today's show.

18         That's not what happens.  Best Books World refunded

19   money for the books that were -- the counterfeit that they sent

20   back to Best Books World.

21         So I'll get to that in a little bit more detail, but

22   obviously not all their books are counterfeit, because that's

23   not the way they were operating their business.  And if they

24   can't produce an actual book, you can't say it's more likely

25   than not.  They don't produce statistical evidence, they don't

1   produce an actual book, they don't produce anything so that you

2   can believe that those books are more likely than not

3   counterfeit and actually distributed by the defendants.

4          The next one is titles pulled out of circulation,

5   that's the quarantine; I talked about that before.  These are

6   the bad cookies.

7          Then there's the titles found in third-party

8   inventory.  This is important, ladies and gentlemen.  People

9   are going to say, What about the books that MBS had?

10          Why this is important is these books were found in

11  MBS's inventory, and MBS does not have any evidence whatsoever

12  tying them to Best Books World.  That's very important.

13          What you need for these books to be tied to Best Books

14  World is someone from MBS to say, Yes, for these 33 titles we

15  know that we got it from Best Books World -- excuse me, we know

16  that we got it from Book Dogs.  They have no testimony for that

17  whatsoever.

18          And what Mr. Oppenheim said is, Isn't it more likely

19  than not that one book that was counterfeit that we randomly

20  pulled out of MBS's inventory is coming from the defendants in

21  this case?  And people might say that to you.  Someone might

22  say to you, Isn't it more likely than not that that book came

23  from MBS?  And you would say to them, Well, how many other

24  people sold to MBS?  How many books were in MBS's inventory?

25  What was the likelihood -- what was the statistical likelihood

1    that that particular book actually came from the defendants?

2            And you'll notice the publishers didn't put on any of

3    that evidence.  The answer is of course it's not more likely

4    than not.  If they had evidence that statistically it was more

5    likely than not it came from our inventory, they would have had

6    to show you the number of books in MBS's inventory, they'd have

7    to show you what was selected out of there, they'd have to show

8    you something.  But there's nothing.  And that's because their

9    argument is basically this:

10           We know you sold that title to MBS.  We found one

11   counterfeit copy in MBS's inventory.  We know lots of other

12   people sell that title to MBS, but we assume it's you.

13           Would that be acceptable proof for anything anywhere

14   in your life?  If you decide that you're going to sell

15   something, you know, you sell your -- can't say car because

16   that one is pretty easy to trace back.  But if you decide to

17   sell an antique that you have to somebody, and the antique --

18   and the person who has like a bunch of those antiques says, You

19   know, I found one of these antiques is counterfeit.  I assume

20   it's your fault.  That's not right.  They have to actually say,

21   This is the counterfeit I got from you.  That's why there's no

22   evidence whoever.

23           It's similar.  Sometimes they were found in

24   third-party inventories, sometimes they were found in

25   quarantine and third-party inventories.  But there's no

1   evidence whatsoever that we actually distributed a copy of that

2   book.

3          And that leaves us with the 45 titles with some level

4   of evidence.  So that's what these are, ladies and gentlemen.

5   We are not trying to hide the ball from you.  Here are the 45

6   titles.  If you're taking notes you can write down and you can

7   cross-reference this on the roadmap if you wanted to.  Here are

8   the 45 works, where, after you cross out 116, these are the

9   ones where there's some level of evidence.  One, two, three,

10  the roadmap number is right there on the left.  And you will

11  have the ability to look at those.

12         Now, out of those 45 works, just because there's some

13  evidence that's not the quarantine or the missing books or the

14  fact that it was an MBS or Tichenor's inventory, just because

15  there's some level of evidence, that doesn't mean it's proven

16  that it's our book.

17         We will say, however, for 14 of them there's a sticker

18  that is tied back to TextbookRush.  And for these 14 books, it

19  is more likely than not, we will concede, that we distributed

20  these books.  So that is the first thing you have to look at.

21  For 14 of these titles, it's more likely than not that we

22  distributed these books and we are not walking away from that.

23         But you have to then go to the second issue, which is

24  whether or not these books are counterfeit.  And that they have

25  not proven as well.  You have to make sure that the books are

1    actually counterfeit if we distributed them.

2              So let's take a look at what the evidence is that we

3    supposedly distributed some of these -- the 45 books.

4              There's a Chegg spreadsheet that they cite for some of

5    those 45 books.  Not the ones with our stickers; the ones with

6    our stickers we are not walking away from.  But for the other

7    ones they've got a Chegg spreadsheet.

8              You heard the testimony from Mr. Singh today.  Chegg

9    created that spreadsheet.

10             And then he was asked:  How accurate is Chegg source

11   information on those spreadsheets?

12             And his answer was:  It's a system that we rely on.

13             He didn't say it's very accurate; he didn't say

14   everything in it is correct.  He just said it's a system we

15   relied on it.

16             There are certain MBS documents, such as PX-32,

17   DX-287, DX-288 that are in evidence that don't shed any further

18   light on who actually distributed these books.  Then there's

19   scraps of paper that don't seem to show anything.  For example,

20   title 141 has some sort of invoice that was written on by the

21   plaintiffs or the plaintiffs' lawyers for $400,000 that

22   Mr. Garry claimed was found in the book or near the book.  So

23   there are other ones.  Even out of the ones that are there, you

24   would be able to eliminate many of them if you were to do the

25   work yourself.

1          So that brings us to -- for the 14 books that have our

2   stickers on them or maybe some small number above that that you

3   think that there's some evidence of distribution for, how do we

4   know they are counterfeit?  And the way we supposedly know they

5   are counterfeit is because the plaintiffs' employees got up

6   there and said, Listen, we look at them.  And we're right not

7   90 percent of the time, not 99 percent of the time, we're right

8   100 percent of the time.

9          Ladies and gentlemen of the jury, this system makes no

10  sense whatsoever.  Here are some of the books that are at issue

11  in this case.  Now, the plaintiffs claim that they are right

12  100 percent of the time with these books, but you remember what

13  their process was.  Their process is that they get books that

14  already have counterfeit stamps on them.  Then the job of the

15  plaintiffs' employees is to look at books that have a

16  counterfeit sticker on them and come up with reasons for why

17  it's counterfeit.

18         When we provided two authentic copies, Jensen 104 and

19  106, to plaintiffs from several of these companies and said,

20  Can you tell us whether or not Jensen 105 is authentic or

21  counterfeit?  None of them could.  Unless they already have the

22  sticker that's on it saying that it's counterfeit, they can't

23  actually make the decision.

24         And that testimony, Mr. Jensen himself changed his

25  testimony.  When he was being deposed he said, I can't tell

1    whether or not Jensen 105 is authentic or counterfeit.  He's

2    like, I don't know.  On the stand he said, I think it's

3    authentic.

4           The point is eyeballing books is not the most reliable

5    method for figuring out whether or not books are counterfeit.

6    And certainly having the plaintiffs' own employees, who are

7    extremely biased, and looking at them when they already have

8    counterfeit stickers on them is totally not the right way to do

9    it.

10          You've probably heard of something called confirmation

11   bias before.  It's the idea that if you want -- if you want an

12   outcome to happen, you look for all the information that

13   supports that outcome.

14          And you probably heard of something called the Pepsi

15   Challenge.  The Pepsi Challenge was when people had to decide

16   whether or not one soda tasted better than the other soda.  One

17   of the sodas was not labeled "Coke" and the other one was not

18   labeled "Pepsi"; they were both kept under wraps so that if a

19   person is trying to do a true taste test, they don't know which

20   one is which.

21          The methodology used by the plaintiffs in this case

22   doesn't even meet that basic standard.  When you're doing a

23   bunch of advertisements for Pepsi, you at least cover up and

24   you don't tell them whether or not you think it's Pepsi or not

25   Coke.  Here, every single one of the ones that was examined was

1    supposedly counterfeit.

2           Now, maybe that would be okay if there wasn't another

3    method that could be used.  But all of you heard there's a

4    really easy other method that could be used and it was to test

5    the paper.  They all said that you can run paper tests to

6    figure out whether or not the paper is exactly the same as the

7    paper that's in the questionable book.  And whether or not they

8    look beat-up, whether or not they look different, whether or

9    not they have differences, if you run the paper tests, that's

10   something that can very frequently tell you for sure if

11   something is the same or different.

12          Why would the publishers, which are

13   multi-billion-dollar companies, not just run these basic paper

14   tests?  It doesn't make any sense.  The reason they don't run

15   the paper tests is because they know that their employees are

16   not 100 percent accurate.  They wouldn't even test their

17   employees; they never even do any sort of statistical analysis

18   to know how right they are.

19          So remember three things:  When people say to you in

20   the jury room, Well, those four folks who came in from the

21   publishers sounded like they knew what they were doing.  They

22   were looking at a lot of books.  How can you say that it's not

23   more likely than not that they are correct?

24          You can say three things to them:

25          First, they didn't even talk to us about most of the

1    books.  Out of the 161 titles they only talked to us about

2    eight or ten of them.

3           Second, the books that they did talk to us about, they

4    weren't always from the same print run, and yet they still made

5    decisions on them.  You remember Ms. Peirano's testimony where

6    she had two books from different print runs, and she still

7    concluded that the book in the middle was counterfeit, but

8    nobody else could do that when it was the Jensen books.

9           And the third thing is they are the employees of the

10   plaintiffs.  They are totally biased.  Would that be the kind

11   of evidence you would expect if you were being judged for

12   something?  Wouldn't you want an objective expert to explain

13   this to you?  A paper test could be easily done.  It would be

14   like a doctor testifying that someone has high cholesterol

15   without running a cholesterol test.  It literally makes no

16   sense.

17          Now, let's talk about the Book Dog Books stuff.

18          This is not what this case is about.  This case is

19   about the 161 works at issue in this case, and there's only the

20   five of the Best Books World books are missing, and the conduct

21   from 2007 to 2010 is not what this case is about.  But even if

22   it was, I'm going to explain to you why Mr. Smyres was acting

23   perfectly reasonable.

24          I'm going to show you a timeline.

25          On September 28, 2007, Ple offered to sell books to

1    Book Dog Books.  On October 2nd, 2007, the publishers sued Book

2    Dog Books.  On October 6, 2007, Smyres declined to buy the

3    books, citing concerns about books from Thailand.

4            So the first thing he did was say, Listen, I hear that

5    there are counterfeit books coming out of Thailand.  I don't

6    want any of them.  Not the sign of someone who's looking to

7    acquire counterfeits.

8            Now, a year goes by.  July 1st, 2008, Ple again offers

9    to sell books.  Book Dog Books makes a small test order --

10   sorry, my colleague reminded me to say something to you.

11           It is very important to know that Book Dog Books did

12   not buy any books for that time period between 2007 and here we

13   are on July 1st, 2008.  You probably knew that because there's

14   no evidence of that, but I need to make sure that you remember

15   that.

16           So July 1st, 2008, it's a year later, Ple again offers

17   to sell books, and Book Dog Books makes a small test order and

18   sends books to publishers.

19           Now, this is amazing.  Someone might say to you, Come

20   on.  Phil Smyres knew that dealing with Ple was extremely

21   dangerous.  He had to know.  Well, if they say that to you, you

22   would say, Well, then why did he send books to publishers?

23   Does a drug dealer decide that if someone says, Hey, here's

24   some baking soda, but he thinks it's cocaine, does he decide to

25   send it over to the police department to get it inspected?  Of

1   course not.

2          Mr. Smyres did not think he was getting counterfeit

3   books from Best Books World.  He checked with them.  He said,

4   Listen, I'm going to send these to the publishers.  They said

5   send them to the publishers.  He did send them to the

6   publishers.  If his goal was to secretly sell counterfeit

7   books, you're not showing the publishers the counterfeit books

8   to begin with.

9          So there's a July 2008 settlement agreement that gets

10  signed.  The publishers inform Mr. Smyres that the books that

11  Ple sent, those books were counterfeit.  And on September 12,

12  2008, after two out of the three books that were sent to the

13  publisher were counterfeit, Mr. Smyres ends the relationship

14  with Best Books World.  So that's September 12, 2008.  Except

15  for those small number of books that were bought as a test buy,

16  no books were bought by Mr. Smyres from September of 2007

17  through September of 2008.

18         Now, whoever this Ple person is, you've got to give

19  them some credit, they are persistent.  September 17th, 2009,

20  Ple reestablishes contact with Mr. Smyres.

21         Now, put yourself in Mr. Smyres' position.  Ple had

22  given refunds before; Ple had accepted the return of the books.

23  Mr. Smyres assumed that she was also victimized by some

24  unscrupulous sources selling counterfeit books.  He thought

25  that the counterfeit problem had gone down significantly

1   because between the time he settled with the publishers in

2   2008, he hadn't received any notifications from the publishers

3   that there were any counterfeiters that were out there.  He

4   himself had not been encountering counterfeit books.

5          So he thought, You know what?  Let's give her a second

6   chance.  Let's see if this relationship can work out now.  She

7   was probably victimized by the books, so was I.  If we can work

8   together, that would be great.  And they did.  For a little bit

9   over a year they worked together.  And again, he didn't see any

10  books that he thought were counterfeit.  They were always on

11  the lookout for that.

12         You heard from Josh Frenette; you heard from Barb

13  MacFarland; you heard from the people who were there in those

14  early years that even then they were looking for counterfeit

15  books and they would always say, We don't want any.

16         But on February 4th, 2011, Mr. Smyres was notified

17  that there were counterfeit books coming out of Thailand.  And

18  then you saw the emails that Mr. Oppenheim showed you, that in

19  April of 2011, he said, Either prove to me your books are real

20  or I'm going to stop buying from you.  She didn't prove that

21  those books were real and so he stopped buying from her.

22         It is very easy in a trial, where you can condense

23  four years into a day or a week or two weeks, to show a bunch

24  of emails over the course of some years, to suggest that

25  Mr. Smyres is a total idiot.  You're like, How can he be so

1   dumb?  These are six emails or eight emails that he received

2   where he was like trying to meet with her -- was that me?  Oh,

3   it is me.  Battery is running low.  Give me one moment.  This

4   could be with less visuals in a few moments.

5           So you have to remember the context.  I don't know

6   what your email boxes are like, but in the course of, you know,

7   many people's lives, they send hundreds of emails a week,

8   thousands of emails a month, tens of thousands of emails a

9   year.  I bet if you pulled out emails from any single person

10  anywhere in the world, you're going to find some emails which,

11  in retrospect, might make you think, Oh, if I had known all of

12  those things then, I would have done something differently.

