UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                :

JOHN WILEY & SONS, INC., *et al.*,      :
                :
                :       13cv816
          Plaintiffs,  :
       - against -     :
                :

BOOK DOG BOOKS, LLC, *et al.*,        :
                :
         Defendants.  :
                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                :

CENGAGE LEARNING, INC., *et al.*,    :
                :     16cv7123
                :
          Plaintiffs,  :
       - against -     :
                :

BOOK DOG BOOKS, LLC, *et al.*,        :
                :
         Defendants.  :
                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

       On April 5, 2018, a nine-person jury found Defendants liable on Plaintiffs'

trademark infringement, copyright infringement, and breach of contract claims and awarded

Plaintiffs $34.2 million in statutory damages. In the wake of that verdict, the parties filed a

plethora of motions. Defendants move for: (1) renewed judgment as a matter of law, (2) a new

trial, (3) remittitur, and (4) a stay of enforcement of any judgment pending appeal. Plaintiffs

move for: (1) entry of a partial final judgment, (2) prejudgment interest, (3) a permanent injunction, (4) disposition of infringing materials, and (5) attorneys' fees and costs. For the reasons that follow, Defendants' motions are denied. Plaintiffs' motion for partial final judgment is denied as moot. Plaintiffs' motion for prejudgment interest is denied. Plaintiffs' motions for a permanent injunction, disposition of infringing materials, and attorneys' fees and costs are granted in part and denied in part.

BACKGROUND

The April 2018 verdict was the dénouement of a decade of litigation between the parties. Plaintiffs are a consortium of textbook publishers: John Wiley & Sons, Cengage Learning, Pearson Education, and McGraw–Hill Global Education. Defendants are used book sellers owned and operated by Philip Smyres. (See Trial Tr. 765:3–767:14.)

In 2007, Plaintiffs sued Defendants for copyright infringement and trademark infringement. (See Second Amended Complaint, No. 13-cv-816 ("BDB I"), ECF No. 263 ("BDB I SAC"), ¶ 3.) The parties settled that action with an agreement that Defendants would cease importing and selling counterfeit books. (See PX127 ("Settlement Agreement").) In 2011, Plaintiffs discovered that Defendants were selling counterfeit books once again. (BDB I SAC, ¶ 4.) This time, settlement negotiations failed, and Defendants filed a preemptive federal action against Plaintiffs in the Southern District of Ohio seeking a declaration that Defendants were not violating Plaintiffs' rights under the Copyright Act. See Book Dog Books, LLC v. Cengage Learning, Inc., No. 12-cv-1165 (S.D. Ohio) (the "Ohio Action"). Plaintiffs responded by filing the first action in this proceeding ("Book Dog Books I"), asserting trademark infringement, copyright infringement, breach of the Settlement Agreement, and related claims. In 2013, the

Ohio Action was transferred to this Court, and the parties stipulated to dismiss it. (See Order, No. 13-cv-6413, ECF No. 89.)  In 2016, Plaintiffs filed Book Dog Books II, which identified additional works that Plaintiffs claimed Defendants infringed during the pendency of Book Dog Books I.  (See Plaintiffs' Second Amended Complaint, No. 16-cv-7123 ("BDB II"), ECF No. 30.)  This Court consolidated both cases for trial.  (See Scheduling Order, BDB II, ECF No. 28.)

Scorched-earth litigation ensued, including numerous discovery motions, followed by appeals of determinations made by the Magistrate Judge, and multiple motions for summary judgment (followed by motions for reconsideration).  As the trial date loomed, the parties filed nearly twenty motions in limine and five Daubert motions.  The docket sheet for each case approaches 500 entries.  And on the eve of trial, Plaintiffs discovered that Defendants had concealed certain business entities and profit distributions, prompting further litigation over sanctions and adverse inference instructions.

Trial began on March 19, 2018 and spanned three weeks.  The parties presented hundreds of textbooks to the jury.  Plaintiffs argued that this was "a case about a bookseller swarming in counterfeits . . . who was caught, sued, and settled, [but] ignored the settlement and ignored the law."  (Trial Tr. 40:11:14.)  They averred that Defendants "knowingly purchased counterfeits from known counterfeit suppliers," "failed to maintain the kinds of records that would allow anybody to track . . . what they did," and "destroy[ed] evidence when they thought that it might be useful."  (Trial Tr. 40:16–24.)  Plaintiffs offered evidence that Smyres knew or should have known that he was importing and selling counterfeits, but continued to do so with reckless abandon.  (See, e.g., Trial Tr. 891:23–892:2.)  Plaintiffs' financial expert testified that from 2012 to 2016, Defendants earned more than $53 million in profits and generated $783

million in revenue, and that from 2008 to 2016 Smyres personally received over $47 million. (Trial Tr. 1948:16–1950:19, 1975:23–1976:2.)

Defendants countered that their companies used robust procedures and training to detect counterfeit books, but, like all booksellers, were unable to stop counterfeits from slipping through the cracks. (See, e.g., Trial Tr. 3021:8–3022:25.) Defendants also argued that Plaintiffs failed to prove that some or all counterfeits at issue originated from the Defendants.

At the end of Plaintiffs' case-in-chief, Defendants moved for judgment as a matter of law. (Trial Tr. 2079:2–2084:5.) This Court reserved decision. (Trial Tr. 2088:18.) During its charge, this Court gave adverse inference instructions concerning the scope of Defendants' business and profits, and their failure to maintain records. (Trial Tr. 3123:6–3124:3.) The jury found that Defendants' infringement was willful and chose to award Plaintiffs the maximum statutory damages of $2 million for each of their 10 trademark claims, as well as $100,000 for each of their 142 copyright claims. The jury also determined that Defendants breached the Settlement Agreement.

DISCUSSION

I.      Judgment as a Matter of Law

A.  Legal Standard

Under Federal Rule of Civil Procedure 50, within 28 days of a verdict, a party "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). The movant must demonstrate that "the evidence, drawing all inferences in favor of the non-moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a

reasonable juror to find in [the opposing party's] favor." <u>Lavin-McEleney v. Marist Coll.</u>, 239

F.3d 476, 479 (2d Cir. 2001). There must be "such a complete absence of evidence supporting

the verdict that the jury's findings could only have been the result of sheer surmise and

conjecture . . . or pure guesswork." <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 156 (2d Cir.

2001) (citations and quotation marks omitted). The movant's burden is "particularly heavy."

<u>Cash v. Cty. of Erie</u>, 654 F.3d 324, 333 (2d Cir. 2011) (citation omitted). The court may not

"assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute

its judgment for that of the jury." <u>Black v. Finantra Capital, Inc.</u>, 418 F.3d 203, 208 (2d Cir.

2005) (citation omitted).

B. <u>Distribution</u>

Defendants contend that Plaintiffs failed to show evidence of distribution for 116

works, meaning Plaintiffs did not establish that Defendants sold at least one counterfeit copy of

those works. This contention undergirded an earlier summary judgment motion. (<u>See</u> Mot. for

Partial Summ. J. by Defs., BDB I, ECF No. 266; Report & Recommendation, BDB I, ECF No.

308.) This Court declined to adopt that portion of a Report and Recommendation that had

concluded that Plaintiffs failed to show distribution for certain works. <u>See</u> <u>John Wiley & Sons,</u>

<u>Inc. v. Book Dog Books, LLC</u>, 2016 WL 11468565, at *1, *4–5 (S.D.N.Y. Mar. 29, 2016).

Noting that copyright infringement can be proven by circumstantial evidence, this Court held

that "a reasonable jury could find that Book Dog's purchases from suppliers accused of dealing

in counterfeit textbooks, failure to keep accurate records, and destruction of potentially

infringing textbooks—combined with the counterfeit exemplars uncovered by the Publishers—

support the inference that Book Dog sold the counterfeit textbooks." <u>John Wiley & Sons</u>, 2016

WL 11468565, at *5.

Defendants now resurrect that argument, contending that no reasonable jury could find sufficient evidence of distribution for 116 works. But "direct proof of actual dissemination is not required under the Copyright Act." Capitol Records, Inc. v. Thomas, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) (emphasis omitted). Indeed, in a case where there was no "direct proof" that the defendant had infringed, the Second Circuit determined that there was "a significant amount of circumstantial evidence that support[ed] the district court's . . . finding of liability," including defendant's (1) failure to keep adequate records, (2) failure "to adequately check the authenticity of the goods it purchased," (3) failure "to adequately inquire" about the authenticity and sources of the goods purchased, and (4) return of merchandise after being sued. Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc., 507 F. App'x 26 (2d Cir. 2013) (summary order).

Aside from direct evidence of distribution, the circumstantial evidence against Defendants was legion and harmonizes with the indicia of liability described in Fendi. Defendants admitted they sold at least some of the works. (Trial Tr. 3044:3–22.) The jury saw "counterfeit exemplars," or counterfeit works returned to Plaintiffs from Defendants' customers or found in Defendants' warehouses. (See Trial Tr. 315:11–13.) Plaintiffs presented emails in which Smyres and his staff recognized that they might have been buying counterfeits and had counterfeits in their inventory. (Trial Tr. 334:10–17, 2371:8–17.) Defendants continued to purchase from sources that they knew sold counterfeits. (Trial Tr. 823:17–824:23, 827:23–828:1.) And they acknowledged that their procedures for checking counterfeits were ineffective. (Trial Tr. 935:12–20, 1205:20–25, 1391:5–1395:12.) The jury also heard that other textbook

distributors believed Defendants had sold them counterfeits and were "risky suppliers." (Trial Tr. 1913:2–16, 1932:3–12, 1943:21–1944:4, 2051:1–3.)

Further, the jury learned that Defendants kept inadequate records. (Trial Tr. 315:17–24, 2229:3–10.) Photographs of Defendants bulldozing counterfeit books for "fear of a lawsuit" were received in evidence. (Trial Tr. 917:23–924:2.) And this Court instructed the jury that they could "consider defendants' document destruction practices and their failure to retain records regarding those books in determining whether defendants infringed plaintiffs' trademarks and copyrights." (Trial Tr. 3123:12–15.) Topping everything off, the jury was permitted to "infer that the evidence that defendants failed to provide would have been unfavorable to defendants." (Trial Tr. 3123:24–3124:1.)

Defendants acknowledge that infringement can be established through circumstantial evidence. (See June 26, 2018 Hr'g Tr., BDB II, ECF No. 485 ("Hr'g Tr.") 11:24). But they contend that Plaintiffs did not present a sufficient quantum. In making this argument, Defendants separate the 116 works they challenge into four categories: (1) works found in Defendants' quarantine, (2) works for which Plaintiffs had no counterfeit exemplar, (3) works found in other book distributors' inventories, and (4) works for which Plaintiffs had evidence from multiple sources. Defendants' overly cramped analysis does not give proper weight to the evidence.

First, Defendants contend that the works found only in their quarantine cannot support an inference that Defendants also sold those works. But Plaintiffs' Roadmap summarized that Defendants purchased more of those works than were held in quarantine. And the jury heard that Defendants inadequately checked books before selling them. Therefore, a

reasonable jury could have inferred that other copies of that title had slipped through the cracks and been sold. Combined with the circumstantial evidence described above, the jury could have determined that it was more likely than not that a counterfeit copy in Defendants' inventory meant that Defendants also sold a copy of that work.

Second, Defendants challenge the five works for which Plaintiffs did not present a counterfeit copy. However, the jury heard that Defendants had purchased copies of those works from Best Books World, a known counterfeiter, returned some of them after determining that they were counterfeit, keeping the rest, and that none were found in Defendants' inventory. This could support an inference that Defendants sold the copies they did not return. Indeed, when Smyres sent some copies back to Best Books World, he wrote "I cannot trust that any of the[] [books] are authentic." (PX18; Trial Tr. 831:23–832:2.) Although Smyres doubted that <u>any</u> of these copies were authentic, Defendants only shipped <u>some</u> back. The jury could have logically concluded that Defendants sold the rest.

Third, some of the works that Plaintiffs offered were found in the inventories of other book distributors. Defendants argue that those works could have come from other sources. But deposition testimony revealed that those distributors considered Defendants to be one of the most prevalent suppliers of counterfeit books and had ceased doing business with Defendants based on their history of infringement. (<u>See</u> Trial Tr. 1913:2–16, 1932:3–12, 1943:21–1944:4, 2051:1–3.) And Plaintiffs' Roadmap summarized that Defendants sourced these works from known counterfeiters like Best Books World, the Blackerbys, and Morena.

Last, Defendants challenge works for which a copy was found both in Defendants' quarantine and a distributor's inventory. But the evidence is even stronger for this

category.  As Plaintiffs aptly characterized it, the jury was presented with "counterfeit copies swarming around Defendants—in their possession, their upstream supplier's possession, and their downstream customers' possession."  (Mem. of Law in Opp. to Defs.' Post-Trial Mots., BDB II, ECF No. 443, at 9.)

