I2QVWILO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JOHN WILEY & SONS, INC.,
ET AL,

                    Plaintiffs,

            v.                          13 CV 816 (WHP)

BOOK DOG BOOKS, LLC, ET AL,

                    Defendants.

------------------------------x

CENGAGE LEARNING, INC., ET AL,

                    Plaintiffs,

            v.                          16 CV 7123 (WHP)

BOOK DOG BOOKS, LLC, ET AL,

                    Defendants.         ARGUMENT

------------------------------x

                                        New York, N.Y.
                                        February 26, 2018
                                        5:15 p.m.

Before:

                    HON. WILLIAM H. PAULEY III,

                                        District Judge

                            APPEARANCES

OPPENHEIM ZEBRAK
        Attorneys for Plaintiffs
BY:  MATTHEW J. OPPENHEIM

MANDEL BHANDARI
        Attorneys for Defendants
BY:  EVAN MANDEL
        ROBERT A. GLUNT

2

I2QVWILO1

1                          APPEARANCES (continued)

2

3     GREENBERG TRAURIG
           Attorneys for Miscellaneous Party Chegg, Inc.
4     BY:  NINA D. BOYAJIAN (appearing via telephone)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Case called)

 2                 THE COURT:  I'm going to deal with a number of matters

 3       here.  I don't understand why every disagreement between the

 4       parties results in an urgent letter to the Court.  I can tell

 5       you all that this is not the way the trial is going to proceed;

 6       that I've read some of these marathon sessions that you've had

 7       with Magistrate Judge Gorenstein.  There are no more marathon

 8       sessions, okay?  This is going to be a sprint to the finish for

 9       the jury.  I'm going to set time limits on both sides for the

10       trial, strict time limits, which I will enforce with a chess

11       clock.  And when your time is up, your case is over or your

12       cross-examinations are over.  Because it's about time that you

13       understand that there have to be certain concessions to the

14       mortality of man.

15                 Now, the first dispute which I regard as emblematic of

16       other disputes in this case is petty.  It involves the

17       plaintiffs' complaint about the number of witnesses that the

18       defendants have identified.  The defendants, quite properly,

19       point out that they don't know precisely what the contours of

20       the plaintiffs' case are and so it's just a protective

21       mechanism.  If the defendants want to waste their time during

22       trial with duplicative testimony, at some point I'll just cut

23       it off, because I don't want the jury bored to death.