13          But the truth is when you look at this timeline and

14  you see the information that Mr. Smyres had, that is not the

15  actions of somebody who's trying to get counterfeit books.

16  It's the actions of somebody who wanted to give a second

17  chance, who thought that other people were like him who were

18  also trying to weed out counterfeit books, but sometimes had

19  bad luck with counterfeit books.  And if you look at their

20  emails, they really are -- they all support that.

21          Mr. Smyres in 2008 said, We will send copies of

22  several titles to the publishers for verification of

23  authenticity unless we receive a refund.  Then he received his

24  refund.  In August, as you see in this, So sorry for the

25  troubled situation.  Ple wrote back saying, Please recheck or

 1    submit the result of the verification to me for the best

 2    decision and action.  More details needed.  Frankly, we are

 3    faithful in our business supporting data.  Other customers has

 4    not had this problem and first time in this case.

 5           I get it, words are cheap; anyone can say that in an

 6    email.  But actually giving a refund is really different than

 7    what a true counterfeiter -- intentional counterfeiter would

 8    do.  And she also told him to send it to the publishers.

 9    Obviously that's not something else that a real counterfeiter

10    would do.

11           Another email is from Phil Smyres:  I would like to

12    reiterate that we do not buy unauthorized copies.  I mean how

13    much clearer could he be?  Mr. Oppenheim comes up here and he

14    says, I'm going to explain to you what all these emails mean.

15    He comes up here and he very creatively comes up with a story

16    for every single one of these emails.  He's like, When he says

17    I reiterate that we do not buy unauthorized copies, he's really

18    saying, Be more secretive; send them to me in some sort of

19    secret channel; send me way more counterfeit copies.

20           That's not true.  There's no evidence of that.  The

21    creativity of the argument doesn't make it so.

22           Then Phil Smyres says again in 2008:  You need to

23    speak to the company you are buying these books from and tell

24    them this is very serious.  You should ask them to refund your

25    money and pay for all shipping costs.

1            Mr. Smyres obviously doesn't think Ple is a real
2     counterfeiter if he's telling her to speak to her sources.
3            What's the theory of this?
4            In August of 2008, Mr. Smyres was like, I'm going to
5     pretend that I think Ple has legitimate sources, so I'm going
6     to send this email.  But that's all he does.  That's the only
7     thing he does to cover his tracks is send this email.  Of
8     course not.  This is what he meant; he thought she had
9     legitimate sources and told her that she should speak to the
10    sources.
11           And then we're in 2011.  Mr. Smyres says again, If
12    these books are counterfeit copies, I will need you to send me
13    the money back we paid for these books in April of 2011.
14    Mr. Smyres never wanted to circulate counterfeits.  There's no
15    evidence that all of the books from Best Books World were
16    counterfeit.  It's what I said before.
17           In order for the plaintiffs to try and make out their
18    case, you have to assume that every single book sold by Best
19    Books World was counterfeit.  And that's why any book that they
20    sourced, including the five missing ones, were obviously
21    counterfeit also.  But there's no evidence of that.
22           When Best Books World gives the refund and when Best
23    Books World is selling books for a long time and there's no
24    counterfeits in any of the ones between 2009 until February of
25    2011, all of those things indicate they had legitimate sources.

I44VWIL5                    Summation - Mr. Bhandari

1    There were some bad books in there, yes, and that was enough

2    for Mr. Smyres to stop doing business with them.

3              (Continued on next page)

1          MR. BHANDARI:  Again, in 2011, Mr. Smyres said, you

2     should check with your supplier where they were sourced.  Ask

3     them to produce an invoice from the publisher.  These are not

4     e-mails from someone who thinks he is dealing with a real

5     legitimate counterfeiter.  Whatever it may look like years

6     later, when you look at all the e-mails, that was obviously not

7     his intent, but this was enough for him to stop doing business

8     with them in 2011.  Again, there is no evidence that all the

9     books were counterfeit.

10          That brings us to the Blackerbys.  The publisher said

11    there is so many things you can do for due diligence.

12    Mr. Smyres didn't even meet with Ple.  Mr. Smyres met the

13    Blackerbys face to face before doing business with them.  The

14    Blackerbys are based in Alabama, not outside the United States.

15    They sold over a hundred million dollars of books to Follett

16    each year and the vast majority of those books were obviously

17    authentic.  Mr. Oppenheim doesn't dispute that.  He said, oh,

18    he was just bragging.  That shouldn't have been enough.  He

19    doesn't say that the books were never sold.

20          Book Dog Books independently researched the business

21    by comparing their pricing to Follett's, which also seemed to

22    confirm they were selling to Follett.  The defendants had no

23    idea that the publishers had sued the Blackerbys.  After the

24    first allegation that the Blackerbys had sold a questionable

25    book, the defendants limited their purchases from them and

1    ceased purchasing from them a few months later when they were

2    not convinced that they were getting all authentic books.

3    That's what you are supposed to do.  And yet the Blackerbys are

4    one of the two pillars of the plaintiffs' case here.  The

5    Blackerbys did not sell 100 percent counterfeit books.  There

6    is no way.  They couldn't have been selling that volume to

7    Follett if that was the case.

8              So the plaintiffs come up with a really creative

9    argument.  They said, well, remember when Mr. Smyres sent books

10   back to Ple.  When he rejected the books and he said, give me a

11   refund, that is distribution.  That would be like if you get

12   something broken from Amazon or something that you think is

13   counterfeit from Amazon and you send it back for a refund,

14   supposedly you distributed a counterfeit.  You are not going to

15   hear any jury instruction that says rejecting books constitutes

16   the distribution.

17             And the importation of books, what you saw was that

18   there is no evidence whatsoever that Mr. Smyres or Book Dog

19   imported any books from Best Books World.  When we looked at

20   that PIERS report, if you recall, there was some back and

21   forth.  We were like, we have never seen this before.  What is

22   this?  We have to be able to look into it.  And then Mr. Essig

23   got up on the stand and he said, out of all the books that I

24   see in this PIERS report, they were sold to the defendants by

25   sellers other than Best Books World.  So they have literally

1    zero evidence for the importation of books.

2              As you heard Josh Frenette testify, that when Best

3    Books World sent books to the United States, they did it by Fed

4    Ex.  They were the ones who exported it.  We never filled out

5    any customs forms.  We never imported it.  You saw testimony

6    that we had paid some amount for shipping because they were the

7    ones that were sending the books.  When people ask you, well,

8    did the defendants import books from Best Books World, the

9    answer is definitely not.

10             That brings us to Mr. Oppenheim's argument at the end

11   of the closing.  He said, you know what, there might be some

12   holes here and there in the evidence, you know.  We are not

13   going to be able to prove everything of every single thing

14   here, but you can rely on these jury instructions saying that

15   you can draw an adverse inference because there was supposedly

16   the destruction of property and we didn't produce some

17   financial or rental records.  He basically is saying, don't

18   trust your eyes on this one.  Just because I haven't shown you

19   any evidence and our roadmap is garbage, you should still find

20   against them because there was destruction of evidence.

21             You have seen this.  I don't think I can say this any

22   more clearly, and Mr. Mandel said it in his opening or,

23   frankly, Mr. Oppenheim said it in his closing.  You heard from

24   Mr. Davenport this morning.  Today is the day for you to

25   understand this issue.

1           The destruction of these books was done because
2     Mr. Smyres did not want the books to get back into circulation.
3     It was done on July 1, 2011, before there was a cease and
4     desist letter.  It was done to try and make it so that sort of
5     sad event with Noah Davenport, the son of Mark Davenport,
6     stealing books from the barn wouldn't happen.  There was no
7     intentional destruction of evidence at any point in this case.
8     And while they say the pictures were done because Mark
9     Davenport wanted to show that he used a bulldozer, the receipt
10    was requested by Mr. Smyres because he wanted proof that these
11    questionable books were being destroyed.
12          It's true, you may draw some sort of adverse inference
13    from the destruction.  But why would you?  If somebody says to
14    you, shouldn't we just fill in the blanks in the plaintiffs'
15    case by assuming the defendants did something bad but they
16    destroyed those books, you should say absolutely not.  They
17    didn't destroy those books to hide evidence or to do anything
18    bad in this case.  They did it because they wanted to get rid
19    of counterfeit books, and there wasn't even a cease and desist
20    letter.
21          Similarly, the other instances that supposedly exist
22    of destruction of books, you heard testimony that Mr. Smyres
23    and Mr. Dimm said, do not destroy any Cengage books, do not
24    destroy any Pearson books or Wiley books.  There was never any
25    effort to destroy evidence.  In fact, we have 5,000 books kept

1    on our quarantine.  There is really no reason and no

2    possibility of drawing an inference from these things.

3           That brings us to damages.  Listen.  As I said before,

4    this case should be an easy one.  There is not any proof and

5    they have the burden that we distributed these books and that

6    the books were actually counterfeit.  They have not provided

7    evidence.  But if you do believe for some small portion of them

8    there is -- you believe that there is evidence and that's how

9    this jury goes, it's my job to tell you what to think about

10   damages now.

11          There are six factors you should consider:

12   Defendants' state of mind, expenses saved and profits earned,

13   revenue lost by publishers, deterrent effect on defendants and

14   third parties, and defendants' cooperation in providing

15   evidence concerning the value of the infringing material, and

16   the conduct and attitude of the parties.

17          Let's start first with the defendants' state of mind.

18   Remember the company culture here.  The testimony of every

19   single one of these Book Dog employees was that there is a

20   strong company culture to weed out counterfeits.  Remember, we

21   are partners with Amazon, and in that trade-in program there is

22   only a handful of companies that can do that.

23          We are partners with Chegg.  You heard from Chegg that

24   they wouldn't do business with a company that they thought was

25   bad, and Chegg is one of the best practices partners that the

1    plaintiffs have talked about.

2          We trained Noram, which is the company that does

3    inspections for Amazon, and we offered to pay the publishers to

4    help protect counterfeits.

5          We obviously have a culture of trying to weed out

6    counterfeits.  If there is going to be damages award for some

7    small portion of the books that we were accused of distributing

8    in the case, it should be the smallest possible damages.

9          We are the good guys.  We are trying to do everything

10   we can to stop them.  You will remember this letter where we

11   said Book Dog is willing to provide the publishers with space

12   in our warehouse alongside BDB's own fraud department so they

13   may jointly determine who, if anyone, is attempting to sell

14   counterfeits.

15         The Chegg spreadsheet we went over before  .886 of all

16   of our books that we sent to Chegg were alleged counterfeits.

17   You heard the testimony from Richard Essig and William Sampson

18   that if it's less than 1 percent of books, you can assume that

19   those people are more conscientious and more reliable.  That's

20   us.  You've seen the numbers.  161 titles out of a million

21   titles sold.  500 to a thousand books out of 14 million books

22   sold .886 percent.  Those are the numbers.

23         Expenses saved and profits earned by infringement.

24   That's important.  It has to be by the infringement.  So in

25   this case you saw that we earned between 2 and $3 per book.  If

1    you determine that we distributed counterfeit copies of any of

2    the titles at issue in this case, we made between two and $3

3    per book on that.  If you wanted to take all of our profits

4    from selling those potential books for whatever the handful of

5    books are that we sold, you would be able to do that.  It would

6    end up being something on the very low end.  You would probably

7    still have to round it up to hit whatever the statutory minimum

8    is, but you might not even get to $200 because there are so few

9    books, from their allegations, that we have actually

10   distributed.  You would have to do the minimum.  But this would

11   be our profits.  If you decided to double our profits and say,

12   it's $4 to $6 per book, that would still be a tiny amount for

13   the number of titles at issue in this case.

14          Remember, the profits are relevant only if they are

15   earned by the infringement.  This is a very, very important

16   jury instruction.  You cannot consider our profits generally.

17   Mr. Smyres has got a successful company because he provides a

18   great service for a lot of students.  But the only profits that

19   are relevant for your calculation would be the ones earned by

20   the infringement.  That's $2 to $3 a book for a tiny number of

21   books.

22          And the revenue lost by the publishers as a result of

23   the infringement.  As you probably know, there is zero evidence

24   that they lost any revenue because used books are their main

25   competitor and counterfeit books essentially displace other

1   used books.  They have not come in here with any numbers on

2   lost revenue.

3          Then we get to the deterrent effect on the defendants

4   and third parties.  You heard Mr. Oppenheim talk about this as

5   being potentially the most important factor.  Well, think about

6   it.  It is a very important factor.  What do you want to deter

7   people from doing?  What steps could Book Dog Books

8   realistically take that would be any different than what they

9   do now and still be able to sell used books?  It's not

10  possible.  You can't run a used book company and do more than

11  what we are doing now.

12         That brings me to like their one suggestion.  Their

13  suggestion is, people are going to say to you in the jury room,

14  what about those best practices?  How come they don't ask for

15  the sources of their information?  Let's take that as one.  You

16  heard from every person who testified as a textbook distributor

17  that they do not share their sources because that is

18  proprietary information.  If people tell Book Dog who their

19  sources are of books, then Book Dog can go directly to those

20  sources to buy them.  That's not how the textbook industry

21  works.

22         You also heard that Amazon, the trade-in partner, will

23  not reveal the information about the trade-in books that come

24  in that Book Dog Books is distributing as part of its fulfilled

25  by Amazon program.  So what the plaintiffs are really telling

1    you is, Book Dog Books should not be able to do business with

2    Amazon.  That literally makes no sense whatsoever.  Amazon is

3    obviously a conscientious company that's trying to do

4    everything that it's legally required to do.  But according to

5    the plaintiffs, if they don't tell us who all the sellers of

6    the books are in the trade-in program, we can't do business

7    with them.

8         The second thing that doesn't make any sense is that

9    according to the best practices, every single book has to be

10   checked against an exemplar.  What's the testimony you remember

11   hearing from every single one of the witnesses?  Not even the

12   publishers have exemplars of every print run for every copy.

13   The publishers don't have that.  There is literally no possible

14   way that a book seller can have every single copy, an exemplar

15   of every single copy.  So the best practices are impossible.

16        That being said, Mr. Oppenheim said, well, for

17   deterrence you can think of their total profits and he said,

18   somewhere between 31 million and 53 million.  That's, of

19   course, not true.  You remember Mr. Quintero's testimony.  The

20   real profits that were earned by Mr. Smyres after taxes was

21   closer to $18 million.