Considering the high burden on a motion for judgment as a matter of law, Defendants fail to demonstrate that the verdict amounts to "sheer surmise and conjecture."  See Rosas v. Balter Sales Co., 2018 WL 3199253, at *3 (S.D.N.Y. June 29, 2018) (citation omitted). The jury was permitted to make inferences based on the totality of the evidence.  Their inferences were within reason and established by a preponderance of the evidence.  See United States v. Dibrizzi, 393 F.2d 642, 644–45 (2d Cir. 1968) ("[I]nferences may arise from a combination of acts, even though each act standing by itself may seem to be unimportant.").

C.  Ownership

Defendants assert that Plaintiffs failed to demonstrate ownership for thirteen titles,[1] meaning that Plaintiffs failed to establish statutory standing to sue for those works.  See Kwan v. Schlein, 634 F.3d 224, 229 (2d Cir. 2011) (a plaintiff suing for copyright infringement must establish "ownership of a valid copyright") (citation omitted); Davis v. Blige, 505 F.3d 90, 100 (2d Cir. 2007) ("[A]n exclusive licensee may sue others for infringement. . . .").

Six of Defendants' challenges are easily turned aside.  First, no copyright registration was necessary for Work 18 because Plaintiffs only pursued a trademark claim with respect to that title.  (See PX1, at 3.)  Second, Plaintiffs submitted copyright registrations for Works 66, 134, and 143, each listing a Plaintiff as the copyright claimant.  (See PX5, at 185 &

---

[1] Works 18, 29, 34, 55, 66, 71, 81, 84, 86, 134, 135, 143, and 147.  (See PX13, at 1–3.)

188–90; PX4, at 6; PX3, at 130–31.)  Finally, Plaintiffs offered evidence of ownership for Works

34 and 86 by submitting copyright registrations for prior editions of those titles.  (See PX5, at 44,

56.)  Later textbook editions are derivatives of the original edition.  See 17 U.S.C. § 101.  Thus,

copyright registrations for the earlier editions constitute sufficient evidence of ownership.  "[S]o

long as a copyright owner has registered the underlying work . . . she need not independently

register the derivative work to sue based on its unauthorized preparation or reproduction."

Pearson Educ., Inc. v. Frances, 2012 WL 1788148, at *2 (S.D.N.Y. May 16, 2012).

   With respect to the seven remaining Works (29, 55, 71, 81, 84, 135, and 147), five

of those titles are owned by Cengage and two by Pearson.  In each instance, while the copyright

registrations submitted in evidence identified someone other than Cengage or Pearson as the

copyright holder, trial testimony established that the person or entity listed was either the

textbook's author or a publishing company acquired by Cengage or Pearson.  Plaintiffs

maintained that Cengage or Pearson were granted exclusive licenses for these works.

   Although Plaintiffs did not submit documentation, Cengage representative Jessica

Stitt testified that Cengage owns or holds the exclusive license for every Cengage title.  (Trial Tr.

1323:11–16, 1327:19–1328:3.)  Pearson representative Richard Essig did the same for the

Pearson titles.  (Trial Tr. 1619:22–1620:2.)  Stitt and Essig explained that when an author is

listed as the copyright holder, the author signs "a written agreement that [the publishing

company] has the exclusive rights to market and distribute that particular title."  (Trial Tr.

1620:24–1621:5, 1324:16–19.)  Similarly, Stitt and Essig explained that when Pearson and

Cengage acquire publishing companies, they acquire that company's copyrights as a matter of

corporate practice.  (Trial Tr. 1325:17–1326:18, 1621:8–17.)

Defendants never challenged this testimony, nor did they ask any questions regarding Plaintiffs' ownership of these works. No contradictory evidence of ownership presented. The jury was entirely justified in concluding that Plaintiffs established ownership for all works.

D. Preemption

Defendants assert that Plaintiffs' breach of contract claim was preempted by the Copyright Act. "Section 301 of the Copyright Act expressly preempts a state law claim only if (i) the work at issue 'come[s] within the subject matter of copyright' and (ii) the right being asserted is 'equivalent to any of the exclusive rights within the general scope of copyright.'" Forest Park Pictures v. Univ. Tel. Network, Inc., 683 F.3d 424, 429 (2d Cir. 2012) (citing 17 U.S.C. § 301(b)). Most "contract clams involving the subject matter of copyright do not contest rights that are equivalent of rights under the Copyright Act, and thus are not preempted." Forest Park Pictures, 683 F.3d at 431. "A contract claim may escape preemption if it seeks to vindicate rights, such as a promise to pay, that are qualitatively different from those included in the Copyright Act." We Shall Overcome Found. v. Richmond Org., Inc. (TRO INC.), 221 F. Supp. 3d 396, 412 (S.D.N.Y. 2016); see also Forest Park Pictures, 683 F.3d at 431.

Here, the rights provided by the Settlement Agreement are qualitatively different from rights under the Copyright Act. The Settlement Agreement consists of mutual promises and forbearances to resolve a prior lawsuit between the parties. (Settlement Agreement ¶ 1.) It specifically provided for damages in the event of a breach, which included a "liab[ility] to pay the reasonable costs and attorney's fees incurred by the non-breaching party." (Settlement Agreement ¶ 17(a).) "A claim for breach of a contract including a promise to pay is qualitatively

different from a suit to vindicate a right included in the Copyright Act and is not subject to preemption." Forest Park Pictures, 683 F.3d at 433. Additionally, the Settlement Agreement barred Defendants from assisting other infringers, regardless of whether Defendants knew they were aiding and abetting infringement. (Settlement Agreement ¶ 5.) That clause confers a broader right than the Copyright Act. Accordingly, Plaintiffs' breach of contract claim is distinct from their rights under the Copyright Act and is not preempted.

E. Importation

Defendants contend that Plaintiffs failed to introduce evidence of importation of counterfeit books. They argue that PX1423, a PIERS report compiling bills of lading for cargo vessels entering United States ports, and showing textbooks imported by SRockPaper Imports, was the only evidence of importation. Defendants contend the PIERS report only showed imports of textbooks from Thailand but did not indicate that those books were counterfeit. Finally, they contend that SRockPaper Imports's data cannot be linked to Defendants because that entity was not named in the lawsuits.

However, while not a defendant in these actions, SRockPaper Imports is owned by Smyres and within the constellation of companies he controls. (See Trial Tr. 1172:12–1173:8.) And Defendants' effort to discredit the PIERS report ignores other evidence in the record. For instance, Smyres conceded that his companies paid "Best Books World shipping costs to ship . . . books from Thailand to the United States." (Trial Tr. 791:6–13.) And the jury heard from Plaintiffs' representative that Defendants had been importing hundreds of thousands of textbooks from Thailand, the undisputed source of many counterfeits, "for years and right up through 2017." (Trial Tr. 1643:23–1644:1.) One of Defendants' employees testified to

receiving shipments of 50,000 books from foreign sources per year.  (Trial Tr. 2309:18–2310:24; see also PX154.)  And Smyres stationed Defendants' employees in Thailand in order to purchase books.  (Trial Tr. 854:1–9.)  The jury reasonably concluded that counterfeit textbooks were commingled with the hundreds of thousands of textbooks, many from counterfeit sources, that Defendants purchased and imported each year.

But even if the jury found the evidence of importation insufficient, the verdict would not need to be set aside.  The verdict form did not require the jury to specify which right they determined Defendants had infringed under the Copyright Act and the Settlement Agreement.  This Court instructed the jury that "[t]he right to distribute a copyright is violated by someone other than the copyright holder importing, selling, renting, or otherwise transferring ownership of an unauthorized copy."  (Trial Tr. 3111:11–14.)  Similarly, the Settlement Agreement required Defendants to "cease all sales and importation into the United States of any pirated editions of the publishers textbooks, and to not assist any other individual or entity to sell or import pirated editions . . . into the United States." (Trial Tr. 3111:11–14, 3115:3–7 (citation omitted).)  Accordingly, the overwhelming evidence of Defendants' sales and/or rentals of counterfeit books was sufficient to sustain the jury's liability determinations.

F.   Duplicate Damages

Defendants allege that Plaintiffs were awarded double recovery under the Lanham and Copyright Acts.  Defendants rely on other courts that rejected attempts by the same Plaintiffs to seek both trademark and copyright damages based on the same act of infringement.  See Cengage Learning, Inc. v. Globonline SDN, 2018 WL 1989574, at *2–3 (S.D.N.Y. Apr. 25, 2018) ("[T]he recent trend among Courts is to preclude double recovery in cases involving the

sale of pirated, copyrighted material."); Cengage Learning, Inc. v. Shi, 2017 WL 1063463, at *3 (S.D.N.Y. Mar. 31, 2017) (same). But see Innovation Ventures, LLC v. Ultimate One Distrib. Corp., 176 F. Supp. 3d 137, 175 (E.D.N.Y. 2016) (holding "that the injuries suffered by plaintiffs for trademark and copyright infringement are distinct . . . neither of which precludes recovery under both statutes").

Defendants' argument is misplaced. Although other courts have concluded that Plaintiffs impermissibly sought both trademark and copyright damages for the same work, Plaintiffs did not do so here. Rather, Plaintiffs sought trademark damages for one set of works and copyright damages for another non-overlapping set. The jury was instructed to consider Plaintiffs' trademark and copyright claims separately and to "only make one award of statutory damages for [each] title." (Trial Tr. 3122:19–20.) The verdict sheet differentiated between the works for which Plaintiffs sought trademark damages and the works for which Plaintiffs sought copyright damages. During a charge conference, Defendants conceded that Plaintiffs were not seeking duplicate recovery, stating "they are not asking for it. . . . They have not requested it, therefore the jury may not award it. . . . [I]t's perfectly clear that they are not requesting it." (Trial Tr. 2468:24–2469:19.)

Acknowledging that Plaintiffs avoided the double recovery conundrum, Defendants also raise a novel argument that even if Plaintiffs cabined their claims to trademark damages for some works and copyright damages for others, this nevertheless results in a double recovery. Specifically, they assert that because the Lanham Act provides for damages "per type of goods . . . sold," 15 U.S.C. § 1117(c), statutory trademark damages provides an award to Plaintiffs for each and every work bearing that mark, including those works for which Plaintiffs

sought only copyright damages. But no court has embraced such a theory.

Defendants offer no authority forcing a plaintiff to choose between a trademark claim and a copyright claim when the claims are brought for separate works and no single work is the predicate for both trademark and copyright claims. This Court repeatedly instructed the jury to consider Plaintiffs' trademark and copyright claims separately. And Defendants offer nothing to suggest that the jury disregarded those instructions. Indeed, Defendants suggested a verdict sheet structuring Plaintiffs' trademark and copyright claims in the manner that they now challenge. (See Defendants' Proposed Verdict Form, BDB II, ECF No. 379-3 (delineating the works for which Plaintiffs sought trademark damages and copyright damages).) That verdict sheet, similar to the one this Court adopted, made clear that Plaintiffs' were seeking trademark damages on 19 works and that those works were to be considered separately from the 142 works that were the subject of Plaintiffs' copyright claims. (Verdict at 4.)

G. Willfulness

Defendants contend that no reasonable jury could find willfulness. They stress that they never knowingly distributed counterfeits and that they had procedures in place to protect against the sale of counterfeits. "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' or 'willful blindness' to, the copyright holder's rights." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005); see also Bryant v. Media Right Prods., Inc., 603 F.3d 135, 143 (2d Cir. 2010) (holding that willfulness can be shown by a defendant's "recklessly disregarding the possibility" of infringement) (citation and quotation marks omitted). The same standard is used

for trademark infringement.  See Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 109 (2d Cir. 2010).

Plaintiffs presented ample evidence that Defendants recklessly disregarded or were willfully blind to infringement.  Mere days after entering into the Settlement Agreement, Smyres agreed to purchase books from Best Books World, a known counterfeiter.  (See Trial Tr. 823:17–824:23, 827:23–828:1.)  Moreover, after learning that another textbook supplier sold counterfeits to Defendants, Smyres increased his purchases from that source.  (Trial Tr. 891:23–892:3, PX181.)  Despite settling copyright infringement claims in 2007, Defendants thereafter delayed implementing formal anti-counterfeiting procedures for years.  (Trial Tr. 935:12–20, 1205:20–25.)  And even after implementing basic procedures, Defendants failed to ascertain where their suppliers sourced their books.  (Trial Tr. 2391:10–16.)