24                 Now, why, Mr. Oppenheim, are there still 1300 exhibits

25       on the plaintiffs' list?
```

1          MR. OPPENHEIM:  Your Honor, the defendants keep

2     throwing that around.

3          THE COURT:  You can remain seated and speak into the

4     microphone because that will be the best way for counsel on the

5     phone to hear the proceedings.

6          MR. OPPENHEIM:  Very well.  Habit, your Honor.

7     Apologies.

8          Your Honor, of those 1300, 800 of them are just books

9     and 150 of them --

10          THE COURT:  Those 800 -- I'm not too worried -- those

11     are cited in the roadmap, right, those books?

12          MR. OPPENHEIM:  Certainly the counterfeits are.  I'm

13     trying to remember whether the legitimate exemplar --

14          THE COURT:  I'm worried about the other 500 exhibits

15     that are not referred to in the roadmap.

16          MR. OPPENHEIM:  So 800 are the books, 150 are images

17     of the books as backups, in part because we didn't know whether

18     the defendants were going to bring the books within their

19     possession.  That now significantly reduces the number of

20     exhibits at issue.  Many of the other documents are just

21     documents underlying the roadmap.

22          THE COURT:  There's 161 works at issue, right?

23          MR. OPPENHEIM:  Yes, your Honor.

24          THE COURT:  Why do we need 800 exhibits for 100 -- why

25     do we need 800 books for 161 titles?

1            MR. OPPENHEIM:  Well, your Honor, first off, for each

2     title at issue there's a counterfeit and there's a legitimate

3     comparison copy.  We will allow the jury to see some, but we're

4     certainly not going to go through all of them, a handful of

5     them for them to see because the defendants are contesting

6     whether or not the books are counterfeit.  So that's two for

7     each.  And for some of them there are just two.

8            THE COURT:  But that takes us to 320.

9            MR. OPPENHEIM:  Yes, your Honor.

10           In some instances there are multiples because they

11    came from different places.  So, for example, your Honor, the

12    defendants have contested whether or not they distributed

13    counterfeit copies of a particular title.  And we may have

14    received a counterfeit copy from Follett, a counterfeit copy

15    from MBS, we may have gotten one from Chegg, we may have bought

16    one from the defendants; and so we'll have -- since they

17    continue to contest whether or not they'll distribute it, we'll

18    have multiple counterfeit copies, your Honor.

19           We'll move them in, your Honor, in bulk, assuming

20    there's no objection, and they don't want us to go through each

21    and every one of them.  But we don't want there to be any

22    argument later, Well, you didn't present that you got books

23    from four different sources for a particular title.  Your

24    Honor, we have far more and we've tried to reduce it, but, your

25    Honor, this kind of leads directly into the issue of

1    defendants' roadmap.  We've tried to reduce the number that we

2    are using.  They then are using that against us to say that's

3    the only -- those are the only counterfeits that the plaintiffs

4    are aware of.  We've only infringed that many books.

5           THE COURT:  We're going to get to the motion *in limine*

6    with respect to the defendants' roadmap in a few moments.

7           Mr. Mandel, on the witness issue, why do you need

8    testimony from five third parties on counterfeit detection

9    practices?

10          MR. MANDEL:  As we said in the letter, your Honor, I

11   would be surprised if we call more than two or three of those

12   witnesses.  That's really in there prophylactically.  What

13   we've got is we've got an expert who's going to testify as to

14   market practices.  That expert has been shown depositions from

15   most or all of those parties.  If we are satisfied at the end

16   of the cross-examination of our expert on that market practice

17   issue, we're very likely not going to call another distributor.

18   Possibly we will call one or two more.  The primary reason

19   those five distributors are in there is because there are

20   authenticity issues concerning documents or books produced by

21   those parties in discovery, and the plaintiffs have already

22   contested, such as with MBS, some of the evidence that we are

23   putting in with respect to MBS.

24          I will also just finally globally note we were very

25   surprised to see the plaintiffs' letter on the witness issue,

1   because we have identified 31 live witnesses and they have

2   identified 26 live witnesses.  Unsurprisingly, those lists are

3   substantially the same.  So we don't think there's any

4   prejudice whatsoever to plaintiffs, and we don't think there

5   was any basis for the letter in the first place.

6          THE COURT:  Look, I'm going to jump ahead, in the

7   interest of counsel in California, and deal with the Chegg

8   issue.  And then, Ms. Boyajian, if you wish, after we've

9   disposed of that issue, you can just alert me as to whether or

10  not you want to remain on the conference call with the Court.

11         All right?  Ms. Boyajian?

12         MS. BOYAJIAN:  Yes, I said thank you, your Honor.

13         THE COURT:  All right.

14         With respect to the Chegg summary, doesn't it really

15  summarize a different set of evidence, Mr. Oppenheim?

16         MR. OPPENHEIM:  I think you mean that question for

17  Mr. Mandel; correct?

18         THE COURT:  No.  You object, don't you?  You object to

19  the summary to the defendants' attempt to submit a summary of

20  data disclosed by Chegg.  You say it violates Judge

21  Gorenstein's order, right?

22         MR. OPPENHEIM:  Yes, your Honor.  Sorry, I

23  misunderstood your question.

24         THE COURT:  My question to you is isn't this really a