22        But the truth is, none of those numbers are anywhere,

23   anywhere, anywhere in the ballpark of what the appropriate

24   level of damages would be in this case.  When you are making

25   between 2 and $3 per book, that is the appropriate anchor of

I44MWIL6                    Summation - Mr. Bhandari

what the damages should be, not the profits.  And for whatever

reason they showed you $700 million in revenue, totally

irrelevant.

          That brings us to the defendants' cooperation in

providing evidence.  He didn't even talk about this because he

knows, of course, this cuts in our favor.  John Garry

testified.  Defendants never agreed to let plaintiffs audit

their inventory.  He said that under oath.  And then we saw the

settlement agreement.  Paragraph 8 gives the publishers the

ability to inspect the Smyres' parties premises, including any

warehouse.  He admitted that.  And we also heard the publishers

never exercised that right once.  The e-mail from Mr. Smyres to

Bill Sampson where he gave Cengage an open invitation to visit.

They were trying to cooperate in every way that they could.

          Now, one last thing on the deterrence.  I just got a

nice note which is something I forgot.  This is an important

point, also.  Think about the deterrence.  You have to think

about what it will do to others.  What other company can

realistically sell textbooks if every time one of those

mosquitoes makes it past your mosquito net, and a counterfeit

gets through, which is inevitable, you are betting the entire

company that there can be some huge amount of damages that

wipes out all of your profits or wipes out double your profits.

It would be like playing Russian roulette.  You can't ever,

ever sell a used book because you can't know with 100 percent

1    certainty whether or not there is any chance it's counterfeit,

2    so it would stop the entire industry.  It would be like playing

3    Russian roulette, but instead of just one bullet in there, it

4    would be a thousand bullets a day during the slow season and

5    10,000 bullets a day during the rush season.  Think about that.

6            If you find in favor of the publishers, you are

7    sending a message to every other used book seller out there

8    that they are going to be found liable for doing something that

9    there is no possible way to stop.  So in this case and without

10   any real proof, if anybody looks at this case closely and says,

11   how on earth did Book Dog actually get found to be liable on

12   any titles where they didn't provide any real proof and their

13   roadmap is garbage?  How is that possible?  Every seller out

14   there is going to think, we can't be in the used book industry

15   anymore.

16           So that brings us to the conduct and attitude of the

17   parties.  The publishers themselves make the counterfeiting

18   problem worse in so many ways.  And the reason why, it's their

19   business strategy to sue.  They themselves continued to sell

20   new books to Wirat, who printed counterfeit copies of them.

21   You heard them testify about that.  The publishers send their

22   digital files to outside printers where they can be leaked.

23   Wiley has no anticounterfeit department whatsoever and nobody

24   was in charge of the issue there and all the other ones are

25   tiny.  This is critically important.

1          The publishers don't employ anticounterfeiting

2     technology used in all sorts of other products.  Not a single

3     book in this case has one of these Cengage stamps on it that

4     would allow a textbook distributor to know if it's authentic or

5     not.  There is no proof tags that they were using at the time

6     that this lawsuit was brought.  These anticounterfeiting

7     technologies are so easy for the publishers to do.  You see

8     them on baseball hats.  You see them on all sorts of products

9     all around the world.  They don't do that and they come in here

10    and they say, you can't tell the difference of these books to

11    determine if they are counterfeit or if they are real.  They

12    contribute to this problem.

13          The publishers refuse to tell the distributors about

14    the known sources of counterfeits.  The publishers don't

15    provide characteristics that can be used to identify

16    counterfeits.  And, of course, the publishers use the

17    information provided by distributors to sue them.  You heard

18    that testimony by Follett.  Follett surrendered a lot of books,

19    tried to cooperate with the publishers, and then Bill Sampson

20    testified that just four weeks before his deposition in

21    September of 2017, the publishers sued Follett.

22          You remember the testimony of Steven Rosenthal.  The

23    best practices that they are talking about were created by the

24    plaintiffs in this case.  That's why they are impossible.  It

25    was the plaintiffs and Oppenheim & Zebrak that put together

1    best practices that no legitimate book seller can confidently

2    adhere to 100 percent of the time.

3            That brings us to the jury charge.  This is the exact

4    language you are going to see when it comes to the

5    infringement.  There is some allegations about willfulness, but

6    if you determine that the defendants reasonably believed their

7    conduct was permissible or their infringement was only

8    negligent by mistake or by accident, then you should not find

9    that the defendants infringed willfully.  That's critically

10   important.

11           I think everyone in this room can agree that if there

12   was a infringement -- again, they haven't provided proof that

13   there was, but if there was for some small number of titles, it

14   happened by mistake or by accident or maybe even negligently,

15   although I bet nobody in this room could really figure out how

16   to avoid a tiny number of counterfeits from going through.  But

17   it should not be found willful and it's innocent if the

18   defendants had a good-faith belief that their conduct was

19   innocent and their belief was reasonable under the

20   circumstances.

21           That brings us to the verdict form.  This is the first

22   thing I mentioned.  You are going to have to answer questions

23   that are provided to you by the Court.  There are three

24   questions that you are going to have to answer and they are

25   going to be on page 2, 5, and 16 of the jury form.  It's a long

1    jury form because, as I am going to explain to you, you will

2    have to go title by title if you are not able to determine this

3    right off the bat.

4          Question 1.  It's about trademark infringement.  Which

5    trademarks, if any, have the plaintiffs established by a

6    preponderance of the evidence the defendants infringed?  The

7    answer to that is none.  Trademarks is relatively easy.  You

8    have not heard any real testimony about how the trademarks were

9    infringed.  The trademarks are not something that's been talked

10   about by the plaintiffs in any sort of detail.  They have not

11   provided you with any evidence that the defendants were trying

12   to use these trademarks.

13         When people buy books, they buy books because of the

14   title.  When you are a student in college, do you buy a book

15   because you are like, I wonder who the publisher is.  I would

16   love to just buy a Pearson book.  No.  You buy a book because

17   it's called Strategic Market Management and it doesn't matter

18   what trademark, if it's McGraw-Hill, if it's Pearson or

19   Cengage.  It doesn't matter.

20         For copyright infringement, similarly, we have gone

21   through this.  You are not going to be able to find any

22   infringement because they have not provided you evidence of two

23   things:  One, distribution; and, two, that the actual book

24   itself that was distributed was counterfeit.

25         And that brings us to this breach of contract

1    question.  Mr. Oppenheim didn't talk about it very much because
2    he said it was easy.  It is easy.  The answer is no.  The
3    question is, did we assist in the selling or importation of
4    counterfeit books or did we sell or import counterfeit books?

5            Again, if you find that there was no copyright
6    infringement and no trademark infringement, the answer to the
7    breach of contract claim is very easy.  The answer is no.  Even
8    if you didn't necessarily feel that way, there is no way that
9    you can find that we assisted in the sale of counterfeit books.
10   We did nothing to assist in the sale.

11           There is a word called buying.  If buying was the
12   thing that was barred by the contract, they would use that
13   word, you cannot buy books according to this.  But because
14   everybody knew, the plaintiffs and the defendants, knew in 2008
15   it's impossible to stop someone from selling you a book that
16   you didn't know was counterfeit or not until it gets to your
17   location, you can't say that you are never going to
18   potentially buy a book that's questionable which you then
19   reject.

20           It's easy for three of these.  That's the way that
21   this should go.  That's the way that the used book industry
22   will be able to continue on.

23           Now, if you don't find that, if you find for some
24   small number, then you are going to have to check a box that
25   some trademarks were infringed or some copyrights were

1   infringed, and you'll have to go title by title to decide which

2   ones were infringed.  That's why when I showed you before,

3   there were 14 books with stickers on them.  If you find that

4   they were all counterfeit and they have proven it by a

5   preponderance of the evidence that those were counterfeit, you

6   would end up filling in the table.  But you must hit some.

7   There is no argument here whatsoever that it could possibly be

8   all.  It's either none or some.  Should be none.  But there is

9   no chance that it's all.  It's the same thing for the

10  counterfeits, for the copyright infringement, and the trademark

11  infringement.  You'll have to go work by work to determine

12  that.

13          The publisher's logic is this.  The publisher's logic

14  is this.  Here is a roadmap that I and my colleagues put

15  together.  This is a real roadmap that will make sense to you

16  and that is logical.  A seller sends a questionable book.

17  Nothing you can do about that, right.  You're a textbook

18  distributor.  How are you going to stop someone from sending

19  you a questionable book.  You can order books.  You can hope

20  they are legitimate because you don't want counterfeits, but

21  someone sends you a questionable book.  You discover the book

22  is questionable through your inspection process.  You think

23  it's potentially counterfeit.

24          Now, your options are -- obviously, from this point

25  on, you've got five options.  You can either sell the book.

1    That's wrong.  We can all agree that if a person intentionally

2    sells a counterfeit book, that's wrong.  You can destroy the

3    book.  You can return the book.  You can quarantine the book,

4    just keep it aside and say, we are not going to sell it, but we

5    are not going to destroy it, we are not going to return it.  Or

6    you can send the book to the publisher.  Those are your five

7    choices.

8           Let's see what happens.  Let's see whether or not any

9    of those things would make it so that a textbook distributor

10   would not get sued.  On the first one, obviously, there is a

11   lawsuit for infringement, rightfully so.  In the second one,

12   there is a lawsuit for destruction of evidence.  The third

13   one -- if you sell the book, you get sued for infringement.  If

14   you destroy the book, they claim you destroyed evidence.  If

15   you return the book, according to their logic, that's an

16   unlawful distribution.  You returned a book for a refund.  If

17   you quarantine the book, you have got cookie on your face and

18   you must have eaten all the cookies or sold them to others.  If

19   you send the books to a publisher, just like Follett did, they

20   will use that against you and they will sue you because they

21   will say, look, you had counterfeit books.  You obviously got

22   them.  You sent them to us, so must have more in your

23   inventory.

24          There is no way to please the publishers and the

25   plaintiffs in this case.  You probably know people like this.

1    There are some people in the world who literally, whatever you

2    say, no matter what you do, they are like, that's not good

3    enough.  No.  That's not OK.  You are like, OK.  I tried really

4    hard.  I got a 99 percent on this test.  I studied all night.

5    They are like, why didn't you get a hundred?  OK.  Fair enough.

6    You are like, I drove all night to see you.  There is terrible

7    traffic, but I wanted to get here.  I was just dying to see

8    you.  They are like, why didn't you fly here yesterday?  No

9    matter what happens, that's who the plaintiffs are in this

10   case.

11          Mr. Mandel said it in his opening statement.  He said

12   imagine for a moment that whatever the plaintiffs say that we

13   did, we did the exact opposite.  Would we still be here getting

14   sued by them?  The answer is yes.  If we quarantine the book,

15   they would sue us because we are the cookie monster.  If we

16   destroy the book, we are trying to hide evidence.  If we return

17   the book, that's an unlawful distribution.

18          What was this case really about?  Again, Mr. Mandel

19   told this to you right at the very beginning.

20          You heard from Mr. Rosenthal, their witness, I think.

21          (Video played)

22   "Q.  Are there any steps that the defendants can take that you

23   believe would eliminate the possibility of them selling

24   counterfeit books 100 percent?

25   "A.  Yes.

1    "Q.  What steps would those be?

2    "A.  Well, I know that the publishers sell only authentic

3    genuine product, so by extension if all product was purchased

4    directly from the publishers and the publishers only sell

5    genuine authentic product, then the defendants would only sell

6    genuine authentic product."

7              I couldn't say it any more clearly than that.  The

8    McGraw-Hill representative told you point blank, there is no

9    way to stop counterfeits from infiltrating the system 100

10   percent.

11             In this case they decided -- because they don't really

12   care one way or the other about 161 titles.  They didn't lose

13   any revenues from it.  It wasn't particularly important for

14   them for these multibillion dollar companies to recover any

15   money for the 161 titles in this case.  So in this case they

16   were just lazy.  They decided they weren't going to show you

17   any actual proof of distribution for 116 of these.  For the

18   remaining 45, they are like, look at our roadmap.  Our roadmap

19   is great.  And then the roadmap falls apart because it has a

20   bunch of problems with it and their witnesses basically stand

21   off and say, under oath, I cannot tell you to believe this

22   roadmap.  It is not my roadmap.  It's the world's roadmap.

23   They were lazy, ladies and gentlemen.

24             And if anybody you knew was in a case that's anything

25   similar to this, you would never believe that this flimsy

1    evidence is one feather heavier than what it needs to be in

2    order for them to meet their preponderance of the evidence

3    standard.  They barely have a feather of evidence, let alone

4    enough evidence so that against all of our analysis where we

5    did not distribute these books -- many of these books are not

6    clearly counterfeit.  They can't even get close to the point

7    where a feather will make a difference.

8           Ladies and gentlemen, think about the general book

9    industry, think about the deterrence on others.  This is going

10   to be a hugely important case.

11          It might seem to you that things were low key in this

12   courtroom.  Judge Pauley is very funny.  There were times when

13   some of the witnesses were very funny.  People cracked jokes

14   from time to time.  This case is deadly, deadly serious.  Any

15   award, any finding for the publishers saying that there was

16   infringements here will have a terrible effect on Book Dog's

17   business because you know what the publishers are going to do

18   next.

19          They are going to go to Chegg and they are going to

20   say, you are our best practices partner.  How can our best

21   practices partner do business with Book Dog Books when Book Dog

22   Books was just found liable for infringement on one title or

23   two titles?  It could be innocent infringement.  It could be

24   the nonwillful infringement, whatever it is.  If you guys make

25   the decision that based on this flimsy evidence that doesn't

1   amount to anything, you are going to find Book Dog liable.

2   Obviously, you are going to make it very hard, if not possible,

3   for Book Dog to stay in business.  So the deterrence effect of

4   just a finding of even innocent infringement will make it very

5   difficult for them to continue.

6            THE COURT:  Mr. Bhandari, begin to conclude your

7   summation.

8            MR. BHANDARI:  I was on the landing part of it.

9            Any finding, any finding at all will be terrible for

10  Book Dog's business.  If you were to find them, even on the

11  lowest end of the scale, and you'll see that it's $200 for

12  innocent infringement or $750 for nonwillful infringement, even

13  if you were to find them at the lowest level, that is going to

14  be devastating for their business because many other people are

15  going to be threatened by the publishers to not do business

16  with Book Dog.

17           Think about all the other sellers that are out there

18  in this world.  They are going to look at this case and they

19  are going to say, Book Dog is the company that trains Noram.

20  Book dog is the company that has all these inspection processes

21  in place.