Additionally, the jury learned that Defendants violated the Settlement Agreement by failing to disclose the true sources of their textbooks. (Trial Tr. 1861:4–19.)  By 2011, Defendants were aware that they continued to source from counterfeit suppliers and that they had counterfeit books within their inventory.  (Trial Tr. 927:24–934:12.)  And the jury saw graphic evidence of Defendants' destruction of counterfeit books—the bulldozing of counterfeit textbooks at a municipal landfill—because they feared a lawsuit.  (Trial Tr. 2920:19–22.)

In short, the evidence of Defendants' reckless disregard of potential infringement was overwhelming.  See Fendi Adele, S.R.L., 507 F. App'x at 31 (district court's finding of willfulness was appropriate given that defendants were "clearly on notice that [they] might be infringing trademarks" but "failed to adequately inquire about the authenticity and original sources of the goods they purchased"); State of New York v. United Parcel Serv., Inc., 253 F. Supp. 3d 583, 666 (S.D.N.Y. 2018) ("[T]he law deems a person to have 'knowledge' when he or

she has a strong suspicion that a fact exists, but intentionally avoids confirmation.").

II.    New Trial Motion

    A.    Legal Standard

        Federal Rule of Civil Procedure 59 permits the district court to grant a new trial.

Unlike a motion under Rule 50, "a trial judge is free to weigh the evidence himself, and need not

view it in the light most favorable to the verdict winner." Manley v. AmBase Corp., 337 F.3d

237, 244–45 (2d Cir. 2003) (citation omitted). However, "jury verdicts should be disturbed with

great infrequency," ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 99 (2d

Cir. 2014) (citation omitted), and the movant is "held to a heavy burden," Toliver v. N.Y.C.

Dep't of Corr., 202 F. Supp. 3d 328, 340 (S.D.N.Y. 2016) (citation and quotation marks

omitted).

        A new trial on the basis of evidentiary error should not be granted unless "the

introduction of inadmissible evidence was a clear abuse of discretion and was . . . clearly

prejudicial to the outcome of the trial [such that] the verdict is a miscarriage of justice." Luciano

v. Olsten Corp., 110 F.3d 210, 217 (2d Cir. 1997). An evidentiary ruling is a clear abuse of

discretion where it is based on "an erroneous view of the law or on a clearly erroneous

assessment of the evidence, or [where the court] rendered a decision that cannot be located

within the range of permissible decisions." Vill. of Freeport v. Barrella, 814 F.3d 594, 611 (2d

Cir. 2016) (citation omitted). The error must not have been harmless. Leo v. Long Island R.R.

Co., 307 F.R.D. 314, 321 (S.D.N.Y. 2015).

    B.    Arguments Raised under Motion for Judgment as a Matter of Law

        In a single sentence, Defendants seek a new trial on the same grounds that they

sought judgment as a matter of law.  Such an argument deserves nothing more from this Court

than this single sentence rejecting the motion for the same reasons that the motion for judgment

as a matter of law was denied.

    C.    Admission of 2008 Settlement Agreement

        Defendants contend that admission of the Settlement Agreement violated Federal

Rule of Evidence 408, led the jury to presume Defendants' liability, and produced the large

damages award.  Defendants posit that this Court compounded the error by excluding the amount

of the settlement.  Rule 408 prohibits the introduction of evidence of "furnishing, promising or

offering—or accepting, promising to accept, or offering to accept—a valuable consideration in

compromising or attempting to compromise [a] claim" in order to "prove or disprove the validity

or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."

Fed. R. Evid. 408(a).  However, Rule 408 permits the introduction of such evidence for other

purposes.  Fed. R. Evid. 408(b).

        The Settlement Agreement formed the basis of Plaintiffs' breach of contract

claim.  It would have been impossible for Plaintiffs to provide context for their claim without

referencing that agreement.  It was also admissible on Plaintiffs' trademark and copyright

claims—a defendant's history of infringement is relevant in determining willfulness.  See Gucci

Am., Inc. v. Guess?, Inc., 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012) ("[C]ourts frequently

consider prior judicial resolution of trademark disputes when discussing the alleged infringer's

intent or bad faith."); Stevens v. Aeonian Press, Inc., 2002 WL 31387224, at *3 (S.D.N.Y. Oct.

23, 2002) (after bench trial, court determined damages based on Defendants' "habit of reprinting

works without permission from the copyright owners").

Therefore, evidence of the Settlement Agreement was not offered for an improper purpose. Cf. Starter Corp. v. Converse, Inc., 170 F.3d 286, 293 (2d Cir. 1999) (affirming use of settlement negotiations to prove estoppel). Plaintiffs were entitled to offer the Settlement Agreement as evidence of the breach of contract claim and to show that Defendants were on notice of possible infringement. Further, because the amount of the settlement could have unreasonably anchored the jury's determination of damages, preclusion of that figure was appropriate. (Trial Tr. 14:3–7, 65:6–9.)

Finally, after losing their motion in limine to exclude the Settlement Agreement, Defendants were the party that offered it in evidence. (See Trial Tr. 190:23–191:4.) "'A party introducing evidence cannot complain on appeal that the evidence was erroneously admitted,' even when that party loses a motion in limine and then preemptively introduces the evidence to draw the 'sting.'" In re Fosamax Prods. Liab. Litig., 509 F. App'x 69, 74 (2d Cir. 2013) (summary order) (citing Ohler v. United States, 529 U.S. 753, 755 (2000) (alteration omitted).

D. Admission of Cease-and-Desist Letters

Defendants contend that the cease-and-desist letters regarding additional infringements that Plaintiffs discovered during the pendency of this litigation were improperly received in evidence. Their argument glosses over how those cease-and-desist letters came into evidence.

At the motion in limine stage, this Court held that evidence of continuing infringement would be "confusing and unnecessary" given "the staggering number of works the jury will [already] have to wade through." (Memorandum & Order, BDB II, ECF No. 270, at 6.) Thus, before the jury was empaneled, the cease-and-desist letters were precluded. However,

prior to jury selection, Plaintiffs alerted this Court that Defendants planned to contrast the number of works at issue in this lawsuit (161) with the total number of works Defendants sold over a nine year period (1,081,000). This Court warned Defendants' counsel that such a comparison would misleadingly suggest that Defendants did not sell any other counterfeit textbooks, and cautioned that such an argument would "open the door to the plaintiff examining defendant and offering evidence on the fact that the defendant is continuing to sell counterfeit books." (Trial Tr. 26:17–20.) Nevertheless, Defendants' counsel failed to heed the Court's warning and during opening statement contrasted the 161 works at issue with the "more than one million titles that defendants sold between 2008 and 2017." (See Trial Tr. 86:9–15.)

After opening statements, Plaintiffs moved for reconsideration of this Court's in limine ruling precluding cease-and-desist letters. In a ruling that could have hardly come as a surprise, this Court concluded that Defendants "opened the door" to Plaintiffs "offer[ing] evidence that [they] continue[] to find counterfeits in defendants' inventory." (Trial Tr. 146:6–18.) Accordingly, this Court determined "the plaintiffs are [now] entitled to rebut and counter the argument that the defendants are getting better every day at what they are doing in detecting counterfeits and stopping counterfeits." (Trial Tr. 149:18–21.)

On cross examination, Plaintiffs confronted Smyres with the cease-and-desist letters. (Trial Tr. 1026:10–1031:6.) In an effort to avoid confusion and prejudice, this Court issued a preemptive limiting instruction to the jury prior to any offer of the letters in evidence. Specifically, this Court instructed the jury that the letters were "only offered for the purpose of showing that the defendants were on notice that the plaintiff publishers here believed that there were other counterfeits. These counterfeits are not involved in the titles that are at issue in these

consolidated cases." (Trial Tr. 1025:25–1026:4.)

Cease-and-desist letters are not hearsay when offered to show bad faith and willful infringement. See <u>Gucci Am.</u>, 858 F. Supp. 2d at 254 n.21. Here, Plaintiffs never provided any evidence that the cease-and-desist letters referred to works definitively determined to be counterfeit. Rather, they were offered only to show that Defendants were on notice that Plaintiffs continued to collect potential evidence of infringement. This undercut Defendants' argument that the jury should contrast the 161 works at issue with the 1,081,000 titles that Defendants sold, as well as their argument that Defendants now take all reasonable efforts to protect against the sale of counterfeit books.

Further, because Plaintiffs never attempted to initiate compromise negotiations through the cease-and-desist letters, Rule 408 is inapplicable. See <u>Atronic Int'l, GmbH v. SAI Semispecialists of Am., Inc.</u>, 2006 WL 2654827, at *7 n.4 (E.D.N.Y. Sept. 15, 2006) ("Where a letter provides solely demands and lacks any suggestion of compromise, such a document would not be excludable by Rule 408."). Defendants' reliance on <u>Vacation Rental Partners, LLC v. VacayStay Connect, LLC</u>, is distinguishable because those cease-and-desist letters stated that the plaintiff "was interested in resolution 'without litigation' . . . which could be read as an invitation to settle." <u>See</u> 2017 WL 1150806, at *8 (N.D. Ill. Mar. 28, 2017). Finally, Rule 404(b) does not preclude Plaintiffs' letters because "evidence of [other] bad actions may be admissible to show 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.' On this basis . . . [c]ourts . . . consider the alleged infringer's receipt of and response to cease-and-desist letters . . . ." <u>Gucci Am.</u>, 858 F. Supp. 2d at 253 (citing Fed. R. Evid. 404(b) and collecting cases).

E.  Exclusion of Chegg and MBS Data

Like so many other issues in this case, Defendants reiterate all of their arguments

regarding their attempts to introduce spreadsheets created by Chegg and MBS (two other

textbook distributors).  Defendants sought to use those spreadsheets to show that other textbook

distributors occasionally sell counterfeit books.  At the motion in limine stage, this Court held

that this evidence was relevant on the question of "whether Defendants took sufficient

precautions to detect counterfeits."  (Memorandum & Order, BDB II, ECF No. 285.)  Despite

that ruling in their favor, Defendants failed to lay a proper foundation for the admission of those

spreadsheets, and then had no witness who could testify about their meaning and significance.

To lay a foundation, Defendants first resorted to Federal Rule of Evidence 1006.

On March 5, 2018, this Court determined that Defendants' proposed Rule 1006 summaries of the

Chegg and MBS spreadsheets were deficient.  (Memorandum & Order, BDB II, ECF No. 370

("Rule 1006 Op.").)  The Chegg summary misleadingly listed percentages of counterfeits found

in various textbook distributors' inventory without revealing that different inspection criteria had

been used for each distributor.  (Rule 1006 Op., at *2–3.)  As for the MBS summary, this Court

found that it was impermissibly based on defense counsel's own interpretation of the underlying

spreadsheet.  (Rule 1006 Op., at *5–7.)  Accordingly, this Court ruled that a witness from MBS

would be needed to interpret the spreadsheet if Defendants sought to use it at trial.

Defendants' attempts to secure the appearance of an MBS representative at trial

took many avenues, including an aborted order to show cause, a telephonic conference with

MBS, and various letter motions, creating a diversionary sideshow.  Ultimately, this Court

permitted Defendants to introduce the spreadsheets as Chegg and MBS business records. (See

DX341, DX371.)  However, Defendants called no witness to explain them.  This was a problem of Defendants' own making because they previously obtained permission to depose an MBS representative, but then elected not to proceed with the deposition.  Instead, they bargained with MBS's counsel for a Rule 902(11) certification that this Court ultimately determined was improper.  Then, at trial, Defendants sought to use their financial expert as a human calculator to run various computations on the spreadsheet.  (Trial Tr. 2570:5–2577:25.)  This Court struck that testimony because the witness had no affiliation with MBS or knowledge of the textbook distribution business.  (Trial Tr. 2577:8–13.)

Near the end of trial, Defendants offered excerpts of a deposition of a Chegg representative concerning the Chegg spreadsheet.  (See Trial Tr. 2675:10–14.)  While this Court permitted counsel to read that testimony to the jury, it warned Defendants not to "make any percentage argument to the jury" based on the spreadsheets.  (Trial Tr. 2675:11–13.)  This Court relied on the Second Circuit's holding "that in the absence of explanatory testimony by a witness [a] jury would be unable to understand [a] document[] without representations by counsel or speculation, either of which would be improper."  United States v. Gupta, 747 F.3d 111, 138 (2d Cir. 2014).  Once again, Defendants' counsel ignored this Court's ruling and did precisely what they were told they could not do.  (Trial Tr. 3021:17–3022:20.)  Accordingly, this Court gave a curative instruction to the jury to disregard that fragment of Defendants' closing that referred to percentages from the spreadsheets.  (See Trial Tr. 3096:8–10.)  In any event, the jury heard testimony and argument from Defendants that their infringement was modest and that other textbook distributors also sold counterfeit works.  (See Trial Tr. 231:22–232:1, 370:5–13, 1438:15–24, 3019:14–19, 3021:8–11.)