25  different set of evidence?

1          MR. OPPENHEIM:  Your Honor, what they are trying to do

2     is put forward, whether you call it a roadmap or you call it a

3     summary, right, essentially a counterweight to what the

4     plaintiffs have put forward.  Now, they are trying to

5     substantially broaden the scope of it because they are going

6     beyond titles and they are trying to look at the

7     industry-wide -- beyond the titles at issue and they are trying

8     to look industry-wide.  But they are essentially attempting to

9     respond to the roadmap with this summary.

10          There was no deadline set, I will concede, for when

11    summaries should have been presented.  We put our summary

12    forward in 2014, I believe, your Honor, maybe it was 2015.  We

13    have responded and adjusted it to issues that they have raised

14    all along.  They had an opportunity to take depositions of our

15    witnesses about our roadmap.  They have done nothing of the

16    like; this came in very much at the very end, right after

17    discovery is closed.  Clearly Judge Gorenstein said to them,

18    No -- they asked Judge Gorenstein, Can we put other things in?

19    And he said no.  So they said, Okay, we are not going to call

20    this a counter roadmap or a defendants' roadmap, we'll call

21    this a summary and put it forward.  But we haven't had a chance

22    to address it.

23          The reason that's important here is because it really

24    does attempt to do things very different than the roadmap.  And

25    so they are putting it in for very different purposes.  It is

I2QVWILO1

1    substantively problematic, your Honor.

2              THE COURT:  All right.  But why can't you

3    cross-examine defendants on the problems that you note with

4    this Chegg summary?

5              MR. OPPENHEIM:  Your Honor, if they are going to

6    start -- first off, the purpose that they want to use it for is

7    to say, Look at the counterfeiting rate of defendants as

8    compared to the counterfeiting rate of other distributors based

9    on what the plaintiffs reviewed within that inventory.

10             The problem is that when the plaintiffs went in and

11   reviewed Chegg inventory, it was very different sets of

12   inventory.  So the plaintiff said, Here are a specific set of

13   titles that we know are likely counterfeited frequently that we

14   want to look at for these, say, three or four different

15   entities.  But with respect to defendants, because we are in

16   litigation with them, we want to see everything they've ever

17   given to you.  So it is not an apples-to-apples comparison.

18             For us to have to go through and explain that to the

19   jury after they've put forward these numbers, which are

20   absolutely not a fair statement.  If you wanted to do a

21   sampling, you could do a sampling.  This is not a sampling.  So

22   they are trying to take Chegg data which is not theirs and use

23   it for purposes it was not intended for to show something that

24   it doesn't show.

25             If we had taken every book of every one of the other

1   distributors, we would have had a very, very low number for the

2   other distributors as well, but we didn't.  This is going to

3   very much mislead the jury; it's not an appropriate use of that

4   data.

5           Also, your Honor, 14 of the additional titles that are

6   in there are titles that we want to raise.  But your Honor has

7   precluded us by saying that we can't.  So, in other words,

8   we've got infringements from the defendants after discovery

9   closed, so 14 titles that are in the Chegg data.  So if the

10  Chegg data comes in and we get to cross-examine because you're

11  allowing it in and we just go to the weight, then we should be

12  allowed to raise the issue maybe it's just big-picture, maybe

13  it's not handing actual infringing books up, but at least raise

14  the issue, Well, at least with respect to 14 of those titles,

15  we know the defendants infringed them as well and we've got

16  evidence of it.

17          THE COURT:  All right.  Let me turn to the issue that

18  concerns Chegg directly.  I'm directing my inquiry now to you,

19  Ms. Boyajian.

20          As I understand it, Chegg objects to this summary data

21  because it identifies specific suppliers, and also

22  mischaracterizes student buybacks, and also fails to reveal

23  that it is, in fact -- that the audit was only a subset of all

24  of the books in the inventory of Chegg.

25          So turning to the first issue, the identity of

I2QVWILO1

1    suppliers, what would Chegg's position be if the identities

2    were simply changed to supplier one, two, and three?

3              MS. BOYAJIAN:  That would certainly alleviate some of

4    our concerns.  The concern is with respect to the suppliers.

5    One is their actual identity, as your Honor knows; and the

6    second is enforcing strategy.  And by that, the books that we

7    buy back --

8              THE COURT:  I'm having trouble hearing you.  What kind

9    of phone are you on?

10             MS. BOYAJIAN:  I'm on my landline, but I should pick

11   up the receiver.

12             THE COURT:  Yes, that makes a big difference.

13             MS. BOYAJIAN:  Sure.  Apologies.

14             I could start from the beginning of the argument, if

15   your Honor would prefer.

16             THE COURT:  I would.

17             MS. BOYAJIAN:  Okay.

18             So the issue with the suppliers are twofold:  The

19   first is the identities, as your Honor notes.  The second is

20   the sourcing strategy, I'll call it.  What I mean by that is a

21   proportion of books that Chegg sources from one supplier as

22   opposed to another, so what the volume is relative to --

23   student buybacks relative to a large distributor such as MBS.

24   And those are concerns that we have with respect to the