22           Phil Smyres has been in this business since the 1990s.

23  We possibly can't have better inspection systems than what Book

24  Dog has put into place between 2007 and 2018, and every used

25  book seller is going to have to think, can we stay in this

I44MWIL6

1    business or do we have to move on to do something else.

2              And what would the effect of that be?  It would mean

3    that basically students aren't going to be able to buy

4    reasonably priced textbooks.  The used book market is the

5    threat to the publishers.  It's not Book Dog.  Book Dog didn't

6    do anything wrong.  Book Dog tried its hardest and they made

7    this case about Best Books World and the Blackerbys from 2006

8    to 2011 because they know that they have no evidence, zero

9    evidence that they can point to that will make it so you have

10   to believe beyond a preponderance of the evidence that there

11   was a distribution of 161 books and those books were

12   counterfeit.

13             Ladies and gentlemen of the jury, thank you very, very

14   much for your patience.  I know this has been a long trial and

15   I know that in deliberations you guys are going to think very

16   seriously about each of these questions.

17             But I am confident that you guys will come to the

18   right conclusion and you will realize, while this is a business

19   strategy for the plaintiffs to try and slow down the used book

20   industry, this is a critically important case for Book Dog.

21             There should be no finding of infringement in this

22   case, no finding of breach of contract, and I trust that you

23   guys will be able to deliberate and come to the same

24   conclusion.  Thank you very much.

25             THE COURT:  Members of the jury, we are going to take

I44MWIL6

1    another short recess and then we will hear a brief rebuttal

2    from plaintiffs' counsel.

3            Please keep an open mind and come to no conclusions.

4            Please recess the jury.

5        (Jury not present)

6            MR. OPPENHEIM:  Your Honor, I have several issues I'd

7    like to raise with the Court.  If possible, can we do that

8    after a short break?

9            THE COURT:  Sure.  We will take five minutes and come

10   back.

11           MR. OPPENHEIM:  That will be perfect.  Thank you, your

12   Honor.

13       (Recess)

14           THE COURT:  Mr. Oppenheim, you want to be heard?

15           MR. OPPENHEIM:  Yes, please, your Honor.  There are

16   three issues I'd like to raise as a result of Mr. Bhandari's

17   summation.

18           The first is that this Court has repeatedly heard

19   argument on the issue of the Chegg summary, and yesterday this

20   is what you said, your Honor:  "I am going to let you read the

21   Singh deposition testimony but I'm telling you right now, you

22   cannot make any percentage argument to the jury in closing

23   based upon that testimony because it's misleading.  That will

24   be a line you can't cross."

25           Your Honor, he crossed that line.  He put a percentage

I44MWIL6

1    number up there, and that needs to be cured.  That's No. 1.

2             MR. BHANDARI:  May I be heard or should I wait for all

3    three?

4             THE COURT:  Go ahead.

5             MR. BHANDARI:  Your Honor, first of all, that was

6    based on the Essig testimony, not the Singh testimony.  That's

7    obviously a huge difference.

8             Second of all, I previewed this for the Court twice

9    this morning, and the Court never told me not to say that.  I

10   made it clear that that is what I was going to say in my

11   closing for that one.  I am not comparing it to anyone.  I

12   didn't use comparative statistics.  I didn't say we were better

13   than anyone else.  I said out of the sample of books that they

14   got from our people, this is the percentage of books that they

15   allege were counterfeit.  There was never any indication that

16   would not be allowed, and I previewed that twice for the Court

17   this morning, and I obviously would have followed any Court

18   instruction.

19            I think it's clear I didn't do anything wrong on this,

20   but I am not going to presume to speak for the Court.

21            And after Mr. Oppenheim speaks, I won't speak again,

22   unless you tell me to.

23            MR. OPPENHEIM:  Your Honor, you couldn't be clearer

24   yesterday about this.  What Mr. Bhandari is saying, yeah, you

25   ordered me that way yesterday, but this morning I basically

1    tried to hint to you or tell you that I was going to violate

2    the order and you didn't tell me that that would be wrong, so

3    I'm OK.  That doesn't cut it.

4         THE COURT:  It was clear yesterday.  I am going to

5    give a curative instruction when the jury comes out that they

6    are to disregard the percentage figure that was referred to in

7    Mr. Bhandari's argument.

8         MR. BHANDARI:  Your Honor, it's based on the Essig

9    testimony.  It's not Singh's testimony.  It was simply he

10   refreshed his recollection that it was 50 of our books were

11   suspect out of 4400.  That's totally different.  We have got

12   the cites for it which we can pull to you.  There is nothing

13   misleading about it, your Honor.  I did not violate any court

14   order and there is nothing misleading about what I said.

15        THE COURT:  I didn't limit it.  I said no percentages

16   based on the Chegg summary.

17        MR. BHANDARI:  No, no.  You said on the Singh

18   deposition.  You said that.  That's why this morning I made it

19   clear.  I said it twice that I was going to be doing it based

20   on the Essig statement, because I thought that's a close call,

21   your Honor.  I thought maybe you meant it more broadly than

22   what you said yesterday, so I said it twice.  Mr. Glunt got up

23   and said it was stated in Mr. Essig's testimony.  He somewhat

24   unwisely -- he said he refreshed his recollection and that was

25   the basis for us making it.

I44MWIL6

1          THE COURT:  I said you could bring in the Singh

2     deposition.  I also said you can't make percentage arguments in

3     closing.  I'm giving a curative instruction.

4          Next.

5          MR. OPPENHEIM:  Your Honor, the plaintiffs have not

6     once during this case raised an issue that there is insurance

7     coverage.  Defense counsel several times during his closing

8     told the jury that if they return a large award they could be

9     putting this business out of business, and that's inaccurate

10    because there is potentially significant insurance coverage

11    here, so we need to somehow remedy that in the jury's mind.

12         MR. BHANDARI:  Your Honor, I said the opposite of

13    that.  I said even a negligible award at the lowest end of the

14    spectrum, where there is a finding of innocent infringement or

15    nonwillful infringement, could jeopardize the company because

16    they will be told that they can't do business with other best

17    practices companies.  I never talked about the size of the

18    award.  I never said a large award would bankrupt us.  I never

19    said it would put us out of business.  I said even the smallest

20    award, if there is a finding of infringement, would be

21    problematic.

22         MR. OPPENHEIM:  Your Honor, I believe if we pull up

23    the transcript, we will find two instances that Mr. Bhandari

24    used the expression, or something to the effect of, put the

25    company out of business.  The example that Mr. Bhandari gave,

I44MWIL6

1    he did say that as well.  But he specifically twice made

2    reference to the fact that an award here could put the

3    defendants out of business.  We need to correct that.

4              MR. BHANDARI:  I never said there was an inability to

5    pay, your Honor, never.

6              THE COURT:  He did not make any reference whatsoever

7    to bankruptcy or anything like that.

8              MR. OPPENHEIM:  Isn't that what putting somebody out

9    of business is, your Honor?

10             THE COURT:  No.  You can be driven out of business

11   because nobody will do business with you anymore because you

12   are tainted.  That was part of the argument that Mr. Bhandari

13   made.  There will be no references to insurance in the

14   rebuttal.

15             MR. OPPENHEIM:  Last issue, your Honor.  Mr. Bhandari

16   said that the jury could not consider profits generally, and he

17   said that with respect to that one particular provision of the

18   factors.  That is contrary to what we decided this morning was

19   going to be in the jury instructions.

20             So I think in addition to just reading the jury

21   instruction to them, we need to specifically call out for them

22   now that, in fact, that is something that the jury will be

23   permitted to consider.

24             THE COURT:  No.  I don't think I need to call that out

25   now.  I'm glad that I added the sentence in the charge that we

1   discussed this morning, and you'll have an opportunity in

2   rebuttal to make it clear.  He made one reference to it.  So I

3   am going to decline to give any curative instruction on that.

4           Let's bring in the jury.

5           (Jury present)

6           THE COURT:  Members of the jury, at this time we are

7   going to turn to the rebuttal argument, and I ask you once

8   again to give your undivided attention to Matthew Oppenheim,

9   Esq., as he delivers that closing rebuttal on behalf of the

10  publisher plaintiffs.

11          MR. OPPENHEIM:  Thank you, your Honor.

12          Defendants got up here a few moments ago and told you

13  that publishers brought this case because they wanted to put a

14  successful used book seller out of business.  Was there any

15  evidence whatsoever that that's what the publishers were doing?

16  There wasn't.  There was absolutely none.

17          In fact, if you look at the documents or you think

18  about the documents we saw during the course of this case and

19  the counterfeits at issue, they were new.  It's not the used

20  books that are the issue, and I said this in my opening.  I

21  said it's not about used books.  It's about counterfeit books.

22          The defendants want to distract from what this case is

23  really about.  It's not about putting a used book seller out of

24  business.  There are plenty of used book sellers that we, the

25  publishers, cooperate with all the time, Follett, MBS.  You

1    heard all these companies over and over.  They work with the

2    publishers.  They surrender books they think are counterfeit.

3    They send books in when they need to get them tested because

4    they are not sure.  There is an ongoing cooperation.  This is

5    not about putting used book sellers out of business.  This is

6    about dealing with an infection that is horrid in the

7    defendants' business and that infection is counterfeits.

8         Mr. Bhandari said that the defendants have a culture

9    against counterfeits.  You've heard two and a half weeks of

10   evidence, and I invite you to give serious consideration of

11   whether you think that's true.  Because when I sit back and I

12   look at what we have seen, I don't see that culture.

13        In fact, let me answer one of the questions that Mr.

14   Bhandari posed.  He said, what should they do?  What should the

15   defendants do?  What steps should they take?  Let me answer

16   that.  Let's start with no more secret accounts, no more false

17   names.  Let's not call customers names.  Let's not hide what we

18   find with e-mails that say mum's the word.  When we have

19   policies and procedures on what to do with counterfeiting,

20   let's abide by it.  Even 50 percent of them.  They don't abide

21   by any of them, their own policies.

22        How about knowing who they buy from?  Why not track

23   the counterfeit sellers that are selling books to you?  Keep a

24   log of it.  Why don't you stop sending the counterfeits back to

25   the sellers?  Why don't you stop buying large quantities of

1    U.S. edition books overseas cheap?  Why don't you do what other

2    distributors do, adopt the best practices or at least cooperate

3    with the publishers?  How about that for a list of things of

4    what the defendants should do?

5          Let me turn to that cooperation issue for a moment.

6    Mr. Bhandari said that the defendants have been trying to

7    cooperate and it's the publishers that haven't been

8    cooperating, and he pointed to the contractual provision in the

9    settlement agreement that the publishers could come in and

10   inspect the warehouse.

11         Do you remember that contractual provision had a

12   three-year term?  And you remember that it just so happened

13   that the day Follett gave notice to the publishers was exactly

14   that three-year mark.  Remember, Follett, the evidence you

15   heard, knew about the counterfeits several months earlier, and

16   they had been talking to the defendants about the counterfeits

17   that the defendants had sold them.

18         But for some reason, we don't know why, Follett didn't

19   tell the publishers about those counterfeits until the exact

20   day that the inspection right expired.  Mr. Bhandari says,

21   well, look, they had this right.  Yeah.  We were denied that

22   right because for some reason we weren't notified until the day

23   that right expired.

24         Mr. Bhandari also talked about defendants' other

25   cooperation.  How about cooperation with abiding by court

1    orders?  Because they didn't do that repeatedly and

2    systematically in this case.

3           Mr. Bhandari said, we invited the publishers in to

4    inspect our inventory.  We have been through this.  They wanted

5    us to inspect their inventory on their terms, which was not to

6    look at the bulk overseas shipments that were coming from Asia.

7    When we talk about cooperation, this is not about the

8    publishers not cooperating.  It's about the defendants not

9    cooperating.

10          On that note, the defendants here, they get up and

11   they want you to believe they are the victim.  We are these

12   billion dollar companies, and they are a small mom-and-pop shop

13   and look at what we are trying to do.  We are trying to drive a

14   used book seller out of business.  There is absolutely no

15   evidence of any of that.

16          Yes, these are big companies who employ lots of people

17   and have lots of authors that they pay to do a thing which is a

18   good thing.  They create educational and academic materials.

19   That is an important thing and it's something we should

20   support.

21          These four plaintiffs, they have historic foundations.

22   When you hear the history of John Wiley, a company started

23   right in this New York area, they published Edgar Allan Poe.

24   These are companies whose marks and their businesses mean

25   something.

1          Should we allow somebody to go over to Thailand and

2     import counterfeit copies to the United States and just say,

3     well, that's OK because it's a mosquito in the net and we can't

4     do anything about it?  I don't think so.

5          Now, Mr. Bhandari said, the plaintiffs didn't present

6     any evidence that the books were counterfeit.  That's very hard

7     to see, he said.  Remember, we had four witnesses on this.

8     Dick Jensen was the first one from Cengage.  Then there was

9     Diane Peirano, Steve Rosenthal and Ron Tesoro.  Their testimony

10    was unequivocal.  They had evaluated every one of the books at

11    issue in case, hundred percent certain that everyone one of

12    those books was counterfeit.  They gave you demonstrations.

13    Mr. Bhandari is right, they did not go through every book.  If

14    we wanted this trial to be another three weeks, we could have

15    done that.  I'm guessing none of us wanted that to happen.

16         If the defendants wanted to demonstrate these books

17    weren't counterfeit, put a witness up who has inspected them

18    and have that witness say, I examined these books, I did paper

19    samples.  They are not counterfeit.  They didn't do that.

20         There were witnesses with impeccable credentials.

21    They showed you what they saw and you saw it yourself.  There

22    is no question when you see a plastic zipper headband, that's a

23    counterfeit.  When you see a paper which is shiny in

24    reflection, different from what the publishers sell, that's

25    counterfeit.  So there was no question about that testimony.

1            Mr. Bhandari keeps pointing to the exhibits Jensen
2      104, 105, and 106 and says these were legitimate Cengage books
3      and they couldn't tell the difference.  First off, these are
4      just not books in the case.  We don't know which one may be an
5      exemplar and which may not.  And he sprung something on
6      Mr. Jensen and, frankly, I think Mr. Jensen handled it fine.
7      But it really doesn't matter.  They are not titles in the case.