F. Plaintiffs' Roadmap

In another argument reminiscent of Groundhog Day, Defendants challenge Plaintiffs' Roadmap. Plaintiffs' Roadmap (PX13) was a 272-page Rule 1006 summary exhibit condensing Plaintiffs' evidence of infringement for the 161 works at issue. For months prior to trial, Defendants challenged every aspect of the Roadmap. Finally, this Court ordered Defendants to specify each objection that they intended to interpose to its admissibility. On January 30, 2018, in response to that order, Defendants catalogued a staggering 772 objections. After a laborious review, this Court overruled nearly all of them. (Memorandum & Order, BDB II, ECF No. 371.)

Defendants now reassert the same objections and arguments. First, they contend that the Roadmap was created by Plaintiffs' attorneys. But "[s]ummary evidence can be properly introduced through the testimony of a witness who supervised its preparation." (Memorandum & Order, BDB II, ECF No. 285, at *7 (citing UPS Store, Inc. v. Hagan, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017).) Plaintiffs' witness John Garry testified that he oversaw the creation of Plaintiffs' Roadmap. (Trial Tr. 309:16–310:14.) This is sufficient. See United States v. Fahnbulleh, 752 F.3d 470, 479 (D.C. Cir. 2014) (allowing witness to introduce summary where he "supervised others who prepared" it).

Second, Defendants argue that the Roadmap did not accurately summarize the underlying evidence. Defendants cherry-pick a mistake that they now say they discovered in preparing their post-trial motions. But a single error does not render an entire document inadmissible. "The inaccuracy of a summary under Rule 1006 . . . goes to the weight, rather than the admissibility, of the evidence." BD ex rel. Doe v. DeBuono, 193 F.R.D. 117, 130 (S.D.N.Y.

2000).  More fundamentally, it is too late to raise an argument that Defendants failed to assert at trial or in the 772 objections lodged before trial.

At trial, Defendants highlighted other errors in the Roadmap.  (See, e.g., Trial Tr. 459:15–18.)  The jury was free to consider those errors in determining how much weight, if any, to give to the Roadmap.  Defense counsel argued vigorously to the jury that the Roadmap was inaccurate and unworthy of belief.  (Trial Tr. 3039:12–3040:10.)  In its charge, this Court instructed the jury that it "heard the parties challenge the accuracy of" Plaintiffs' Roadmap and "must decide how much weight, if any, [to] give to [it]."  (Trial Tr. 3107:6–17.)

Finally, Defendants argue that the Roadmap's underlying evidence was inadmissible because Plaintiffs' witness Richard Essig did not recall a single spreadsheet referenced in the Roadmap.  (See Trial Tr. 1708:14–18.)  However, on redirect, Essig was shown the cover email for that spreadsheet which refreshed his recollection and enabled him to recall what the spreadsheet described.  (See Trial Tr. 1711:18–1712:3.)

G.   Verdict Sheet and Charge

Defendants challenge the verdict sheet and certain elements of this Court's charge.  Originally, the parties offered this Court radically different proposals for the verdict sheet.  (See Joint Letter, BDB II, ECF No. 379, Exs. 2 & 3.)  Plaintiffs requested a 4-page verdict sheet that required the jury to state whether Defendants had infringed any of Plaintiffs' trademarks and/or copyrights, and if so, how many.  Defendants asked for a 24-page verdict sheet listing every work at issue and requiring the jury to separately check off each trademark and copyright claim and specify the amount of damages awarded for each claim.  After extensive discussions with counsel, this Court prepared a 6-page verdict sheet that afforded three options:

25

(1) a determination that Defendants were liable for <u>all</u> of Plaintiffs' claims, (2) a determination that Defendants were liable for <u>none</u> of Plaintiffs' claims, or (3) a determination that Defendants were liable for <u>some</u> of Plaintiffs' claims. If the jury determined that Defendants infringed some of Plaintiffs' claims, they were instructed to specify which works Defendants infringed on an accompanying 10-page spreadsheet. In a parallel vein, the verdict sheet afforded the option to choose the same amount of damages for each work infringed or to differentiate the damages awarded for each work. (<u>See</u> Verdict.)

Defendants contend that the verdict sheet encouraged the jury to make globalized determinations rather than individualized assessments. But this Court instructed the jury to make individual determinations on a work-by-work basis. (Trial Tr. 3108:14–15, 3110:19–20.) All indications are that the jury followed this instruction. In fact, even though the jury found that Defendants infringed all of Plaintiffs' trademarks and copyrights, they nevertheless completed the accompanying spreadsheets, checking off every single work that they determined had been willfully infringed and assigning a dollar amount of damages.

The verdict sheet was a reasonable compromise between the parties' competing proposals and, with this Court's instructions, reasonably assured that the jury applied the law to the facts. Defendants also challenge this Court's determination that the jury need not perform an arithmetic calculation to tally the statutory damages awarded. Defendants' proposal did nothing more than invite computational errors. <u>See</u> <u>TeeVee Toons, Inc. v. MP3.Com, Inc.</u>, 148 F. Supp. 2d 276, 279 (S.D.N.Y. 2001) (ordering new trial based on jury's errors in calculating verdict).

Defendants challenge this Court's rejection of their request to charge the jury that statutory damages must be proven by a preponderance of the evidence. Such an instruction is

wrong as a matter of law. The purpose of statutory damages is to allow a plaintiff to seek damages where it is unable to prove actual damages. Requiring a plaintiff to prove statutory damages is at odds with the "wide judicial discretion" and "necessary flexibility to do justice" that statutory damages are meant to provide. See F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 232 (1952); see also L.A. News Serv. v. Reuters Television Int'l, Ltd., 149 F.3d 987, 996 (9th Cir. 1998) ("Because awards of statutory damages serve both compensatory and punitive purposes, a plaintiff may recover statutory damages whether or not there is adequate evidence of the actual damages suffered by plaintiff or the profits repeated by defendant . . . .") (citation and quotation marks omitted).

On the breach of contract claim, Defendants contend that this Court should have instructed the jury on all elements required for such a claim, including the requirement that the parties had a valid contract. But the existence of a valid and enforceable contract was already the law of the case. See John Wiley & Sons, Inc. v. Book Dog Books, LLC, 2016 WL 1216583 (S.D.N.Y. Mar. 25, 2016). At trial, Plaintiffs needed only to prove that Defendants' breached the Settlement Agreement. To instruct the jury regarding validity would have raised the specter of a jury decision inconsistent with this Court's prior holding.

Finally, Defendants challenge the adverse inference instructions. As explained in this Court's April 2016 Memorandum and Order, a permissive adverse inference regarding Defendants' destruction of evidence was appropriate. (See Memorandum & Order, BDB I, ECF No. 353, at *6–7.) And after reviewing Plaintiffs' motions for sanctions, this Court explained its decision regarding the adverse inference instruction on Defendants' discovery misconduct. (Trial Tr. 2811:1–2814:19.) Just days before trial, through an anonymous source, Plaintiffs

learned of entities and profit distribution agreements that Defendants concealed throughout discovery. (Trial Tr. 2812:2–13, 2814:9–14.) This Court tempered Plaintiffs' proposed mandatory adverse inference instruction with a permissive instruction that the jury may make an adverse inference based on discovery misconduct.

III.  Remittitur

Defendants move for remittitur, contending that the jury award was untethered to Defendants' profits and Plaintiffs' losses and was inconsistent with the evidence presented at trial. See Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998). Defendants blend an argument for conditional remittitur with a constitutional due process argument.

Turning first to conditional remittitur, a "district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally where the award is intrinsically excessive, in the sense of being greater than the amount a reasonable jury could have awarded." Kirsch, 148 F.3d at 165 (citation, quotation marks, and alterations omitted). "The court is not free to set aside the verdict merely because the judge might have awarded a different amount of damages . . . ." 11 Fed. Prac. & Proc. Civ. § 2807; see Psihoyos v. John Wiley & Sons, Inc., 2012 WL 5506121, at *1 (S.D.N.Y. Nov. 7, 2012), aff'd 748 F.3d 120 (2d Cir. 2014) (noting that remittitur should be done cautiously as it "encroach[es] on the role of the jury").

Defendants do not contend that the jury made any particular error in quantifying the verdict, but that the award is greater than what a reasonable jury should have awarded.

Relying primarily on cases granting default judgments, Defendants cite decisions awarding lower amounts of statutory damages. Those cases are not persuasive. First, many courts have imposed maximum statutory damages. See, e.g., Nike Inc. v. Top Brand Co., 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006) (recommending the maximum amount of statutory damages based on "the size of the defendants' infringing operations, . . . the willfulness of their conduct, and their behavior in th[e] litigation"), report and recommendation adopted by 2006 WL 2884437 (S.D.N.Y. Oct. 6, 2006); Phillip Morris USA Inc. v. Marlboro Express, 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005) (finding "maximum statutory damages [was] warranted").

More fundamentally, awards calculated on a motion for default judgment are different in kind than factual determinations by a jury. While "[i]t is true that courts setting statutory damages after bench trials or defaults have often awarded less than the jury did in this case . . . the question is not what this [c]ourt would award were it deciding the question itself; the question is whether the jury's award is so excessive that the [c]ourt should intrude on [the jury's] prerogative to set damages." Agence Fr. Presse v. Morel, 2014 WL 3963124, at *15 (S.D.N.Y. Aug. 13, 2014).

Defendants' argument that the jury's award is disproportionate to their profits or Plaintiffs' losses is unpersuasive because "statutory damages are not meant to be merely compensatory or restitutionary [but] also to discourage wrongful conduct." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 113 (2d Cir. 2001) (citation and quotation marks omitted). In Psihoyos, Judge Oetken discussed the reasons why such an argument lacks merit. Those factors easily apply to this case:

> Several of the [statutory damages] factors may well explain the
> magnitude . . . of the jury's award. . . . [E]vidence in the record

> supports a finding that Defendant's conduct was willful. Plaintiff also demonstrated that Defendant garnered substantial profits from its textbook sales. The jury also may have seen itself as deterring 'others besides the defendant' as well as 'discouraging the defendant' itself. Indeed, given both the evidence presented to the jury that Defendant continued to distribute copies of infringing textbooks even after discovering that infringement had occurred, as well as the evidence indicating that Defendant is a repeat infringer, the jury's determination as to the amount of statutory damages for willful infringement was not erroneous.

Psihoyos, 2012 WL 5506121, at *3. On appeal, the Second Circuit agreed, rejecting the same argument Defendants raise here, and holding that the jury, in its discretion, may have chosen a larger award to reflect willfulness, defendant's substantial profits, and the need to deter "a repeat infringer." Psihoyos, 748 F.3d at 127.

Statutory damages serve multi-faceted purposes, including compensating the owner, penalizing the infringer, and deterring future infringement. (Trial Tr. 3116:23–25, 3119:13–16.) This Court explained that the jury may consider Defendants' state of mind, the profits they earned and expenses they saved in infringing, the revenue Plaintiffs' lost, deterrence, Defendants' cooperation, the conduct and attitude of the parties, and "Defendants' total profits and the effect the award may have on other sellers in the marketplace." (Trial Tr. 3117:4–15, 3119:23–3120:8.)

The evidence of willfulness was overwhelming. See Section I.G. "The jury could have felt Defendants infringement . . . was not just willful but reflected a gross disregard for the rights of copyright holders." See Agence Fr. Presse, 2014 WL 3963124, at *15 (citation and quotation marks omitted). The jury heard from Plaintiffs' expert that those practices led Defendants to earn $53,800,000 in profit in a four-year period. (Trial Tr. 1948:16–18.) Considering Defendants' lengthy history of infringement, the jury could have determined that

only a large award would effectively promote deterrence, especially given the evidence that

Defendants continued to infringe even days before trial.  The jury could have concluded that the

award was necessary for general deterrence after learning how prevalent counterfeits are in the

textbook market.   It also could have focused on the "conduct and attitude of the parties" and

compared it with this Court's instructions indicating that Defendants destroyed evidence and

failed to comply with discovery orders.  "Applying these factors is necessarily a subjective and

fact-intensive exercise." Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d 424, 464

(S.D.N.Y. 2014) (declining to reduce award where multiple factors supported substantial

damages).

Defendants fail to show why this Court should interfere with the jury's reasonable

exercise of its discretion.  This Court's role is not to "average the high and low awards [but to]

focus instead on whether the verdict lies within the reasonable range." Zeno v. Pine Plains Cent.

Sch. Dist., 702 F.3d 655, 671 (2d Cir. 2012) (citation, quotation marks, and alteration omitted).