25   suppliers, I think would be alleviated by what your Honor

I2QVWILO1

1    suggests.

2         What would not be alleviated is what Mr. Oppenheim

3    noted, which is that this number, the 17 percent number,

4    grossly misrepresents what the counterfeit problem is in

5    Chegg's inventory, which would cause significant reputational

6    competitive harm to Chegg.  That is not the actual proportion

7    of counterfeits in our inventory, and it's so much larger that

8    it is damaging to our reputation.

9         THE COURT:  How does it misrepresent the proportion of

10   books in Chegg's inventory?

11        MS. BOYAJIAN:  As Mr. Oppenheim explained, when the

12   publishers came to us to do the audits, they have specific

13   titles that tended to have higher rates of counterfeit.  And

14   they selected those titles to audit.

15        I was not 100 percent sure until Mr. Oppenheim made

16   the representation just a moment ago that with respect to

17   defendants, they audited the entire inventory, which is why our

18   number is 16 or 17 percent higher than their number.  It was

19   not a pure sampling, a typical sampling, a random sampling, if

20   you will.

21        THE COURT:  All right.

22        Mr. Mandel, how does this summary make any sense then

23   when different standards were used for each supplier?

24        MR. MANDEL:  First of all, we don't know what the

25   standards that were used.  All we know is that Mr. Oppenheim's

1    firm chose which books to review.  We have not deposed

2    Mr. Oppenheim's firm on this issue; although there are a

3    variety of issues we could have deposed Mr. Oppenheim's firm

4    on, we chose not to do so because we didn't want to slow down

5    this case or interfere with it and that's just not how we

6    practice when there's any way to avoid it.

7             We don't know that this is the case, Mr. Oppenheim's

8    firm had sole decision-making with respect to which books were

9    and were not inspected.  To the extent that some different

10   standard was used, that has nothing to do with the

11   admissibility of the evidence.  If anything, it goes to the

12   weight of the evidence.  If they want to respond and say, Well,

13   actually -- and what they say in their papers is that if you

14   did the analysis, if you looked at the defendants' books that

15   are only the titles at issue in this case, it would be, in

16   their words, a 500 percent higher percentage for the

17   defendants.  "500 percent" is a fancy way of saying five times

18   more.

19            If you look at these numbers and you say, Our number

20   is five times higher than it really is, that still shows that

21   our numbers are a tiny fraction of the Chegg figure, and

22   substantially in line with the two major distributors that are

23   on here, and we'd still compare favorably to everyone else on

24   the chart, with one exception.

25            So even if you looked at these numbers the way the

I2QVWILO1

1    plaintiffs are asking the Court to look at it -- and we have no

2    reason to believe that they should be looked at the way

3    plaintiffs are asking, but that's what they say -- then it

4    still shows that, one, when they went into MBS and pulled a

5    book off the shelf, it was no more likely to come from us than

6    it was to come from a buyback or Chegg or the other

7    distributors that are listed on this list. And, two, if it did

8    ultimately come from us when they pulled a random book off

9    MBS's shelf and then sued us claiming it came from us, that we

10   didn't distribute it willfully, because our percentages are no

11   higher than these other distributors.

12          MBS, for instance, was deposed in this case. The

13   plaintiffs share a ton of information with MBS; they've trained

14   MBS's personnel in how to detect counterfeit books. Plaintiffs

15   don't share any information with us. Plaintiffs have never

16   trained us on how to detect counterfeit books; yet we are just

17   as good, if not better, than MBS at detecting counterfeit books

18   and removing them from our inventory, according to their

19   reading of the numbers.

20          So this is extremely persuasive evidence, even if it's

21   interpreted in the way that plaintiffs ask for it to be

22   interpreted, and it is absolutely mission critical for this

23   case, which the Court has already ruled on.

24          MS. BOYAJIAN: Your Honor, if I may be heard.

25          Mr. Mandel's argument doesn't at all address Chegg's

confidentiality concerns.  And while defendants and plaintiffs

are in a position to argue persuasiveness and reputation and

what a counterfeit rate might mean for defendants, Chegg is not

in that position.  We're going to have our confidential

information paraded out in front of our potential consumers

without any opportunity to explain our position and our

procedure in the policies.

           MR. OPPENHEIM:  Your Honor, may I --

           THE COURT:  Go ahead, Mr. Oppenheim.

           MR. OPPENHEIM:  This doesn't speak to what the

defendants are buying and selling generally.  This speaks to

what they sold to Chegg, compared to what other distributors

sold to Chegg.  The number of books that they sold to Chegg was

smaller than the other distributors.  Chegg may rely much more

on other distributors.  It doesn't mean anything.  In fact, the

defendants sell a huge number of their books through their

online system, Apex Media, and Chegg isn't buying them through

there or, if they are, they are not being marked as defendants.

           So this isn't representative of what the defendants

are doing, this is just representative of what Chegg has

received from the defendants.  And to use it as a proxy to say,

We're not willful because look at how less egregious our

infringement is compared to others, that's exactly the kind of

argument that a jury should never hear.  This just shows what

they're selling Chegg.

I2QVWILO1