8            I heard this garbage roadmap expression so many times.
9      It's literally an encyclopedia of evidence.  That's what it is.
10     And Mr. Garry, remember Mr. Garry.  Mr. Garry is a decorated
11     former New York police detective, highly credentialed lawyer,
12     long-time publisher executive.  He testified in depth about all
13     the types of evidence that were accumulated into that.  He
14     testified about the publishers purchased books directly from
15     the defendants.  The publishers went to the defendants'
16     customers, some students even, and had them turn over books
17     that were counterfeit and had all the receipts with them.

18           The publishers went to the wholesaler customers and
19     got counterfeits that the wholesalers said came from the
20     defendants.  The publishers went downstream, the customers and
21     the wholesalers, but they also went upstream.  They said,
22     Tichenor, you wee supplying.  Let's see what you were
23     supplying.  Blackerby, you were supplying.  Let's see what you
24     were supplying.  Literally, the publishers collected evidence
25     from every single spot, including in the defendants' own

1    possession.

2            Now, the defendants want you to believe on that front,

3    well, they found the book, they put it in quarantine.  That was

4    the only counterfeit copy of that title and they never

5    distributed it.  There were some problems with that.  Because

6    there is no evidence that that was the only copy, counterfeit

7    copy of that book.  This is about titles, not books; titles,

8    not books.  We have no idea how many other counterfeit copies

9    they had and they sold.  There is no evidence.

10           And, in part, it's because of Matasa.  Do you remember

11   Matasa?  Matasa is the entity that is owned by a former

12   employee, has no other employees, and Book Dog Books hired to

13   do all of their rentals.  But Matasa has no employees and no

14   warehouse and no inventory.

15           So Matasa turns around and hires Book Dog Books back

16   to actually do the work.  Do you remember this?  This was on

17   the very first day we heard this.  We have no idea.  Those

18   books that they claim were in quarantine were in their

19   possession.  Whether they were sold to Matasa, whether Matasa

20   had rented them out, there is no evidence on any of that.  We

21   know that defendants had counterfeit copies of those titles in

22   their possession.  We know the defendants bought counterfeit

23   copies in bulk.  We know that the number they had in their

24   possession was very limited.  And we have no idea what they had

25   rented and sold before.

I44MWIL6                    Rebuttal - Mr. Oppenheim

1            The defendants say, well, this is a case that the

2       plaintiffs have put forward that is just about the past, 2006

3       to 2011.  That couldn't be less true.  The defendants have

4       clearly evolved in 10 years.  But evolution isn't always a good

5       thing.  So what they have evolved to do is to hide better their

6       actions.

7            Now, Mr. Cahill isn't an employee.  They took the

8       employee who was dealing with the Blackerbys and they said, you

9       are going to have your own company in Australia and you are

10      going to buy from all these sources in Asia, and you are going

11      to ship those books to us, but we are going to close our eyes

12      as to who is sending them.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. OPPENHEIM:  For all we know, they are still

2     getting books from Best Books World; they are still getting

3     books from the Blackerbys; they are still getting books from

4     Wirat.  We have no idea.  Because they've created this blind,

5     if you will, so they can't see what's going on.  That's

6     happening today.

7          Let's talk about this Amazon program.

8          So they say we tell them they shouldn't do business

9     with Amazon.  That's not what we are saying.  We are saying

10    when you enter into a program where you're repeatedly getting

11    counterfeits coming through it and you have no ability to check

12    what it is that is being bought and sold in your name, you need

13    to change what you're doing.

14         They have a choice to make.  They could participate in

15    the program or not.  They've signed up to a program and said,

16    We're fine with you buying and selling books in our name, doing

17    it this way, where we have no oversight whatsoever of those

18    books.  Again, they are willing to be totally blind who the

19    books are being bought from, right, and what those books are.

20         Let's talk about buyback for a minute now.  Buyback

21    now.  Yes, they inspect them, that's great.  They have no

22    authentication on their website.  Show me a business that you

23    go to now that doesn't have some authentication on their

24    website.  If you go to buy anything online, there's some sort

25    of authentication, because that's what happens.  That's what

1   happens in a legitimate environment.  They have zero

2   authentication.  So they have no idea who's selling them books.

3   And if they do decide to cut off a seller, the seller can just

4   create a new user name and start over again because they don't

5   track IP addresses.

6          We heard great testimony about what they do on the

7   fraud side of the business, tracking IP addresses, doing

8   investigations, using LinkedIn and Facebook and all this stuff.

9   Great.  It would be nice if they actually did that on the

10  counterfeit side.  They don't.

11         But the worse part of the buyback process is they take

12  the books in.  And when they ship them back to the customers,

13  they use this euphemism.  Instead of telling the customer the

14  books are counterfeit, they say they do not meet our purchasing

15  standards.  So not only are they returning it, but they are not

16  telling the people they are returning the books to, Hey, these

17  are counterfeit.  So they are just putting these books back

18  into the stream.

19         And you heard testimony that sometimes these sellers

20  come right back to the same buyback site and try to sell it

21  again.  And they've caught them.  So their current efforts are

22  totally inadequate.

23         Now, the real proof in the pudding in that is the fact

24  that the publishers have been continuing to find counterfeits,

25  including in the month of March of this year.  So they are not

1      doing what they need to do.  The law says you can't do this.

2      And their attitude is, Well, it's just a few mosquitoes in the

3      nets.  We don't think that that works.

4              My last issue.  I'm getting handed lots of notes.  My

5      last issue.

6              So Mr. Bhandari put up this slide talking about the

7      financials of the company.  And one of the things he said is

8      that you cannot consider the profits of the company generally;

9      you have to look at it with respect to the infringing activity.

10             You're going to hear the jury instruction from Judge

11     Pauley that's 100 percent wrong.  When you are considering the

12     factors that go into a statutory damage award, you can

13     absolutely decide -- consider the profits.  And it makes sense.

14     Because let's take Apple Company, Apple Corporation.  If Apple

15     Corporation does something wrong and you want to issue an award

16     to deter it -- not that I'm saying Apple would, but let's say

17     you did -- I don't know how many billions of dollars they have

18     in the bank, but if you issued a $2 million award or a $10

19     million award against Apple, that's petty cash.  You'd need to

20     know how much money they have in the bank in order to have some

21     impact that deters them.

22             It's the same thing here.  Mr. Smyres has $47 million

23     coming his way from the last ten years.  You need to know that

24     to decide what an appropriate award is.  Should he be able to

25     keep some of that money after he's done what he's done?

1              So Mr. Bhandari puts up this slide, 2 to $3 a book.

2     It reminds me of a college course I took as a freshman, a long

3     time ago.  But it was how to have fun with statistics and how

4     you could come up with numbers and rejigger things, all kinds

5     of ways to basically say whatever you want.

6              They did a great job on this.  We have no idea how

7     many books they are actually selling; we have no idea how many

8     of those books are counterfeit.  The most outrageous part of it

9     is because they violated court orders and didn't disclose all

10    of their financial information, we don't know if we even know

11    all of their profits.  So they did a great job coming up with

12    this two-to-three-dollar-a-book number, but you don't know what

13    percentage of those sales were counterfeit.

14             In thinking about the numbers, you need to think about

15    the issue of punishment, because it's not just deterrence,

16    though deterrence, I think, is the most important factor.  The

17    defendants' behavior is not acceptable.  There are simple

18    things that we expect of legitimate businesses, and they are

19    not doing that.  And they should be not only deterred, but

20    punished.  And we ask that you consider that.

21             I leave you with this thought:  This case is not about

22    the defendants claiming that they have been victimized by the

23    publishers; it's about do we want to support the real

24    legitimate intellectual property of the companies in our

25    backyard.  Thank you very much.

I44VWIL7

1          THE COURT:  All right.

2          Members of the jury, we've concluded closing

3     arguments.  In a few moments I'm going to deliver my charge to

4     you.

5          But before I do, I want to tell you that during the

6     defendants' closing argument, you heard Mr. Bhandari refer to a

7     percentage of counterfeit books found in Chegg's inventory that

8     allegedly came from Book Dog Books.  I'm instructing you to

9     disregard that portion of Mr. Bhandari's argument that

10    referenced that percentage, just that percentage.

11         All right.  With that, we're going to take a very

12    short recess.  Keep an open mind.  Don't come to any

13    conclusions.  You haven't heard the most important part of the

14    case yet, my instructions on the law to you.

15         So we're just going to take a few moments and you'll

16    be right back in the courtroom, all right?

17         Please recess the jury.

18         (Jury not present)

19         THE COURT:  Any other issues at this moment?

20         MR. OPPENHEIM:  Not from plaintiffs, your Honor.

21         MR. BHANDARI:  Your Honor, one of the elements that

22    Mr. Oppenheim talked about in his rebuttal just now was that

23    they should consider punishment.  And that's not one of the

24    factors for damages.  I think that there should be a curative

25    instruction to the jury on that, your Honor.  Deterrence -- the

1    six factors are very clearly laid out and one of them is not

2    punishment.

3            MR. OPPENHEIM:  Your Honor, there's Supreme Court case

4    law on the notion that the jury in a statutory damages context

5    can consider punishment.  So it is not enumerated as one of the

6    six factors, but it is clearly permissible under the law.

7            THE COURT:  I think that the jury can consider

8    anything in deciding what award of statutory damages is

9    appropriate.  So I'm going to decline to give any further

10   curative instruction.

11           My clerk will circulate to you, if he hasn't already,

12   a copy of the charge as I'll deliver it, and a copy of the

13   verdict sheet.  And literally we're going to bring the jury out

14   in about two minutes, so make it real quick.

15           (Recess)

16           (Jury present)

17           THE COURT:  Members of the jury, my charge to you on

18   the law is lengthy and covers many points.  You must listen

19   closely as I read the charge to you.  I will send one copy of

20   these instructions into the jury room for you to have during

21   your deliberations.

22           We are now approaching the most important part of this

23   case, your deliberations.  You've heard all of the evidence in

24   the case, as well as the final arguments of the lawyers for the

25   parties.  Before you retire to deliberate, it is my duty to

I44VWIL7                    Charge

1   instruct you as to the law.  It is your duty to accept these

2   instructions of law and apply them to the facts as you

3   determine them.

4           Regardless of any opinion that you may have as to what

5   the law may be or ought to be, it's your sworn duty to follow

6   the law as I give it to you.  If any attorney has stated a

7   legal principle different from any that I state to you in my

8   instructions, it is my instructions that you must follow.  In

9   listening to these instructions now and in reviewing them

10  later, you should not single out any particular instruction as

11  alone stating the law, but you should instead consider my

12  instructions as a whole.

13          Your duty is to decide the fact issues in the case.

14  You are the sole and exclusive judges of the facts.  You pass

15  upon the weight of the evidence, you determine the credibility

16  of the witnesses, you resolve such conflicts as there may be in

17  testimony, and you draw whatever reasonable inferences you

18  decide to draw from the facts as you determine them.

19          In determining the facts, you must rely upon your own

20  recollection of the evidence.  None of what the lawyers have

21  said in their opening statements, in their closing arguments,

22  or in their objections is evidence.  You should bear in mind

23  particularly that a question put to a witness is never

24  evidence; it is only the answer in the context of the question

25  that is evidence.  You may not consider any answer that I

1   directed you to disregard, and I remind you that nothing I have

2   said during the trial or will say during these instructions is

3   evidence.  Similarly, the rulings I've made during the trial

4   are not any indication of my views of what your decision should

5   be

6          The evidence before you consists of the answers given

7   by the witnesses, the exhibits that were received in evidence,

8   and any stipulations between the parties and the deposition

9   testimony that was read.  Exhibits marked for identification

10  are used as demonstratives, but not received into evidence, may

11  not be considered as evidence.  Anything you may have seen or

12  heard about this case outside the courtroom is not evidence and

13  must be disregarded entirely.

14         Now, it is the duty of the attorney for each side to

15  object when the other side offers testimony or other evidence

16  that the attorney believes is not properly admissible.  Counsel

17  also have a right and duty to ask the Court to make rulings of

18  law and to request conferences at the sidebar out of the

19  hearing of the jury.  You should not harbor any prejudice

20  against any attorney or party because the attorney objected to

21  the admissibility of evidence or asked for a conference out of

22  the hearing of the jury or asked me for a ruling on the law.

23         Now, this is a civil case.  Accordingly, the

24  plaintiffs have the burden of proving the elements of their

25  claims by a preponderance of the credible evidence.  "To

establish by a preponderance of the evidence" simply means that

something is more likely so than not so.  A preponderance of

the evidence means the greater weight of the evidence; it

refers to the quality and persuasiveness of the evidence, not

to the number of witnesses or documents.

If you find that the credible evidence on a given

issue is evenly divided between the parties, that it is equally

probable that one side is right as it is that the other side is

right, then you must decide that issue against the party having

this burden of proof.  That is because the party bearing this

burden must prove more than a simple equality of evidence; the

party must prove the element at issue by a preponderance of the

evidence.  The party's own subjective belief is not sufficient

to meet this burden.

On the other hand, the party with the burden of proof

need prove no more than preponderance.  So long as you find

that the scales tip, however slightly, in favor of the party

with this burden of proof, that what the party claims is more

likely true than not true, then that element will have been

proved by a preponderance of the evidence.  If you conclude

that the party bearing the burden of proof has failed to

establish its claim by a preponderance of the evidence, you

must decide against that party on the issue you're considering.

Now, some of you may have heard of proof beyond a

reasonable doubt, which is the proper standard of proof in a

1   criminal trial.  That requirement does not apply to a civil

2   case such as this and you should put it out of your minds.

3            Now, there are two types of evidence that you may

4   consider in reaching your verdict:  Direct evidence and

5   circumstantial evidence.

6            Direct evidence is evidence that proves a disputed

7   fact directly.  For example, where a witness testifies to what

8   he or she saw, heard, or did, that is called direct evidence.

9            Circumstantial evidence is evidence that tends to

10   prove a disputed fact by proof of other facts.  To give a

11   simple example, you may remember the story of Robinson Crusoe

12   who was marooned on a deserted island.  He spent years thinking

13   he was alone, until one day, as he walked along the beach, he

14   noticed large footprints in the sand.  Because his feet were

15   too small to have made them, Robinson concluded that somebody

16   else must have left the footprints, even though he had not seen

17   anyone else, in other words, he had no direct evidence of that

18   fact.  But it would be reasonable for him to conclude from the

19   footprints on the beach that, in fact, he was not alone.

20            That's all there is to circumstantial evidence.  Using

21   your reason and experience, you infer from established facts

22   the existence or the nonexistence of some other fact.

23            The law makes no distinction between direct and

24   circumstantial evidence.  Circumstantial evidence is of no less

25   value than direct evidence, and you can consider either or both

1    and can give them such weight as you conclude is warranted.