Defendants also contend that the award violates due process.  Statutory damages

may violate due process where "the penalty prescribed is so severe and oppressive as to be

wholly disproportionate to the offense and obviously unreasonable." St. Louis, I.M. & S. Ry.

Co. v. Williams, 251 U.S. 63, 67–68 (1919).  Because Congress specifically determined the

appropriate statutory range for damages in trademark and copyright actions, a court's review of

such a reward "is extraordinarily deferential." Zomba Enters., Inc. v. Panorama Records, Inc.,

491 F.3d 574, 587 (6th Cir. 2007); see Eldred v. Ashcroft, 537 U.S. 186, 212 (2003) ("[I]t is

generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's

objectives.").  "[I]n the specific context of statutory damages under the Copyright Act [and

Lanham Act], Congress has placed an upper bound on the damages that a jury can award, which mitigates the risk of a truly untethered award." Agence Fr. Presse, 2014 WL 3963124, at *15.

The jury's award was within the range appropriate for willful infringement. In creating that range, one of Congress's goals was "to discourage wrongful conduct." F.W. Woolworth, 344 U.S. at 233. Although the award was large, it reflects an amalgam of ten separate trademark infringement claims and 142 separate copyright infringement claims. The jury determined that the upper limit of statutory damages was appropriate for Plaintiffs' trademark claims, but exercised its discretion in awarding $100,000 out of a possible $150,000 on Plaintiffs' copyright claims. Under these circumstances, an award of this magnitude was foreseeable and is not "so severe and oppressive as to be . . . obviously unreasonable." Williams, 251 U.S. at 67–68.

Defendants also contend that the award violates the factors set out in BMW of North America Inc. v. Gore. See 517 U.S. 559, 570 (1996). Although not yet considered by the Second Circuit, other circuits agree that the Gore factors are inapplicable to statutory damages awards. See Sony BMG Music Entm't. v. Tenenbaum, 719 F.3d 67, 70–71 (1st Cir. 2013) ("Williams applies to awards of statutory damages . . . while Gore applies to awards of punitive damages . . . ."); Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899, 907 (8th Cir. 2012) (holding that the application of the Gore factors to statutory damages would be "nonsensical"); Zomba Enters., 491 F.3d 588; accord Arista Records LLC v. Usenet.com, Inc., 2010 WL 3629587, at *4 (S.D.N.Y. Sept. 16, 2010).

IV.     Partial Final Judgment

Plaintiffs move for partial final judgment under Federal Rule of Civil Procedure

54(b).  Because this Opinion & Order resolves all outstanding motions, no further issues need to be addressed.  Accordingly, this motion is denied as moot.

V.    Prejudgment Interest

Plaintiffs move for prejudgment interest.  In trademark cases, awarding prejudgment interest "is within the discretion of the trial court and is normally reserved for 'exceptional' cases."  Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 263–64 (2d Cir. 2014) (citation omitted).  For copyright, the question is unresolved in this Circuit, see Psihoyos v. John Wiley & Sons, Inc., 2013 WL 1285153, at *5 n.5 (S.D.N.Y. Mar. 29, 2013), but district courts hold that prejudgment interest may be awarded to "achieve the goal of restoring a party to the condition it enjoyed before the injury occurred," Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d 310, 329 (S.D.N.Y. 2010) (citation omitted), rev'd in part on other grounds 650 F.3d 876 (2d Cir. 2011).

Plaintiffs contend that prejudgment interest is warranted based on the scope of Defendants' counterfeiting, their willfulness, and their failure to comply with court orders. Defendants counter that the verdict already covers Plaintiffs' losses and that this litigation was prolonged by both sides.

This Court declines to award prejudgment interest.  Although the jury found that Defendants willfully infringed, "[t]he sizable damages already levied against [Defendants], without the addition of pre-judgment interest, are sufficient to fully compensate Plaintiffs for their injuries."  Capitol Records, Inc. v. MP3tunes, LLC, 2015 WL 13684546, at *4 (S.D.N.Y. Apr. 3, 2015); see also In Design v. K-Mart Apparel Corp., 13 F.3d 559, 569 (2d Cir. 1994), overruled on other grounds by Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994) (upholding district

court's denial of prejudgment interest "in light of [plaintiff's] sizable damage award and the lack of . . . initiative . . . to shorten this litigation"); Coty Inc. v. Excell Brands, LLC, 277 F. Supp. 3d 425, 469–70 (S.D.N.Y. 2017) (declining to award prejudgment interest in trademark case).

## VI.    Permanent Injunction

### A.  Legal Standard

The Copyright Act and Lanham Act provide for permanent injunctions.  See 17 U.S.C. § 502(a); 15 U.S.C. § 1116.  Such relief is not automatic.  See Silverstein v. Penguin Putnam, Inc., 368 F.3d 77, 84 (2d Cir. 2004) (injunctive relief "is an extraordinary remedy" and "not compelled").  A plaintiff must demonstrate: (1) irreparable injury in the absence of an injunction, (2) the inadequacy of monetary damages alone, (3) that "the balance of hardships tips in [its] favor," and (4) that a permanent injunction would not disserve the public interest.  U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (citing Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010)).  "[C]ourts must not simply presume irreparable harm. . . . Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm."  Salinger, 607 F.3d at 82.

"Permanent injunctions are generally granted where liability has been established and there is a threat of continuing infringement."  Complex Sys., Inc. v. ABN AMRO Bank N.V., 2014 WL 1883474, at *11 (S.D.N.Y. May 9, 2014) (citation and alterations omitted).  "In many instances, injunctive relief may be the best or only way to preserve the exclusivity of a copyright."  Silverstein, 368 F.3d at 84.  A district court must ensure that a permanent injunction is "narrowly tailored to fit specific legal violations" and does not "impose unnecessary burdens on lawful activity."  Starter Corp., 170 F.3d at 299 (citation omitted).

B.  Need for an Injunction

Plaintiffs have established the need for a permanent injunction.  Evidence presented at trial and in post-trial motions reveals that Defendants continue to sell counterfeits.  (See Trial Tr. 1026:9–1031:6; Decl. of Jeffrey M. Gould, BDB II, ECF No. 420 ("Gould Decl.") ¶ 3.)  The jury's willful infringement determination and Defendants' continuing infringement post-verdict demonstrate that Plaintiffs are likely to suffer injury in the absence of an injunction and that money damages alone are insufficient.  See Warner Bros. Entm't Inc. v. RDR Books, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008).  Defendants have been on notice of their infringement for years but continue to sell counterfeits.  This "hardly suggests that [they] will refrain from infringing Plaintiffs' copyright[s] in the future." See Hounddog Prods., LLC v. Empire Film Grp., Inc., 826 F. Supp. 2d 619, 634 (S.D.N.Y. 2011), report and recommendation adopted.

The balance of hardships tips in Plaintiffs' favor each time Defendants sell an infringing work.  "The only possible harm to Defendant[s] is the loss of the chance to sell an infringing book, but the law does not protect this type of hardship."  Warner Bros., 575 F. Supp. 2d at 553; see WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 287 (2d Cir. 2012) ("[A]n infringer of copyright cannot complain about the loss of ability to offer its infringing product." (citation omitted)).  And a permanent injunction would not disserve the public interest as it would prevent the proliferation of counterfeit works.

In opposition, Defendants argue that they take all reasonable steps to protect against infringement.  But those platitudes are contradicted by Defendants' history and current conduct.  Defendants do not grapple with the fact that they have been caught selling counterfeits

even after allegedly improving their practices.  The jury found Defendants' conduct willful—

emails showed that Defendants realized they might be selling counterfeits but willfully blinded

themselves to that possibility.  "Courts are free to assume that past conduct is highly suggestive

of the likelihood of future violations."  United States v. Carson, 52 F.3d 1173, 1184 (2d Cir.

1995) (citation and quotation marks omitted).  Accordingly, Defendants must be enjoined.

Defendants also contend that an injunction prohibiting them from selling or

renting counterfeit books would be inappropriate because like other large textbook distributors,

they occasionally sell a counterfeit copy despite their best efforts.  Instead, Defendants propose

an injunction requiring that they "take all reasonable steps" to prevent infringement.  But the

history of these Defendants over more than a decade demonstrate that such a vague and

aspirational undertaking would be tantamount to no injunction at all.  It would not protect

Plaintiffs' rights and would spawn additional litigation over compliance with an amorphous

standard.  The time has come for an absolute bar.  Trademark and copyright law prohibits all

infringement and does not just oblige businesses to "take reasonable steps."  Finally, enjoining

infringement by Defendants would only be improper if "compliance [was] beyond the realm of

possibility, not just difficult to achieve."  Nat'l Basketball Ass'n v. Design Mgmt. Consultants,

Inc., 289 F. Supp. 2d 373, 377 (S.D.N.Y. 2003) (citation omitted).  Defendants fail to establish

that compliance is impossible.  It may be burdensome, but the best way to prevent future

infringement is to enjoin future infringement.

C.  Scope of Injunction

Defendants argue that it would be improper to enjoin those Smyres' entities which

are not Defendants in this litigation.  Under Federal Rule of Civil Procedure 65, an injunction

may bind those who receive actual notice, the parties, the parties' officers, agents, servants, employees, and attorneys, and "other persons who are in active concert or participation with" any of the above. Fed. R. Civ. P. 65(d)(2). "A permanent injunction, through the automatic operation of Rule 65(d)(2), may bind a non-party who is in active concert or participation with the parties." Ecopetrol S.A. v. Offshore Expl. & Prod. LLC, 172 F. Supp. 3d 691, 699 (S.D.N.Y. 2016). "Courts in this Circuit have found 'active concert' between non-parties and already-enjoined parties in cases where an enjoined party is substantially intertwined with a non-party, including the shared occupation of office space, payment of employee expenses between the non-party and enjoined party, considerable control by the enjoined party over the non-party's operations, and other substantial interconnections . . . ." In re Sledziejowski, 533 B.R. 408, 424 (Bankr. S.D.N.Y. 2015); see also N.Y. by Vacco v. Operation Rescue Nat'l, 80 F.3d 64, 70 (2d Cir. 1996); Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979).

The trial evidence demonstrates that Smyres owns and/or controls all twenty-five entities that Plaintiffs seek to enjoin, and that each plays some role in his textbook distribution enterprise. (Trial Tr. 769:21–771:5, PX 1135.) Although Smyres does not own Matasa Agila Holdings ("Matasa"), the evidence shows that Matasa conducts back-end operations for Defendants' rental business, works out of Defendants' warehouse, has no employees of its own, and is managed by Defendants on a day-to-day basis. (Trial Tr. 782:9–785:25.) Therefore, enjoining all twenty-five entities is warranted and would provide the clarification necessary to ensure compliance and enforcement.

Defendants also dispute that provision in the proposed injunction preventing them from making assignments or transfers or forming new entities or associations outside of the

ordinary course of business with the purpose or effect of circumventing their payment obligations. Defendants argue that enjoining transfers "with the effect of" reducing their ability to pay is vague and threatens to block legitimate transactions. This objection is unpersuasive. The proposed language of the injunction makes clear that this provision applies only to transfers outside of the ordinary course of business. Reasonable businesspeople understand what is and what is not in the ordinary course of business.

On the other hand, certain elements of Plaintiffs' proposed relief push the envelope too far. This Court may not "restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of the litigation." City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 145 (2d Cir. 2011). Plaintiffs request that going forward, Defendants be required to send Plaintiffs suspected counterfeit books they receive and notify Plaintiffs of the source of those books, the source's contact information, and Defendants' purchase price. When pressed at oral argument whether Defendants' return of counterfeits to suppliers would constitute an illegal distribution under the Copyright Act, Plaintiffs acknowledged that it was an unresolved question. (Hr'g Tr. 54:3–9.) While Plaintiffs contend that this provision would help interdict the sale of counterfeits, it has the effect of enlisting Defendants in Plaintiffs' efforts to determine if other entities are selling counterfeit textbooks. Because Plaintiffs have not shown how this provision would restrain Defendants' illegal conduct, nor provided authorities for such relief, this Court declines to include such a provision in the permanent injunction. However, Defendants will be required to purge all counterfeits currently in their inventory, which is standard relief under the Copyright Act and Lanham Act.

Plaintiffs also ask that Defendants be required to provide a sworn declaration of compliance with this Court's injunction within 90–120 days from its issuance, and annually for ten years thereafter. Defendants object to providing compliance reports for ten years. Courts commonly require a certificate of compliance with an injunction. See Triangl Grp. Ltd. v. Jiangmen City Xinhui Dist. Lingzhi Garment Co. Ltd., 2017 WL 2831025, at *4 (S.D.N.Y. June 22, 2017). Defendants will be required to provide such a report within 120 days and annually thereafter for five years.