```
 1          This case should be about the books that we've
 2    reviewed that have come from the defendants, what they are
 3    doing internally, what they've distributed, not what Chegg has
 4    bought from the world and what Chegg's operations happen to
 5    have found and what a statistically odd sampling process for
 6    different distributors into Chegg showed.  That's not what this
 7    case should be about.
 8          THE COURT:  All right.
 9          Mr. Mandel, I'll think about this a little further,
10    but I tell you that I think that this summary is highly
11    misleading, because it's clear that different standards were
12    used, and it's argumentative.  But I don't want to hear -- I've
13    heard enough on it.  I'll think about it some more, but I'm
14    going to -- and I'll issue an opinion.
15          Now, let me turn to the MBS summary.
16          MS. BOYAJIAN:  Your Honor, before your Honor proceeds,
17    may I disconnect from the call?
18          THE COURT:  You may.
19          MS. BOYAJIAN:  Thank you.
20          THE COURT:  Have a good afternoon.
21          MS. BOYAJIAN:  Good afternoon.
22          THE COURT:  With respect to plaintiffs' motion *in
23    limine* on the MBS summary, Mr. Oppenheim, Judge Gorenstein
24    specifically allowed the defendants to offer a counter roadmap.
25    I don't understand your argument as to how they waived the
```

I2QVWILO1

1          right to do so.

2                    MR. OPPENHEIM:  Yes, your Honor.

3                    So that's the procedural issue we've raised; we also

4          had a substantive issue.

5                    But procedurally, your Honor, back in 2015, the

6          defendants indicated they had objections to plaintiffs' roadmap

7          and that there were issues they wanted to raise with it.  And

8          we said fine.  And we had a meet-and-confer with Ms. Miller,

9          their counsel of record at the time, lead trial counsel.  We

10         agreed upon a process.  They designated a witness who was going

11         to be their witness to state their objections to the roadmap

12         and what was not included in the roadmap.  And we said, Fine,

13         we'll take his deposition.

14                   We went to take his deposition; Mr. Mooney defended

15         him.  And at the deposition they said -- they stopped us from

16         asking questions about his objections to our roadmap and said

17         they were going to put forward their own version, so we should

18         just wait until they did that.  So we didn't follow through

19         with the rest of the deposition and we waited.  And we kept

20         sending emails, where is it, right, we want to get it, move the

21         process forward.  And then Ms. Miller came back and said

22         unequivocally, You should have no continuing expectation to

23         receive a document of that nature; they have no intent on

24         putting forward a counter roadmap.

25                   We said okay.

1          So it didn't happen.

2          Now, it's not as though that part of the litigation

3     just doesn't matter anymore because Mr. Mandel's firm is now

4     involved.  We did what we were supposed to do.  They raised

5     objections; we created a process to address their objections;

6     they did an about-face midway through the deposition, which was

7     a little frustrating, but we dealt with it on the fly.  They

8     said they were going to put up something; we said okay.

9          I'm not sure what else we could have done, your Honor,

10    but I think that you can't just erase it and say that didn't

11    happen.  There's a very clear record where they said they

12    weren't going to put it forward, and that should mean

13    something.  Judge Gorenstein was unaware of this record at the

14    time because the issue had not arisen before Judge Gorenstein.

15    But the record, it really couldn't be clearer.

16          For the defendants to say it was part of a settlement

17    dialogue, it wasn't at all.  Does it sound like settlement

18    dialogue?  It wasn't at all; it was all part of a roadmap

19    discussion.  And they said, No, we are not putting one forward.

20          And then to come after discovery is closed, very late

21    in the game, and put forward this counter roadmap, which, by

22    the way, has all kinds of issues, and I would like to walk

23    through the substantive issues with your Honor if we need to,

24    but for them to now put it in on the eve of trial, it's just

25    wrong, your Honor.  It's as though what we did two years ago is

1    irrelevant, and that can't be the case.

2              THE COURT:  Mr. Mandel.

3              MR. MANDEL:  Two points, your Honor.

4              First, it's not a counter roadmap.  There are 161

5    titles at issue in this case.  This document does not purport

6    to have anything to do with all 161 titles; instead, all it

7    does is summarize two spreadsheets that MBS produced.  So

8    there's no way to construe this as some sort of counter

9    roadmap.

10             THE COURT:  First of all, you can call it whatever you

11   want, okay, it is a counter roadmap.  It's 41 titles or so that

12   came from MBS that are involved in this litigation, right?

13             MR. MANDEL:  Correct, your Honor.

14             THE COURT:  Okay.  Isn't it incredibly misleading?

15             MR. MANDEL:  I don't think it's misleading at all,

16   your Honor.

17             THE COURT:  How can you take the plaintiffs' number of

18   alleged counterfeits, which are exemplars, and say that that's

19   the total number of counterfeits?

20             MR. MANDEL:  To be clear, your Honor, those are not

21   exemplars.  In this case those are the total number of books

22   that plaintiffs have educed any evidence whatsoever were

23   counterfeit.  They went to MBS; they pulled two books off the

24   shelf, for instance; they studied those two books.  They gave

25   us an expert report that said, These two books are counterfeit.

I2QVWILO1

1    That is our evidence that you sold a counterfeit copy of this

2    particular title, and that's the basis of our liability claim

3    for copyright infringement here.

4              THE COURT:  But plaintiffs never argued -- nor do they

5    need to -- that those are the only specific copies that were

6    counterfeit.

7              MR. MANDEL:  I don't know if they have sufficient

8    evidence to make the argument to the jury that any more than

9    those two books are counterfeit.  This information is no

10   different than the information that's in their roadmap.  They

11   only identify -- where there's two titles, where there's two

12   books that they have provided expert testimony on, their

13   roadmap says there's two books here, here are the books, take a

14   look at those books, and identifies them by exhibit number.

15             THE COURT:  Mr. Oppenheim?

16             MR. OPPENHEIM:  I think it would be useful, your

17   Honor, to look at a particular page.

18             THE COURT:  Go ahead.

19             MR. OPPENHEIM:  So if you're looking at Exhibit B of

20   our motion *in limine*, your Honor, and turn to title 10B, as in

21   boy.

22             THE COURT:  Just hang on one second.

23             MR. OPPENHEIM:  Sure.

24             THE COURT:  Can you work with the summary of data

25   disclosed by MBS?

I2QVWILO1

1          MR. OPPENHEIM:  If you could turn to the actual page,

2     your Honor, I think that would help.

3          THE COURT:  All right.  Give me the page number.