2             Now, in their arguments the parties have asked you to

3    infer on the basis of your reason, experience, and common sense

4    from one or more established facts the existence of some other

5    fact.  The process of drawing inferences from facts in evidence

6    is not a matter of guesswork or speculation.  An inference is a

7    reasonable deduction or logical conclusion which you, the jury,

8    are permitted -- but not required -- to draw from the facts

9    that have been established by either direct or circumstantial

10   evidence.  In drawing inferences, you should use your common

11   sense.

12            Now, you've had the opportunity to observe all the

13   witnesses.  How do you evaluate the credibility or

14   believability of those witnesses?  The answer is that you use

15   your plain common sense.  Was the witness candid, frank, and

16   forthright?  Or did the witness appear evasive as if he or she

17   was trying to hide something?

18            How much you choose to believe a witness may be

19   influenced by the witness's bias.  Does the witness have some

20   incentive, loyalty, or motive that might cause him or her to

21   shade the truth?  Or does the witness have some bias,

22   prejudice, or hostility that may have caused the witness,

23   consciously or not, to give you something other than a

24   completely accurate account of the facts?

25            You are not required to accept testimony, even though

1    the testimony is uncontradicted and the witness's testimony is

2    unchallenged.  You may decide, because of the witness's bearing

3    or demeanor or because of the inherent improbability of the

4    testimony or for other reasons that the testimony is not worthy

5    of belief.

6           If you find that a witness willfully testified

7    falsely, that's always a matter of importance that you should

8    weigh carefully.  If you find that any witness has lied under

9    oath, you should view the testimony cautiously and weigh it

10   with great care.  It is, however, for you to determine how much

11   of the witness's testimony, if any, you wish to believe.  Thus,

12   there is no formula by which you can evaluate testimony.  You

13   determine for yourselves every day in a multitude of

14   circumstances the reliability of statements made to you by

15   others.  You may consider the interest of any witness in the

16   outcome of this case, regardless of who called or questioned

17   the witness.

18          The issue of credibility may -- but need not be --

19   decided in an all-or-nothing fashion.  If you find that a

20   witness testified falsely in one part, you still may accept his

21   or her testimony in other parts, or you may disregard all of

22   it.  That is a determination entirely for you, the jury.

23          Now, you've also heard testimony from certain

24   witnesses who offered opinions based on acquired learning and

25   experience in a specialized area of knowledge.  Such a witness

1    is permitted to give his opinions or her opinions as to

2    relevant matters in which he or she professes to be

3    knowledgeable and give reasons for his or her opinions.  Such

4    testimony is presented to you on the theory that someone who is

5    experienced in the field can assist you in understanding the

6    evidence or in reaching an independent decision on the facts.

7         Your role in judging credibility applies to these

8    witnesses as well.  You should consider the witnesses' opinions

9    and give them as much or as little weight as you think they

10   deserve.  If you should decide that the opinion is based on

11   insufficient education or experience or on insufficient data or

12   if you should conclude that their trustworthiness or

13   credibility is questionable for any reason or that their

14   opinion is outweighed by other evidence in the case, then you

15   may disregard the witness's opinion entirely or in part.

16        On the other hand, if you find the witness's opinion

17   is based on sufficient data, education, or experience, and the

18   other evidence does not give you reason to doubt the expert

19   witness's conclusions, you'd be justified in relying on his or

20   her testimony.

21        Now, you've heard evidence that at some earlier time

22   witnesses have said or done something or failed to say or do

23   something which counsel argues is inconsistent with the

24   witness's trial testimony.  Evidence of a prior inconsistent

25   statement is not to be considered by you as affirmative

1    evidence in determining the facts.  Evidence of a prior

2    inconsistent statement was placed before you for the more

3    limited purpose of helping you decide whether to believe the

4    trial testimony of the witness who contradicted a prior

5    statement.

6           If you find that the witness made an earlier statement

7    that conflicts with the witness's trial testimony, you may

8    consider that fact in deciding how much of the witness's trial

9    testimony, if any, to believe.  In making this determination,

10   you may consider whether the witness purposely made a false

11   statement or whether it was an innocent mistake; whether the

12   inconsistency concerns an important fact or whether it had to

13   do with a small detail; whether the witness had an explanation

14   for the inconsistency; and whether that explanation appealed to

15   your common sense.  It is exclusively your duty, based upon all

16   of the evidence and your own good judgment, to determine

17   whether the prior statement was inconsistent and, if so, how

18   much, if any, weight to give to the inconsistent statement in

19   determining whether to believe all or part of the witness's

20   testimony.

21          Now, you may have heard evidence during the trial that

22   witnesses have discussed the facts of the case and their

23   testimony with the lawyers before the witnesses appeared in

24   court.  Although you may consider that fact when you are

25   evaluating a witness's credibility, I should tell you that

1   there is nothing either unusual or improper about a witness

2   meeting with lawyers before testifying so that the witness can

3   be aware of the subjects he or she will be questioned about,

4   focus on those subjects, and have the opportunity to review the

5   relevant exhibits before being questioned about them.  Such

6   consultation helps conserve your time and the Court's time.  In

7   fact, it would be unusual for a lawyer to call a witness

8   without such consultation.  Again, the weight you give to the

9   fact or the nature of the witness's preparation for his or her

10  testimony and what inferences you draw from such preparation

11  are matters completely within your discretion.

12          In determining what weight you'll attach to a

13  witness's testimony, you should consider the interest or lack

14  of interest that a witness has in the outcome of the case.

15  That means that in evaluating the credibility of the witness,

16  you should take into account any evidence that such witness may

17  benefit in some way from the outcome of the case.  Such

18  interest in the outcome creates a motive to testify falsely and

19  may sway a witness to testify in a way that advances his or her

20  own interests.  A witness who is interested in the outcome of a

21  case is not necessarily unworthy of belief, but the interest of

22  a witness is a factor or possible motive that you may consider

23  in determining the weight and credibility to be given to his or

24  her testimony.

25          Before leaving this subject, I wish to emphasize that

1   merely because a witness has an interest in the outcome of this

2   litigation, this does not render him or her unworthy of your

3   belief.  You may, however, consider this interest as one factor

4   among others in determining what weight and credibility to

5   attach to his or her testimony.

6          Now, some of the exhibits in this case are charts and

7   summaries.  These charts and summaries were admitted merely as

8   summaries of voluminous documents.  You may use those charts

9   and summaries as evidence, even though the underlying documents

10  and records have not been admitted into evidence.  You are

11  entitled to consider the charts and summaries if you find that

12  they assist you in analyzing and understanding the evidence.

13  However, you've also heard the parties challenge the accuracy

14  of those charts and summaries.  You must decide how much

15  weight, if any, you will give to them.  In making that

16  decision, you should consider the testimony you heard about the

17  way in which those charts and summaries were prepared.

18         Some exhibits in this case were redacted.  "Redacted"

19  means that part of the document was taken out.  You are to

20  focus on those portions of exhibits that have been admitted

21  into evidence.  You should not consider any reason why parts of

22  exhibits were deleted or redacted.

23         Now, this trial combined two cases that the plaintiffs

24  brought against the defendants.  The first, which I will refer

25  to as *Book Dog Books I*, was filed on February 4, 2013.  The

1   second, which I will refer to as *Book Dog Books II*, was filed

2   on September 12, 2016.  You will be provided with a chart

3   showing the titles at issue in *Book Dog Books I* and the titles

4   at issue in *Book Dog Books II*.

5          Now, let me turn to the substantive claims in this

6   case.

7          Plaintiffs bring three claims in this litigation:

8   Trademark infringement, copyright infringement, and breach of

9   contract.

10          The first claim that I will instruct you on is

11   trademark infringement.

12          You must decide if defendants are liable for

13   infringing trademarks belonging to plaintiffs and, if so, how

14   many trademarks defendants infringed.  This must be determined

15   individually on a trademark-by-trademark basis.

16          Plaintiffs allege that by distributing textbooks

17   bearing unauthorized reproductions of their trademarks,

18   defendants infringed ten of plaintiffs' trademarks.  Defendants

19   deny infringing these trademarks.

20          A trademark, sometimes referred to as a mark, is a

21   word, name, symbol, or device, or any combination of these

22   items, that indicates the source of goods.  The main function

23   of a trademark is to identify and distinguish goods or services

24   as the product of a particular manufacturer or merchant and to

25   protect its goodwill.  The owner of a trademark has the right

1    to exclude others from using that trademark or a similar mark

2    that is likely to cause confusion in the marketplace.

3          In order to establish trademark infringement,

4    plaintiffs must prove three elements:

5          First, one of the plaintiffs is the owner or exclusive

6    licensee of a valid trademark at issue.

7          Two, defendants used, without plaintiffs' consent, a

8    reproduction, copy, or colorable imitation of plaintiffs' mark.

9          Three, defendants used the mark in commerce in

10   connection with the sale, offering for sale, distribution, or

11   advertising of goods or services.

12         For purposes of determining whether defendants

13   infringed one or more of plaintiffs' trademarks, you are not to

14   consider whether defendants intended to infringe that

15   trademark.  An unintentional infringement is an infringement

16   nonetheless.  If you find that plaintiffs did not prove each of

17   these elements by a preponderance of the evidence, then you

18   must find for the defendants.  If, on the other hand, you find

19   that plaintiffs proved each of these elements by a

20   preponderance of the evidence, you must find for the

21   plaintiffs.

22         Now, a certificate of registration issued by the

23   United States Patent and Trademark Office creates a presumption

24   that the trademark is valid and owned by the holder of the

25   certificate.  This means that for each trademark for which

1    plaintiffs have presented a certificate listing a plaintiff as

2    the trademark holder, you must find that that plaintiff owns

3    that trademark and that the trademark is valid, unless

4    defendants have proven by a preponderance of the evidence that

5    such trademark is not valid or is not, in fact, owned by one of

6    the plaintiffs.

7         Additionally, if plaintiffs present a registration

8    certificate listing a person or entity from which a plaintiff

9    has obtained ownership through an exclusive license, transfer,

10   or assignment of rights, or by operation of law, you must find

11   that that plaintiff is the trademark owner and that the

12   trademark is valid, unless defendants have proved by a

13   preponderance of the evidence that the trademark is not valid

14   or that the plaintiff does not, in fact, own the trademark.

15        Let me turn to copyright infringement.

16        Plaintiffs' second claim is for copyright

17   infringement.  You must determine whether defendants are liable

18   for infringing copyrights belonging to plaintiffs and, if so,

19   how many.  This must be determined individually on a

20   copyright-by-copyright basis.

21        Plaintiffs contend that defendants are liable for the

22   infringement of 142 of plaintiffs' copyrights as a result of

23   defendants' distributing unauthorized copies of those titles.

24   Defendants deny infringing any of plaintiffs' copyrights.

25        A copyright is a kind of legal protection extended to

1    an author of an original work against the unauthorized

2    appropriation of that work by others.  In order to establish

3    copyright infringement, plaintiffs must prove two elements:

4          First, one of the plaintiffs is the owner or exclusive

5    licensee of a valid copyright for the title at issue.

6          And second, defendants violated one or more of

7    plaintiffs' exclusive rights to the copyright.

8          As relevant to this trial, one of the rights held by a

9    copyright holder is the exclusive right to copy the title and

10   to distribute copies of the copyrighted title to the public and

11   to license others to do so as well.  The right to distribute a

12   copyright is violated by someone other than the copyright

13   holder importing, selling, renting, or otherwise transferring

14   ownership of an unauthorized copy of a title to another person

15   or entity.  For purposes of determining whether the defendants

16   infringed one or more of plaintiffs' copyrights, you are not to

17   consider whether defendants intended to infringe that

18   copyright.  An unintentional infringement is an infringement

19   nonetheless.

20         If you find that plaintiffs did not prove each of

21   these elements by a preponderance of the evidence, then you

22   must find for the defendants.  If, on the other hand, you find

23   that plaintiffs have proven each of these elements by a

24   preponderance of the evidence, then you must find for the

25   plaintiffs.

1          Now, when a copyright is registered with the United

2     States Copyright Office, the person or entity listed as a

3     claimant on the copyright registration is presumed the owner of

4     the copyright.  This claimant may be the author of the title,

5     but it can also be any person or entity to whom the author

6     assigned, sold, or otherwise transferred the copyright prior to

7     filing the registration.  The owner may also be a person or

8     entity to whom a copyright claimant transferred the copyright

9     to after registration.

10          Here, plaintiffs may prove that they own a copyrighted

11    title in three ways:

12          First, by submission of a certificate of registration

13    listing a plaintiff as the claimant of the copyright.

14          Second, by demonstrating that a plaintiff is the

15    recipient of a valid transfer or assignment of ownership of the

16    copyright.

17          Or third, by demonstrating that a plaintiff is the

18    holder of the exclusive right to the title by virtue of a

19    license or other agreement.

20          A transfer of copyright ownership may take place in

21    various ways, including by means of a conveyance or by

22    operation of law, such as through a corporate merger or

23    acquisition or through a licensing agreement.  This can be

24    shown through an instrument of conveyance or a note or a

25    memorandum of the transfer.  Such an instrument of conveyance,

1  note, or memorandum of transfer is not valid unless it is in

2  writing and signed by the owner of the rights conveyed or the

3  owner's duly authorized agent.  If the right transferred --

4  excuse me.  If the right granted, transferred, or licensed by

5  the copyright owner is valid, the grantee, transferee, or

6  licensee becomes the owner of that particular right, meaning no

7  one else can have that right.

8         Now, for certain titles in this case, it's already

9  settled and conclusive that plaintiffs own or exclusively

10  control those titles' copyrights and you are not to

11  second-guess that fact.  Those titles are on a list that will

12  be provided to you.

13         For the rest of the titles, plaintiffs have provided a

14  certificate of registration for that title's copyright.  This

15  certificate of registration is known as *prima facie* evidence of

16  plaintiffs' ownership of the copyright.  That means it is

17  considered proof on its face or, in other words, that once

18  plaintiffs provide a certificate of registration listing it as

19  the copyright claimant, they have satisfied their burden of

20  proof to show that one of the plaintiffs own that copyright.

21         Accordingly, for each title that plaintiffs have

22  presented a certificate of registration listing one of the

23  plaintiffs as the claimant, you must find that that plaintiff

24  owns that title, unless defendants prove by a preponderance of

25  the evidence that the certificate of registration is not valid

1    or that a plaintiff does not, in fact, own such title.