Finally, Plaintiffs ask that Defendants be required to provide notice of this Permanent Injunction to all entities that it conducts business with, including Amazon, Barnes & Noble, and eBay. But the authorities cited for such a provision concern false advertising and ordered a corrective advertising campaign as a remedy. That is distinguishable from this case, and this Court declines to include such a provision.

VII.  Disposition

Plaintiffs move for an order requiring Defendants to surrender to Plaintiffs all suspected counterfeits of Plaintiffs' works currently in their possession, custody, or control. Plaintiffs agree to return any works determined not to be counterfeit. If Plaintiffs determine that a work is counterfeit, they seek to impose on Defendants the requirement to notify Plaintiffs of the source of the work and its purchase price.

Under the Copyright Act, "[a]s part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies . . . found to have been made or used in violation of the copyright owner's exclusive rights." 17 U.S.C. § 503(b). Under the Lanham Act, where a trademark violation has been established, a court may order infringing

material be "delivered up and destroyed." 15 U.S.C. § 1118; see Jab Distrib., LLC v. Home Linen Collections, 2016 WL 1255729, at *4 (E.D.N.Y. Mar. 30, 2016) (collecting cases). In opposition, Defendants agree to destroy infringing materials and provide a certificate of destruction, but ask that they not be required to deliver those materials to Plaintiffs, as they allege it would be more costly and may lead to further litigation.

Requiring forfeiture is "discretionary relief" but "particularly appropriate where a court seeks to prevent future infringements." BMG Music v. Pena, 2007 WL 2089367, at *6 (E.D.N.Y. July 19, 2007); see also Rogers v. Koons, 960 F.2d 301, 313 (2d Cir. 1992) (holding that requiring a defendant to turn over infringing works "is an equitable remedy issued under the broad powers vested in a trial judge").

Given Defendants' long history of infringement, their breach of the Settlement Agreement, and their distribution of counterfeit works during trial and post-verdict, a disposition of infringing materials is the safest option to ensure Plaintiffs' rights are protected. See Hounddog Prods., 826 F. Supp. 2d at 624–25 (requiring defendants turn over infringing materials based on their "continuing exploitation . . . rais[ing] a significant risk of future copyright infringement"). Defendants asserted at trial how difficult it often is to determine which books are counterfeits. Accordingly, Defendants will be required to send all suspect counterfeits currently in their inventory to Plaintiffs at Defendants' sole cost and expense. However, Defendants will not be required to reveal where they purchased the works or the price they paid as Plaintiffs offer no authority for this relief.

VIII. Attorneys' Fees and Costs

Plaintiffs move for an award of attorneys' fees and costs under a trident of

authorities: (i) the fee-shifting provision of the Settlement Agreement, (ii) 17 U.S.C. § 505 for

copyright infringement, and (iii) 15 U.S.C. § 1117(a) for trademark infringement.  Plaintiffs seek

approximately $5,910,000 in fees and $852,000 in costs.  (See Declaration of Matthew J.

Oppenheim, BDB II, ECF No. 438 ("Oppenheim Decl."), ¶¶ 20, 38.)  Defendants contend that an

award of attorneys' fees is inappropriate and alternatively argue that Plaintiffs' fees and costs are

excessive.

A.  Legal Standard

"In determining the amount of a fee award, district courts are to calculate the

'presumptively reasonable fee.'"  Capitol Records, Inc. v. MP3tunes, LLC, 2015 WL 7271565,

at *1 (S.D.N.Y. Nov. 12, 2015) (citing Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 172 (2d

Cir. 2009)).  "A variety of factors informs the court's determination of whether a requested

amount of attorneys' fees is reasonable or unreasonable, including the difficulty of the questions

involved; the skill required to handle the problem; the time and labor required; the lawyer's

experience, ability and reputation; the customary fees charged by the Bar for similar services;

and the amount involved."  F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1263

(2d Cir. 1987) (citation and quotation marks omitted).  Courts aim to discern the "so-called

'lodestar' figure, which is arrived at by multiplying the number of hours reasonably expended on

the litigation by a reasonably hourly rate."  Kirsch, 148 F.3d at 172 (citation, quotation marks,

and alteration omitted).

Absent unusual circumstances, the submission of billing records is a

"'prerequisite' for the award of fees."  Scott v. City of New York, 626 F.3d 130, 133 (2d Cir.

2010) (citation omitted).  The movant bears the burden of justifying the reasonableness of

requested fees.  See Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1059 (2d Cir. 1989).  "As a concession to the mortality of judges, the law does not require a line-item review."  Campbell v. Mark Hotel Sponsor, LLC, 2012 WL 4360011, at *2 (S.D.N.Y. Sept. 13, 2002); see also Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994) (courts need not "set forth item-by-item findings concerning what may be countless objections to individual billing items").  Instead, a court may "use a percentage deduction as a practical means of trimming fat from a fee application."  McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund, 450 F.3d 91, 96 (2d Cir. 2006) (citation and quotation marks omitted).

B.  Fees Based on Breach of the Settlement Agreement

Plaintiffs anchor one branch of their fee request to Defendants' breach of the Settlement Agreement.  In March 2016, this Court adopted a Magistrate Judge's finding that Paragraph 17(a) of the Settlement Agreement unambiguously provided that in the event of a breach, the breaching party would be liable to pay damages in the form of attorney's fees and costs incurred by the non-breaching party.  See John Wiley & Sons, 2016 WL 1216583, at *2–3. In adopting that finding, this Court determined that Defendants breached the forum selection clause in the Settlement Agreement by filing suit against Plaintiffs in Ohio.  John Wiley & Sons, 2016 WL 1216583, at *3.  At trial, the jury determined that Defendants breached the Settlement Agreement's provision prohibiting the sale or importation of counterfeit books.  (See PX127 ¶ 5; Verdict, at 16.)

"As a general matter of New York law . . . when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party,

so long as those amounts are not unreasonable." F.H. Krear, 810 F.2d at 1250. "Because a fee-shifting clause can produce perverse incentives for a litigant . . . courts must scrutinize fee requests to ascertain whether they are reasonable." Diamond D Enters. USA, Inc. v. Steinsvaag, 979 F.2d 14, 19 (2d Cir. 1992).

Defendants contend that Plaintiffs' fee request based on breach of the Settlement Agreement is improper because their request is not for the amount of fees that Plaintiffs actually paid, but is instead based on a lodestar calculated by the total number of hours logged and Plaintiffs' counsel's regular hourly rates. Plaintiffs' counsel acknowledges that this lodestar calculation does not reflect what Plaintiffs are obligated to pay. Instead, Plaintiffs will pay their attorneys based on an undisclosed discounted rate coupled with a success fee arrangement. (Oppenheim Decl. ¶ 19.) Defendants rely on the Second Circuit's holding that a "court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." F.H. Krear, 810 F.2d at 1263 (emphasis added). Because Plaintiffs' counsel does not disclose what Plaintiffs have paid, Defendants contend that the fee application is inadequate.

Defendants misread F.H. Krear and the other decisions they rely on. Those authorities simply require that a plaintiff not "demand from [the opposing party] greater expenses than [it] has itself incurred." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 179 (2d Cir. 2005). Those decisions do not require that the lodestar hourly rates harmonize with the hourly rates the client is actually paying. In other words, a lodestar calculation is only impermissible where it exceeds the amount the client is obligated to pay. For example, in Parker Hannifin Corp. v. North Sound Properties, the district judge took

issue with the fee application because it requested a lodestar amount nearly twice what the client was obligated to pay. 2013 WL 3527761, at *2–3 (S.D.N.Y. 2013) ("[A] fee award must be capped . . . at whatever amount the plaintiff will owe counsel under their retainer agreement.").

That Plaintiffs' counsel's hourly billings do not match the fees that Plaintiffs actually pay does not invalidate the fee application. As Plaintiffs' counsel's declaration makes clear, the discounted rate that Plaintiffs are responsible for paying together with the percentage fee of the verdict, will exceed the amount of the lodestar. (Oppenheim Decl. ¶ 19.)

C. Fees Based on Copyright and Trademark Violations

Plaintiffs contend that fees are also warranted under the Copyright and Lanham Acts. Under the Copyright Act, "the court may . . . award a reasonable attorney's fees to the prevailing party as part of the costs." 17 U.S.C. § 505. "Fee awards are not 'automatic' or granted 'as a matter of course,' but rather are committed to the discretion of the court." Barcroft Media, Ltd. v. Coed Media Grp., LLC, 2018 WL 357298, at *1 (S.D.N.Y. Jan. 10, 2018) (citing Fogerty, 510 U.S. at 533).

In 2016, the Supreme Court clarified the standard for awarding attorneys' fees in copyright cases. See Kirtsaeng v. John Wiley & Sons, Inc., 136 S. Ct. 1979 (2016). In Kirtsaeng, the Supreme Court stressed that courts must give "substantial weight" to the "objective reasonableness" of a party's litigating position. Kirtsaeng, 136 S. Ct. at 1988. However, objective reasonableness is not "controlling"—a district court may also "take into account a range of considerations beyond the reasonableness of litigating positions," such as "frivolousness, motivation, . . . and the need in particular circumstances to advance considerations of compensation and deterrence." Kirtsaeng, 136 S. Ct. at 1959, 1988 (citing

Fogerty, 510 U.S. at 534 n.19). Accordingly, "in any given case a court may award fees even though the losing party offered reasonable arguments. . . . For example, a court may order fee-shifting because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses. . . .Or a court may do so to deter repeated instances of copyright infringement . . . ." Kirtsaeng, 136 S. Ct. at 1988–89. A court "retains discretion, in light of [all] factors, to make an award even where the losing party advances a reasonable claim or defense." Kirtsaeng, 136 S. Ct. at 1983.

Here, fee-shifting is appropriate under the Copyright Act. Defendants took unreasonable positions throughout this litigation. "[T]he courts of this circuit have generally concluded that only those claims that are clearly without merit or otherwise patently devoid of legal or factual basis ought to be deemed objectively unreasonable." Silberstein v. Fox Entm't Grp., Inc., 536 F. Supp. 2d 440, 444 (S.D.N.Y. 2008) (citation omitted). Defendants provoked this lawsuit by filing the Ohio Action despite the clear language in the Settlement Agreement that all further litigation would be handled "in the federal or state courts located in the state of New York." (PX127 ¶ 19.)

In Book Dog Books II, Defendants pled 52 affirmative defenses, many of which were previously stricken in Book Dog Books I. Then, in their proposed jury instructions, Defendants requested separate instructions on six affirmative defenses: statute of limitations/laches, innocent infringement, excessive statutory damages, lack of standing, preemption, and bankruptcy discharge. (See Joint and Independent Proposed Jury Instructions, BDB II, ECF No. 379-1.) However, none of those affirmative defenses were proper. Defendants presented no evidence that Plaintiffs learned of their claims more than three years before filing

<u>Book Dog Books II</u>.  Standing was an element of Plaintiffs' case-in-chief, and innocent infringement was an element of damages.  Further, "excessive statutory damages," "preemption," and "preclusion" are all matters of law for the court, not the jury.  This Court denied all six requests to charge affirmative defenses.  This was another frolic that Defendants foisted on the Court and Plaintiffs.

In closing argument, Defendants' counsel acknowledged that Defendants sold at least some of the works at issue.  Fourteen titles bore Defendants' stickers, leading counsel to concede "it is more likely than not . . . that we distributed these books."  (Trial Tr. 3044:18–20.) Defendants reiterated this concession at argument on the post-trial motions.  (<u>See</u> Hr'g Tr. 68:24–69:2 ("There are a number of works in this case they bought directly from the defendants. There are a number of books in this case that bear our stickers.  There are books for which they have evidence.").  But at trial, Defendants attempted to advance the untenable position that Plaintiffs could not prove these particular works were actually counterfeit.  They argued that Plaintiffs' representatives—employees whose duties are to identify counterfeit works—could not differentiate between legitimate and illegitimate copies of their own textbooks.  (<u>See</u> Trial Tr. 3046:1–8.)  The failure to remove claims that could not be disputed from the jury's consideration was emblematic of the "give no quarter" approach taken by Defendants.  <u>See</u> <u>We Shall Overcome Found. v. The Richmond Org., Inc.</u>, 2018 WL 3629597, at *5 (S.D.N.Y. July 31, 2018) (awarding fees based on "objectively unreasonable" litigating positions);  <u>Beastie Boys v. Monster Energy Co.</u>, 112 F. Supp. 3d 31, 42 (S.D.N.Y. 2015) (finding defendant's refusal to admit clear copyright infringement objectively unreasonable).

Further, Defendants' litigation conduct merits an award of attorneys' fees under

the Copyright Act.  See Matthew Bender & Co. v. West Publ'g. Co., 240 F.3d 116, 124–25 (2d

Cir. 2001) (a court may award fees if "a party's conduct is unreasonable") (emphasis original).