4          MR. OPPENHEIM:  It's title 10B.  They don't have page

5     numbers, but the title is called, ironically, "Business

6     Ethics."

7          THE COURT:  All right.  I've got it.

8          MR. OPPENHEIM:  Your Honor, let's look at this for a

9     moment.

10          So the ISBN is right.  The number of alleged

11     counterfeits they say is one.  Here's the evidence that we've

12     presented that we know of for a certainty:  We know and have

13     presented to them a copy of a book that they've had an

14     opportunity to review from MBS that has the defendants' sticker

15     on it.  They have seen another copy from MBS that does not have

16     the sticker on it.  They have seen records that show they

17     bought 100 copies of this from Best Books World, who they, on

18     at least three different instances on their own internal

19     communications, indicated was a counterfeit supplier.  They've

20     also acknowledged that they don't have clear records of all of

21     the purchases from Best Books World.

22          So to put forward to a jury that the plaintiffs are

23     claiming that the defendants only sold one copy of this, A,

24     it's wrong; and, B, it's misleading.  We have no idea how many

25     counterfeit copies of "Business Ethics" the defendants sold,

1    but we have certainly given them evidence of far more than one.

2          And then they carry that problem down from the number

3    of alleged counterfeits down to the percentage of defendant

4    sales alleged to be counterfeit, because that number is just

5    derivative of the one.  So they've exacerbated the problem and

6    then carried it over to percentage of counterfeits alleged to

7    come from defendants to .34, all on this -- it's all built on a

8    foundation which is false, your Honor.  The only thing in here

9    that could possibly come from the MBS data is the books

10   purchased from defendants and books purchased from other

11   distributors.  But that's only for MBS.

12         MR. MANDEL:  Your Honor, with respect to the fields at

13   the top of this page, we copied that information from

14   plaintiffs' roadmap.  That is just background information that

15   is designed to help the jury understand precisely what is going

16   on.  I think it's entirely appropriate.  I don't think it can

17   be prejudicial to the plaintiffs in any way since the same

18   information is on their roadmap.  And if they've got a summary,

19   we should be allowed to use the exact same information on our

20   summary.

21         However, if the Court is particularly concerned with

22   these issues that Mr. Oppenheim is raising, what is mission

23   critical to the case is the summary of the two MBS

24   spreadsheets.  I know that, so the record is clear, at the

25   Court's request, we forwarded copies of those spreadsheets to

I2QVWILO1

the Court this morning via email.  Those spreadsheets are
impossible to understand without some kind of summary.  And
although I don't think there's any basis for doing this, if the
Court finds the specific pages of the roadmap that go -- or the
pages of the MBS summary that go title-by-title to be
problematic in some way, then the spreadsheet at the beginning
of the MBS summary data provides the absolutely mission
critical information.

            So going to 10B, "Business Ethics," there's a title
page called "MBS Titles by the Numbers," and then I'm on the
following page.  And if you go to 10B, it says, Alleged
counterfeits from defendants, one.  And then it says, Total
purchases from defendants, 17.  That's the total number that
MBS purchased from defendants.  Total purchases of this title
from others, that's 6,035.  Total counterfeits found at MBS,
that's 291.

            We've submitted a revised version of this that
addresses some of the plaintiffs' concerns about numbers, but
then the last column is defendants' sticker on alleged
counterfeits, and then there's a yes or no just to provide that
information.

            Obviously this data is most important for the books
for which there was no sticker on.  Those are books that
plaintiffs just pulled off the shelf at MBS, and they are
asking the jury to draw an inference on the basis of

I2QVWILO1

1    circumstantial evidence that defendants are the one who sold

2    that book that they pulled off the shelf at MBS to MBS.

3           As the Court will recall during the summary judgment

4    briefing, we argued that without the numbers that are in the

5    spreadsheet here, without knowing how many copies MBS purchased

6    from defendants, and how many copies MBS purchased from others,

7    and how many copies on the shelf were found to be counterfeit,

8    it's impossible to find by a preponderance of the evidence that

9    it's more likely than not that we sold MBS that book.  We said

10   you need both a numerator and a denominator in order to make

11   that analysis.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I2q1joha2

1          MR. MANDEL:  Judge Gorenstein agreed with us and

2    dismissed virtually every single claim that was based on

3    circumstantial evidence.

4          THE COURT:  Are you suggesting getting rid of all the

5    individual title-by-title pages?

6          MR. MANDEL:  I'm saying that if your Honor is

7    concerned with the individual title-by-title pages, either

8    because it makes it appear more similar to the plaintiff's

9    roadmap or because the Court doesn't like some of the specific

10   fields in that thing, what is mission critical from our

11   perspective is making sure that the jury has access to both the

12   numerator and the denominator.  I think there's a purer -- your

13   Honor of course disagreed with Judge Gorenstein on this issue

14   on summary judgment and brought the 117 titles that are based

15   on circumstantial evidence back into the case.  But what there

16   is, if this evidence is excluded, is a pure question of law,

17   which is, if this numerator and denominator information isn't

18   provided to the jury, can a jury ever find that it's more

19   likely than not that we sold that book to MBS.  I know that

20   Judge Gorenstein came out one way on that issue, your Honor

21   reversed Judge Gorenstein, but if this information is included,

22   it makes it much easier for the jury to address this issue, and

23   as the Court has seen the spreadsheet, the spreadsheet -- the

24   two spreadsheets that MBS produced are impossible to understand

25   without a summary, and it's the kind of document that is

I2q1joha2

1     screaming for a summary to be provided.

2              THE COURT:  I'll tell you that the title-by-title

3     pages are very misleading.  For instance, you characterize them

4     as counterfeit when they just had counterfeit characteristics.

5     You're substituting your own loaded terms, not summarizing the

6     spreadsheet.

7              So Mr. Oppenheim, what about getting rid of all the

8     individual title-by-title pages?

9              MR. OPPENHEIM:  So your Honor, certainly that

10    addresses one aspect of the substantive issues, but there are

11    two other issues on that.

12             But before I go to it, it's critical to understand as

13    a background, your Honor, that what they deem as circumstantial

14    evidence and that the jury could never possibly tell whether or

15    not the counterfeit books came from the defendants or not is so

16    misleading.  The records will show that they bought the books

17    from a known counterfeit source, they sold them on sometimes

18    the exact same day or within days, the same quantity to MBS.