2              For some of the titles submitted, a certificate of

3    registration listing someone other than a plaintiff as a

4    claimant.  If plaintiffs prove by a preponderance of the

5    evidence that a plaintiff obtained ownership of that title

6    through an exclusive license, transfer, or assignment of rights

7    from the claimant listed on that certificate of registration,

8    then you must find that that plaintiff owns that title.

9              For some of the titles at issue, defendants assert

10   that plaintiffs cannot establish ownership of the copyright,

11   nor that they were granted an exclusive license, transfer, or

12   assignment of rights by the copyright's owner.  If plaintiffs

13   fail to establish this for a given title, then they have not

14   established an essential element of their claim for that title

15   and you must find in favor of defendants for plaintiffs'

16   copyright claim for that title.

17             Finally, plaintiffs' third claim is that defendants

18   are liable for breach of contract.

19             A contract is a legally binding promise.  In 2008,

20   plaintiffs entered into a settlement agreement with defendants

21   Book Dog Books, LLC and Philip Smyres.  That settlement

22   agreement settled previous claims that plaintiffs brought

23   against defendants regarding copyright infringement.  This

24   Court already determined that this settlement agreement is a

25   legally binding contract.  For purposes of this trial, that

1    determination is conclusive and you are not to second-guess it.

2           The only remaining issue for you to decide concerns

3    one provision of that settlement agreement.  That provision

4    required defendants to "cease all sales and importation into

5    the United States of any pirated editions of the publishers'

6    textbooks," and to "not assist any other individual or entity

7    to sell or import pirated editions... in the United States."

8           The phrase "the publishers" refers to the plaintiffs

9    in this litigation.  You must determine if defendants violated

10   either element of that provision of the parties' settlement

11   agreement.  If you find that plaintiffs proved by a

12   preponderance of the evidence that defendants violated that

13   provision, then you must find defendants liable for breach of

14   contract.

15          Now, if you determine that plaintiffs have proven one

16   or more of their trademark or copyright claims, then you will

17   have to determine what amount of damages to award plaintiffs.

18   You should not interpret the fact that I'm giving you

19   instructions about damages now as an indication that I believe

20   that plaintiffs should receive damages.  It is your task -- and

21   yours alone -- to determine whether plaintiffs should prevail

22   on their claims.  In other words, you should only reach the

23   issue of what damages are appropriate if you decide that the

24   plaintiffs have proven one or more of their claims.

25          The law permits me to charge you on damages now so

1   that in the event you decide that plaintiffs have prevailed on

2   one or more of their claims and you reach the issue of damages,

3   you will not have to file back into the courtroom and listen to

4   my charges on damages.

5          So let me turn to statutory damages for trademark

6   infringement.

7          If you determine that defendants are liable for

8   trademark infringement, you must determine what amount of

9   damages to award plaintiffs.

10          Plaintiffs have chosen to recover statutory damages

11   for their trademark infringement claims.  Federal trademark law

12   allows a party to elect to recover statutory damages instead of

13   having to prove actual monetary damages.  You should,

14   therefore, award statutory damages whether or not there is

15   evidence of actual damages suffered by plaintiffs and whether

16   or not you believe plaintiffs suffered actual damages.  You

17   must make one award of statutory damages for each trademark

18   that plaintiffs proved defendants infringed.  This is true no

19   matter how many copies were made or how widely they were

20   distributed or how many of the defendants participated in the

21   infringement.  Those factors are irrelevant to your

22   consideration

23          The general purposes of statutory damages are to, one,

24   compensate the owner of the trademark; two, penalize the

25   infringer; and three, deter future infringement.

1          You have broad discretion in determining the amount of

2     statutory damages that you find to be just, based on the

3     evidence presented.  In deciding what amount is just, you

4     should consider various factors, including, one, the

5     defendants' state of mind; two, the profits that defendants

6     earned and expenses that they saved in connection with the

7     infringement; three, the revenue lost by plaintiffs in

8     connection with the infringement; four, the deterrent effect of

9     the award, both on defendants and others; five, defendants'

10    cooperation in providing evidence concerning the value of the

11    infringing material; and six, the conduct and attitude of the

12    parties.

13          In considering what amount would have a deterrent

14    effect, you may also consider defendants' total profits and the

15    effect the award may have on other sellers in the marketplace.

16    For each trademark that plaintiffs prove defendants infringed,

17    you must award statutory damages between 1,000 and $200,000.

18    However, if plaintiffs prove that defendants' infringement of

19    that trademark was willful, then you may -- but are not

20    required -- to increase the statutory damage award to $2

21    million per trademark infringed.

22          Therefore, if you find that defendants infringed one

23    or more of plaintiffs' trademarks, you will be required to

24    characterize the nature of that infringement as either willful

25    or not willful.  It is plaintiffs' burden to prove by a

1    preponderance of the evidence that an infringement by

2    defendants was willful.

3            Infringement is willful if the defendants had actual

4    knowledge that their actions infringed plaintiffs' trademark or

5    acted with reckless disregard to or willful blindness to that

6    possibility.  "Reckless disregard" means that the infringer

7    behaved recklessly in ignoring the possibility that its acts

8    could constitute infringement or in disregarding the rights of

9    the trademark owners.  "Willful blindness" means the defendants

10   were aware of a high probability that their activities

11   constituted infringement and consciously avoided confirming

12   that fact.

13           In other words, defendants' infringement need not have

14   been intentional for you to find that it was willful.  You may

15   infer defendants' state of mind, including reckless disregard

16   or willful blindness, from their overall course of conduct.  If

17   you determine that defendants reasonably believed their conduct

18   was permissible or that their infringement was only negligent

19   by mistake or by accident, then you should not find that

20   defendants infringed willfully.

21           Now let me turn to statutory damages for copyright

22   infringement.

23           If you determine that defendants are liable for

24   copyright infringement, you must determine what damages to

25   award plaintiffs.

1          Plaintiffs have chosen to recover statutory damages

2     for copyright infringement.  Federal copyright law allows

3     plaintiffs to elect to recover statutory damages instead of

4     having to prove actual monetary damages.  You should therefore

5     award statutory damages whether or not there is evidence of

6     actual damages suffered by plaintiffs and whether or not you

7     believe plaintiffs suffered actual damages.  You must make one

8     award of statutory damages for each copyright that plaintiffs

9     proved defendants infringed.  This is true no matter how many

10    copies were made or how widely they were distributed or how

11    many of the defendants participated in the infringement.  Those

12    factors are irrelevant to your consideration.

13         Now, here again the general purpose of statutory

14    damages are to, one, compensate the owner of the copyright;

15    two, penalize the infringer; and three, deter future

16    infringement.  You have broad discretion in determining the

17    amount of statutory damages that you find to be just, based on

18    the evidence presented.  In deciding what amount is just, you

19    may consider all of the facts and circumstances and, in

20    particular, any notice that defendants had of plaintiffs'

21    copyrights.

22         You may also consider the following factors:

23         One, defendants' state of mind; two, the profits

24    earned and expenses saved by defendants in connection with the

25    infringement; three, the revenue lost by plaintiffs as a result

1   of defendants' infringement; four, the deterrent effect of the

2   award both on defendants and others; five, the defendants'

3   cooperation in providing evidence concerning the value of the

4   infringing material; and six, the conduct and attitude of the

5   parties.  Here again, in considering what amount would have a

6   deterrent effect, you may also consider defendants' total

7   profits and the effect the award may have on other sellers in

8   the marketplace.

9           For each copyright that plaintiffs prove defendants

10  infringed, you must award statutory damages between 750 and

11  $30,000.  However, that range can be adjusted up or down

12  depending on whether the infringement was willful or innocent.

13  If plaintiffs prove that defendants' infringement was willful,

14  then you may -- but are not required to -- increase the

15  statutory damage award up to $150,000 per copyright infringed.

16  If defendants prove that an infringement was innocent, then you

17  may -- but are not required to -- decrease the statutory

18  damages awarded down to $200 per title.

19          Therefore, if you find that defendants infringed one

20  or more copyrights, you will be required to characterize the

21  nature of that infringement as either willful, innocent, or

22  neither willful nor innocent.  It is plaintiffs' burden to

23  prove by a preponderance of the evidence that an infringement

24  by defendants was willful, but it is defendants' burden to

25  prove by a preponderance of the evidence that an infringement

1   by defendants was innocent.

2        Infringement is willful if the defendants either knew

3   that their actions infringed plaintiffs' copyright or acted

4   with reckless disregard to or willful blindness to that

5   possibility.  "Reckless disregard" means that the infringer

6   behaved recklessly in ignoring the possibility that its acts

7   could constitute infringement or in disregarding the rights of

8   copyright owners.  "Willful blindness" means that defendants

9   were aware of a high probability that their activities

10  constituted infringement and consciously avoided confirming

11  that fact.  In other words, defendants' infringement need not

12  have been intentional for you to find that it was willful.  You

13  may infer defendants' state of mind, including reckless

14  disregard or willful blindness from their overall course of

15  conduct.

16       If you determine the defendants reasonably believe

17  their conduct was permissible or that their infringement was

18  only negligent by mistake or by accident, then you should not

19  find that the defendants infringed willfully.

20       Infringement is innocent if the defendants were not

21  aware that their actions constituted infringement of the

22  copyright and had no reason to believe that their acts

23  constituted infringement of the copyright.  You must find that

24  defendants both, one, had a good-faith belief that their

25  conduct was innocent; and two, that belief was reasonable under

I44VWIL7                        Charge

1    the circumstances.

2            It is defendants' burden to prove by a preponderance

3    of the evidence that a particular infringement was innocent.

4    In making this determination, you may consider defendants'

5    level of sophistication.  You may not find that defendants'

6    infringement was innocent if defendants had access to a copy of

7    plaintiffs' textbook displaying a notice of copyright in the

8    correct form and position.  A notice of copyright contains

9    three elements:  One, either the copyright symbol, which is a

10   "C" in a circle, the word "copyright," or the abbreviation

11   "COPYR"; two, the year of the first publication of the

12   copyrighted title; and three, the name of the copyright owner

13   or a recognizable abbreviation.

14           Now, you must consider each trademark and copyright

15   separately and make a separate liability determination for each

16   of the ten infringement claims and each of the 142 copyright

17   infringement claims.  If you determine defendants are liable on

18   any trademark infringement claims or copyright infringement

19   claims, you may only make one award of statutory damages for

20   that title.  This is true no matter how many infringing copies

21   may have been sold or how many of the defendants jointly

22   participated in infringing that copyright -- that trademark or

23   copyright.

24           Now, plaintiffs contend that defendants purchased

25   books at prices "too good to be true" for the 140 titles in

1   *Book Dog Books I*.  Please do not consider this argument for the

2   21 titles in *Book Dog Books II*.  To the extent that you choose

3   to consider whether the pricing of certain titles at issue was

4   "too good to be true," you may do so only for the 140 titles at

5   issue in *Book Dog Books I*.

6          You've heard evidence that in *Book Dog Books I*

7   defendants destroyed textbooks that had been set aside as

8   potentially counterfeit; and that they failed to maintain

9   records regarding those books.  Plaintiffs contend that those

10   actions prevented them from discovering additional evidence of

11   defendants' infringing activity.  During your deliberations,

12   you may consider defendants' document destruction practices and

13   their failure to retain records regarding those books in

14   determining whether defendants infringed plaintiffs' trademarks

15   and copyrights for the titles in *Book Dog Books I*.

16          You've heard evidence that in the course of litigating

17   this case, defendants failed to comply with court orders

18   requiring them to identify all of the entities and businesses

19   through which they conduct business, and to provide certain

20   financial and rental information regarding their companies.

21   Those failures deprived plaintiffs of the ability to present

22   certain evidence regarding defendants' business and finances,

23   possibly including the full extent of defendants' profits and

24   sales.  Given defendants' violation of those orders, you may

25   infer that the evidence that defendants failed to provide would

1  have been unfavorable to defendants, and that the evidence

2  would have shown a higher level of profits than demonstrated by

3  the records that defendants produced.

4         Now, shortly you'll go into the jury room to begin

5  your deliberations.  In order to prevail on their claims,

6  plaintiffs must sustain their burden of proof as I've explained

7  it to you.  If you find that plaintiffs succeeded, you should

8  return a verdict in their favor.  If you find plaintiffs

9  failed, you should return a verdict in favor of the defendants.

10         As you deliberate, please listen to the opinions of

11  your fellow jurors and ask for an opportunity to express your

12  own views.  Every juror should be heard; no one juror should

13  hold center stage in the jury room, and no one juror should

14  control or monopolize the deliberations.

15         If, after listening to your fellow jurors, and if,

16  after stating your own view, you become convinced that your

17  view is wrong, do not hesitate to change your view.  On the

18  other hand, do not surrender your honest convictions and

19  beliefs solely because of the opinions of your fellow jurors or

20  because you are outnumbered.  Your final vote must reflect your

21  conscientious belief as to how the issues should be decided.

22  Your duty is to decide the issues fairly and impartially and to

23  see that justice is done.

24         Remember at all times you are not partisans, you are

25  judges, judges of the facts.  Your sole interests are to seek

I44VWIL7                        Charge

the truth from the evidence in this case and determine whether

plaintiffs have proven their claims by a preponderance of the

evidence.

          Your verdict must be unanimous.  Each of you must

decide this case for yourself.  If at any time you are not in

agreement, you are instructed that you are not to reveal the

standing of the jurors -- that is, the split of the vote -- to

anyone, including the Court, at any time during your

deliberations.

          (Continued on next page)

1          THE COURT:  Finally, I say this not because I think

2    it's necessary, but because it's the custom in this courthouse

3    to say this.  You should treat each other with courtesy and

4    respect during your deliberations.

5          Your first duty in the jury room is to select one

6    member of the jury as your foreperson.  That foreperson has no

7    greater voice or authority than any other juror but is the

8    person who will communicate with the Court when questions

9    arise.  If during your deliberations you want to see any of the

10   exhibits, you may request that they be sent to you in the jury

11   room.

12         A list of exhibits received in evidence will be

13   forwarded to you in the jury room along with a copy of my

14   charge.  If you want any of the testimony read, that can also

15   be done but will occur here in open court.  Your requests for

16   exhibits or testimony, in fact any communications with the

17   Court should be made to me in writing, signed by your

18   foreperson, and give it to the marshal.  I will respond to any

19   questions or requests you have as promptly as possible by

20   having you return to the courtroom so that I can address you in

21   person.  In any event, do not tell me or anyone else how the

22   jury stands on any issue until after a unanimous verdict is

23   reached.