While there were many abuses, the paradigm of Defendants' scorched-earth approach was their

willful concealment of business entities and profit distribution agreements, which required this

Court to issue an adverse inference instruction.  Even then, this Court afforded Defendants the

opportunity to avoid such an instruction by reopening discovery so that Defendants could come

clean on their financial machinations.  (See Scheduling Order, ECF No. 272.)  But they doubled

down on their obstructive tactics.  During trial, this Court explained why an adverse inference

instruction was necessary.  (Trial Tr. 2810:20–2814:19.)  Through an anonymous source,

Plaintiffs learned weeks before trial that Defendants had violated the Court's Orders to reveal

"any entity" through which they conduct their businesses, to "produce their financials 'in as

accessible and clear a form as possible,'" and to reveal "'all distributions or other payments . . .

by any of the defendants to any other individual and/or entities that received distributions or

payment from profits.'"  (Trial Tr. 2811:9–25 (citation omitted).)  Defendants did not disclose

the existence of Matasa, the rental arm for Book Dog Books, or certain equity participation

agreements.

      Aside from Defendants' discovery evasions, this Court has described Defendants'

incomprehensible decision to plead 52 affirmative defenses in Book Dog Books II knowing that

many had been stricken in Book Dog Books I.  This profligate pleading led to rebriefing at the

motion in limine stage.  Finally, this Opinion & Order has detailed Defendants' obsessive

relitigation of the Chegg and MBS spreadsheets.  (See Section II.E.)

      Defendants argue that their litigating positions were reasonable and stress that the

Magistrate Judge accepted their argument that Plaintiffs could not establish distribution for certain works. The fact that Defendants raised a few reasonable arguments in an ocean of unreasonable ones does not excuse their conduct. See Univ. Instruments Corp. v. Micro Sys. Eng'g, Inc., 2018 WL 748871, at *2 (N.D.N.Y. Feb. 7, 2018) (granting attorneys' fees where party "litigated this case in an unreasonable manner that exacerbated the issues to be resolved and the expenses incurred by all parties"); Megna v. Biocomp Labs. Inc., 225 F. Supp. 3d 222, 225 (S.D.N.Y. 2016). In briefing, Defendants do not address their conduct and how that factor should be assessed in determining fees.

While Defendants cite Barcroft Media, that court declined to award fees because the defendant "did not waste the [c]ourt's resources," "readily abandoned an argument that the [c]ourt found unpersuasive," "did not exhibit bad faith," and upon receiving a cease-and-desist letter "promptly took down all potentially infringing content . . . and implemented mechanisms for preventing future infringement." Barcroft Media, 2018 WL 357298, at *2, *3. The behavior described there is diametrically opposite to the antics Defendants engaged in here.

Awarding fees is also appropriate based on the jury's finding of willful infringement for all works at issue. See Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283, 289 (2d Cir. 1999) (finding fees warranted "based on the court's finding of willfulness"). And fees are warranted because Defendants are repeat infringers who were caught selling counterfeits over the last decade and up to the present time. See Kirtsaeng, 136 S. Ct. at 1989 ("[A] court may [award fees] to deter repeated instances of copyright infringement. . . ."); Beastie Boys, 112 F. Supp. 3d at 45 (finding fees appropriate for deterrence)

The Lanham Act permits an award of attorneys' fees "in exceptional cases." 15

U.S.C. § 1117(a). "As the Supreme Court has explained with regard to the identically worded fee-shifting provision of the patent laws, 'an 'exceptional' case is simply one that stands out from others with respect to substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'" Lightbox Ventures, LLC v. 3rd Home Ltd., 2018 WL 1779346, at *16 (S.D.N.Y. Apr. 13, 2018) (citing Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014)). "As in the comparable context of the Copyright Act, '[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised . . . ." Octane Fitness, 134 S. Ct. at 1756–57 (citing Fogerty, 510 U.S. at 534.)

For the reasons previously described, this case is also exceptional under the Lanham Act. See Romeo & Juliet Laser Hair Removal, Inc. v. Assara I LLC, 2016 WL 1328936, at *3 (S.D.N.Y. Apr. 5, 2016) (finding trademark case exceptional based on "bad faith litigation tactics"); Cognex Corp. v. Microscan Sys., Inc., 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (holding patent case exceptional based on weak defenses, "objectively high likelihood" that defendants' infringed plaintiffs' patent, and defendants' "unreasonable litigation tactics that have wasted the [c]ourt's time and have required plaintiffs to expend significant resources").

D.  Plaintiffs' Rates and Hours Billed

"A reasonable hourly rate is a rate in line with prevailing rates in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation." McDonald ex rel Prendergast, 450 F.3d at 96 (citation and alterations omitted). "The court may determine the reasonable hourly rates by relying both on its own knowledge of comparable rates

charged by lawyers in the district and on evidence proffered by the parties." <u>Congregation</u>

<u>Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona</u>, 188 F Supp. 3d 333, 338 (S.D.N.Y. 2016)

(citation and quotation marks omitted). Plaintiffs' counsel's hourly rates range from $375–$540

for partners, $325–$465 for senior counsel, $175–$430 for associates, and $100–$245 for

paralegals. (<u>See</u> Oppenheim Decl., ¶ 21 & Ex. 7.)[2] Ohio counsel billed between $290–$400 per

hour, and those rates have been reduced by 40% in Plaintiffs' counsel's fee application. (<u>See</u>

Oppenheim Decl. ¶ 30.)

 Without any reasoned explanation, Defendants ask that Plaintiffs' counsel's

rates be reduced across the board by 50%. But counsel's rates are in line with rates other courts

have accepted. <u>See</u> <u>Capitol Records</u>, 2015 WL 7271565, at *4 (in complex copyright litigation,

holding that rates between $517–$562 for partners and $315–$397 for associates were

reasonable); <u>Beastie Boys</u>, 112 F. Supp. 3d at 55–57 (approving hourly rates of $675 for

partners, $325–$505 for associates, and $200 for support staff). While a $245 hourly rate for

paralegals is higher than the limit customarily approved in this Circuit, <u>see, e.g.</u>, <u>Vaigasi v.</u>

<u>Solow Mgmt. Corp.</u>, 2017 WL 3868990, at *4 (S.D.N.Y. Sept. 5, 2017), the aggregate dollar

amount at issue is <u>de minimis</u>.

 Given the overall reasonableness of the requested hourly rates, this Court turns to

whether the number of hours expended by counsel was reasonable. Counsel excluded certain

time from its fee request, including: (1) fees incurred in settlement discussions, (2) fees related to

administrative tasks and weekly update calls, (3) matters that were dismissed early on or related

to defending claims in the Ohio action, (4) fees incurred in pre-lawsuit investigations, and (5)

---

[2] Counsel's rates vary as widely as they do because this litigation spanned more than five years. (Oppenheim Decl., ¶ 21.)

work performed by attorneys who were not directly on the case.  (Oppenheim Decl. ¶ 29.)

Plaintiffs' counsel represents that it excluded "at least $347,039.11" from their fee application.

(Oppenheim Decl. ¶ 31.)  This is not inconsequential, but further reductions are warranted.

In determining reasonable hours, a "court looks to its own familiarity with the

case and its experience . . . generally as well as to the evidentiary submissions and arguments of

the parties."  Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992) (citation and quotation marks

omitted).  "The touchstone inquiry is what a reasonable, paying client would be willing to pay."

Filo Promotions, Inc. v. Bathtub Gins, Inc., 311 F. Supp. 3d 645, 650 (S.D.N.Y. 2018) (citation

and quotation marks omitted).

First, hundreds of Plaintiffs' contemporaneous time entries are redacted.  (See

Declaration of Robert Glunt, BDB II, ECF No. 446 ("Glunt Decl.") Exs. 2–3, 9–10.)  Some

redacted entries prevent any meaningful review by this Court, such as June 12, 2017's entry for

"Analyze [REDACTED]," or July 26, 2017's entry of "Strategize re [REDACTED]."  (See

Glunt Decl., Ex. 3, at 12–13.)  These entries deprive "the [c]ourt [of] an adequate basis for

reviewing the reasonableness of [the] claimed hours."  Osterweil v. Bartlett, 92 F. Supp. 3d 14,

31 (N.D.N.Y. 2015); see also Capitol Records, 2015 WL 7271565, at *3 (reducing fees based on

vague billing entries).

Second, hundreds of hours reflect internal meetings and conferences.  (Glunt

Decl., Ex. 8.)  Courts often discount or strike such hours from a fee application, especially when

they seem excessive.  See Anthony v. Franklin First Fin., Ltd., 844 F Supp. 2d 504, 509

(S.D.N.Y. 2012) (reducing fees based in part on internal meetings).

Many of Plaintiffs' counsel's entries display block-billing.  "As a general rule,

block billing is disfavored. It impedes the client's ability to understand the precise time allocable to the tasks for which it is being billed on an hourly basis." Beastie Boys, 112 F. Supp. 3d at 53. Although Plaintiffs' often parsed out time spent on each task within an entry, block-billing impeded this Court's ability to survey 141 pages containing nearly 7,000 time entries.

Plaintiffs seek full reimbursement for approximately two hundred hours of travel time. (Glunt Decl. Ex. 13.) The custom in this Circuit is to reduce billing rates for travel by 50%. See Spencer v. City of New York, 2013 WL 6008240, at *7 (S.D.N.Y. Nov. 13, 2013); Adusumelli v. Steiner, 2013 WL 1285260, at *5 (S.D.N.Y. Mar. 28, 2013).

Finally, more time was devoted to some legal tasks than appears reasonable to this Court. As Defendants point out, when Plaintiffs' time entries are distilled, counsel, who are highly experienced in copyright infringement and trademark infringement actions, expended 272 hours preparing jury instructions. In another vein, this Court cannot fathom how attorneys could spend 467 hours preparing deposition designations when there were nowhere near that number of hours of deposition in the case. (See Glunt Decl. Exs. 4 & 5.) This excessive expenditure of time does not square with counsel's expertise. In response, Plaintiffs contend that the totals identified by Defendants are misleading because their block-billings include tasks other than creating jury instructions and deposition designations. But that underscores the problem— because Plaintiffs combine tasks, no one can easily quantify how long Plaintiffs spent on particular tasks. "Trial courts need not, and indeed should not, become green-eyeshade accountants." Ernest Gene Therapeutic, LLC v. Sloan-Kettering Inst. for Cancer Research, 286 F. Supp. 3d 585, 588 (S.D.N.Y. 2018) (citing Fox v. Vice, 563 U.S. 826, 838 (2011)), report and recommendation adopted by 2018 WL 3094913 (S.D.N.Y. June 21, 2018).

In determining the appropriate amount of fees, this Court balances the concerns described above with its appreciation that this litigation was complex and hard-fought.  See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d 182, 184 (2d Cir. 2008) (holding that in awarding fees a district court may consider the "complexity and difficult of the case").  "It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldly or potentially inaccurate."  Beastie Boys, 112 F. Supp. 3d at 57 (citation omitted).

Courts often "cut the fee award by 30% across the board due to deficiencies found in counsel's billing records."  See, e.g., De La Paz v. Rubin & Rothman, LLC, 2013 WL 6184425, at *4 (S.D.N.Y. Nov. 25, 2013).  This Court exercises its informed discretion to reduce the total attorneys' fees sought by 30%.[3]  See Hines v. City of Albany, 613 F. App'x 52, 55 (2d Cir. 2015) (summary order) (upholding a reduction of fees by 30% where block-billing "frustrated meaningful review of the reasonableness of the hours claimed"); Beastie Boys, 112 F. Supp. 3d at 57 ("Fee reductions around 30% are . . . common in this District to reflect considerations of whether work performed was necessary, leanly staffed, or properly billed.").  This yields total attorney fees of $4,137,081.70.  While this award is substantial, it reflects work performed over five years in three lawsuits on behalf of four of the world's major publishers bringing 161 separate claims.

E.  Costs

Plaintiffs' counsel seeks $852,493.43 in costs.  (See Oppenheim Decl. ¶ 38.)

_____

[3] Defendants' assertion that Plaintiffs' counsel's hours should be subject to an across-the-board 90% reduction is absurd.  Given Defendants' litigation conduct, they should have a clear and informed view of why their adversaries were required to spend so much time and resources litigating this matter.

These include transcripts, service and filing fees, e-discovery, experts, and travel. (See

Oppenheim Decl. Ex. 9.) Defendants challenge (1) the $225,000 accounting expert witness fee,

(2) travel expenses totaling $132,621.84, (3) Lexis costs of $12,857.20, and other minuscule

expenses too trivial for consideration. In total, Defendants seek to cap Plaintiffs' costs at

$400,000.