19    MBS then had counterfeits in their inventory, they turned them

20    over.  We asked the MBS witnesses:  Do you believe this came

21    from the defendants?  Yes, they do.  So it's not as though

22    there's no record and the jury can decide and they can make

23    their arguments.  So the arguments are there without these

24    numbers.

25             But let me turn to the two substantive issues on this.

1           The first is that, I'm very confused.  They fought

2     vigorously and said they were going to call, as an expert

3     witness, Professor Wu, who did a statistical analysis of this.

4     Now we thought Dr. Wu's analysis was weak and should not be

5     admitted, and we said as much in our motion *in limine*.  We lost

6     that, your Honor, but if they're bringing Dr. Wu, who did a

7     statistical analysis on this, to then do this as well seems to

8     be loaded for bear against us, your Honor, on presenting the

9     evidence two different ways.  This way, your Honor, it's not

10    calculated right, and we can't figure it out why.

11          And let me explain that to you.  And I have to go back

12    historically.  We received this MBS data in BDB-I.  The

13    plaintiffs, we did not ask the deponent about these

14    spreadsheets because they're really, as compared to the other

15    things we were asking the witness, not relevant.  The

16    defendants chose not to examine MBS on the underlying data

17    spreadsheets either.  They never asked any questions.  So the

18    case goes on.  They bring this expert in who doesn't

19    understand -- he only understands what the data is from talking

20    to the defendants.  That raises other issues, your Honor.  But

21    so be it.  They realize, oh, no, we may have an issue with

22    this.

23          After discovery is closed, they go to Judge Gorenstein

24    and they say, your Honor, in BDB-II, there are four titles that

25    came from MBS, and even though discovery is closed, we'd like

1      to take MBS's deposition.  And Judge Gorenstein issues an

2      order, which you can't tell from the transcript likely he

3      agonized over it during one of those marathon sessions, and he

4      said, you know what, I'm going to let you do it, but this

5      deposition is limited to those four titles and those four

6      titles alone, and nothing else.  And you'll do it

7      telephonically, and you'll patch, you know -- so on and so

8      forth.

9               They turned around and went to MBS and they said, if

10     you give us a 902(11) certification, on BDB-I, we won't take

11     your deposition on these four titles.  So MBS does that.

12              Your Honor, I think that's improper.  Can I cite a

13     rule that says it's improper?  No.  I think it's improper.  But

14     I ask you to turn to Exhibit O and look at the 902(11)

15     certification to see what the problem is here, your Honor.

16              THE COURT:  The problem is Appendix B.

17              ATTORNEY O:  Yes.  Well, sorry, your Honor.  Yes.

18     Well, and the explanation of it in the declaration, your

19     Honor -- in the certification, your Honor.  It's hearsay.  And

20     when the defendants, in doing their analysis for purposes of

21     their roadmap, defendant's roadmap, counter roadmap, summary,

22     whatever you want to call it, the MBS analysis, all they did is

23     look at the books coming in.  They didn't look at the books

24     that went out.  So if there was a restock or a return or some

25     other change in status by virtue of one of these adjustments,

I2q1joha2

1    they didn't look at it.  Your Honor, I don't know what effect

2    that has, because I don't understand what each of these things

3    is.  But the way you would figure that out is in a deposition,

4    where you would talk to the witness.  But discovery is closed.

5    They did this after discovery closed.  We can't go and ask them

6    to understand it.  So we can't tell whether these numbers are

7    right or not.  All we know is that they only looked at

8    incoming, they didn't look at outgoing.

9            THE COURT:  What if I ordered it?

10           MR. OPPENHEIM:  Two weeks before the trial, your

11   Honor?  Because of all of the new things that keep getting

12   turned over last minute, we're already struggling to get ready

13   for this trial, your Honor.  And you've kicked this trial

14   several times, which it should be a lot easier, but we're

15   getting documents we should have gotten five years ago, your

16   Honor.  So yes, you could order it, but then we're going to sit

17   there and they're going to do a data analysis, they're going to

18   produce another summary, I'm going to have to have somebody go

19   through all the numbers and check whether they're right, and

20   we're going to meet and confer and correct it.  That's a huge

21   amount of time when we should be narrowing our case and getting

22   our witnesses ready to put on a very succinct trial.

23           THE COURT:  Mr. Mandel, how is Appendix B to the 902

24   certification appropriate?

25           MR. MANDEL:  Appendix B is just a description of the

I2q1joha2

1    fields.

2              THE COURT:  It's testimonial, isn't it?

3              MR. MANDEL:  I would disagree with that, your Honor.

4    I think it's -- they produced the spreadsheet.  It's simply,

5    they --

6              THE COURT:  It interprets a business record, doesn't

7    it?

8              MR. MANDEL:  Well, there were column headings on it,

9    and those column headings were shorthand for information.  All

10   they're telling you is what the full name of those column

11   headings are.  They could have written the entire description

12   on those column headings.  But to sort of focus the big picture

13   issue here, have plaintiffs somehow been prejudiced by the way

14   all of this occurred?  And the answer is, absolutely not.  They

15   admit that they had this document before MBS's deposition in

16   Book Dog Books I.  Had they had concerns they wanted to raise

17   at that time and they wanted to ask the witness about the

18   document, they could have done so.

19             Second, they have identified MBS as a live trial

20   witness.  MBS is owned by Barnes & Noble.  It's a wholly-owned

21   subsidiary.  Barnes & Noble is headquartered in New York.  It's

22   clearly subject to the court's subpoena power.  And they're

23   going to, if either party would like, appear here at trial.  No

24   deposition is necessary.  They can provide this testimony live

25   on the stand.

I2q1joha2

1          Third, I will say, according to the plaintiffs, MBS

2     has signed on to plaintiff's best practices.  And those best

3     practices require MBS to cooperate with the plaintiffs in their

4     anticounterfeiting investigation.  Presumably that cooperation

5     includes not just providing documents, which they have done

6     voluntarily throughout these cases to MBS, to the plaintiffs,

7     but it also includes testifying, which they also did -- they

8     were willing to do in both cases.  So I have no doubt

9     whatsoever that if the plaintiffs need additional information

10    from MBS, either they've already obtained it or they'll have no

11    difficulty obtaining it voluntarily, and if not, they can

12    subpoena MBS to testify at this trial.

13          THE COURT:  All right.  Let me turn to one final

14    issue:  The declarations that are cited in the plaintiff's

15    roadmap.

16          First, I've reviewed the defendant's objections to the