24         After you have reached a verdict, your foreperson will

25   fill out the jury verdict form that will be given to you,

 1   signed and dated, and advise the marshal outside your door that

 2   you are ready to return to the courtroom.  I stress that each

 3   of you should be in agreement with the verdict which is

 4   announced in court.  Once the verdict is announced by your

 5   foreperson in open court and officially recorded, it cannot

 6   ordinarily be revoked.

 7            Now, I am going to review with you now the jury

 8   verdict form, a copy of which I am going to give to each of you

 9   to have in the jury room.

10            Please distribute the verdict form and we will go over

11   it together.

12            Turning to page 2, according to the principles of law

13   as charged by this Court and the facts a you find them, please

14   answer the following questions:  I.  Trademark infringement.

15   Question 1:  Plaintiffs are pursuing trademark infringement

16   claims for 10 trademarks.  Those trademarks are listed in table

17   1.  Which trademarks, if any, have plaintiffs established by a

18   preponderance of the evidence that defendants infringed?  And

19   then there is a box to check, either all, some, or none.

20            Now, the table is on page 4 of this verdict form.

21            Turning back to question 1:  If you answered all to

22   question 1, go to question 2.  If you answered none to question

23   1, go to Section 2.  Section 2 involves copyright infringement.

24   If you answer none, you are done with respect to trademark

25   infringement.  If you answer some to question 1, please mark in

the liability column of table 1 the trademarks that you find

defendants infringed and then proceed.  You would go to table 1

on page 4 and mark in the liability column those trademarks

that you find infringed, and then you will return to answer

question 2 on page 2.

Question 2:  If you answered all or some to question

1, you must decide whether defendants' infringement was willful

or not willful.  Which trademarks, if any, have plaintiffs

established by a preponderance of the evidence that defendants'

infringement was willful?  Here again, you are given a menu of

options.  Check only one, either all, some, or none.

If you answered all, you will proceed to question 3.

If you answered none to question 2, you will also proceed to

question 3.  If you answered some to question 2, please

identify the trademarks that you find defendants willfully

infringed by checking the box in the willful follow of table 1.

Please identify the trademarks that you find defendants did not

willfully infringe by checking the box in the not willful

column of table 1 and then proceed to question 3.

Question 3:  If you answered all or some to question

1, you must determine an amount of statutory damages to award

plaintiffs for each trademark that you found defendants

infringed.  If you choose to award the same amount of statutory

damages for each trademark infringed, please fill in the amount

you award plaintiffs for each trademark infringed on the line

1   below.  If you choose to award different amounts of damages for

2   different trademarks, please identify the amount you award

3   plaintiffs for each trademark that you find defendants

4   infringed in the damages award column of table 1.

5          We then go on to restate the parameters for statutory

6   damages, namely, the amount of statutory damages that you must

7   award plaintiffs for each trademark infringed is as follows:

8   If not willful, you must award damages between a thousand and

9   $200,000 per trademark infringed.  If willful, you must award

10  damages between 1,000 and $2 million per trademark infringed.

11  Then what amount of statutory damages per trademark infringed

12  do you award plaintiffs.  There is a dollar sign and an amount.

13  That is only if you determine that damages are the same amount

14  for all trademarks infringed.  Otherwise, you will fill in the

15  amounts on table 1 on page 4.

16         Now we turn to Section 2, copyright infringement.

17         Question 4:  Plaintiffs are pursuing copyright

18  infringement claims for 142 titles.  Those 142 titles are

19  listed in table 2.  Which copyrights, if any, have plaintiffs

20  established by a preponderance of the evidence that defendants

21  infringed?  Here again, you have a menu of options:  All, some,

22  or none.  If you answered all to question 4, go to question 5.

23  If you answered none to question 4, go directly to Section 3.

24  That's because you are then done with copyright infringement

25  and Section 3 involves the contract.  If you answered some to

1    question 4, please mark the copyrights that you find defendants

2    infringed in the liability column of table 2 and then proceed

3    to question 5.

4           Let's go to table 2, and here it's a multipage

5    document.  It's longer than it need be, but the reason is that

6    I thought it would be a good idea to put the damage award

7    parameters for willful, innocent, and neither willful nor

8    innocent on each page as you consider each copyright

9    individually.

10          Let's then return to page 5 because if you have

11   decided that some copyright claims have been proven you will

12   have completed some rows on table 2 of the verdict sheet, and

13   then you will return and you will see that you are instructed

14   then to proceed to question 5, which is right below.

15          Question 5:  If you answered all or some to question

16   4, you must determine whether defendants' infringement was

17   willful, innocent, or neither willful nor innocent.  Please

18   mark below whether you find defendants' copyright infringement

19   was all willful, all innocent, all neither willful nor

20   innocent, or some mix of the above.  This is a four-choice

21   menu, if you decide after addressing each claim individually

22   that you wish to respond in that fashion.

23          If you answered all willful, go to question 6.  If you

24   answered all innocent, go to question 6.  If you answered all

25   neither willful nor innocent, go to question 6.  It's only if

1    you've answered some mix of the above that you'll then return

2    to table 2 and mark the willfulness determination you make for

3    each copyright that you found defendants infringed in the

4    columns marked willful, innocent, and neither willful nor

5    innocent in table 2.  And then you will proceed to question 6.

6          Question 6:  If you answered all or some to question

7    4, you must determine an amount of statutory damages to award

8    plaintiffs for each copyright that you found defendants

9    infringed.  If you choose to award the same amount of statutory

10   damages per copyright infringed, please fill in the number you

11   award plaintiffs for each copyright infringed on the line

12   below.  If you choose to award different amounts of damages for

13   different copyrights, please identify the amount you award

14   plaintiffs for each copyright that you found defendants

15   infringed in the damages award column of table 2.  Here again,

16   we recite the amount of statutory damages that you must award

17   for plaintiffs for each copyright infringed is as follows:

18         If willful, you must award damages between 750 and

19   $150,000 per title infringed.  If innocent, you must award

20   damages between $200 and $30,000 per title infringed.  If

21   neither willful nor innocent, you must award damages between

22   750 and $30,000 per title infringed.

23         And then there is the question:  What amount of

24   statutory damages per copyright infringed do you award

25   plaintiffs?  There is an amount with a dollar sign and a blank

I44MWIL8                        Charge

1   per copyright.  This is only to be completed if you determine

2   that you are awarding the same amount of damages per copyright.

3   If not, you will proceed to award damages on table 2.

4          Turning to page 16, Section 3, breach of contract.

5   Question 7:  Have plaintiffs established by a preponderance of

6   the evidence that defendants are liable for a breach of the

7   2008 settlement agreement?  It's a yes or a no answer.

8          With that, the jury's work will be done other than to

9   have the foreperson sign and date the verdict form.  I've taken

10  the liberty of putting in the month of April, but you'll have

11  as much time as you need to deliberate in this case.

12         Now, members of the jury, I am going to ask for your

13  patience a few moments before.  I need to confer with counsel

14  up at the side bar.

15         (At the side bar)

16         THE COURT:  Are there any additional requests to

17  charge or exceptions to the charge?

18         MR. OPPENHEIM:  There are no additional requests from

19  the plaintiffs.  I think we have to give you the table

20  instructions that we are going to provide to the jury.  I don't

21  know that we have given you that yet.  We need to do that.

22         THE COURT:  You need to get that.

23         MR. OPPENHEIM:  Otherwise, no issues, your Honor.

24         THE COURT:  Any issues with respect to the verdict

25  form?

1            MR. OPPENHEIM:  No, your Honor.

2            MR. MANDEL:  No additional issues.  The Court has

3     ruled already on all of our issues.

4            THE COURT:  No additional requests to charge.

5            MR. MANDEL:  Correct.

6            THE COURT:  No exceptions to the verdict form.

7            MR. MANDEL:  Nothing that the Court hasn't already

8     ruled upon.

9            MR. OPPENHEIM:  We preserve all of our objections that

10    we previously noted.

11           THE COURT:  I am going to let them get started and

12    give them some instructions about how deliberations are to

13    proceed.  We will get them into the jury room and then we will

14    bring them out 10 minutes later and send them home to the

15    evening, unless they decide to stay.

16           (In open court)

17           THE COURT:  I told you that we were going to get this

18    case in your capable hands this afternoon.  I have made it.

19    Part of my job is to keep the trains running on time.

20           Momentarily you are going to go into the jury room.

21    At this time would counsel be seated.  I am going to direct my

22    deputy to administer the oath to the marshal.

23           (Court security officer sworn)

24           THE COURT:  Members of the jury, I am going to send

25    you into the jury room to begin your deliberations.  As I've

I44MWIL8

1    told you, we are going to be sending certain documents in to

2    you.  It's unlikely that you are going to get those documents

3    before you go home tonight.  If you decide you want to stay

4    beyond 5:00, that's up to you.  But, otherwise, at 5:00 I am

5    going to bring you back out and give you some instructions and

6    send you home for the evening.

7          Tomorrow I will ask that you return and begin your

8    deliberations at 9:15, and I'll give you further instructions

9    at 5:00.  For now, please recess the jury.

10          (At 4:49 p.m., the jury retired to deliberate)

11          THE COURT:  It makes sense to let them talk with each

12    other for a few minutes.  I suspect that we will just send the

13    documents in to them tomorrow morning.  Is there a list of

14    exhibits that have been received into evidence that's been

15    prepared, a joint list?

16          MR. GLUNT:  Your Honor, we don't have a joint list.

17    We have our list and we are keeping track.  I assume they are,

18    too.  I assume the parties can confer on that relatively

19    quickly and come to a quick agreement.

20          MR. OPPENHEIM:  I thought we had conferred last night.

21    Your Honor, give us a moment.  We will figure this out amongst

22    us.

23          THE COURT:  It might make sense actually in this case

24    to have separate lists only because both sides used numbers in

25    their exhibit lists, unless counsel have a better idea.

1          MR. OPPENHEIM:  We will figure it out one way or

2     another.  They are all P something or D something.

3          THE COURT:  They can all be combined into one list

4     with the plaintiffs' exhibits and then the defendants' exhibits

5     in one list.  And I don't want any disputes about how a

6     document is identified in its title, which is why I want you to

7     confer.

8          MR. OPPENHEIM:  Very well.  We will do that, your

9     Honor.

10          If I may, when the jury ultimately returns some

11     verdict, would the Court entertain offering the jury the

12     opportunity to chat with counsel after they return a verdict?

13          THE COURT:  What I generally do is, I'll go into the

14     jury room and greet them and talk to them for a few minutes,

15     and I tell them that they are free to speak with anyone they

16     want so long as they respect the sanctity of jury deliberations

17     and speak only for themselves.

18          I do generally tell them that the lawyers may want to

19     speak to them and it's totally up to them as to whether or not

20     they want to speak with the lawyers.  Sometimes I tell them

21     that when I was a trial lawyer I always wanted to talk to the

22     jury after the verdict because I wanted to find out what I did

23     that annoyed them so I would never do it again.

24          I'm going to bring them out in five minutes.  Don't go

25     too far.

1          (Recess pending verdict)

2          THE COURT:  Counsel, we are going to bring the jury

3     back in now and send them home.

4          (Jury present)

5          THE COURT:  Members of the jury, I am going to send

6     you home for the evening.  What I'd like you to do is, you will

7     leave your jury verdict forms in the jury room.  Tomorrow

8     morning I will send in one other jury verdict form which the

9     foreperson can use to record any verdict.  I'll send a copy of

10    the charge, the tables that we referred to, and a list of

11    exhibits.  You'll have those documents in the jury room when

12    you begin your deliberations.  I would ask you to endeavor to

13    start your deliberations at 9:15.  Please be sure to send us

14    the signal because we keep track of the time that a jury

15    deliberates.

16         If you have any questions or you want any exhibits,

17    any communications with the Court have to be in writing in a

18    note signed by your foreperson and that foreperson can sign

19    their name and put their jury number, 1 to 9, whoever it may

20    be, on the note so we know who the foreperson is.

21         During your deliberations you are not to begin your

22    deliberations until you are all in the jury room all gathered

23    around the table.  And if one or more need the restroom or are

24    not at the jury table, you should stop your deliberations until

25    you are all together.  That's the very purpose of jury

I44MWIL8

deliberations.

When you are all together tomorrow morning you are now free to talk about the case with each other, but not with anyone else and not separately; only when you are all together in the jury room.

Tomorrow we will be available to you to receive notes at any time except between 1 and 2 because we will be taking our lunch between 1 and 2.

You will have a decision to make as soon as you arrive in the jury room, what you are going to have for lunch. Fill out the orders so that we can get them to Max and we can see that that is accommodated.

It's been a long day. You've been very attentive. The parties really appreciate it. I really appreciate it. We will see you all tomorrow morning at 9:15. Have a great evening. Looks like the sun has come out again. And a safe trip home.

Please recess the jurors.

(Jury not present)

THE COURT: I need counsel to get together and confer and reach agreement tonight so that there are no issues tomorrow regarding the exhibit list, the works in BD1 and BD2, and the copyrights that are stipulated to be a nonissue for the jurors.

Is there anything else we need to accomplish this

I44MWIL8

1     afternoon?

2              MR. MANDEL:  What is the Court's policy with respect

3     to deliberations?  Is one lawyer per side sufficient or does

4     the Court want everyone here?

5              THE COURT:  As long as there is one attorney here.

6     When I get a note I like to respond immediately.  It's not

7     California.  Don't leave the courthouse except between 1 and 2

8     because when I get a note, we are going to jump on it and it's

9     going to be resolved.

10             I think you should be here by 9:00 tomorrow morning so

11    that we can get these documents into the jury room, and they

12    will be able to start and make the most productive use of their

13    time.

14             With that, we will wait to see what happens tomorrow

15    morning.  I hope that all of you get a good night's sleep for

16    the first time in a couple of weeks.

17             And you need to move out of the well or make some room

18    because I have a criminal case on now.  I have to turn my

19    attention to that.

20             Have a good evening, everyone.

21             (Adjourned to April 5, 2018, at 9:00 a.m.)

22

23

24

25

I44MWIL8

1                        PLAINTIFF EXHIBITS

2    Exhibit No.                                    Received

3      254   . . . . . . . . . . . . . . . . . .2966

4                        DEFENDANT EXHIBITS

5    Exhibit No.                                    Received

6      287 and 288   . . . . . . . . . . . . . . .2857

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25