"Courts generally award costs to prevailing parties in cases [involving] claims

brought under the Lanham Act." Farberware Licensing Co., LLC v. Meyer Mktg. Co., 2009 WL

5173787, at *3 (S.D.N.Y. Dec. 30, 2009). "Unlike the more limited costs recoverable under 28

U.S.C. § 1920, costs recoverable under section 505 of the Copyright Act include any 'reasonable

out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'"

TufAmerica Inc. v. Diamond, 2016 WL 1029553, at *7 (S.D.N.Y. Mar. 9, 2016) (citing U.S.

Football League v. Nat'l Football League, 887 F.2d 408, 416 (2d Cir. 1989)); see also Capitol

Records, 2015 WL 7271565, at *6.[4]

Defendants' challenge to the $225,000 accounting expert fee has some merit.

Plaintiffs did not submit any contemporaneous time records for their accounting expert.

Undoubtedly, significant professional time was needed to cut through the Gordian knot of

Defendants' tangled financial relationships. And Defendants' concealment of certain financial

transactions assuredly complicated Plaintiffs' expert's analysis. But Defendants paid their

---

[4] There is substantial disagreement among courts regarding whether costs under the Copyright Act are limited to the categories delineated in 28 U.S.C. § 1920. See Clarity Software, LLC v. Fin. Independence Grp., LLC, 2016 WL 3083383, at *6–7 (W.D. Pa. May 31, 2016) (summarizing the conflicting case law). For purposes of this Opinion & Order, this Court utilizes its prior determination that the Copyright Act permits broader shifting of costs than the categories listed in § 1920. This holding is in line with "the interests of the Copyright Act [including] raising of objectively reasonable claims and defenses, which may serve not only to deter infringement but also to ensure that the boundaries of copyright law are demarcated as clearly as possible in order to maximize the public exposure to valuable works." Capitol Records, Inc., 2015 WL 7271565, at *4 (citation, quotation marks, and alteration omitted); see Kirtsaeng, 136 S. Ct. at 1986 ("[F]ee awards under § 505 should encourage the types of lawsuits that promote the purposes of the Copyright Act.").

accounting expert only a fraction of $225,000.  (See Glunt Decl., Ex. 21.)  Accordingly, the

accounting expert fee is reduced to $125,000.

The travel costs incurred in prosecuting this case reflect the fact that Defendants

are located in Ohio, witnesses were located in various cities across the United States, Plaintiffs'

counsel are located in Washington, D.C., and the action was litigated and tried in New York.  To

the extent that Plaintiffs' counsel travelled to New York for conferences and trial, that expense is

offset by the fact that counsel charged lower market rates than most major New York law firms.

Defendants also challenge an award of costs for Lexis fees.  "[T]he cost of the

computer service used in the research is no more reimbursable than the cost of the West's

Keynote Digests and the volumes of the Federal Report and the Federal Supplement that lawyers

used to use (and many still use) to find authority and research issues of law."  BD v. DeBuono,

177 F. Supp. 2d 201, 209 (S.D.N.Y. 2001).  Accordingly, this Court declines to award

$12,857.20 in Lexis fees.

While Defendants do not challenge certain other trial costs, including

$112,850.13 for a trial support company and $81,807 for hotel accommodations during trial, this

Court finds them to be excessive.  The trial lasted only three weeks.  This Court reduces these

specific costs by 30%.  This Court has reviewed the remainder of Plaintiffs' costs and finds them

reasonable.  Adjusting Plaintiffs' costs based on this Court's analysis, Plaintiffs' counsel are

awarded $694,096.29 in costs.

IX.     Stay of Enforcement

Perhaps anticipating that their post-trial motions would be unsuccessful,

Defendants also move for a stay of enforcement of any judgment pending appeal without the

need to post a supersedeas bond.  In the alternative, Defendants ask that they be permitted to post

a security interest in commercial property as a substitute for a bond.  Although there is some

question whether Defendants' motion is timely as no final judgment has been issued and no

appeal taken, the matter has been briefed and there is no need to delay adjudication.

Under Federal Rule of Civil Procedure 62(d), "[i]f an appeal is taken, the

appellant may obtain a stay by supersedeas bond."  Fed. R. Civ. P. 62(d); see 11 Fed. Prac. &

Proc. Civ. § 2905 (3d ed. 2018) ("The stay issues as a matter of right in cases within Rule 62(d),

and is effective when the supersedeas is approved by the court.").  "The bond serves three

purposes: (1) it ensures the judgment debtor may obtain a refund if he or she is meritorious on

appeal . . .; (2) it mitigates any risk that the judgment debtor may not be able to fulfill the

judgment after appeal; and (3) it guarantees that the appellee can recover damages caused by any

delay incident to the appeal, such as interest and costs."  SDF9 Cobk LLC v. AF & AR LLC,

2015 WL 3440259, at *1 (E.D.N.Y. May 27, 2015).

A Court may waive a supersedeas bond "if the appellant provides an acceptable

alternative means of securing the judgment."  In re Nassau Cty. Strip Search Cases, 783 F.3d

414, 417 (2d Cir. 2015) (citation and quotation marks omitted).  In Nassau County Strip Search

Cases, the Second Circuit adopted a non-exclusive five-factor test for determining whether to

waive a supersedeas bond:

> (1) the complexity of the collection process; (2) the amount of time
> required to obtain a judgment after it is affirmed on appeal; (3) the
> degree of confidence that the district court has in the availability of
> funds to pay the judgment; (4) whether the defendant's ability to pay
> the judgment is so plain that the cost of a bond would be a waste of
> money; and (5) whether the defendant is in such a precarious
> financial situation that the requirement to post a bond would place
> other creditors of the defendant in an insecure position.

783 F.3d at 417–18 (citing <u>Dillon v. Chicago</u>, 866 F.2d 902, 904–05 (7th Cir. 1988)).  These factors are meant to "ensure recovery for a party who ultimately prevails on appeal, and to protect the judgment debtor from risk of losing their money if the decision is reversed."  <u>Nassau Cty. Strip Search Cases</u>, 783 F.3d at 418.

Defendants ask this Court to apply a four-factor test often used in conjunction with stays of injunctions.  Those factors include likelihood of success on appeal, injury to the movant, injury to the non-moving party, and the public interest.  <u>See</u> <u>Mohammed v. Reno</u>, 309 F.3d 95, 100 (2d Cir. 2002).  Although some courts in this Circuit have applied these factors to cases involving monetary damages, in <u>Nassau County Strip Search Cases</u> the Second Circuit rejected that practice, holding that the five-factor test "more directly address[es] the primary purpose of Rule 62(d)."  <u>Nassau Cty. Strip Search Cases</u>, 783 F.3d at 418.

This Court agrees with those courts holding the traditional four factors "appl[y] only when the judgment sought to be stayed is for injunctive or equitable relief."  <u>Moore v. Navillus Tile, Inc.</u>, 2017 WL 4326537, at *4 (S.D.N.Y. Sept. 28, 2017); <u>see also</u> <u>Butler v. Ross</u>, 2017 WL 6210843, at *2 (S.D.N.Y. Dec. 7, 2017) ("[A] motion for a stay of money judgment is assessed under the announced test for Rule 62(d), which is separate and apart from the test used when assessing a Rule 62(c) motion.")

The <u>Nassau County Strip Search Cases</u> factors weigh decisively against granting Defendants a stay without posting a supersedeas bond.  Those factors "contemplate waiving the requirement of a supersedeas bond because a court is satisfied that the debtor would be able to pay the judgment with ease."  <u>Butler</u>, 2017 WL 6210843, at *3; <u>see</u> <u>Rivera v. Home Depot USA Inc.</u>, 2018 WL 3105069, at *3 (S.D.N.Y. June 25, 2018) (waiving bond because Home Depot

had "extremely deep pockets" and would be able to pay any judgment).  Here, Defendants

ground their stay request on their <u>inability</u> to pay the judgment.  They provide documentation

showing that the award dwarfs their assets.  But "the bond requirement will not be waived solely

on the basis that it will pose a severe financial hardship on the appellant."  11 Fed. Prac. & Proc.

Civ. § 2905; <u>Butler</u>, 2017 WL 6210843, at *3 (denying waiver of bond where defendant "ple[d]

a case of impecuniosity").  In fact, a concession of inability to pay is often "determinative" in

this inquiry.  <u>Moore</u>, 2017 WL 4326537, at *2.

 Therefore, the fact that the need to post a bond may impair a business is

irrelevant.  "The bond requirement is not designed to protect the judgment debtor's ability to

continue in business. . . . ."  <u>Leevson v. Aqualife USA Inc.</u>, 2017 WL 6541766, at *2 (E.D.N.Y.

Dec. 8, 2017) (citation and alteration omitted), <u>report and recommendation adopted by</u> 2017 WL

6550683 (E.D.N.Y. Dec. 21, 2017); <u>accord</u> <u>Allied Erecting & Dismantling Co. v. U.S. Steel

Corp.</u>, 2016 WL 1106854, at *17 (N.D. Ohio Mar. 21, 2016) (debtor's bankruptcy "is precisely

the injury against which a supersedeas bond is designed to protect").  Here, a bond is necessary

to safeguard Plaintiffs' recovery.  <u>See</u> <u>Howard Town Ctr. Developer, LLC v. Howard Univ.</u>, 288

F. Supp. 3d 11, 15 (D.D.C. 2017) (requiring full bond partly due to court's "great concern" with

debtor's "inability or unwillingness to satisfy the judgment").  Additionally, it appears that

Defendants' net worth consists largely of illiquid assets, likely complicating any collection

effort.

 Defendants cite <u>Texaco Inc. v. Pennzoil Co.</u>, where the Second Circuit held that

"denial of a stay of execution unless a supersedeas bond in the full amount of the judgment is

posted can in some circumstances be irrational, unnecessary, and self-defeating [and] reduce . . .

appeal to a meaningless ritual." <u>Texaco</u>, 784 F.2d 1133, 1154 (2d Cir. 1986), <u>rev'd</u> 481 U.S. 1 (1987). However, the Supreme Court's reversal of <u>Texaco</u> undermines "[a]ny 'precedential value'" of that case and "does not justify overlooking [the more recent holding in] <u>Nassau County [Strip Search Cases]</u>." <u>Moore</u>, 2017 WL 4326537, at *5.

Defendants' proposal to substitute Defendants' interest in two warehouses in place of a $39,031,177.99 bond is inadequate. The value of those warehouses is a trivial fraction of the obligation imposed by the judgment. <u>See</u> <u>Leevson</u>, 2017 WL 6541766, at *4 (rejecting equity in a building <u>equal</u> to amount of the judgment). Where courts have permitted interest in real property in place of a bond, the property was worth substantially <u>more</u> than the judgment, meaning it provided clear assurance of payment. <u>See</u> <u>Brooktree Corp. v. Advanced Micro Devices, Inc.</u>, 757 F. Supp. 1101, 1105 (S.D. Cal. 1990) (permitting posting of property worth twice the amount of judgment).

The fifth factor addresses whether requiring Defendants to post bond could damage other creditors. But this factor requires the debtor to show that their inability to pay other creditors would stem from the <u>bond itself</u>, not merely from the judgment. <u>See</u> <u>Moore</u>, 2017 WL 4326537, at *2. It "does not envisage waiving the bond requirement because a debtor simply cannot pay." <u>Butler</u>, 2017 WL 6210843, at *3. And even if the fifth factor favors a stay without bond, it does not outweigh the other factors. <u>See</u> <u>Butler</u>, 2017 WL 6210843, at *3; <u>Moore</u>, 2017 WL 4326537, at *3 (considering the fifth factor "a weak reed on which to premise an argument that bond requirement should be waived").

Because the <u>Nassau County Strip Search Cases</u> factors decisively weigh against a stay of enforcement without the posting of a bond and Defendants fail to offer a sufficient

alternative, this Court declines to waive the requirement for a bond in the event that Defendants appeal.

CONCLUSION

For the foregoing reasons, Defendants' motions for renewed judgment as a matter of law, remittitur, a new trial, and a stay of enforcement of judgment are denied. Plaintiffs' motion for partial final judgment is denied as moot. Plaintiffs' motion for prejudgment interest is denied. Plaintiffs' motions for a permanent injunction, a disposition of infringing materials, and attorneys' fees and costs are granted in part and denied in part. Plaintiffs' counsel are awarded $4,137,081.70 in attorneys' fees and $694,096.29 in costs. This Court will issue a final judgment in the aggregate amount of $39,031,177.99 concurrent with this Opinion & Order. The Clerk of Court is directed to terminate all pending motions and to mark these cases as closed.

Dated: August 17, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.