17    exhibits cited in the plaintiff's roadmap, all 772 of them.  I

18    can tell you that I'm not persuaded by any of those objections

19    other than the objections that are raised with respect to

20    Plaintiff's Exhibits 63, 73, and 84, which are the

21    declarations.  Who are these individuals, Mr. Oppenheim, and

22    how did the plaintiffs get in touch with them?

23          MR. OPPENHEIM:  So your Honor, during the course of

24    BDB-I, at some point we became aware of certain titles having

25    been sold by the defendants to certain customers and that they

1   had come from a known counterfeit source, and we reached out to

2   those individuals and asked whether we could buy the book back

3   from them when they were done with it, or something to that

4   effect.  And a handful of them responded and they sent us the

5   books, and they were in fact counterfeit.  It confirmed -- the

6   defendants were saying, well, just because you found something

7   in our inventory or just because it was sold to us by a

8   counterfeit supplier, you can't show that it was actually

9   distributed.  So this was a way for us to identify that these

10  books had actually been distributed to these sources.  And they

11  signed declarations, and we reviewed the books, and we made it

12  all available to the defendants so that if they wanted, they

13  could take these people's deposition if they wanted, they could

14  look at the books if they wanted.  They had access to all of it

15  for several years now.  And it just further supports the

16  existing claims, your Honor.

17          THE COURT:  Did any of these individuals, these three

18  individuals receive any compensation?

19          MR. OPPENHEIM:  I think we gave them a $10 Starbucks

20  card, your Honor.

21          THE COURT:  And the defendants were afforded an

22  opportunity to depose them?

23          MR. OPPENHEIM:  They've had these -- we produced them

24  immediately in BDB-I, your Honor, so they've had them for

25  several years.

I2q1joha2

1          THE COURT:  All right.  Mr. Mandel, what factors weigh

2    against admitting these declarations under the residual

3    exception?  I mean, they're pretty cut and dry, aren't they?

4          MR. MANDEL:  I don't have them in front of me and I

5    didn't know this was going to be discussed.  I've read them

6    some months ago.

7          THE COURT:  Well, as I say, out of the 772 objections

8    that were lodged, there's only three that attracted my

9    attention.  I'm overruling all the other ones.

10          MR. MANDEL:  I understand, your Honor.  You know, I

11    don't know if they ever identified in BDB-I these individuals

12    as witnesses.  They were on their 26(a) disclosure.  Unless and

13    until they're identified on their 26(a) disclosure, there's no

14    reason for the defendants to depose them.  But as a general

15    matter, and in my experience, courts do not entertain the

16    admissibility of declarations at trial.  So it would not have

17    occurred to me that I needed to depose someone just because the

18    other side produced a declaration.  If they wanted testimony

19    from that person, they will produce that person at trial and

20    I'll be able to cross-examine that person at trial.  I

21    understand that depositions are common in civil practice, but

22    they're not required, and you're allowed to confront witnesses

23    at the trial.

24          So for all those reasons, I don't think the

25    declarations should come in.

I2q1joha2

1              THE COURT:  Well, do you have anything to suggest that
2        they're faulty or in some fashion fraudulent?
3              MR. MANDEL:  We have no idea how these people were
4        compensated.
5              THE COURT:  He just said they got a $10 Starbucks
6        card.
7              MR. MANDEL:  Actually, your Honor, he said two
8        different things that were inconsistent with each other.  First
9        he said that they offered to buy the books back from them and
10       then later, when your Honor asked about compensation, he said
11       it was a Starbucks card.  So it's not clear to us from what
12       we've heard whether they offered to buy -- they actually bought
13       them back and, if so, at what price did they buy them back; and
14       two, we don't know about these Starbucks cards.  So I think
15       there's a compensation issue.
16             Second, it's not clear -- you know, the way students
17       behave, it's not entirely clear that at the end of the semester
18       every student winds up with the book they had at the beginning
19       of the semester.  You're in a class with possibly hundreds of
20       other people, you're studying with other people, and had there
21       been a deposition or if there's going to be trial testimony, we
22       would inquire as to whether they're sure that they didn't swap
23       books with their roommate or their classmate or whatever.  And
24       the issue is an authenticity issue.
25             MR. OPPENHEIM:  Your Honor, to the issue of

I2q1joha2

communications with these witnesses, we turned over all of them, so the letter that says the $10 Starbucks card, they have all those communications.  They have everything.  They've had them for years.

THE COURT:  Did you buy back the books?

MR. OPPENHEIM:  Actually, I think we gave them another copy.  We swapped out, gave them another copy of the book, and took the one that they had, and then gave them a $10 Starbucks card on top of it.  That's my recollection.  I don't have the documents right in front of me, your Honor, but they have them. They also provided to us, your Honor, the documents showing they bought the books from the defendants.  So we contacted the individuals, they say yes, I bought it from the defendants, here's my Amazon receipt, here's the book, and, you know, so they're free to argue, well, you don't know that maybe it was swapped in the classroom.  They're free to make that argument to the jury.  I don't think anybody's going to believe it, but they can make it.

THE COURT:  All right.  Counsel, I think I've heard enough.  I'll issue some short orders on these outstanding issues in the next week or so, during the hours of the day when I'm not trying a criminal case.

MR. OPPENHEIM:  Very well, your Honor.  May I ask -- I'm sorry.

THE COURT:  Yes.

I2q1joha2

1          MR. OPPENHEIM:  Would it be all right for us to

2     coordinate with your clerk on the issue of bringing evidence

3     into the courtroom for the purposes of the trial?

4          THE COURT:  Yes, of course.  All right.  That will be

5     fine.  And any equipment that you want to bring in or any

6     electronic devices, submit orders to me.  But be parsimonious

7     about the number of electronic devices that you want to bring

8     in because recently I had a matter where lawyers had 20 people

9     bringing in a variety of devices, and I said fine, two people

10    bringing in just a couple devices.  Because that's not going to

11    get past the security committee, and I wouldn't even purport to

12    sign off on something like that.  All right?

13         MR. OPPENHEIM:  Very well, your Honor.

14         THE COURT:  And that means attorneys in the case or

15    people in your firm, not clients.  Okay?  Clients can't bring a

16    cellphone in here or another device.

17         Have a good evening.

18         ALL COUNSEL:  Thank you, your Honor.

19         THE COURT:  Decision reserved.

20         THE DEPUTY CLERK:  All rise.

21                        o0o

22

23

24

25